**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

MICHAEL THOMAS, MARIA CONYERS-JORDAN, AUSTIN SHERMAN, LYNDA ALEXANDRA MAHER, AVA DORÉ, RACHEL RICHENBERG, and EMILY BURKE, on behalf of themselves and others similarly situated,

      *Plaintiffs*,

v.

TEKSYSTEMS, INC.,

      *Defendant*.

Civil Action No. 2:21-cv-00460-WSS

Class and Collective Action

(Document Filed Electronically)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF COMMON FACTS ............................................................... 2

    I.     TEK Is a Recruitment Firm............................................................... 2

    II.    Recruiters Work in an Entry-Level Position..................................... 3

    III.   Recruiters' Common Primary Job Duty Is Producing IT Job Candidates to AMs . 4

    IV.   TEK Subjects All Recruiters to the Same Production Quotas ............................. 13

    V.    TEK's Connected Data Shows Plaintiffs Overwhelmingly Spent Their Time Contacting Candidates ............................................................................. 15

    VI.   TEK Provides Uniform Training to Recruiters................................... 16

    VII.  Recruiters Are Closely Supervised ................................................. 18

    VIII. TEK Does Not Pay Overtime and Missed Meal and Rest Break Premiums to Recruiters ............................................................................. 21

PROPOSED CLASS DEFINITIONS ................................................................ 22

LEGAL ANALYSIS.......................................................................................... 23

    I.     The Application of the Administrative Exemption Supports Class Certification. 23

          A.    Primary Job Duty ...................................................................... 24

          B.    Work Directly Related to Management or General Business Operations  25

          C.    Work Requiring the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance .................................... 27

    II.    Plaintiffs Meet All of the Rule 23(a) Requirements ............................ 28

          A.    Plaintiffs Easily Meet the Numerosity Requirement ................. 29

          B.    There Are Questions and Facts Common to the Class ............... 29

          C.    Plaintiffs' Claims Are Typical of the Class's Claims................ 30

          D.    Plaintiffs Will Adequately Protect the Class ............................ 31

    III.   Plaintiffs Meet All of the Rule 23(b) Requirements............................ 33

A.  Common Questions Regarding Recruiters' Exempt Status Predominate Over Any Individualized Issues...............................................................33

1.  The Common Evidence and Generalized Proof in this Case........33

2.  The Common Questions Presented Can be Answered by Common Evidence........................................................................34

3.  The Common Questions Are More Substantial Than Questions Requiring Individualized Inquiry.................................................37

B.  Common Questions of Law and Fact Predominate Over Plaintiff Dore's Washington Meal and Rest Break................................................38

C.  Common Questions of Law and Fact Predominate Over Plaintiff Richenberg's New York Wage Statement Claims...................................39

D.  A Class Resolution is Superior .................................................................39

CONCLUSION.............................................................................................................40

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ..................................................................................................... 40

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
   568 U.S. 455 (2013) ............................................................................................... 28, 33

*Andreas-Moses v. Hartford Fire Ins. Co.*,
   326 F.R.D. 309 (M.D. Fla. 2018) ................................................................................ 36

*Avery v. TEKsystems, Inc.*,
   No. 22 Civ. 02733, 2024 WL 590364 (N.D. Cal. Feb. 13, 2024) ..................................... *passim*

*Baum v. Astrazeneca LP*,
   372 Fed. Appx. 246 (3d Cir. 2010)............................................................................... 23

*Boley v. Universal Health Servs., Inc.*,
   337 F.R.D. 626 (E.D. Pa. 2021),
   *aff'd*, 36 F.4th 124 (3d Cir. 2022) ............................................................................... 29

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010) ........................................................................................ 35

*Butela v. Midland Credit Mgmt. Inc.*,
   341 F.R.D. 581 (W.D. Pa. 2022) ..................................................................... 28, 29, 32, 40

*Canelas v. World Pizza, Inc.*,
   No. 14 Civ. 7748, 2017 WL 1233998 (S.D.N.Y. Mar. 31, 2017) ........................................ 39

*Carlson v. Home Depot USA Inc.*,
   No. 20 Civ. 1150, 2021 WL 4636858 (W.D. Wash. Oct. 7, 2021) ...................................... 39

*Carter v. City of Philadelphia*,
   417 F. Supp. 3d 639 (E.D. Pa. 2019)............................................................................ 25

*Charlot v. Ecolab, Inc.*,
   No. 18 Civ. 10528, 2019 WL 6888621 (D.N.J. Dec. 17, 2019) ................................... 30, 31

*Chavez v. Our Lady of Lourdes Hosp. at Pasco*,
   190 Wn.2d 507 (2018).............................................................................................. 38

*Crowe v. Examworks, Inc.*,
   136 F. Supp. 3d 16 (D. Mass. 2015)............................................................................. 23

*Damassia v. Duane Reade, Inc.*,
   250 F.R.D. 152 (S.D.N.Y. 2008).......................................................................... 23, 24, 30, 36

*DeLuca v. Farmers Ins. Exch.*,
No. 17 Civ. 00034, 2018 WL 1981393 (N.D. Cal. Feb. 27, 2018) ............................................ 38

*Demetrio v. Sakuma Bros. Farms, Inc.*,
183 Wn.2d 649 (2015)............................................................................................................ 38

*Dietrich v. C.H. Robinson Worldwide, Inc.*,
No. 18 Civ. 4871, 2020 WL 635972 (N.D. Ill. Feb. 11, 2020) .................................................. 30

*In re Enter. Rent-a-Car Wage & Hour Emp. Pracs. Litig.*,
No. 07 Civ. 1687, 2012 WL 4356762 (W.D. Pa. Sept. 24, 2012)............................................ 26

*Felps v. Mewbourne Oil Co., Inc.*,
336 F.R.D. 664 (D.N.M. 2020) .............................................................................................. 30

*Fowler v. OSP Prevention Grp., Inc.*,
38 F.4th 103 (11th Cir. 2022)................................................................................................ 26

*Goldman v. Radioshack Corp.*,
No. 03 Civ. 0032, 2005 WL 1124172 (E.D. Pa. May 9, 2005)................................................ 36

*Jackson v. Bloomberg, L.P.*,
298 F.R.D. 152 (S.D.N.Y. 2014)............................................................................................ 23

*Jacob v. Duane Reade, Inc.*,
289 F.R.D. 408 (S.D.N.Y. 2013)............................................................................................ 30

*LoCurto v. AT&T Mobility Servs. LLC*,
No. 13 Civ. 4303, 2018 WL 4519201 (S.D.N.Y. Sept. 20, 2018);........................................... 30

*Loomis v. Unum Grp. Corp.*,
No. 20 Civ. 251, 2023 WL 3267707 (E.D. Tenn. May 4, 2023)............................................. 30

*Lyons v. Citizens Financial Group, Inc.*,
2012 WL 5499878 (D. Mass. Nov. 9, 2012) ........................................................................... 30

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) ............................................................................................. 29, 30

*Martin v. Cooper Elec. Supply Co.*,
940 F.2d 896 (3d Cir. 1991) .................................................................................................. 25

*McKeen-Chaplin v. Provident Sav. Bank, FSB*,
862 F.3d 847 (9th Cir. 2017) ................................................................................................. 25

*Metrow v. Liberty Mut. Managed Care LLC*,
2017 WL 4786093 (C.D. Cal. May 1, 2017)........................................................................... 35

*Morris v. Alle Processing Corp.*,
No. 08 Civ. 4874, 2013 WL 1880919 (E.D.N.Y. May 6, 2013) ............................................... 36

*Nelson v. Avon Prods., Inc.*,
No. 13 Civ. 02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015) .............................. 30, 37, 40

*Pellino v. Brink's, Inc.*,
164 Wn. App. 668 (2011) ........................................................................................ 38

*Perez v. Allstate Ins. Co.*,
11 Civ. 1812, 2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014) ................................... 30

*Prinzo v. Hannaford Bros. Co., LLC*,
343 F.R.D. 250 (D. Mass. 2023) ............................................................................. 29

*Pruess v. Presbyterian Health Plan, Inc.*,
No. 19 Civ. 00629, 2024 WL 3844965 (D.N.M. Aug. 16, 2024) ............................. 30

*Rivet v. Off. Depot, Inc.*,
207 F. Supp. 3d 417 (D.N.J. 2016) ............................................................... 30, 33, 37

*Robert Hendricks v. Total Quality Logs., LLC*,
No. 10 Civ. 0649, 2023 WL 6217073 (S.D. Ohio Sept. 25, 2023) ........................... 30

*Rodriguez v. Peak Pressure Control, LLC*,
No. 17 Civ. 0576, 2020 WL 3000415 (D.N.M. June 4, 2020) .................................. 36

*Rood v. R&R Express, Inc.*,
No. 17 Civ. 1223, 2021 WL 3021978 (W.D. Pa. July 16, 2021) ................................. 30, 31, 40

*Rood v. R&R Express, Inc.*,
No. 17 Civ. 1223, 2022 WL 1082481 (W.D. Pa. Apr. 11, 2022) ................................. 24, 25, 26

*Roseman v. Bloomberg L.P.*,
No. 14 Civ. 2657, 2017 WL 4217150 (S.D.N.Y. Sept. 21, 2017) ....................................... 30, 31

*Salvatora v. XTO Energy Inc.*,
No. 19 Civ. 01097, 2023 WL 4137306 (W.D. Pa. June 2, 2023),
*report and recommendation adopted sub nom.* 2023 WL 4135570 (W.D. Pa. June 22, 2023) 39

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ................................................................................................ 28

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ................................................................................................ 34

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......................................................................................... 28, 29

*Walsh v. Unitil Serv. Corp.*,
64 F.4th 1 (1st Cir. 2023) ................................................................................... 25, 26

*Webster v. Pub. Sch. Emps. of Washington, Inc.*,
247 F.3d 910 (9th Cir. 2001) ................................................................................... 23

*Williams v. Jani-King of Philadelphia Inc.*,
   837 F.3d 314 (3d Cir. 2016) ............................................................. 28

**Statutes**

34 Pa. Code § 231.83 ............................................................. 23, 24

Mass. Gen. Laws Ann. ch. 151, § 1A ............................................................. 23

N.Y. Labor Law § 651(5) ............................................................. 23

N.Y. Labor Law § 195(3) ............................................................. 39

Wash. Admin. Code 296-126-092 ............................................................. 38

Wash. Admin. Code 296-128-520 ............................................................. 23, 24

Wash. Rev. Code Ann. § 49.46.010(3)(c) ............................................................. 23

**Rules**

Fed. R. Civ. P. 23 ............................................................. *passim*

**Regulations**

29 C.F.R. § 541.200 ............................................................. 24

29 C.F.R. § 541.201 ............................................................. 24, 25

29 C.F.R. § 541.202 ............................................................. 24, 27, 28

29 C.F.R. § 541.203 ............................................................. 24, 28

29 C.F.R. § 541.700 ............................................................. 24, 25

454 C.M.R. 27.03 ............................................................. 23, 24

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 ............................................................. 23, 24

**Other Authorities**

7A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure, § 1768 (3d ed.
   1986) ............................................................. 31

# INTRODUCTION

Plaintiffs are entry-level Recruiters for Defendant TEKsystems, Inc. ("TEK"), which is a professional staffing company focused on the IT field. Recruiters search and match candidates for open positions with TEK's clients. The job involves long hours and mundane tasks. Recruiters consistently work overtime, during which they review resumes, scroll LinkedIn profiles, call candidates, and complete intakes. TEK classifies all Recruiters as exempt from Pennsylvania's, Massachusetts's, New York's and Washington's overtime laws, thereby pocketing funds it should pay as wages and enriching itself at Recruiters' expense. Plaintiffs bring this case to recover overtime wages that TEK withheld, as well as other damages stemming from TEK's policy. To ensure other Recruiters may recover the same, Plaintiffs are moving to certify the four state law classes under Federal Rule of Civil Procedure 23 ("Rule 23").

Plaintiffs' state law claims are tailor-made for class action resolution. In fact, a Court in the Northern District of California recently granted class certification, based on identical facts, in a case alleging TEK misclassified Recruiters as administratively exempt under California law. *Avery v. TEKsystems, Inc.*, No. 22 Civ. 02733, 2024 WL 590364, at *1 (N.D. Cal. Feb. 13, 2024). Just as in *Avery*, Plaintiffs here meet all Rule 23's requirements. The classes here are too numerous for practicable joinder of all its members. The classes also satisfy Rule 23's commonality and predominance requirements. The heart of this case is Plaintiffs' claim that TEK misclassifies *all* Recruiters, and, because of this, the Court may resolve that claim in one stroke. The class members are virtually identical to each other in all respects relevant to this lawsuit; TEK trains, supervises, and evaluates Recruiters in a uniform manner, and all Recruiters share the same job duties.

Plaintiffs also meet Rule 23's typicality and adequacy requirements. Plaintiffs and absent class members all suffered the same types of injuries stemming from TEK's common practice. Plaintiffs have the same goals as the class, and extensive discovery has uncovered no conflicts of

interest between Plaintiffs and class members. Finally, the class action device is the superior method because it will allow class members to pursue their claims without fear of retaliation, reduce unnecessary costs, and promote efficiency; rather than litigating the propriety of TEK's policy across hundreds of individual suits, the parties may resolve that issue in a single case.

## STATEMENT OF COMMON FACTS[1]

### I.    TEK Is a Recruitment Firm.

TEK describes itself as a "leading information technology ('IT') staffing company."[2] TEK's principal business purpose is to recruit IT workers and place them at companies as either direct employees of the companies or as temporary workers through TEK.[3] TEK has two client bases – "companies that [TEK is] working with to help them build staffing" and "consultants that [TEK] work[s] with."[4] TEK competes with other recruiting firms to place candidates.[5] To compete against other companies, TEK often submits multiple candidates for a single requirement, submits

---

[1]    Unless otherwise identified in the Abrahamson declaration, all exhibit numbers refer to the exhibits previously filed in support of Plaintiffs' Motion for Final FLSA Certification.

[2]    Ex. 20 (*TEKsystems, Inc. v. Andiamo Consulting, LLC* ("*Andiamo*") Compl.) at ¶ 2; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3 ("Defendant is in the staffing business"); Ex. 21 (*Andiamo* Preliminary Injunction) at 1; Ex. 24 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.

[3]    Ex. 6 (TEK Senior Vice President of Talent Delivery Haycock Tr. ("Haycock Tr.")) 60:2-6; Ex. 3 (Rule 30(b)(6) Deposition DiBenedetto Tr. ("DiBenedetto Tr.")) 134:5-13; Ex. 20 (*Andiamo* Compl.) at ¶ 2; Ex. 23 (*Andiamo* Rule 30(b)(6) Dep. Tr. of Alexander Pulido ("*Andiamo* Rule 30(b)(6) Tr.")) 24:14-25:5, 153:13-23; Ex. 25 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 3.

[4]    Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) 23:22-24:3.

