**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

| | |
|---|---|
| MICHAEL THOMAS, MARIA CONYERS-JORDAN, AUSTIN SHERMAN, LYNDA ALEXANDRA MAHER, AVA DORE, RACHEL RICHENBERG, and EMILY BURKE, on behalf of themselves and others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>TEKSYSTEMS, INC.,<br><br>                Defendant. | Civil Action No.   2:21-cv-00460-WSS<br><br>CLASS AND COLLECTIVE ACTION |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Andrew L. Scroggins
Noah A. Finkel
James P. Nasiri
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
ascroggins@seyfarth.com
nfinkel@seyfarth.com

Brian P. Long (*pro hac vice*)
SEYFARTH SHAW LLP
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 270-9600
Facsimile: (213) 270-9601
bplong@seyfarth.com

*Attorneys for Defendant
TEKsystems, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

II.     RELEVANT FACTS ..........................................................................................................4

      A.      TEK's Business And The Recruiter Role ............................................................. 4

      B.      Recruiter Is Not An Entry-Level Role; It Is A Promotion, The Time To
             Attain It Varies Significantly Among Putative Class Members, And There
             Are Significant Differences In Tenure ................................................................. 5

      C.      TEK Expects Recruiters To Exercise Independent Judgment And
             Discretion In The Performance Of Their Highly Specialized Job Duties
             And Testimony From Recruiters Bears This Out .................................................. 6

      D.      Holding Recruiters To Performance Metrics Does Not Subtract From
             Their Use of Independent Judgment and Discretion.............................................. 9

      E.      Recruiters Exercise Varying Amounts of Discretion and Independent
             Judgment ............................................................................................................. 11

            1.      There are significant differences in how Recruiters in the putative
                  class describe identifying and sourcing candidates ................................. 12

            2.      There are significant differences in how Recruiters in the putative
                  class describe using TEK-provided screening tools and checklists.......... 13

            3.      There are significant differences in whether and how often
                  Recruiters in the putative class engaged with customers......................... 13

            4.      There are significant differences in whether and how Recruiters in
                  the putative class negotiate with candidates ............................................. 14

            5.      There are significant differences in Recruiters' level of
                  engagement with candidates throughout the life of the recruiting
                  process and after placement ..................................................................... 14

            6.      There are significant differences in whether AMs routinely
                  accepted Recruiter recommendations ...................................................... 14

            7.      The training plaintiffs describe is for non-exempt employees to
                  learn the skills to be exempt..................................................................... 15

            8.      AverySupervision Varies From Recruiter to Recruiter ........................... 15

            9.      Recorded Recruiter Activities Do Not Capture The Amount Of
                  Time Spent On A Particular Task Or Whether The Recruiter Is
                  Exercising Discretion And Judgment ....................................................... 16

III.    LEGAL ARGUMENT......................................................................................................16

A.      Avery is Neither Controlling Nor Persuasive. ....................................... 17

B.      Plaintiffs Cannot Meet the Requirements of Rule 23(a)...................................... 19

        1.      Plaintiffs Have Not Shown that the Classes Are So Numerous that
                Joinder Is Impracticable, as Required by Rule 23(a)(1). .......................... 19

        2.      Plaintiffs Have Not Shown that there are Questions and Facts
                Common to the Class, as Required by Rule 23(a)(2). ............................ 23

C.      Plaintiffs Cannot Meet the Requirements of Rule 23(b) ...................................... 26

        1.      Plaintiffs Cannot Show that Common Questions Predominate Over
                Individual Questions. ................................................................................. 26

                a.      Plaintiffs are wrong that common evidence shows
                        Recruiters' primary job duty is to "screen" and match
                        candidates to requirements determined by TEK's
                        customers. ......................................................................................26

                b.      Plaintiffs are wrong that common evidence shows that there
                        are standardized templates and other tools TEK requires all
                        Recruiters to screen and match. ....................................................28

                c.      Plaintiffs are wrong that common evidence shows
                        standardized supervision and hierarchy. .......................................28

                d.      Plaintiffs are wrong that common evidence shows uniform
                        production metrics that TEK utilizes to evaluate Recruiters
                        on a weekly basis. .........................................................................29

                e.      Plaintiffs are wrong that common evidence can answer
                        whether Recruiters' primary job duty relates to
                        management policies or general business operations of
                        TEK or its clients. .........................................................................30

                f.      Some of Plaintiffs "common evidence" is irrelevant to
                        Recruiter's job duties. ...................................................................30

                g.      Plaintiffs are wrong that common evidence can answer
                        whether Recruiters customarily and regularly exercise
                        discretion and independent judgment in executing their
                        primary duties. ..............................................................................31

        2.      Whether Recruiters meet TEK's reasonable expectations raises
                individualized issues ................................................................................. 32

        3.      Plaintiffs' and their Declarant's testimony have limited evidentiary
                value ........................................................................................................... 33

        4.      Other unique issues show that common issues do not predominate. ........ 33

a.      Some putative class members are subject to agreements that require them to pursue any claims in arbitration and on an individual basis. ...............................................................................33

b.      Some putative class members are subject to the individualized defense that state law does not have extraterritorial effect as to their claims. ........................................34

c.      Some putative class members in Massachusetts and New York are subject to the defense that they satisfy the highly compensated employee exemption. ................................35

5.      Plaintiffs Cannot Show that a Class Action Is Superior to Other Available Methods. ...................................................................................... 36

D.      Adjudicating Plaintiffs' Claims On A Class Basis Would Not be Manageable ........................................................................................... 38

IV.      CONCLUSION.......................................................................................................39

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altnor v. Preferred Freezer Services, Inc.*,
  197 F. Supp. 3d 746 (W.D. Pa. 2016) ....................................................................17

*Anderson v. Weinert Enterprises, Inc.*,
  986 F.3d 773 (7th Cir. 2021) ........................................................................19, 20

*Avery v. TEKsystems, Inc.*,
  No. 22 Civ. 02733, 2024 WL 590364 (N.D. Cal. Feb. 13, 2024)..............................17, 18, 21

*Bostain v. Food Exp., Inc.*,
  153 P.3d 846, 159 Wash.2d 700 (Wash. 2007) ....................................................35

*Comcast v. Behrend*,
  133 S.Ct. 1426 (2012) ..............................................................................39

*Crowe v. Examworks, Inc.*,
  136 F.Supp. 3d (D. Mass. 2015) ....................................................................36

*Damassia v. Duane Reade, Inc.*,
  250 F.R.D. 152 (S.D.N.Y. 2008) ....................................................................24

*Dow v. Casale*,
  83 Mass. App. Ct. 751 (2013) ......................................................................34

*Estrada v. Maguire Ins. Agency, Inc.*,
  No. 12-604, 2014 U.S. Dist. LEXIS 25785 (E.D. Pa. Feb. 28, 2014) ....................................33

*Ferreras v. American Airlines, Inc.*,
  946 F.3d 178 (3rd Cir. 2019) ....................................................................2, 23, 26

*Fischer v. Fed. Express Corp.*,
  42 F.4th 366 (3d Cir. 2022) ........................................................................20

*Gonyou v. Tri–Wire Eng. Solutions, Inc.*,
  717 F.Sup.2d 152 (D.Mass. 2010) ..................................................................34

*Harnisch v. Widener Univ. Sch. Of Law*,
  833 F.3d 296 (3rd 2016.) ..........................................................................26

*Helix Energy Solutions Group, Inc. v. Hewitt*,
  598 U.S. 39 (2023) ................................................................................36

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
No. 98-cv-1241, 1999 WL 554591 (E.D. Pa. June 30, 1999)................................................23

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3rd Cir. 2008) ..................................................................................16, 17, 18

*Jackson v. Bloomberg, L.P.*,
298 F.R.D. 152 (S.D.N.Y. 2014) ........................................................................................36

*Knickerbocker v. Ada Cty.*,
Idaho, 2006 U.S. Dist. LEXIS 39069 (D. Idaho June 12, 2006) ...........................................37

*Leuthold v. Destination America, Inc.*,
224 F.RD. 462, 469 (N.D. Cal. 2004)..................................................................................37

*Magnuson v. Newman*,
2013 WL 5380387 (S.D.N.Y. 2013).....................................................................................35

*Marlo v. United Parcel Serv., Inc.*,
639 F.3d 942 (9th Cir. 2011) ..............................................................................................33

*McLaughlin v. Liberty Mutual Ins. Co.*,
224 F.R.D. 304 (D. Mass. 2004)..........................................................................................22

*Mekhitarian v. Deloitte & Touche (ICS), LLC*,
2009 WL 6057248 (C.D. Cal. 2009).....................................................................................28

*Metrow v. Liberty Mut. Managed Case LLC*,
2017 U.S. Dist. LEXIS 73656 (C.D. Cal. May 1, 2017) .................................................28, 29

*Muecke v. A-Reliable Auto Parts & Wreckers, Inc.*,
2002 U.S. Dist. LEXIS 11917 (N.D. Ill. June 21, 2002) ........................................................37

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3rd Cir. 2001) ..............................................................................................26

*Pedroza*,
2013 WL 1490667 ..............................................................................................................33

*Perez v. Express Scripts, Inc.*,
2024 WL 957978 (3rd Cir. 2024) .........................................................................................36

*Perry v. Randstad General Partner (US) LLC*,
876 F.3d 191 (6th Cir. 2017) ..............................................................................................24

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)............................................................................................................34

v

*Prickett v. DeKalb Cnty.*,
  349 F.3d 1294 (11th Cir. 2003) ......................................................................21

*Reinig v. RBS Citizens, N.A.*,
  912 F.3d 115 (3rd Cir. 2018) ....................................................................2, 23

*Smith v. Gov't Employees Ins. Co.*,
  590 F.3d 886 (D.C. Cir. 2010) ......................................................................28

*Taylor v. Rodale, Inc.*,
  2004 WL 1196145 (E.D. Pa. 2004) ...............................................................35

*Viscito v. Nat'l Plan. Corp.*,
  34 F.4th 78 (1st Cir. 2022) ............................................................................35

*Wal-Mart Stores Inc. v. Dukes*,
  564 U.S. 338 (2011) ...............................................................16, 23, 26, 33

*Zelasko-Barrett v. Brayton-Purcell, LLP*,
  198 Cal. App. 4th 582 (2011) ........................................................................28

**Statutes**

29 U.S.C. § 216(b) ...............................................................................19, 38

Fair Labor Standards Act ..................................................................... *passim*

Massachusetts Overtime Law, M.G.L. c. 151, §1A ...........................................1

Massachusetts Wage Act ...........................................................................34, 35

Pa. Stat. § 333.101 ....................................................................................35

Pa. Stat. § 1921(a) ....................................................................................35

Pa. Stat. § 1921(b) ....................................................................................35

Pennsylvania Human Relations Act ...................................................................35

Pennsylvania Wage Act ..................................................................................35

**Other Authorities**

29 C.F.R. § 541.203(e) ................................................................................27

12 NYCRR § 142-2.14 ...................................................................................36

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 ...............................................1

Rule 23 .................................................................................................... *passim*

Rule 23(a) ............................................................................................16, 18, 19, 26

Rule 23(a)(1) ...............................................................................................19, 22

Rule 23(a)(2) ...............................................................................................23, 26

Rule 23(a)(a)(2) ..................................................................................................23

Rule 23(b) ........................................................................................... *passim*

Rule 23(b)(3) ....................................................................................... *passim*

313796685v.4

Defendant TEKsystems, Inc. ("TEK") states as follows for its Response in Opposition to Plaintiffs' Motion for Class Certification, ECF No. 145.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs move to certify four state law classes comprised of individuals who have worked for TEK in the job title "Recruiter." They assert that they should not have been classified as overtime exempt under the state laws of Massachusetts, New York, Pennsylvania, and Washington because none of them satisfy the administrative exemption.[1] The New York class purports to include additional claims related to pay stubs, and the Washington class to include additional claims related to meal and rest breaks.[2] Together, the proposed classes have approximately 1,040 individuals who have worked as Recruiters during the applicable state law statutory periods.

