**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

| | |
|---|---|
| MICHAEL THOMAS, MARIA CONYERS-JORDAN, AUSTIN SHERMAN, LYNDA ALEXANDRA MAHER, AVA DORÉ, RACHEL RICHENBERG, and EMILY BURKE, on behalf of themselves and others similarly situated, | Civil Action No. 2:21-cv-00460-WSS |
| *Plaintiffs*, | Class and Collective Action |
| | (Document Filed Electronically) |
| v. | |
| TEKSYSTEMS, INC., | |
| *Defendant*. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
FINAL FLSA COLLECTIVE ACTION CERTIFICATION**

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II. ARGUMENT ........................................................................................................ 1

A.  The *Avery* Court's Partial Summary Judgment Decision Underscores that this Case is Well Suited for Collective Treatment ........................................................ 1

B.  TEK Argues the Wrong Standard for FLSA Certification ...................................... 2

C.  The Collective Was Subject to Substantially Similar Employment Settings .......... 3

    1.  Plaintiffs Are "Unified" Under TEK's Talent Delivery Department ......... 3

    2.  Plaintiffs Have Similar Claims and Seek Similar Forms of Relief ............. 4

    3.  Common Evidence Determines How TEK Paid Recruiters and Whether They Shared Circumstances of Employment .............................. 5

D.  TEK's Defenses Will be Resolved on Substantially Similar Proof ........................ 8

    1.  Administrative Exemption Defense .......................................................... 8

        a.  Plaintiffs Are Similarly Situated Because They All Are Production Workers ...................................................................... 10

        b.  Plaintiffs' Common, Primary Job Duties Do Not Include Customarily and Regularly Exercising Discretion and Independent Judgment on Matters of Significance ...................... 14

    2.  Highly Compensated Employee Exemption .............................................. 17

    3.  Whether TEK Violated the FLSA Willfully Does Not Create an Issue that Warrants Decertification .................................................................... 18

    4.  Non-Exempt Recruiter Trainees and Other Roles, and Those Without Timely Claims Are Not Part of the Collective .......................................... 18

E.  Fairness and Procedural Considerations Favor Certification ................................. 19

F.  TEK's Declarations Are Irrelevant and Should be Disregarded ........................... 20

III. CONCLUSION ..................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                  **Page(s)**

*Alvarez v. BI Inc.*,
   2020 WL 1694294 (E.D. Pa. Apr. 6, 2020) ................................................................ 7

*Andrade v. Aerotek, Inc.*,
   700 F. Supp. 2d 738 (D. Md. 2010) ......................................................................... 15

*Andrade v. Aerotek, Inc.*,
   No. 08 Civ. 2668, 2009 WL 2757099 (D. Md. Aug. 26, 2009)................................. 16

*Andrako v. U.S. Steel Corp.*,
   788 F. Supp. 2d 372 (W.D. Pa. 2011)........................................................................ 8

*Aquilino v. Home Depot, U.S.A., Inc.*,
   No. 04 Civ. 04100, 2011 WL 564039 (D.N.J. Feb. 15, 2011).................................. 16

*Avery v. TEKsystems, Inc.*,
   No. 22 Civ. 02733, 2024 WL 4281442 (N.D. Cal. Sept. 23, 2024) ................................. *passim*

*Avery v. TEKsystems, Inc.*,
   No. 22 Civ. 02733, 2024 WL 590364 (N.D. Cal. Sept. 23, 2024) ........................ 4, 14

*Bell v. Reading Hosp. & Med. Ctr.*,
   No. 13 Civ. 05927, 2016 WL 3902938 (E.D. Pa. July 19, 2016)................................ 3

*Berrada v. Cohen*,
   No. 16 Civ. 574, 2018 WL 4629569 (D.N.J. Sept. 27, 2018) .................................. 17

*Butler v. DirectSAT USA, LLC*,
   47 F. Supp. 3d 300 (D. Md. 2014)............................................................................ 18

*Carr v. Flowers Foods, Inc.*,
   No. 15 Civ. 6391, 2019 WL 2027299 (E.D. Pa. May 7, 2019) ........................ 2, 6, 11

*Casco v. Ponzios RD, Inc.*,
   2021 WL 870709 (D.N.J. Mar. 9, 2021) ................................................................ 5, 9

*Cottle v. Falcon Holdings Mgmt., LLC*,
   892 F. Supp. 2d 1053 (N.D. Ind. 2012).................................................................... 19

*DaRosa v. Speedway LLC*,
   557 F. Supp. 3d 315 (D. Mass. 2021)....................................................................... 16

*Drake v. Aerotek, Inc.*,
   No. 14 Civ. 216, 2016 WL 80672 (W.D. Wis. Jan. 7, 2016)................................... 15

*Fenley v. Wood Grp. Mustang, Inc.*,
   325 F.R.D. 232 (S.D. Ohio 2018)............................................................................. 17

*Goff v. Bayada Nurses, Inc.*,
   424 F. Supp. 2d 816 (E.D. Pa. 2006) ........................................................................ 15

*Goodman v. Burlington Coat Factory*,
   No. 11 Civ. 4395, 2012 WL 5944000 (D.N.J. Nov. 20, 2012) .................................. 20

*Gordon v. Maxim Healthcare Servs., Inc.*,
   No. 13 Civ. 7175, 2017 WL 3116153 (E.D. Pa. July 21, 2017) ................................... 3

*Guy v. Absopure Water Co., LLC*,
   No. 20 Civ. 12734, 2023 WL 5953225 (E.D. Mich. Sept. 12, 2023) ........................... 5

*Hudgins v. Total Quality Logistics, LLC*,
   No. 16 Civ. 7331, 2019 WL 354958 (N.D. Ill. Jan. 29, 2019) .................................. 17

*Hudkins v. Maxim Healthcare Servs., Inc.*,
   39 F. Supp. 2d 1349 (M.D. Fla. 1998) ....................................................................... 15

*Ivanovs v. BAYADA Home Health Care, Inc.*,
   No. 17 Civ. 01742, 2021 WL 3464771 (D.N.J. Aug. 6, 2021) ........................... 5, 8, 10

*King v. W. Corp.*,
   No. 04 Civ. 318, 2006 WL 118577 (D. Neb. Jan. 13, 2006) ..................................... 17

*Levine v. Vitamin Cottage Nat. Food Markets, Inc.*,
   No. 20 Civ. 00261, 2023 WL 3648684 (D. Colo. May 25, 2023) ............................... 16

*Levitt v. Tech. Educ. Servs., Inc.*,
   No. 10 Civ. 6823, 2012 WL 3205490 (E.D. Pa. Aug. 7, 2012) .................................. 15

*Lugo v. Farmer's Pride Inc.*,
   737 F. Supp. 2d 291 (E.D. Pa. 2010) ........................................................................... 3

*Martin v. Cooper Elec. Supply Co.*,
   940 F.2d 896 (3d Cir. 1991) ...................................................................................... 11

*McDonnell v. KRG Kings LLC*,
   No. 20 Civ. 01060, 2022 WL 3681672 (W.D. Pa. Aug. 25, 2022) ........................ 2, 19

