# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
### PITTSBURGH DIVISION

| | |
|---|---|
| MICHAEL THOMAS, MARIA CONYERS-JORDAN, AUSTIN SHERMAN, LYNDA ALEXANDRA MAHER, AVA DORE, RACHEL RICHENBERG, and EMILY BURKE, on behalf of themselves and others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>TEKSYSTEMS, INC.,<br><br>　　　　　Defendant. | Civil Action No.　2:21-cv-00460-WSS<br><br>CLASS AND COLLECTIVE ACTION |

**DEFENDANT'S SUR-REPLY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR FINAL FLSA COLLECTIVE ACTION CERTIFICATION**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................1

II. ARGUMENT ..................................................................................................................1

    A. PLAINTIFFS HAVE NOT SATISFIED THE STRINGENT STANDARD OF PROOF TO SHOW THAT MEMBERS OF THE COLLECTIVE ARE SIMILARLY SITUATED AND COMMON QUESTIONS CAN BE ANSWERED ON A COLLECTIVE BASIS. .......................................................... 1

    B. MEMBERS OF THE PROPOSED COLLECTIVE ARE NOT SIMILARLY SITUATED ........................................................................................ 3

    C. THIS COURT SHOULD DISREGARD DECISIONS IN *AVERY*, WHICH ARE BASED ON APPLYING CALIFORNIA LAW TO DIFFERENT FACTS ......................................................................................... 16

III. CONCLUSION .............................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Andrade v. Aerotek, Inc.*,
    No. CCB-08-2668, 2009 WL 2757099 (D. Md. Aug. 26, 2009) ............................ 13

*Aquilino v. Home Depot, U.S.A., Inc.*,
    2011 WL 564039 (D.N.J.,2011) ....................................................................... 7, 13

*Camesi v. University of Pittsburgh Medical Center*,
    2011 WL 6372873 (W.D.Pa. 2011) ..................................................................... 2, 3

*DaRosa v.Speedway LLC*,
    557 F. Supp. 3d 315 (D. Mass. 2021) ..................................................................... 14

*Gordon v. Maxim Healthcare Services, Inc.*,
    2017 WL 3116153 (E.D.Pa. 2017) .......................................................................... 7

*Halle v. West Penn Allegheny Health System, Inc.*,
    842 F.3d 215 (3rd Cir. 2016) ................................................................................... 6

*Morales v. Compass Grp., PLC*,
    No. CV 13-9231-JFW MANX, 2014 WL 5304913 (C.D. Cal. Oct. 16, 2014) ....... 5

*Prise v. Alderwoods Group, Inc.*,
    817 F.Supp.2d 651 (W.D. Pa. 2011) ....................................................................... 2

*Reinig v. RBS Citizens, N.A.*,
    No. 2:15-CV-01541-CCW, 2023 WL 5497106 (W.D. Pa. Aug. 25, 2023) ..... 2, 3, 6

*Ruiz v. Serco, Inc.*,
    No. 10-cv-394-bbc, 2011 WL 7138732 (W.D. Wis. Aug. 5, 2011) ......................... 7

*Zavala v. Wal-Mart Stores, Inc.*,
    691 F.3d 527 (3rd Cir. 2012) ......................................................................... *passim*

*Zivali v. AT&T Mobility, LLC*,
    784 F.Supp.2d 456 (S.D.N.Y. 2011). ...................................................................... 2

315123972v.1

I.  **INTRODUCTION**

Plaintiffs have failed to show by a preponderance of the evidence that the Court should grant final certification of their FLSA collective actions claims. A careful inspection of the evidence, which the case law requires, shows that Plaintiffs' representations do not match the record. Plaintiffs ignore or elide material and contradictory differences in the employment circumstances of Recruiters in the collective, as reflected in the testimony of Named Plaintiffs, Opt-In Plaintiffs, managers, peers, corporate witnesses, and corporate documents. An accurate assessment shows that there are far too many differences across far too many variables for the Court to fairly and efficiently adjudicate the claims of hundreds of Named Plaintiffs and Opt-Ins on a collective basis. And contrary to Plaintiffs' arguments, these differences are not "merits" questions that can be ignored now and to be resolved at a later time. Rather, these differences in employment circumstances illustrate that members of the collective are not similarly situated to each other and their claims cannot be resolved on a collective basis.

For the reasons stated in TEK's opposition brief and this sur-reply, the Court should deny Plaintiff's motion for final certification of the FLSA collective action and dismiss the claims of the Opt-In Plaintiffs without prejudice.

