**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

|  |  |
|---|---|
| MICHAEL THOMAS, MARIA CONYERS-JORDAN, AUSTIN SHERMAN, LYNDA ALEXANDRA MAHER, AVA DORÉ, RACHEL RICHENBERG, and EMILY BURKE, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TEKSYSTEMS, INC.,<br><br>Defendant. | CIVIL ACTION No.: 2:21-cv-00460-WSS<br><br>CLASS AND COLLECTIVE ACTION<br><br>ELECTRONICALLY FILED |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    RELEVANT PROCEDURAL HISTORY .............................................................. 1

III.   LEGAL STANDARD AND BURDEN OF PROOF ............................................ 2

IV.    STATEMENT OF UNDISPUTED FACTS ........................................................... 3

       A.    TEK Is a Recruiting Firm ........................................................................ 3

       B.    Recruiters Are Entry-Level Employees Under Close Supervision. ....... 4

       C.    Recruiters' Primary Duty: Production Work Screening Candidates ..... 5

             1.    TEK's Connected Data Shows Recruiters Overwhelmingly Spend
                   Their Time Contacting Candidates. ......................................... 7

             2.    TEK Requires Recruiters to Meet Production Quotas. ............. 8

             3.    Recruiters' Compensation Is Tied to Their Production Tasks. .... 9

       D.    Recruiters' Work Is Not Related to the General Business Operations of
             TEK or Its Customers. ............................................................................ 9

V.     ARGUMENT ............................................................................................................ 10

       A.    Recruiters' Primary Duties Are Not Directly Related to the Management
             or General Business Operations of TEK. ............................................ 10

             1.    Recruiters Are Producers and Not Administratively Exempt. ....11

             2.    Recruiters' Primary Job Duties Are Not Directly Related to the
                   Management or Business Operations of TEK. ......................... 13

             3.    Recruiters' Primary Duties Are Not Directly Related to the
                   Management or General Business Operations of TEK's Customers. ....... 15

       B.    Recruiters Do Not Exercise Discretion and Independent Judgment on
             Matters of Significance ......................................................................... 17

VI.    CONCLUSION ......................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Avery v. TEKsystems, Inc.*
No. 22 Civ. 02733, 2024 WL 4281442 (N.D. Cal. Sept. 23, 2024) ................................... *passim*

*Baum v. Astrazeneca LP*
372 Fed. Appx. 246, n. 4 (3d Cir. 2010) .................................................................. 3

*Calderon v. GEICO Gen. Ins. Co.*
809 F.3d 111 (4th Cir. 2015) ................................................................................... 15

*Carter v. City of Philadelphia*
417 F. Supp. 3d 639 (E.D. Pa. 2019) ...................................................................... 18

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ................................................................................................. 2

*Crowe v. Examworks, Inc.*
136 F. Supp. 3d 16 (D. Mass. 2015) ....................................................................... 3

*Deluca v. Farmers Ins. Exch.*
386 F. Supp. 3d 1235 (N.D. Cal. 2019) .................................................................. 18

*F.W. Webb Co. v. Micone*
145 S. Ct. 1329 (2025) ........................................................................................ 11, 12

*Fowler v. OSP Prevention Grp., Inc.*
38 F.4th 103 (11th Cir. 2022) ............................................................................ 15, 16

*Gordon v. Model N, Inc.*
No. 15 Civ. 01423, 2016 WL 3194240 (N.D. Cal. June 9, 2016), *aff'd*, 705 F.
App'x 647 (9th Cir. 2017) ....................................................................................... 16

*Hendricks v. Total Quality Logistics, LLC*
694 F. Supp. 3d 1005 (S.D. Ohio 2023) .............................................................. 14, 16

*In re Enter. Rent-a-Car Wage & Hour Emp. Pracs. Litig.*
No. 07 Civ. 1687, 2012 WL 4356762 (W.D. Pa. Sept. 24, 2012) ...................... 13, 16

*Jackson v. Bloomberg, L.P.*
298 F.R.D. 152 (S.D.N.Y. 2014) ............................................................................. 3

*Martin v. Cooper Elec. Supply Co.*
940 F.2d 896 (3d Cir. 1991) ............................................................................ *passim*

*McKeen-Chaplin v. Provident Sav. Bank, FSB*
862 F.3d 847 (9th Cir. 2017) ................................................................................. 11

*Ogden v. CDI Corp.*
No. 08 Civ. 2180, 2010 WL 2662274 (D. Ariz. July 1, 2010 ................................ 19

*Rood v. R&R Express, Inc.*
No. 17 Civ. 1223, 2022 WL 1082481 (W.D. Pa. Apr. 11, 2022) ....................... *passim*

*Su v. F.W. Webb Co.*
677 F. Supp. 3d 7 (D. Mass. 2023) ................................................................... *passim*

*Su v. F.W. Webb Co.*
677 F. Supp. 3d 7 (D. Mass. 2023)
*aff'd*, 110 F.4th 391 (1st Cir. 2024) ................................................................11

*Thomas v. TEKsystems, Inc.*
No. 21 Civ. 460, 2025 WL 756067 (W.D. Pa. Mar. 10, 2025) ....................... *passim*

*Tooker v. BlueJay Sols., Inc.*
715 F. Supp. 3d 1022 (W.D. Mich. 2024) .................................................11, 20

*Walsh v. Unitil Serv. Corp.*
64 F.4th 6-7 (1st Cir. 2023) ...................................................... 12, 16, 17

*Webster v. Pub. Sch. Emps. of Washington, Inc.*
247 F.3d 910 (9th Cir. 2001) ............................................................... 3

**Statutes**

29 U.S.C. § 213(a)(1) ......................................................................... 3

34 Pa. Code § 231.83 ......................................................................... 3

Fair Labor Standards Act ................................................................ 1, 20

Mass. Gen. Laws Ann. ch. 151, § 1A; 454 C.M.R. 27.03(3) ................................. 3