[5]    Ex. 3 (DiBenedetto Tr.) 96:2-6 (customer service goal with potential job candidates is to get them to utilize TEK over its competitors); Ex. 4 (Rule 30(b)(6) Deposition Doyle Tr. ("Doyle Tr.")) 199:18-200:2; Ex. 5 (Doyle Sealed Tr. Portion) 237:20-238:9 (only 31.8% of the job requirements that TEK works to fill get filled by TEK); Ex. 6 (Haycock Tr.) 44:22-45:4 ("There's always a war for talent."); 48:1-8 ("[T]here are many, many, many competitors out there"); 48:10-49:12; Ex. 12 (TEK Vice President McNelley Tr. ("McNelley Tr.")) 40:23-41:23; Ex. 9 (Lead Fronzaglio Tr. ("Fronzaglio Tr.")) 97:8-97:17; Ex. 10 (AM Hollister Tr. ("Hollister Tr.")) 36:16-37:16; Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) 181:12-17; Ex. 26 (Haycock Email Oct. 26, 2020) at TEK-Recruiter_Lit-00386105 ("we get beat on a requirement.").

one candidate for multiple requirements, and has multiple Recruiters work on the same requirement in order to increase the chances that one of its candidates will be selected.[6] TEK represents that it has an "exhaustive search, training, and matching process" and that the process was "developed and fine-tuned over 20-plus years in the market."[7] TEK has five divisions: Applications, Communications, Dynamic Workplace Services, and Infrastructure Optimization, as well as TEK Global Services.[8] All the divisions train, utilize, and evaluate Recruiters the same.[9]

## II.    Recruiters Work in an Entry-Level Position.

Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team.[10] TEK employs people in 46 different recruiting job titles.[11] These job titles include the senior and supervisory level recruiting positions.[12] With the exception of Recruiter Trainees, all of TEK's recruiting job titles are classified as exempt.[13] Plaintiffs' proposed classes only include one of the 46 recruiting job titles: "Recruiter."

---

[6]    Ex. 4 (Doyle Tr.) 139:8-14, 140:3-11; Ex. 99 (Clavet Dec.) ¶¶ 17, 28; Ex. 100 (Coles Dec.) ¶¶ 17, 28; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 17, 28; Ex. 101 (Gahard Dec.) ¶¶ 16, 27; Ex. 106 (Holin Dec.) ¶¶ 17, 28; Ex. 107 (Martin Dec.) ¶¶ 17, 28; Ex. 102 (Miller Dec.) ¶¶ 16, 27; Ex. 108 (Olszewski Dec.) ¶¶ 16, 27; Ex. 103 (Seaward Dec.) ¶¶ 17, 28; Ex. 104 (Strauchen Decl.) ¶¶ 16, 27; Ex. 109 (Stein Dec.) ¶¶ 17, 28; Ex. 110 (Walker Dec.) ¶¶ 16, 27; Ex. 140 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520227 ("Is this a marketable candidate that can be submitted to multiple other opportunities?"); Ex. 114 (Multiple Submittals)TEK-Recruiter_Lit-00000303; Ex. 14 (Bhasin Email May 27, 2022) at TEK-Recruiter_Lit-00127828 ("A candidate can be submitted by multiple producers"); Ex. 121 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467 (describing a coaching opportunity to ask Recruiters what other requirement a candidate Auto-Matches or fits).

[7]    Ex. 20 (*Andiamo* Compl.) at ¶ 22.

[8]    Ex. 6 (Haycock Tr.) 73:19-75:6; Ex. 27 (Executive Dashboard) at TEK-Recruiter_Lit-00161733.

[9]    Ex. 3 (DiBenedetto Tr.) 46:6-21; Ex. 4 (Doyle Tr.) 58:22-59:3, 160:3-8, 163:4-164:16, 279:8-22, Ex. 6 (Haycock Tr.) 67:22-68:16, 129:17-131:13; 144:8-149:20, 157:19-21.

[10]    Ex. 6 (Haycock Tr.) 21:13-22:16, 103:6-104:1; Ex. 28 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 5.

[11]    Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.

[12]    *Id.*

[13]    *Id.* No. 3.

Recruiters are entry-level employees.[14] TEK hires individuals early in their career and TEK has an average annual attrition rate of approximately 38% to 47% of Recruiters.[15] The average tenure for Recruiters at TEK in Pennsylvania is only 1.43 years, in Massachusetts is 1.42 years, in New York is 1.86 years, and in Washington is 1.43 years.[16] TEK intends for Recruiters to be promoted to its Account Manager ("AM") or Recruiter Lead positions.[17] TEK does not require Recruiters to have any previous IT knowledge or experience.[18]

### III.    Recruiters' Common Primary Job Duty Is Producing IT Job Candidates to AMs.

TEK's witnesses, corporate officers, and documents concede that Recruiters work in a

---

[14]    Ex. 6 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 11 (TEK Director of Business Operations Lis Tr. ("Lis Tr.")) 33:23-34:11; Ex. 13 (Former TEK AM Pappas Tr. ("Pappas Tr.")) 91:3-9; Ex. 35 (Recruiter Conyers-Jordan Tr. ("Conyers-Jordan Tr.")) 15:20-16:6; Ex. 29 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At and entry level role, there are certain competencies that are more likely correlated to performance than others."); Ex. 30 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 (474 of Recruiters are new graduates, 75 had six months to one year of experience, and 110 of Recruiters had 1-2 years of experience. Therefore, approximately 74% of the 892 Recruiters have less than two years of experience); Ex. 31 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 148 (Maltese Email Feb. 19, 2018) TEK-Recruiter_Lit-00616402; Ex. 147 (Maltese Email July 21, 2021) TEK-Recruiter_Lit-00586352.

[15]    Ex. 4 (Doyle Tr.) 266:23-268:10; Ex. 145 (Marland Email Feb. 4, 2022) at TEK-Recruiter_Lit-00557691-92 (describing that year-end attrition rate for Recruiters was 45.8%).

[16]    Ex. 98 (Major Dec.) ¶ 31.

[17]    Ex. 3 (DiBenedetto Tr.) 27:14-25 (describing promotion to recruiter lead/retention lead); Ex. 4 (Doyle Tr.) 50:8-14 ("promoting recruiter leads"), 106:12-16; Ex. 24 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 ("TEKsystems promotes from within. More than 90 percent of current leaders began their careers as recruiters."); Ex. 32 (Ligouri Email Dec. 6, 2018) at TEK-Recruiter_Lit-00045215 ("We offer . . . a promote from within growth model"); Ex. 119 (2019 Recruiter Trainee Compensation Talking Points) at TEK-Recruiter_Lit-00103684 ("After gaining some experience, many of our recruiters choose to pursue a sales career path and move into the role of account manager.").

[18]    Ex. 3 (DiBenedetto Tr.) 121:1-7; Ex. 4 (Doyle Tr.) 59:4-17, 79:16-20; Ex. 6 (Haycock Tr.) 121:12-17; Ex. 69 (Job Description) at TEK-Recruiter_Lit-00588313.

producing role.[19] Recruiters' primary job duty is to screen and match IT job candidates for open

roles with TEK's clients and to submit candidates who match with the open roles to TEK's AMs.[20]

Recruiters spend over 50% of their time reviewing potential candidates' resumes and LinkedIn

---

[19]    Ex. 3 (DiBenedetto Tr.) 158:4-12; Ex. 4 (Doyle Tr.) 65:24-66:5 128:16-18, 213:4-7; Ex. 6 (Haycock Tr.) 68:1-16 ("Anyone that is in a role that is a salesperson account manager or recruiter, we consider those as producing roles. Meaning that they are producing for the company. . . . Again, as I've stated before, they are a recruiter that is producing. Meaning that they are a – they're a recruiter that produces what recruiters produce . . . They find people for jobs."), 86:9-19 (SPP means "spread per producer" and refers to "recruiters"); Ex. 36 (Haycock Ex. 15) TEK-Recruiter_Lit-00124518 (email attaching "*Producer* EOY Performance Reviews" and "*Producer* Performance Reviews 2021" for Recruiters) (emphasis added); Ex. 37 (Haycock Dep. Ex. 5 (Project Lighthouse Communication Plan)) at TEK-Recruiter_Lit-00614413 (Recruiters are "production focused"); Ex. 38 (Alvather Email Oct. 2, 2019) at TEK-Recruiter_Lit-00392555-56; Ex. 39 (Bhasin Email May 17, 2022) at TEK-Recruiter_Lit-00125213; Ex. 40 (Fullerton July 10, 2020 Email) TEK-Recruiter_Lit-00194291 ("our producers must document in a consistent, timely manner"); Ex. 27 (Executive Dashboard) TEK-Recruiter_Lit-00161739 ("SPP," which means spread per producer); Ex. 41 (Recruiter Excellence: Scorecard FAQs) at TEK-Recruiter_Lit-00095089 ("we have *producers* who are under their PM line, yet they are maintaining 30 interactions; Meanwhile, many of our top *producers* are not maintaining 30 interactions.") (emphasis added); Ex. 42 (Role Impact Summary: Producers (AM and Recruiters)) TEK-Recruiter_Lit-00004483; Ex. 43 (Performance Review Guide 2021) at TEK-Recruiter_Lit-00528423 (referring to Recruiters as "Producers"); Ex. 44 (Producer Documentation Guide) TEK-Recruiter_Lit-00125601; Ex. 45 (Producer Performance KPI 8-4-2020) TEK-Recruiter_Lit-00281725 (Recruiter metric summaries are referred to "Producer Performance KPI"); Ex. 46 (Annual Operating Plan) TEK-Recruiter_Lit-00583663 at 3, 8 ("Producer Enablement Technology").

[20]    Ex. 3 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 162:18-163:7; Ex. 4 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 6 (Haycock Tr.) 21:13-22:16, 32:5-13, 59:2-11, 60:7-12; Ex. 34 (Recruiter Burke Tr. ("Burke Tr.")) 136:18-137:1, 145:19-24; Ex. 35 (Conyers-Jordan Tr.) 52:24-53:6; Ex. 55 (Recruiter Thomas Tr. ("Thomas Tr.")) 121:12-16, 214:7-15; Ex. 50 (Recruiter Seijas Tr. ("Seijas Tr.")) 38:15-39:10; Ex. 99 (Clavet Dec.) ¶¶ 17, 27, 36; Ex. 100 (Coles Dec.) ¶¶ 17, 27, 36; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 17, 27, 36; Ex. 101 (Gahard Dec.) ¶¶ 16, 26, 35; Ex. 106 (Holin Dec.) ¶¶ 17, 27, 36; Ex. 107 (Martin Dec.) ¶¶ 17, 27, 36; Ex. 102 (Miller Dec.) ¶¶ 16, 26, 35; Ex. 108 (Olszewski Dec.) ¶¶ 16, 26, 35; Ex. 103 (Seaward Dec.) ¶¶ 17, 27, 36; Ex. 104 (Strauchen Dec.) ¶¶ 16, 26, 35; Ex. 109 (Stein Dec.) ¶¶ 17, 27, 36; Ex. 110 (Walker Dec.) ¶¶ 16, 26, 35; Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) 165:15-24; Ex. 24 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386846; Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter: . . . Screens consultants"); Ex. 131 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692 (same); Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 144 (Seattle Welcome Packet) TEK-Recruiter_Lit-00552030 (same); Ex. 51 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. *Screens* consultants . . . .").

profiles, cold calling, and completing intakes of potential job candidates.[21]

As the initial recruiting step, TEK's clients fill out a form that TEK's employees refer to as "job requisitions," "job requirements," or "job reqs."[22] Job requisitions outline TEK's clients' requirements for particular positions.[23] TEK's managers assign them to Recruiters.[24] AMs, and not Recruiters, are responsible for directly communicating with TEK's clients regarding their hiring needs.[25] AMs provide information regarding the necessary qualifications, job details, and

---

[21]    Ex. 4 (Doyle Tr.) 252:24-253:2, 271:8-272:5 (Recruiters spend "the majority of the time . . . talking to consultants"); Ex. 6 (Haycock Tr.) 59:2-11; Ex. 10 (Hollister Tr.) 109:5-20; Ex. 47 (Recruiter Dore Tr. ("Dore Tr.")) 70:8-13 Ex. 50 (Seijas Tr.) 27:19-23; Ex. 99 (Clavet Dec.) ¶ 24; Ex. 100 (Coles Dec.) ¶ 24; Ex. 105 (Dries-Wielandt Dec.) ¶ 24; Ex. 101 (Gahard Dec.) ¶ 23; Ex. 106 (Holin Dec.) ¶ 24; Ex. 107 (Martin Dec.) ¶ 24; Ex. 102 (Miller Dec.) ¶ 23; Ex. 108 (Olszewski Dec.) ¶ 23; Ex. 103 (Seaward Dec.) ¶ 24; Ex. 104 (Strauchen Dec.) ¶ 23; Ex. 109 (Stein Dec.) ¶ 24; Ex. 110 (Walker Dec.) ¶ 23; Ex. 53 (Recruiter Success Profile) TEK-Recruiter_Lit-00020276 ("high call volume environment").

[22]    Ex. 6 (Haycock Tr.) 175:18-24; Ex. 3 (DiBenedetto Tr.) 91:9-22; Ex. 50 (Seijas Tr.) 48:17-49:5; Ex. 54 (Requisition Form) TEK-Recruiter_Lit-00281942.

[23]    Ex. 54 (Requisition Form) TEK-Recruiter_Lit-00281942; Ex. 3 (DiBenedetto Tr.) 91:9-22, 154:11-155:17; Ex. 4 (Doyle Tr.) 58:5-25; Ex. 6 (Haycock Tr.) 59:2-6, 140:13-15.

[24]    Ex. 3 (DiBenedetto Tr.) 122:10-13, 136:24-137:16; Ex. 4 (Doyle Tr.) 78:9-12 ("And who assigns them?" A. "Generally it's going to be a delivery manager or a delivery director or, in some cases, a team lead, depending on the size of the team"), 101:2-102:20 (delivery manager team lead decide to reassign requirements), 123:25-124:8, 140:5-11 (allocate means assign), 238:16-246:4, 251:3-253:17 (AMs and Recruiters talk "multiple times" a day). 255:3-256:8,; Ex. 47 (Dore Tr.) 39:23-40:5, 80:1-19; Ex. 55 (Thomas Tr.) 89:6-25; Ex. 50 (Seijas Tr.) 27:12-18; Ex. 116 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 (". . . we should fully qualify each req in order for the DBO to . . . evaluate where to allocate recruiters in the office.").

[25]    Ex. 3 (DiBenedetto Tr.) 115:9-14; Ex. 4 (Doyle Tr.) 150:8-10, 178:14-15, 189:11-25,; Ex. 13 (Pappas Tr.) 121:9-13; Ex. 35 (Conyers-Jordan Tr.) 68:4-5; Ex. 48 (Recruiter Malone Tr. ("Malone Tr.")) 121:21-24; Ex. 99 (Clavet Dec.) ¶ 30; Ex. 100 (Coles Dec.) ¶ 30; Ex. 105 (Dries-Wielandt Dec.) ¶ 30; Ex. 101 (Gahard Dec.) ¶ 29; Ex. 106 (Holin Dec.) ¶ 30; Ex. 107 (Martin Dec.) ¶ 30; Ex. 102 (Miller Dec.) ¶ 29; Ex. 108 (Olszewski Dec.) ¶ 29; Ex. 103 (Seaward Dec.) ¶ 30; Ex. 104 (Strauchen Dec.) ¶ 29; Ex. 109 (Stein Dec.) ¶ 30; Ex. 110 (Walker Dec.) ¶ 29; Ex. 23 (*Andiamo* Rule 30(b)(6) Tr.) at 16:2-4; Ex. 57 (Delivery Qualification Form) at TEK-Recruiter_Lit-00413296 ("Recruiters "should come to the AM meeting PREPARED just like an AM would with their client."); Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and AMs communicating with TEK's customers.); Ex. 150 (Framework for AM Calls with Clients) TEK-Recruiter_Lit-00731015; Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132 ("Account Manager (AM): Internal TEKsystems employee that focuses

pay for the position, and if Recruiters have questions about the job requisition, they ask the AMs.[26]

Recruiters search TEK's internal database and external sources, like LinkedIn, to match potential candidates with the clients' requirements.[27] Recruiters engage in mundane tasks of reviewing resumes and LinkedIn profiles to match potential job candidates' experience and skills meet the minimum qualifications.[28] TEK provides Recruiters with "search and match" technology that helps automatize the screening process.[29] TEK also provides Recruiters with step-by-step

---

on providing solutions to our client's business & technology needs."); Ex. 131 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691 (same); Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274 (same); Ex. 144 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552029 (same).