This misclassification case is unsuitable for class treatment. While Plaintiffs' and their declarants describe their versions of their job duties as Recruiters, those accounts differ greatly from TEK's reasonable expectations for those performing the job, and the testimony of other members of the putative classes, and people who are familiar with the work that Recruiters do. Indeed, the differing accounts are starkly different. While the Court need not resolve the merits of Plaintiffs' claims at this stage, the stark conflicts among these accounts show that Plaintiffs' experiences are not representative of those in the putative class. Instead, Plaintiffs' claims call for

---

[1] Plaintiffs do not address the highly compensated employee exemption, which is available to TEK with respect to the Massachusetts and New York classes. *See* Massachusetts Overtime Law, M.G.L. c. 151, §1A and its regulations at 455 C.M.R. §2.02(3), which adopt the relevant portion of the federal regulations arising from the Fair Labor Standards Act ("FLSA"); 13. N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (incorporating FLSA regulations concerning exemptions, including the highly compensated employee exemption).

[2] Specifically, Richenberg asks to represent a class under New York state law from "January 19, 2016 to the final date of judgment" related to overtime and paystubs; Thomas and Conyers-Jordan a class under Pennsylvania state law from "April 9, 2018 to the final date of judgment" related to overtime; Burke a class under Massachusetts law from "January 19, 2019 to the final date of judgment" for overtime; and Dore a class under Washington law from "January 19, 2019 to the final date of judgment" for overtime and meal and rest breaks. (ECF No. 145 at 22-23).

a fact-intensive analysis of TEK's reasonable expectations and what each particular Plaintiff *actually did* (day-to-day job duties and how much time they spent on them, degrees of supervision, extent and type of contact with TEK's clients, and the level of discretion and judgment they exercised). While Plaintiffs' claims may proceed individually, this case should not be certified as a class action. This is consistent with decisions involving the same exemptions as those at issue in this case and on similar facts by courts across the country, including in this Circuit. *E.g., Ferreras v. American Airlines, Inc.*, 946 F.3d 178, 185 (3rd Cir. 2019) (reversing grant of class certification on wage claims); *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 129 (3rd Cir. 2018) (same).

In their motion, Plaintiffs focus the bulk of their argument on their claim that Recruiters universally do not exercise discretion and independent judgment (required by the third prong of the administrative exemption), claiming that all putative class members are "entry-level Recruiters" who perform uniform "mundane tasks" and "work in a producing role." (Memo at 1, 4-5). As told by Plaintiffs and their declarants, Recruiters robotically relied on checklists, detailed instructions and guidance, internal databases, and external sources, as well as automated "search and match technology" to locate candidates who met minimum qualifications and blindly sent them to individuals in the role of Account Manager ("AM") without any additional screening and or analysis to judge where a candidate would indeed be suited for the job at issue. Plaintiffs and their declarants also testify that they never had any role in interacting with TEK's customers at any point during the recruiting process, always deferring to others in the role of AM. Plaintiffs and their declarants liken their work to that of a personnel clerk who does no more than check resumes and pass along any that meet the minimum qualifications for the role.

These statements are directly contradicted by other evidence, and it is this vast difference in the facts which show why Plaintiffs cannot meet the prerequisites of Rule 23. Other Recruiters

2

in the putative class describe, *consistent* with the Company's reasonable expectations of how Recruiters *should* perform their job, that they regularly use their discretion and judgment to provide their market expertise and help clients to define the roles that to be filled with talented consultants to execute the client projects to solve their business problems.

Unlike the Plaintiffs, these Recruiters devise a strategy to find those candidates, thoroughly validate a candidate's skills and experience, evaluate a candidate's fit for client and role, negotiate with the candidate over terms of employment, then make recommendations as to who the client should engage for the project. These Recruiters describe becoming subject matter experts in the labor market for specialized and highly technical roles, specific industries, and/or clients, so that they can provide expert counsel to TEK's clients and TEK's AMs.

Unlike the Plaintiffs, these Recruiters attest that they frequently interacted directly with TEK's customers in order to share that specialized knowledge, including helping to craft the requirements a customer may identify to be well suited to fill a desired position and opining at the outset of the process on the availability of talent for a certain skill set in the local or national job market and the market rate for those skills to ensure competitive pay.

Unlike Plaintiffs, these Recruiters describe how their efforts contribute to solving the business problems for which TEK's clients have asked for help. And unlike Plaintiffs, Recruiters testify this is all done with little supervision or oversight.

Ultimately, the evidence in this case shows that Recruiters in the putative classes demonstrate great variety in the duties they perform, the methods they use to perform those duties, the discretion and judgment they exercise, and the supervision to which they are subjected. There are simply no common facts or theories that can lead to the resolution of Plaintiffs' claims and certification must be denied.

## II.    RELEVANT FACTS

### A.    TEK's Business And The Recruiter Role

TEK is a global business and technology firm that assists its customers in achieving their business transformation, customer experience, and business goals.[3] IT talent services are the core of TEK's business, and they involve staff augmentation, which means placing workers with specific skills on assignment at customer companies for a certain period of time.[4] Capacity solutions are another type of service that TEK offers. This involves assembling teams of workers for customers who need a larger or more specialized workforce for a project.[5] For example, TEK might assemble a team to take on an online retailer's project to streamline delivery to customers' homes faster and more efficiently, by increasing the volume of products carried in each delivery vehicle, or improve the client's customer experience by enabling real-time tracking of shipments. Total management services are the most advanced and comprehensive type of service that TEK offers. Total management involves outsourcing and managing an entire IT function or outcome for a customer.[6] For example, TEK might build, design, and maintain a website for a customer who does not have the internal resources or expertise to do so.[7]

At the heart of each of these services is the Recruiter. Recruiters start from the client's requirements for each of the business purposes outlined above, which can be complex and varied,

---

[3] Declaration of Andrew Scroggins ("Scroggins Decl.") **Ex. N** (references to "Ex" infra refer to the Scroggins Decl., to which pertinent deposition testimony, declarations, and documents are attached), Deposition of TEK's Senior Vice President of Talent Delivery Garrett Haycock ("Haycock Dep.") 25:6-26:6, 134:6-13. This is more expansive than Plaintiffs' overly simplistic characterization of TEK as an "IT staffing company." (Memo at 2.) As Haycock explained, TEK's business includes staff augmentation, i.e., placing workers with specific skills on assignment at customer companies to perform needed services for a certain period of time; capacity solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. Haycock Dep. 25:22-34:18, 73:16-77:7.
[4] **Ex. N**, Haycock Dep. 25:1-27:10; **Ex. H**, Fahey Decl. ¶ 8.
[5] **Ex. H**, Fahey Decl. ¶ 11.
[6] **Ex. N**, Haycock Dep. p. 25:11-26:22.
[7] *Id*. at 73:16-77:7

and find and validate the qualifications of the best suited candidates to perform the work.[8] Recruiters often spend weeks or months researching (and then specializing in) certain IT roles because a Recruiter must have an intimate enough understanding about a role to validate that a candidate has the skills TEK's client is seeking, not just that they have listed on a resume.[9] At its core, Recruiters function to locate the absolute best talent in the demanding and competitive IT marketplace and match those professionals to important roles that serve a variety of purposes for TEK's customers, so that TEK's customers do not have to.[10]

**B.    Recruiter Is Not An Entry-Level Role; It Is A Promotion, The Time To Attain It Varies Significantly Among Putative Class Members, And There Are Significant Differences In Tenure**

While Plaintiffs claims that the Recruiter position is an entry-level role, TEK does not hire people directly into the role. To the contrary, in order to become a Recruiter, one must first be a Recruiter Trainee, complete a 13 week training program, and then demonstrate their ability to independently perform the job duties of the salaried exempt Recruiter role.[11] Many Recruiter Trainees never satisfy these requirements.[12] Some Recruiter Trainees take a significant amount of time to do so—up to a year or more.

There is significant variance among putative class members as to the amount of time worked in the non-exempt Recruiter Trainee role prior to being promoted to the role of an exempt Recruiter. Plaintiffs correctly allege that there is an established 13-week training period for Recruiter Trainees, but to be promoted to Recruiter requires satisfying certain performance benchmarks after those 13 weeks.[13] The time periods for putative class members to be promoted

---

[8] **Ex. E**, Bohen Decl. ¶ 10-11; **Ex. C**, Chong Decl. ¶ 14, 18-28.
[9] **Ex. N**, Haycock Dep. 27:2-29:8; **Ex. J**, Fronzaglia Decl. ¶¶4-8; **Ex. C**, Chong Decl. ¶ 12; **Ex. A**, Fink Decl. ¶ 7.
[10] **Ex. N**, Haycock Dep. at 25:1-27:10, 60:22-61:16; **Ex. H**, Fahey Decl. ¶ 11-13;
[11] **Ex. BB**, Bury Dep. 22:19-23:20; **Ex. U**, Thomas Dep. 65:6-21.
[12] Scroggins Decl. ¶ 65.
[13] **Ex. N**, Haycock Dep. p. 104:20-105:6.

out of the Recruiter Trainee role ranged from more than a year to just a few short months.[14]

Some members of the putative class worked in other roles between the time they were Recruiter Trainees and when they became Recruiter.[15] Unlike Plaintiffs, other members of the putative class worked in the role of Recruiter, took another role such as AM, Recruiting Lead, and Specialization Lead, among others, then returned to the role of Recruiter.[16] Christian Mosquera, for example, is in the putative class by virtue of working as a Recruiter from January 1, 2020 until June 11, 2020.[17] However, he had nearly 10 years of prior experience in recruiting roles at TEK before this time period, including four years as a Lead.[18] This is a vastly different picture than painted by Plaintiffs and shows that their experiences do not represent all.