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128 (1988) .................................................................................................. 18

*In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*,
   No. 11 Civ. 3121, 2016 WL 1407743 (D.N.J. Apr. 11, 2016) ..................................... 8

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
   111 F. Supp. 2d 493 (D.N.J. 2000) .............................................................................. 3

*Moss v. Crawford & Co.*,
   201 F.R.D. 398 (W.D. Pa. 2000) ..................................................................... 4, 18, 19

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2nd Cir. 2010) ........................................................... 8

*Nash v. Horizon Freight Sys., Inc.*,
  2020 WL 7640878 (N.D. Cal. Dec. 23, 2020) ........................................ 20

*Nelson v. Avon Prod., Inc.*,
  No. 13 Civ. 02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015) ............................ 7

*Reinig v. RBS Citizens, N.A.*,
  No. 15 Civ. 01541, 2023 WL 5497106 (W.D. Pa. Aug. 25, 2023) ........................ 2, 3

*Rivet v. Off. Depot, Inc.*,
  207 F. Supp. 3d 417 (D.N.J. 2016) .................................................. *passim*

*Rodolico v. Unisys Corp.*,
  199 F.R.D. 468 (E.D.N.Y. 2001) ........................................................... 8

*Rood v. R&R Express, Inc.*,
  No. 17 Civ. 1223, 2021 WL 3021978 (W.D. Pa. July 16, 2021) ..................... 2, 8, 11

*Ruffin v. Avis Budget Car Rental, LLC*,
  No. 11 Civ. 1069, 2014 WL 294675 (D.N.J. Jan. 27, 2014) ................................. 8, 12

*Ruiz v. Serco, Inc.*,
  No. 10 Civ. 394, 2011 WL 7138732 (W.D. Wis. Aug. 5, 2011) ................................ 16

*Scott v. SSP Am., Inc.*,
  No. 09 Civ. 4399, 2011 WL 1204406 (E.D.N.Y. Mar. 29, 2011) ......................... 8

*Sloane v. Gulf Interstate Field Serv.'s, Inc.*,
  No. 16 Civ. 01571, 2017 WL 1105236 (M.D. Penn. Mar. 24, 2017) ...................... 17

*Sobolewski v. Boselli & Sons, LLC*,
  No.16 Civ. 01573, 2018 WL 3838140 (D. Colo. June 13, 2018) ............................ 20

*Talarico v. Pub. Partnerships, LLC*,
  No. 17 Civ. 2165, 2022 WL 1524109 (E.D. Pa. May 12, 2022) ................................ 5

*Walsh v. Unitil Serv. Corp.*,
  64 F.4th 1 (1st Cir. 2023)............................................................ 11

*Wintjen v. Denny's Inc.*,
  No. 19 Civ. 00069, 2023 WL 4510520 (W.D. Pa. July 13, 2023)............................. 18

*Zavala v. Wal Mart Stores Inc.*,
  691 F.3d 527 (3d Cir. 2012) ...................................................... 2, 3, 5, 6

**Regulations**

29 C.F.R. § 541.200 ............................................................ 9

29 C.F.R. § 541.201 ................................................................................................................... 11

29 C.F.R. § 541.601 ................................................................................................................... 17

## I.    INTRODUCTION

TEKsystems' ("TEK") opposition fails to overcome the substantial evidence demonstrating that Plaintiffs and Opt-in Plaintiffs (collectively, "Plaintiffs") are similarly situated for purposes of final FLSA collective certification. TEK focuses on merits arguments and stretches the record to great lengths to point to claimed "variations" between Plaintiffs, but the minor variations identified are irrelevant to the FLSA analysis. TEK classifies all Recruiters as exempt from overtime. All Recruiters are "unified" under the same department. All Recruiters engage in the same role for TEK – soliciting job candidates for whom they are at least two levels away from making any hiring or firing determinations. TEK requires all Recruiters to adhere to the same "production" metrics. The law is clear that Plaintiffs must be similarly situated but total uniformity is not required. What matters is that Plaintiffs were subject to a common policy – TEK's uniform classification of Recruiters as exempt from overtime – and that their claims can be adjudicated efficiently as a collective action. The evidence and applicable legal standards strongly support final certification.

## II.    ARGUMENT

### A.    The *Avery* Court's Partial Summary Judgment Decision Underscores that this Case is Well Suited for Collective Treatment.

TEK Recruiters who worked in California brought a similar case in the Northern District of California, alleging that TEK misclassified Recruiters as administratively exempt under California law. *Avery v. TEKsystems, Inc.*, No. 22 Civ. 02733, 2024 WL 4281442, at *1 (N.D. Cal. Sept. 23, 2024). The *Avery* court granted partial summary judgment, finding that as a matter of law, TEK could not meet the requirements of the California administrative exemption with respect to the certified class of California TEK Recruiters. *Id.* For the reasons set forth in Plaintiffs' Reply in Support of their Motion for Class Certification, ECF No. 163 at 1-3, the *Avery* decision demonstrates that common evidence will drive resolution here.

## B.    TEK Argues the Wrong Standard for FLSA Certification.

TEK improperly conflates the FLSA's "similarly situated" standard with the more demanding requirements for Rule 23 class certification.[1] "Rule 23(b)(3) class certification is a higher standard, because Rule 23(b)(3)'s predominance requirement requires a more rigorous showing than the FLSA's 'similarly situated' requirement." *Carr v. Flowers Foods, Inc.*, No. 15 Civ. 6391, 2019 WL 2027299, at *7 (E.D. Pa. May 7, 2019). Courts in this Circuit have repeatedly held that "complete symmetry of job functions is not required for final certification under the FLSA." *Rood v. R&R Express, Inc.*, No. 17 Civ. 1223, 2021 WL 3021978, at *6 (W.D. Pa. July 16, 2021) (cleaned up). Minor variations in how Recruiters performed their duties do not preclude certification where, as here, they were subject to common policies and expectations. *See McDonnell v. KRG Kings LLC*, No. 20 Civ. 01060, 2022 WL 3681672, at *2, 4 (W.D. Pa. Aug. 25, 2022) (granting final certification despite "minor" differences where plaintiffs held the same job, were subject to the same compensation and other policies, and shared similar working conditions).