II.  **ARGUMENT**

    A.  **PLAINTIFFS HAVE NOT SATISFIED THE STRINGENT STANDARD OF PROOF TO SHOW THAT MEMBERS OF THE COLLECTIVE ARE SIMILARLY SITUATED AND COMMON QUESTIONS CAN BE ANSWERED ON A COLLECTIVE BASIS.**

When considering final certification, the Court applies a "stringent standard of proof" to determine whether Named Plaintiffs and Opt-Ins are "similarly situated" for purposes of the FLSA.

1

*Zivali v. AT&T Mobility, LLC*, 784 F.Supp.2d 456, 460 (S.D.N.Y. 2011).[1] As the Third Circuit has explained, district courts should undertake an *ad hoc* analysis to determine whether members of the collective are similarly situated, taking into account "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment," as well as whether there are "dissimilar[ities] based on the existence of individualized defenses." *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 537 (3rd Cir. 2012).

Plaintiffs falsely assert in their Reply that "TEK argues that the Court should disregard the *Zavala* factors[.]" (ECF 164 at 8.) That is plainly not true; TEK cited *Zavala* in its opposition brief and spent pages explaining how Plaintiffs did not satisfy the factors spelled out in that case. (ECF No. 155 at 29, 32, 39-40.) TEK also pointed to case law in this District explaining that courts must go beyond a "first glance" to conduct an inspection of the *Zavala* factors and how they apply in the case at bar. (*Id.* at 39, citing *Reinig v. RBS Citizens, N.A.*, No. 2:15-CV-01541-CCW, 2023 WL 5497106 (W.D. Pa. Aug. 25, 2023) (decertifying collective, and taking note of varied and inconsistent testimony on relevant issues, as well as the geographic dispersion of opt-ins, differences in managers, and each opt-in's "considerable flexibility with where they work, how they perform their duties, how they schedule their days, and how they follow up with clients.").

That is not rejection of *Zavala*; it is a recognition that plaintiffs must meet a higher standard to obtain final certification and courts must scrutinize the evidence rather than accepting plaintiffs'

---

[1] In TEK's earlier opposition brief, the citation to *Zivali* was not shown clearly. (ECF No. 155 at 29.) Courts in this district apply the same standard. *See, e.g., Prise v. Alderwoods Group, Inc.*, 817 F.Supp.2d 651, 670 (W.D. Pa. 2011) ("the court uses a significantly higher standard to analyze the similarly situated issue at the decertification stage" as compared to conditional certification); *Camesi v. University of Pittsburgh Medical Center*, 2011 WL 6372873, at *3 (W.D.Pa. 2011) (plaintiffs' "burden is significantly higher at stage II").

2

representations as true. As one court explained, "[t]he entire purpose of the similar situation analysis is to determine whether the benefits of resolving common questions outweigh the difficulties presented by individualized inquiries." *Camesi*, 2011 WL 6372873, at *10 (decertifying collective).

Analyzed under this standard, the differences among Named Plaintiffs and Opt-Ins in this case preclude final certification of a collective.

> **B. MEMBERS OF THE PROPOSED COLLECTIVE ARE NOT SIMILARLY SITUATED**
>
> **1. Members Of The Proposed Collective Are Not Employed In The Same Corporate Department, Division, And Location, Or Under Similar Circumstances Of Employment.**

An assessment of whether collective members are similarly situated includes consideration of "whether the plaintiffs are employed in the same corporate department, division, and location" and similar "circumstances of employment." *Zavala*, 691 F.3d at 536-37. No such similarities are present here.

Members of the collective are spread out and aligned to more than 100 different locations in 38 states and the District of Columbia. (ECF No. 156 ¶ 64.) They also reported to hundreds of separate managers while working as Recruiters.[2] These are undisputed facts, and they support decertification. *Reinig*, 2023 WL 5497106 at *5 (decertifying collective where "opt-in [plaintiffs] are scattered across the country in 18 different states … and worked for many different managers").

The variations among the dozens of locations where collective members worked also reflect differences in the circumstances of their employment. Plaintiffs direct their attention to field offices, and amodel that has become increasingly uncommon at TEK. Some, but not all, of the Named Plaintiffs and Opt-Ins worked in field offices that focused on filling local requisitions, and

---

[2] Scroggins Decl. ¶ 4.

3

in those working environments they reported to Account Managers ("AMs") and/or Directors of Business Operations ("DBO").[3] According to some Named Plaintiffs and Opt-Ins, the DBOs or AMs in those offices ran daily meetings and gave out work assignments. (ECF No. 142 at 25.)