N.Y. Labor Law § 651(5) ...................................................................... 3

Wash. Admin. Code § 296-128-520 ............................................................. 3

Wash. Rev. Code § 49.46.010(3)(c) ........................................................... 3

**Rules**

Fed. R. Civ. P. 23 ....................................................................... 1, 20

Fed. R. Civ. P. 56 .......................................................................... 2

**Regulations**

29 C.F.R § 541.203(e) ...................................................................... 10

29 C.F.R. § 541.200 ......................................................................... 3

29 C.F.R. § 541.200(a)(3) .................................................................. 18

29 C.F.R. § 541.201(a) ..................................................................... 10

29 C.F.R. § 541.201(c) ..................................................................... 15

29 C.F.R. § 541.202(a) ..................................................................... 18

29 C.F.R. § 541.202(b) ..................................................................... 18

29 C.F.R. § 541.202(c) ..................................................................... 18

29 C.F.R. § 541.202(e) ................................................................. 19, 20

29 C.F.R. § 541.203(e) ................................................................. 18, 19

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2. .............................................. 3

## I.    INTRODUCTION

Plaintiffs,[1] on behalf of the Fair Labor Standards Act ("FLSA") collective and the certified Pennsylvania, Washington, New York, and Massachusetts Rule 23 classes of Recruiters, move for partial summary judgment on TEKsystems, Inc.'s ("TEK") administrative-exemption affirmative defense. TEK bears the burden to prove *every* element of that exemption. The undisputed record forecloses it. Recruiters' primary job duty does not "directly relate[] to the management or general business operations" of TEK or its clients. Instead, Recruiters produce TEK's marketplace offering, candidate placements, under detailed procedures, daily supervision, and quota-driven metrics. Nor do Recruiters exercise discretion and independent judgment on "matters of significance": Account Managers and clients set requisitions, control submissions, and make the hiring and pay decisions. On this record, no reasonable jury could find for TEK on either duty element of the exemption.

Another federal court, confronted with identical evidence about TEK's Recruiters, has already reached the same conclusion under California law. *Avery v. TEKsystems, Inc.*, No. 22 Civ. 02733, 2024 WL 4281442, at *1, *4–7, *9–11 (N.D. Cal. Sept. 23, 2024). And this Court has certified the collective and classes after finding that TEK's uniform treatment of Recruiters presents common and predominating, class-wide answers. *Thomas v. TEKsystems, Inc.*, No. 21 Civ. 460, 2025 WL 756067, at *1, *4 (W.D. Pa. Mar. 10, 2025). The Court should grant partial summary judgment to Plaintiffs on TEK's administrative-exemption defense as to the FLSA collective and all certified classes, and reserve damages and willfulness for trial.

## II.    RELEVANT PROCEDURAL HISTORY

On March 10, 2025, the Court granted final FLSA Collective Action Certification and

---

[1]    Plaintiffs are Michael Thomas, Maria Conyers-Jordan, Austin Sherman, Lynda Alexandra Maher, Ava Doré, Rachel Richenberg, and Emily Burke.

certified the following Rule 23 Classes:

- **Pennsylvania Overtime Class –** All current and former Recruiters employed by Defendant in Pennsylvania from April 9, 2018 to the final date of judgment.
- **Washington Overtime and Meal and Rest Break Class –** All current and former Recruiters employed by Defendant in Washington from January 19, 2019 to the final date of judgment.
- **New York Overtime and Accurate Paystub Class –** All current and former Recruiters employed by Defendant in New York from January 19, 2016 to the final date of judgment.
- **Massachusetts Overtime Class –** All current and former Recruiters employed by Defendant in Massachusetts from January 19, 2019 to the final date of judgment.

*Thomas*, 2025 WL 756067, at *4. On July 28, 2025, notice of the class action was sent to 102 Massachusetts class members, 362 New York class members, 309 Pennsylvania class members, and 156 Washington class members. Abrahamson Decl. ¶ 4. Class members have until September 26, 2025 to file any requests for exclusion. *Id.* ¶ 5. To date, one class member has requested to be excluded from the state law classes. *Id.* ¶ 6.

## III.    LEGAL STANDARD AND BURDEN OF PROOF

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Because TEK bears the burden of proof on its administrative-exemption affirmative defense, Plaintiffs may prevail by showing that the record forecloses TEK from establishing one or more of the required elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). Employers carry the burden of proving each element of the exemption; "[i]f the employer fails to establish any one of these requirements, then it will not be entitled to the exemption." *Rood v. R&R Express, Inc.*, No. 17 Civ. 1223, 2022 WL 1082481, at *5 (W.D. Pa. Apr. 11, 2022).

The administrative exemption applies only to employees: (1) compensated at or above a salary threshold; (2) whose primary duty is "office or non-manual work *directly related to the management or general business operations*" of the employer or its customers; and (3) whose

"primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200 (emphasis added); *see also* 29 U.S.C. § 213(a)(1). This Court has already held that the state laws for each of the four certified classes (and California) incorporate substantially identical standards. *Thomas*, 2025 WL 756067, at *13, n.6. [2]

Whether employees fall within the administrative exemption is a mixed question of law and fact, but the governing legal framework is settled. Courts must compare the employer's business purpose and the employee's actual primary duties to determine whether those duties relate to running the business itself, or to producing the goods or services the business sells. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991).

Here, TEK cannot satisfy either of the duty elements. Recruiters' primary duty is producing TEK's marketplace offering—candidate placements—not servicing TEK's or its clients' general business operations. And Recruiters do not exercise discretion and independent judgment on matters of significance, but instead follow established procedures, under close supervision, with Account Managers ("AMs") and clients making the consequential decisions. As the *Avery* court already found, TEK cannot prove both elements, its exemption defense fails as a matter of law.