[26]     Ex. 3 (DiBenedetto Tr.) 115:7-25, 123:2-14; Ex. 4 (Doyle Tr.) 137:19-138:4, 169:5-170:17, 176:9-19, 187:9-25; Ex. 34 (Burke Tr.) 76:17-77:7, 79:4-16; Ex. 49 (Recruiter Richenberg Tr. ("Richenberg Tr.")) 65:19-66:2; Ex. 48 (Malone Tr.) 43:9-23, 55:12-19, 106:19-107:3; Ex. 50 (Seijas Tr.) 48:17-49:10, 78:9-18; Ex. 99 (Clavet Dec.) ¶ 16; Ex. 100 (Coles Dec.) ¶ 16; Ex. 105 (Dries-Wielandt Dec.) ¶ 16; Ex. 101 (Gahard Dec.) ¶ 15; Ex. 106 (Holin Dec.) ¶ 16; Ex. 107 (Martin Dec.) ¶ 16; Ex. 102 (Miller Dec.) ¶ 15; Ex. 108 (Olszewski Dec.) ¶ 15; Ex. 103 (Seaward Dec.) ¶ 16; Ex. 104 (Strauchen Dec.) ¶ 15; Ex. 109 (Stein Dec.) ¶ 16; Ex. 110 (Walker Dec.) ¶ 15; Ex. 120 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 73 (slide titled "Business Qualifications") ("these are the questions that you must have the answers to in order to have a better understanding of the req. If you do not have this information you need to hold your AM accountable to providing you with the answers."), 74 ("Call the AM to better understand the Req that the Recruiter is working on."); Ex. 121 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129468 (AMs must ensure Recruiters have all the information necessary).

[27]     ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) Answer to ¶ 63 ("Defendant admits that Recruiters find candidates . . . Defendant admits that Recruiters may search employment databases, including LinkedIn, Indeed, and Defendant's internal system Connected, to assemble a list of names of potential candidates."); Ex. 3 (DiBenedetto Tr.) 92:6-93:25; Ex. 6 (Haycock Tr.) 60:7-12; Ex. 35 (Conyers-Jordan Tr.) 43:10-18; Ex. 55 (Thomas Tr.) 79:2-20; Ex. 99 (Clavet Dec.) ¶ 18; Ex. 100 (Coles Dec.) ¶ 18; Ex. 105 (Dries-Wielandt Dec.) ¶ 18; Ex. 101 (Gahard Dec.) ¶ 17; Ex. 106 (Holin Dec.) ¶ 18; Ex. 107 (Martin Dec.) ¶ 18; Ex. 102 (Miller Dec.) ¶ 17; Ex. 108 (Olszewski Dec.) ¶ 17; Ex. 103 (Seaward Dec.) ¶ 18; Ex. 104 (Strauchen Dec.) ¶ 17; Ex. 109 (Stein Dec.) ¶ 18; Ex. 110 (Walker Dec.) ¶ 17; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5; Ex. 125 (Finding, Qualifying, & Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824.

[28]     *Supra* n. 26; Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and AMs communicating with TEK's customers.).

[29]     Ex. 6 (Haycock Tr.) 40:22-24 ("Technology is getting better obviously every day to be able to do those matches by themselves"), 139:22-140:22; Ex. 4 (Doyle Tr.) 141:15-142:9, 143:3-14; Ex. 12 (McNelley Tr.) 82:11-15, 158:4-10; Ex. 113 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065.

guidance on how to search and match candidates.[30] TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs."[31]

Once Recruiters have matched potential job candidates to the job requisition, Recruiters contact potential candidates in the hope of reaching them to complete an initial intake.[32] TEK's own documents describe a primary duty for Recruiters as "[s]creen[ing] consultants."[33] TEK and Recruiters describe their job duties as a "grind," and the vast majority of Recruiters' outreach goes

---

[30]    Ex. 3 (DiBenedetto Tr.) 140:8-146:11; Ex. 4 (Doyle Tr.) 130:25-152:18; Ex. 6 (Haycock Tr.) 38:6-41:4; Ex. 34 (Burke Tr.) 104:4-12, 146:1-8; Ex. 55 (Thomas Tr.) 79:2-80:14; Ex. 99 (Clavet Dec.) ¶¶ 18-21; Ex. 100 (Coles Dec.) ¶¶ 18-21; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 18-21; Ex. 101 (Gahard Dec.) ¶¶ 17-20; Ex. 106 (Holin Dec.) ¶¶ 18-21; Ex. 107 (Martin Dec.) ¶¶ 18-21; Ex. 102 (Miller Dec.) ¶¶ 17-20; Ex. 108 (Olszewski Dec.) ¶¶ 17-20; Ex. 103 (Seaward Dec.) ¶¶ 18-21; Ex. 104 (Strauchen Dec.) ¶¶ 17-20; Ex. 109 (Stein Dec.) ¶¶ 18-21; Ex. 110 (Walker Dec.) ¶¶ 17-20; Ex. 59 (Connected User Guide) TEK-Recruiter_Lit-00175558; Ex. 76 (Degreed Pathway) TEK-Recruiter_Lit-00078540.

[31]    Ex. 21 (*Andiamo* Preliminary Injunction) at 1; *see also* Ex. 22 (*Andiamo* Aff. of Alexander Pulido) at ¶ 7 ("In support of its staffing and recruitment efforts, TEK uses a proprietary and confidential candidate database"); Ex. 111 (*TEKsystems, Inc. v. Ambar* ("*Ambar*") Complaint) at ¶¶ 15-20; Ex. 112 (*TEKsystems, Inc. v. Berardis* ("*Berardis*") Complaint) at ¶¶ 15-20.

[32]    Ex. 4 (Doyle Tr.) 134:5-22, 271:14-18, 278:22-279:7; Ex. 3 (DiBenedetto Tr.) 180:13-182:13; Ex. 34 (Burke Tr.) 90:10-17, 102:1-9; Ex. 35 (Conyers-Jordan Tr.) 44:19-22, 49:22-50:10; Ex. 47 (Dore Tr.) 70:8-13; Ex. 48 (Malone Tr.) 43:9-45:1; Ex. 99 (Clavet Dec.) ¶¶ 19-21; Ex. 100 (Coles Dec.) ¶¶ 19-21; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 19-21; Ex. 101 (Gahard Dec.) ¶¶ 18-20; Ex. 106 (Holin Dec.) ¶¶ 19-21; Ex. 107 (Martin Dec.) ¶¶ 19-21; Ex. 102 (Miller Dec.) ¶¶ 18-20; Ex. 108 (Olszewski Dec.) ¶¶ 18-20; Ex. 103 (Seaward Dec.) ¶¶ 19-21; Ex. 104 (Strauchen Dec.) ¶¶ 18-20; Ex. 109 (Stein Dec.) ¶¶ 19-21; Ex. 110 (Walker Dec.) ¶¶ 18-20; ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) ¶ 63.

[33]    Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter: . . . Screens consultants"); Ex. 131 (Rochester Welcome Packet) at TEK-Recruiter Lit-0039969 (same); Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 144 (Seattle Welcome Packet) TEK-Recruiter_Lit-00552030 (same); Ex. 51 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. *Screens* consultants . . . ."); *see also* Ex. 56 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152743 (evaluated on "screen[ing]" candidates); Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK business cycle as including Recruiters "screening" candidates.); *supra* n.20.

unanswered or is rebuffed.[34] When Recruiters are able to connect with candidates, they do an

intake, internally referred to as a "G2."[35] TEK provides Recruiters with detailed training and

instructions about how to conduct a G2 with a candidate, and TEK's internal database prompts

Recruiters to gather specific information from the candidates during the G2.[36] If the potential

candidate's experience and skills match TEK's client's requirements the Recruiters forward their

resume and information to the AMs and the AMs then determine which candidates to forward on

---

[34]    Ex. 3 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact); Ex. 13 (Pappas Tr.) 93:14-24, 99:4-100:18, 100:25-101:14; Ex. 34 (Burke Tr.) 90:10-17, 100:16-101:15; Ex. 35 (Conyers-Jordan Tr.) 123:10-24; Ex. 49 (Richenberg Tr.) 102:18-103:3; Ex. 99 (Clavet Dec.) ¶¶ 19, 22; Ex. 100 (Coles Dec.) ¶ 22; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 19, 22; Ex. 101 (Gahard Dec.) ¶¶ 18, 21; Ex. 106 (Holin Dec.) ¶¶ 19, 22; Ex. 107 (Martin Dec.) ¶ 22; Ex. 102 (Miller Dec.) ¶ 21; Ex. 108 (Olszewski Dec.) ¶ 21; Ex. 103 (Seaward Dec.) ¶ 22; Ex. 104 (Strauchen Dec.) ¶¶ 18, 21; Ex. 109 (Stein Dec.) ¶¶ 19, 22; Ex. 110 (Walker Dec.) ¶ 21; Ex. 61 (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-00044799.

[35]    Ex. 3 (DiBenedetto Tr.) 84:11-85:13; Ex. 4 (Doyle Tr.) 144:25-145:10; Ex. 6 (Haycock Tr.) 60:19-21 ("A G2 is an information form that we use to be able to collect information about the candidate"); Ex. 34 (Burke Tr.) 78:5-16; Ex. 50 (Seijas Tr.) 33:2-11; Ex. 59 (Connected User Guide) at TEK-Recruiter_Lit-00175558 at 148-157.

[36]    Ex. 3 (DiBenedetto Tr.) 80:14-84:10, 87:12-88:5, 90:13-91:8, 105:2-107:8, 148:1-18; Ex. 4 (Doyle Tr.) 130:25-152:18; Ex. 6 (Haycock Tr.) 151:1-12; Ex. 34 (Burke Tr.) 73:12-16; Ex. 49 (Richenberg Tr.) 170:18-20; Ex. 48 (Malone Tr.) 113:10-21, 117:5-24; Ex. 50 (Seijas Tr.) 55:2-16, 106:15-107:7; Ex. 99 (Clavet Dec.) ¶ 21; Ex. 100 (Coles Dec.) ¶ 21; Ex. 105 (Dries-Wielandt Dec.) ¶ 21; Ex. 101 (Gahard Dec.) ¶ 20; Ex. 106 (Holin Dec.) ¶ 21; Ex. 107 (Martin Dec.) ¶ 21; Ex. 102 (Miller Dec.) ¶ 20; Ex. 108 (Olszewski Dec.) ¶ 20; Ex. 103 (Seaward Dec.) ¶ 21; Ex. 104 (Strauchen Dec.) ¶ 20; Ex. 109 (Stein Dec.) ¶ 21; Ex. 110 (Walker Dec.) ¶ 20; Ex. 76 (Degreed Pathway) TEK-Recruiter_Lit-00078540; Ex. 62 (DiBenedetto Email Nov. 22, 2020) TEK-Recruiter_Lit-00041158; Ex. 59 (Connected User Guide) TEK-Recruiter_Lit-00175558.

to TEK's client.[37] TEK's clients determine who they want to interview.[38] Recruiters do not interview candidates.[39] If TEK's client is interested in interviewing the candidate, the client informs the AM, who informs the Recruiter, and then the Recruiter contacts the candidate to coordinate the scheduling of the interview with the client.[40] The client, and not the Recruiters,

---

[37]    Ex. 3 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"); Ex. 4 (Doyle Tr.) 133:16-23, 137:10-139:14; Ex. 6 (Haycock Tr.) 60:7-12; Ex. 34 (Burke Tr.) 95:9-22, 136:18-137:1, 149:7-10, 150:19-151:3; Ex. 9 (Fronzaglio Tr.) 155:18-20; Ex. 35 (Conyers-Jordan Tr.) 60:3-17; Ex. 19 (Recruiter Blendy Tr.("Blendy Tr.")) 123:19-23; Ex. 52 (Shestopalko Tr.) 56:17-57:1; Ex. 99 (Clavet Dec.) ¶¶ 27-29; Ex. 100 (Coles Dec.) ¶¶ 27-29; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 27-29; Ex. 101 (Gahard Dec.) ¶¶ 26-28; Ex. 106 (Holin Dec.) ¶¶ 27-29; Ex. 107 (Martin Dec.) ¶¶ 27-29; Ex. 102 (Miller Dec.) ¶¶ 26-28; Ex. 108 (Olszewski Dec.) ¶¶ 26-28; Ex. 103 (Seaward Dec.) ¶¶ 27-29; Ex. 104 (Strauchen Dec.) ¶¶ 26-28; Ex. 109 (Stein Dec.) ¶¶ 27-29; Ex. 110 (Walker Dec.) ¶¶ 26-28; Ex. 120 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 76 (slide titled "Present Candidate / Engage with AMs") ("sell/present the candidate to the AM in person"); Ex. 141 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952.

[38]    Ex. 3 (DiBenedetto Tr.) 188:2-9; Ex. 4 (Doyle Tr.) 158:1-12; Ex. 34 (Burke Tr.) 137:13-21.

[39]    Ex. 4 (Doyle Tr.) 158:1-12, 159:3-10; 199:4-17; Ex. 47 (Dore Tr.) 41:16-24; Ex. 99 (Clavet Dec.) ¶ 31; Ex. 100 (Coles Dec.) ¶ 31; Ex. 105 (Dries-Wielandt Dec.) ¶ 31; Ex. 101 (Gahard Dec.) ¶ 30; Ex. 106 (Holin Dec.) ¶ 31; Ex. 107 (Martin Dec.) ¶ 31; Ex. 102 (Miller Dec.) ¶ 30; Ex. 108 (Olszewski Dec.) ¶ 30; Ex. 103 (Seaward Dec.) ¶ 31; Ex. 104 (Strauchen Dec.) ¶ 30; Ex. 109 (Stein Dec.) ¶ 31; Ex. 110 (Walker Dec.) ¶ 30; Ex. 123 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at slides 14-15 (TEK's clients interview candidates); Ex. 142 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted your screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 115 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.