### C.    TEK Expects Recruiters To Exercise Independent Judgment And Discretion In The Performance Of Their Highly Specialized Job Duties And Testimony From Recruiters Bears This Out

While Plaintiffs' may testify to how they claim to have performed individually in the role of Recruiter, they do not define the Company's expectations for how the role is to be performed. The basic expectations for Recruiters are set out in TEK's job description for the role and demand far more than simple "personnel clerk" duties:

- Recruit top IT talent and match their career goals with our clients' hiring needs
- Develop recruiting strategies to identify qualified candidates by using specialized networking tools
- Evaluate the strengths and weaknesses of candidates through our screening process
- Negotiate unique compensation packages (wages, benefits, etc.) to attract and close candidates
- Communicate details of new assignments and manage contract employees while on assignment

---

[14] Scroggins Decl. ¶ 70, **Ex. MMM**.
[15] Scroggins Decl. ¶ 72, **Ex. OOO**.
[16] Scroggins Decl. ¶ 71, **Ex. NNN**.
[17] **Ex. D**, Mosquera Decl. ¶ 4.
[18] *Id. See also* **Ex. K**, Stefanie Marshal Decl. ¶¶ 2-4.

- Partner with TEKsystems sales team to identify top accounts and target skill sets
- Maintain relationships with Technical Professionals to gain industry knowledge and obtain referrals

ECF No. 143-68, Plaintiffs Ex. 69 (Recruiter Job Description).[19] In order to perform these duties, Recruiters need to understand the customer, the business problem the customer has engaged TEK to solve, the skills and experience needed to solve those business problems, the customer's culture and environment, in addition to understanding the labor market for people who possess those attributes, where to find those people, how to validate their experience or ability to apply those attributes to the client's project, how to persuade candidates to provide their services to TEK's customer, and how to present the person to the customer in a manner that makes the match clear.[20]

Contrary to the Company's reasonable expectations, Plaintiffs and their declarants describe the Recruiter position as solely an entry-level position and describe their job duties in robotic and uniform ways. But other Recruiters in the putative class describe their job duties as a Recruiter in drastically different ways, demonstrating why this case should not be certified as a class action.

Consistent with the Company's reasonable expectations, these Recruiters described the Recruiting role as requiring deep knowledge and skill in recruiting as well as specific technical knowledge about the highly-paid IT roles they recruit for. These Recruiters explain that they often had a more intimate understanding of the position than their AM counterparts and even TEK's client's internal staff. As explained herein, these Recruiters describe using their knowledge and skills to both: (1) educate TEK's clients at the outset of the recruitment process about the availability of talent in the local, regional, or national job market; and (2) make decisions and

---

[19] *See also* **Ex. J**, Fronzaglia Decl. ¶¶ 13-15.
[20] **Ex. N**, Haycock Dep. 27:14-30:2; *id.* 50:1-51:18 (Recruiters support AMs and others at TEK; they "are the knowledge experts and understand more about a particular skill specialty than sometimes. . .way more than the customer would themselves"); **Ex. R**, Fronzaglio Dep. 115:7-16, 173:12-20 (Recruiters use different styles to approach candidates, persuade them to work with TEK; some "talk about their area of expertise or their specialization."); **Ex. A**, Fink Decl. ¶ 12.

judgments about which candidates are best qualified to meet TEK's clients' needs for important projects. These Recruiters include:

- Corey Fink in PA has 9 years with TEK, including 3 as a Recruiter, and has worked in a local TEK office and a Delivery Center.

- Matt Bohen in PA has 12 years TEK, including more than 4 as a Senior Recruiter, Contracts Manager, and AM *before* becoming a Recruiter.

- Christian Mosquera in NY has been with TEK for 12 years. He spent 10 years in other recruiting-related roles before becoming a Recruiter and is now a Recruiter – 10x, meaning he has been a contest winner (achieving his personal goals) at least 10 times.

- Stefanie Marsall in PA joined TEK with 5 years of prior experience, and has been with TEK for 9 years. She was in a Recruiter role for about 1 year, took a leadership role for about 3 years, then returned to Recruiter for 2 more years.

- Michael Chong in WA has 4 years of experience with TEK, including 1 year as a Recruiter.

- Jason Edds in WA has 10 years with TEK, starting with 2 years as an Assigned Recruiter, followed by about 8 years as a Recruiter. He is based in Seattle but aligned to a Delivery Center in Phoenix.

- Victoria Payonk in NY had 1 year of prior experience before joining TEK, where she has now been for 8 years, including more than 4 as a Recruiter.

- Colleen Rice in NY has been with TEK for 3 years, including 6 months as a Recruiter

- Nathan Warren in WA has been with TEK for 2 years, most of it as a Recruiter.[21]

Moreover, while Plaintiffs seek to convince the Court that Recruiters strictly report and take all their direction about the performance of their job duties from AMs, these Recruiters describe the role working *with* AMs (if they worked with them at all[22]) as a non-hierarchical *partnership*. Recruiters and AMs have different focuses: Recruiters focus on recruiting new talent, while AMs focus on obtain new clients with recruiting needs.[23]

---

[21] **Ex. A**, Fink Decl. ¶¶ 1-6; **Ex. B**, Edds Decl. ¶¶ 1-6; **Ex. C**, Chong Decl. ¶¶ 1-6; **Ex. D**, Mosquera Decl. ¶¶ 1-4; **Ex. E**, Bohen Decl. ¶¶ 1-4; **Ex. F**, Rice Decl. ¶¶ 1-5; **Ex. G**, Warren Decl. ¶¶ 1, 7; **Ex. K**, Marshall Decl. ¶¶ 1-7; **Ex. L**, Payonk Decl. ¶¶ 1-6; **Ex. M**, Walther Decl. ¶¶ 1-2.
[22] As explained in Section  below, many Recruiters have never reported to AMs.
[23] **Ex. C**, Chong Decl. ¶ 8 (spoke to Lead only as needed, less than daily); **Ex. A**, Fink Decl. ¶ 11, 26, 34 (partnership).

**D.    Holding Recruiters To Performance Metrics Does Not Subtract From Their Use of Independent Judgment and Discretion**

Plaintiffs allege that TEK expects Recruiters to meet results-based metrics around the number of candidates successfully placed on assignment and the profitability ("spread") earned from those candidates. TEK also measures various activity metrics that it has determined to be correlated to success in placements on assignment, such as number of calls and outreaches to potential candidates. Plaintiffs and their declarants go to great lengths to show that holding Recruiters to such task and results-based performance metrics somehow results in an inescapable conclusion that Recruiters do not exercise independent judgment and discretion in the performance of their primary job duties. It does not. And although Plaintiffs claim they exercised none, other putative class members had a completely different experience working for TEK as a Recruiter.[24] There is thus significant variance in whether putative class members used independent judgment and discretion in achieving such metrics, so class certification is inappropriate.

In engaging in activities designed to meet metrics and ultimately place individuals into open positions, Recruiters are expected to (and many members of the putative class do) use their knowledge, experience, discretion, and judgment when identifying, screening, and evaluating potential candidates. [25] For example and as described more in below, the Company expects Recruiters to choose which form of outreach suits their personal style and results in their success (*i.e.*, some recruiters excel at "cold calling," while others prefer "warm calling" individuals they already know something about through a pipeline of established references or prior communications, and still others capitalize on well-crafted written communications via text, email

---

[24] **Ex. D**, Mosquera Decl. ¶ 22; **Ex. B**, Edds Decl. ¶ 30; **Ex. A**, Fink Decl. ¶ 36; **Ex. L**, Payonk Decl. ¶¶ 24-26.
[25] **Ex. N**, Haycock Dep. 32:10-13; **Ex. O**, Doyle Dep. 78:10-79:14; **Ex. EE**, Donahue Dep. 84:20-85:1; **Ex. BB**, Bury Dep. 88:1-88:18.

or a third-party website like LinkedIn to get candidates' attention).[26] Ultimately, TEK expects candidates to engage in activities to help them meet their individual metrics and reach the end result, *i.e.*, successfully placing a candidate, but TEK understands and expects the means by which different recruiters get there to vary considerably. The Recruiters are also expected to negotiate pay rates and other terms and conditions of employment with candidates as well as customers.[27] The complexities of the Recruiters' job means that while TEK tracked metrics for Recruiters, it expected variation on how Recruiters accomplished their jobs.[28] And, as further explained in Section E below, declarations from certain putative class members show this this variance.

As TEK's Senior Vice President of Talent Delivery describes its expectations:

Their job [Recruiter ] is to understand the customer, the customer's need, the customer's project, the outcomes that the customer is looking to achieve.

They need to understand the customer's environment, what type of culture do they have, and also understanding what are the skills necessary for them to be able to assist the customer in achieving the outcomes that they're looking for.

They also have to understand the nuances and details associated with the contractual arrangements associated with that particular customer. . . . they have to know what are the details of what they can offer a consultant associated with the hourly bill rate that we might be billing a customer as well as any parameters or necessary background investigations or screening that would be necessary[.]

[T]hey will then have to understand the skills, goals, and interests of the consultant to be able to make a very complex match between this person [who] has not only the skills, the technical skills, they have the level of experience associated with those skills.

At times maybe need to understand the industry. . . Sometimes it doesn't matter; sometimes it does.

[Recruiters] have to manage all of these complexities associated with the assignment and the skills to be able to make a match to be able to associate that consultant, not waste a customer's time sending over people that are not qualified for that requirement, and ensuring that that customer ultimately is satisfied.

---

[26] *See also* **Ex. LL, MM, and NN** (Job Descriptions) (Recruiters "[d]evelop recruiting strategies to identify qualified candidates" and "[e]valuate the strengths and weaknesses of candidates[.]"); **Ex. R**, Fronzaglio Dep. 135:8-138:18 ("Recruiters are very creative in finding new ways to connect with candidates" and may connect with potential talent in a myriad of ways, choosing the way that best works for them); **Ex. P**, Faith Johnson First Dep. 202:12-21.

[27] **Ex. N**, Haycock Dep. p. 140:23-142:10

[28] **Ex. N**, Haycock Dep. p. 156:1-157:11, 153:4-18 ("Because the complexity of recruiting has increased to the degree that we needed to have a customized solution that allowed for the nuances and differences between individual recruiters.")

> Because they placed the person. Then they maintain the person; meaning, they are getting feedback from the customer, providing that feedback to the consultant[.]
>
> And then ultimately the recruiter is responsible for continuing to work with that consultant . . . [T]heir responsibility is to help that person find another job once their current assignment comes to conclusion.[29]

Consistent with that expectation. TEK expects Recruiters to provide their labor market expertise to clients through direct interactions.[30] Recruiters in the putative class testified that they do exactly that.