Under the FSLA, courts in the Third Circuit consider if plaintiffs are similarly situated, including whether plaintiffs: (1) are employed in the same corporate department and location; (2) advance similar claims; (3) seek substantially the same form of relief; and (4) have similar salaries and circumstances of employment. *Zavala*, 691 F.3d at 536–37. Courts also look at: (1) whether individualized defenses overwhelm similarities; and (2) fairness and procedural considerations. *Id.*

Relying on *Reinig v. RBS Citizens, N.A.*, No. 15 Civ. 01541, 2023 WL 5497106, at *4 (W.D. Pa. Aug. 25, 2023), TEK argues that the Court should disregard the *Zavala* factors and focus solely

---

[1]    TEK quotes an unidentified case in arguing that at the decertification stage, courts apply a "stringent standard of proof." ECF No. 155 ("Def.'s Br.") at 23 (citing only "*Id.*"). The Third Circuit has said only that the standard of proof at final certification is "*more* stringent than the standard for *conditional* certification." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 534 (3d Cir. 2012) (emphasis added).

on TEK's administrative defense. But *Reinig* makes no such holding. In *Reinig*, an off-the-clock case, plaintiffs failed to identify a "common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Id.* at *4. Here, Plaintiffs identify a common policy and practice – misclassifying Recruiters as exempt from overtime. TEK's other cases are also inapplicable. As set forth in Plaintiffs' opening brief, TEK uniformly classifies all Recruiters as exempt from overtime, requires them to perform the same production work, holds them to the same standardized job requirements, and utilizes uniform reporting and evaluation processes. TEK cites to cases where the plaintiffs were not subject to similar uniform policies. In *Bell v. Reading Hosp. & Med. Ctr.*, No. 13 Civ. 05927, 2016 WL 3902938 (E.D. Pa. July 19, 2016), the plaintiffs alleged they missed breaks for various reasons. The court found that individual inquiries were necessary to examine if and why individuals missed meals. *Id.* at *11. Similarly, neither *Gordon v. Maxim Healthcare Servs., Inc.*, No. 13 Civ. 7175, 2017 WL 3116153 (E.D. Pa. July 21, 2017), nor *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291 (E.D. Pa. 2010), involved plaintiffs who were challenging a uniform exemption policy. The *Morisky* plaintiffs also held a "wide variety of positions and perform[ed] a wide variety of job duties." *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000). Here, Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team. Plaintiffs share the same job title, primary job duties, undergo the same training, are evaluated by the same production metrics, and work in the same department.[2]

### C.    The Collective Was Subject to Substantially Similar Employment Settings.

### 1.    Plaintiffs Are "Unified" Under TEK's Talent Delivery Department.

The first factor in the similarly situated analysis is whether workers are employed in the same department, division, or location. *Zavala*, 691 F.3d at 537. The underlying concern of this

---

[2]    ECF No. 142 ("Pls. Br.") at 5-21; Def.'s Br. at 2, 4 (admitting that Recruiters all "must complete" 13 weeks of uniform training).

factor is whether the employer imposes common practices and procedures that permit resolution of the claims based on common evidence, not whether the employees share identical duties within the same building. *See, e.g., Rivet v. Off. Depot, Inc.*, 207 F. Supp. 3d 417, 424-27 (D.N.J. 2016) (centralized common practices for a class of workers "regardless of [] location," demonstrates employees work in same business unit).

TEK's own corporate witness testified that Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team.[3] By placing undue emphasis on the fact that Recruiters work in different offices and that uniform reporting structures evolved slightly for *all Recruiters*, TEK defies precedent within the Third Circuit that recognizes shared characteristics—"unified" in the same department, have the same job title, undergo the same training, have uniform production quotas, and are subject to centralized reporting structures—establish that plaintiffs are part of the same department and division.[4] *See* Pls.' Br. at 29 (citing nationwide final certification cases); *Rivet*, 207 F. Supp. 3d at 424 (plaintiffs employed in the same corporate department or division because all locations abide by the "the same standard operating procedures . . ., regardless of [office] location and size."); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) ("variations in the plaintiffs' duties, job locations and hourly billing rates do not differentiate the collective basis of the class to the extent that it defeats the primary objectives of a § 216(b) action.").

## 2.    Plaintiffs Have Similar Claims and Seek Similar Forms of Relief.

---

[3]    ECF No. 143-6 (Haycock Tr.) 103:6-104:1; ECF No. 143-27 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 5.

[4]    In granting the more rigorous Rule 23 class certification, the *Avery* court noted that "while TEK has established the supervision structure changed over the class period, TEK has not established the level of supervision ever meaningfully changed." *Avery*, 2024 WL 590364, at *12.

That TEK misclassified all Recruiters as exempt based on its uniform exemption policy and denied Recruiters overtime wages establishes the second and third factors of the *Zavala* test: whether Plaintiffs have similar claims and seek substantially similar forms of relief. "The Third Circuit has held that the existence of a common policy may relieve concerns about plaintiffs' otherwise varied circumstances." *Talarico v. Pub. Partnerships, LLC*, No. 17 Civ. 2165, 2022 WL 1524109, at *11 (E.D. Pa. May 12, 2022). In applying *Zavala*, courts in this Circuit have repeatedly held that where workers challenge an entity's classification of employees as exempt, and demand to be paid overtime wages, this demonstrates similar claims and similar forms of relief. *Ivanovs v. BAYADA Home Health Care, Inc.*, No. 17 Civ. 01742, 2021 WL 3464771, at *4-5 (D.N.J. Aug. 6, 2021); *Rivet*, 207 F. Supp. 3d at 424.

### 3. Common Evidence Determines How TEK Paid Recruiters and Whether They Shared Circumstances of Employment.

Regarding the fourth factor of workers' salaries and employment circumstances, the common evidence demonstrates that TEK pays all its Recruiters on a salary basis, based on a set scale and has a uniform commission structure for all Recruiters.[5] *See Guy v. Absopure Water Co., LLC*, No. 20 Civ. 12734, 2023 WL 5953225, at *3-4 (E.D. Mich. Sept. 12, 2023) (different pay rates do not render plaintiffs dissimilar). TEK's contention that Recruiters must share a uniform pay rate to be similarly situated is unsupported by law. "[I]f one zooms in close enough on anything, differences will abound . . .The claims need to be viewed from a higher level of abstraction." *Casco v. Ponzios RD, Inc.*, 2021 WL 870709, at *9 (D.N.J. Mar. 9, 2021) ("Although the actual rate of pay differed by employee, such minute differences do not automatically vitiate the collective action.").

---

[5]    Ex. 179 (2020 Recruiter Compensation – U.S.) at TEK-Recruiter_Lit-00073389 (setting forth Recruiter salary scale and commission tiers).

In applying this *Zavala* factor, courts have looked to whether the collective is "all mak[ing] money through the same method" and whether their compensation structure is tethered to the same policy at issue in their FLSA claim. *Carr*, 2019 WL 2027299, at *4. Here, all members had the same job description, are paid on a salary basis within a corporate-dictated range, and all are denied overtime premiums, satisfying this criterion for similarly situated. [6]

Beyond compensation, Recruiters all share the same circumstances of employment that are relevant to the central dispute over whether TEK misclassified them as exempt from overtime. There is no dispute that the recruiting process, and Recruiters' role in it, is uniform. As a first step, TEK's clients determine their staffing needs, budget, and the requirements for open positions. *Avery*, 2024 WL 4281442, at *1.[7] It is Account Managers' ("AM") primary duty, and not Recruiters, to "directly communicate with TEK's clients regarding their hiring needs and requirements." *Id.*; *see also* Def.'s Br. at 9 (admitting the primary duty of AMs, and not Recruiters, is to engage with clients). Once TEK receives a client's requisition, Recruiters' role in the recruiting process is uniform:

> Recruiters "work to solicit candidates that meet the needs specified in the requisition." Recruiters search TEK's internal database ("Connected"), or other sources to find potential candidates that match clients' requirements. Recruiters present candidates that match the client's requirements to Account Managers. Account Managers decide which individuals to submit for consideration to TEK's clients, although the Recruiter's recommendation is often accepted. The client then decides which candidates to hire.