Other Named Plaintiffs and Opt-Ins were aligned to locations focused exclusively on one client. This was true of Named Plaintiff Maria Conyers-Jordan, Opt-In Sean Blendy, and others.[4] These locations often have exclusive relationships with the customer (i.e., no other staffing company is retained to fill open positions), and repeated work for a single customer means that Recruiters working in such an arrangement become deeply knowledgeable about the client, including the client's principles, culture, work environment, and project needs, among other things.[5]

As an example of yet another type of work environment, at least 65 Named Plaintiffs and Opt-Ins were aligned to Delivery Centers.[6] Delivery Centers bring together Recruiters of different experience levels and different areas of specialization, who service multiple marketplaces or locations, and learn from and develop each other.[7] Some Recruiters work onsite at a Delivery Center, while others are part of virtual teams aligned to a Delivery Center.[8] Delivery Centers do not have DBOs or AMs at all. (ECF No. 155 at 40.)

---

[3] ECF No. 155 at 40; ECF No. 156-1 ¶ 2, 37-38 (co-worker of Named Plaintiff once worked in office focused on filling jobs in local Philadelphia market; since 2021, has be aligned to a Delivery Center); Exhibit XXX (Estimada Dep. 54:1-57:9) (Named Plaintiff Sherman worked in a field office in Hawaii); Exhibit YYY (Blendy Dep. 97:7-18) (Blendy reported to an AM, who reported to a DBO).)
[4] ECF No. 159-8 (identifying individuals aligned to the location for Philadelphia, PA Comcast); ECF No. 159-20 (McNelley Dep.) at 143:20-144:12; ECF 159-21 (Hollister Dep.) at 28:7-29:8); ECF No. 156-1 ¶ 37 (co-worker of Named Plaintiff on same team); ECF No. 156-8 ¶6-12 (describing client relationship with dedicated Recruiters).
[5] ECF No. 156-8 ¶6-12.
[6] ECF No. 155 at 40; Scroggins Decl. ¶ 5.
[7] ECF No. 156-13 ¶ 3, 7-8.
[8] ECF No. 156-5 ¶ 31 (based in Delivery Center); ECF No. 156-2 ¶ 5 (aligned to Delivery Center, based elsewhere); ECF No. 156-11 ¶ 6 (aligned to Delivery Center but did not work from the Center until later).

Plaintiffs ignore these many distinctions and wrongly assert that Recruiters work under common management because each of these structures are collectively referred to as "talent delivery." (ECF No. 164.) What Plaintiffs do not reveal is that it is necessary to roll all of these disparate units up to one level below the CEO in order to reach a common unit.[9] The great distance between the circumstances of each collective members' employment and the ultimate "common management" one level below the CEO simply cannot be construed to render them all "similarly situated."

Plaintiffs' only attempt to deal with TEK's evolution from field offices to Delivery Centers and other alternative work models over the period covered by the suit is to wrongly suggest that "uniform reporting structures evolved slightly for *all Recruiters*." (ECFR No. 164 at 10 (emphasis in original).) However, the record evidence shows that the change from a field office model to a Delivery Center model is a notable shift, and many collective members have seen their reporting structures change significantly, while some may have seen little change.

There are other notable differences in the circumstances of employment among Recruiters in the collective as well. Some members of the collective come to TEK with years of prior experience.[10] Other members of the collective have many years of experience in the Recruiter role.[11] Some members of the collective leave the Recruiter role for another position, then elect to go back to the Recruiter role later.[12] All of that experience undercuts Plaintiffs' incorrect suggestion that the Recruiter role is "entry-level."[13]

---

[9] Exhibit ZZZ (organization chart).)
[10] ECF No. 155 at 10.
[11] ECF No. 155 at 10.
[12] ECF No. 155 at 10.
[13] Plaintiffs argue that TEK cited no case law for the proposition that experience in a role can matter to the analysis of whether one is exempt (ECF No. 164 at 22 n. 24.) This is not true. TEK cited *Morales v. Compass Grp., PLC*, No. CV 13-9231-JFW MANX, 2014 WL 5304913, at *6 (C.D. Cal. Oct. 16, 2014), which found that duration of tenure in a position can correlate with the exercise of increased discretion and independent judgment. (ECF No. 155 at 37.)