## IV.  STATEMENT OF UNDISPUTED FACTS

### A.  TEK Is a Recruiting Firm

TEK is an IT staffing company. Plaintiffs' Concise Statement of Undisputed Facts ("SOF") ¶ 1. TEK's principal business purpose is to recruit IT workers to work for third-party companies.

---

[2]    34 Pa. Code § 231.83; Wash. Rev. Code Ann. § 49.46.010(3)(c); Wash. Admin. Code 296-128-520; N.Y. Labor Law § 651(5); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (incorporating the FLSA exemptions); Mass. Gen. Laws Ann. ch. 151, § 1A; 454 C.M.R. 27.03(3); *Baum v. Astrazeneca LP*, 372 Fed. Appx. 246, n. 4 (3d Cir. 2010); *Webster v. Pub. Sch. Emps. of Washington, Inc.*, 247 F.3d 910, 918 (9th Cir. 2001); *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 160 (S.D.N.Y. 2014); *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 46 (D. Mass. 2015).

*Id.* ¶ 2. TEK has two primary client bases: customers who need staffing and candidates/consultants whom TEK places with customers. *Thomas*, 2025 WL 756067, at *1; SOF ¶ 3. TEK competes with other recruiting firms to place candidates and ultimately is only successful at placing less than one-third of the job requirements TEK works on gets filled by one of its candidates. SOF ¶ 4. To compete against other companies, TEK often submits multiple candidates for a single requirement, submits one candidate for multiple requirements, and has multiple Recruiters work on the same requirement. *Id.* ¶ 5. TEK claims that it has an "exhaustive search, training, and matching process" and that the process was "developed and fine-tuned over 20-plus years in the market." SOF ¶ 6.

### B.    Recruiters Are Entry-Level Employees Under Close Supervision.

TEK's own witnesses and documents describe Recruiters as an "entry-level position." SOF ¶ 7. TEK hires Recruiters early in their career and it has an average annual Recruiter attrition rate of approximately 38% to 47%. *Id.* ¶ 8. The average tenure of the Named Plaintiffs and Opt-in Plaintiffs in the Recruiter position at TEK is 1.33 years, and 49% of the Recruiters worked in the position for less than one year and 79% of them worked in the position less than two years. *Id.* ¶ 9. TEK does not require Recruiters to have prior IT knowledge or experience, or any specialized training or education. *Id.* ¶ 11.

TEK intends for Recruiters to be promoted to AM or Recruiter Lead. *Id.* ¶ 12. Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team. *Id.* ¶ 13. TEK employs people in 46 different recruiting job titles. *Id.* ¶ 14. These job titles include the senior and supervisory level recruiting positions. *Id.* ¶ 15. With the exception of Recruiter Trainees, all of TEK's recruiting job titles are classified as exempt. *Id.* ¶ 16. This lawsuit only concerns the lowest level, after Recruiter Trainee, of those 46 recruiting job titles: Recruiter.

TEK employs multiple layers of supervisors for Recruiters – Director of Business

Operations ("DBOs"), Director of Regional Operations, Delivery Managers, Team Leads, Specialization Leads, and Recruiter Leads – who closely supervise Recruiters. *Id.* ¶ 17. Recruiters and their supervisors attend daily Red Zone meetings where Recruiters receive work assignments and report on their work activities. *Id.* ¶ 18. Recruiters' managers monitor Recruiters' performance through weekly reports on their quota attainment and performance metrics. *Id.* ¶ 19. Corporate officers also monitor Recruiters' quota compliance and spread. *Id.* ¶ 20.

Recruiters are aligned to AMs, whose job is to "provid[e] solutions to [the] client's business & technology needs [and] Ensures [they] place quality (technical & cultural fit) consultants." *Id.* ¶ 21. Recruiters work near AMs, they speak "multiple times" a day and the AMs also regularly monitor Recruiters' work activities. *Id.* ¶ 22. Recruiters' desks are located in the "pit," an open office set up with cubicles, with managers' offices surrounding them, which allows managers to monitor Recruiters. *Id.* ¶ 23. TEK refers to the specific industry and/or job category that Recruiters work in as a "specialization," or "verticals" but Recruiters assigned to specializations or verticals do not have any specific training or experience adjacent to that field. *Id.* ¶¶ 24-25.

### C.    Recruiters' Primary Duty: Production Work Screening Candidates

TEK views the Recruiter as a production employee (because they are), which it considers to be sales and not human resources. *Id.* ¶ 26-27. In its own internal recruiting documents, TEK states: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales." *Id.* ¶ 28.

Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's AMs. *Id.* ¶ 29. Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn

profiles, cold calling, and completing intakes of potential job candidates. *Id.* ¶ 30. As the initial recruiting step, TEK's clients fill out a form that the employees refer to as "job requisitions." *Id.* ¶ 31. Job requisitions outline the clients' requirements for a position. *Id.* ¶ 32. The clients, not Recruiters, determine the job requirements for job openings. *Id.* ¶ 33. TEK's managers assign the job requisitions to Recruiters. *Id.* ¶ 34. AMs, not Recruiters, are responsible for directly communicating with clients regarding their hiring needs. *Id.* ¶ 35. If Recruiters have questions about the job requisition, they ask the AMs. *Id.* ¶ 36. AMs provide information regarding the necessary qualifications, job details, and target pay for the position to Recruiters, and if Recruiters have questions about the job requisition, they ask the AMs. *Id.* ¶ 37.

Relying on TEK's practices and procedures, Recruiters then search TEK's internal database and external sources, like LinkedIn, to match potential candidates with clients' requirements. *Id.* ¶ 38. To do this, Recruiters review resumes and LinkedIn profiles to make sure candidates' experience and skills meet the clients' minimum qualifications. *Id.* ¶ 39. TEK provides Recruiters with "search and match" technology that helps automatize the screening process. *Id.* ¶ 40. TEK also provides Recruiters with step-by-step guidance on how to search and match candidates. *Id.* ¶ 41. TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs." *Id.* ¶ 42.