[40]    Ex. 4 (Doyle Tr.) 158:1-12, 159:3-10; 199:4-17; Ex. 47 (Dore Tr.) 41:16-24, 91:18-92:2; Ex. 55 (Thomas Tr.) 101:3-18; Ex. 50 (Seijas Tr.) 59:16-24; Ex. 99 (Clavet Dec.) ¶ 31; Ex. 100 (Coles Dec.) ¶ 31; Ex. 105 (Dries-Wielandt Dec.) ¶ 31; Ex. 101 (Gahard Dec.) ¶ 30; Ex. 106 (Holin Dec.) ¶ 31; Ex. 107 (Martin Dec.) ¶ 31; Ex. 102 (Miller Dec.) ¶ 30; Ex. 108 (Olszewski Dec.) ¶ 30; Ex. 103 (Seaward Dec.) ¶ 31; Ex. 104 (Strauchen Dec.) ¶ 30; Ex. 109 (Stein Dec.) ¶ 31; Ex. 110 (Walker Dec.) ¶ 30; Ex. 59 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 142 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview."); Ex. 123 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at slides 14-15 (TEK's clients interview candidates); Ex. 142 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted your screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 115 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.

decide which candidates it wants to hire.[41] If the client decides to make the candidate an offer, Recruiters relay the offer to the candidate.[42] Recruiters do not negotiate terms of employment and AMs and TEK's clients determine the pay rates. [43]

TEK makes clear that it views the Recruiter position primarily as a production job, which it identifies as akin to a sales position and not a human resources position.[44] In fact, in its internal recruitment efforts to hire Recruiters, TEK states: "If someone is interested in HR make sure you

---

[41]    Ex. 5 (DiBenedetto Tr.) 167:9-14, 188:2-9; Ex. 4 (Doyle Tr.) 192:13-193:8; Ex. 55 (Thomas Tr.) 102:3-20; Ex. 19 (Blendy Tr.) 82:13-24; Ex. 99 (Clavet Dec.) ¶ 32; Ex. 100 (Coles Dec.) ¶ 32; Ex. 105 (Dries-Wielandt Dec.) ¶ 32; Ex. 101 (Gahard Dec.) ¶ 31; Ex. 106 (Holin Dec.) ¶ 32; Ex. 107 (Martin Dec.) ¶ 32; Ex. 102 (Miller Dec.) ¶ 31; Ex. 108 (Olszewski Dec.) ¶ 31; Ex. 103 (Seaward Dec.) ¶ 32; Ex. 104 (Strauchen Dec.) ¶ 31; Ex. 109 (Stein Dec.) ¶ 32; Ex. 110 (Walker Dec.) ¶ 31.

[42]    Ex. 4 (Doyle Tr.) 277:13-20; Ex. 34 (Burke Tr.) 138:7-16; Ex. 55 (Thomas Tr.) 102:3-20; Ex. 99 (Clavet Dec.) ¶ 32; Ex. 100 (Coles Dec.) ¶ 32; Ex. 105 (Dries-Wielandt Dec.) ¶ 32; Ex. 101 (Gahard Dec.) ¶ 31; Ex. 106 (Holin Dec.) ¶ 32; Ex. 107 (Martin Dec.) ¶ 32; Ex. 102 (Miller Dec.) ¶ 31; Ex. 108 (Olszewski Dec.) ¶ 31; Ex. 103 (Seaward Dec.) ¶ 32; Ex. 104 (Strauchen Dec.) ¶ 31; Ex. 109 (Stein Dec.) ¶ 32; Ex. 110 (Walker Dec.) ¶ 31.

[43]    Ex. 4 (Doyle Tr.) 192:7-193:14, 194:13-16; Ex. 34 (Burke Tr.) 138:17-139:4; Ex. 35 (Conyers-Jordan Tr.) 70:23-71:11; Ex. 47 (Dore Tr.) 83:15-85:7; Ex. 55 (Thomas Tr.) 102:11-20; Ex. 19 (Blendy Tr.) 105:20-106:1; Ex. 50 (Seijas Tr.) 43:15-44:4; Ex. 52 (Shestopalko Tr.) 63:18-64:12, 64:17-65:9; Ex. 99 (Clavet Dec.) ¶ 32; Ex. 100 (Coles Dec.) ¶ 32; Ex. 105 (Dries-Wielandt Dec.) ¶ 32; Ex. 101 (Gahard Dec.) ¶ 31; Ex. 106 (Holin Dec.) ¶ 32; Ex. 107 (Martin Dec.) ¶ 32; Ex. 102 (Miller Dec.) ¶ 31; Ex. 108 (Olszewski Dec.) ¶ 31; Ex. 103 (Seaward Dec.) ¶ 32; Ex. 104 (Strauchen Dec.) ¶ 31; Ex. 109 (Stein Dec.) ¶ 32; Ex. 110 (Walker Dec.) ¶ 31.

[44]    Ex. 3 (DiBenedetto Tr.) 90:13-91:8 (distinguishing Recruiters from human resources and noting Recruiters must have good sales skills) Ex. 4 (Doyle Tr.) 64:24-66:5 ("So roles where you've got either sales-specific activities as part of your responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."); Ex. 24 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386851 ("We work in a sales environment"); Ex. 32 (Ligouri Email Dec. 6, 2018) at TEK-Recruiter_Lit-00045214; Ex. 64 (Ligouri Email Sept. 19, 2018) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiting role inside sales"); Ex. 141 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-005279252 ("You're an inside sales person!"); Ex. 124 (Thomson Email Apr 20, 2020) TEK-Recruiter_Lit-00183226 ("We are hiring for both inside sales (Recruiter) roles as well as Outside (Account Manager) roles."); Ex. 138 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at slide 30 ("You're an inside sales person!").

explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sales."[45]

TEK also does not consider Recruiters to be "managers" – "they're not overseeing the actual work getting done," and Recruiters are not evaluating substance of consultants' work, and Recruiters also do not make termination decisions regarding consultants.[46] Recruiters are not involved in creating management policies and operational practices, or deciding whether to implement them.[47] Recruiters have no authority to: waive or deviate from TEK's or its customers' policies in performing their work; formulate, interpret, or enforce management policies or operating procedures; or negotiate or enter into contracts on behalf of TEK or its customers.[48]

---

[45]     Ex. 64 (Ligouri Email Sept. 19, 2018) TEK-Recruiter_Lit-00256524; Ex. 32 (Ligouri Email Dec. 6, 2018) TEK-Recruiter_Lit-00045214 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales"); Ex. 135 (Framingham Female Hiring Blitz) TEK-Recruiter_Lit-00468402 ("If someone is interested in HR make sure you explain the difference between recruiting and human resources.  These are not the same thing in TEKsystems!"); Ex. 137 (Lightkep Email Jan. 18, 2021) at TEK-Recruiter_Lit-00472820; Ex. 134 (Donegan Email Feb. 21, 2020) at TEK-Recruiter_Lit-00435815; Ex. 126 (Haskin Email Mar. 9, 2020) at TEK-Recruiter_Lit-00198733; Ex. 122 (Bullock Email Sept. 13, 2019) at TEK-Recruiter_Lit-00132369; Ex. 127 (Haskin Email Aug. 5, 2019) at TEK-Recruiter_Lit-00199040.

[46]     Ex. 3 (DiBenedetto Tr.) 167:12-14 (Q: "Do recruiters make the ultimate [termination] decisions for the consultants?" A: No."), 167:19-168:7; Ex. 6 (Haycock Tr.) 36:12-17, 121:20-122:16, 144:18-145:12; Ex. 10 (Hollister Tr.) 46:6-12, 139:7-19; Ex. 49 (Richenberg Tr.) 170:6-13; Ex. 55 (Thomas Tr.) 113:11-16; Ex. 48 (Malone Tr.) 89:20-90:5; Ex. 52 (Shestopalko Tr.) 84:6-85:1; Ex. 99 (Clavet Dec.) ¶¶ 33-35; Ex. 100 (Coles Dec.) ¶¶ 33-35; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 33-35; Ex. 101 (Gahard Dec.) ¶¶ 32-34; Ex. 106 (Holin Dec.) ¶¶ 33-35; Ex. 107 (Martin Dec.) ¶¶ 33-35; Ex. 102 (Miller Dec.) ¶¶ 32-34; Ex. 108 (Olszewski Dec.) ¶¶ 32-34; Ex. 103 (Seaward Dec.) ¶¶ 33-35; Ex. 104 (Strauchen Dec.) ¶¶ 32-34; Ex. 109 (Stein Dec.) ¶¶ 33-35; Ex. 110 (Walker Dec.) ¶¶ 32-34.

[47]     Ex. 3 (DiBenedetto Tr.) 167:15-18; Ex. 6 (Haycock Tr.) 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives, and not recruiters, because the executives are "running [the] business."); 98:12-100:9 (Recruiters not part of the team "responsible for driving business"), 158:20-162:5 (Recruiters do not create or implement human resource, operational, or management policies for TEK or its clients).

[48]     Ex. 3 (DiBenedetto Tr.) 167:15-18; Ex. 4 (Doyle Tr.) 30:11-23 (testifying that he negotiated contracts as an AM and Director of Business Operations); Ex. 6 (Haycock Tr.) 159:1-162:5 (Recruiters cannot bind TEK in legal proceedings); Ex. 2 (Def.'s Resp. to Pls. 3rd

Recruiters do not have the authority to negotiate and bind TEK or its clients with respect to significant matters.[49] Recruiters do not supervise anyone; represent TEK in formal grievance proceedings; advise TEK or its clients on how to more efficiently run operate; or study or recommend changes to the operations or structure of any business.[50] Nor do Recruiters provide human resource or public relations services, employee benefits, quality control, or advertising or marketing for TEK.[51] Finally, TEK utilizes the same job description for all Recruiters.[52]

## IV.    TEK Subjects All Recruiters to the Same Production Quotas.

TEK requires all Recruiters to meet the same quotas.[53] These quotas are determined at the corporate-level.[54] Currently, the quota for Recruiters is 25 points a week based on the following activity points: G2s (intakes); reference checks; submittals (which is when an AM submits a candidate to a client that the Recruiter solicits); interviews (which is when TEK's clients interview the candidate); and starts (which is when a candidate ultimately starts a job with a TEK's client).[55] Prior to July 2022, TEK required Recruiters to maintain a weekly average of 30 "interactions"

---

Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters.").

[49]     *Supra* n. 47; Ex. 3 (DiBenedetto Tr.) 109:23-110:3; Ex. 6 (Haycock Tr.) 123:1-24, 158:20-161:15; Ex. 4 (Doyle Tr.) 194:13-16, 198:19-25, 209:2-12; Ex. 48 (Malone Tr.) 71:8-14; Ex. 2 (Def.'s Resp. to Pls. 3rd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters.").

[50]     *Supra*; Ex. 6 (Haycock Tr.) 34:3-6, 69:9-71:22, 122:17-123:25, 160:15-162:5.

[51]     Ex. 6 (Haycock Tr.) 123:21-24, 158:20-161:15; Ex. 4 (Doyle Tr.) 198:19-25, 209:2-12.

[52]     Ex. 6 (Haycock Tr.) 116:20-118:3 (testifying "general job description" comes from corporate); Ex. 69 (Marland Email May 28, 2019) TEK-Recruiter_Lit-00588314.

[53]     Ex. 4 (Doyle Tr.) 129:16-130:20; Ex. 6 (Haycock Tr.) 157:19-158:1; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069.

[54]     Ex. 6 (Haycock Tr.) 157:19-158:1; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069.

[55]     Ex. 4 (Doyle Tr.) 159:18-161:6; Ex. 6 (Haycock Tr.) 153:19-158:1; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71; Ex. 71 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512.

with candidates.[56] TEK requires all Recruiters to meet the same spread, which align to their tenure

at the company and is referred to as the "performance management line."[57] Spread is the difference

between what the client pays TEK for placing the consultant and the costs to TEK to place them.[58]

TEK closely monitors Recruiters' compliance with the quotas and performance

management line.[59] Every week, TEK generates a WIN Report to each Recruiter and their

supervisors, which tracks how well Recruiters are meeting their quotas and spread compared to

their peers.[60] Also TEK executives receive weekly Executive Dashboards, which include

summaries about how well Recruiters are attaining their quotas.[61] TEK's offices have "spread

boards" that publicize the amount of spread attained by each Recruiter from best to worst.[62] If

---

[56]    Ex. 4 (Doyle Tr.) 129:16-130:20, 153:5-19, 154:19-155:12; Ex. 6 (Haycock Tr.) 152:3-153:10; Ex. 70 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069; Ex. 10 (Hollister Tr.) 123:14-124:17; Ex. 40 (Fullerton July 10, 2020 Email) at TEK-Recruiter_Lit-00194292; Ex. 71 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512; Ex. 138 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at slide 16.

[57]    Ex. 4 (Doyle Tr.) 92:3-94:2, 299:8-21.

[58]    Ex. 6 (Haycock Tr.) 72:19-21; Ex. 12 (McNelley Tr.) 33:2-6; Ex. 132 (Pittsburgh Welcome Packet) TEK-Recruiter_Lit-00408137; Ex. 131 (Rochester Welcome Packet) TEK-Recruiter_Lit-00399696; Ex. 139 (Boston Welcome Packet) TEK-Recruiter_Lit-00489276; Ex. 144 (Seattle Welcome Packet) TEK-Recruiter_Lit-00552034.

[59]    Ex. 4 (Doyle Tr.) 92:3-94:20, 112:6-113:21, 162:14-164:13, 255:3-256:8; Ex. 6 (Haycock Tr.) 147:5-11, 158:2-15; Ex. 12 (McNelley Tr.) 62:21-63:6; Ex. 9 (Fronzaglio Tr.) 56:8-15; Ex. 34 (Burke Tr.) 123:19-124:3; Ex. 99 (Clavet Dec.) ¶ 10; Ex. 100 (Coles Dec.) ¶ 10; Ex. 105 (Dries-Wielandt Dec.) ¶ 10; Ex. 101 (Gahard Dec.) ¶ 9; Ex. 106 (Holin Dec.) ¶ 10; Ex. 107 (Martin Dec.) ¶ 9; Ex. 102 (Miller Dec.) ¶ 9; Ex. 108 (Olszewski Dec.) ¶ 9; Ex. 103 (Seaward Dec.) ¶ 10; Ex. 104 (Strauchen Dec.) ¶ 9; Ex. 109 (Stein Dec.) ¶ 10; Ex. 110 (Walker Dec.) ¶ 9; Ex. 72 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 27 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-65; Ex. 136 (Performance Warning & Action) TEK-Recruiter_Lit-00471328.

[60]    Ex. 4 (Doyle Tr.) 112:6-113:21; Ex. 6 (Haycock Tr.) 158:2-15; Ex. 9 (Fronzaglio Tr.) 59:2-20, 65:5-9; Ex. 49 (Richenberg Tr.) 152:20-153:8; Ex. 72 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 140 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("The report will be emailed to every person who is directly managing Recruiters as well as Production Delivery Managers, Delivery Director, and DBOs each week.").

[61]    Ex. 6 (Haycock Tr.) 69:13-71:19, 91:15-93:14; Ex. 27 (Executive Dashboard) at TEK-Recruiter_Lit-00161739, TEK-Recruiter_Lit-00161755-65.

[62]    Ex. 19 (Blendy Tr.) 72:3-8; Ex. 146 (New Hire Checklist) TEK-Recruiter_Lit-00571397 ("Name on spread board"); *see also* Ex. 129 (Spread: Overview & Problem Resolution) at TEK-Recruiter_Lit-00240020.