TEK expects that Recruiters operate with little supervision, and in partnership with AMs typically to "touch base at the beginning and the end of the day to discuss the status and challenges they are facing their efforts, but otherwise they work independently." **Ex. E**, Bohen Decl. ¶ 16. And, as explained below, many putative class members did exactly that.

## E.    Recruiters Exercise Varying Amounts of Discretion and Independent Judgment

TEK strongly disputes Plaintiffs' claim that they did absolutely nothing but screen and match candidates in mechanical ways that involve no independent judgment or discretion, but even taking that testimony as true, the vast difference in how other putative class members describe their job duties shows that this case is not suited for class treatment. There are significant variations in the roles and duties of Recruiters based on the industry they support and the roles they typically recruit to fill.[31] Recruiters in the putative class describe different levelz of interaction with a customer, personal strategies for finding candidates and deciding whether they are well-matched to a position, input on which candidates are presented to the customer for the job being fulfilled,

---

[29] **Ex. N**, Haycock Dep. p. 27:14-30:2.
[30] **Ex. J**, Fronzaglio Decl. ¶¶ 5-8.
[31] In addition, remote work that became commonplace in response to the COVID-19 pandemic changed many practices, as did business-driven changes to job duties. Ex. A, Fink Decl. ¶ 12-13, 15, 27; Ex. C, Chong Decl. ¶ 14, 28, 30; Ex. D, Mosquera Decl. ¶ 9-12.

preparing candidates to make the strongest presentation of their credentials to the hiring manager, and approach to negotiating pay and other terms and conditions of employment.

Furthermore, the level of supervision of Recruiters varies, based on both the customer being served and the position being filled, and the nature of the TEK team involved.[32] Finally, the impact of the Recruiters' duties and decisions on TEK and its customers varies greatly. The jobs TEK Recruiters fill are for skilled and valuable IT employees, often earning $90-$120 per hour, working in roles that may range from working as one team member on a team of individuals performing IT support services for a customer to providing highly technical and mission critical IT skills that are necessary to creating, improving, or maintaining the customer's core product.

Recruiters' use of independent judgment and discretion varied based on numerous factors, showing that this case cannot be decided in a single stroke, as Plaintiff' claim.

1. **There are significant differences in how Recruiters in the putative class describe identifying and sourcing candidates**

Recruiters devise their own sourcing strategies to find candidates in their own ways. Plaintiffs' declarants testify, in identical language, that they robotically searched Connected (a TEK internal database) or LinkedIn and looked for people whose resumes shared keywords with the requisition. Yet, many Recruiters testify that is simply not how they performed their jobs, nor was it the expectation that they do so. Indeed, TEK suggests to Recruiter Trainees to start sourcing from people they already have relationships with, and people who those contacts may refer.[33]

---

[32] Plaintiffs and their declarants each assert that they worked under the "close supervision" of AMs. However, many Recruiters have never been supervised by AMs, or only for limited periods of time, and have been supervised only by other Recruiters in Recruiting Lead or Specialization Lead roles. Similarly, some Recruiters worked in offices overseen by a Director of Business Operations ("DBO") while others worked in Delivery Centers wherein no DBOs worked.. Since TEK reorganized and moved to its Talent Delivery model, it has become uncommon for DBOs to supervise Recruiters at all. It is also common for a Recruiter to become a Recruiting Lead, then decide after a period of time to return to the role of Recruiter.

[33] Plaintiff Michael Thomas testified that he actually developed search strings on his own and only asked his AM for assistance on an as-needed basis. **Ex. U**, Thomas Dep. 127:16-18; Maher testified that she reached out to a cybersecurity college to see if the college would be interested in

Those Recruiters who use Connected or LinkedIn did so in considered and strategic ways.

### 2. There are significant differences in how Recruiters in the putative class describe using TEK-provided screening tools and checklists

Screening of candidates is highly variable, depending on each Recruiter's own methodology. Plaintiffs' declarants again contend that they did bare minimum screening involving a brief surface identification of listed skills on a resume, sending any candidate who matched the top three skills to the AM to sort out without doing anything else to actually vet the candidate. This is not what TEK hires Recruiters to do. TEK's expectations are that screening demands much more than just matching a few buzz words on a resume to a particular job requirement. Many Recruiters in the putative class testified to their individualized approaches, where identifying relevant skills was just *the beginning* of a screening inquiry. F

A Recruiter's job duties related to screening cannot be reduced to matching a few skills on someone's written resume to a job description and summarily recommending them for a position, with no further analysis. It also cannot be scripted. TEK certainly gives Recruiters guides to them learn and develop her own personal style and "elevator pitch," but that there are "no rule books."

### 3. There are significant differences in whether and how often Recruiters in the putative class engaged with customers

Plaintiffs' declarants testify in nearly identical language that they very rarely if ever interacted with TEK's customers. Yet, again, many Recruiters in the putative class testify to a significantly different experience, confirming that they often communicate directly with clients alone or in partnership with their AM counterpart throughout the life of the recruiting process.

---

introducing her to their new graduates "for job opportunities." **Ex. Y**, Maher Dep. 139:1-140:7. Maher also posted details about open reqs on job boards such as LinkedIn, Indeed, university job boards (e.g. Handshake). *Id.*, 142:5-143:13.

This included during the initial requisition stage through submitting a candidate for a potential interview.

      **4.**     **There are significant differences in whether and how Recruiters in the putative class negotiate with candidates**

Plaintiffs and their declarants assert that they were unequivocally unable to negotiate rates, benefits, or other compensation issues with candidates. In contrast, the experience of many Recruiters in the putative class was again, wildly different.

      **5.**     **There are significant differences in Recruiters' level of engagement with candidates throughout the life of the recruiting process and after placement**

The amount of interaction between Recruiters and candidates for placements also varies substantially between members of the putative class. While Plaintiffs and their declarants testify that they have little interaction with candidates other than to gauge their interest in accepting a role and conduct basic screening, others Recruiters in the putative class testify to detailed and long-term relationships wherein they prepped candidates for interviews and consulted with them in advance of their start date (if the candidate was placed), and, after placement, delivered feedback and had regular and routine six-week check-ins. Some Recruiters found that it was very beneficial to ensure both TEK's client and the candidate were happy, as this builds trust and can result in repeat recruiting work and candidate referrals or requests for additional engagements, contract extensions or permanent placements. TEK has the expectation that "Recruiters are always managing" the consultants they place.

      **6.**     **There are significant differences in whether AMs routinely accepted Recruiter recommendations**

Plaintiffs and their declarants state that they have little to no say on whether an AM accepts the candidates they present and in turn submit to a client. That is not the experience of many Recruiters in the putative class. Some indeed, opted to submit candidates to their AM first and

discuss the same with them before submitting a candidate to a client. But many described, more often than not, their AM counterpart accepted and deferred to their recommendation and good judgment about whether to submit a candidate to a client.

Others submitted candidates: via a Managed Service Provider (MSP), to customer directly for consideration, or by just sending the person to work without customer input (Go-To-Works, or GTWs). Still others staffed individuals to TEK-managed teams to deliver a product/outcome to a customer, rather than sending to customer to work as part of their team.

**7.    The training plaintiffs describe is for non-exempt employees to learn the skills to be exempt**

Plaintiffs also characterize training as uniform, focusing on the first thirteen weeks of training that non-exempt Recruiter Trainees undergo. Plaintiffs ignore the fact that training does not exist of just 13 weeks. TEK recognizes that individuals hired in the Recruiter Trainee role need time to prepare to engage in the type of independent judgment and discretion necessary to promote them to the exempt Recruiter role. And that is why some Recruiters are promoted to the Recruiter role in a few short months whereas others need more time and stay in the Recruiter Trainee role for a year or more before they are promoted. The training period itself is designed to give individuals the skills they need to use approach judgment and make appropriate recommendations.

**8.    AverySupervision Varies From Recruiter to Recruiter**

The amount of supervision Recruiters had also varied. Plaintiffs' declarants testify to close supervision of their work. Yet, many recruiters testified to little if any oversight on how they performed their jobs.

9. **Recorded Recruiter Activities Do Not Capture The Amount Of Time Spent On A Particular Task Or Whether The Recruiter Is Exercising Discretion And Judgment**

Additionally, Plaintiffs' focus on the purported fact that 76.62% of the activities recorded by Recruiter involve attempted contact followed by G2s or "calls" is misplaced and does not show that class certification is warranted. Plaintiffs fail to quantify the time spent on those activities. "Calls" as a category are full of variability that is not captured in the activity data. As described above, Recruiters develop individualized "elevator pitches" to use during outreach and one person's "pitch" is often significantly different than another's. Some Recruiters may choose to focus their efforts on cold calling, while others focus on their six degrees of separation, finding new candidates almost exclusively through referrals or prior contact. Screening candidates can also take an hour or more and how one Recruiter screens a candidate can be entirely different than another. Some Recruiters also participated in calls with TEK's clients, be that prior to the requisition to understand the role or roles being staffed through the interview and/or placement, or later to obtain feedback on the performance of the placed candidate. The fact that Recruiters engage in call-based activities does not mean they are performing the same activities because the content of the calls vary.

## III. LEGAL ARGUMENT

### A. Standard for Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 348 (2011). To invoke this exception, every purported class action must satisfy the requirements of Rule 23. *Id*. In deciding whether to certify a class under Federal Rule of Civil Procedure 23, the district court undertakes a two-step analysis to "determine if the certification requirements of Rule 23(a) and Rule 23(b) have been met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309

(3rd Cir. 2008). The party that seeks certification bears the burden to establish each element of Rule 23 by a preponderance of the evidence. *Id.* at 307; *Altnor v. Preferred Freezer Services, Inc.*, 197 F. Supp. 3d 746, 756 (W.D. Pa. 2016). The court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action. *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d at 307.

To satisfy Rule 23, Plaintiffs must demonstrate "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Altnor*, 197 F. Supp. 3d at 756. Plaintiffs seeking class certification must also meet one of the requirements of Rule 23(b), and Plaintiffs here seek to certify a class under Rule 23(b)(3) only. (ECF 145 at 40-47.) To satisfy Rule 23(b)(3), Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at 757.