*Avery*, 2024 WL 4281442, at *1 (cleaned up) (relying on the same common evidence here).

---

[6]    ECF No. 143-68 (Marland May 28, 2019 Email with Job Description) at TEK-Recruiter_Lit-00588313; Ex. 179 (2020 Recruiter Compensation – U.S.) at TEK-Recruiter_Lit-00073389; ECF No. 55 (Def.'s Ans. to Pls. 1st Am. Compl.) Answers to ¶¶ 10, 87, 92, 98; ECF No. 143-7 (Def.'s Resp. to Pls. 1st Requests for Admission) No. 2; ECF No. 143-111 (2019 Recruiter Trainee Compensation Talking Points) at TEK-Recruiter_Lit-00103685.

[7]    ECF No. 143-3 (DiBenedetto Tr.) 166:9-167:15; ECF No. 143-4 (Doyle Tr.) 193:15-194:16, 195:8-198:12; ECF No. 143-91 (Maher Tr.) 142:13-24; ECF No. 143-48 (Richenberg Tr.) 63:3-16; *see also* ECF No. 143-2 (Def.'s Responses to Third Set of Interrogatories) at 3.

TEK's corporate documents and data, Plaintiffs' deposition testimony, and Plaintiffs' declarants corroborate the *Avery* court's findings. *See* Pls.' Br. at 6-13. TEK maintains an internal database where Recruiters enter their activities in real time. *Id.* at 18. The data demonstrates that the vast majority of Plaintiffs' activities—approximately 75%—involved attempting to make contact with candidates, conducting intakes, and making calls. *Id*.

TEK does not dispute that it uniformly subjects Recruiters to multiple levels of reporting; it just quibbles that the uniform practices do not constitute "supervision." Def.'s Br. at 19-21. For instance, TEK acknowledges that Recruiters attend daily Red Zone meetings where Recruiters receive work assignments and report on the work activities that they performed the prior day, but TEK argues the Red Zone meetings do not qualify as supervision. *Id*. at 20. TEK agrees that all offices mandate that Recruiters sit in the "pit," but it disputes that the goal of requiring Recruiters to sit in the pit is supervision. *See id*. TEK admits it monitors Recruiters' compliance with the uniform "production metrics" on a weekly basis, but argues about the purpose of the monitoring. *See id*. at 21; Pls. Br. at 21-23. TEK admits that it even exercises control over the specific job duties "such as number of calls and outreaches to potential candidates" that Recruiters make on a weekly basis. Def.'s Br. at 21; *see Nelson v. Avon Prod., Inc.*, No. 13 Civ. 02276, 2015 WL 1778326, at *7 (N.D. Cal. Apr. 17, 2015) (certifying under Rule 23's higher standard where supervisors monitored key performance indicators of all class members). Whether this level of uniform supervision renders Recruiters non-exempt is a liability question. All that is relevant at this stage is that the production metrics, policies requiring attendance at daily Red Zone meetings, and other work circumstances are *uniform* among Recruiters. Pls.' Br. at 17-18; *Alvarez v. BI Inc.*, 2020 WL 1694294, at *4 (E.D. Pa. Apr. 6, 2020) (similar training and responsibilities weigh in favor of finding that employees worked in the same department).

### D.    TEK's Defenses Will be Resolved on Substantially Similar Proof.

TEK asserts one affirmative defense–that *every* Recruiter is exempt from the FLSA overtime requirements.[8] "Nothing about the collective forum will prevent Defendant from employing these defenses." *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 382 (W.D. Pa. 2011). Regardless, the "existence of separate defenses does not necessarily mean that the plaintiffs are not similarly situated." *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 484 (E.D.N.Y. 2001). TEK appears to argue that collective certification is improper any time an employer raises the administrative exemption defense. Def.'s Br. at 24-26.[9] This is incorrect. Courts regularly grant final collective certification in cases where defendants rely on the exemption defenses. *See, e.g.,* *Rood*, 2021 WL 3021978, at *6; *Ivanovs,* 2021 WL 3464771, at *5; *Rivet*, 207 F. Supp.3d at 426; *Ruffin v. Avis Budget Car Rental, LLC*, No. 11 Civ. 1069, 2014 WL 294675, at *4 (D.N.J. Jan. 27, 2014).

#### 1.    Administrative Exemption Defense

The applicability of the administrative exemption can be determined based on common evidence. To prevail on the administrative exemption, TEK has the burden to prove that Recruiters' ***primary job*** duty: (1) is the performance of office or non-manual work directly related to the

---

[8]    For the reasons explained in Section II(D)(2), TEK's potential highly compensated employee exemption defense substantively overlaps with the administrative exemption.

[9]    The cases on which TEK relies are distinguishable. *See Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2nd Cir. 2010) (concluding district court did not abuse its discretion in determining common issues did not predominate in Rule 23 action where plaintiffs failed to assert their own deposition testimony was generalizable to other class members or submit other evidence regarding class members working at other locations outside of where the plaintiffs worked, but recognizing that the administrative exemption defense is not an inherently individualized inquiry and that district courts have certified state law claims involving FLSA exemptions); *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, No. 11 Civ. 3121, 2016 WL 1407743, at *6 (D.N.J. Apr. 11, 2016) (defendant's internal corporate policies showed significant variations among all aspects of putative collective members' duties and work circumstances); *Scott v. SSP Am., Inc.*, No. 09 Civ. 4399, 2011 WL 1204406 (E.D.N.Y. Mar. 29, 2011) (summary judgment decision involving a single plaintiff).

management or general business operations of the employer or the employer's customers; *and* (2) includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. TEK has failed to demonstrate that either of the prongs requires an individualized inquiry. TEK's argument that Recruiters' primary job duty renders them exempt, while wrong, is for the *merits* stage. Def.'s Br. at 5-6.

While TEK points to minor variations in how some Plaintiffs performed their screening and matching tasks, these differences are not material to whether the administrative exemption applies.[10] Courts have routinely rejected decertification attempts based on such minute differences. *Casco*, 2021 WL 870709, at *9; *Avery*, 2024 WL 4281442, at *9 ("TEK has not presented any evidence Recruiters' decisions as to *how* to source and screen candidates is a matter of significance for TEK.") (emphasis added). TEK also argues that Recruiters "validat[ed]" candidates' resumes in different ways, but this is not true. Recruiters do not technically evaluate potential job candidates.[11] Rather, TEK uses standardized online technical assessments and "Tech Outs" (in-person or telephonic skills evaluations with third-party experts paid for by TEK) to evaluate

---

[10]        TEK points out that some Recruiters developed and used their "networks" to find candidates, as if this constitutes a creative sourcing strategy. Def.'s Br. at 10-11. However, a Recruiter's network is simply a list of individuals the Recruiter has talked to, added as a connection in Connected or LinkedIn, or previously placed in a job for one of TEK's clients.  ECF No. 143-4 (Doyle Tr.) 135:21-136:20; ECF No. 101-5 (DiBenedetto Tr.) at 118:11-19; Ex. 174 (Bury Tr. II) 75:24-76:17 (Recruiters mark consultants with whom they spoke as "Network Addition" on Connected), 92:23-93:13; ECF No. 156-1 (Fink Decl.) at ¶ 18; ECF No. 143-18 (Blendy Tr.) 43:19-21; Ex. 180 (Welcome to The HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 71.