5

Plaintiffs only rebuttal is to suggest that *more* Recruiters have short tenure in the role than have long tenure (ECF No. 164 at 22), but they cannot argue that some members of the collective they have proposed are quite tenured and do not fit their characterizations of Recruiters at all.

In sum, there are many variables members of the proposed collective along with respect to their locations, departments, divisions, and other circumstances of employment that are incompatible with final certification.

### 2. Members Of The Proposed Collective Do Not Have Similar Claims, And Each Member Is Subject To Individualized Defenses.

To obtain final certification, Named Plaintiffs and Opt-In Plaintiffs also must "advance similar claims," a point which here is intertwined with consideration of "the existence of individualized defenses." *Zavala*, 691 F.3d at 537.

Plaintiffs argue that they have met the "similar claims" requirement because TEK has a uniform policy of classifying Recruiters as exempt. (ECF No. 164 at 7.) But this misses the mark. "Crucial to the *Zavala* analysis is whether members of a collective action are "subject to some common employer practice that, if proved, *would help demonstrate a violation of the FLSA*."" *Reinig*, 2023 WL 5497106 at *4, citing *Zavala*, 691 F.3d at 538 (emphasis added); see also *Halle v. West Penn Allegheny Health System, Inc.*, 842 F.3d 215, 226 (3rd Cir. 2016) ("Being 'similarly situated' … means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA."). Here, proof that Recruiters are classified as overtime exempt under the FLSA does not "demonstrate a violation of the FLSA," because such a classification is permitted under the law. Rather, what Plaintiffs must show is that TEK *misclassified* all Named Plaintiffs and Opt-In Plaintiffs as overtime exempt. That conclusion must rise or fall on a collective basis. Here, it is possible that TEK's reasonable expectations for the role are consistent with satisfying the exemption, and individual Recruiters perform the role in an

exempt manner, but other individual Recruiters do not perform the role in an exempt manner. *Aquilino v. Home Depot, U.S.A., Inc.*, 2011 WL 564039, *7 (D.N.J.,2011) ("[C]ourts have made clear that "[m]erely showing that the employer classified a group of employees as exempt is not sufficient to establish that [those] employees are similarly situated for the purposes of an FLSA collective action.")

Consequently, as TEK explained in its opposition brief (ECF No. 155 at 30-32), many courts that have considered FLSA exemptions "in the context of collective action claims have concluded that the individualized nature of the inquiry precludes certification." *Gordon v. Maxim Healthcare Services, Inc.*, 2017 WL 3116153, at *15 (E.D.Pa. 2017). This is because "it would be difficult to generate common answers in light of the individualized inquiries arising from the wide variations in duties, experience, responsibility, discretion and supervisors on part of the potential class members … the class definition … include[s] … [those] whose primary job responsibilities and levels of discretion vary significantly from those of plaintiffs … [and] it would be impossible to determine on a collective basis whether the class members are classified properly." *Ruiz v. Serco, Inc.*, No. 10-cv-394-bbc, 2011 WL 7138732, at *6-7 (W.D. Wis. Aug. 5, 2011).

TEK laid out in detail in its opposition brief the ways that Recruiters satisfy the administrative exemption. But the Court does not need to decide that issue now, but only consider the differences among members of the collective that show the question cannot be decided on a collective basis. This is perhaps best addressed through looking at Plaintiffs' arguments about the duties of Recruiters as compared to the record evidence.

Plaintiffs wrongly state that "[t]here is no dispute that the recruiting process, and Recruiters' role in it, is uniform." (ECF No. 164 at 12.) Nothing could be further from the truth. Plaintiffs ignore record evidence that Recruiters are responsible for the entirety of the process. For

7

315123972v.1

example, Plaintiffs state "TEK does not rebut the common evidence that TEK's client's requisition forms dictate the required qualifications or that Recruiters cannot bind TEK or its customers on matters of significance." (ECF No. 164 at 21.) This is false. There is no such thing as a "client requisition form" – the document cited by Plaintiffs (ECF No. 143) is a screenshot from TEK's internal Connected database, not a document completed by a customer. And multiple witnesses have testified that Recruiters are involved from the very outset of discussions with clients and routinely meet with and help customers to define the requirements for a role before recruiting even begins.[14] Plaintiffs argue that it is "the AM's primary job duty to interact with clients," but of course that does not preclude Recruiters from also having a duty to interact with clients as part of their ownership of the entirety of the recruiting process.