TEK's own documents describe Recruiters' primary duty as "[s]creen[ing] consultants." *Id.* ¶ 43. Once Recruiters have matched potential job candidates to the job requisition, Recruiters attempt to contact potential candidates to complete an initial intake. *Id.* ¶ 44. Recruiters' job duties are a "grind," and the vast majority of Recruiters' outreach goes unanswered or is rebuffed. *Id.* ¶ 45. Recruiters face obstacles in reaching candidates – including consultants not answering their

phone calls because, for one reason, they get on average 34 solicitation calls a week. *Id.* ¶ 46.

When Recruiters are able to connect with candidates, they do an intake, referred to as a "G2." *Id.* ¶ 47. TEK's internal database prompts Recruiters to gather specific information from candidates during the G2. *Id.* ¶ 48. TEK provides Recruiters with detailed training and instructions about how to conduct a G2 with a candidate. *Id.* ¶ 49. Recruiters face additional barriers to finding candidates who match the open job position. The candidate's skills and experience may not match the client's prerequisites. *Id.* ¶ 50. Additionally, the candidate may not be interested in the position for a variety of reasons. *Id.* ¶ 51.

If the candidate's experience and skills match the client's requirements, and is interested in the position, Recruiters forward their resume and information to the AMs. *Id.* ¶ 52. AMs then determine which candidates to forward on to the client. *Id.* ¶ 53. The clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them. *Id.* ¶ 54. TEK's clients, not Recruiters, interview the candidates. *Id.* ¶ 55. If the client decides to make an offer, Recruiters relay the offer to the candidate. *Id.* ¶ 56. Recruiters do "not oversee[] the actual work getting done." *Id.* ¶ 57. Recruiters are not evaluating the substance of consultants' work. *Id.* ¶ 58.

Recruiters do not technically evaluate potential job candidates. *Id.* ¶ 59. Rather, TEK uses standardized online technical assessments and "Tech Outs" (in-person or telephonic skills evaluations with third-party experts paid for by TEK) to evaluate candidates' technical skill. *Id.* ¶ 60. This is true for all Recruiters. *Id.*

### 1.  TEK's Connected Data Shows Recruiters Overwhelmingly Spend Their Time Contacting Candidates.

TEK's data demonstrates that 74% of Recruiters recorded activities are comprised of: "Attempted Contact," "G2" intakes and "Calls." *Infra*. Recruiters use TEK's Connected database to search for potential candidates, review information about candidates, and record the work

activities they perform. SOF ¶ 61. TEK expects Recruiters to enter their activities into Connected in real time. *Id.* ¶ 62. Defendant produced Connected data for a total of 123 Recruiters who are Plaintiffs, Opt-in Plaintiffs and/or Rule 23 Class Member Declarants. *Id.* ¶ 63. The Connected data identifies the work activities Recruiters performed and the dates and times the activities were performed. *Id.* ¶ 64. The data shows that 33.72% of the Recruiters' activities recorded in Connected were "Attempted Contact," followed by "G2" at 20.44%, and "Call" at 19.89%, which altogether comprise approximately 74% of the total work activities. *Id.* ¶ 65. Recruiters' activity levels are consistent among the classes. *Id.* ¶ 68.  An "attempted contact" "means the recruiter made a phone call and the consultant did not answer." *Id.* ¶ 66. The Connected data shows that the number of attempted contacts, G2 intake calls, and calls Recruiters made dwarfed their submittals and starts:

| Activity | Count | % |
|---|---|---|
| Attempted Contact | 238,398 | 31.90% |
| G2 | 143,893 | 19.25% |
| Call | 171,714 | 22.98% |
| Submitted | 15,399 | 2.06% |
| Started | 2,509 | 0.34%[3] |

### 2.    TEK Requires Recruiters to Meet Production Quotas.

TEK requires Recruiters to meet weekly production quotas. SOF ¶ 70. Currently, the quota for Recruiters is 25 points a week based on the following activity points: G2s; reference checks; submittals; interviews (when the client interviews the candidate); and starts. *Id.* ¶ 71. Prior to July 2022, TEK required Recruiters to maintain a weekly average of 30 "interactions" a week, such as reference checks, G2s, and meals (lunches) with candidates. *Id.* ¶ 72. TEK requires all Recruiters to meet the same "spread" levels, which align to their tenure at the company and is referred to as the "performance management line." *Id.* ¶ 73. Spread is the difference between the amount a client

---

[3]    SOF ¶ 67.

pays TEK for placing the consultant and the costs to TEK to place them. *Id.* ¶ 74.

TEK closely monitors Recruiters' compliance with their quotas and performance management line. *Id.* ¶ 75. Every week, TEK generates a WIN Report for each Recruiter and their managers, which tracks how well Recruiters are meeting their quotas and spread compared to their peers. *Id.* ¶ 76. TEK executives also receive weekly Executive Dashboards, which provide "a snapshot on the various operations of the business." *Id.* ¶ 77. Included in the Executive Dashboard are summaries about how well Recruiters are meeting their quotas. *Id.* ¶ 78. TEK's offices have "spread boards" that publicize the amount of spread attained by each Recruiter from best to worst. *Id.* ¶ 79. If Recruiters fail to hit their quotas and meet their spread requirements, TEK puts them on a performance improvement plan. *Id.* ¶ 80. TEK evaluates Recruiters annually based on their satisfaction of TEK's quotas and spread requirements. *Id.* ¶ 81.

### 3.    Recruiters' Compensation Is Tied to Their Production Tasks.

TEK pays Recruiters a salary and commission based on their spread. SOF ¶ 82. In other words, the more Recruiters produce candidates for TEK, the more TEK pays them. *Id.* ¶ 83.