Recruiters fail to hit the quotas and meet their spread requirements, TEK puts them on a performance improvement plan ("PIP").[63] TEK's human resources provides uniform PIP forms for Recruiters' managers to use.[64] Finally, TEK's annual reviews for all Recruiters are based on the same quotas and spread requirements, and follow the same process.[65]

## V.    TEK's Connected Data Shows Plaintiffs Overwhelmingly Spent Their Time Contacting Candidates.

TEK maintains an internal database, formally called RWS and now called Connected, that all of its Recruiters use.[66] Recruiters use Connected to search for potential candidates, to review information about candidates, and to record the work activities they perform.[67] TEK expects Recruiters to enter their activities into Connected in real time.[68]   TEK produced Connected data for five Named Plaintiffs and 19 current Opt-ins who worked in one of the four state law classes ("plaintiffs").[69] The Connected data identifies the work activities the plaintiffs performed and the dates and times the activities were performed.[70] The data shows that 39.67% of plaintiffs' activities recorded in Connected were "Attempted Contact," followed by "G2" at 19.04%, and "Call" at

---

[63]    Ex. 4 (Doyle Tr.) 162:14-164:9; Ex. 136 (Performance Warning & Action Plan Job Aid) TEK-Recruiter_Lit-00471328.

[64]    Ex. 4 (Doyle Tr.) 162:14-164:9; Ex. 136 (Performance Warning & Action Plan Job Aid) TEK-Recruiter_Lit-00471328.

[65]    Ex. 4 (Doyle Tr.) 212:20-216:11; Ex. 36 (Haycock Dep. Ex. 15) Recruiter_Lit-00124518; Ex. 36 (Yearly Performance Summary) TEK-Recruiter_Lit-00124520; Ex. 43 (Performance Review Guide 2021: For Leaders and Leads) TEK-Recruiter_Lit-00528422.

[66]    Ex. 6 (Haycock Tr.) 140:19-22; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.

[67]    Ex. 6 (Haycock Tr.) 140:19-22, 150:21-152:2; Ex. 10 (Hollister Tr.) 67:4-19; Ex. 34 (Burke Tr.) 93:17-23, 159:3-160:6; Ex. 35 (Conyers-Jordan Tr.) 43:10-18, 104:8-16; Ex. 47 (Dore Tr.) 21:2-13; Ex. 49 (Richenberg Tr.) 21:9-24; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.

[68]    Ex. 3 (DiBenedetto Tr.) 180:13-181:10; Ex. 4 (Doyle Tr.) 124:25-126:20; Ex. 40 (Fullerton Email July 10, 2020) TEK-Recruiter_Lit-00194291.

[69]    Ex. 98 (Major Decl.) ¶ 5.

[70]    Ex. 3 (DiBenedetto Tr.) 180:13-181:10; Ex. 4 (Doyle Tr.) 124:25-126:20; Ex. 98 (Major Dec.) ¶ 10; Ex. 34 (Burke Tr.) 191:3-10; Ex. 47 (Dore Tr.) 21:2-13; Ex. 40 (Fullerton Email July 10, 2020) TEK-Recruiter_Lit-00194291.

17.91%, which altogether comprise approximately 76.62% of the total work activities.[71] The Connected data further shows that the number of attempted contacts, G2 intake calls, and calls the plaintiffs made dwarfed the number of submittals and starts they had:[72]

| State Law Class Members in Connected Data[73] | Attempted Contact | G2s | Calls | Submitted | Starts |
|---|---|---|---|---|---|
| MA (Plf Burke & 4 MA Opt-ins) | 16,667 | 5,192 | 4,986 | 322 | 52 |
| NY (Plf Richenberg & 13 NY Opt-ins) | 26,831 | 16,025 | 11,925 | 1,204 | 240 |
| PA (Plfs Thomas & Conyers-Jordan and 2 PA Opt-ins) | 16,062 | 6,435 | 9,650 | 570 | 67 |
| WA (Plf Dore & 1 WA Opt-in) | 2,860 | 2,306 | 1,624 | 297 | 16 |

## VI.    TEK Provides Uniform Training to Recruiters.

TEK provides the same training to all its Recruiters.[74] The Recruiter Trainees undergo a 13-week training period designed by TEK's corporate training department.[75] During the 13-week period, Recruiters travel to Phoenix or Baltimore for a three-day classroom training.[76]

TEK's Professional Development department provides identical training materials to all Recruiters.[77] TEK's training includes how to: engage in conversations with potential job

---

[71]    Ex. 98 (Major Dec.) ¶ 19.

[72]    Ex. 98 (Major Dec.) ¶ 21.

[73]    One Opt-in worked in both Massachusetts and New York so he is counted in both state law classes; his activity counts are applied to the state he was working in at its recorded time. *Id.*

[74]    Ex. 3 (DiBenedetto Tr.) 44:10-46:21, 61:7-63:10, 68:13-69:10, 129:7-25; Ex. 73 (2022 Recruiter Training Plan) TEK-Recruiter_Lit-00228010; Ex. 74 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00391876 (uniform training and promotion process for Recruiters); Ex. 75 (Welcome to New Recruiter Training) TEK-Recruiter_Lit-00000942.

[75]    Ex. 3 (DiBenedetto Tr.) 39:18-43:7; Ex. 4 (Doyle Tr.) 204:1-11; Ex. 6 (Haycock Tr.) 127:5-132:12; Ex. 60 (Professional Development Org. Chart) TEK-Recruiter_Lit-00078541; Ex. 77 ("Recruiter Training Period FAQ") TEK-Recruiter_Lit-00252623; Ex. 24 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386848.

[76]    Ex. 3 (DiBenedetto Tr.) 44:10-46:21; Ex. 6 (Haycock Tr.) 127:5-132:12; Ex. 34 (Burke Tr.) 47:13-48:4;  Ex. 47 (Dore Tr.) 59:6-16; Ex. 99 (Clavet Dec.) ¶ 9; Ex. 105 (Dries-Wielandt Dec.) ¶ 9; Ex. 106 (Holin Dec.) ¶ 9; Ex. 107 (Martin Dec.) ¶ 8; Ex. 104 (Strauchen Dec.) ¶ 8; Ex. 109 (Stein Dec.) ¶ 9; Ex. 110 (Walker Dec.) ¶ 8; Ex. 73 (2022 Recruiter Training Plan) TEK-Recruiter_Lit-00228010; Ex. 74 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00391876; Ex. 128 (Luettel Email Mar. 13, 2020) TEK-Recruiter_Lit-00205617.

[77]    Ex. 3 (DiBenedetto Tr.) 50:3-4.

candidates, complete an intake, present candidates to AMs, explain statistics regarding the industry, match resumes with requisitions, and check references.[78] TEK provides uniform guides to all its Recruiters including, but not limited to: Recruiter Onboarding Plan and the Participant Guide, including sample scripts for conversations with candidates, , Reference Check Guidance, Red Zone Script, Search Strings for LinkedIn Recruiters, "Sourcing Strategy: Plan of Attack," "Consultant Conversation Guide," and "Smart Questions."[79]

TEK hires all new Recruiters as hourly, non-exempt Recruiter Trainees.[80] After Recruiter Trainees hit certain metrics and duration of employment, including earning a passing score on the Recruiter Evaluation, they are converted into salaried, exempt Recruiters.[81] The same Recruiter Trainee Evaluation is used company-wide for all Recruiters - It evaluates the Recruiter Trainee on

---

[78] Ex. 3 (DiBenedetto Tr.) 80:14-91:8, 114:7-25; Ex. 34 (Burke Tr.) 77:17-78:4; Ex. 55 (Thomas Tr.) 64:13-65:1; Ex. 50 (Seijas Tr.) 55:2-16; Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097836-38 (listing training topics); Ex. 78 (Recruiter Onboarding Participant Guide) TEK-Recruiter_Lit-00528540-43.

[79] Ex. 79 (Consultant Conversation Guide) at TEK-Recruiter_Lit-00422808; Ex. 58 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097862-63, TEK-Recruiter_Lit-00097895, TEK-Recruiter_Lit-00097914, TEK-Recruiter_Lit-00097925, TEK-Recruiter_Lit-00097933, TEK-Recruiter_Lit-00097941; Ex. 80 (New Recruiter Training) at TEK-Recruiter_Lit-00000697-99; Ex. 81 (Reference Check Guidance) TEK-Thomas-00435337; Ex. 82 (Applications Recruiting Smart Questions) TEK-Thomas-00435342; Ex. 83 (Sourcing Strategy: Plan of Attack) TEK-Recruiter_Lit-00001034; Ex. 84 (.Net Qual Sheet) TEK-Thomas-00435339; Ex. 85 (Elevator Pitch TEK 2021) TEK-Recruiter_Lit-00019819.

[80] Ex. 6 (Haycock Tr.) 104:14-16; Ex. 99 (Clavet Dec.) ¶ 7; Ex. 100 (Coles Dec.) ¶ 7; Ex. 105 (Dries-Wielandt Dec.) ¶ 7; Ex. 101 (Gahard Dec.) ¶ 6; Ex. 107 (Martin Dec.) ¶ 6; Ex. 102 (Miller Dec.) ¶ 6; Ex. 108 (Olszewski Dec.) ¶ 6; Ex. 104 (Strauchen Dec.) ¶ 6; Ex. 109 (Stein Dec.) ¶ 7; Ex. 110 (Walker Dec.) ¶ 6; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3; Ex. 117 (2020 New Recruiter Compensation Talking Points) TEK-Recruiter_Lit-00059836; Ex. 119 (2019 New Recruiter Compensation Talking Points) at TEK-Recruiter_Lit-00103684.

[81] Ex. 3 (DiBenedetto Tr.) 63:20-64:9; Ex. 6 (Haycock Tr.) 104:14-105:25, 137:20-144:6; Ex. 99 (Clavet Dec.) ¶ 7; Ex. 100 (Coles Dec.) ¶ 7; Ex. 105 (Dries-Wielandt Dec.) ¶ 7; Ex. 101 (Gahard Dec.) ¶ 6; Ex. 106 (Holin Dec.) ¶ 7; Ex. 107 (Martin Dec.) ¶ 6; Ex. 102 (Miller Dec.) ¶ 6; Ex. 108 (Olszewski Dec.) ¶ 6; Ex. 103 (Seaward Dec.) ¶ 7; Ex. 104 (Strauchen Dec.) ¶ 6; Ex. 109 (Stein Dec.) ¶ 7; Ex. 110 (Walker Dec.) ¶ 6; Ex. 56 (Recruiter Trainee Evaluations) TEK-Recruiter_Lit-00152740-44; Ex. 86 (13-week Recruiter Evaluation FAQ) TEK-Recruiter_Lit-00530436.

skills such as sourcing, but does not evaluate Recruiter Trainees on any management skills.[82] Recruiter Trainees and Recruiters perform the same job duties.[83]

## VII.    Recruiters Are Closely Supervised

TEK commonly employs multiple layers of supervisors – DBOs, DROs, Delivery Managers, Team Leads, Specialization Leads, Recruiter Leads, and Account Leads – who supervise Recruiters on a constant and daily basis.[84] Recruiters and their supervisors all attend daily Red Zone meetings where Recruiters receive work assignments and report on the work activities they performed the prior day.[85] Recruiters' managers monitor Recruiters' performance

---

[82]    Ex. 3 (DiBenedetto Tr.) 61:7-65:11, 168:18-173:1; Ex. 6 (Haycock Tr.) 143:15-144:6; Ex. 56 (Recruiter Trainee Evaluations) TEK-Recruiter_Lit-00152740-00152744.

[83]    Ex. 4 (Doyle Tr.) 210:5-15; Ex. 34 (Burke Tr.) 49:6-10; Ex. 35 (Conyers-Jordan Tr.) 18:5-16; Ex. 99 (Clavet Dec.) ¶ 8; Ex. 100 (Coles Dec.) ¶ 8; Ex. 105 (Dries-Wielandt Dec.) ¶ 8; Ex. 101 (Gahard Dec.) ¶ 7; Ex. 106 (Holin Dec.) ¶ 8; Ex. 107 (Martin Dec.) ¶ 7; Ex. 102 (Miller Dec.) ¶ 7; Ex. 108 (Olszewski Dec.) ¶ 7; Ex. 103 (Seaward Dec.) ¶ 8; Ex. 104 (Strauchen Dec.) ¶ 7; Ex. 109 (Stein Dec.) ¶ 8; Ex. 110 (Walker Dec.) ¶ 7.

[84]    Ex. 6 (Haycock Tr.) 65:14-18; Ex. 4 (Doyle Tr.) 78:3-12, 101:2-102:20; Ex. 12 (McNelley Tr.) 62:21-63:6; Ex. 34 (Burke Tr.) 105:5-22, 109:14-110:12, 112:15-19; Ex. 35 (Conyers-Jordan Tr.) 59:3-17, 141:15-20; Ex. 47 (Dore Tr.) 81:11-82:5; Ex. 49 (Richenberg Tr.) 56:19-57:9; Ex. 19 (Blendy Tr.)139:22-140:13; Ex. 48 (Malone Tr.) 13:23-14:17, 136:22-137:8; Ex. 50 (Seijas Tr.) 26:23-27:11; Ex. 52 (Shestopalko Tr.) 121:14-122:7, 134:23-135:10; Ex. 99 (Clavet Dec.) ¶ 12; Ex. 100 (Coles Dec.) ¶ 12; Ex. 105 (Dries-Wielandt Dec.) ¶ 12; Ex. 101 (Gahard Dec.) ¶ 11; Ex. 106 (Holin Dec.) ¶ 12; Ex. 107 (Martin Dec.) ¶ 11; Ex. 102 (Miller Dec.) ¶ 11; Ex. 108 (Olszewski Dec.) ¶ 11; Ex. 103 (Seaward Dec.) ¶ 12; Ex. 104 (Strauchen Dec.) ¶ 11; Ex. 109 (Stein Dec.) ¶ 12; Ex. 110 (Walker Dec.) ¶ 11; Ex. 24 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386849 (identifying leaders above "Recruiter."); Ex. 120 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 (describing supervisory tasks performed by Recruiter Leads); Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter Lit-00408116; Ex. 131 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399677; Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489259; Ex. 144 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552015.

[85]    Ex. 3 (DiBenedetto Tr.) 136:17-137:16; Ex. 4 (Doyle Tr.) 123:25-124:8, 238:16-246:4; Ex. 47 (Dore Tr.) 79:24-80:8; Ex. 49 (Richenberg Tr.) 95:12-96:3; Ex. 19 (Blendy Tr.) 32:14-23; Ex. 99 (Clavet Dec.) ¶ 14; Ex. 100 (Coles Dec.) ¶ 14; Ex. 105 (Dries-Wielandt Dec.) ¶ 14; Ex. 101 (Gahard Dec.) ¶ 13; Ex. 106 (Holin Dec.) ¶ 14; Ex. 102 (Miller Dec.) ¶ 13; Ex. 108 (Olszewski Dec.) ¶ 13; Ex. 103 (Seaward Dec.) ¶ 14; Ex. 104 (Strauchen Dec.) ¶ 13; Ex. 109 (Stein Dec.) ¶ 14; Ex. 110 (Walker Dec.) ¶ 13; Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408136 ("Red Zone (RZ): An office meeting to *determine the priority of each requirement and Recruiter allocation.*") (emphasis added); Ex. 131 (Rochester Welcome Packet) at TEK-

through weekly reports to their quota attainment and performance metrics.[86]

The offices are headed by a Director of Business Operations or Director of Branch Operations ("DBO"), whose job is to be "responsible for daily operations of a branch office," including "office productivity" and "professional development.[87] DBOs monitor Recruiters' metrics, run daily morning Red Zone meetings, at which they assign work to Recruiters, manage Recruiters' performance, and participate in the hiring and termination of Recruiters.[88] The DBOs report to Regional Vice Presidents ("RVPs") who oversee all offices within their region.[89] RVPs also monitor Recruiters' spread.[90]

TEK offices also have Delivery Managers, whose job is to focus on "driving strategy around getting a requirement up to presenting a candidate and closing the business . . . Works to

---

Recruiter_Lit-00399695 (same); Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489276; Ex. 144 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552033; Ex. 149 (Running an Effective Red Zone) TEK-Recruiter_Lit-00665469; Ex. 133 (DBO Operations: Red Zone) TEK-Recruiter_Lit-00426755; Ex. 115 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.