A.    *Avery* **is Neither Controlling Nor Persuasive.**

Plaintiffs invite this Court to follow the decision issued from the U.S. District Court for the Northern District of California applying California state law. *See Avery v. TEKsystems, Inc.*, No. 22 Civ. 02733, 2024 WL 590364, at *1 (N.D. Cal. Feb. 13, 2024). TEK disagrees with the outcome and will appeal it at the appropriate time. For purposes of this instant case, however, the decision is neither controlling nor persuasive. Indeed, Plaintiffs in that case sought to separate their California claims from the claims before this Court. Each of the *Avery* named plaintiffs initially *opted-in* to the FLSA collective action before this Court. (ECF Nos. 26-1 (Bo Avery, Kristy Camilleri); 26-2 (Jill Unverferth); 33-6 (Phoebe Rodgers).) All four subsequently opted-out (ECF

No. 54-1) before filing a separate lawsuit in California state court, asserting California state law claims. (*Avery* Docket, No. 22 Civ. 02733, ECF No. 1.) TEK removed the complaint to federal court (*id*.), then requested it be transferred to this Court so it could be consolidated with this case (*Avery* Docket, ECF No. 21.) The *Avery* plaintiffs opposed the transfer, arguing that it "Involves Distinct Issues, Claims, and a Different Class of Employees," "The Parties in the Two Cases Are Not Substantially Similar," "The Legal Issues in the Cases Are Not Substantially Similar," "The Lawsuits Do Not Share a Single Cause of Action," California Law Is Significantly Different than the FLSA," and "The Administrative Exemption under California Law Is Materially Dissimilar to the FLSA Administrative Exemption." (*Avery* Docket, ECF No. 28.) Plaintiffs prevailed on their argument, and the case stayed in California. (*Avery* Docket, ECF No. 31.) Now Plaintiffs argue that Massachusetts, New York, Pennsylvania, and Washington state law are similar in all material respects to the FLSA and that California law is no different. (ECF No. at 145 at 30.) This Court should reject Plaintiffs' about face on the question whether the cases are similar.

In addition to having different state laws at issue, the factual record before this Court is not the same as was presented in Avery. There is testimony from Plaintiffs, Opt-In Plaintiffs, and managers from locations outside of California, declarations from Recruiters and managers not previously submitted, a greater number and variety of offices, and a longer time period. In short, both the legal and factual disputes differ, and the Court must "determine if the certification requirements of Rule 23(a) and Rule 23(b) have been met" in this case.[34]

---

[34] *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d at 309.

**B.    Plaintiffs Cannot Meet the Requirements of Rule 23(a)**

**1.    Plaintiffs Have Not Shown that the Classes Are So Numerous that Joinder Is Impracticable, as Required by Rule 23(a)(1).**

Plaintiffs rely solely on the fact that their proposed classes contain a minimum of 137 members in a particular proposed class to establish numerosity under Rule 23(a)(1). (Pl. Memo, ECF No. 145 at 36 29.) This is insufficient to carry Plaintiffs' burden because the collective action procedure of which they have availed themselves makes joinder practicable.

As the long-time leading treatise on class action litigation observes:

> Rule 23(a)(1) provides that a class action is maintainable only if "the class is so numerous that joinder of all members is impracticable." Rule 23(a)(1) is often referred to as the "numerosity" requirement. In fact, the Rule's core requirement is that joinder be impracticable. . . . Thus, Rule 23(a)(1) is an impracticability-of-joinder rule, not a strict numerosity rule. It is based on considerations of due process, judicial economy, and the ability of claimants to institute suits. . . . There is neither one specific "magic number" nor, as noted, is numerosity alone necessarily determinative. Joinder impracticability must be determined in the context of the particular litigation.[35]

"The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder."[36]

Here, at the outset of this case, Plaintiffs sought and obtained conditional certification of this matter as a collective action under 29 U.S.C. § 216(b), resulting in a notice of the collective action being issued to all Recruiters who had been employed by TEKsystems since August 9, 2018, via both regular mail and email (so most Recruiters received it twice). That notice explained to them how they could join this litigation as party-plaintiffs to pursue a claim that they had been denied overtime pay for working hours in excess of 40 hours in a week due to being allegedly misclassified as exempt, and included a form that notice recipients could use to opt-in via mail or

---

[35] § 3:11. Introduction to Rule 23(a)(1)—Impracticability of joinder, *1 Newberg and Rubenstein on Class Actions § 3:11* (6th ed.) (internal citations and quotations omitted)

[36] *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021).

on-line. (ECF No. 25, Ex. A.) Subsequently, 599 did join, 100 of them putative class members. In other words, this litigation already has involved joinder, and in a practicable manner.[37]

Against this backdrop of joinder, Plaintiffs have failed to demonstrate that joinder is impracticable. The vast majority[38] of putative class members have had the opportunity to join this case. In doing so, they are pursuing – or had the opportunity to pursue – the same overtime claim stemming from alleged misclassification that Plaintiffs seek to pursue through the class action device. *Compare* FLSA collective action notice, ECF No. 45, Ex. A at 1 ("The lawsuit alleges that Recruiters should have received overtime under the FLSA for the hours they worked over 40 in a workweek because TEKsystems improperly classified them as 'exempt' from the FLSA's overtime protections.") *with* Pl. Memo, ECF No. 145 at 8 (stating in first paragraph of class certification motion, "TEK classifies all Recruiters as exempt from Pennsylvania's, Massachusetts's, New York's and Washington's overtime laws, … . Plaintiffs bring this case to recover overtime wages …, as well as other damages stemming from TEK's policy.").

Indeed, in assessing the practicability of joinder, courts consider a number of factors which weigh strongly against finding that joinder is impracticable here.[39] *First*, there is no evidence that any putative class members desire to file separate actions claiming overtime pay. Indeed, those who want to make an overtime claim were invited to do so through the collective action device,

---

[37] *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 378 (3d Cir. 2022) ("Courts, including this one, have similarly described the FLSA collective action device as a species of joinder" (citing *Genesis Healthcare Corp.*, 569 U.S. at 70 n.1 (describing Section 216 as a "joinder process") and *Mineo v. Port Auth. of N.Y. & N.J.*, 779 F.2d 939, 941 n.5 (3d Cir. 1985) (describing § 216 as a form of "permissive joinder")).

[38] Exceptions are those who were Recruiters in New York state more than 3 years ago, and recently hired Recruiters in all states. Of the latter group, many are bound to arbitrate an overtime claim on an individual basis (Scroggins Decl.) so can't be part of the class, so this is a small exception.

[39] *Newberg on Class Actions* § 3.11; *Anderson*, 986 F.3d at 777 (collectively, considering judicial economy arising from avoidance of a multiplicity of actions; dispersion of class members; size of individual claims; financial resources of class members; ability of class members to institute individual suits; and whether there are requests for injunctive relief).

and 100 putative class members did so.[40] *Second*, while putative class members are dispersed among four states, such dispersion has had no ill effect on joinder, as Recruiters from 36 states have filed consents to join as party-plaintiffs under the FLSA.[41] *Third,* the size of the claims in this case are sufficiently large to make joinder practicable because they involve substantial sums that have been sufficient to motivate class members to file consents to join this case. *Fourth,* the putative class members – whose annual compensation as Recruiters ranges from at least $35,568 to more than $140,000 per year[42] – possess sufficient financial resources to pursue claims through joinder and, in any event, the statues under which they bring their claims contain fee-shifting provisions, as the collective action notice explains.(ECF No. 45, Ex. A, p. 4 ("How will the Plaintiffs' lawyers be paid? You will not be required to pay any attorneys' fees or costs out of your own pocket.").) *Fifth*, all class members maintain the ability to institute individual, or collective, suits for overtime pay. *Sixth*, there is no request for injunctive relief.

Plaintiffs likely will assert that their state law class claims are not necessarily the same as their FLSA claims (because state law may offer additional remedies and provide claims for denial of meal and rest breaks under Washington law and incorrect wage statements under New York law) and, therefore, the FLSA's joinder mechanism does not substitute for class certification of state law claims. Such an argument confuses substance for procedure. An FLSA opt-in plaintiff is a Plaintiff with full rights and responsibilities in the litigation they join.[43] Each can seek to assert

---

[40] The only separate overtime action filed by Recruiters against TEK is the *Avery* matter on which Plaintiffs rely. That matter was filed by Plaintiffs' counsel, on behalf of named plaintiffs who first opted in and then opted out of this suit, then successfully resisted TEK's effort to transfer that matter to this Court so that it could be consolidated with this case. *Avery* Docket Nos. 31.

[41] *See* Scroggins Decl.

[42] *See* Scroggins Decl. (the lower figure is the weekly salary minimum required to satisfy the administrative exemption, while the higher figure is an amount earned by one of the class members). The parties have not engaged in class discovery or disclosed information about the earnings of putative class members.

[43] *Prickett v. DeKalb Cnty.*, 349 F.3d 1294, 1296 (11th Cir. 2003) (in case deciding whether opt-in plaintiffs join individual claims brought by the named plaintiffs or the action as a whole, "by

a state law claim through an amendment to the complaint that makes them a plaintiff pursuing such a claim. Plaintiffs Thomas and Conyers-Jordan did so and claim remedies under Pennsylvania Law. Plaintiff Burke did so under Massachusetts law. Plaintiff Dore did so under Washington law and asserted a violation of Washington's meal and rest period statute. Plaintiff Richenberg did so and asserted a claim for incorrect wage statements under New York. The latter three Plaintiffs first joined this litigation by filing consents to become party-plaintiffs under the FLSA. Once in this litigation, they then asserted state law claims. There is nothing that prevented anyone else from doing the same. The class action *procedure* is not required to assert *substantive* state law claims.

Plaintiffs also may contend that they nevertheless can show that joinder is impracticable because employees fear retaliation from their employer.[44] But there is no evidence that TEK has retaliated against any Recruiter for joining this case, or that a Recruiter declined to join because of a justified fear of retaliation. Indeed, the FLSA collective action notice advised as follows:

> Q. Can TEKsystems and/or my current employer retaliate against me if I join the lawsuit?
>
> A. No. It is a violation of federal law for TEKsystems or any other employer to fire, discipline, or in any manner discriminate against you for taking part in this case. If you believe that you have been penalized, discriminated against, or disciplined in any way as a result of receiving this notification, considering whether to joint this lawsuit, or actually joining this lawsuit, please contact the Plaintiffs' lawyers listed below.

(ECF No. 25, Ex. A, p. 4. Accordingly, Plaintiffs fail to carry their burden of showing that joinder is impracticable and thus cannot satisfy Rule 23(a)(1).

---

referring to them as 'party plaintiff[s]' Congress indicated that opt-in plaintiffs should have the same status in relation to the claims of the lawsuit as do the named plaintiffs").

[44] *E.g, McLaughlin v. Liberty Mutual Ins. Co.*, 224 F.R.D. 304, 307-09 (D. Mass. 2004).

### 2.    Plaintiffs Have Not Shown that there are Questions and Facts Common to the Class, as Required by Rule 23(a)(2).

Rule 23(a)(2) requires "questions of law or fact" common to the class. Fed. R. Civ. P. 23(a)(2). The ultimate question is whether plaintiffs can establish that common answers that can resolve class-wide claims "in one stroke." *Wal-Mart*, 564 U.S. at 350. Commonality is "easy to misread," because "[a]ny competently crafted class complaint literally raises common 'questions.'" *Id*. at 349. "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. at 350.