[11]        *See* ECF No. 143-6 (Haycock Tr.) 121:20-122:16 (TEK uses a third-party software to evaluate consultants' technical skills, and evaluation of a person's technical abilities is not typically the responsibility of Recruiters); ECF No. 143-3 (DiBenedetto Tr.) 168:2-7; *see also* ECF No. 143-91 (Maher Tr.) 87:3-11 (Q. "How would you validate whether they have the appropriate experience in those technologies?" A. "I can't."); Ex. 174 (Bury Tr. II) 118:2-13 ("I don't know software development or languages or coding, so I can't say I can actually validate what they do."); ECF No. 143-51 (Shestopalko Tr.) 63:3-12 ("I'm not technical myself, so I have no idea if – you know, a person can tell me they use the technology. I wouldn't know. My job is more so get that from them. Then that person goes to the account manager. It's their job to figure it out.").

candidates' technical skill. This is true for all Recruiters.[12] TEK also relies on vague language in Plaintiffs' LinkedIn profiles to argue for decertification. Courts have routinely refused to decertify based on similar arguments. *Ivanovs*, 2021 WL 3464771, at *5 ("Defendant relies upon the minutia of each Plaintiff's work day and the job duties listed on some Plaintiffs' resumes and LinkedIn profiles to argue against this case proceeding as a collective action. Courts, however, 'have routinely held [that] [p]laintiffs do not need to be identical to be similarly situated for purposes of an FLSA collective action.'").[13] For example, TEK points to language from certain Plaintiffs' LinkedIn profiles that refer to "full life cycle" and "interview[ing]" candidates. Def.'s Br. at 6. However, Plaintiffs and TEK's witnesses uniformly testified that clients, not Recruiters, interviewed candidates. Pls. Br. at 12-13. TEK does not dispute the common evidence that its *clients* interview and determine whether to hire a candidate.[14]

> ### a. Plaintiffs Are Similarly Situated Because They All Are Production Workers.

Where an employee's primary duty supports their employer's marketplace offerings, such

---

[12] Ex 181 (Recruiter Skill Plan Onboarding Facilitator Guide March 2020) at TEK-Recruiter_Lit-00077253, p. 30 (explaining that "TEK has various tools to help validate skills of our consultants and set them apart from the competition" and describing these tools as IKMs (standardized online assessments) and Tech Outs (in person or telephonic evaluations conducted and scored by experts paid by TEK); Ex. 182 (Doyle Email Aug. 13, 2020) TEK-Recruiter_Lit-00125624 (showing technical screenings of consultants are performed either through an assessment or a Tech Out from a consultant); Ex. 173 (Baker Tr. II) 69:20-70:2.

[13] As both Plaintiffs and Defendant's witnesses' testimony demonstrates, LinkedIn profiles and resumes may be untrustworthy because they commonly contain exaggerations or "fluff." *See, e.g.*, Ex. 170 (Kartchner Tr.) 53:9-54:3; Ex. 171 (McNelley Tr. II) 24:20-25:23 (TEK's witness admitting her LinkedIn profile contained an omission); Ex. 175 (Raras Tr. II) 125:15-21, 124:12-125:9; ECF No. 143-51 (Shestopalko Tr.) 101:8-20; Ex. 176 (Suliman Tr. II) 121:8-122:3.

[14] ECF No. 143-3 (DiBenedetto Tr.) 188:2-9 (noting the difference from when a Recruiter speaks to a job candidate and when "a consultant is actually interviewing with the customer"); ECF No. 143-4 (Doyle Tr.) 158:1-12; ECF No. 143-33 (Burke Tr.) 137:13-21; ECF No. 143-95 (Suliman Tr.) 85:2-10; ECF No. 143-134 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted your screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates.")

as providing recruiting services for a recruitment firm, the employee's work is not related to management policies or general business operations. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991). The phrase "work directly related to the management or general business operations" means work directly related to "assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). This distinction is often referred to as the "administrative/production dichotomy." *Rood*, 2022 WL 1082481, at *6. TEK does not rebut the corporate-wide, common evidence that TEK views the Recruiters as "producers." Pls. Br. at 6 n.18. If Recruiters are producers for TEK, they cannot be exempt. TEK requires Recruiters to meet specific uniform production metrics per week, and Recruiters are evaluated on meeting this quota. *Carr*, 2019 WL 2027299, at *4 ("Indeed, as to a number of the most salient features of [p]laintiffs' work, there is near uniformity among the members of the collective."). TEK also concedes that it has uniform expectations for all Recruiters, including: "recruit[ing]," using "networking tools," and "screening" candidates. Def.'s Br. at 5-6.

At summary judgment, the *Avery* court found that Recruiters' primary duty involved the "day-to-day carrying out of TEK's business—finding talent for its clients—and not performing work related to TEK's management policies or general business operations." *Avery*, 2024 WL 4281442, at *4; *see also Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 8 (1st Cir. 2023) (noting that dispatchers provided day-to-day services to the employer's customers and did not "analyze how [systems] work or how they can be improved"). Plaintiffs are similarly situated because the key question is whether Recruiters serve TEK's business purposes, and this will be the same for all Plaintiffs. *Walsh*, 64 F.4th at 6.

The *Avery* court relied on common evidence in finding that Recruiters' primary job duty

also did not relate to the management of TEK's customers, because "TEK's Recruiters do not independently judge or manage the work of consultants; instead, they merely communicate TEK's clients' feedback to consultants or communicate information from Account Managers to consultants." *Avery*, 2024 WL 4281442, at *7 ("given that TEK does not require Recruiters to have IT experience, and that TEK hires many Recruiters right out of college, it would defy common sense to have Recruiters, rather than TEK's clients or management, 'manage' the IT professional consultants.") (citing ECF No. 143-3 (DiBenedetto Tr.) 185:4-14.).[15]

TEK argues that some Recruiters occasionally worked to "refine" the clients' job requirements, but this does not create an impediment to final certification. First, TEK does not argue that this duty is some Recruiters' *primary duty* (nor can it make that argument because it is the AM's primary job duty to interact with clients). Thus, this does not create dissimilarities that would support decertification. *Ruffin*, 2014 WL 294675, at *3 (minor variations in job duties does not necessitate decertification). Second, the evidence on which TEK relies does not support that Recruiters *advised* the clients on management or business operations – rather Plaintiffs *occasionally* met with clients while *with the AMs* and *occasionally* asked clarifying questions.[16]

---

[15]    TEK argues the Recruiters are not "exclusively entry-level." Def.'s Br. at 3, n.8. However, TEK advertises and treats the role as entry-level. ECF No. 143-6 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; ECF No. 143-22 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); ECF No. 143-28 (Recruiter Interview Aid) at TEK-Recruiter_Lit-00020318 ("At an entry level role, there are certain competencies that are more likely correlated to performance than others."); ECF No. 143-29 at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 (approximately 74% of Recruiters have less than two years of experience).