Plaintiffs wrongly state that "TEK acknowledges that Recruiters attend daily Red Zone meetings where Recruiters receive work assignments and report on the work activities that they performed the prior day, but TEK argues the Red Zone meetings do not qualify as supervision." (ECF No. 164 at 13.) This is not true across the board. Plaintiffs pointed to evidence that some Recruiters attended daily Red Zone meetings and received assignments there. (ECF No. 142 at 25.) But other evidence shows there are Recruiters who do not have daily Red Zone meetings, or do not get "work assignments" at those meetings, and it is now common for Recruiters to have Red Zone meetings only amongst themselves, and not with AMs or DBOs.[15]

---

[14] *See* ECF No. 155 at 8, 13; ECF No. 156-10 ¶ 3-8 (explaining that practice was to include Recruiters in meetings with clients to define requirements); ECF No. 156-11 ¶ 12; ECF No. 156-12 ¶ 13; ECF No. 156-15 ¶ 6; ECF No. 156-4 ¶ 10.

[15] ECF No. 155 at 26 n. 55; ECF No. 156-9 ¶ 9 (DBO reports there is no Red Zone meeting for the New York City office Recruiters); ECF No. 156-8 ¶ 15 (as DBO in Boston, does not run or participate in Red Zones for Recruiters); Ex. AAAA (Lis Dep. 60:18-62:2) (DBO in Pittsburgh testifies that Recruiters are not assigned to reqs); ECF No. 156-3 ¶ 37 (Red Zone meetings are virtual, and two days per week are attended by Recruiters only); ECF No. 156-4 ¶ 11 (prioritizes own reqs to work on, sometimes volunteers at Red Zone); ECF 156-6 ¶ 9 (Recruiters vocalize which reqs they want to work on; AMs join Recruiters at Red Zone meetings only twice per

8

Plaintiffs make a further deceptive argument about how Recruiters spend their time, claiming that data in TEK's internal Connected database "demonstrates that the vast majority of Plaintiffs' activities—approximately 75%—involved attempting to make contact with candidates, conducting intakes, and making calls." (ECF No. 164 at 13.) This is an absurd statement not consistent in any way with the record, and it is a blatant misrepresentation of the Connected data. As TEK explained in its response, Plaintiffs have only summarized the types of records that are made in Connected. (*See* ECF No. 155 at 28-29.) However, Connected does not collect records about all of the work Recruiters do (including such activities as searching for candidates), and it does not say anything at all about how much time a Recruiter spent on any record. (*Id.*)

Plaintiffs wrongly state that "TEK admits that it even exercises control over the specific job duties ' such as number of calls and outreaches to potential candidates' that Recruiters make on a weekly basis." (ECF No. 164 at 13.) In fact, TEK's statement only says that Recruiters record this information, not that anyone else at TEK looks at it. (ECF No. 155 at 27 ("Recruiters also record various activities correlated to success in placements on assignment, such as number of calls and outreaches to potential candidates, since this information can help the Recruiter identify areas for improvement if placements are lagging behind expectations.").)

Plaintiffs wrongly state that "Recruiters do not technically evaluate potential job candidates." (ECF No. 164 at 15.) In fact, TEK submitted extensive evidence that Recruiters evaluate potential job candidates in multiple respects to vet whether and the extent to which they possess the skills necessary for the requirement, which may include a mix of technical and non-technical attributes. (ECF No. 155 at 17-122.) Recruiters develop expertise in the roles that they recruit for and their clients' project needs. (*Id.*)

---

week); ECF No. 156-7 ¶ 14 (volunteers for reqs he is interested in that he hears about at Red Zone meetings).

9

Plaintiffs wrongly state that "TEK does not dispute the common evidence that its *clients* interview and determine whether to hire a candidate." (ECF No. 164 at 16.) But this ignores the evidence that it is Recruiters who identify candidates, validate candidates' credentials, interview candidates, and make decisions about who is the best fit for the role, so that clients are relieved of that work and need only confirm that the candidate is appropriate for the assignment. (ECF No. 155 at 28.)

Plaintiffs wrongly state that "TEK admits it monitors Recruiters' compliance with the uniform 'production metrics' on a weekly basis, but argues about the purpose of the monitoring." (ECF No. 164 at 13.) Plaintiffs submitted some evidence of Recruiters who believed that to be true. (ECF No. 142 at 21.) But other evidence before the Court goes a different way and shows that Recruiters are not required to meet "production metrics" but do use the information to understand and manage their own performance or obtain coaching input from others. (ECF No. 155 at 27.)