### D.    Recruiters' Work Is Not Related to the General Business Operations of TEK or Its Customers.

Recruiters do not create or implement management or operational policies for TEK or its customers. SOF ¶ 84. Recruiters have no authority to: waive or deviate from TEK's policies and procedures in performing their work; formulate, interpret, or enforce management policies or operating procedures; or negotiate or enter into contracts on behalf of TEK or its clients. *Id.* ¶ 85. Recruiters do not have the authority to negotiate or bind TEK or its clients with respect to significant matters. *Id.* ¶ 86. They do not supervise anyone; represent TEK or its clients in formal grievance proceedings; advise TEK or its clients on how to more efficiently run their operations; or study or recommend changes to the operations or corporate structure of any business. *Id.* ¶ 87. Nor do Recruiters provide human resource services, public relations services, employee benefit

functions, quality control services, or advertising or marketing services. *Id.* ¶ 88.

## V.    ARGUMENT

### A.    Recruiters' Primary Duties Are Not Directly Related to the Management or General Business Operations of TEK.

TEK's business is placing candidates with clients—its marketplace offering. SOF ¶¶ 1-4. Recruiters' primary duty is to produce that offering: sourcing, screening, and matching candidates to client-set requisitions, under daily supervision and weekly quotas, with AMs deciding which candidates are submitted. *Id.* ¶¶ 26-60. Work that goes to the heart of the marketplace offering, rather than internal administration, is non-exempt production/sales work. 29 C.F.R. § 541.201(a); § 541.203(e); *Martin*, 940 F.2d at 903; *Rood*, 2022 WL 1082481, at *6. TEK's own materials and witnesses call Recruiters "sales" employees and "producers," and Recruiters' compensation turns on spread/production. SOF ¶¶ 26-28. No reasonable jury could find this element satisfied.

The *Avery* court analyzed the same evidence regarding TEK's Recruiters' primary job duties and found that TEK "failed to meet its burden" on the "directly related" management and business operations requirement. *Avery*, 2024 WL 4281442, at *4-7, *11. The *Avery* court found that Recruiters "engaged in the day-to-day carrying out of TEK's business—finding talent for its clients—and not performing work related to TEK's management policies or general business operations." *Id.* at *4; *see* SOF ¶¶ 26-60, 85-89.

TEK's own data and testimony demonstrates that Recruiters spend vast majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and conducting intakes by following prompts in TEK's database in support of TEK's core business function of producing potential job candidates to its customers. SOF ¶¶ 30, 61-69. "The primary duty is the main, or most important, duty that the employee performs and 'generally means that the employee spends at least 50% of his or her time performing the duty.'" *Su v. F.W. Webb Co.*, 677 F. Supp. 3d

7, 19 (D. Mass. 2023), *judgment entered*, 2023 WL 6439451 (D. Mass. Aug. 30, 2023), *aff'd*, 110 F.4th 391 (1st Cir. 2024), *cert. denied sub nom. F.W. Webb Co. v. Micone*, 145 S. Ct. 1329 (2025) (cleaned up); *see also Rood*, 2022 WL 1082481, at *6. It would insufficient for TEK to argue Recruiters sporadically engaged in administratively exempt tasks.

### 1.    Recruiters Are Producers and Not Administratively Exempt.

Recruiters are production employees, which is how TEK routinely refers to them. SOF ¶ 26. Their primary job duty is to screen and match IT job candidates based on job requisition forms submitted by TEK's customers. SOF ¶ 29-33. Once they find candidates whose experience match the job requisition, Recruiters send the potential candidates to AMs, who then determine which candidates to forward on to the clients. *Id.* ¶¶ 52-53. Recruiters are at the bottom of TEK's hierarchy. *Id.* ¶¶ 14-16. Employees who engage in the day-to-day services of a company and are at the bottom of the company's hierarchy do not qualify as administratively exempt. *Tooker v. BlueJay Sols., Inc.*, 715 F. Supp. 3d 1022, 1025, 1028 (W.D. Mich. 2024).

The distinction between frontline employees who work on the day-to-day services that the business offers to the marketplace and employees running the overall business is often referred to as the "administrative/production dichotomy." *Rood*, 2022 WL 1082481, at *6. The "administrative/production dichotomy turns on whether the services or goods provided by the employee constitute the marketplace offerings of the employer, or whether they contribute to the running of the business itself." *Id.* at *6 (the "concept of a 'production worker' is not limited to individuals involved in the manufacture of tangibles.") (cleaned up); *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 855 (9th Cir. 2017) ("the question is not whether an employee is essential to the business, but rather whether her primary duty goes to the heart of internal administration—rather than marketplace offerings."); *Martin*, 940 F.2d at 903.

"[I]t is often useful to identify and articulate the business purpose of the employer and (if necessary) the employer's customers. By business purpose we mean the production or provision of the very product or service that the employer or its customers offers to the public. . . . Having done so, one may then compare the employee's primary duty to the business purpose of the employer and/or the employer's customers to determine whether the employee's primary duty directly relates to the business purpose or, conversely, is directly related to the running or servicing of the business." *Walsh v. Unitil Serv. Corp.*, 64 F.4th 6-7 (1st Cir. 2023) (citation cleaned up); *see also Martin*, 940 F.2d at 903 ("it is important to consider the nature of the employer's business" when deciding whether an employee is an administrative or production worker").

Recruiters' primary job duty relates to TEK's "principal production activity." *Walsh*, 64 F.4th at 6; *Rood*, 2022 WL 1082481, at *6. TEK is a *recruiting* company. SOF ¶¶ 1-3. Recruiters' primary job duties are to support TEK's marketplace offering of recruiting services. *Id.* ¶¶ 26-30. This Court previously found that "[a]t the core of all of TEK's services are its recruiters." *Thomas*, 2025 WL 756067, at *1. TEK requires Recruiters to meet weekly production metrics reflecting that production is their most important job duty. SOF ¶¶ 70-76. Recruiters' primary job duty of screening and matching supports TEK's ability generate revenue, demonstrating they help *produce* what TEK offers the marketplace and which undercuts any argument that Recruiters are administratively exempt. *See Su v. F.W. Webb Co.*, 110 F.4th 391, 398 (1st Cir. 2024), *cert. denied sub nom. F.W. Webb Co. v. Micone*, 145 S. Ct. 1329 (2025).