[86]    Ex. 4 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead . . . [and contains] certain key performance indicators"), 44:2-18, 84:1-14, 91:21-92:2, 94:17-20, 108:9-16, 247:12-248:10, 255:3-256:8; Ex. 6 (Haycock Tr.) 158:2-14; Ex. 140 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Using the weekly report, a Lead should be able to identify which activities a recruiter needs to focus on."); Ex. 72 (WIN narratives) TEK-Recruiter_Lit-00392430.

[87]    Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter Lit-00408132; Ex. 131 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691; Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274; Ex. 144 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552029.

[88]    Ex. 4 (Doyle Tr.) 44:2-18, 84:1-14, 91:21-92:2, 108:9-16, 247:12-248:10; Ex. 6 (Haycock Tr.) 131:9-132:3; Ex. 12 (McNelley Tr.) 62:21-63:6, 138:8-19, 171:16-172:8; Ex. 11 (Lis Tr.) 49:21-24; Ex. 34 (Burke Tr.) 111:20-112:9; Ex. 47 (Dore Tr.) 79:24-80:8; Ex. 19 (Blendy Tr.) 32:14-23; Ex. 50 (Seijas Tr.) 27:12-18; *see also* Ex. 4 (Doyle Tr.) 45:23-47:1, 48:9-13, 64:5-65:5 (Smaller offices at TEK are headed by Sales Managers, whose jobs are identical to DBOs except that they have to engage in sales activities in addition to DBO duties).

[89]    Ex. 4 (Doyle Tr.) 50:22-51:14; Ex. 6 (Haycock Tr.) 77:15-78:13, 81:7-8; Ex. 27 (Executive Summary) TEK-Recruiter_Lit-00161739-40.

[90]    Ex. 4 (Doyle Tr.) 104:3-11.

improve performance with Recruiters."[91] Delivery Managers report to the DBO and Director of Regional Operations.[92] Under Delivery Managers are Team Leads and Recruiter Leads, who are also referred to as Specialization Leads.[93] Recruiter Leads supervise Recruiters, monitor their weekly production metric, train them, and "assess" their work.[94] Finally, corporate officers also monitor the quota compliance and spread attainment of Recruiters.[95]

Recruiters are also aligned to AMs, whose job is to "provid[e] solutions to [the] clients' business and technology needs and ensures [they] place quality (technical and cultural fit) consultants."[96] Recruiters work near AMs, they speak "multiple times" a day and the AMs also regularly monitor Recruiters' work activities.[97] Each office is laid out similarly – Recruiters' desks

---

[91]    Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133; Ex. 131 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692; Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274; Ex. 144 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552030.

[92]    Ex. 4 (Doyle Tr.) 255:3-256:8 (DROs monitor the Recruiters on a region-wide basis), 275:2-5; Ex. 91 (Talent Delivery) TEK-Thomas-00000214 at 2.

[93]    Ex. 4 (Doyle Tr.) 94:17-20.

[94]    Ex. 4 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead"); Ex. 140 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Using the weekly report, a Lead should be able to identify which activities a recruiter needs to focus on."); Ex. 120 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 18 ("You should feel empowered knowing how to assess talent and recognize skill gaps" "You are the leader in your office" "Recruiter Leads are RESPONSIBLE for their Pod members[]"), 20 ("Managing"), 25, 29, 33, 36-37 (how to "track" Recruiters production data), 39-56 (leadership training), 66, 73 (how to provide feedback), 89, 105

[95]    Ex. 6 (Haycock Tr.) 70:13-71:22; Ex. 27 (Executive Dashboard) TEK-Recruiter_Lit-00161741-65; Ex. 87 (Haycock Email Jan. 25, 2018) TEK-Recruiter_Lit-00253346.

[96]    Ex. 132 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132; Ex. 131 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691 (same); Ex. 139 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274 (same); Ex. 144 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552029 (same); Ex. 4 (Doyle Tr.) 101:15-102:7, 137:19-138:4, 169:18-170:5; Ex. 3 (DiBenedetto Tr.) 114:23-25.

[97]    Ex. 4 (Doyle Tr.) 251:3-253:17 (AMs and Recruiters talk "multiple times" a day); Ex. 13 (Pappas Tr.) 30:21-31:5; Ex. 34 (Burke Tr.) 90:24-91:11, 105:5-22; Ex. 35 (Conyers-Jordan Tr.) 141:15-20; Ex. 48 (Malone Tr.) 110:4-17, 134:23-135:2, 136:22-137:8; Ex. 50 (Seijas Tr.) 26:23-27:11; Ex. 100 (Coles Dec.) ¶ 13; Ex. 105 (Dries-Wielandt Dec.) ¶ 13; Ex. 101 (Gahard Dec.) ¶ 12; Ex. 106 (Holin Dec.) ¶ 13; Ex. 107 (Martin Dec.) ¶ 12; Ex. 102 (Miller Dec.) ¶ 12; Ex. 108

are located in the "pit," an open office set up with cubicles, with managers' offices surrounding them.[98] This layout allows managers to monitor Recruiters' phone calls and hours.[99]

## VIII. TEK Does Not Pay Overtime and Missed Meal and Rest Break Premiums to Recruiters.

TEK requires its Recruiters to regularly work over 40 hours a week.[100] TEK's policies explain that Recruiters are expected to work "45-60 Hours Per Week. The habits you develop early in your career play a pivotal role in determining success. Working long days and weekends are often a necessary part of meeting business goals."[101] TEK requires Recruiters to be in the office or, when remote, online prior to the morning Red Zone meeting.[102] Generally, Recruiters start work before 8:00 a.m.[103] Recruiters generally work past 5:00 p.m.[104] TEK also expects Recruiters to respond to manager and potential candidate emails, texts, and calls in the evenings

---

(Olszewski Dec.) ¶ 12; Ex. 103 (Seaward Dec.) ¶ 13; Ex. 104 (Strauchen Dec.) ¶ 12; Ex. 109 (Stein Dec.) ¶ 13; Ex. 110 (Walker Dec.) ¶ 12.

[98] Ex. 4 (Doyle Tr.) 251:3-252:14, 253:14-17; Ex. 34 (Burke Tr.) 42:18-20; Ex. 99 (Clavet Dec.) ¶ 13.

[99] Ex. 4 (Doyle Tr.) 252:5-253:17; Ex. 130 (Manage & Develop Your Team) at TEK-Recruiter_Lit-00395328-29 ("You can't own the pit if you aren't there"); Ex. 118 (Thomson Email Sept. 18, 2020) TEK-Recruiter_Lit-00079338.

[100] Ex. 99 (Clavet Dec.) ¶¶ 39, 42; Ex. 100 (Coles Dec.) ¶¶ 39, 42; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 13; Ex. 101 (Gahard Dec.) ¶¶ 38, 40; Ex. 106 (Holin Dec.) ¶¶ 39, 42; Ex. 107 (Martin Dec.) ¶¶ 39, 44; Ex. 102 (Miller Dec.) ¶¶ 38, 43; Ex. 108 (Olszewski Dec.) ¶¶ 38, 41; Ex. 103 (Seaward Dec.) ¶¶ 39, 42; Ex. 104 (Strauchen Dec.) ¶¶ 38, 41; Ex. 109 (Stein Dec.) ¶¶ 39, 42; Ex. 110 (Walker Dec.) ¶¶ 38, 43.

[101] Ex. 24 (Career Opportunities & Expectations) TEK-Recruiter_Lit-00386851; *see* Ex. 128 (Luettel Email Mar. 13, 2020) TEK-Recruiter_Lit-00205617 ("[A]verage recruiters work 50 hours a week").

[102] Ex. 9 (Fronzaglio Tr.) 111:17-22; Ex. 34 (Burke Tr.) 116:18-24; Ex. 47 (Dore Tr.) 19:23-20:13; Ex. 55 (Thomas Tr.) 208:13-22; Ex. 52 (Shestopalko Tr.) 32:19-33:4.

[103] Ex. 4 (Doyle Tr.) 238:16-240:5; Ex. 34 (Burke Tr.) 116:9-11, 116:18-24; Ex. 47 (Dore Tr.) 19:23-20:13; Ex. 49 (Richenberg Tr.) 23:19-22; Ex. 55 (Thomas Tr.) 203:15-21, 208:13-22; Ex. 19 (Blendy Tr.) 31:7-8, 135:22-136:2; Ex. 48 (Malone Tr.) 40:11-21; Ex. 50 (Seijas Tr.) 26:5-21; Ex. 52 (Shestopalko Tr.) 139:10-13.

[104] Ex. 34 (Burke Tr.) 122:4-13; Ex. 55 (Thomas Tr.) 208:13-22; Ex. 19 (Blendy Tr.) 135:22-136:2; Ex. 48 (Malone Tr.) 40:22-41:5; Ex. 52 (Shestopalko Tr.) 139:10-13.

and on the weekends.[105] Recruiters work through lunch either taking consultants and/or job

candidates out to lunch or soliciting potential candidates to meet TEK's aggressive quotas.[106]

Washington Recruiters do not receive rest breaks of 10 minutes for each four hours they work.[107]

TEK admits it does not pay Recruiters overtime premiums.[108] TEK also does not have a

policy or practice of ensuring Recruiters in Washington are provided a meal or rest break,[109] and

it does not provide Recruiters in Washington with any premium for missed meal and rest breaks.[110]

## PROPOSED CLASS DEFINITIONS

Plaintiffs request the Court certify four state law classes:[111]

**Pennsylvania Overtime Class –** Plaintiffs Michael Thomas and Maria Conyers-Jordan
request the Court certify a class of "All current and former Recruiters employed by

---

[105]    Ex. 13 (Pappas Tr.) 99:25-100:18; Ex. 34 (Burke Tr.) 124:4-12; Ex. 47 (Dore Tr.) 21:2-13;
Ex. 19 (Blendy Tr.) 88:1-14, 138:9-17; Ex. 52 (Shestopalko Tr.) 139:22-140:20; Ex. 99 (Clavet
Dec.) ¶ 26; Ex. 100 (Coles Dec.) ¶ 26; Ex. 105 (Dries-Wielandt Dec.) ¶ 26; Ex. 101 (Gahard Dec.)
¶ 25; Ex. 106 (Holin Dec.) ¶ 26; Ex. 107 (Martin Dec.) ¶ 26; Ex. 102 (Miller Dec.) ¶ 25; Ex. 108
(Olszewski Dec.) ¶ 25; Ex. 103 (Seaward Dec.) ¶ 26; Ex. 104 (Strauchen Dec.) ¶ 25; Ex. 109 (Stein
Dec.) ¶ 26; Ex. 110 (Walker Dec.) ¶ 25; Ex. 89 ("TEKsystems December 2020 Engagement
Survey") TEK-Recruiter_Lit-00161021; Ex. 138 (New York City Apps New Recruiter Training)
TEK-Recruiter_Lit-00473570 at slide 16 ("Some nights you Will have to stay late to hit your
EBRS and/or meet client expectations").

[106]    Ex. 34 (Burke Tr.) 120:5-21; Ex. 48 (Malone Tr.) 34:10-21; Ex. 50 (Seijas Tr.) 29:1-19;
Ex. 52 (Shestopalko Tr.) 139:14-21; Ex. 99 (Clavet Dec.) ¶¶ 40-41; Ex. 100 (Coles Dec.) ¶¶ 40-
41; Ex. 105 (Dries-Wielandt Dec.) ¶¶ 40-41; Ex. 101 (Gahard Dec.) ¶ 39; Ex. 106 (Holin Dec.) ¶¶
40-41; Ex. 107 (Martin Dec.) ¶¶ 40-41, 43; Ex. 102 (Miller Dec.) ¶¶ 39-40, 42; Ex. 108 (Olszewski
Dec.) ¶¶ 39-40; Ex. 103 (Seaward Dec.) ¶¶ 40-41; Ex. 104 (Strauchen Dec.) ¶¶ 39-40; Ex. 109
(Stein Dec.) ¶¶ 40-41; Ex. 110 (Walker Dec.) ¶¶ 39-40, 42; Ex. 58 (Recruiter Onboarding Plan) at
TEK-Recruiter Lit-00097891 ("AMs or RLs should Work with Recruiters to develop . . . Smart
questions to ask during . . . lunches for current/former employees."); Ex. 128 (Luettel Email Mar.
13, 2020) TEK-Recruiter_Lit-00205617 ("[A]verage recruiters work 50 hours a week, but because
you have working lunches").

[107]    Ex. 107 (Martin Dec.) ¶ 42; Ex. 102 (Miller Dec.) ¶ 41; Ex. 110 (Walker Dec.) ¶ 41.

[108]    ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Cmplt.) Answers to ¶¶ 10, 87, 92, 98; Ex.
7 (Def.'s Resp. To Pls. 1st Requests for Admission) No. 2; Ex. 119 (2019 Recruiter Trainee
Compensation Talking Points) at TEK-Recruiter_Lit-00103685.

[109]    Ex. 4 (Doyle Tr.) 260:18-262:23.

[110]    Ex. 4 (Doyle Tr.) 263:2-264:11.

[111]    Excluded from all the proposed classes are: Recruiting Leads, Recruiter IIs, Recruiting
Lead IIs, Specialization Leads, Team Leads – Delivery, VMS Recruiters, Team Leads – Delivery
II, Sourcing Specialists – Alt Del, and Specialization Leads II.

Defendant in Pennsylvania from April 9, 2018 to the final date of judgment."

**Washington Overtime and Meal and Rest Break Class –** Plaintiff Ava Dore requests the Court certify a class of "All current and former Recruiters employed by Defendant in Washington from January 19, 2019 to the final date of judgment."

**New York Overtime and Accurate Paystub Class –** Plaintiff Rachel Richenberg requests the Court certify a class off "All current and former Recruiters employed by Defendant in New York from January 19, 2016 to the final date of judgment."

**Massachusetts Overtime Class –** Plaintiff Emily Burke requests the Court certify a class of "All current and former Recruiters employed by Defendant in Massachusetts from January 19, 2019 to the final date of judgment."