In *Ferreras v. American Airlines, Inc.*, the Third Circuit held that the plaintiffs bringing New Jersey state law wage claims failed to meet the requirements of Rule 23(a)(2), despite having identified two common questions. 946 F.3d 178, 185 (3rd Cir. 2019) (reversing lower court decision that plaintiffs satisfied their burden under Rule 23(a)(a)(2) by identifying common questions). As the court explained, the common questions were not likely to "generate common *answers* apt to drive the resolution of the litigation." *Id*., citing *Wal-Mart*, 564 U.S. at 350.

The same is true here. Plaintiffs have not even offered a common question under Rule 23(a)(2). *See* Pl. Memo, ECF No. 145 at 36-37. Though they do not say so explicitly, perhaps their intention is to point to the common fact that TEK classifies all Recruiters as exempt. *Id*. If that is the case, though, it does nothing to generate a common *answer* to the question whether Recruiters are properly classified as exempt.[45]

---

[45] *See Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 129 (3rd Cir. 2018) (a "company-wide policy" on its own will not suffice to establish commonality where there is conflicting testimony about its application). "Commonality will not be found where the alleged common issues can only be resolved by making factual determinations that will be different for each class member." *Holmes*

At issue here is the application of the administrative and/or highly compensated employee exemptions. "[D]etermining what an employee's primary duties are and whether they are covered by the administrative exemption is a fact-intensive inquiry."[46] To resolve that question requires that the Court "focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations." *Id*. That is the opposite of common evidence.

That point is highlighted here. Plaintiffs offer that misclassification claims can be proved through common evidence "where job duties are well defined, as they are here." (Pl. Memo, ECF No. 145 at 37.) To support the point, they cite *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008). But that case, which concerned Assistant Managers at Duane Reade stores, centered around a detailed job description describing multiple non-exempt duties and uniform statements that all putative class members perform the same duties.[47] *Id*. at 159. Here, in contrast, the Plaintiffs have not argued that the job description sets out job duties that facially cannot satisfy the administrative exemption. Plaintiffs sometimes disavowed and sometimes accepted the job description, and even how they described their jobs outside of litigation.

Some examples bear out that Plaintiffs cannot make out their case common evidence. A job description states that Recruiter responsibility is to "Develop recruiting strategies to identify qualified candidates by using specialized networking tools." (Ex. MM.) Plaintiff Richenberg was

---

*v. Pension Plan of Bethlehem Steel Corp.*, No. 98-cv-1241, 1999 WL 554591, *6 (E.D. Pa. June 30, 1999).

[46] *Perry v. Randstad General Partner (US) LLC*, 876 F.3d 191, 200 (6th Cir. 2017).

[47] The court in *Damassia* largely disregarded declarations submitted by both sides because they were all nearly identical to each other and clearly drafted by lawyers. *Id*. at 159-60. Here, the declarations submitted by Plaintiffs are virtually identical (see, e.g., Paragraph 19 of declarations by Clavet, Stein, Dries-Wielandt, and Holin, "Sourcing was a grind," and Strauchen, Paragraph 18, "Sourcing was a repetitive grind."), while the declarations submitted by TEK reflect significant differences from one person to the next.

asked whether that was one of her responsibilities as a Recruiter and answered "Yes."[48] Plaintiff Burke was asked whether she performed that responsibility and answered "I didn't specifically develop the recruiting strategies."[49] No common evidence resolves that dispute among the Plaintiffs. And the differences become positively insurmountable when compared to the testimony of other putative class members, who describe being integrally involved in the creation of requirements and deciding the best way to find candidates.[50]

The same job description says that it is a Recruiter responsibility to "Evaluate the strengths and weaknesses of candidates through our screening process." (Ex. MM.) Plaintiff Richenberg again said simply, "Yes," that was one of her responsibilities.[51] Plaintiff Burke answered, "So I would evaluate strengths and weaknesses based off of if they had the correct skills and experience for the role I was looking for."[52] Putative class members describe the extensive steps that they follow to evaluate and validate the skills and experience of candidates.[53]

Plaintiffs' claims also lack commonality with respect to what Recruiters do that is not reflected in the job description. Plaintiff Richenberg that AMs and client hiring managers had calls to do "req intake" (defining the requirements for a position), and "occasionally, recruiters would listen in on those calls, usually just on mute." **Ex. Z**, Richenberg Dep. 63:21-23. In contrast, multiple putative class members were regular and active participants in this type of meeting, and

---

[48] **Ex. Z**, Richenberg Dep. 137:23-138:3.
[49] **Ex. VVV**, Burke Dep. 146:1-146:8.
[50] **Ex. A**, Fink Decl. ¶¶ 16-18; **Ex. G**, Warren Decl. ¶¶ 12; **Ex. C**, Chong Decl. ¶¶ 18-20; **Ex. D**, Mosquera Decl. ¶ 14; **Ex. E**, Bohen Decl. ¶ 16; **Ex. B**, Edds ¶ 17; **Ex. L**, Payonk Decl. ¶ 15; **Ex. K**, Marshall Decl. ¶ 15; **Ex. F**, Rice ¶ 11.
[51] **Ex. Z**, Richenberg Dep. 138:13-17.
[52] **Ex. VVV**, Burke Dep. 148:5-11.
[53] **Ex. A**, Fink Decl. ¶ 19-25; **Ex. G**, Warren Decl. ¶ 17; **Ex. C**, Chong Decl. ¶¶ 21-25; **Ex. D**, Mosquera Decl. ¶¶ 15-16; **Ex. E**, Bohen Decl. ¶¶ 17-19; **Ex. B**, Edds ¶¶ 18-23; **Ex. L**, Payonk Decl. ¶¶ 16-20; **Ex. K**, Marshall Decl. ¶¶ 16-18; **Ex. F**, Rice ¶ 12.

25

multiple managers explained that was common as well. There is no common evidence that will show the breadth of job duties in which Recruiters regularly engaged.

In short, Plaintiffs have failed to identify common "questions of law or fact" that are shared among themselves and members of the proposed putative classes, and they have thus failed to establish that their claims may proceed on a classwide basis.

### C.    Plaintiffs Cannot Meet the Requirements of Rule 23(b)

#### 1.    Plaintiffs Cannot Show that Common Questions Predominate Over Individual Questions.

While the commonality and predominance are "closely linked," "the Rule 23(b)(3) predominance requirement is far more demanding than the commonality requirement found in Rule 23(a)." *Ferreras*, 946 F.3d at 185. Commonality tests whether a classwide proceeding is capable of generating "common *answers* apt to drive the resolution of the litigation," *Dukes*, 564 U.S. at 350 (quotations omitted). Predominance requires that common questions predominate over individualized ones. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3rd Cir. 2001). An "individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Harnisch v. Widener Univ. Sch. Of Law*, 833 F.3d 296, 304 (3rd 2016.) Plaintiffs fall short on both their common evidence and their common questions, leaving Plaintiffs unable to satisfy Rule 23(a)(2).

#### a.    Plaintiffs are wrong that common evidence shows Recruiters' primary job duty is to "screen" and match candidates to requirements determined by TEK's customers.

There is no common evidence that the primary duty of Recruiters is merely to "screen" and

"match" candidates to requirements determined by TEK's customers. In Plaintiffs' conception, Recruiters are analogous to "personnel clerks" who "screen" applicants to obtain data regarding their minimum qualifications and fitness for employment," in order to "reject all applicants who do not meet minimum standards for the particular job or for employment by the company," where the minimum standards and other decisions are handled by someone else. (Pl. Memo, ECF No. 145 at 35, citing 29 C.F.R. § 541.203(e).) But this old-fashioned notion of a clerk passively waiting for resumes to come in, then sorting them into piles of "not minimally qualified" and "not my problem" bears no relation to what Recruiters in the putative classes do. Recruiters are involved in setting the requirements for the job – and not just minimum standards – in discussions with clients.[54] Recruiters do not passively wait for applications; they are specialists who devise strategies to find highly skilled professionals in niche markets.[55] Recruiters do not screen for minimum qualifications, but for the best fit for the client, project, and role. [56] Recruiters make decisions all along the way about whether or not a candidate will continue through the process.[57] Then Recruiters continue to manage consultants once on assignment, making sure things are going well and giving them feedback, which client managers often do not want to do or are not good at delivering. These attributes of Recruiters exceed the duties and responsibilities of the exempt HR manager described in the regulations. See 29 C.F.R. § 541.203(e).

---

[54] **Ex. S**, Lis Dep. 137:16-141:2; **Ex. A**, Fink Decl. ¶ ; **Ex. G**, Warren Decl. ¶ ; **Ex. C**, Chong Decl. ¶ ; **Ex. D**, Mosquera Decl. ¶ 10; **Ex. E,** Bohen Decl. ¶ ; **Ex. B**, Edds ¶ 17; **Ex. L**, Payonk Decl. ¶ ; **Ex. K**, Marshall Decl. ¶ ; **Ex. F**, Rice ¶ ; **Ex. J**, Fronzaglio ¶ ; **Ex. I**, Pagano  ¶ ; **Ex. H**, Fahey ¶ 3, 12.

[55] Ex. S, Lis Dep. 137:16-141:2; Ex. A, Fink Decl. ¶¶ 12, 33; Ex. C, Chong Decl. ¶ 14; Ex. D, Mosquera Decl. ¶ 10; Ex. E, Bohen Decl. ¶ 10; Ex. B, Edds ¶ 17; Ex. H, Fahey ¶ 3, 12.

[56] Ex. A, Fink Decl. ¶¶ 7-8, 10, 12, 17, 20; Ex. G, Warren Decl. ¶¶ 10-12; Ex. C, Chong Decl. ¶¶ 11-13, 15, 16, 18-20; Ex. D, Mosquera Decl. ¶¶ 9, 14; Ex. E, Bohen Decl. ¶¶ 14-16.

[57] Ex. A, Fink Decl. ¶¶ 13. 24-27; Ex. G, Warren Decl. ¶ 17 ; Ex. C, Chong Decl. ¶ 21-25; Ex. D, Mosquera Decl. ¶¶ 8, 15-17; Ex. E, Bohen Decl. ¶  .

> **b.    Plaintiffs are wrong that common evidence shows that there are standardized templates and other tools TEK requires all Recruiters to screen and match.**

Plaintiffs evidence shows that tools are available to Recruiters, but there is no proof those are required. Plaintiffs and putative class members varied in whether or when they used Connected, RWS, LinkedIn, their own networks, user group meetings, or other sources to search for candidates.[58] Recruiters undoubtedly do use the common tool of Connected to record activities, but that is separate from screening or matching.[59]

> **c.    Plaintiffs are wrong that common evidence shows standardized supervision and hierarchy.**

Similarly, contrary to Plaintiffs' assertion, "[t]he fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment…."[60] Indeed, section 541.207(e) states this explicitly:

> (e) Final Decisions not necessary. (1) The term "discretion and independent judgment" as used in the regulations . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and judgment.