[16]    TEK contends that Opt-in Plaintiff John Bury worked with clients to help define requirements. Def.'s Br. at 7, n. 19 (citing ECF No. 157-2 (Bury Tr.) at 40:3-12). But Mr. Bury never testified that he advised clients or helped define requirements. To the contrary, Mr. Bury testified that the Account Managers, not Recruiters, primarily interact with TEK's clients, *id*. at 39:8-16. On the occasions he attended Account Managers' meetings with TEK clients, he "asked questions just about the technologies" so he could "get a better understanding of the top skills that

This too does not render any of the Plaintiffs dissimilar with respect to the *primary job duty*. *See Rivet*, 207 F. Supp. 3d at 425-26. Many of TEK's assertions regarding Recruiters' job duties are unsupported by any citations, *see, e.g.* Def.'s Br. at 8, or misrepresent the full context of Plaintiffs' testimony.[17]

Further, the *Avery* court found that common evidence demonstrated that *TEK's clients*, and not the Recruiters, determine the clients' hiring needs, staffing budget, and requirements necessary for open job positions. *Id.*[18] Common evidence also shows that Recruiters are not involved in

_____

we should be looking for" not to *advise* TEK's clients. *Id*. at 40:3-12. TEK similarly misconstrues Maria Conyers-Jordan's testimony. Def.'s Br. at 7, n. 19. Ms. Conyers-Jordan did not advise TEK's clients. In fact, she had virtually no contact with them. ECF No. 143-34 (Conyers-Jordan Tr.) 68:14-23 ("The only time I had direct communication with a hiring manager was when I went with an Account Manager to meet them, but that was a one-off-situation for sure. I didn't have access to, like, contact and communicate the client hiring managers at Comcast because you would need an account manager for then. So that was – their role."), 68:4-5. Likewise, while Alexia Fronzaglio testified that at times she brought Recruiters to her client calls, she points to only two Recruiters who provided general market information to clients, and neither of those Recruiters are Plaintiffs. *See* ECF No. 156-10 (Fronzaglio Decl.) at ¶ 7. As former Account Manager Alexandra Pappas testified, it was the Account Managers' primary duty to communicate with TEK's clients, and during the rare occasions when Recruiters were included in Account Managers' calls to clients, it was TEK's expectation that Account Managers lead the conversations. ECF No. 143-12 (Pappas Tr.) 20:13-21:1; Ex. 172 (Pappas Tr. II) 26:22-24.

[17]    TEK refers to "Section C, 2 below" for its contention that many Recruiters would "decide where the best place was to find…candidates" but Section C, 2 does not exist.  Def.'s Br. at 7, n. 21. TEK also states without citation that many Recruiters "evaluated candidate's non-technical skills…like communication style, leadership experience, and temperament", and, among other things, "decide at each step…whether the candidate would continue through the process, including which candidates to offer for consideration by the client."  Def.'s Br. at 7-8.  TEK fails to provide any support for its assertion that "Recruiters are expected to use their detailed industry knowledge as well as their experience and judgment to make sure that a candidate is not only a potential match for a client, but an excellent match that will fulfill the client's business needs and grow TEK's business."  Def.'s Br. at 12. Throughout its Opposition, TEK also frequently misconstrues Plaintiffs' testimony, *see, e.g.*, *supra* at n. 16, or passes off testimony from Senior Recruiters and Account Recruiting Managers as that of Recruiters. *See* Def.'s Br. at 19 & n. 53 (citing testimony from Jason Schwan and John Donahue to support its argument that Recruiters were subjected to varying levels of supervision despite its awareness that neither Schwan nor Donahue were Recruiters during the collective period; Ex. 177 (Major Dec. II) ¶ 6).

[18]    The *Avery* court relied on the same deposition testimony of TEKsystems' Rule 30(b)(6) witnesses to demonstrate that clients, rather than Recruiters, decide which candidates to hire and

creating or implementing management, operational or human resource policies for TEK or TEK's customers; and Recruiters do not provide human resource services, employee benefit functions, or quality control services for TEK or its clients. Pls. Br. at 13-15, n. 45-48, 51.

> **b.    Plaintiffs' Common, Primary Job Duties Do Not Include Customarily and Regularly Exercising Discretion and Independent Judgment on Matters of Significance.**

TEK does not rebut Plaintiffs' common evidence that Recruiters' *primary duty* does not include customarily exercising discretion over *matters of significance*. Corporate documents and testimony demonstrate that multiple employees supervise Recruiters throughout the talent delivery department. Pls. Br. at 21-24; *Avery*, 2024 WL 590364, at *2 ("TEK's internal database allows for Recruiters' supervisors to see metrics . . . 'on a daily basis.'").[19] Recruiters cannot deviate from TEK or its customers' established policies and procedures without prior approval – they must source candidates that "match" the predetermined customers' needs and must meet TEK's uniform production metrics.[20] Plaintiffs rely on quantitative data, which demonstrates that approximately 75% of Recruiters' activities include: (1) attempting to contact individuals to solicit them for jobs; (2) calls with potential job candidates; and (3) G2 potential candidate intakes.[21]

---

how much to pay consultants, and that TEK and the clients negotiate the "burden" or costs associated with employing the consultant. *Avery*, 2024 WL 4281442, at *5; ECF No. 143-3 (DiBenedetto Tr.) 166:9-167:14; ECF No. 143-4 (Doyle Tr.) 193:15-194:16, 195:8-198:12. The *Avery* court, relied on Defendant's interrogatory responses stating that "[t]he rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters" to find that Recruiters do not set the bill rate. *Avery*, 2024 WL 4281442, at *5, n.3; ECF No. 143-2 (Def.'s Responses to Third Set of Interrogatories) at 3.

[19]    ECF No. 143-4 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead"), 254:12-21; *see also* ECF No. 143-132 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Using the weekly report, a Lead should be able to identify which activities a recruiter needs to focus on."); ECF No. 143-71 (WIN Narratives) TEK-Recruiter_Lit-00392430.

[20]    ECF No. 143-4 (Doyle Tr.) 185:1-188:14 (customer decides job requirement); ECF No. 143-6 (Haycock Tr.) 59:2-7 (Recruiters must find candidates that *match* the requisitions that are determined by TEK's customers), 140:13-15, 158:20-162:5; *supra*.

[21]    ECF No. 143-96 (Major Decl.) ¶ 18.