Plaintiffs wrongly state that "TEK agrees that all offices mandate that Recruiters sit in the 'pit,' but it disputes that the goal of requiring Recruiters to sit in the pits is supervision." (ECF No. 164 at 13.) Plaintiffs identified some Recruiters to testify that they felt supervised in the pit. (ECF No. 142 at 28.) However, other evidence shows that the "pit" is just a common, open concept office, and Recruiters and others sit in the pit to collaborate. (ECF No. 155 at 26.) The notion that the pit is for supervision is belied by other evidence in the record that many Recruiters work wholly outside the observation of others. Some work from home on some days of the week, and others are on virtual teams and so sit and work from a TEK office that is different from their other team

members.[16] Some DBOs run local offices that Recruiters use to do their work, but the Recruiters do not report to anyone locally.[17]

According to Plaintiffs, "[a]ll that is relevant at this stage is that the production metrics, policies requiring attendance at daily Red Zone meetings, and other work circumstances are *uniform* among Recruiters." (ECF No. 164 at 13 (emphasis in original).) As just shown, there is no uniformity among Recruiters as to these points.

Plaintiffs also incorrectly contend that Recruiters are "production workers." (ECF No. 164 at 16-17.) This ignores the plain language of the FLSA's administrative exemption. As the regulations explain, the exemption applies where an employee's "primary duty" is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers, and includes the exercise of discretion and independent judgment with respect to matters of significance." (ECF No. 155 at 32, citing 29 C.F.R. § 541.200.)

Plaintiffs focus only on whether Recruiters' work relates to the general business operations of TEK. (ECF No. 164 at 17.) TEK offered arguments in its opposition brief why Recruiters do perform work related to the general business operations of TEK. (ECF No. 155 at 32-35.) But TEK also explained why Recruiters perform work related to the general business operations of TEK's

---

[16] ECF No. 156-1 ¶ 40 (remote work for Recruiters is common, including as part of regular schedule); ECF No. 156-2 ¶ 4-5, 29, 31 (works remotely 2 days per week; other days, sits in Seattle office but is part of virtual team aligned to Phoenix Delivery Center since 2021; lead sits in Phoenix); ECF No. 156-3 ¶ 2 (worked remotely for first year of employment; now remote two days per week, sits in Seattle office three days per week; part of a virtual team, and only one other team member is in the same location); ECF No. 156-4 ¶ 22-23 (works remotely two days per week, goes into the New York office on the other days, but reports to someone in Orlando); ECF No. 156-12 ¶ 27 (Recruiter in her pod works remotely one day per week)

[17] ECF No. 156-9 ¶ 9, 11 (DBO for New York City office says most Recruiters there report to people in other offices, his responsibility for Recruiters began to diminish in 2019, and ceased in 2023); ECF No. 156-8 ¶ 15 (DBO for Boston office is focused on Account Managers and others in sales, and "no Recruiters report to [him], directly or indirectly"); ECF No. 156-5 ¶ 31 (works in the Philadelphia Delivery Center, but has Recruiter colleagues in other states who work remotely and do not come in at all); ECF No. 156-12 ¶ 5-6, 27 (worked on a local team, but then joined a national team that is aligned to Philadelphia Delivery Center but team members are remote and not in the same location).

11

customers. (*Id.*) Recruiters are performing the recruiting function for TEK's customers – a classic general business operation. As one manager explained, "Clients hire TEK to do their recruiting for them. TEK's Recruiters save the client a significant amount of time by giving them the right candidate, who is both a technical and cultural fit for the client's workplace and project. That saves the client from than sifting through resumes on their own, conducting multiple interviews, contacting references, and all the other steps that go into hiring. TEK Recruiters talk to the same subset of individuals day in and day out, which helps them to understand trends and what clients are looking for, and to fill roles quickly. TEK Recruiters also have knowledge of skillsets and project demands that enables them to find candidates that are the right match even if the literal terms on their resume don't match what is written in the requirement." (ECF No. 156-8 ¶ 17.) Another explained the importance of Recruiters to TEK's customers, "Our customers need talented consultants in order to complete projects or run functions that are important to their business. Without those consultants, our customers could not get that work done. If our customers could find those consultants on their own, I believe they would, but in fact they need the specialized help that TEK's Recruiters can provide to them to do so." (ECF No. 156-10 ¶16.)[18]

      Most important at this stage is the fact that these are not issues that can be resolved by common evidence. Rather, whether any given Recruiter satisfies the administrative exemption will turn on their particular job duties, how they performed those job duties, the degree to which they were supervised, and the nature of their involvement with TEK's clients and their general business operations, among other things. The Court need not reach a common answer to the question: some

---

[18] *See also* ECF No. 156-7 ¶ 22 ("Ultimately, we help client's meet their staffing needs. If a client is not equipped or cannot source appropriate talent, they lose money and their products or services might suffer."); ECF No. 156-5 ¶ 33 ("In my opinion, TEK Recruiters are important for TEK customers because we provide them talent that they need to get their projects done in a timely manner. Customers have problems that they come to TEK to solve, and Recruiters are a key part to providing those solutions.")