TEK views Recruiters as "sales" employees and *not* "human resources." SOF ¶ 27. In its own documents, TEK states: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role ***sales***." *Id.* ¶ 28 (emphasis added).

12

"Inside sales are production tasks." *In re Enter. Rent-a-Car Wage & Hour Emp. Pracs. Litig.*, No. 07 Civ. 1687, 2012 WL 4356762, at *18 (W.D. Pa. Sept. 24, 2012); *Martin*, 940 F.2d at 906 ("the nature of an inside salesperson['s] . . . work is to produce sales for [the employer], *not to develop or implement specific work assignments consistent with an overall company policy.*") (cleaned up); *Su*, 677 F. Supp. 3d at 19-20; *Rood*, 2022 WL 1082481, at *1, *6. Notably, in *Martin*, the Third Circuit found that inside sales employees' primary job duty was "producing" sales and, therefore, they were not administratively exempt. 940 F.2d at 903-04. TEK repeatedly admits that Recruiters' job is sales. SOF ¶ 27.

TEK assigns the same requisition to multiple Recruiters because of the challenges in connecting with potential candidates and because TEK often submits multiple candidates to the client for consideration. *Id.* ¶¶ 5, 34. This demonstrates Recruiters are engaged in mass outreach efforts and not administrative duties.

### 2. Recruiters' Primary Job Duties Are Not Directly Related to the Management or Business Operations of TEK.

The Third Circuit has held that to be administratively exempt, an employee must carry out major assignments that affects the internal workings of the employer or its customers to a "substantial degree." *Martin*, 940 F.2d at 905. Recruiters do not engage in any major assignments that affect TEK (or its customers) to substantial degree. TEK's corporate witnesses conceded that:

- **Recruiters do not create or implement management, operational or human resources policies for TEK or its customers.** SOF ¶ 84.

- **Recruiters do not have the authority to negotiate or bind TEK or its customers with respect to significant matters.** Ex. 2 (Def.'s Resp. to Pls.' 2nd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters."); Ex. 4 (DiBenedetto Tr.) 109:23-110:3; Ex. 3 (Haycock Tr.) 161:3-5 (Recruiters cannot bind TEK in legal proceedings); Ex. 5 (Doyle Tr.) 194:13-16 (Q: But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate" A: Correct. Yes.). SOF ¶ 85-86.

13

- **Recruiters do not provide human resource services, employee benefit functions, or quality control services for TEK or its clients.** SOF ¶¶ 87-88.

Employees are **not** engaged in work directly related to the management or business operations of an employer where they occasionally "negotiate" individual sales and negotiating not the employee's primary job. *Martin*, 940 F.2d at 904-05. Negotiating "discrete" sales is simply "part and parcel" to the activity of "producing a sale" and does not relate to the overall business operation or management thereof. *Id.* at 904-05; *see also Hendricks v. Total Quality Logistics, LLC*, 694 F. Supp. 3d 1005, 1023 (S.D. Ohio 2023) ("negotiating a rate to have a customer's products shipped . . . is not directly related to the management or general business operations"). TEK also admits that Recruiters play no role in the "rates negotiated between Defendant and its customers." Ex. 2 (Def.'s Resp. to Pls. 3rd Interrogatories) No. 1. With respect to individual job candidates, TEK's clients, not Recruiters, determine how much to pay them. SOF ¶ 54. Even if Recruiters play a minor role in negotiating the pay for job candidates, it does not rise to the level of the administrative exemption. First, Recruiters do not have the capacity to bind TEK to any contracts. *Id.* ¶¶ 85-86. Second, TEK's customers submit requisition forms that contain the pay rates because the customers, and not Recruiters, determine pay rates. *See* Ex. 81 (Requisition Form). Third, there is no evidence that negotiating is Recruiters' primary job duty. *Avery*, 2024 WL 4281442, at *5. Demonstrating this, on average on a monthly basis, only one job candidate who Recruiters screen are ultimately placed at one of TEK's customers. Ex. 19 (Calderon Dec.) ¶ 28. With so few candidates placed, Recruiters' primary job duty cannot possibly be negotiating. SOF ¶¶ 65, 67.

The *Avery* court found "TEK's emphasis on Recruiters' 'negotiating' duties [to be] unpersuasive." 2024 WL 4281442, at *5 ("The record supports a finding Recruiters 'negotiate' the potential consultant's pay rate. But, the negotiated rate must fall within the pay range provided by

the client's requisition.") (relying on, in part, Ex. 5 (Doyle Tr.) 192:7-198:25); *Avery*, 2024 WL 4281442, at \*5 ("The 'burden,' which is negotiated between the client and TEK, refers to the costs of employment, including the costs of recruiting, unemployment insurance, and workers' compensation.") (relying on Ex. 5 (Doyle Tr.) 196:1-198:12); *Avery*, 2024 WL 4281442, at \*5 ("The 'standard burden' is 16%, and any changes to that percentage are negotiated by TEK's 'senior director of finance.'") (relying on Ex. 5 (Doyle Tr.) 196:1-198:12; Ex. 121 (Spread: Overview) at TEK-Recruiter Lit-00240024.). "Drawing all reasonable inferences from the record in TEK's favor, Recruiters' negotiating potential consultants' pay rate is not exempt work. It is part of TEK's day-to-day business—finding and placing IT professionals with TEK's clients." *Avery*, 2024 WL 4281442, at \*5.