## LEGAL ANALYSIS

### I.    The Application of the Administrative Exemption Supports Class Certification.

The primary merits dispute is whether class members are exempt pursuant to the administrative exemption. In determining whether the dispute can be resolved class-wide, the Rule 23 requirements must be viewed in light of the specific issues in dispute. *See Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008). At the crux of this case is TEK's common practice of classifying all Recruiters as exempt from overtime under Pennsylvania, Washington, New York, and Massachusetts law. All four states have virtually identical requirements for the administrative exemption and all four states either have parallel statutory language to, or explicitly incorporate, the Fair Labor Standards Act ("FLSA").[112]

---

[112]    34 Pa. Code § 231.83; Wash. Rev. Code Ann. § 49.46.010(3)(c); Wash. Admin. Code 296-128-520; N.Y. Labor Law § 651(5); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (incorporating the FLSA exemptions); Mass. Gen. Laws Ann. ch. 151, § 1A; 454 C.M.R. 27.03(3); *Baum v. Astrazeneca LP*, 372 Fed. Appx. 246, n. 4 (3d Cir. 2010) (applying 29 C.F.R. § 541.202 to interpret the administrative exemption under the PMWA, as "Pennsylvania courts have looked to federal law regarding the Fair Labor Standards Act ('FLSA') for guidance in applying the PMWA."); *Webster v. Pub. Sch. Emps. of Washington, Inc.*, 247 F.3d 910, 918 (9th Cir. 2001) ("Washington State has statutory provisions for overtime and exemption for administrative work that parallel the FLSA."); *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 160 (S.D.N.Y. 2014) ("FLSA's exemptions are incorporated into the NYLL."); *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 46 (D. Mass. 2015) ("The definition of exempt employees under Massachusetts law, like the overtime pay provisions, mirrors that of the FLSA.").

Those working in an "administrative" capacity are employees whose *primary job duty*: (1) is the performance of office or non-manual work directly *related to the management or general business operations of the employer or the employer's customers*; and (2) includes the exercise of discretion and independent judgment *with respect to matters of significance*.[113] 29 C.F.R. § 541.200; *see also* 34 Pa. Code § 231.83; Wash. Admin. Code 296-128-520; N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; 454 C.M.R. 27.03.[114] Thus, to qualify for this exemption, *each* of the prongs must be satisfied and the employer bears the burden of establishing each prong. *Rood v. R&R Express, Inc.*, No. 17 Civ. 1223, 2022 WL 1082481, at *5 (W.D. Pa. Apr. 11, 2022) ("If the employer fails to establish any one of these requirements, then it will not be entitled to the exemption, regardless of the outcome of the other requirements").

Because TEK uniformly classifies Recruiters as exempt, requires them to engage in the same production duties to support its sales process, utilizes the same quotas and metrics to measure Recruiters' productivity, utilizes several layers of hierarchy that subjects Recruiters to common and significant oversight, and requires them to work overtime, this case is well positioned to be adjudicated on a class-wide basis. *See Damassia*, 250 F.R.D. at 157.

## A.    Primary Job Duty

At the merits stage, TEK must show that Recruiters' *primary job duty* meets the second and third prong of the administrative exemption. Significantly, "'[p]rimary duty' is defined to mean

---

[113]    Plaintiffs do not dispute that TEK meets the first prong because it pays a sufficiently high salary to meet the salary requirement of the exemption. However, Plaintiffs assert that Recruiters' primary job duties do not meet the requirements of the other duty prongs. 29 C.F.R. § 541.200.

[114]    The United States Department of Labor has promulgated additional regulations that define certain of the terms in the second and third prongs. *See*, e.g., 29 C.F.R. §§ 541.201-202; 541.700. The regulations also describe relevant factors to consider in determining whether those same prongs are satisfied. *Id*. §§ 541.201-202. And the regulations further include a list of hypothetical employees (with corresponding hypothetical job descriptions) meant to illustrate circumstances in which an employee may or may not qualify for the administrative exemption. *Id*. § 541.203.

'the principal, main, major or most important duty that the employee performs,' and generally means that the employee spends at least 50% of his or her time performing the duty." *Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 6 (1st Cir. 2023) (citing 29 C.F.R. §§ 541.700); *Carter v. City of Philadelphia*, 417 F. Supp. 3d 639, 647 (E.D. Pa. 2019).

### B.    Work Directly Related to Management or General Business Operations

The phrase "work directly related to the management or general business operations" means work directly related to "assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). This distinction is often referred to as the "administrative-production dichotomy." *Rood*, 2022 WL 1082481, at *6.   The so-called "administrative/production dichotomy turns on whether the services or goods provided by the employee constitute the marketplace offerings of the employer, or whether they contribute to the running of the business itself." *Id.* at *6 (the "concept of a 'production worker' is not limited to individuals involved in the manufacture of tangibles.") (cleaned up). Employees' work is production and not administrative where the job is "related to the goods and services which constitute the business' marketplace offerings and work which contributes to running the business itself." *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 851, 855 (9th Cir. 2017) ("the question is not whether an employee is essential to the business, but rather whether her primary duty goes to the heart of internal administration—rather than marketplace offerings.") (citation cleaned up); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991) (work related to the business' marketplace offerings does not qualify as administrative). Further, where an employee's primary job duty is comprised of "inside sales tasks," the employer may not avail itself of the administrative exemption. *Martin*, 940 F.2d at 906 ("the nature of an inside salespersons . . . work is to produce sales for [the employer], *not to develop or implement specific work*

*assignments consistent with an overall company policy.*") (cleaned up); *Rood*, 2022 WL 1082481, at *1, *6; *In re Enter. Rent-a-Car Wage & Hour Emp. Pracs. Litig.*, No. 07 Civ. 1687, 2012 WL 4356762, at *19 (W.D. Pa. Sept. 24, 2012).

As discussed below, for the purposes of this Motion, the Court need not decide whether Class members are administrative workers or production workers. Rather, the Court must only determine whether all Class members perform the same type of work in relation to the business's "principal production activity." *Walsh*, 64 F.4th at 6; *Rood*, 2022 WL 1082481, at *6. Under this analysis, TEK's "principal production activity" is recruiting. Because every Recruiters' primary duty is screening and matching candidates, they necessarily perform the same type of work with respect to the company's core business – recruiting and staffing.

TEK may argue that Recruiters' duties directly relate to the management or general business operation, but this argument will also fail. First, it is a *merits* argument that is common to all Recruiters. Second, Recruiters' primary job duty is to screen and match job candidates for TEK's AMs to pitch to TEK's customers and not to advise TEK's customers on management and general business operations of customers. SOF § III. "[A]lthough the regulations do not define the phrase 'directly related to the management or general business operations,' they do make clear that the phrase 'refers to the type of work performed by the employee.'" *Walsh*, 64 F.4th at 6. That Recruiters' duties "may, in a limited or superficial way implicate [general administrative functions] does not mean that this was their 'primary duty.'" *Id.* at 9. Where employees "do not design or plan the systems, nor do they analyze how they work or how they can be improved," the employee's work does not directly relate to management or general business operations. *Id.* at 8; *see also Fowler v. OSP Prevention Grp., Inc.*, 38 F.4th 103, 111 (11th Cir. 2022) ("Duties related to managing a company's business typically involve significant decision-making authority,

including authority to make policy-level decisions.").

Common evidence demonstrates that TEK repeatedly refers to Recruiters as "inside sales" as their primary job duty is pitching candidates to AMs, who then decide which candidates to pitch to TEK's customers. Recruiters do not take part in managing or determining general business operations of TEK's customers – their primary job duty does not even include interacting with TEK's customers. SOF § III. This is a merits issue not appropriate for this stage of litigation but nothing about this dispute requires individualized inquiries.

C.    **Work Requiring the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance.**

As with the second prong, federal regulations provide guidance as to what it means to exercise discretion and independent judgment: "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice." *Id.* § 541.202(c). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* § 541.202(a). Factors courts are to consider regarding whether employees have discretion over matters of significance include: "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices"; "whether the employee has authority to waive or deviate from established policies and procedures without prior approval"; "whether the employee has authority to *negotiate and bind* the company on significant matters"; "whether the employee is involved in planning long- or short-term business objectives"; and "whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." 29 C.F.R. § 541.202(b) (emphasis added). All of these factors are subject to common proof.

Thus, if an employee's job duties involve "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources," the exemption does not apply. 29 C.F.R. § 541.202(e). That is, to the extent TEK argues Recruiters have discretion over decisions like whether to source potential candidates on Linkedin or Connected, this is simply applying well-established techniques and does not rise to discretion over matters of significance.

Directly on point, Section 541.203(e) explains:

> [P]ersonnel clerks who "screen" applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption. Such personnel clerks typically will reject all applicants who do not meet minimum standards for the particular job or for employment by the company. The minimum standards are usually set by the exempt human resources manager or other company officials, and the decision to hire from the group of qualified applicants who do meet the minimum standards is similarly made by the exempt human resources manager or other company officials.

29 C.F.R. § 541.203(e). Common evidence demonstrates Recruiters' primary job duty is to screen.

## II. Plaintiffs Meet All of the Rule 23(a) Requirements.

"A class action . . . merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010). Courts have broad discretion to determine whether to certify a Rule 23 class. *Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581, 589 (W.D. Pa. 2022) (Stickman, J.). Though a court's class certification analysis is "rigorous," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), the Supreme Court has made clear that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ; *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 322 (3d Cir. 2016).

Rule 23(a) requires plaintiffs to establish four prerequisites for classes to be certified. All

four requirements are met here.

**A.  Plaintiffs Easily Meet the Numerosity Requirement.**

Numerosity exists where the proposed classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, numerosity is satisfied in this circuit if the number of class members exceeds 40. *See, e.g., Boley v. Universal Health Servs., Inc.*, 337 F.R.D. 626, 631 (E.D. Pa. 2021), *aff'd*, 36 F.4th 124 (3d Cir. 2022).  Here, there are over 336 Pennsylvania Class Members, 194 Washington Class Members, 294 New York Class Members, and 137 Massachusetts Class Members so numerosity is easily satisfied.[115]

**B.  There Are Questions and Facts Common to the Class.**

Rule 23 requires "questions of law or fact" to be common to the class. Fed. R. Civ. P. 23(a)(2). To "satisfy the commonality requirement, the claims 'must depend upon a common contention,' and that contention must be 'capable of classwide resolution,' meaning that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Butela*, 341 F.R.D. at 594 (quoting *Wal-Mart*, 564 U.S. at 349). "Rule 23(a)(2)'s commonality requirement "does not require identical claims or facts among class member[s]. . . . For purposes of Rule 23(a)(2), even a single common question will do." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) (cleaned up).

Where, as here, an employer uniformly classifies employees as exempt, courts often find that the commonality prong is met and certify the class. *See Avery,* 2024 WL 590364, at *4-5; *Prinzo v. Hannaford Bros. Co., LLC*, 343 F.R.D. 250, 253 (D. Mass. 2023) (courts "have expressed a strong preference for rendering decisions on the classification of employees on [a] class wide basis.") (cleaned up); *Rood v. R&R Express, Inc.*, No. 17 Civ. 1223, 2021 WL 3021978, at *3-4

---

[115]    Ex. 98 (Major Decl.) ¶ 31.

(W.D. Pa. July 16, 2021); *Rivet v. Off. Depot, Inc.*, 207 F. Supp. 3d 417, 429 (D.N.J. 2016); *Lyons v. Citizens Financial Group, Inc.*, 2012 WL 5499878, at *2 (D. Mass. Nov. 9, 2012) (certifying overtime misclassification class and noting "[i]n characterizing the work of the [employees] as substantially similar . . . the plaintiff is simply following the defendants' lead").[116] Employers like TEK make categorical determinations of exempt status by position and not by the specific tasks that any individual employee performs on a day-to-day basis. For this same reason, courts have recognized that those categorical determinations are well suited to being challenged on a class basis, particularly where job duties are well defined, as they are here. *See, e.g., Damassia*, 250 F.R.D. at 160 ("Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities."); *see also Avery*, 2024 WL 590364, at *7 (TEK's uniform exemption classification of Recruiters is "relevant" to the court's analysis).

### C.    Plaintiffs' Claims Are Typical of the Class's Claims.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The concepts of typicality and commonality are closely related and often tend to merge." *Marcus v. BMW of N. Am.*, 687 F.3d

---

[116]    *See also Nelson v. Avon Prods., Inc.*, No. 13 Civ. 02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015) (certifying class of recruiters); *Pruess v. Presbyterian Health Plan, Inc.*, No. 19 Civ. 00629, 2024 WL 3844965 (D.N.M. Aug. 16, 2024); *Robert Hendricks v. Total Quality Logs., LLC*, No. 10 Civ. 0649, 2023 WL 6217073 (S.D. Ohio Sept. 25, 2023); *Loomis v. Unum Grp. Corp.*, No. 20 Civ. 251, 2023 WL 3267707 (E.D. Tenn. May 4, 2023*); Felps v. Mewbourne Oil Co., Inc.*, 336 F.R.D. 664, 670 (D.N.M. 2020); *Dietrich v. C.H. Robinson Worldwide, Inc.*, No. 18 Civ. 4871, 2020 WL 635972, at *2 (N.D. Ill. Feb. 11, 2020); *Charlot v. Ecolab, Inc.*, No. 18 Civ. 10528, 2019 WL 6888621, at *12 (D.N.J. Dec. 17, 2019*) ; LoCurto v. AT&T Mobility Servs. LLC,* No. 13 Civ. 4303, 2018 WL 4519201 (S.D.N.Y. Sept. 20, 2018); *Roseman v. Bloomberg L.P.*, No. 14 Civ. 2657, 2017 WL 4217150 (S.D.N.Y. Sept. 21, 2017) ; *Perez v. Allstate Ins. Co.*, 11 Civ. 1812, 2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014); *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408 (S.D.N.Y. 2013); *Damassia*, 250 F.R.D. at 156.

583, 597 (3d Cir. 2012). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Charlot*, 2019 WL 6888621, at *13 (cleaned up). In evaluating typicality, courts "consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." *Rood*, 2021 WL 3021978, at *4 (cleaned up). "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, factual difference will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.* "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Roseman*, 2017 WL 4217150, at *4 (cleaned up).

Here Plaintiffs' claims are typical of the claims of the classes because they all arise out of TEK's uniform conduct toward Plaintiffs and the classes – namely, TEK's misclassification of Recruiters. Plaintiffs and the classes all worked for TEK as Recruiters, and all performed the same job duties under substantially similar levels of supervision such that their claims can be resolved using common evidence. *Avery*, 2024 WL 590364, at *6.

### D.    Plaintiffs Will Adequately Protect the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy has two elements: (1) that the proposed representatives do not have conflicts of interest with the proposed class, and (2) Plaintiffs are represented by qualified and competent counsel. *See, e.g.*, *Rood*, 2021 WL 3021978, at *4. The law governing adequacy is well-settled that "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." 7A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure, § 1768 (3d ed. 1986).

31

Here, both elements are met. There is no conflict between the proposed Class Representatives and members of the class. The proposed Class Representatives are pursuing the same claims as the classes and are subject to the same exemption defenses. Further, they have protected the class's interests by actively participating in discovery, including sitting for day-long depositions, and will continue to vigorously prosecute the case. *Butela*, 341 F.R.D. at 597 ("named plaintiff must 'represent a class capably and diligently'"); Abrahamson Decl. ¶¶ 22-24. Named Plaintiffs have no conflict of interests with the classes. *Id.* ¶ 22.