In short, the fact that all Recruiters have a supervisor is meaningless.[61]  Plaintiffs' reliance on *Metrow v. Liberty Mut. Managed Case LLC*, 2017 U.S. Dist. LEXIS 73656 (C.D. Cal. May 1,

---

[58] Ex. A, Fink Decl. ¶ 23; Ex. G, Warren Decl. ¶ 18; Ex. C, Chong Decl. ¶ 26; Ex. D, Mosquera Decl. ¶ 40; Ex. E, Bohen Decl. ¶¶ 10, 17, 19.

[59] Connected is just a customer-relationship management tool, that allows TEK employees to share information with each other. The fact that all use it is akin to saying that all share the same electronic folder for their notes.

[60] *Zelasko-Barrett v. Brayton-Purcell, LLP*, 198 Cal. App. 4th 582, 591 (2011).

[61] *See*, e.g., *Smith v. Gov't Employees Ins. Co.*, 590 F.3d 886, 894-95 (D.C. Cir. 2010) (employees' exempt status was not defeated simply because they routinely communicated with supervisors); *Mekhitarian v. Deloitte & Touche (ICS), LLC*, 2009 WL 6057248, *4 (C.D. Cal. 2009) ("Virtually

2017), is misplaced. In *Metrow* the Court was addressing the exempt status of nurse care managers. The Court found that predominance under Rule 23(b) could be found because "all NCMs must perform these tasks chronologically based on a uniform schedule and the tasks must be completed within a specified time period. Also, every NCMs' performance of each task is evaluated based on the same standardized criteria. The record shows that every NCM completes their assignment based on standardized step-by-step instructions." *Id* at *29. As set forth above and below, that is simply not applicable to the facts of this case.

Here, the evidence regarding the degree of oversight varies significantly. Some Recruiters testify that while supervisors were frequently involved in evaluating whether the Recruiters met underlying production metrics, they were not being supervised regarding how they were evaluating, screening, and selecting candidates for submission. Recruiters were held to account and overseen on whether they got results, but not as to how those results were achieved. That is the critical difference that makes common proof in this case impossible on the issue of supervision. Moreover, even if not the case, multiple Recruiters testified that they operate independently, and in fact are subject to little to no supervision, other than to review whether they got the job done.

> **d.    Plaintiffs are wrong that common evidence shows uniform production metrics that TEK utilizes to evaluate Recruiters on a weekly basis.**

There are metrics. They aren't really about "production." A "meal" doesn't produce anything. Neither does a call for that matter. More to the point, multiple people say it is a coaching tool Christian Mosquero testifies no one talks to him about it at all. He sometimes looks at it

---

every employee—no matter how high ranking—is subject to some degree of supervision by a superior. It is the degree of supervision that is key, and the degree of supervision of class members cannot be determined on common proof because the evidence indicates that they had significantly different experiences while working for Defendants.").

himself as self-evaluation aid. Nobody cares about your G2s if submittals and spread are good. It's just a way to straight things out when results get wobbly.

> **e.    Plaintiffs are wrong that common evidence can answer whether Recruiters' primary job duty relates to management policies or general business operations of TEK or its clients.**

There is no dispute that Recruiters perform work that is "directly related" to the management policies or general business operations of TEK's customers. The appropriate analysis must be conducted not just with respect to TEK (the employer), but also as to "**the employer's customers.**" Here, Plaintiffs do not even attempt to argue, and therefore concede that Recruiters are not production employees for TEK's customers. Instead, Recruiters are unquestionably directly involved in the running and servicing of TEK's clients' businesses. Recruiters serve as **personnel management and human resources** recruiters to staff critical positions for a variety of TEK's customers in a variety of industries. The recruitment services that TEK Recruiters provide are not the primary business of the technology companies, bio engineering, education institutions, non-profits, or any other company that TEK provides services for and thus the holding only supports denial of certification in this case. Although the first prong of the administrative exemption can be decided as a matter of law – in TEK's favor, the second prong reveals significant individualized issues that predominate.

> **f.    Some of Plaintiffs "common evidence" is irrelevant to Recruiter's job duties.**

Plaintiffs point to TEK's internal jargon that "producer" is used as a generic term for any internal employee who is client-facing.[62] But what of it? Calling them "cartoonists" would not make them exempt creative professionals. To the extent this is a common "fact," or of how TEK

---

[62] *See*, for example, Plaintiffs' Exhibit 4, where Rob Doyle says that those with "sales-specific activities" and "recruiting responsibilities" are called "producing roles." Ex. D, Mosquera Decl. ¶ 8

"values" them, it is not proof of any Recruiter's job duties. Likewise, Plaintiffs say that AM's primary duty is to directly communicate with TEK's customers. It is irrelevant whether true, as it would not bar Recruiters from also having meaningful client contact. And likewise, it is irrelevant that there is uniform training for Recruiter *Trainees*. Recruiter is a different role, with training focused on each person's area of specialization.

> **g.    Plaintiffs are wrong that common evidence can answer whether Recruiters customarily and regularly exercise discretion and independent judgment in executing their primary duties.**

The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." Wage Order 4-2001(A). This phrase "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id*. at §541.207(a). The regulations "do not require the exercise of discretion and independent judgment at so high a level." *Id*. at (d). "Customarily and regularly" means a task is performed on a recurring basis each week, as opposed to being performed only sporadically. *Id*. at §541.701. For example, exempt employees can make use of a "best practices" manual, but the use of even a detailed manual does not eliminate discretion and independent judgment. Indeed, even where a supervisor "regularly speaks" to the employee, courts have found that fact insufficient to override the application of the administrative exemption.

Despite Plaintiffs' assertions that TEK's sourcing and screening tools and their interactions with AMs deprived them of discretion and judgment, other Recruiters testified that the screening tools were only a starting point for their duties, and further many had little oversight from AMs, and instead independently developed their own network of highly qualified candidates. Testimony also reveals sharp contrasts in the way Recruiters performed their jobs on tasks such as evaluating

31

potential candidates, responding to particular job requisitions, interacting with TEK's clients, and oversight of a candidate's career. Many Recruiters operated independently and worked with AMs across the county, leaving Recruiters with great discretion and judgment on how to evaluate and source candidates as well as which candidates to submit for a particular job requisition.

Plaintiffs argue they had no discretion and judgment when performing their duties, and simply checked for minimum qualifications and submitted any candidate that met them and answered the phone. Yet, many other Recruiters say the opposite. In fact, several Recruiters even testified that they would be failing to do their job if they submitted every potential match to an AM and let the AM decide. Such conduct would run contrary to expectations regarding how Recruiters are relied upon to screen and evaluate candidates, and a Recruiter that does so "will not last long." The precise level of discretion and judgment used by each Recruiter depends on, among other things, the client who has provided the job requirements, the industry the job requisition is in, and the specific job to be filled, the network and expertise developed by the Recruiter, the marketplace for a particular set of skills, the depth of knowledge a candidate can relay to the recruiter beyond their resume, and the cultural fit for a particular employer, among other things. As demonstrated above, there is a wide variation among Recruiters on how they accomplish these tasks. Some Recruiters evaluate highly specific technical skills, and the depth of experience applying those skills; some evaluate aesthetic and artistic portfolios; some evaluate the candidate's personal presentation and potential team and culture fit; and some evaluate whether the actual experience set forth in the candidate's resume aligns with the job requisition at hand.

### 2.    Whether Recruiters meet TEK's reasonable expectations raises individualized issues

Even if a Recruiter were found not to have performed the job in a way that meets the administrative exemption, an issue remains as to whether that Recruiter's performance meets

TEK's reasonable expectations. When evaluating the factors pertaining to whether job duties, an employer's realistic expectations are to be considered. *Estrada v. Maguire Ins. Agency, Inc.*, No. 12-604, 2014 U.S. Dist. LEXIS 25785, *20 (E.D. Pa. Feb. 28, 2014) (disregarding Plaintiff's conclusory testimony that he did not exercise discretion and independent judgment as claims examiner when this contradicted the job description, company witness testified that doing so would not be performing his job properly, and other admissions and granted summary judgment to the employer). The Recruiter's job descriptions, which identify exempt duties, supports a realistic expectation that Recruiters primarily engage in exempt duties. To the extent a Recruiter may claim to have no discretion and judgment due to screening tools or AM oversight or otherwise, that runs contrary to TEK's reasonable expectations articulated through policy and management.

### 3.    Plaintiffs' and their Declarant's testimony have limited evidentiary value

Plaintiffs' declarations do not support a class-wide finding for Rule 23 certification. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 949 (9th Cir. 2011) (affirming district court's determination that plaintiff's declarations and deposition testimony "did not support a class-wide determination"). "[U]nder *Dukes*, for anecdotal evidence to give rise to an inference of a common practice, the evidence should be representative in number and in geography." *Pedroza*, 2013 WL 1490667, at *8; *citing Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (2011).

### 4.    Other unique issues show that common issues do not predominate.

#### a.    Some putative class members are subject to agreements that require them to pursue any claims in arbitration and on an individual basis.

On December 19, 2023, TEK rolled out a Mutual Arbitration Agreement to all internal employees, including Recruiters. (ECF No. 120 at ¶ 7.) The policy went into effect on January 1, 2024 for those then employed by TEK. (ECF No. 120-1 at ¶ 15.) TEK previously moved to compel

to arbitration the claims of 11 Opt-In Plaintiffs subject to the policy. (ECF No. 119-121.) Rather than respond, Plaintiffs voluntarily moved to dismiss the 11 Opt-In Plaintiffs without prejudice (ECF No. 128-129), and the Court granted the Motion. (ECF No. 130.)

Here, the proposed class representative Plaintiffs ended their employment before the arbitration policy went into effect. However, there are 381 class members who are parties to the Agreement and whose claims must be pursued in individual arbitration. (Scroggins Decl. ¶ 76, Ex. RRR).