TEK does not rebut the common evidence that TEK's client's requisition forms dictate the required qualifications or that Recruiters cannot bind TEK or its customers on matters of significance. TEK concedes the recruiting process is uniform - Recruiters are multiple levels away from any staffing or hiring decisions (matters of significance).[22] In engaging in intakes, TEK requires all Recruiters to perform G2 intakes and enter information into prompts in TEK's database. Pls. Br. at 11. Recruiters' job duties do not rise to the level of discretion on matters of significance required by the regulations. *See* Pls. Br. at 35-37. This is particularly true where the decision to hire rests with TEK's customers and the majority of requisitions that TEK works on, its customers do not hire *any* candidates provided by TEK. ECF No. 143-5 (Doyle Sealed Tr. Portion) 237:20-238:9. These types of common restraints on discretion, common reporting structures, and uniform quotas support that Plaintiffs are similarly situated. *Rivet*, 207 F. Supp. 3d at 424.

TEK argues that Recruiters' duties render them administratively exempt, Def.'s Br. at 26-29, but this is a merits argument inappropriate for this stage of the case. *Rivet*, 207 F. Supp. 3d at 423 (declining to consider defendant's merits arguments at final certification phase). As such, the court should disregard TEK's heavy reliance on summary judgment cases. Def.'s Br. at 26-29.[23]

TEK's blanket merits assertion that Recruiters are "highly specialized" concedes the

---

[22]    Def.'s Br. at 6, 8 (admitting that TEK's customers make hiring decisions).

[23]    *Drake v. Aerotek, Inc.*, No. 14 Civ. 216, 2016 WL 80672 (W.D. Wis. Jan. 7, 2016); *Levitt v. Tech. Educ. Servs., Inc.*, No. 10 Civ. 6823, 2012 WL 3205490, at *8 (E.D. Pa. Aug. 7, 2012); *Andrade v. Aerotek, Inc.*, 700 F. Supp. 2d 738, 746 (D. Md. 2010), *Goff v. Bayada Nurses, Inc.*, 424 F. Supp. 2d 816, 821 (E.D. Pa. 2006), and *Hudkins v. Maxim Healthcare Servs., Inc.*, 39 F. Supp. 2d 1349, 1350 (M.D. Fla. 1998) are not certification decisions relevant to whether Plaintiffs are similarly situated here. None of these cases included an analysis about whether the plaintiffs were production employees, and, therefore, not administratively exempt. The *Avery* court's summary judgment decision demonstrates that questions of liability can be answered on a collective-wide basis for TEK Recruiters. *Avery*, 2024 WL 4281442, at *11.

appropriateness of collective litigation. Def.'s Br. at 18. While wrong, this is a merits argument that is inappropriate at this juncture. *See Avery*, 2024 WL 4281442, at *10 (TEK's internal documents indicate Recruiters are an "entry-level position.") (quoting ECF No. 143-63 (in describing efforts to hire more Recruiters, indicating employees should "[b]e careful with the super tenured candidate. Try to stay under 5 years of experience, being this is an entry-level position."))[24]

The other cases upon which TEK relies are distinguishable. For example, in *Andrade v. Aerotek, Inc.*, No. 08 Civ. 2668, 2009 WL 2757099, at *1-3, n.7 (D. Md. Aug. 26, 2009), the court denied certification in a case brought by recruiters *and* their managers in which candidates were recruited for a wide variety of jobs – including "blue collar" and "white collar" jobs and where some recruiters could make hiring and firing decisions. One of the primary similar issues in this case - whether Recruiters' primary job duty is production – was not examined by the *Andrade* court. Similarly, TEK's reliance on *Aquilino v. Home Depot, U.S.A., Inc.*, No. 04 Civ. 04100, 2011 WL 564039 (D.N.J. Feb. 15, 2011) is misplaced. In *Aquilino*, some plaintiffs had the authority to make ultimate hiring and firing decisions and some did not, and some had the ability to bind the employer financially and some did not. *Id.* This disparity is not present here. Def.'s Br. at 22 (citing testimony that TEK's *clients* make hiring decisions).[25]

---

[24]    TEK argues that different tenures necessitate decertification but fails to cite a single case decertifying a collective based on different tenures. Further, the *vast* majority of Recruiters only stay in the position a little over a year. *See* Pls. Br. at 5; ECF No. 143-96 (Major Dec.) ¶ 25. In fact, TEK only identifies two Opt-in Plaintiffs who worked close to five years (TEK exaggerates their tenure). Def.'s Br. at 4, n. 13; Ex. 177 (Major Dec. II) ¶ 7.

[25]    TEK also relies heavily on out-of-circuit cases that are also distinguishable. *See, e.g., DaRosa v. Speedway LLC*, 557 F. Supp. 3d 315, 322 (D. Mass. 2021) (plaintiff-managers testified differently regarding if they primarily managed or engaged in hourly tasks of their subordinates. Here, the parties do not dispute the job duties – soliciting potential candidates to submit to AMs. The parties only dispute whether those duties are exempt.); *Levine v. Vitamin Cottage Nat. Food Markets, Inc.*, No. 20 Civ. 00261, 2023 WL 3648684, at *5 (D. Colo. May 25, 2023) (same); *Ruiz*

## 2.    Highly Compensated Employee Exemption.

TEK's assertion of the highly compensated employee ("HCE") exemption for some Plaintiffs does not defeat certification. First, TEK only identifies a single Recruiter who potentially could qualify for the HCE exemption. The second Opt-in Plaintiff TEK identified, Jason Phillip Arndt, worked for TEK in a role other than Recruiter for the year TEK asserts he met the HCE exemption. Ex. 177 (Major Dec. II) ¶ 8. The HCE exemption is an affirmative defense, and it is TEK's burden to prove. *Berrada v. Cohen*, No. 16 Civ. 574, 2018 WL 4629569, at *6 (D.N.J. Sept. 27, 2018). Even if the HCE applied to some Recruiters, the existence of a defense applicable to a few collective members does not justify decertification of the entire collective. *See Fenley v. Wood Grp. Mustang, Inc.*, 325 F.R.D. 232, 246 (S.D. Ohio 2018) (defendant raising the HCE defense with respect to some plaintiffs does not warrant decertification); *Hudgins v. Total Quality Logistics, LLC*, No. 16 Civ. 7331, 2019 WL 354958, at *7 (N.D. Ill. Jan. 29, 2019).[26] Regardless, the HCE exemption still requires that the employee "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(a). This inquiry overlaps substantially with the administrative exemption and can be addressed collectively.

---

*v. Serco, Inc.*, No. 10 Civ. 394, 2011 WL 7138732, at *5-6 (W.D. Wis. Aug. 5, 2011) (proposed collective included 15 different job titles); *King v. W. Corp.*, No. 04 Civ. 318, 2006 WL 118577, at *14-15 (D. Neb. Jan. 13, 2006) (plaintiffs held multiple distinct jobs that provided different services to defendant's customers, which is not the case here).

[26]    TEK's reliance on *Sloane v. Gulf Interstate Field Serv.'s, Inc.*, No. 16 Civ. 01571, 2017 WL 1105236, at *16, 22 (M.D. Penn. Mar. 24, 2017) is misplaced. The *Sloane* court declined to conditionally certify a collective of at least 10 different job positions, which had distinct job duties, and were supervised by defendant's different clients.