Recruiters may be determined to be exempt and others non-exempt. Resolving those questions will require individualized inquiries as to each person in the collective.

Plaintiffs' attempt to distinguish *Andrade v. Aerotek, Inc*., No. CCB-08-2668, 2009 WL 2757099 (D. Md. Aug. 26, 2009), based in part by the breadth of the putative class of recruiters that "recruited for a wide variety of jobs – including 'blue collar' and 'white collar' jobs." Plaintiffs' attempts to minimize this directly applicable precedent are misplaced.  While it may be true that the administrative exemption is more difficult to meet for the recruiters focused on "blue collar" jobs, the Court in *Andrade* was clear that the duties of recruiters recruiting for "white collar" jobs were more likely to meet the administrative exemption.  Here, there is no dispute that TEK's recruiters are recruiting for "white collar" IT jobs, which on their face meet the elements off the administrative exemption.  Yet, Plaintiffs nonetheless have introduced purported evidence that the duties of some of TEK's recruiters do not meet all elements that the Andrade Court found were present for the similar situated recruiters in that case.  If anything, were the Court to accept Plaintiffs' constructs of how Recruiters perform their jobs for TEK, such acceptance would in turn necessitate an individual analysis of the duties performed by each recruiter.  Such an analysis would be necessary in order to reconcile the vastly different characterizations of what , and more importantly how recruiters per form their jobs.

Plaintiffs' attempt s to distinguish TEK's other authorities fare no better.  Plaintiffs assert that *Aquilino v. Home Depot, U.S.A., Inc*., No. 04 Civ. 04100, 2011 WL 564039 (D.N.J. Feb. 15, 2011), is irrelevant to this case because "some plaintiffs had the authority to make ultimate hiring and firing decisions and some did not, and some had the ability to bind the employer financially and some did not."  Here, the evidence is clear that many Recruiters exercised independent discretion and judgment over matters of significance, while Plaintiffs claims that at least their own

13

declarants did not. As in *Aquilino*, resolution of the applicability of the administrative exemption cannot be resolved without taking into account this disparity, and doing so makes this case incapable of collective treatment.

Similarly, Plaintiff's attempt to distinguish *DaRosa v. Speedway LLC*, 557 F. Supp. 3d 315, 322 (D. Mass. 2021) is without merit. Plaintiffs assert that in *DaRosa*, the focus was whether managers were performing exempt or hourly tasks, that that here Recruiters all perform the same tasks. What Plaintiffs gloss over, and seek to have this Court ignore is that the primary issue in this case is not what the duties of Recruiters are, but instead whether those duties were performed in an exempt fashion. As TEK has set forth in its opposition, numerous recruiters testify, and TEK's reasonable expectations are, that recruiters perform their duties with independent discretion and judgment. Further, TEK's evidence is also clear that the Recruiters' tasks are for matters of significant for both TEK and its clients. While Plaintiffs' contend that their evidence supports a contrary conclusion (which TEK denies), such a conclusion can only be reached following a hyper individualized inquiry.

In sum, as in *Zavala*, "[t]he similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many." 691 F.3d at 537-38. Accordingly, TEK respectfully requests that the Court deny Plaintiffs' motion for final certification of the FLSA collective.

### 3. Principles Of Fairness And Procedural Considerations Weigh In Favor Of Decertification.

Courts in the Third Circuit also look to fairness and procedural considerations in deciding whether to grant final certification. (ECF No. 164 at 25.) Here, those considerations weigh in favor of decertification.