TEK may argue that Recruiters' duties are "indispensable" to its business, but "indispensability [is] not dispositive because it [is] the nature of the work, not its ultimate consequence." *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 124 (4th Cir. 2015) (finding claims adjusters whose primary job duty was to investigate, asses, and resolve claims "too far removed from their employer's management or general business operations to satisfy the directly related element") (citation cleaned up); *Fowler v. OSP Prevention Grp., Inc.*, 38 F.4th 103, 110 (11th Cir. 2022); *see also Avery*, 2024 WL 4281442, at \*4.

### 3.    Recruiters' Primary Duties Are Not Directly Related to the Management or General Business Operations of TEK's Customers.

Recruiters also do not advise TEK's clients on policy or operations; they do not design systems or carry out major assignments affecting clients "to a substantial degree." 29 C.F.R. § 541.201(c); SOF ¶ 84-88. AMs handle client relationships; clients alone decide who to interview, hire, and how much to pay. SOF ¶¶ 35, 54. Recruiters' interactions with clients, if any, occur only within the narrow context of asking questions or providing requested information, not advising on

policy. *Avery*, 2024 WL 4281442, at *6. That is production activity, not administrative consulting.

In *Avery*, the court found that "TEK does not identify evidence that would support a finding Recruiters 'carry out major assignments in conducting the operations of TEK's clients' businesses, or that information Recruiters share with clients affects clients' business operations to a substantial degree." 2024 WL 4281442, at *6 (cleaned up). Recruiters help produce candidates to TEK customers for their hiring consideration—a production service, not administrative consultation. They do not "advise TEK's clients on the running of their business." *Id.* The same is true here.

Where, like here, employees are *not* "charged with developing 'long-term processes and programs,'" and the employees "do not perform any customer-service duties 'outside the context of making sales or sales that had been made,'" their primary duty is not related to the management or business operations of the employer's customers. *Su*, 110 F.4th at 399; *Hendricks*, 694 F. Supp. 3d at 1024; *Walsh*, 64 F.4th at 8 (where employees "do not design or plan the systems, nor do they analyze how they work or how they can be improved," the employee's work does not directly relate to management or general business operations); *Fowler*, 38 F.4th at 111 ("Duties related to managing a company's business typically involve significant decision-making authority, including authority to make policy-level decisions."); *Gordon v. Model N, Inc.*, No. 15 Civ. 01423, 2016 WL 3194240, at *3 (N.D. Cal. June 9, 2016), *aff'd*, 705 F. App'x 647 (9th Cir. 2017).

Rather, Recruiters "generate revenue" for TEK by aiding in producing "particular" contractors to TEK's customers. *See Su*, 110 F.4th at 399; *see also In re Enter. Rent-a-Car Wage & Hour Emp. Pracs. Litig.*, 2012 WL 4356762, at *18 (making "sales calls to customers and prospective customers" is not an exempt duty).

The evidence is uncontroverted that Recruiters' *primary* job duty does not include even speaking with its customers. SOF ¶¶ 26-29, 35. But to the extent Recruiters periodically speak

with TEK's clients, those interactions are limited to the placement of contractors and do not perform duties "outside [that] context." *Su*, 110 F.4th at 399. That Recruiters' duties "may, in a limited or superficial way implicate [its customers' general administrative functions] does not mean that this was their 'primary duty.'" *Walsh*, 64 F.4th at 9; *see also Su*, 677 F. Supp. 3d at 20 (rejecting the employers' argument that that the "most important function [inside sales employees] serve is to "create solutions for its customers" because the employees' "only partake in all of these activities, especially the customer facing work, in order to facilitate the sale of [the employers'] products.") (citation cleaned up) (citing *Martin*, 940 F.2d at 904).

Recruiters are not making any hiring decisions, rather they attempt to find as quickly as possible candidates that match the clients' job requisitions so that AMs can determine which candidates to submit to the clients and not "get beat on a requirement" by a competitor's candidate.[4] *Thomas*, 2025 WL 756067, at *2 ("It is undisputed that AMs decide whether to approve Recruiters' chosen candidates and that AMs focus primarily on working with TEK's customers to define their hiring needs (as opposed to focusing on candidates and consultants as Recruiters do).").

Recruiters "do not design or plan the systems [for employer's customers], nor do they analyze how they work or how they can be improved." *Walsh*, 64 F.4th at 8. TEK admits that Recruiters cannot commit its customers to particular job candidates or job requirements, or to take any particular courses of action as to the candidates they have sourced. SOF ¶¶ 54-58. Recruiters are not designing or planning systems for TEK's customers, nor are they analyzing how the systems work or how they could be improved. Thus, Recruiters are not exempt under the "directly related" requirement of the administrative exemption, and TEK's defense must fail.

### B.      Recruiters Do Not Exercise Discretion and Independent Judgment on Matters of Significance

---

[4]      Ex. 27 (Haycock Email Oct. 26, 2020) at TEK-Recruiter_Lit-00386105.

The Court need not reach the discretion requirement if it finds that TEK cannot meet its burden under the "directly related" requirement. *Rood*, 2022 WL 1082481, at \*5. If the Court reaches this issue, TEK's administrative exemption argument also fails because Recruiters' primary job duty does not include the "exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Rather, Recruiters' primary job duty is more akin to the "personnel clerk" analogy set forth in Section 541.203(e).

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice." *Id.* § 541.202(c). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* § 541.202(a). Factors courts are to consider regarding whether employees have discretion over matters of significance include: "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices"; "whether the employee has authority to waive or deviate from established policies and procedures without prior approval"; "whether the employee has authority to *negotiate and bind* the company on *significant matters*"; "whether the employee is involved in planning long- or short-term business objectives"; and "whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." 29 C.F.R. § 541.202(b) (emphasis added). Recruiters' primary job duty does not include any of these tasks.