Plaintiffs' counsel meets the adequacy requirement of Rule 23(a). "In making that determination, a court must consider: (1) 'the work counsel has done in identifying or investigating potential claims in the action'; (2) 'counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action'; (3) 'counsel's knowledge of the applicable law'; and (4) 'the resources that counsel will commit to representing the class.'" *Butela*, 341 F.R.D. at 597-98 (quoting Fed. R. Civ. P. 23(g)(1)(A)). Plaintiffs' counsel include Werman Salas P.C. and Lichten & Liss-Riordan, P.C., two nationally recognized firms with robust wage and hour class action practices. *See* Abrahamson Decl. ¶¶ 4-21 (outlining Werman Salas's credentials); Schalman-Bergen Decl. ¶¶ 3-18 (outlining Lichten & Liss-Riordan's credentials). Both firms were appointed class counsel in *Avery*, 2024 WL 590364, at *15. Both firms have done a tremendous amount of work on this case, have experience in complex litigation, have knowledge of the applicable law, and will devote all necessary resources to the prosecution of this case. *See* Abrahamson Decl. ¶¶ 4-21; Schalman-Bergen Decl. ¶¶ 3-18.

If the classes are certified, the Court must appoint class counsel. Fed. R. Civ. P. 23(g)(1). For the reasons set forth in the Abrahamson and Schalman-Bergen declarations, Plaintiffs' lawyers meet the Rule 23(g)(1) factors and are particularly well suited to be appointed Class Counsel.

Abrahamson Decl. ¶¶ 4-21; Schalman-Bergen Decl. ¶¶ 3-18.

**III.    Plaintiffs Meet All of the Rule 23(b) Requirements.**

Rule 23(b)(3) authorizes class certification where (1) questions of law or fact common to the classes predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Both factors are met here, rendering class certification appropriate.

**A.    Common Questions Regarding Recruiters' Exempt Status Predominate Over Any Individualized Issues.**

To meet the predominance standard, Plaintiffs need only demonstrate that their claims are "capable of proof through evidence that is common to the class rather than individual to its members." *Rivet, Inc.*, 207 F. Supp. 3d at 431 ("granular uniformity between class members is not required for establishing predominance"). "Rule 23(b)(3) … does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof." *Amgen Inc.*, 568 U.S. at 469 (cleaned up). Here, the legal and factual questions—the applicability of the administrative exemption and TEK's failure to pay Recruiters overtime pay when they work more than 40 hours per week—can be resolved through common proof applicable to all class members' claims. Because the common proof is sufficient to resolve all liability questions in this case, such issues necessarily predominate over any issues subject only to individualized proof.

**1.    The Common Evidence and Generalized Proof in this Case**

As discussed above, there are numerous sources of common evidence that apply to all Recruiters and can be used with respect to one or more elements of liability, including: (1) TEK's policies and practices, including TEK's common policy of classifying all Recruiters as exempt administrative employees; (2) Recruiters' primary job duty is to "screen" and match candidates to the requirements determined by TEK's customers; (3) TEK values the Recruiter position as "inside

sales" or "producing" employees and not "human resources"; (4) the standardized templates, and other tools TEK requires all Recruiters to screen and match; (5) standardized supervision and hierarchy; (6) the uniform production metrics that TEK utilizes to evaluate Recruiters on a weekly basis; (7) AMs', and not Recruiters', primary job duty is to directly communicate with TEK's customers regarding their hiring needs; (8) the uniform training; (9) TEK's clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them; (10) Recruiters do not evaluate the work performed by consultants; (11) Recruiters are not involved in creating or implementing management, operational or human resources policies for TEK or TEK's customers; (12) Recruiters do not have the authority to negotiate any contracts and (13) bind TEK or its customers with respect to significant matters; and Recruiters do not provide human resource services, employee benefit functions, or quality control services for TEK or its clients.[117] In sum, TEK's corporate deposition testimony and documents, supported by Recruiter witness's consistent testimony, all show uniform practices, job duties, level of supervision, manner of compensation, and exemption status. As discussed below, is more than sufficient to resolve the questions common to the Class.

### 2.    The Common Questions Presented Can be Answered by Common Evidence.

"[A] common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). The primary merits inquiry in this litigation presents two common questions that correspond to the two contested prongs of the administrative exemption and predominate over any individual questions—specifically, (1) whether Recruiters' primary job duty relates to management policies or general business

---

[117]    *See supra* SOF § III.

operations; and (2) whether Recruiters customarily and regularly exercise discretion and independent judgment in executing their primary duties. These questions can be resolved through common evidence. For example, the second prong of the administrative exemption is negated by demonstrating that Recruiters are "production workers"—that is, they perform the very service that TEK sells to its customer - recruiting.  This is supported by numerous corporate documents and TEK's corporate witnesses all referring to Recruiters as "producers."[118] With respect to TEK's customers, Recruiters' primary job duty does not directly relate to the management or general business operations of TEK's customers. Recruiters do not have an active role in planning the business objectives, operating practices, or management policies of TEK or its customers; do not have the ability to bind TEK or its customers; and are not associated with departments traditionally related to the running or servicing of the business. Thus, the second prong of the administrative exemption—and, as a result, the entirety of the administrative exemption—can be rejected using common evidence. And the fact that this issue is potentially dispositive on the merits weighs heavily in favor of its predominance in the litigation.

As one court explained: "To defeat application of the administrative exemption, Plaintiffs need only demonstrate that one of the elements is unsatisfied. Thus, if the Court finds that disproving one element of the administrative exemption is susceptible to common proof, Plaintiffs will have satisfied the predominance requirement under Rule 23(b)." *Metrow v. Liberty Mut. Managed Care LLC*, No. 16 Civ. 1133, 2017 WL 4786093, at *10 (C.D. Cal. May 1, 2017) (cleaned up); *see also Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010).

The third prong of the administrative exemption is also negated by common evidence. For example, centralized corporate documents—which apply to all Recruiters—and TEK's Rule

---

[118]     *Supra* ns.19-20.

30(b)(6) testimony demonstrate that Recruiters merely screen and match job candidates to the job requirement determined by TEK's *customers*; are subject to significant supervision, including TEK monitoring Recruiters' weekly production quotas; TEK's clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them; and Recruiters do not represent TEK or its customers in handling complaints or resolving grievances.[119]

Courts routinely find that predominance has been satisfied in misclassification class actions where, as here, common evidence shows that the challenged policy is common to the classes as a whole and the proposed class members share similar *primary* job duties. *Rodriguez v. Peak Pressure Control, LLC*, No. 17 Civ. 0576, 2020 WL 3000415, at *16 (D.N.M. June 4, 2020); *Morris v. Alle Processing Corp.*, No. 08 Civ. 4874, 2013 WL 1880919, at *12 (E.D.N.Y. May 6, 2013) ("predominance is satisfied where, as here, the 'central issue' is whether defendants had a "uniform policy or practice" of denying wages for all hours worked, overtime wages, and spread of hours compensation."); *Damassia*, 250 F.R.D. at 160 ("there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies," like classifying all Recruiters as exempt from overtime, courts have "routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities."); *Goldman v. Radioshack Corp.*, No. 03 Civ. 0032, 2005 WL 1124172, at *4 (E.D. Pa. May 9, 2005) (finding predominance where the employer "is a large corporation with many standardized procedures governing the [employees'] position.").

The *Andreas-Moses v. Hartford Fire Ins. Co.* court found predominance in part because of the employer's uniform decision to uniformly classify the employees and this preempts an employer from arguing that the "exemption status can only be determined on individual assessment

---

[119]    SOF § III.

of the employee. [The employer] cannot have its cake and eat it, too." 326 F.R.D. 309, 317 (M.D. Fla. 2018).

TEK classifies all Recruiters as exempt, TEK's documents uniformly describe Recruiters' primary job duty as screening, and TEK requires all Recruiters to meet the same production quotas subject to a common supervision structure. That Recruiters' primary job duties are screening and matching, which is also reflected in TEK's own data - approximately 76.62% of recorded activities involved attempting to contact candidates, conducting intakes, and making calls. Courts find predominance based on a similar record as here. *See Avery,* 2024 WL 590364, at *5 ("Plaintiffs provide evidence indicating all Recruiters have the same primary job duties" and finding that: (1) whether Recruiters' duties directly relate to the management or general business operations of TEK or its customers; and (2) whether Recruiters exercise discretion and independent judgment over matters of significance was subject to common proof"); *Nelson*, 2015 WL 1778326, at *2.

### 3. The Common Questions Are More Substantial Than Questions Requiring Individualized Inquiry.

The common questions—that is, whether Recruiters are production workers and whether their job duties require discretion and independent judgment—are the *central* questions with respect to liability. Indeed, because of the conjunctive nature of the administrative exemption, each of these questions has the potential to be, and likely will be, dispositive as to liability. While TEK will undoubtably point to minor differences in Recruiters' execution of their job duties, any differences are insignificant compared to the Recruiters' common primary duty and will not defeat predominance. *Avery*, 2024 WL 590364, at *9 ("Variations in how TEK's Recruiters accomplish their primary job duty of screening candidates and finding matches for job requirements do not overcome Plaintiffs' evidence indicating all Recruiters' primary job duties can be determined through common proof.") (cleaned up); *Rivet*, 207 F. Supp. 3d at 432 ("the differences pointed out

by [employer] are largely immaterial to the ultimate determination of whether [employees] are exempt. Instead, those differences unremarkably demonstrate that [employees] were not exactly the same in every single way imaginable."). There can be no doubt that these common questions outweigh and predominate over any questions requiring individualized proof.

### B.    Common Questions of Law and Fact Predominate Over Plaintiff Dore's Washington Meal and Rest Break.

Plaintiffs' remaining claims flow from TEK's uniform misclassification of Recruiters and can also be resolved on a class-wide basis. *DeLuca v. Farmers Ins. Exch.*, No. 17 Civ. 00034, 2018 WL 1981393, at *11 (N.D. Cal. Feb. 27, 2018). Washington law places an affirmative obligation on employers to provide employees with rest and meal breaks, "ensure" those breaks are taken, and record and compensate for any missed breaks. *See Pellino v. Brink's, Inc.*, 164 Wn. App. 668, 688 (2011); *Chavez v. Our Lady of Lourdes Hosp. at Pasco*, 190 Wn.2d 507, 518 (2018); *Demetrio v. Sakuma Bros. Farms, Inc.*, 183 Wn.2d 649, 658 (2015) ("[E]mployers must affirmatively promote meaningful break time").[120] TEK regularly deprives Recruiters of meal and rest breaks, and TEK uniformly fails to pay them any premiums for the missed meal and rest breaks in violation of Washington law. Ex. 8 (Stipulation) at ¶¶ 1-4. TEK admits it did not ensure such breaks were taken and did not record any breaks. *Id*. TEK instructs Recruiters to take candidates out for lunch, depriving them of a meal break free from job obligations. SOF § VIII. TEK's aggressive quotas requires Recruiters to work through lunch and breaks during the day. *Id.*

Meal and rest break claims are well suited for class treatment where, like here, the employer has an unlawful policy because common issues predominate. *Chavez*, 190 Wn.2d at 519

---

[120]    The Washington Industrial Welfare Act, RCW 49.12, and its implementing regulation, WAC 296-126-092, require employers to provide 30-minute meal periods to their employees for work shifts greater than five hours in length.  The law also requires employers to provide 10-minute rest breaks for every four hours of work. *See* Wash. Admin. Code 296-126-092.

(Washington Supreme Court finding common issues predominate where "the dominant and overriding issue in this litigation is whether [employer] failed to ensure [employees] could take rest breaks and second meal periods and could record missed breaks"); *Carlson v. Home Depot USA Inc.*, No. 20 Civ. 1150, 2021 WL 4636858, at *7 (W.D. Wash. Oct. 7, 2021).

### C.    Common Questions of Law and Fact Predominate Over Plaintiff Richenberg's New York Wage Statement Claims.

New York Law requires that employers provide employees with a wage statement accompanying every payment of wages. NYLL § 195(3). For non-exempt employees, which is how Recruiters should lawfully be classified, employers must include "the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." *Id*. TEK did not include this information on Recruiters paystubs. Ex. 167 (Paystub); Ex. 8 (Stipulation) at ¶¶ 5-8. Courts often certify classes pursuing claims under the NYLL wage statement requirements. *See Canelas v. World Pizza, Inc.*, No. 14 Civ. 7748, 2017 WL 1233998, at *5-8 (S.D.N.Y. Mar. 31, 2017) (certifying a class on "whether Defendants in practice failed to provide employees with proper wage notices and statements.").

### D.    A Class Resolution is Superior.

"There is substantial overlap between the superiority and predominance requirements of Rule 23(b)(3). . . . Indeed, they have been described as the twin requirements of Rule 23(b)(3), which were both adopted to cover cases in which a class action would achieve economies of time, effort, and expense . . . without sacrificing procedural fairness." *Salvatora v. XTO Energy Inc.*, No. 19 Civ. 01097, 2023 WL 4137306, at *19 (W.D. Pa. June 2, 2023), *report and recommendation adopted sub nom.* 2023 WL 4135570 (W.D. Pa. June 22, 2023). In evaluating superiority, courts consider: (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or

against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). The superiority requirement is designed to ensure the "vindication of rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

The superiority requirement is satisfied here. "There is no indication that any other class members want to individually control this litigation." *Rood*, 2021 WL 3021978, at *5. Because Plaintiffs challenge TEK's uniform exemption policy and all Recruiters share the same primary job duty, "any individual lawsuit would likely proceed in the same fashion as a class action." *Butela*, 341 F.R.D. at 599. Courts in Pennsylvania have noted that "class trials in wage-and-hour actions . . . are common, and the procedures for administering such trials are well established." *Rood*, 2021 WL 3021978, at *5. Finally, where, as is the case here, the proposed classes include current employees, a class action is also superior because it allows employees to pursue their claims without fear of retaliation. *Nelson*, 2015 WL 1778326, at *10.

## **CONCLUSION**

The Court should certify the Pennsylvania, New York, Washington, and Massachusetts classes, and appoint Plaintiffs and their counsel to represent the class, so that it can adjudicate in one action the lawfulness of TEK's policy of misclassifying Recruiters as exempt from overtime.

Dated: August 29, 2024                    Respectfully submitted,

*/s/* Sally J. Abrahamson

Sally J. Abrahamson* (DC 999058)
sabrahamson@flsalaw.com
**Werman Salas P.C.**
335 18th Pl NE
Washington, D.C. 20002
Phone No.: (202) 830-2016
Fax No.: (312) 419-1025

Douglas M. Werman * (IL 6204740)
dwerman@flsalaw.com
Maureen A. Salas* (IL 6289000)
msalas@flsalaw.com
Anne Kramer* (MA 697435)
akramer@flsalaw.com
Joseph E. Salvi* (IL 6336691)
jsalvi@flsalaw.com
**Werman Salas P.C.**
77 West Washington Street, Ste 1402
Chicago, Illinois 60602
Phone No.: (312) 419-1008
Fax No.: (312) 419-1025

Sarah R. Schalman-Bergen (PA 206211)
ssb@llrlaw.com
Krysten Connon* (PA 314190)
kconnon@llrlaw.com
Olena Savytska* (MA 693324)
osavytska@llrlaw.com
**Lichten & Liss-Riordan, P.C.**
729 Boylston Street, Suite 2000,
Boston, MA 02116
Phone No.: (617) 994-5800
Fax No.: (617) 994-5801

*Attorneys for Plaintiffs and the FLSA Collective and Proposed Rule 23 Classes*

*\*Pro hac vice*