> **b.**    **Some putative class members are subject to the individualized defense that state law does not have extraterritorial effect as to their claims.**

The list of putative class members includes all those who worked as Recruiters and were aligned to a TEK office in one of the four states at issue. But remote work is common at TEK, and some individuals aligned to an office may not perform work in or otherwise have substantial ties to that state. Numerous class members reside in states other than the state of the office to which they are aligned: 65 of the New York putative class, 21 of the Massachusetts putative class, 61 of the Pennsylvania putative class; and 17 of the Washington putative class.[63]

Generally, a state "must have a significant contact or significant aggregation of contacts" to activity in a foreign jurisdiction before it can apply its law extraterritorially.[64] In Massachusetts, a non-resident employee may bring a claim under the Wage Act only so long as that state has "the most significant relationship" to the parties and their employment situation.[65] The "refined

---

[63] Scroggins Decl. ¶ 77, Ex. SSS. While some of these differences may reflect normal commuting distances, others do not, such as the Massachusetts aligned Recruiters residing in California and Florida; the New York aligned Recruiters residing in California, Florida, Ohio, Virginia, and Illinois; the Pennsylvania aligned Recruiters residing in Colorado, Georgia; and the Washington aligned Recruiters residing in Arizona and Indiana, among others.  *Id.*
[64] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985).
[65] *Dow v. Casale*, 83 Mass. App. Ct. 751, 756-57 (2013); *Gonyou v. Tri–Wire Eng. Solutions, Inc.*, 717 F.Supp.2d 152 (D.Mass. 2010).

analysis" to answer this question includes consideration of factors such as state of residence, location of managers, where work is performed, and extent of travel to the state.[66]

"Under New York law, it is a settled rule of statutory interpretation, that unless expressly stated otherwise, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state ... enacting it."[67] This includes the state's overtime laws. *Id*. In Washington, an employee is entitled to compensation under the Act only if employed to work in that state.[68]

The Pennsylvania Wage Act exists to correct "unreasonably low" wages that exist in "occupations in the Commonwealth of Pennsylvania," and to fight the "evils" that plague "employes employed in the Commonwealth of Pennsylvania." 43 Pa. Stat. § 333.101.    In Pennsylvania, a statute must be interpreted to "give effect to all its provisions," and statutes that are "clear and free from all ambiguity" must be interpreted based upon the "letter" of the law. 1 Pa. Stat. §§ 1921(a), 1921(b).    Applying those canons here means recognizing that, when the legislature spoke of rectifying harms to "employes employed in the Commonwealth of Pennsylvania," the legislature meant what it said, and said what it meant: the PMWA covers only employees who are actually employed in Pennsylvania.    In other words, "the relevant location" is the "location of [each] Plaintiff[s'] workplace."[69]

> **c.    Some putative class members in Massachusetts and New York are subject to the defense that they satisfy the highly compensated employee exemption.**

As to the proposed class representative Plaintiffs, TEK is asserting the affirmative defense that they were properly classified as exempt from overtime under the administrative exemption

---

[66] *Viscito v. Nat'l Plan. Corp*., 34 F.4th 78, 83-86 (1st Cir. 2022) (Florida-based employee could not assert MA Wage Act claim).
[67] *Magnuson v. Newman*, 2013 WL 5380387, at *5 (S.D.N.Y. 2013).
[68] *Bostain v. Food Exp., Inc.*, 153 P.3d 846, 856, 159 Wash.2d 700, 720 (Wash. 2007).
[69] *Taylor v. Rodale, Inc.*, 2004 WL 1196145, at *2–3 (E.D. Pa. 2004) (holding that a different Pennsylvania statute, the Pennsylvania Human Relations Act, did not cover "out-of-state employees").

provided by state law. TEK may assert an additional affirmative defense as to certain putative class members in Massachusetts and New York, namely that they are highly compensated employees.

As Plaintiffs noted in their brief, the "FLSA's exemptions are incorporated into the NYLL."[70] So too under Massachusetts law.[71] As compared to the administrative exemption, "the duties test becomes easier to satisfy" under the FLSA's highly compensated employee ("HCE") exemption.[72] The applicable salary thresholds in Massachusetts follow those set under the FLSA, while New York has set a higher amount that differs among cities and counties in that state. 454 CMR 27.00; 12 NYCRR § 142-2.14. If the salary threshold is satisfied, an employer must show only that the employee regularly performs at least one of the elements of the administrative exemption to satisfy the HCE exemption.[73] The employee need not perform such work "constant[ly]" for it to be a customary and regular duty. *Id.* at *2.

The parties have yet to engage in discovery concerning the wages earned by putative class members. But some members of the New York and Massachusetts putative classes earned weekly salaries and total annualized compensation above the salary thresholds applicable in those states.

### 5.     Plaintiffs Cannot Show that a Class Action Is Superior to Other Available Methods.

The Court should deny Plaintiffs' motion for the additional reason that Plaintiffs cannot satisfy Rule 23(b)(3)'s requirement that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As discussed, Plaintiffs sent a notice to the vast majority of those who would be in their proposed classes seeking overtime pay advising them of how they can claim overtime pay as an FLSA opt-in plaintiff, and including an opt-in form, link

---

[70] *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 160 (S.D.N.Y. 2014).
[71] *Crowe v. Examworks, Inc.*, 136 F.Supp. 3d, 46 (D. Mass. 2015).
[72] *Helix Energy Solutions Group, Inc. v. Hewitt*, 598 U.S. 39, 45 (2023).
[73] *Perez v. Express Scripts, Inc.*, 2024 WL 957978, at *1 (3rd Cir. 2024).

to a website, details on how they can join this case. This is a fair and efficient method for adjudicating this controversy, and Plaintiffs cannot show that a class action here would be superior to the FLSA collective action.[74] Court routinely come to this same conclusion.[75]

The arguments in favor a class action being superior lack merit. In some cases, the desire to avoid a multiplicity of suits by putative class members can be a good reason to find superiority, but there is no evidence, or even indication, that class members are seeking to file separate lawsuits. Those who do wish to affirmatively make overtime claims have had such an opportunity through the FLSA collective action device, and 100 of them have availed themselves of that opportunity.

Plaintiffs nevertheless may argue that a class action's opt-out procedure is superior to the FLSA's opt-in requirement because putative class members may be inhibited from exercising an affirmative choice to join an FLSA collective action, and so they need to be provided an

---

[74] Rule 23(b)(3) states that "the matters pertinent to a superiority finding *include*:
  (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
  (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
  (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
  (D) the likely difficulties in managing a class action."
(emphasis added). None of these factors point toward, or are very relevant to, a superiority finding against the backdrop of an existing collective action in the same case.

[75] *E.g., Knickerbocker v. Ada Cty*., Idaho, 2006 U.S. Dist. LEXIS 39069 at *2 (D. Idaho June 12, 2006) (denying Rule 23 certification because "plaintiffs have not demonstrated to the Court how a Rule 23 class for the state law claims would provide relief that is not already provided by the FLSA collective action."); *Leuthold v. Destination America, Inc.*, 224 F.RD. 462, 469 (N.D. Cal. 2004) (state law class action is not superior where "FSLA [collective] action allows individuals to control their participation in this litigation in a far more expeditious fashion than does a Rule 23 class action."); *Muecke v. A-Reliable Auto Parts & Wreckers, Inc.*, 2002 U.S. Dist. LEXIS 11917 at *5-7 (N.D. Ill. June 21, 2002) ("Because all of the companies' present and former employees will have the chance to decide whether to join the case, and because those who wish to do so will be before the Court, it makes no real sense to the Court to certify a class that will automatically include all of the employees unless they opt out. Under these circumstances, and because of the relatively modest number of existing and present employees, the Court sees nothing to favor the proposition that we should impose on the FLSA collective claim an overlay of a Rule 23(b)(3) state law class" (emphasis in original)).

opportunity to pursue claims passively through Rule 23, which includes them in a class unless they affirmatively opt out of it. The Court should reject such an argument here, where there is no evidence that TEK has retaliated against any putative class member or threatened to do so, and the FLSA opt-in notice explicitly advised that retaliation is prohibited and provided instructions on what a Recruiter should do if they perceive it. Further, this is not a case in which the class members are low-wage workers with limited education where English is not their first language; rather, Recruiters earn significant annual compensation and work in a white collar setting[76].

Plaintiffs also may contend that an opt-out class action is superior to an opt-in collective action, as an opt-out procedure would involve more claimants. That, however, is a political judgment that is irrelevant to the legal analysis under Rule 23(b)(3). That a Rule 23 class action may net more participants than the FLSA's opt-in procedure does not make one "superior" to the other. Indeed, in enacting Section 216(b), the United States Congress made the political decision that an opt-in procedure is superior to the then existing opt-out procedure. Congress' decision does not necessarily mean that an overtime class action never can meet the superiority requirement, but it does point strongly against a Rule 23(b)(3) superiority finding in this case.

### D.    Adjudicating Plaintiffs' Claims On A Class Basis Would Not be Manageable

Plaintiffs have not and cannot describe a coherent trial plan. Plaintiffs make no effort to explain how this case could be tried with collective proof. They appear to suggest that a trial will be unnecessary because the Court can grant summary judgment as to the "directly related to" prong. But even if this could be done, they make no mention of what happens if Recruiters meet this prong. There is no collective proof for the other elements of the exemption and thus the case

---

[76] Plaintiffs also may urge the Court to find superiority because some of the state laws under which they seek to proceed provide additional claims or remedies in comparison to the FLSA. TEKsystems described the flaws in this argument above.

would have to be decertified. Even if the question of whether Recruiters' work meets the "directly related to" prong were an appropriate question for certification, Plaintiffs cannot offer any plan as to how the issues of whether Recruiters customarily and regular exercise discretion and judgment could be tried with collective proof.

Here, a class action is not a superior means of conducting this litigation because individual inquiries into the hundreds of class members' assignments, work schedules, and hours would overwhelm the court and render a class action unmanageable. Plaintiffs offer no method to manage a class action where the existence, type, and extent of damage varies from person to person and therefore individual damages issues predominate. As the United States Supreme Court held: "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."[77]

## IV.    CONCLUSION

Plaintiffs insist that the exempt status of Recruiters can be determined in one fell swoop. The record demonstrates otherwise. As the court made clear in in *DeLodder*, "t]he record here makes clear that this question can only be answered on an individualized basis. The degree of discretion exercised by Recruiters varies at nearly every step of the recruiting process. The record shows broad diversity in the discretion exercised by Recruiters at various steps in the recruiting process on an office-by-office, division-by-division, and Recruiter-by-Recruiter basis. Given that diversity, determining whether a Recruiter exercised discretion and independent judgment sufficient to satisfy the second condition of the administrative exemption requires an

---

[77] *Comcast v. Behrend,* 133 S.Ct. 1426, 1433 (2012) (rejecting Court of Appeals' acceptance of plaintiffs' damages methodology without analyzing whether that model was "speculative," because "[u]nder that logic, at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity.")

313796685v.4

individualized factual inquiry, and does not lend itself to common proof on a class-wide basis."

*DeLodder* at *13-14. For all the foregoing reasons, Defendant respectfully requests that Plaintiffs' motion for class certification be denied in its entirety.

DATED: October 7, 2024                                   SEYFARTH SHAW LLP

                                         By:    */s/Andrew L. Scroggins*
                                                Andrew L. Scroggins

Andrew L. Scroggins
Noah A. Finkel
James P. Nasiri
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
ascroggins@seyfarth.com
nfinkel@seyfarth.com

Brian P. Long (*pro hac vice*)
SEYFARTH SHAW LLP
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 270-9600
Facsimile: (213) 270-9601
bplong@seyfarth.com

*Attorneys for Defendant*
*TEKsystems, Inc.*