### 3. Whether TEK Violated the FLSA Willfully Does Not Create an Issue that Warrants Decertification.

TEK argues that the FLSA Collective must be decertified because 109 Plaintiffs must prove willfulness to extend the statute of limitations from two to three years, because they only worked in the third year. TEK's argument fails for two reasons. One, the willfulness inquiry is not limited to 109 Opt-in Plaintiffs. It more broadly applies to an additional 131 Opt-in Plaintiffs who worked for TEK as Recruiters in the first and/or second year of the limitations period as well as the third year of the limitations period. [27] Two, the willfulness inquiry is perfectly suited to be resolved on a collective basis because the inquiry examines whether TEK knew or showed reckless disregard for whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). This determination will turn on common evidence regarding TEK's decisions about the exemption classification and corresponding policies. Courts reject the notion that a willfulness defense warrants decertification. *See Wintjen v. Denny's Inc.*, No. 19 Civ. 00069, 2023 WL 4510520, at *3 (W.D. Pa. July 13, 2023); *Moss*, 201 F.R.D. at 411; *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 313 (D. Md. 2014).

### 4. Non-Exempt Recruiter Trainees and Other Roles, and Those Without Timely Claims Are Not Part of the Collective.

TEK argues the FLSA should be decertified because 66 Opt-in Plaintiffs only worked for TEK as non-exempt Recruiter Trainees and 34 Opt-in Plaintiffs never worked as Recruiters. This does not justify decertification of the FLSA Collective because Opt-in Plaintiffs who never worked as Recruiters do not fall within the definition of the FLSA Collective and do not have claims in the lawsuit. At the time notice was issued, the collective was defined to include only those employees who were "employed by Defendant as Recruiters . . . who were paid on a salary basis and classified

---

[27]    Ex. 177 (Major Dec. II) ¶ 9-10.

as exempt from overtime." ECF No. 24. Notice should have been limited to individuals who fell within this definition, but TEK mistakenly provided an overinclusive collective list. This resulted in individuals who do not belong in the FLSA Collective who filed opt-in forms. Plaintiffs agree that Opt-in Plaintiffs who did not work as exempt Recruiters should be removed from the case. Plaintiffs request the opportunity to meet and confer with Defendant to (1) reach agreement on which Opt-in Plaintiffs do not belong in the FLSA Collective, and (2) discuss a procedure for removing Opt-in Plaintiffs who do not fall within the FLSA Collective definition from the lawsuit and giving them notice of their removal. Individuals who do not meet the collective definition can be easily identified and excluded without undermining collective treatment for those who do qualify. *See Cottle v. Falcon Holdings Mgmt., LLC*, 892 F. Supp. 2d 1053, 1073-74 (N.D. Ind. 2012) (declining to decertify class and removing opt-in plaintiffs who received notice through defendant's overinclusive notice list).

Similarly, individuals who did not file consent forms within three years from the last date of their employment as a Recruiter, do not have a timely claim, are easily identifiable, and can be dismissed from the case. *See Moss*, 201 F.R.D. at 411 (concluding it is more efficient and practical to consider statute of limitations defenses for each plaintiff in a single collective than to decertify the collective and analyze the statute of limitations for each plaintiff in 70 separate lawsuits).

E.    **Fairness and Procedural Considerations Favor Certification.**

Fairness and procedural considerations strongly favor final certification. Decertification would "place each opt-in Plaintiff back at square one without the benefit of pooled resources to resolve" the common liability questions in this case. *McDonnell*, 2022 WL 3681672, at \*6 (cleaned up). It would also result in duplicative proceedings and risk inconsistent rulings on the same legal issues. *Rivet*, 207 F. Supp. 3d at 428 ("Even if many [exempt-classified plaintiffs] did individually sue, litigating hundreds of individual wage and hour claims arising out of the same corporate policy

would place an onerous—and totally unnecessary—burden on this Court."). The interests of judicial economy are best served by allowing this case to proceed collectively.

### F.    TEK's Declarations Are Irrelevant and Should be Disregarded.

For the reasons stated in Plaintiffs' Motion to Strike, the Court should strike the twelve declarations TEK failed to timely produce in discovery. *See* ECF No. 161. Alternatively, the declarations should be given little to no weight because they do not speak to the *Opt-in Plaintiffs'* experiences and are not relevant to their claims. *Goodman v. Burlington Coat Factory,* No. 11 Civ. 4395, 2012 WL 5944000 (D.N.J. Nov. 20, 2012) (declining to consider 38 declarations the defendant submitted in opposition to the plaintiffs' motion for conditional certification because "the Court will consider the individual differences among the [employees] who actually opt-in"). TEK's declarations also should be given little weight because they were almost exclusively obtained from individuals who have been promoted out of the Recruiter role. Additionally, all of TEK's declarants are current employees. Given the significant influence employers wield against current employees, "courts have expressed skepticism about the use of these 'happy camper' declarations to defeat a motion for class certification in wage and hour cases." *Nash v. Horizon Freight Sys., Inc.*, 2020 WL 7640878, at *1 (N.D. Cal. Dec. 23, 2020) (collecting cases). Happy camper declarations are even more suspect where, as here, defendants rely almost exclusively on them and largely ignore the voluminous evidence supporting certification, including TEK's business records and the deposition testimony. *See Sobolewski v. Boselli & Sons, LLC,* No.16 Civ. 01573, 2018 WL 3838140, at *4 (D. Colo. June 13, 2018).

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Final FLSA Collective Action Certification.

Dated: November 15, 2024

Respectfully submitted,

*/s/* Sally J. Abrahamson

Sally J. Abrahamson* (DC 999058)
sabrahamson@flsalaw.com
**Werman Salas P.C.**
335 18th Pl NE
Washington, D.C. 20002
Phone No.: (202) 830-2016
Fax No.: (312) 419-1025

Douglas M. Werman * (IL 6204740)
dwerman@flsalaw.com
Maureen A. Salas* (IL 6289000)
msalas@flsalaw.com
Anne Kramer* (MA 697435)
akramer@flsalaw.com
Joseph E. Salvi* (IL 6336691)
jsalvi@flsalaw.com
**Werman Salas P.C.**
77 West Washington Street, Ste 1402
Chicago, Illinois 60602
Phone No.: (312) 419-1008
Fax No.: (312) 419-1025

Sarah R. Schalman-Bergen (PA 206211)
ssb@llrlaw.com
Krysten Connon* (PA 314190)
kconnon@llrlaw.com
Olena Savytska* (MA 693324)
osavytska@llrlaw.com
**Lichten & Liss-Riordan, P.C.**
729 Boylston Street, Suite 2000,
Boston, MA 02116
Phone No.: (617) 994-5800
Fax No.: (617) 994-5801

*Attorneys for Plaintiffs and the FLSA Collective and Proposed Rule 23 Classes*

*\*Pro hac vice*

21