As Plaintiffs noted in their opening brief, 595 individuals submitted forms to become Opt-In Plaintiffs. (ECF 142 at 6.) As Plaintiffs also noted, 46 Opt-Ins withdrew their consents over the course of the litigation and no longer are pursuing claims under the FLSA, leaving 549 in the collective for which Plaintiffs sought final certification. (*Id.*)

TEK pointed out in its opposition brief that the number in fact is smaller, and Plaintiffs conceded the point in their reply. Sixty-six people who opted-in never advanced out of the Recruiter Trainee role to become Recruiters. (ECF No. 164 at 24-25.) Another 34 did not work as Recruiters at any time covered by the suit. (*Id.*) Another 32 did not file consent forms within three years of the last date of their employment as a Recruiter. (*Id.*; ECF No. 155 at 43.) None of these individuals are eligible to join the collective. Significant amounts of time were expended on discovery related to individuals who did not fit the revised collective definition for which final certification ultimately was sought.[19] This is notable because TEK was limited in the discovery it could take from Opt-In Plaintiffs.

As illustrated in TEK's opposition brief and above, the record reflects a wide variety of circumstances relevant to the working conditions and job duties of Recruiters. These differences have been identified despite that discovery from Opt-Ins has been quite limited. TEK sought to take discovery from each Opt-In Plaintiff since each became a party to the litigation upon filing their notice of consent to join the litigation. (ECF No. 51 at 3-11.) The Court exercised its discretion to limit discovery from Opt-In Plaintiffs, such that only 20% could be asked to answer

---

[19] In Plaintiffs' Amended Complaint, the collective is defined to include "All individuals employed by Defendant as Recruiters, or in other positions with similar job duties, at any time within three years prior to the filing date of this action through the date of final disposition and who were paid on a salary basis and classified as exempt from overtime." (ECF No. 52 at ¶ 72.) Plaintiffs' motion for final certification eliminated the clause "or in other positions with similar job duties," thus limiting the collective only to those in the specific "Recruiter" job title. (ECF No. 142 at 6.)

15

written discovery, and written discovery was limited to just five interrogatories and five requests for documents. (ECF No. 53 at 2, modified at ECF No. 67.) As to depositions, TEK was limited to no more than 5% of Opt-In Plaintiffs, with each deposition limited to just three hours. (*Id*.) Many Opt-In Plaintiffs elected to withdraw from the litigation when served with discovery or requested to sit for a deposition.[20] Ultimately, TEK was able to obtain abbreviated testimony only from 14 Opt-In Plaintiffs the seven Named Plaintiffs, or less than 5% of the collective.

In these circumstances, it would be unfair and prejudicial to TEK to proceed on a collective basis when Plaintiffs have either avoided or minimized discovery from certain Recruiters, and where the factual record is correspondingly small and unrepresentative as compared to the collective as whole. This is particularly true in an exemption case such as this one, where a decision whether the exemption is satisfied turns on the job duties of each individual, rather than on issues that can be resolved on a collective basis as to all Opt-In Plaintiffs.

Accordingly, in the interests of fairness and in light of procedural considerations, TEK respectfully requests that the Court deny Plaintiffs' motion for final certification of the FLSA collective.

### C.  THIS COURT SHOULD DISREGARD DECISIONS IN *AVERY*, WHICH ARE BASED ON APPLYING CALIFORNIA LAW TO DIFFERENT FACTS.

As a final point, this Court should reject Plaintiffs' repeated invitation to adopt a decision issued in the separate *Avery* case pending the U.S. District Court for the Northern District of California. That case concerns claims brought under California state law, not the FLSA, and the arguments by both parties differs significantly from what was presented to this Court.[21] TEK also

---

[20] Scroggins Decl. ¶ 3.
[21] The Avery court earlier concluded that "the parties and issues between the *Thomas* and *Avery* actions are not 'substantially similar,' [and] neither action will create a final preclusive judgment." (Avery, ECF No. 31 at 6.)

respectfully disagrees with the findings made by the judge in *Avery*, including decisions to disregard some of TEK's evidence, and has preserved its right to seek review of those decisions at the appropriate time. The Court should decide the motion based on the arguments and record evidence that has been presented by the parties in this case.

### III. CONCLUSION

For all the foregoing reasons, Defendant respectfully requests that Plaintiffs' motion to for final certification of the FLSA collective action be denied.

DATED: December 16, 2024                    SEYFARTH SHAW LLP

                                            By:    */s/Andrew L. Scroggins*
                                                   Andrew L. Scroggins

Andrew L. Scroggins
Noah A. Finkel
James P. Nasiri
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
ascroggins@seyfarth.com
nfinkel@seyfarth.com

Brian P. Long (*pro hac vice*)
SEYFARTH SHAW LLP
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 270-9600
Facsimile: (213) 270-9601
bplong@seyfarth.com

*Attorneys for Defendant
TEKsystems, Inc.*