Employees that are required to adhere to corporate guidelines or procedures with minimal deviation do not qualify for the exemption. *See, e.g.*, *Carter v. City of Philadelphia*, 417 F. Supp. 3d 639, 642, 648-50 (E.D. Pa. 2019) (finding employees of a mental health line non-exempt because even though they screened calls and determined where to delegate the calls, the calls were "repetitious" and Plaintiffs followed the "criteria"); *see also Deluca v. Farmers Ins. Exch.*, 386 F. Supp. 3d 1235, 1260 (N.D. Cal. 2019) (investigators did not hold the exemption level of discretion even though they acted "independently in planning and carrying out their investigations" because

this type of discretion is "more appropriately viewed as choices among established techniques, procedures or specific standards described in manuals or other sources.") (citation cleaned up)

Thus, if an employee's job duties involve "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources," the exemption does not apply. 29 C.F.R. § 541.202(e). That is, to the extent TEK argues Recruiters have discretion over decisions like whether to source potential candidates on Linkedin or Connected, this is simply applying well-established techniques and does not rise to discretion over matters of significance.

Directly on point, Section 541.203(e) explains:

> [P]ersonnel clerks who "screen" applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption. Such personnel clerks typically will reject all applicants who do not meet minimum standards for the particular job or for employment by the company. The minimum standards are usually set by the exempt human resources manager or other company officials, and the decision to hire from the group of qualified applicants who do meet the minimum standards is similarly made by the exempt human resources manager or other company officials.

In *Ogden v. CDI Corp.*, under similar facts, the court found a recruiter is "more like the personnel clerk who screens applicants and does not 'formulate, interpret or implement employment policies.'" No. 08 Civ. 2180, 2010 WL 2662274, at *5 (D. Ariz. July 1, 2010).

The *Avery* court found that "[t]he Recruiters' job is similar to the personnel clerk described in the regulation: they spend most of their time screening for candidates that match the job qualifications listed in the job requirements or requisitions." 2024 WL 4281442, at *8-9 ("TEK has not identified evidence creating a genuine dispute of material fact as to whether Recruiters exercise independent judgment and discretion as to matters of significance."). Recruiters work from client requisitions and TEK scripts, prompts, and procedures (e.g., Connected prompts; G2 intakes; standardized technical assessments), with AMs and clients making the consequential decisions. SOF ¶¶ 31-56. Their choices (which database to search; whom to call) are the kind of "use of skill in applying well-established techniques" that Section 541.202(e) deems non-exempt.

Recruiters do not exercise discretion and independent judgment over matters of significance. Recruiters' primary duty does not include formulating, interpreting or implementing

employment policies. SOF ¶¶ 84-88. Recruiters cannot deviate from procedures without approval; negotiate and *bind* TEK or clients; plan business objectives; or resolve grievances. *Id.* Recruiters screen candidates using standardized recruiting tools, such as TEK's internal databases and the G2 intake fields housed in the database, and screen out candidates who do not match the minimum requirements provided to them. *Id.* ¶¶ 38-49. Recruiters spend most of their time engaged in outreach because connecting with potential job candidates is challenging. *Id.* ¶¶ 46, 61-70. That is, Recruiters engage in the "grind" of TEK's recruiting business. *Id.* ¶ 45; *Avery*, 2024 WL 4281442, at *8 ("While Recruiters can choose how to source candidates, they do not have discretion or independence in terms of the candidates that get sent to the client—instead, Account Managers decide which individuals to send to clients."). Recruiters cannot override an AM's decision not to send a particular candidate to a client. *Id.* ¶¶ 29, 52-53. "Similarly, the clients, not Recruiters, decide which consultants to hire and how much to pay them." *Avery*, 2024 WL 4281442, at *8; *Id.* ¶ 54. Where employees act as "middlemen, merely delivering the messages," they are not exempt. *Tooker*, 715 F. Supp. 3d at 1031.

Ultimately, Recruiters' job duties are "repetitive, recurrent or routine" and "applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). Thus, Recruiters do not have discretion over matters of significance, and TEK's affirmative administrative exemption defense fails as a matter of law.

## VI.    CONCLUSION

TEK cannot establish that Recruiters meet the duty elements of the administrative exemption. As the *Avery* court concluded after analyzing identical facts, "[d]rawing all reasonable inferences in TEK's favor, TEK has failed to meet its burden" to prove the administrative exemption applies. *Avery*, No. 32024 WL 4281442, at *11. For the foregoing reasons, the Court should grant partial summary judgment to Plaintiffs, the FLSA collective, and the four Rule 23 classes on TEK's administrative exemption affirmative defense.

Dated: August 29, 2025

Respectfully submitted,

*/s/* Sally J. Abrahamson

Sally J. Abrahamson* (DC 999058)
sabrahamson@flsalaw.com
**Werman Salas P.C.**
335 18th Pl NE
Washington, D.C. 20002
Phone No.: (202) 830-2016
Fax No.: (312) 419-1025

Douglas M. Werman * (IL 6204740)
dwerman@flsalaw.com
Maureen A. Salas* (IL 6289000)
msalas@flsalaw.com
Anne Kramer* (MA 697435)
akramer@flsalaw.com
**Werman Salas P.C.**
77 West Washington Street, Ste 1402
Chicago, Illinois 60602
Phone No.: (312) 419-1008
Fax No.: (312) 419-1025

Sarah R. Schalman-Bergen (PA 206211)
ssb@llrlaw.com
Krysten Connon* (PA 314190)
kconnon@llrlaw.com
Olena Savytska* (MA 693324)
osavytska@llrlaw.com
**Lichten & Liss-Riordan, P.C.**
729 Boylston Street, Suite 2000,
Boston, MA 02116
Phone No.: (617) 994-5800
Fax No.: (617) 994-5801

*Attorneys for Plaintiffs and the FLSA Collective and
Proposed Rule 23 Classes*

*\*Pro hac vice*

### **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the foregoing

was served via CM/ECF filing system on August 29, 2025 to all counsel of record.

_/s/_ Sally J. Abrahamson

One of the Attorneys for Plaintiffs