IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | |
|---|---|
| MICHAEL THOMAS, MARIA CONYERS-JORDAN, AUSTIN SHERMAN, LYNDA ALEXANDRA MAHER, AVA DORÉ, RACHEL RICHENBERG, and EMILY BURKE, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TEKSYSTEMS, INC., <br><br> Defendant. | Civil Action No.  2:21-cv-00460-WSS |

**DEFENDANT'S RESPONSES TO
PLAINTIFFS' STATEMENT OF MATERIAL UNDISPUTED FACTS AND
DEFENDANT'S FURTHER STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civ. R. 56(b)(1), Defendant

TEKsystems, Inc. ("TEK" or "Defendant") submits the following response to Plaintiffs'

Statement of Material Undisputed Facts ("PSMF") in support of Plaintiffs' Motion for Partial

Summary Judgment.

1.     TEK is an IT staffing company. Ex. 3 (TEK Senior Vice President of Talent

Delivery Haycock Tr. ("Haycock Tr.")) 25:6-26:6; Ex. 20 (*TEKsystems, Inc. v. Andiamo

Consulting, LLC* ("*Andiamo*") Complaint) at ¶ 2.

**RESPONSE: Disputed in part. In the cited testimony, Haycock does not accept**

**Plaintiffs' counsel's characterization that TEK "provides IT staffing services." (Pls. Ex. 3,**

**Haycock Tr. 25:6-10.) Haycock explained that TEK is a talent services company, and its**

**business includes staff augmentation, i.e., placing workers with specific skills on assignment**

**at customer companies to perform needed services for a certain period of time; capacity**

320884109v.1

solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 59, Haycock Dep. 25:22-34:18, 73:16-77:7.)

2.     TEK's principal business purpose is to recruit IT workers to work for third-party companies. *Id.*; Ex. 3 (Haycock Tr.) 60:2-6; Ex. 4 (Rule 30(b)(6) Deposition DiBenedetto Tr. ("DiBenedetto Tr.")) 134:5-13; Ex. 21 (*Andiamo* Rule 30(b)(6) Dep. Tr. of Alexander Pulido ("*Andiamo* Rule 30(b)(6) Tr.")) 24:14-25:5, 153:13-23; Ex. 26 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5.

**RESPONSE:  Disputed**. **As noted in response to PSMF 1, TEK's business includes staff augmentation, i.e., placing workers with specific skills on assignment at customer companies to perform needed services for a certain period of time; capacity solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 59, Haycock Dep. 25:22-34:18, 73:16-77:7.)**

**Further, TEK's "business purpose" is not merely to "recruit" people to work for third-party companies. TEK's employees assist TEK's customers to define the requirements for roles the customers wants to fill; identify and develop sources of potential candidates to fill those roles; evaluate candidates' qualifications against the role requirements; negotiate pay rates and other conditions of employment with candidates; submit the best qualified candidates to customers for consideration; and employ and manage consultants who are on assignment. (Df. Ex. 59, Haycock Dep. 27:14-30:2; Df. Ex. 2, 3, 5, and 10 (compiling testimony regarding requisition intake, sourcing strategy, negotiation, and managing consultants on assignment).**

**In addition, the citations offered by Plaintiffs do not support their assertion. The Haycock testimony states that TEK makes money when it makes a direct placement of a candidate to, or engages a contractor to perform work, at a third-party company. (See Pl. Ex. 3, 60:2-6.) The DiBendetto testimony states that TEK Recruiters "[w]ork on the placement of IT consultants." (See Pl. Ex. 4, 134:5-13.) The Pulido testimony describes how TEK generates fees from staffing engagements and direct placements. (See Pl. Ex. 21, 24:14-25.) The Q2 Talent Delivery Call is a single page from a PowerPoint presentation that states TEK's "goal is to become the most dominant recruiting workforce on the planet." (See Pl. Ex. 26, 5.)**

3. TEK has two primary client bases: customers who need staffing help and candidates/consultants whom TEK places with customers. Ex. 21 (*Andiamo* Rule 30(b)(6) Tr.) 23:22-24:3 ("we technically have two client bases. We have – we have our customers, those companies . . . Then we have our consultants"), 24:14-25:5, 153:13-23; Ex. 3 (Haycock Tr.) 60:2-6; Ex. 4 (DiBenedetto Tr.) 134:5-13; Ex. 20 (*Andiamo* Compl.) at ¶ 2; Ex. 26 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting workforce on the planet").

**RESPONSE: Disputed in part.** Undisputed that part of the cited *Andiamo* testimony identifies the "two client bases." (Pls. Ex. 21 at 23:22-24:3.)

Disputed insofar as it suggests that both "client bases" pay fees to TEK; the *Andiamo* testimony states that fees are paid by TEK customers who seeks TEK's help with staffing engagements and direct placements. (*Id*. at 24:14-25:5.) Haycock also testified that consultants do not pay for TEK's services. (Df. Ex. 59, Haycock Dep. at 43:14-44:5.) Also disputed that

- 3 -

Plaintiffs' remaining citations support the statement, as none of them say anything about "client bases." (*See* Pls. Ex. 4, 20 and 26.)

4.    TEK competes with other recruiting firms to place candidates and ultimately is only successful at placing less than one-third of the candidates it submits to third-party companies. Ex. 4 (DiBenedetto Tr.) 96:2-6 (part of the customer service goal with potential job candidates is to get them to utilize TEK over its competitors); Ex. 5 (Rule 30(b)(6) Deposition Doyle Tr. ("Doyle Tr.")) 199:18-200:2; Ex. 6 (Doyle Sealed Tr. Portion) 237:20-238:9 (only 31.8% of the job requirements that TEK works to fill get filled by TEK); Ex. 3 (Haycock Tr.) 44:22-45:4 ("There's always a war for talent."), 48:1-8 ("[T]here are many, many, many competitors out there"), 48:10-49:12; Ex. 7 (TEK Vice President of Managed Service Program Strategy McNelley Tr. ("McNelley Tr.")) 38:17-39:3, 40:23-41:13, 58:20-59:11; Ex. 8 (TEK Regional Director of Applications Innovation Services Estimada Tr. ("Estimada Tr.") 86:16-21, 88:2-6, 89:14-21, 92:18-25; Ex. 9 (TEK Change Management Lead Fronzaglio Tr. ("Fronzaglio Tr.")) 97:8-17; Ex. 10 (AM Hollister Tr. ("Hollister Tr.")) 36:16-37:16, 86:10-87:6; Ex. 11 (TEK Director of Business Operations Matthew Minniear ("Minniear Tr.")) 54:22-55:9, 92:15-18; Ex. 12 (Former TEK Account Manager Pappas Tr. ("Pappas Tr.")) 130:24-131:20; Ex. 21 (*Andiamo* Rule 30(b)(6) Tr.) 181:12-17; Ex. 27 (Haycock Email Oct. 26, 2020) at TEK-Recruiter_Lit-00386105 (discussing "reduc[ing] 'finger pointing' when we get beat on a *requirement*.") (emphasis added).

**RESPONSE:  Disputed in part. Undisputed that TEK has business competitors that seek to place candidates at third-party companies.**

**Disputed that TEK competes with other companies on all requirements that it is engaged to fill for third-party companies. Some requirements are exclusive to TEK, meaning the third-party company engages only TEK to identify candidates for the role(s.)**

- 4 -

**(Df. Ex. 59, Haycock Dep. 48:10-49:12.) In addition, TEK may give lower priority to requirements where it is in competition with other firms, i.e., choose not to compete to fill those requirements. (Df. Ex. 64, McNelley Dep. 37:23-39:5, 40:23-43:13; Df. Ex. 56, Estimada Dep. 86:16-87:17, 88:2-6; (Df. Ex. 53, Doyle Tr. 199:18-200:11.)**

**Disputed as to Plaintiff's characterization of TEK as a recruiting firm. (*See* TEK's responses to PSMF ¶¶ 1, 2.)**

**Disputed that TEK is "only successful at placing less than one-third of the candidates it submits to third-party companies." The cited testimony is unrelated to *candidate submissions* to third-party companies. (*See* Pls. Ex. 6, 237:20-238:9.) Doyle testified that in 2019, TEK filled 31.8 percent of the requirements that it *entered into its systems*, and that at the time of his deposition in 2023 TEK filled about 41 percent of the requirements it entered into its systems. (*Id.*) Requirements may go unfilled by TEK for many reasons, including that the customer lost its budget for the role, the third-party company has moved an internal candidate into the role, or TEK gives it a low priority, among other things. (Pls. Ex. 11, Minniear Tr. 54:22-55:9; Df. Ex. 53, Doyle Dep. 99:16-100:7, 199:18-201:1.)**

5.      To compete against other companies, TEK often submits multiple candidates for a single requirement, submits one candidate for multiple requirements, and has multiple Recruiters work on the same requirement in order to increase the chances that one of its candidates will be selected. *Id.*; Ex. 5 (Doyle Tr.) 139:8-14, 140:3-11; Ex. 125 (Perrault Sept. 27, 2017 Email) TEK-Recruiter_Lit-00248137; Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Is this a marketable candidate that can be submitted to multiple other opportunities?"); Ex. 29 (Multiple Submittals) TEK-Recruiter_Lit-000000303; Ex. 30 (Bhasin

Email May 17, 2022) at TEK-Recruiter_Lit-00127828 ("A candidate can be submitted by multiple producers"); Ex. 31 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467 (describing a coaching opportunity to ask Recruiters what other requirement a candidate Auto-Matches or fits); Ex. 16 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307 (coaching recruiters to determine whether a candidate is a match for multiple requirements or TEK clients); Ex. 32 (Minniear Email) TEK-Recruiter_Lit-00559495 ("Focus on multiple submittals").

**RESPONSE:  Disputed in part Undisputed that there are instances when TEK may submit more than one candidate that may be fit a to fill a single requirement, or that a candidate may be submitted to more than requirement, or than more than one Recruiter may work on a single requirement.**

**Disputed insofar as Plaintiffs suggests that this is for purposes of "competition," that any of these scenarios are the norm, or that TEK increases its chances of placing its candidates by flooding its customers with resumes. Haycock explains that Recruiters speak with candidates; discuss career goals with candidates; and may present multiple roles that match the candidate's skills, goals, and interests. (Haycock Dep. at 59:3–60:1.) "They are talking to candidates about what it is that they're looking for in their career and making matches with the available jobs… a candidate might match more than one role, and they're talking to them about the role that is best for them." (*Id.*)**

**Doyle explains that sharing a requirement with multiple recruiters is about matching expertise, not boosting selection odds. (Doyle Dep. at 138:16–140:11.) An Account Manager may share a requirement with a "default opportunity team" of Recruiters with appropriate expertise and specialization relevant to the role. (*Id.*.) If an Account Manager "send[s] a requirement to five recruiters, maybe one of them already has a candidate that's**

a good fit, and we don't even need to allocate to that business." In other words, TEK's aim is to match candidates to requirements efficiently. (*Id.*) TEK views this as "putting the consultant first" to help them find work opportunities. (*See* Pls. Ex. 30 (Bhasin Email May 17, 2022.)

Plaintiffs' Ex. 125 is immaterial, as it is an email from September 27, 2017 (outside the relevant time period), from a Senior Account Manager (not a relevant role) based in a California office (not a relevant location), for a single client's requested process, to a distribution list of people whose roles and locations are not specified. (*See* Pls. Ex. 125 Perrault Sept. 27, 2017 Email.)

Plaintiffs' Ex. 28 contradicts their point that TEK "compete[s] against other companies" by submitting candidates to multiple positions. The document is a Guide for people in roles that may coach Recruiters, and the portion highlighted by Plaintiffs suggests that Recruiters consider whether a candidate who has been rejected by a client may have skills that make them the right candidate for a different role. It does not support the notion that candidates are submitted simultaneously for different roles.

Likewise, Plaintiffs' Ex. 29 is a classroom training exercise that encourages participants to view it as TEK's "responsibility to our consultants to keep them consistently employed and match them to positions that match their skills, goals, and interests. By identifying multiple opportunities for each consultant we increase the odds that they can secure a position." (Pls. Ex. 29 (Consultant Support Guidance) at TEK-Recruiter_Lit-000000303.) The guidance says nothing about "compet[ing] against other companies."

Plaintiffs Exs. 16 and 31 are training documents related to providing coaching to Recruiters, both of which include the same cited text about considering what requirements

320884109v.1

**a candidate may be a match for. Neither says anything about "compet[ing] against other companies."**

**Plaintiffs' Ex. 32 is immaterial, as it is an unauthenticated and apparently unsent draft email, from which Plaintiffs have cited one partial, ambiguous, and explained phrase.**

6.      TEK claims that it has an "exhaustive search, training, and matching process" and that the process was "developed and fine-tuned over 20-plus years in the market." Ex. 20 (*Andiamo* Compl.) at ¶ 22.

**RESPONSE: Undisputed but immaterial. The statements are not relevant to Recruiter job duties, but rather are made in the context of claims of breach of agreement, tortious interference with contractual relations, unjust enrichment, and statutory misappropriation of trade secrets by former employees who allegedly took and used without authorization information from a proprietary and confidential candidate database. (Pls. Ex. 20 (*Andiamo* Compl.) at ¶¶ 23, 164-249.)**

7.      TEK's own witnesses and documents describe Recruiters as an "entry-level" position. Ex. 33 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At an entry level role, there are certain competencies that are more likely correlated to performance than others."); Ex. 3 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; Ex. 21 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 13 (TEK Director of Business Operations Lis Tr. ("Lis Tr.")) 33:22-34:10; Ex. 12 (Pappas Tr.) 91:3-9; Ex. 34 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 at 7 (474 of Recruiters are new graduates, 75 had six months to one year of experience, and 110 of Recruiters had 1-2 years of

320884109v.1

experience. Therefore, approximately 74% of the 892 Recruiters have less than two years of experience); Ex. 35 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 36 (Maltese Email Feb. 19, 2018) TEK-Recruiter_Lit-00616402; Ex. 37 (Maltese Email July 12, 2021) TEK-Recruiter_Lit-00586352.

**RESPONSE:  Disputed. Haycock did not refer to the "Recruiter" role as an "entry-level" position. Haycock testified that TEK sometimes hires recruiters out of college, though he did not know what percentage those hires represent. (Pls. Ex. 3 (Haycock Tr.) 95:21-96:2.) The question was about "recruiters" generally, and not the specific Recruiter job title at issue in this litigation. (*Id.*) As Haycock testified, the entry recruiting job at TEK is Recruiter Trainee, not Recruiter, and a Recruiter Trainee cannot move out of their trainee period until they have shown the capability to be a Recruiter. (*Id.*, 104:14-115:6.)**

**Lis did not refer to the "Recruiter" role as an "entry-level" position. Lis testified to the qualities that he looks for when hiring. (Pls. Ex. 13 (Lis Tr.) 33:22-34:10.) The question was about "recruiters" generally, and not the specific Recruiter job title at issue in this litigation. (*Id.*)**

**Pappas did not refer to the "Recruiter" role as an "entry-level" position. Pappas testified to looking for candidates with five years of experience or less. (Pls. Ex. 12 (Pappas Tr.) 91:3-9.) Neither the cited question nor response identifies what role(s) is being discussed. (*Id.*)**

**The *Andiamo* testimony does not refer to the "Recruiter" role as an "entry-level" position. The cited passage says merely that TEK invests in "hiring, training, coaching and development of individuals that have no recruitment experience," but does not even specify**

what role or roles this investment may pertain to. (Pls. Ex. 21. (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6.)

Plaintiffs' Ex. 33 is an unauthenticated and ambiguous document that does not expressly refer to the "Recruiter" role as an "entry-level" position. (Pls. Ex. 33 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318.)

Plaintiffs' Ex. 34 is an unauthenticated email that does not refer to the "Recruiter" role as an "entry-level" position. The document does state "53% of our hires are new grads." TEK-Recruiter_Lit-00405538. However, the same document also indicates that more than one-quarter had 3 or more years of professional or military experience, in professions such as Recruiter / Talent Acquisition, Human Resources, Management, Sales / Account Manager / Business Development, or other fields. TEK-Recruiter_Lit-00405542.

Plaintiffs' Ex. 35 is immaterial, as it is dated May 2, 2017 and purports to include data from the preceding four months (outside the relevant time period), includes data related to hiring in both Canada and the United States (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other role or collection of roles.

Plaintiffs' Ex. 36 is immaterial, as it is an unauthenticated and apparently unsent draft email, that purports to include data about "West Coast Hiring" (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other role or collection of roles.

Plaintiffs' Ex. 37 contradicts their statement, as the document nowhere refers to "Recruiter" as an "entry-level" position. The cited portion explicitly states that people are hired with experience: "At TEKsystems, we aim to find candidates who have demonstrated

**success in a variety of areas – including a traditional 4-year degree, community college, *the military or 3-4 years in a professional career*.” (Emphasis added.)**

**8.** TEK hires Recruiters early in their career and it has an average annual Recruiter attrition rate of approximately 38% to 47%. Ex. 5 (Doyle Tr.) 266:23-268:10; *see also* Ex. 21 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6 (“TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience.”); Ex. 35 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 38 (Marland Email Feb. 4, 2022) at TEK-Recruiter_Lit-00557691-92 (describing that year-end attrition rate for Recruiters was 45.8%).

**RESPONSE: Immaterial in part, and disputed in part. A purported annual attrition rate is immaterial to the job duties of Recruiters and thus irrelevant to whether the role is properly classified as exempt.**

**Undisputed that some of the people TEK hires to perform recruiting work are early in their career.**

**Disputed as to the inference that all Recruiters are hired early in their respective careers because Plaintiff's citations do not support that assertion. TEK hires people with years of experience to perform recruiting work. (*See* Pls. Ex. 34, noting more than one-quarter of recruiting hires had 3 or more years of professional or military experience, in professions such as Recruiter / Talent Acquisition, Human Resources, Management, Sales / Account Manager / Business Development, or other fields. TEK-Recruiter_Lit-00405542.) (See also Df. Ex. 31, Rothermich Decl. ¶¶ 3, 5, 10 (nearly 20 years' prior experience before hire by TEK as a Recruiter Trainee, followed by promotion to Recruiter.).)**

320884109v.1

Disputed that TEK hires people directly into the Recruiter role. The entry point for recruiting at TEK is Recruiter Trainee, and a Recruiter Trainee cannot move out of their trainee period until they have shown the capability to be a Recruiter. (Pls. Ex. 3 (Haycock Tr.) 104:14-115:6.)

Plaintiffs' citations do not support their assertion regarding attrition rates for Recruiters.

The cited Doyle testimony is offered in response to questions about a specific document that was not included among Plaintiffs' exhibits. (See Ex. 5 (Doyle Tr.) 264:15-267:2, referring to Doyle Dep. Ex. 15 (TEK-Recruiter_Lit-00586687-89).) The document does not state whether the attrition rates provided are limited to "Recruiters" specifically (the only job title at issue in this litigation) or include other recruiting roles generally. (*Id.*) The document also does not state what geographic scope applies to the data, so it is not possible to determine whether it describes a population relevant to the litigation. (*Id.*)

Plaintiffs' Ex. 38 does not support the statement, as document does not state whether the attrition rates provided are limited to "Recruiters" specifically (the only job title at issue in this litigation) or include other recruiting roles generally. (Pls. Ex. 38 (Marland Email Feb. 4, 2022) at TEK-Recruiter_Lit-00557691-92.) The document also does not state what geographic scope applies to the data, so it is not possible to determine whether it describes a population relevant to the litigation. (*Id.*)

Plaintiffs' Ex. 21 does not support the statement, as it does not state that TEK is focused on "hir[ing] Recruiters early in their career" and it says nothing about attrition. The cited passage says merely that TEK invests in "hiring, training, coaching and development of individuals that have no recruitment experience," but does not even specify

**what role or roles this investment may pertain to. (Pls. Ex. 21. (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6.)**

**Plaintiffs' Ex. 35 is immaterial, as it is dated May 2, 2017 and purports to include data from the preceding four months (outside the relevant time period), includes data related to hiring in both Canada and the United States (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other role or collection of roles.**

9.      The average tenure of the Named Plaintiffs and Opt-in Plaintiffs in the Recruiter position at TEK is 1.33 years, and 49% of the Recruiters worked in the position for less than one year and 79% of them worked in the position less than two years. Ex. 19 (Calderon Dec.) ¶¶ 35-36.

**RESPONSE:  Immaterial in part, and disputed in part. A purported average tenure is immaterial to the job duties of Recruiters and thus irrelevant to whether the role is properly classified as exempt.**

**Undisputed that the calculations reflected in Pls. Ex. 19 (Calderon Dec.) ¶¶ 35-36 are generally replicable.**

**Disputed that the calculations are meaningful, since the numbers do not reflect time that these same individuals may have similar roles for other companies, time learning Recruiter job duties as a Recruiter Trainee, or time in roles that have different job codes but perform identical job duties to those of Recruiter.**

10.     TEK has not produced the full employee history of the Rule 23 Class Members. Ex. 19 (Calderon Dec.) ¶ 37.

**RESPONSE:  Undisputed**.

- 13 -

11.    TEK does not require Recruiters to have prior IT knowledge or experience, or any specialized training or education. Ex. 4 (DiBenedetto Tr.) 121:1-7 ("The recruiter is not . . . an individual that has a technical background per se."); Ex. 5 (Doyle Tr.) 59:4-17, 79:16-20 (Q: "... recruiters don't have any prerequisites before they're hired to have any sort of technical knowledge; is that true?" A: "That's correct."), 208:23-210:17; Ex. 3 (Haycock Tr.) 121:12-17; Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313-17 (not requiring IT knowledge or a college degree, under some circumstances); Ex. 14 (Rule 30(b)(6) Deposition of Johnson Tr. ("Johnson Tr.")) 87:16-88:9; *see also* Ex. 15 (Recruiter Lead Kartchner Tr. ("Kartchner Tr.")) 178:5-15.

**RESPONSE:  Disputed in part. Undisputed that prior IT knowledge or experience, or any specialized training or education is not a prerequisite to being hired by TEK.**

**Disputed that TEK Recruiters do not have specialized IT knowledge and have not obtained specialized training or education before being promoted from Recruiter Trainee into the Recruiter role. TEK "provides comprehensive training where individuals learn terminology, job functions and applicable practices within the information technology industry." (Pls. Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313-17.) (*See also* Pls. Ex. 5 (Doyle Tr.) 55:15-58:4 (explaining that Recruiter Trainees are taught about specific skill specializations relevant to the particular specialized area of recruiting they will be engaged in).)**

**Disputed that Plaintiffs' Ex. 14 or 15 support the statement. The former testimony states only that TEK does not require college degrees for recruiters. (See Pls. Ex. 14 (Rule 30(b)(6) Deposition of Johnson Tr. ("Johnson Tr.")) 87:16-88:9.) Steve Jobs and Bill Gates both famously dropped out of college but could be said to possess IT knowledge or experience. The latter testimony includes only the unremarkable observation by a**

320884109v.1

**Recruiter Lead that he is not qualified to perform the technical aspects of the roles that he helps clients to fill. (Pls. Ex. 15 (Recruiter Lead Kartchner Tr. ("Kartchner Tr.")) 178:5-15.)**

12.     TEK intends for Recruiters to be promoted to AM or Recruiter Lead. Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 ("TEKsystems promotes from within. More than 90 percent of current leaders began their careers as recruiters."); Ex. 40 (2019 Recruiter Trainee Compensation Talking Points) at TEK-Recruiter_Lit-00103684 ("After gaining some experience, many of our recruiters choose to pursue a sales career path and move into the role of account manager."); Ex. 41 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045215 ("We offer . . . a promote from within growth model"); Ex. 42 (Sales Trainee Program) at TEK-Recruiter_Lit-00527262 (discussing promotions from Recruiter to Account Manager); Ex. 4 (DiBenedetto Tr.) 27:14-17 (describing his promotion to recruiter lead/retention lead); Ex. 5 (Doyle Tr.) 50:8-14 ("promoting recruiter leads"), 106:12-16; Ex. 8 (Estimada Tr.) 103:17-104:3, 115:8-17, 131:18-23; Ex. 9 (Fronzaglio Tr.) 35:15-22; Ex. 43 (Lieberman Email Oct. 24, 2019) at TEK-Avery-00492062; Ex. 44 (LeBaron Email Feb. 26, 2021) TEK-Recruiter_Lit-00452463 ("Growth potential with various career paths for recruiters and sales professionals").

**RESPONSE:  Disputed. Plaintiffs' citations do not support the statement. While the documents identify promotion opportunities, none express that TEK "intends" for Recruiters to move to different roles.**

**Plaintiffs' Ex. 42 directly contradicts Plaintiffs' premise. As the document explains, a portion of Recruiters have "developed more interest in growing in the recruiter career path" rather than transitioning into a sales role like Account Manager, "success in recruiting does not directly correlate to success in sales," and TEK prefer to "focus on**

developing our recruiter talent due to the current volume of business we have" rather than moving people out of the role. (Df. Ex. 44, at TEK-Recruiter_Lit-00527262.) Rather than looking to current Recruiters as a pool for promotion into sales roles, TEK created a Sales Trainee Program for people who "were not interested in Recruiting" at TEK. (Df. Ex. 44, at TEK-Recruiter_Lit-00527266.)

Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page says only that TEK "promotes from within," but does not state that TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 40 is an unauthenticated document dated April 14, 2014 (outside the relevant time period) titled "Recruiter Trainee Compensation Talking Points." The document states that "many" recruiters later choose to move into a sales role, but does not state that TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 41 is an unauthenticated email dated December 6, 2018 from a Talent Acquisition Specialist (not a relevant role) based in an Arizona office (not a relevant location), to a distribution list of people whose roles and locations are not specified. The document states that TEK offers a "promote from within growth model," but does not state that TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 43 is an unauthenticated email thread dated October 24, 2019 and initiated by someone with the title Technical Recruiting Lead-Infrastructure Optimization Services (not a relevant role) based in a California office (not a relevant location), to a distribution list of people whose roles and locations are not specified. The document states

320884109v.1

that TEK offers a "promote from within environment," but does not state that TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 44 is an unauthenticated email dated February 26, 2021 and initiated by someone with the title Division Lead/Sr. Account Executive – Government Services (not a relevant role) based in a Utah office (not a relevant location) to an unknown Gmail address. The document states that TEK offers "Grown potential with various career paths for recruiters and sales professionals," but does not state that TEK intends for Recruiters to be promoted to any role.

The citations in Plaintiffs' Ex. 4 and 5 merely note that the deponents were promoted from Recruiter to other roles based on the deponents' interests. The testimony does not state that TEK intends for Recruiters to be promoted to any role.

The citations in Plaintiffs' Ex. 5 note only that during the period of time when the recruiter lead program began, there was a focus on interviewing, hiring, and promoting recruiter leads. The testimony does not state that TEK intends for Recruiters to be promoted to Recruiter Lead or any other role.

The citations in Plaintiffs' Ex. 8 note than TEK sought to hire a mix of people interested in recruiting and people with aspirations to move into sales. (Pls. Ex. 8 (Estimada Tr.) 115:8-17 ("leaning towards identifying recruiters for the recruiter role" and "recruiters that had aspired to get into sales roles")

13.    Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team. Ex. 3 (Haycock Tr.) 103:6-104:1, 21:13-22:16; Ex. 45 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 7.

- 17 -

**RESPONSE: Disputed in part. "Talent delivery" refers to "all operations and responsibilities for our recruiting operations and all of our recruiters." (Pls. Ex. 3 (Haycock Tr.) 21:13-22:16.) However, the structure has not been the same over the entire period relevant to the litigation. Plaintiffs' Ex. 45 is a presentation dated November 6, 2020. (Pls. Ex. 45 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 1.) The presentation described a desired future state for TEK when it would have "a unified delivery organization that drives exceptional results for clients while creating a differentiated experience for consultants." (*Id*. at 5; *see also id*. at 8 (comparing "Current State" to "Future State" and at 10 (describing an "Evolution Timeline" extending years into the future).)**

14.    TEK employs people in 46 different recruiting job titles. Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.

**RESPONSE: Disputed. Plaintiffs rely on a vague and ambiguous interrogatory seeking a list of "all job titles Defendant used to refer to individuals who worked for Defendant in recruiting job positions, and/or all job titles Defendant used to refer to employees to whom information is provided regarding specific credential and qualifications required of a candidate and who would identify potential candidates who meet the requirements for an open position." (Pls. Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.) The time period covered by the interrogatory spanned April 9, 2015 to the present. (*Id*., General Objection No. 3.) In response, TEK provided a list of all job titles it included in the list used to send notice of the collective action. (Id., Def.'s Resp. No. 2.) Many of those roles only were in use for a portion of the period covered by this litigation, are not currently in use, and have not been in use for years. (Df. Ex. 62, Johnson 2 Tr. 24:8-26:12, 36:11-37:7, 39:17-41:2, 49:12-24.)**

15.    These job titles include the senior and supervisory level recruiting positions. *Id.*

**RESPONSE:  Undisputed. Some of the job titles refer to senior and supervisory level positions in use at some time during the relevant period.**

16.    With the exception of Recruiter Trainees, all of TEK's recruiting job titles are classified as exempt. Id., No. 3.

**RESPONSE:  Disputed in part. Undisputed that of the job titles listed in Defendant's Response to Plaintiffs' First Set of Interrogatories, No. 2, all but the Recruiter Trainee position were classified as exempt.**

**Disputed insofar as the phrase "recruiting job titles" used in the statement is vague and ambiguous and is not the same phrasing that Plaintiffs included in the interrogatory or that TEK included in its response. See Response to Statement 14.**

17.    TEK employs multiple layers of supervisors for Recruiters – Director of Business Operations ("DBOs"), Director of Regional Operations, Delivery Managers, Team Leads, Specialization Leads, and Recruiter Leads – who closely supervise Recruiters. Ex. 3 (Haycock Tr.) 65:14-18; Ex. 5 (Doyle Tr.) 78:3-12, 101:2-102:20, 255:3-256:8 (DROs monitor the Recruiters on a region-wide basis), 275:2-5; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 (identifying leaders above "Recruiter"); Ex. 46 (Lighthouse Recruiter Lead PowerPoint) TEK-Recruiter Lit-00125482 (describing supervisory tasks performed by Recruiter Leads); Ex. 7 (McNelley Tr.) 62:21-63:6; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132-33; Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691-92; Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274-75; Ex. 50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552029-30; Ex. 51 (Talent Delivery) TEK-Thomas-00000214 at 4-5.

**RESPONSE:** **Disputed. Many Recruiters testify that they are not closely supervised in the performance of their work. (Df. Ex. 6, collecting statements that Recruiters do not work under close supervision by Account Managers, Recruiter Leads, or DBOs.) Many Account Managers, Recruiter Leads, and DBOs testify that they do not closely supervise the work of Recruiters. (*Id.*)**

**Plaintiffs' citations do not support the statement either.**

**The cited Haycock testimony says only that TEK's Directors of Business Operations report to Regional Vice Presidents. (Pls. Recruiters. Ex. 3 (Haycock Tr.) 65:14-18.) The testimony says nothing about supervision of Recruiters.**

**The cited Doyle testimony says only that Recruiters doing staffing for global services work receive assignments based on their area of specialization, and those assignments will vary based on the size of the team to come from either a Delivery Manager, Delivery Director, or Team Lead. (Pls. Ex. 5 (Doyle Tr.) 78:3-12, 101:2-102:20.) Doyle also testified that when he was Director of Regional Operations he "would look at" at how Recruiters and salespeople in the Region were performing, since people struggling are "high attrition risks." (*Id.*, 255:3-256:8.) The testimony says nothing about supervision of Recruiters, much less that they are "closely supervised."**

**Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page does not identify "leaders above 'Recruiter,'" as Plaintiffs represent, but rather presents a list of different opportunities within a Region, not all of which are even in the same reporting structures as Recruiters. (Pls. Ex. 39 at TEK-Recruiter_Lit-00386849.) The document says nothing about supervision of Recruiters. (*Id.*)**

320884109v.1

Plaintiffs' Ex. 46 is an unauthenticated June 1, 2018 email with an attached presentation from a pilot program to "train the trainer" as it relates to Recruiter Leads. (Pl. Ex. 46 (Lighthouse Recruiter Lead PowerPoint).) Plaintiffs have highlighted a short list of general "Responsibilities," such as "Recruiter Leads are RESPONSIBLE for their Pod member's – success, growth and development," help with "onboarding and training of new Pod members," help to "Create a strategy for tenured Pod members," and assist with "Goals setting." (*Id*., slide page 10.) None of the highlighted statements suggest "close supervision" of Recruiters. (*Id*.)

In the cited testimony of McNelley, she agrees with the statement that she "monitor[ed] the productivity of producers" as a Director of Business Operations and Executive Director of Business Operations. (Pls. Ex. 7 (McNelley Tr.) 62:21-63:6.) McNelley explained that her definition of "producers" includes Account Managers, Recruiters, Recruiter Leads, Account Leads, Business Development Managers, and Division Leads. (Df. Ex. 64, McNelly Tr. 61:9-18; *see also* TEK's Response to Statement 26 and the general meaning of "producers."). McNelley also explained what she meant by "monitor" – "making sure that we've got high engagement and making sure that we've got clarity of expectation so that they know what it means to be a successful producer on our team." (Df. Ex. 64, McNelly Tr. 61:23-62:8, 62:21-63:3.)

Plaintiffs' Ex. 47-50 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id*.) Plaintiffs cite pages within the documents that describe various roles, including Account Manager, Director of Business Operations, Recruiter, and Regional Vice President. (*Id*.) None of the roles are described as "closely supervising" Recruiters. (*Id*.)

**Plaintiffs' Ex. 51 is an unauthenticated organization chart. The document says nothing about supervision of Recruiters. (*Id.*)**

18.    Recruiters and their supervisors attend daily Red Zone meetings where Recruiters receive work assignments and report on their work activities they performed the prior day. Ex. 4 (DiBenedetto Tr.) 136:17-137:16; Ex. 5 (Doyle Tr.) 123:25-124:8, 238:16-246:4; Ex. 10 (Hollister Tr.) 98:4-99:1; Ex. 12 (Pappas Tr.) 51:16-21, 53:15-23; Ex. 52 (Running an Effective Red Zone) TEK-Recruiter_Lit-00665469; Ex. 53 (Ligouri Oct. 31, 2018 Email) TEK-Recruiter_Lit-00111237 (memorializing Red Zone assignments); Ex. 54 (DBO Operations: Red Zone) TEK-Recruiter_Lit-00426755; Ex. 55 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408136 ("Red Zone (RZ): An office meeting to *determine the priority of each requirement and Recruiter allocation.*") (emphasis added); Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399695 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489276 (same); Ex. 50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552033 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005767 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133190 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425013 (same); Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450707 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508986 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545027 (same); Ex. 62 (Kawabata Email Apr. 30, 2018) TEK-Thomas-00466253.

**RESPONSE: Disputed in part. Undisputed that Recruiters and others attend Red Zone meetings.**

320884109v.1

Disputed that Recruiters attend Red Zone meetings daily, attend Red Zone meetings with their "supervisors," attend Red Zone meetings for the purpose of "receiv[ing] work assignments" or to "report on their work activities they performed the prior day." (Df. Ex. 17, Chong Decl., ¶ 16 (Red Zones are "time to further share information, strategies and takeaways for success and efficiency, and to collaborate on how to excel in the Recruiter role"); Df. Ex. 23, Pagano Decl., ¶ 5 (when he ran Red Zones, he would prioritize the best requirements, have Account Managers speak about the requirements, then open it up for Recruiters to volunteer to work on requirements they thought they could fill); Df. Ex. 15, Rice Decl., ¶ 9 (when working as a Recruiter, Red Zone meetings were collaborative, and Recruiters vocalized what they wanted to work on; as an Account Manager, she joins Recruiters at Red Zone meetings only twice per week); Df. Ex. 12, Mosquera Decl., ¶ 11 (attends Red Zone meetings to learn what requirements are available, volunteers for requirements he thinks he can fill if he is not already working on one); Df. Ex. 18, Warren Decl., ¶ 13 (Red Zones are a "meeting to exchange information, agree which business should be the highest priority to work on, and develop and share sourcing strategies. These are very collaborative meetings."), ¶ 14 (has the freedom to work on whatever requirements he chooses and will volunteer for a requirement at Red Zone if he thinks he can fill it).)

The cited testimony by Doyle is that there are different types of Red Zones that vary by Recruiter, and could include an office-specific meeting, a vertical (industry) specific meeting, or a specialized skill set meeting, and the size of the meetings could range from 10 to well over 100 people. (Pls. Ex. 5 (Doyle Tr.) 238:16-246:4.)

DiBenedetto's testimony is that Red Zones are morning meetings, where there is discussion about whether candidates have been identified to fill open requirements, identify new requirements, and set the precedence for what Recruiters will be working on (Pls. Ex. 4 Plaintiffs' Ex. 4 (DiBenedetto Tr.) 136:17-137:16.) A Recruiter may get an assignment if they are not already working on a requirement. (*Id*.)

Pappas testified that at Red Zones "recruiters and account managers would be present as well to chat through both their business updates from the client-facing side as well as the candidates in the pipeline and where they were at in their process." (Df. Ex. 66, Pappas Tr. 52:20-24.)

Plaintiffs' Ex. 52 is a document that merely explains ways to approach running a Red Zone, with common sense suggestions like "prioritize business vs. treating all reqs the same" and "Resources should be assigned to the most fillable reqs." (Pls. Ex. 52 (Running an Effective Red Zone) TEK-Recruiter_Lit-00665469.) The document does not mention assigning work to Recruiters or having Recruiters report on their work activities from the prior day.

Plaintiffs' Ex. 53 is an unauthenticated email dated October 31, 2018, sent by a Talent Acquisition Specialist – West Region. (Pls. Ex. 53 (Ligouri Oct. 31, 2018 Email) TEK-Recruiter_Lit-00111237.) Plaintiffs describe it as "memorializing Red Zone assignments," but this appears to be inaccurate. Talent Acquisition is part of TEK's human resources function that focuses on recruiting and hiring people to work directly for TEK as recruiters, account managers, and more. (Df. Ex. 62, Johnson 2 Tr., 30:4-31:16.) The email content refers to three recruiter hires made the prior week and committing to two hires during the week of the email. (Pls. Ex. 53 (Ligouri Oct. 31, 2018 Email) TEK-

- 24 -

Recruiter_Lit-00111237.) It says nothing about Recruiters receiving work assignments and reporting on their work activities they performed the prior day. (*Id.*)

Plaintiffs' Ex. 54 is an unauthenticated document that appears to include a self-assessment that DBOs can complete about Red Zones. (Pls. Ex. 54 (DBO Operations: Red Zone) TEK-Recruiter_Lit-00426755.) The document says nothing about Recruiters receiving work assignments and reporting on their work activities they performed the prior day. (*Id.*)

Plaintiffs' Ex. 55 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 55 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.) It includes common sense points, such as a reminder to "prioritize business" and assign Recruiters to "the most 'fillable' requirements." (*Id.*)

Plaintiffs' Ex. 47-50 and 56-61 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite pages within the documents that describe various "General Terms," including Red Zones, which are described as "An office meeting to determine the priority of each requirement and Recruiter allocation." (*Id.*) The documents do not say that Recruiters receive work assignments and report on their work activities they performed the prior day.

19.     Recruiters' managers monitor Recruiters' performance through weekly reports to their quota attainment and performance metrics. Ex. 5 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead . . . [and contains] certain key performance indicators"), 44:2-18, 84:1-14, 91:21-92:2, 94:17-20, 255:3-256:8; Ex. 3 (Haycock Tr.) 158:2-14; Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-

320884109v.1

00520226 ("Using the weekly report, a Lead should be able to identify which activities a recruiter needs to focus on."); Ex. 63 (WIN narratives) TEK-Recruiter_Lit-00392430.

**RESPONSE:  Disputed. Plaintiffs' citations do not support the statement.**

**The word "quota" does not appear in any of the citations provided by Plaintiffs.**

**Haycock testified that a WIN report is "a weekly report that a recruiter gets that gives them an understanding of what happened the week before and how that – how they rank against others in the same kinds of activities." (Pls. Ex. 3 (Haycock Tr.) 158:2-14.) The testimony does not mention anyone else receiving WIN reports, and the word "quota" does not appear. (*Id.*)**

**Doyle testified that a WIN report is a natural language, AI created weekly report to a Recruiter and their lead that is "designed to be a coaching tool" that a recruiter can use to become more successful over time. (Pls. Ex. 5 (Doyle Tr.) 112:6-113:24.)**

**Plaintiffs' Ex. 63 is simply an email exchange with sample narratives that might be included in WIN reports. (Pls. Ex. 63 (WIN narratives).)**

**Plaintiffs cite to testimony by Doyle regarding his time working in for TEK in Las Vegas, Nevada as a Sales Manager. (Pls. Ex. 5 (Doyle Tr.) 44:2-18.) This was from 2009 until 2011 or 2012, which is not in the relevant time period. (Df. Ex. 53, Doyle Tr. 43:11-14, 45:6-17.)**

**Plaintiffs cite to testimony by Doyle regarding the role of DBOs in California offices from 2018-2021; he explained that DBOs "weren't really tied to the success of the recruiters." (Pls. Ex. 5 (Doyle Tr.) 84:1-14.)**

**Doyle testified that there are differences among Recruiters in how much coaching and development they receive. (Pls. Ex. 5 (Doyle Tr.) 91:21-92:2, 94:17-20, 255:3-256:8.)**

Recruiters above the "growth line" – a function of tenure and spread – are "thriving," "highly successful," and "attrition is extraordinarily low" among this group, so they receive less coaching. (*Id.*) Recruiters below the "performance management line" – also a function of tenure and spread – "just aren't feeling successful. They're not making money. They're a high risk to leave." This group "need[s] more coaching, they need more development, they need more push" to prevent their attrition. (*Id.*) In the middle of the two lines are people who are "doing okay. They're doing fine," and they don't attrit at high rates. (*Id.*)

Plaintiffs' Ex. 28 is an unauthenticated Recruiter Excellence – Scorecard Coaching Guide. (Pls. Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide).) The document simply describes how the information in the Scorecard can be used by a Recruiter and their coach to understand how their activities at work impact their success. (*Id.*)

20. Corporate officers also monitor Recruiters' quota compliance and spread (profit) attainment. Ex. 3 (Haycock Tr.) 70:13-71:22; Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161741-65; Ex. 65 (Haycock Jan. 25, 2018 Email) TEK-Recruiter_Lit-00253346.

**RESPONSE:** Disputed.

Plaintiffs' citations do not support the statement.

The cited Haycock testimony states only that a small group of executives receive a "dashboard" to "provide a snapshot on the various operations of the business." (Pls. Ex. 3 (Haycock Tr.) 70:13-71:22.) The words "quota" and "spread" do not appear in the testimony. (*Id.*)

Plaintiffs' Ex. 64 is an example of one of those "dashboards." (Pls. Ex. 64.) The pages cited by Plaintiffs reflect aggregated spread numbers and high level trends across

- 27 -

320884109v.1

Recruiter populations, not "monitoring" individual Recruiters. (*Id.*) The word "quota" does not appear.

Plaintiffs' Ex. 65 is an email from Haycock sent on January 25, 2018 (outside the relevant time period) that shares some information and data about workforce planning. (Pls. Ex. 65 (Haycock Jan. 25, 2018 Email).) As Haycock explains in the email, the purpose of sharing the information is to "[u]understand and get ahead of our 'at risk' population" in order to prevent attrition. (*Id.*, TEK-Recruiter_Lit-00253346.) The words "quota" and "spread" do not appear in the document. (*Id.*)

21.    Recruiters are aligned to AMs, whose job is to "provid[e] solutions to [the] client's business & technology needs [and] Ensures [they] place quality (technical & cultural fit) consultants." Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132; Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274 (same); Ex. 50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552029 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005762 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133186 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425009 (same); Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450703 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508982 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545025 (same); Ex. 5 (Doyle Tr.) 101:15-102:7, 137:19-138:4, 169:18-170:5; Ex. 4 (DiBenedetto Tr.) 114:23-25; Ex. 12 (Pappas Tr.) 30:21-31:5.

RESPONSE: Disputed in part.

Undisputed that some Recruiters during the relevant time period have been aligned to AMs and that Plaintiffs' statement generally describes the AM role.

320884109v.1

Disputed that all Recruiters are aligned to AMs. (See, e.g., Df. Ex. 33, Levine-Gorelick Decl., ¶ 8 ("At the time I was promoted [to Recruiter], my supervisor was an Account Manager. Since then, TEK has moved away from the model of having a Recruiter supervised by an Account Manager, and now that approach is mostly gone. I have not been aligned to an Account Manager since 2018."); Df. Ex. 22, Fahey Decl., ¶ 3 ("When I started in Boston, most Recruiters partnered with an Account Manager in the Boston office and did most of their work on business from the local area, though they could do work they found around other parts of the country. However, since then Recruiters all have become specialized and focus on either a specific candidate skillset, a specific vertical (industry), or a specific account, or sometimes some combination of those three things, and recruiting for roles anywhere in the country is common. There's not a specific point in time when those changes happened. Some of it began organically, then later there were more structured changes."); Df. Ex. 37, Budde Decl., ¶ 14 ("I do not report to an Account Manager, but I do partner with Account Managers frequently."); Df. Ex. 35, Harvey Decl., ¶ 19 ("In my job at TEKsystems, I work with multiple Account Managers to analyze the hiring needs of the clients and develop strategies to have our candidates chosen for positions. The Account Manager is not my supervisor. I treat it as a partnership to determine how to best address the clients' hiring needs. The Account Manager manages the network of clients, and I specialize in various types of technologies and develop a network of candidates who have the requisite skills in those technologies."); (Df. Ex. 16, Bohen Decl., ¶ 32 ("Over the time I've been at TEK, the Delivery model has changed. When I started as a Recruiter, there was no specialization whatsoever. I was aligned to an AM, and my experience was dictated

320884109v.1

**by the AM. Now, Recruiters have more support. They report to other people who are also recruiters.").)**

22.    Recruiters work near AMs, they speak "multiple times" a day and the AMs also regularly monitor Recruiters' work activities. Ex. 5 (Doyle Tr.) 251:3-253:17 (AMs and Recruiters talk "multiple times" a day); Ex. 12 (Pappas Tr.) 30:21-31:5.

**RESPONSE:  Disputed in part.**

**Undisputed that some Recruiters may work near AMs and may speak with AMs multiple times per day.**

**Disputed that all Recruiters work near AMs, speak with AMs multiple times per day, or are regularly monitored by AMs. (See TEK's Response to Plaintiffs' Statement 21. See also Df. Ex. 12, Mosquera Decl., ¶ 23 ("I work remotely two days per week."); Df. Ex. 14, Edds Decl., ¶ 31 ("I work remotely two days per week."); (Df. Ex. 16, Bohen Decl., ¶ 31 ("I've been working out of the Pennsylvania Delivery Center since 2021. There are about 75-80 people who work onsite for at least part of the week. Some of the Recruiters who are aligned to this office work remotely from Baltimore, New York, and Connecticut and don't come into the office.").)**

23.    Recruiters' desks are located in the "pit," an open office set up with cubicles, with managers' offices surrounding them, which allows managers to monitor Recruiters. Ex. 5 (Doyle Tr.) 251:3-253:17; Ex. 8 (Estimada Tr.) 133:16-25, 134:20-22, 155:10-156:9; Ex. 11 (Minniear Tr.) 131:10-132:14; Ex. 66 (Manage & Develop Your Team) at TEK-Recruiter_Lit-00395328-29 ("You can't own the pit if you aren't there"); Ex. 67 (Thomson Email Sept. 18, 2020) TEK-Recruiter_Lit-00079338.

**RESPONSE:  Disputed in part.** Undisputed that TEK refers to its open office concept as the "pit."

Disputed that Recruiters do not have offices. Doyle testified that some Recruiters do have offices. (Df. Ex. 53, Doyle Tr. 250:15-251:7.) Doyle also testified that there are "open offices where people can go in if they need to have conversations that are private." (Df. Ex. 53, Doyle Tr. 252:2-4; see also Df. Ex. 65, Minniear Tr. 157:12–158:21; Df. Ex. 56, Estimada Dep. at 135:4-14.)

Disputed that Recruiters must stay in the pit. Doyle testified that Recruiters are not required to be at their desks during the day when they work in the pit, people are "coming in and out all the time," and "Recruiters sometimes are picking up their computer and phones and walking into an office to have a conversation with somebody." (Df. Ex.53, Doyle Tr. 294:2-25.) Minniear testified that Recruiters have access to private office space in every location he worked, including Salt Lake City, Iowa, and Schaumburg, underscoring that it is common for recruiters to use private workspaces. (Df. Ex. 65, Minniear Dep. at 157:12-159:3.)

Disputed that only Recruiters sit in the pit. Doyle testified that Account Managers also may have desks in the pit, rather than offices. (Df. Ex.53, Doyle Tr. 251:4-7.) Doyle also testified that in the Silicon Valley office, as an example, all account managers and team leaders sit in the pit, which is meant for collaboration. (Df. Ex. 53, Doyle Tr. 252:5-14.) DBOs may sit in the pit for purposes of collaboration. (Df. Ex. 53, Doyle Tr. 253:14-17, 294:13-15.) Minniear testified that "anybody who's coming into the office sits in the pit," including recruiters, account managers, support staff, and even himself. (Df. Ex. 65, Minniear Dep. at 131:13–132:14.)

**Disputed that the pit is set up so that managers monitor Recruiters. Estimada testified that her presence in the pit as a sales manager was intended to provide support and accessibility, not to monitor recruiters. (Df. Ex. 56, Estimada Dep. at 155:10-156:9.) Estimada's team asked her to be more accessible. (Df. Ex. 56, Estimada Dep. at 157:3-15.) She adds "they like it when everybody had access to me because that meant that people on their team could ask me questions whereas if I were sitting in my office, they didn't always feel as if I was easily approachable." (*Id.*) Estimada also described the office layout as a shared community space. (Df. Ex. 56, Estimada Dep. at 135:4-14.)**

**Disputed that managers physically monitor Recruiters. Recruiters routinely work away from the office, beyond observation by managers, including some who are fully remote employees. (Df. Ex. 50, Bury Tr. 36:20-37:7 (worked remotely for 4 months); Df. Ex. 54, Baker Tr. 66:23-67:4 (fully remote during Covid); Df. Ex. 67, Raras Tr. 64:20-65:2 (same); Df. Ex. 12, Mosquera Decl., ¶ 23 ("I work remotely two days per week."); Df. Ex. 14, Edds Decl., ¶ 31 ("I work remotely two days per week."); (Df. Ex. 16, Bohen Decl., ¶ 31 ("I've been working out of the Pennsylvania Delivery Center since 2021. There are about 75-80 people who work onsite for at least part of the week. Some of the Recruiters who are aligned to this office work remotely from Baltimore, New York, and Connecticut and don't come into the office.")**

24.    TEK assigns Recruiters to "verticals" and also refers to "verticals" as "specializations." Ex. 4 (DiBenedetto Tr.) 46:6-21; Ex. 5 (Doyle Tr.) 59:1-17, 81:8-21, 297:4-20, 242:22-244:20; Ex. 14 (Johnson Tr.) 220:3-18.

**RESPONSE:  Disputed in part**.

**Undisputed that some Recruiters are aligned to "verticals," of which there are five: financial services, media and entertainment, healthcare, government services, and technology enablement. (Pls. Ex. 5 (Doyle Tr.) 242:22-244:20.)**

**Disputed that all Recruiters are assigned to "verticals," or that "verticals" are the same as "specializations." This is explained in the cited Doyle testimony. Some Recruiters may be aligned to a vertical, meaning that they only support TEK clients in their aligned industry. (Pls. Ex. 5 (Doyle Tr.) 243:1-6.) Some Recruiters may be aligned to a specialized skill, meaning that they only support TEK clients needed candidates with a particular type of IT skillset. (*Id.*, 242:9-11.) Some Recruiters may be aligned to both a vertical and a specialized skill, meaning that they only support TEK clients in their aligned industry and with a need for a particular type of IT skillset. (*Id.*, 243:1-22.)**

25.     TEK refers to the specific industry and/or job category that Recruiters work in as a "specialization," but those Recruiters do not have any specific training or experience adjacent to that field. Ex. 5 (Doyle Tr.) 79:16-80:23, 244:8-17 (Q: "And when you're saying the specialized -- like, we have new recruiters are joining these teams that haven't done any of this training, but what they're doing is they're focusing on who they're placing, the skills that the job candidates have?" A. "Correct."), 244:18-20 (Q. "If you're in financial service team, you didn't come from a financial services background?" A. "No. Correct."); Ex. 3 (Haycock Tr.) 113:8-12 (Q: "What is the difference between a recruiter and a specialized recruiter?" A: "A specialized recruiter has one contest win and 60 percent of their starts aligned in their specialty area."), 114:4-115:10; Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313 (not requiring IT knowledge).

**RESPONSE:  Disputed in part**.

Undisputed that TEK refers to the specific industry and/or job category that Recruiters work in as a specialization.

Disputed that Recruiters do not have any specific training or experience adjacent to their fields of specialization.

TEK "provides comprehensive training where individuals learn terminology, job functions and applicable practices within the information technology industry." (Pls. Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313-17.) (*See also* Pls. Ex. 5 (Doyle Tr.) 55:15-58:4 (explaining that Recruiter Trainees are taught about specific skill specializations relevant to the particular specialized area of recruiting they will be engaged in).) Doyle testified that Recruiter Trainees "go through… specialized training to learn that expertise," including "13 weeks initially, and then… ongoing training as well" (Df. Ex. 53, Doyle Dep. at 80:17–22.) Recruiters then receive ongoing training through TEK Academy, which offers "a huge library of resources and classes" housed in Degreed to support their continued development (Df. Ex. 53, Doyle Dep. at 80:24–81:7.) (See also Df. Ex. 52, DiBenedetto Dep. at 61:11-62:24 (Recruiter Trainees undergo an onboarding process that includes digital learning via Degreed, a three-day instructor-led training session, and a six-week development pathway).)

Doyle also testified the TEK offers specialization Badging and Credentialing programs that help Recruiters advance at TEK. (Df. Ex. 53, Doyle Dep. at 80:6–11.) "[T]o achieve certain badges, there are specific things such as percentage of their starts in their specialization." (*Id.*) Doyle provided an example of TEK Recruiter training in Java specialization, where Recruiters "get all trained up on the software development lifecycle," and learn "things like full stack versus front end versus back end and what technology is

aligned to them" (Df. Ex. 53, Doyle Dep. at 295:25-297:3, 297:24-299:7.) Recruiters with this specialization are taught to understand "the different kinds of Java developers that customers might want based on this project needs" (Df. Ex. 53, Doyle Dep. at 298:7–13.) Recruiters must be specialized because the candidates who Recruiters are speaking with are "almost always employed," and if Recruiters are not "relevant and talking to them about things that are interesting to them… you have zero chance of recruiting them." (Df. Ex. 53, Doyle Dep. at 296:18-297:3.)

Recruiters also have specialized experience in the specific industry they recruit in. Recruiters are the experts in the labor market for the positions they work to fill and need to understand the customer, the customer's culture and environment, what the customer is seeking, and a number of nuances in order to help provide the services that the customer is seeking. (Df. Ex. 59, Haycock Dep. 27:14-30:2.)

Recruiters may specialize in areas like "enterprise applications" and "data analytics and insights," and "various areas of specialty… have been created" to support recruiter specialization. (Df. Ex. 59, Haycock Dep. at 114:19–115:3.)

Plaintiffs' citations do not support their statement. The citation to Haycock's testimony appears to suggest that specialization is based solely on a contest win and crossing a threshold of placements within one specialty area. (Pls. Ex. Ex. 3 (Haycock Tr.) 113:8-12.) However, Haycock's explanation continues, and he describes TEK's "badging" program, which is a public-facing credential that Recruiter "really understands [the] role" and is "specialized in this particular area," which "adds value" for clients and consultants. (Df. Ex. 59, Haycock Dep. at 114:4–18.) The designations allow potential consultants to understand the recruiter has received a designation relative to their specialization. (Df. Ex.

**59, Haycock Dep. at 114:10-18.) Specialization is an ongoing process that enables Recruiters to "continue their knowledge and understanding of their area of specialty," and "as they reach certain milestones, they're able to move into a different level" (Df. Ex. 59, Haycock Dep. 113:23 –114:2.)**

26.      TEK refers to Recruiters as "producers." Ex. 3 (Haycock Tr.) 60:7-12, 68:1-16 ("Anyone that is in a role that is a salesperson account manager or recruiter, we consider those as producing roles. Meaning that they are producing for the company. Our products and services are associated with putting people to work, and those producers are – it's just a generic term that's used to say you're either a salesperson or a recruiter. . . . Again, as I've stated before, they are a recruiter that is producing. Meaning that they are a – they're a recruiter that produces what recruiters produce . . . They find people for jobs."), 86:9-19 (SPP means "spread per producer" and refers to "recruiters"); Ex. 4 (DiBenedetto Tr.) 158:4-12; Ex. 5 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."), 213:4-7; Ex. 8 (Estimada Tr.) 100:3-101:12; Ex. 10 (Hollister Tr.) 103:4-15; Ex. 69 (Haycock Dep. Ex. 15 (Yearly Performance Summary)) TEK-Recruiter_Lit-00124518 (email attaching "Producer EOY Performance Reviews" and "Producer Performance Reviews 2021" for Recruiters) (emphasis added); Ex. 70 (Haycock Dep. Ex. 5 (Project Lighthouse Communication Plan)) at TEK-Recruiter_Lit-00614413 (referring to Recruiters as "production focused"); Ex. 71 (Alvather Email Oct. 2, 2019) at TEK-Recruiter_Lit-00392555-56; Ex. 30 (Bhasin May 17, 2022 Email) at TEK-Recruiter Lit-00127828; Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291

("our producers must document in a consistent, timely manner"); Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-61; Ex. 73 (Recruiter Excellence: Scorecard FAQs) at TEK-Recruiter_Lit-00095089 ("many of our top producers are not maintaining 30 interactions."); Ex. 74 (Role Impact Summary: Producers (AM and Recruiter)) TEK-Recruiter_Lit-00004483 (emphasis added); Ex. 75 (Performance Review Guide 2021) at TEK-Recruiter_Lit-00528423 (referring to Recruiters as "Producers"); Ex. 76 (Producer Performance KPI 8-4-2020) TEK-Recruiter_Lit-00281725 (Recruiter metric summaries are referred to "Producer Performance KPI"); Ex. 77 (Annual Operating Plan) TEK-Recruiter_Lit-00583663 at 5, 10 ("Producer Enablement Technology").

**RESPONSE: Disputed in part. Undisputed that TEK refers to Recruiters as "producers."**

**Disputed that this term is limited to Recruiters. As Plaintiffs' citations show, this is a "generic term" applicable to people with sales or recruiting responsibilities.**

27.    TEK refers to Recruiters as "sales employees" and not "human resources" employees. Ex. 4 (DiBenedetto Tr.) 90:13-91:8 (distinguishing Recruiters from human resources and noting Recruiters must have good sales skills); Ex. 3 (Haycock Tr.) 60:7-12, 68:1-16 ("[T]hey are a recruiter that is producing."), 123:21-24, 136:13-23; Ex. 5 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."); Ex. 8 (Estimada Tr.) 100:3-101:12; Ex. 10 (Hollister Tr.) 103:4-15; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386851 ("We work in a sales environment"); Ex. 41

(Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045214; Ex. 102 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sales"); Ex. 103 (LinkedIn Recruiting Strategy) at TEK-Recruiter_Lit-00494036 (same); Ex. 104 (Vitrano Email Nov. 29, 2018) at TEK-Recruiter_Lit-00129606 (same); Ex. 105 (Chezik Email Feb. 20, 2020) at TEK-Recruiter_Lit-00135668 (same); Ex. 106 (Zhou Email June 10, 2021) TEK-Recruiter_Lit-00481474 (same); Ex. 96 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952 ("You're an inside sales person!"); Ex. 107 (Thomson Email Apr. 20, 2020) TEK-Recruiter_Lit-00183226 ("We are hiring for both inside sales (Recruiter) roles as well as Outside (Account Manager) roles."); Ex. 108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 33 ("You're an inside sales person!").

**RESPONSE: Disputed. Disputed that "sales" and "recruiting" are synonymous as TEK.**

**The cited Doyle testimony treats sales and recruiting as distinct. (Pls. Ex. 5 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles.") (emphasis added).**

**Plaintiffs include a citation to Haycock reading from a document includes the phrase "We work in a sales environment where professional appearances and first impression matters." (Pls. Ex. 3 (Haycock Tr.) 136:13-23.) Haycock explains that this**

**means the role is "customer facing, that you would be interacting with people," and you need "a high degree of professionalism[]"** (*Id.*)

**Other citations offered by Plaintiffs refer to "producing" or "producers" without any reference to sales." (Pls. Ex. 3 (Haycock Tr.) 60:7-12, 68:1-16, 123:21-24, 136:13-23; Pls. Ex. 5 (Doyle Tr.) 128:16-18.)**

28.     In its own internal recruiting documents, TEK states: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales." Ex. 41 (Ligouri Dec. 6, 2018 Email) TEK-Recruiter_Lit-00045214; *see also* Ex. 102 (Ligouri Email Sept. 19, 2018) TEK-Recruiter_Lit-00256524; Ex. 109 (Framingham Female Hiring Blitz) TEK-Recruiter_Lit-00468402 at 6 ("If someone is interested in HR make sure you explain the difference between recruiting and human resources. These are not the same thing in TEKsystems!"); Ex. 110 (Lightkep Email Jan. 18, 2021) at TEK-Recruiter_Lit-00472820; Ex. 111 (Donegan Email Feb. 21, 2020) at TEK-Recruiter_Lit-00435815; Ex. 112 (Haskin Email Mar. 9, 2020) at TEK-Recruiter_Lit-00198733; Ex. 113 (Bullock Email Sept. 13, 2019) at TEK-Recruiter_Lit-00132369; Ex. 43 (Lieberman Email Oct. 24, 2019) at TEK-Avery-00492061 ("we are looking for sales focused individuals"); Ex. 114 (Stadler Email Dec. 20, 2018) at TEK-Avery-00433138; Ex. 115 (Murrell Email Apr. 2, 2018) at TEK-Avery-00500049; Ex. 116 (Mooney Email Nov. 13, 2018) at TEK-Recruiter_Lit-00076220 ("We are a sales environment, if they don't want to do the brunt of the cold calling, they will not be a fit.").

**RESPONSE: Disputed in part. Disputed insofar as the phrase "its own internal recruiting documents" is vague and ambiguous in the context of litigation about Recruiters.**

**Undisputed that the cited documents included the cited phrases.**

320884109v.1

29.     Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's AMs. Ex. 4 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 162:18-163:7; Ex. 5 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 3 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12; Ex. 15 (Kartchner Tr.) 57:2-6; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter: . . .Screens consultants"); Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552030 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005763 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133187 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425010 (same); Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450704 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508983 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545026 (same); Ex. 78 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. *Screens consultants . . . .*") (emphasis added); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (TEK's business cycle as including Recruiters "screening" candidates and AMs communicating with TEK's customers.).

**RESPONSE:  Disputed. Disputed that Plaintiffs have fully described the primary job duties of TEK's Recruiters. TEK's job descriptions for the Recruiter role identifies the primary duties of the role to include:**

> **• Recruit top IT talent and match their career goals with clients' hiring needs**

- 40 -

• **Develop recruiting strategies to identify qualified candidates**

• **Evaluate the strengths and weaknesses of candidates**

• **Negotiate unique compensation packages (wages, benefits, etc.) to attract and close candidates**

• **Communicate details of new assignments and manage contract employees while on assignment**

• **Partner with TEK's sales team to identify top accounts and target skill sets**

• **Maintain relationships with Technical Professionals to gain industry knowledge and obtain referrals**

**(Pls. Ex. 68 (Job Description), TEK-Recruiter_Lit-0-0588313. *See also* Df. Ex. 40 (TEK-Recruiter_Lit-00407375); Df. Ex. 41 (TEK-Recruiter_Lit-00511675); Df. Ex. 42 (TEK-Recruiter_Lit-00468398).)**

**Disputed that Recruiters only submit candidates to AMs. Recruiters also may submit candidates directly to TEK's clients. (Df. Ex. 57, Fronzaglio Tr. 171:5-9; Df. Ex. 63, Lis. Tr. 139:15-141:2.)**

**Haycock testified that the job of a Recruiter is "to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customers needs." (Pls. Ex. 3 (Haycock Tr.) 32:5-13,**

**Plaintiffs' citation to the testimony of DiBenedetto is incomplete. In his complete response, DiBenedetto explains that during the particular Recruiter Trainee presentation being discussed, Recruiter Trainees practice presenting their candidates to their Account Manager, but in practice each Account Manager does it differently and may train**

**Recruiters to directly present candidates to a client. (Df. Ex. 52, DiBenedetto Tr. 113:7-114:25.)**

**Plaintiffs' Ex. 5 is testimony by Doyle about the importance of submittals, among other things. (Pls. Ex. 5 (Doyle Tr.) 158:1-159:24.) The excerpt mentions Recruiters but does not mention Account Managers.**

**Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page states that "Together, our AMs and recruiters place talented IT professionals with rewarding career opportunities at our customers' workplaces." (Pls. Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.) This is reflective of the partnership between Recruiters and Account Managers.**

**Plaintiffs' Ex. 47-50 and 56-61 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite pages within the documents that include brief descriptions of various roles, including Recruiter. (*Id.*) Even the brief description in those documents is more expansive than what Plaintiffs suggest. (*Id.* ("Recruiter: Partners with AM to understand requirements and culture of a client. Screens consultants to gain insight into their skills, goals, interests and provides aligned opportunities."). See also Plaintiffs' Ex. 78 (same).)**

30.     Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates. Ex. 5 (Doyle Tr.) 252:24-253:2, 271:8-272:5 (Recruiters spend "the majority of the time . . . talking to consultants"); Ex. 3 (Haycock Tr.) 39:4-40:6, 59:2-11; Ex. 10 (Hollister Tr.) 109:5-20; Ex. 15

(Kartchner Tr.) 110:1-7; Ex. 12 (Pappas Tr.) 102:1-9; Ex. 80 (Recruiter Success Profile) at TEK-Recruiter_Lit-00020276 ("high call volume environment").

**RESPONSE:** **Disputed. Plaintiffs' citations do not support the statement. None of the citations provided by Plaintiffs mention "time reviewing potential candidates' resumes and LinkedIn profiles," "cold calling," or "completing intakes of potential job candidates."**

**For example, Plaintiffs cite to Doyle testimony that Recruiters are "[o]n the phone, emailing, texting consultants" and spend "the majority of the time . . . talking to consultants" (Pls. Ex. 5 (Doyle Tr.) 252:24-153:2, 271:8-272:5.) In his testimony, Doyle uses the term "consultant" interchangeably with candidates, though "consultant" generally refers to someone already working on assignment to a TEK client and is distinct from a candidate who has yet to be placed on assignment. (Pls. Ex. 5 (Doyle Tr.) 125:18-24. In addition, Plaintiffs add the word "spend," but in context Doyle is stating that, as it relates to calls, Recruiters speak more frequently with consultants than with clients. (*Id.*) Likewise, they cite to Haycock testimony agreeing that Recruiters "are generally speaking with candidates on a daily basis." (Pls. Ex. 3 (Haycock Tr.) 59:2-11.) Haycock does not opine how much time Recruiters spend speaking with candidates. (*Id.*)**

**Plaintiffs' citation to Haycock also misrepresents his testimony. Haycock describes both the "science" and the "art" of matching the right candidate to the right assignment, but Plaintiffs' citation includes only the portion related to the "science." The complete testimony by Haycock is provided at Pls. Ex. 3 (Haycock Tr.) 39:4-41:4.**

**The cited Pappas testimony only states that Recruiters "made a lot of phone calls." (Pls. Ex. Ex. 12 (Pappas Tr.) 102:1-9.) Pappas did not elaborate on how much time**

320884109v.1

Recruiters spent on the phone but did explain "I just don't know who was on the other side of that phone." (Df. Ex. 66, Pappas Dep. 102:10-25.)

The cited Hollister testimony only states that "skilled verbal and written communications is necessary" because "the recruiter will spend most of their day on the phone and e-mailing," and these communications are "primarily" with consultants. (Pls. Ex. 10 (Hollister Tr.) 109:5-20.) The amount of time is not quantified. (*Id.*)

The cited Kartchner testimony states only that making phone is "a large part of our job[.]" (Pls. Ex. 15 (Kartchner Tr.) 110:1-7.) The amount of time is not quantified.

31.    As the initial recruiting step, TEK's clients fill out a form that the employees refer to as "job requisitions," "job requirements," or "job reqs." Ex. 3 (Haycock Tr.) 175:18-176:1; Ex. 4 (DiBenedetto Tr.) 91:9-22; Ex. 81 (Requisition Form) TEK-Recruiter_Lit-00281942.

**RESPONSE:  Disputed in part. Undisputed that the phrases "job requisitions," "job requirements," or "job reqs" are synonymous with each other.**

**Undisputed that Recruiters are involved at this initial step.**

**Disputed that "TEK's clients fill out a form" that is the job requirement. None of the cited testimony states that clients fill out a form. Plaintiffs' Ex. 81, which Plaintiffs describe as a "Requisition Form," are "mock ups" created as part of a pilot for a proposed new design within the Connected database. (Df. Ex. 43, TEK-Recruiter_Lit-00281939 - TEK-Recruiter_Lit-00281942.) TEK employees, not clients, input information to Connected. (Df. Ex. 45, 2019 Connected Guide, TEK-Recruiter_Lit-00135395.)**

32.    Job requisitions outline the clients' requirements for particular positions. Ex. 81 (Requisition Form) TEK-Recruiter_Lit-00281942; Ex. 4 (DiBenedetto Tr.) 91:9-22; Ex. 5 (Doyle Tr.) 58:5-25; Ex. 3 (Haycock Tr.) 59:2-6, 140:13-15.

- 44 -

**RESPONSE: Disputed in part. Undisputed that "job requisition" and "job requirements" are used interchangeably. See TEK's Response to Statement 31.**

**Undisputed that requirements provide information about the resources a client needs TEK's help to obtain. (Pls. Ex. 4 (DiBenedetto Tr.) 91:9-22.)**

**Disputed that Plaintiffs' Ex. 81 is a "Requisition Form." See TEK's Response to Statement 31.**

33.    The clients, not Recruiters, determine the job requirements for job openings. Ex. 5 (Doyle Tr.) 58:22-59:3 (Q: "[T]he customer is determining what the customer needs for that position; is that correct?" A: "Correct." Q: "And that's true for all the skill specializations?" A: "Yeah."); Ex. 4 (DiBenedetto Tr.) 91:17-22 ("we get customers . . . send us job requirements . . . and we are supporting them"), 120:15-21.

**RESPONSE: Disputed in part. Undisputed that TEK's clients determine whether they need resources.**

**Disputed that clients alone provide the job requirements. Clients, Account Managers, and Recruiters all may contribute to determining what are included among the requirements. (Pls. Ex. 5 (Doyle Tr.) 58:5-21; Df. Ex. 3 (collecting testimony related to the role of a Recruiter at requirement intake).)**

**34.**    TEK's managers assign the job requisitions to Recruiters. Ex. 4 (DiBenedetto Tr.) 122:10-13, 136:24-137:16; Ex. 5 (Doyle Tr.) 78:9-12 ("And who assigns them?" A. "Generally it's going to be a delivery manager or a delivery director or, in some cases, a team lead, depending on the size of the team"), 101:2-102:20 (delivery manager and team lead decide to reassign requirements), 123:25-124:8, 140:5-11 (allocate means assign), 238:16-246:4; Ex. 8 (Estimada Tr.) 80:24-81:10; Ex. 11 (Minniear Tr.) 64:19-23, 151:24-152:7; Ex. 82 (Onboarding Pathway Script)

at TEK-Recruiter_Lit-00056677 (". . . we should fully qualify each req in order for the DBO to prioritize business and evaluate where to allocate recruiters in the office.").

**RESPONSE: Disputed. Many Recruiters choose which requirements they want to work on. (Df. Ex. 4 (collecting testimony that Recruiters decide what requirements to work on.)**

**In other settings, such as Red Zone meetings, it is common for Recruiters to volunteer to work on requirements they believe they can fill, rather than passively accepting an assignment from someone else. See TEK's Response to Plaintiffs' Statement 18.**

35.    AMs' primary job duty (and not Recruiters') is to directly communicate with clients regarding their hiring needs. Ex. 4 (DiBenedetto Tr.) 115:9-14, 121:25-122:13; Ex. 5 (Doyle Tr.) 150:8-10, 167:6-10, 178:14-15, 185:4-188:5, 189:11-25, 191:3-7, 191:22-192:4; Ex. 12 (Pappas Tr.) 121:9-13; Ex. 21 (*Andiamo* Rule 30(b)(6) Tr.) 16:2-4; Ex. 83 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741 (Recruiters are evaluated if they "[o]btain missing information about the requirement from their Account Manager"), TEK-Recruiter_Lit-00152744 (Recruiters evaluated on the "ability to gather the appropriate client information from the Account Manager"); Ex. 84 (Delivery Qualification Form) at TEK-Recruiter_Lit-00413296 ("Recruiter... should come to the AM meeting PREPARED just like an AM would with their client."); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and AMs communicating with TEK's customers.).

**RESPONSE: Disputed in part and immaterial. Undisputed that Account Managers generally communicate with client's regarding the client's hiring needs and that recruiters generally obtain client information from an Account Manager.**

**Disputed as to Plaintiff's characterization of client communication as an Account Manager's primary function and the implication that the Recruiter role could not share the same primary function. (See Pls. Ex. 5, 186:10-187:21.)**

**For example, Plaintiffs' Ex. 83 reflects that Recruiter Trainees are expected to learn how to "Assess their requirement against the 9 key questions to determine if the requirement is qualified or unqualified" and to "Obtain missing information about the requirement from their Account Manager." (Pls. Ex. 83 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741.) Some Recruiters go directly to TEK's customers when a requirement is deficient or additional information is needed. (Df. Ex. 33, Levine-Gorelick Decl, ¶ 23 ("I have direct interactions with TEK's customers on a regular basis. I join calls between Account Managers and customer hiring managers when we are "qualifying" requisitions, which is the call when we talk to the customer about the role they want to fill and the skills that are required. I am the expert on the labor market and the types of candidates that are available, and I am able to speak to the customer hiring manager in detail and to capture the information we need in order to be able to find a candidate who meets the requirement."); Df. Ex. 27, Compton Decl., ¶ 15 "If an Account Manager brings in a new client that has a need for the software developer skill sets that I specialize in, I like to join the Account Manager for a call with the customer to gather the requirements for the position. One of the benefits of this is getting the opportunity to hear about the customer's business and get a better understanding. Another benefit is that I can ask questions and help put together a more detailed requirement.").)**

36.    If Recruiters have questions about the job requisition, they ask the AMs. Id.; Ex. 4 (DiBenedetto Tr.) 110:22-112:4, 115:7-25, 123:2-14; Ex. 5 (Doyle Tr.) 137:19-138:4, 169:5-

170:17, 176:9-19, 187:9-25; Ex. 85 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at 37 ("Identify the right questions to ask the AM to get a fully qualified req"), 39-42; Ex. 46 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 74 (slide titled "Business Qualification") ("these are the questions that you must have the answers to in order to have a better understanding of the req. If you do not have this information you need to hold your AM accountable to providing you with the answers."), 75 ("Call the AM to better understand the Req that the Recruiter is working on."); Ex. 31 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129468 (AMs must ensure Recruiters have all the information necessary); Ex. 82 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("account managers should work very closely with their recruiting partners to develop a strategy for filling qualified reqs.").

**RESPONSE:  Disputed in part. Undisputed that Recruiters may ask AMs questions about job requisitions.**

**Disputed that Recruiters may only ask AMs such questions.**

**Some Recruiters go directly to TEK's customers when a requirement is deficient or additional information is needed. (Df. Ex. 33, Levine-Gorelick Decl, ¶ 23 ("I have direct interactions with TEK's customers on a regular basis. I join calls between Account Managers and customer hiring managers when we are "qualifying" requisitions, which is the call when we talk to the customer about the role they want to fill and the skills that are required. I am the expert on the labor market and the types of candidates that are available, and I am able to speak to the customer hiring manager in detail and to capture the information we need in order to be able to find a candidate who meets the requirement."); Df. Ex. 27, Compton Decl., ¶ 15 "If an Account Manager brings in a new client that has a need for the software developer skill sets that I specialize in, I like to join**

the Account Manager for a call with the customer to gather the requirements for the position. One of the benefits of this is getting the opportunity to hear about the customer's business and get a better understanding. Another benefit is that I can ask questions and help put together a more detailed requirement.").)

Plaintiffs' citations do not support the statement.

Plaintiffs cite four passages of testimony by Doyle. In one, Doyle testifies that Recruiters asks questions about requirements directly to TEK clients. (Pls. Ex. 5 (Doyle Tr.), 187:9-25.) The other passages do not contradict this statement. For example, Doyle describes a way that Recruiters can send messages to Account Managers. (*Id.*, 137:19-138:4.) It does not say this is the only way for Recruiter to asks questions about a job requisition. (*Id.*) Another passage describes how a Recruiter might partner with an Account Manager to discuss whether a candidate is a good match to an open requirement. (*Id.*, 169:5-170:17.) The final cited passage of testimony refers to an unidentified set of "questions that recruiters and the AMs are supposed to communicate to the clients and the consultants." (*Id.* 176:9-19.) Nothing in the passage says that Recruiters may only ask Account Managers such questions.

The cited testimony by DiBenedetto relates to his description of training exercises for Recruiter Trainees, not Recruiters. (Pls. Ex. 4 (DiBenedetto Tr.) 110:22-112:4, 115:7-25, 123:2-14.)

Plaintiffs' Ex. 31, 46, 82, 85 simply discuss ways that Recruiters and Account Managers should partner together to ensure that job requirements contain the detail needed to find quality candidates to fill the role. None are directive of how Recruiters must

320884109v.1

**perform their job duties or contradict the testimony above that Recruiters may go to other sources, including directly to TEK's clients, to obtain additional information.**

37.    AMs provide information regarding the necessary qualifications, job details, and target pay for the position to Recruiters, and if Recruiters have questions about the job requisition, they ask the AMs. Id.; Ex. 5 (Doyle Tr.) 137:19-138:4, 187:9-189:25.

**Disputed in part. Undisputed that Account Managers are part of the process for gathering information from TEK's clients regarding job requirements.**

**Disputed that Account Managers alone gather information from TEK's clients regarding job requirements and that Recruiters only speak with AMs about questions concerning job requisitions. See TEK's Response to Plaintiffs' Statements 35 and 36.**

**Disputed that Account Managers alone establish target pay for a position. See Dfs. Ex. 3 (gathering testimony regarding Recruiters' role in job requirement intake.)**

38.    Relying on TEK's practices and procedures, Recruiters search TEK's internal database and external sources, like LinkedIn, to match potential candidates with clients' requirements. Ex. 4 (DiBenedetto Tr.) 92:6-93:25; Ex. 5 (Doyle Tr.) 143:17-144:22, 148:2-17, 151:9-152:18, 172:12-185:3; Ex. 3 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12; ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) Answer to ¶ 63 ("Defendant admits that Recruiters find candidates . . . Defendant admits that Recruiters may search employment databases, including LinkedIn, Indeed, and Defendant's internal system Connected, to assemble a list of names of potential candidates."); Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5; Ex. 86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.

**RESPONSE: Disputed in part. Undisputed that Recruiters may use TEK's Connected database or external sources, including LinkedIn, to search for candidates.**

Disputed that Recruiters rely on TEK's "practices and procedures" to identify potential candidates for TEK's client's job requirements, and disputed that Recruiters must use or are encouraged to use only these sources. See Df. Ex. 10, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.

Disputed that Recruiters merely "match" candidates to requirements. Recruiters also must validate that candidates in fact possess the skills and other attributes relevant to the job requirement. Df. Ex. 59, Haycock Tr. 40:7-41:4 ("It's not just do the buzz words match, because many buzz words match, and the person is absolutely positively not the right person for the role. Because [candidates also know] that you have to have the right buzz words on your resume to get hits in search and match. … So a recruiter has to be able to discern between this person has all the right buzz words and jargon and they can actually do the job."); Df. Ex. 50, Bury Tr. 116:23-118:24, 119:22-120:5; Df. Ex. 31, Rothermich Decl. ¶¶ 3-10; Df Ex. 27, Compton ¶ 18; Df Ex. 30, Whitman ¶ 20; Df Ex. 26, Mendez ¶¶ 9, 14; Df Ex. 25, Guffy ¶ 12; Df Ex. 29, McCarty ¶ 15; Df Ex. 32, Yancey ¶ 17, 18; Df Ex. 27, Compton ¶ 18; Df Ex. 34, Kehl ¶ 11; Df Ex. 36, Ferrari ¶ 11; Df Ex. 37, Budde ¶ 18.

Plaintiffs' citations also do not support the statement.

Plaintiffs offer an incomplete quote from TEK's Answer to the Amended Complaint, Paragraph 63. The full answer shows that TEK denied the allegation that "Recruiters are required to follow specific protocols. (ECF No. 55, Answer to ¶ 63.)

Plaintiffs' Ex. 86 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 86 (Finding, Qualifying, and

320884109v.1

**Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.) Nonetheless,**

**it does state that anyone following this guidance should not leave it up to the Account**

**Manager to assess a candidate, but rather "tell the [Account Manager] what to think" by**

**"tell[ing] them why this person is ideally qualified for their Req," with references,**

**description of the candidates skills, availability to start, pay rate, and location, among other**

**things. ) (*Id.*)**

39.    Recruiters review resumes and LinkedIn profiles to make sure candidates'
experience and skills meet the clients' minimum qualifications. ECF No. 55 (Def.'s Answer to Pls.
1st Amend. Compl.) Answer to ¶ 63 ("Defendant admits that Recruiters find candidates . . .
Defendant admits that Recruiters may search employment databases, including LinkedIn, Indeed,
and Defendant's internal system Connected, to assemble a list of names of potential candidates.");
Ex. 4 (DiBenedetto Tr.) 92:6-93:25, 162:18-163:7 (listing Recruiter "high value activity" as
"understanding th[e] requirement and then sourcing it"); Ex. 5 (Doyle Tr.) 139:15-140:8, 143:17-
144:22, 148:2-17, 151:9-152:18, 158:1-159:24, 172:12-17 (Q: "But it's still the recruiter's job,
then, to see if the information on the G2 matches a requirement?" A: "Completely, yeah. They're
going to look through the requirements and say this might fit or this might not."), 181:19-23 (Q:
"So recruiters shouldn't generally be matching G2s or candidates with requisitions that are not
qualified yet?" A: "It would largely be a huge waste of time to do so."); Ex. 3 (Haycock Tr.) 32:10-
13 (Recruiters' "job is to find the absolute best talent and the best match between the consultant's
skills, goals, and interests and the customer's needs"), 59:2-11, 60:7-12 (Q: Recruiters' "job is to
try to bring . . . the appropriate people in by finding that appropriate match . . .?" A: "Yes."); Ex.
79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (Recruiters "screening"
candidates and Account Managers communicating with TEK's customers.); Ex. 1 (Def.'s Resp. to

Pls. 1st Interrogatories) No. 5; Ex. 86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; Ex. 87 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 89.

**RESPONSE:** **Disputed in part. Undisputed that part of the Recruiters' role is to understand a candidate's experience and skills and determine whether the candidate meets the minimum qualifications stated in the job requirement.**

**Disputed that a Recruiter's review always includes or is limited to a resume or LinkedIn profile, and disputed that a Recruiter only is making sure that a candidates' experience and skills meet the clients' minimum qualifications. This is only a threshold question, and Recruiters further scrutinize and validate the skills and other relevant qualities of candidates who meet minimum qualifications. See TEK's Response to Plaintiffs' Statement 38.**

**Plaintiffs' citations also do not support the statement.**

**Plaintiffs cite TEK's Answer to Paragraph 63 of the Amended Complaint, but neither the allegation nor the answer mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications."**

**In the first passage of testimony by DiBenedetto, he is providing "in its simplest form" an explanation of how the Connected database can be used to analyze the "local market demo." (Pls. Ex. 4 (DiBenedetto Tr.) 92:6-93:25." In the same passage, DiBenedetto explains that a recruiter might do this analysis because it "really enhances a recruiter's ability to be able to talk about what's happening locally or on a national level." (*Id.*) Nothing in the passage relates to sourcing or minimum qualifications.**

320884109v.1

In the second passage of testimony by DiBenedetto, he explains that what is a "high value activity" by a Recruiter "depends on what part of the recruiting efforts they're in." (Pls. Ex. 4 (DiBenedetto Tr.) 162:18-163:7.) Plaintiffs' cited to just one of the examples he provided. (*Id.*)

In the first passage of testimony by Doyle, he describes a scenario where a Recruiter might see a job requirement and know of a qualified candidate without the need to do a search at all (e.g., if the Recruiter already has the candidate in his or her network). (Pls. Ex. 5 (Doyle Tr.) 139:15-140:8.) The testimony does not mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications."

In another passage of testimony by Doyle, he describes different ways that a Recruiter, having identified a candidate they believe may be a good fit for a job requirement, can flag that candidate or use that candidate's profile to find similar candidates. (Pls. Ex. 5 (Doyle Tr.) 143:17-144:22.) The passage does not relate to how the Recruiter makes the determination that the candidate may be a good fit for the job requirement. (*Id.*)

In other cited passages of testimony by Doyle, he explains why Recruiters' "conversations [with candidates should] be as relevant as possible," and why Recruiters record those conversations in Connected, and offers examples important to candidates (pay expectations, employers that will not be considered). (Pls. Ex. 5 (Doyle Tr.) 148:2-17, 151:9-152:18.) The testimony says nothing about Recruiters "review[ing] resumes and LinkedIn profiles" and contradicts any notion that Recruiters limit themselves to such information.

In another passage of testimony by Doyle, he explains how Recruiters can think about ways they may need to change their approach if their efforts are not turning into

320884109v.1

starts, i.e., consultants beginning assignments with clients. (Pls. Ex. 5 (Doyle Tr.) 158:1-159:24.) The testimony does not mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications."

Plaintiffs next cite a partial answer by Doyle. (Pls. Ex. 5 (Doyle Tr.) 172:12-17.) The full exchange is much longer and shows that Doyle is explaining an attempt to develop technology to try to match potentially qualified candidates to job requirements, observing that "it doesn't work very well," having only about a 30% success rate, and noting that in any event the Recruiter still needs to decide whether the match is valid or not. (Pls. Ex. 5 (Doyle Tr.) 171:13-172:17.)

The final passage of cited testimony by Doyle also is both incomplete, misleading, and irrelevant. (Pls. Ex. 5 (Doyle Tr.) 181:19-23.) Doyle testifies that it would "be a huge waste of time" for Recruiters to match candidates with "requisitions that are not qualified." (*Id.*) This is a statement about the readiness of the job requirement and is irrelevant to how a Recruiter sources and evaluates candidates. The full response explains that are three stages of readiness for a requirement: draft, "qualified," and Red Zone. (*Id.*, 180:22-182:18.) A "qualified requirement" is one that has moved a draft and TEK has "enough details to feel like, yes, this is something we can support," meaning someone from TEK has spoken with the client's hiring manager to understand the role, the bill rate is established, the urgency is known, the competitive landscape is understood, and there likely is a contract between TEK and its client for the work. (*Id.*)

The cited testimony by Haycock demonstrates that Recruiters do more than "review resumes and LinkedIn profiles" to check whether "minimum qualifications" are met; the Recruiter's "job is to find the absolute best talent and the best match between the

consultant's skills, goals, and interests and the customer's needs." (Pls. Ex. 3 (Haycock Tr.) 32:10-13.) The complete answers by Haycock make the point even more clear, explaining that Recruiters consider not just "hard skills and technical skills," but also the candidate's interests (e.g., working independently v. as part of a collaborative team; in person v. remote v. hybrid; nature of the work; pay rate). (*Id.*, 30:18-32: 13.) As Haycock summarized, "when you say 'find,' it's like it's not just doing a database search and looking at all of the people and saying, Okay, this is the right person for the job. There's a lot more complexity in it than that." (*Id.*)

Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891.) The cited page is a graphic with a high level description of the "Delivery Business Cycle." (*Id.*) It does not support Plaintiffs' statement, as it notes that "Recruiters must *thoroughly* screen *or disqualify* candidates via resume review, technical screening, professional references, certifications, etc." (*Id.* (emphasis added).)

Plaintiffs cite TEK's response to an interrogatory seeking a description of "any and all electronic programs, databases, software, systems, interfaces, and applications that Recruiters may use and did use to perform their job duties." (Pls. Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.) Neither the interrogatory nor the response appear relevant to the statement, and Plaintiffs do not provide any explanation for including it.

Plaintiffs' Ex. 86 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.) Nonetheless, it does state that anyone following this guidance should not leave it up to the Account

320884109v.1

Manager to assess a candidate, but rather "tell the [Account Manager] what to think" by "tell[ing] them why this person is ideally qualified for their Req," with references, description of the candidates skills, availability to start, pay rate, and location, among other things. ) (*Id.*)

Plaintiffs' Ex. 87 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 87 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 89.) The cited slide includes a reference to "the importance of Sourcing Strategy, and identifying top talent in the marketplace." (*Id.*) The slide does not appear relevant to the statement, and Plaintiffs do not provide any explanation for including it.

40.     TEK provides Recruiters with "search and match" technology that helps automatize the screening process. Ex. 3 (Haycock Tr.) 39:17-40:24 ("Technology is getting better obviously every day to be able to do those matches by themselves"), 139:22-140:22; Ex. 5 (Doyle Tr.) 141:15-142:9, 143:3-14; Ex. 7 (McNelley Tr.) 82:11-15; Ex. 15 (Kartchner Tr.) 174:5-15; Ex. 88 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065 (describing Mock Red Zone exercise in which Recruiters are instructed to "auto match each candidate to ANY req that's currently open, regardless of location."); Ex. 31 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467 ("What other reqs does this candidate Auto-Match or fit?"); Ex. 16 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307.

**RESPONSE: Disputed in part. Undisputed that limited "search and match" technology is available to Recruiters.**

**Disputed that the technology is used consistently by Recruiters or meaningfully impacts Recruiter job duties.**

Plaintiffs' Ex. 3 cites to a truncated portion of testimony by Haycock. (Pls. Ex. 3 (Haycock Tr.) 39:17-40:24.) In the more fulsome portion of his testimony, Haycock explains that "search and match" is a "very common industry term" used for third-party services like LinkedIn and Google, as well as internal tools. (*Id.*, 38:6-41:4.) Haycock further explains that the tool is the "science of recruiting," but its effectiveness depends on the "art of recruiting" and the ability to "discern" the difference between a candidate having "all the right buzz words and jargon" versus the ability to "actually do the job." (*Id.*) Discerning these differences is "really difficult for technology." (*Id.*)

Plaintiffs' Ex. 5 likewise cites to a truncated portion of testimony by Doyle. (Pls. Ex. 5 (Doyle Tr.) 141:15-142:9, 143:3-14.) In the abbreviated portion Plaintiffs cite, Doyle mentions that Connected was "setup with some AI technology that would comb through candidates and determine who might potentially be a fit for that opportunity and pull that up into a search." (*Id.*) In response to a later question, Doyle added more detail, testifying that while TEK had hoped the technology would help with matching, "It doesn't work very well… it was a great concept, but the technology is not very good." (Df. Ex. 53, Doyle Tr. 170:18-172:11.)

Plaintiffs' Ex. 7 truncates testimony by McNelly about "auto matches." (Pls. Ex. 7 (McNelley Tr.) 82:11-15.) Plaintiffs omitted McNelley's immediately preceding statement: "Q: [W]hat is the auto match matching? A. I don't know. To be honest with you, I'm not in the weeds on the technology to know exactly how auto match works." (Df. Ex. 64, McNelley Tr. 82:3-15.)

Plaintiffs cite an excerpt of testimony by Kartchner explaining the "auto match" function in Connected. (Pls. Ex. 15 (Kartchner Tr.) 174:5-15.) Plaintiffs omitted his later

320884109v.1

statement that auto match does not replace the Recruiter: "If it would replace a recruiter, I wouldn't -- no, it does not. I wouldn't have a job if that were the case." (Df. Ex. 72, Kartchner Tr. 185:8-14.)

(Pls. Ex. 88 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065 (describing Mock Red Zone exercise in which Recruiters are instructed to "auto match each candidate to ANY req that's currently open, regardless of location.").)

Plaintiffs' Ex. 31 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 31 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467.)

Plaintiffs' Ex. 16 is an unauthenticated email and attachment dated February 5, 2019. (Pls. Ex. 16 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307.) The document lists as a "Coaching" opportunity the question: "What other reqs does this candidate Auto-Match or fit?" (*Id*.) The purpose and meaning of the document is not clear from its face and not explained by Plaintiffs.

41.     TEK provides Recruiters with step-by-step guidance on how to search and match candidates. Ex. 5 (Doyle Tr.) 130:25-152:18; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 116-125; Ex. 90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 15, 20-22.

**RESPONSE: Disputed. While TEK provides support and training, "no one tells recruiters how to do their job," and that TEK "teaches [] question-based leadership." (Df. Ex. 25, Guffy Decl. at ¶19.)**

**Plaintiffs' citations do not support the statement, but instead relate to how to use the Connected tool to search for candidates. As explained elsewhere, Recruiters are not required, and many do not, use Connected at all. See TEK's Responses to Statement 38 and**

**Df. Ex. 10, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.**

**Plaintiffs cite testimony by Doyle regarding the Connected User Guide. (Pls. Ex. 5 (Doyle Tr.) 130:25-152:18.) Doyle explains that while the Connected platform may assist in finding potential matches, recruiters are encouraged to rely on conversations and judgment, stating, "we really encourage more conversations versus using technology in these areas just because you can't tell the story there." (*Id.*, 144:6–14.) Doyle also explains that searching and matching is not rigid or standardized. (*Id.*) Doyle also describes the importance of gathering information about a candidate's skills, goals, preferences, and constraints, which helps recruiters tailor their outreach, rather than following standardized steps. (*Id.*, 130:25–152:18).**

**Plaintiffs also point to pages of the Connected User Guide. (Pls. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 116-125.) Those pages explain Connected functionality but do not direct how to conduct a search. (*Id.*) For example, one page describes how "filters" may be used to narrow search results. (*Id.* at 116.) However, the document does not tell the Recruiter what terms should be included in the initial search, or what filters to apply to narrow the results the initial search returns. (*Id.*)**

**Plaintiffs' Ex. 90 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 15, 20-22.) Plaintiffs do not provide any explanation for including it.**

42.     TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with

- 60 -

appropriate customers based on that particular client's needs." Ex. 22 (*Andiamo* Preliminary Injunction) at 2; *see also* Ex. 23 (*Andiamo* Aff. of Alexander Pulido) at ¶ 7 ("In support of its staffing and recruitment efforts, TEKsystems uses a proprietary and confidential candidate database . . . TEKsystems uses the Database to identify candidates who are likely to prove a strong match for the prospective client's needs."); Ex. 24 (*TEKsystems, Inc. v. Ambar* ("*Ambar*") Complaint) at ¶¶ 15-20; Ex. 25 (*TEKsystems, Inc. v. Berardis* ("*Berardis*") Complaint) at ¶¶ 15-20.

**RESPONSE:  Disputed in part. Undisputed that Plaintiffs have accurately quoted the cited portions of Pls. Ex. 22.**

**Disputed insofar as Plaintiffs suggest that the "internal processes and databases" referenced here diminish the job duties of Recruiters. See TEK's Response to Statement 38 and Df. Ex. 10, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.**

43.     TEK's own documents describe a primary duty for Recruiters as "[s]creen[ing] consultants." Ex. 83 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152743 (evaluated on "screen[ing]" candidates); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK business cycle as including Recruiters "screening" candidates.); Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter: Screens consultants"); Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 50 (Seattle Welcome Packet) TEK-Recruiter_Lit-00552030 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005763 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133187 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425010 (same); Ex. 59 (Salt Lake City

320884109v.1

Welcome Packet) at TEK-Recruiter_Lit-00450704 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508983 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545026 (same); Ex. 78 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. Screens consultants . . . ."); *see also* Ex. 15 (Kartchner Tr.) 57:2-6; Ex. 11 (Minniear Tr.) 77:7-19; *supra* ¶ 29.

**RESPONSE:  Disputed in part. Undisputed that TEK documents describe "screening" by Recruiters.**

**Disputed that TEK documents describe "screening consultants" as a primary duty for Recruiters. Plaintiffs' citations do not support the statement.**

**Plaintiffs' Ex. 83 is an unauthenticated document. On its face, it appears to be an evaluation form for Recruiter Trainees, not the Recruiter role at issue in this litigation. (Pls. Ex. 83, misidentified by Plaintiffs as "*Recruiter* Evals Form 2021.") The portion cited by Plaintiffs reflects that recruiters are expected to do more than "screen," describing "screening" as an initial step as part of building a personal network of candidates who the recruiter may be able to match to the right role. (*Id.*, TEK-Recruiter_Lit-00152743.)**

**Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891.) The cited page is a graphic with a high level description of the "Delivery Business Cycle." (*Id.*) It does not support Plaintiffs' statement, as it notes that "Recruiters must *thoroughly* screen *or disqualify* candidates via resume review, technical screening, professional references, certifications, etc." (*Id.* (emphasis added).)**

**Plaintiffs' Ex. 47-50, 56-62 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite pages within the documents that include brief descriptions of various roles, including Recruiter: "Partners with AM to understand requirements and culture of a client. Screens consultants to gain insight into their skills, goals, interests and provides aligned opportunities." (*Id.*) Even the brief description in those documents is more expansive than what Plaintiffs suggest, reflecting that Recruiters delve into learning about a candidate's skills, goals, and interests in order to see whether those align to TEK's customer's job requirements. (*Id.*) See also Plaintiffs' Ex. 78 (same).)**

**Plaintiffs cite the testimony of Kartchner, who agrees that "one of the duties as a recruiter is to screen and match candidates to job requirements." (Pls. Ex. 15 (Kartchner Tr.) 57:2-6.) Kartchner does not testify that this is a primary duty of Recruiters.**

**Plaintiffs cite the testimony of Minniear, who describes the many steps that Recruiters take to "qualify or disqualify candidates," which include understanding the requirement, understanding the candidate's qualifications toward that requirement, references, and in office interviews. (Pls. Ex. 11 (Minniear Tr.) 77:7-19.) Minniear does not use the word "screening" or testify that it is a primary duty.**

44.    Once Recruiters have matched potential job candidates to the job requisition, Recruiters contact potential candidates in the hope of reaching them to complete an initial intake. Ex. 5 (Doyle Tr.) 134:5-22, 271:14-18, 278:22-279:7; Ex. 4 (DiBenedetto Tr.) 180:13-182:13; ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) ¶ 63.

**RESPONSE: Disputed in part. Undisputed that Recruiters contact potential candidates regarding job requirements.**

**Disputed that a Recruiter's contact with potential candidates regarding job requirements is always, or even routinely, an "initial intake."**

As noted above, Recruiters are encouraged to build personal networks so that they already have qualified candidates with whom they have spoken before aligning to a potential job requirement. See TEK's Response to Statements 39, 43. See also Df. Ex. 10, collecting statements regarding Recruiter's different sourcing strategies, including building and relying on personal networks.

Plaintiffs' citations do not support the statement either. The first cited passage of testimony by Doyle explains that Recruiters may plan their day to include calls to their consultants on assignment, people already in their network, or people "they are actively reaching out to see if they're interested in opportunities." (Pls. Ex. 5 (Doyle Tr.) 134:5-22.) The second passage of testimony by Doyle says that Recruiters spend most of their interactions with consultants. (*Id.*, 271:14-18.) He does not say that is in the context of contacting new candidates for initial intake. (*Id.*) The final passage of testimony by Doyle merely confirms that if a Recruiter calls a consultant and leaves a voicemail, they note that fact in Connected so that another Recruiter does not reach to the same person soon thereafter and give the appearance that TEK "do[esn]'t have its act together." (*Id.*, 278:22-279:7.)

Plaintiffs cite testimony by DiBenedetto, but in that passage he merely explains the difference in meaning between "Call" and "Attempted Call" as used in the Connected database. (Pls. Ex. 4 (DiBenedetto Tr.) 180:13-182:13.)

Finally, Plaintiffs cite TEK's Answer to Paragraph 63 of the First Amended Complaint. (ECF No. 55, ¶ 63.) The answer merely confirms that "Recruiters may contact

- 64 -

**potential candidates to see if they meet the qualifications set by Defendant's clients and are interested in the open position." (*Id.*)**

45.    TEK's managers describe Recruiters' job duties as a "grind," and the vast majority of Recruiters' outreach goes unanswered or is rebuffed. Ex. 91 (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-00044799; Ex. 12 (Pappas Tr.) 93:14-24, 99:4-100:18, 100:25-101:14; Ex. 4 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact).

**RESPONSE:  Disputed and immaterial. Plaintiffs citations do not support the broad assertion that TEK's managers generally describe Recruiter job duties as a "grind." It is also immaterial to an assessment of Recruiter job duties.**

**Pappas testified that "There was a lot of grit and a lot of grind to both the recruiting role and the account management role. I grinded in both of the roles when I was there. I worked really hard." (Pls. Ex. 12 (Pappas Tr.) 93:14-24.) She did not testify or suggest that the job duties were a grind, as opposed to her own efforts. Pappas did not testify that the vast majority of Recruiters' outreach goes unanswered or is rebuffed.**

**Plaintiffs' Ex. 91 is an unauthenticated email exchange with messages ranging from September 23, 2018 through April 10, 2019 between DiBenedetto and a Technical Recruiter. (Pls. (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-00044799.) From the face of the document, DiBenedetto sends a message to the Technical Recruiter to ask how she is doing, and she responds, in part, "I finally got my first taste of commission last week and that was so exciting. It's definitely a grind but it's been a rewarding journey so far." (*Id.*) DiBenedetto responds, echoing her words, "Super happy for you to hear that all**

320884109v.1

is well and you're seeing the value in what's called the 'grind'!" (*Id.*) The document does not say that the vast majority of Recruiters' outreach goes unanswered or is rebuffed.

Plaintiffs' Ex. 4 is an excerpt of testimony by DiBenedetto, where he explains that it is important for Recruiters to develop skills to get past roadblocks they may experience when calling consultants, which enable "more meaningful conversations." (Pls. Ex. 4 (DiBenedetto Tr.) 80:14-82:22.) DiBenedetto did not testify that he or others view Recruiters' job duties as a "grind" or that the "vast majority of Recruiters' outreach goes unanswered or is rebuffed." (*Id.*)

46.    Recruiters face obstacles in reaching candidates – including consultants not answering their phone calls because, for one reason, they get on average 34 solicitation calls a week. Ex. 92 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 4 (consultants get on average 34 "solicitation" calls a week); Ex. 93 (Welcome to the H.V.A. Workshop Series) at TEK-Recruiter_Lit-00000343 (same); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097858 (same); Ex. 82 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("Consultants tell us time and again that they're getting inundated with insignificant phone calls regarding jobs that they aren't even right for, and they're not interested in."); Ex. 4 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact), 180:13-182:13; Ex. 94 (Recruiter Lead Video Script) at TEK-Recruiter_Lit-00056681 ("Not everyone will answer the first time you call and persistence is important.").

**RESPONSE: Disputed in part Undisputed that Recruiters are not always able to reach candidates or consultants by phone.**

Disputed insofar as the statement suggests that TEK Recruiters are making, on average, 34 solicitation calls a week to the same candidate or consultant, and disputed insofar as the statement suggests the "obstacles" Recruiters face are insurmountable.

Plaintiffs' Ex. 4 is an excerpt of testimony by DiBenedetto, where he explains that it is important for Recruiters to develop skills to get past roadblocks they may experience when calling consultants, which enable "more meaningful conversations." (Pls. Ex. 4 (DiBenedetto Tr.) 80:14-82:22.)

Plaintiffs' Ex. 92 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 92 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 4.) On its face, the document describes how to use "value messaging" to engage consultants in discussion. (*Id.*)

Plaintiffs' Ex. 93 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 93 (Welcome to the H.V.A. Workshop Series) at TEK-Recruiter_Lit-00000343.) On its face, the document describes how to engage consultants in discussion. (*Id.*)

Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097858.) Plaintiffs appear to have cited the document only for the statement that consultants receive, on average, 34 solicitations for new job opportunities per week, a point that TEK does not dispute.

Plaintiffs' Ex. 82 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 82 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677.) Plaintiffs appear to have cited the document only for the

320884109v.1

statement that consultants feel "inundated with phone calls regarding jobs they aren't even right for," a point that TEK does not dispute.

Plaintiffs' Ex. 94 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 94 (Recruiter Lead Video Script) at TEK-Recruiter_Lit-00056681.) Plaintiffs appear to have cited it for the common sense statement that "Not everyone will answer the first time you call and persistence is important," a point that TEK does not dispute.

47. When Recruiters are able to connect with candidates, they do an intake, internally referred to as a "G2." Ex. 4 (DiBenedetto Tr.) 84:11-85:13; Ex. 5 (Doyle Tr.) 144:25-145:10; Ex. 3 (Haycock Tr.) 60:19-21 ("A G2 is an information form that we use to be able to collect information about the candidate"); Ex. 9 (Fronzaglio Tr.) 157:24-158:10; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159.

RESPONSE: Disputed in part. Undisputed that Recruiters may do an "intake" call the first time they speak with a candidate.

Disputed that a Recruiter does an "intake" each time they reach a candidate, and disputed that "intake" and "G2" are synonymous. See TEK's Response to Statement 44.

The cited testimony by Doyle explains that "G2 is information gathering" to learn about a consultant, with the Recruiter taking notes so that "they can go back and remember more details about that candidate," such as "what they're looking for and what is important to them" at a future time. (Pls. Ex. 5 (Doyle Tr.) 144:25-145:10.) He does not testify that a G2 is an "intake" discussion.

The cited testimony by DiBenedetto explains the "G2 framework," which he describes as the components of a phone conversation. (Pls. Ex. 4 (DiBenedetto Tr.) 84:11-

85:13.) He does not testify that a G2 is an "intake" discussion. He does clarify that a G2 is not a "form," but rather "an empty box where you simply type in what the consultant is saying." (*Id.*, 86:14-87:6.)

The cited testimony by Hancock explains that a G2 is the collection of information about a candidate. (Pls. Ex. 3 (Haycock Tr.) 60:19-21.)

The cited testimony by Fronzaglio explains that a G2 information gathering can refer to a call with someone the Recruiter has spoken with before, where there have been changes to their job search, skill sets, or interests since the previous discussion. (Pls. Ex. 9 (Fronzaglio Tr.) 157:24-158:10.)

Plaintiffs' Ex. 89 is the Connected User Guide, and the cited pages illustrate what a G2 looks like in the database and how a Recruiter can create or update a candidate's G2 information. (Pls. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159.)

48.     TEK's internal database prompts Recruiters to gather specific information from candidates during the G2. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159; Ex. 4 (DiBenedetto Tr.) 87:12-88:5, 148:1-18; Ex. 5 (Doyle Tr.) 144:25-148:17; Ex. 3 (Haycock Tr.) 151:1-12; Ex. 10 (Hollister Tr.) 125:5-8; Ex. 15 (Kartchner Tr.) 105:12-16.

RESPONSE: Disputed in part. Undisputed that Recruiters gather and record information from candidates in Connected.

Disputed that there are "prompts" for a G2. DiBenedetto testified that a G2 is not a "form," but rather "an empty box where you simply type in what the consultant is saying." (Pls. Ex. 4 (DiBenedetto Tr.) 86:14-87:6.)

320884109v.1

**The remaining citations presented by Plaintiffs confirm that there are additional fields in Connected that Plaintiffs may complete when gathering information from a candidate or consultant, but these are not "prompts" that a Recruiter works through when communicating with the candidate or consultant. See Pls. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159 (distinguishing the G2 from other fields that may be completed by a Recruiter).**

49.     TEK provides Recruiters with training and instructions about how to conduct a G2 with a candidate. Ex. 4 (DiBenedetto Tr.) 80:14-84:10, 87:12-88:5, 90:13-91:8, 105:2-107:8, 148:1-18; Ex. 5 (Doyle Tr.) 144:25-148:17; Ex. 3 (Haycock Tr.) 151:1-12; Ex. 90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 17, 24, 39-41, 48; Ex. 95 (DiBenedetto Nov. 22, 2020 Email) TEK-Recruiter_Lit-00041158; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 148-157.

**RESPONSE: Disputed in part. Disputed that the cited training is provided to Recruiters. It is in fact provided to Recruiter Trainees. (See Pls. Ex. 4 (DiBenedetto Tr.) 80:14-84:10, 87:12-88:5, 90:13-91:8, 105:2-107:8, 148:1-18 (discussing Recruiter Trainee training).)**

**Undisputed that Recruiters are knowledgeable regarding how to conduct a G2 with a candidate and have access to reference materials, including the Connected User Guide (Pls. Ex. 89.)**

50.     When Recruiters speak to a candidate, their skills and experience may not match the client's prerequisites. Ex. 5 (Doyle Tr.) 169:5-17, 171:13-24.

**RESPONSE: Undisputed. Note, however, that the phrase "client's prerequisites" does not have a standard meaning at TEK, as confirmed by the many references throughout**

**this document to "job requirements" and "job requisitions," which are the documents intended to embody the information needed for Recruiters to find individuals to fill roles for TEK's clients.**

51.　　Candidates may not be interested in an open position for a variety of reasons, including: the pay is too low, the location is not appealing, the position is for a contract term and the candidate wants a permanent job, the candidate may not like the company, or the candidate may not want to leave their current position. Ex. 5 (Doyle Tr.) 145:25-148:17 (enumerating the reasons candidates may not be interested in a job), 172:20-173:24; Ex. 3 (Haycock Tr.) 30:18-32:3.

**RESPONSE:　Undisputed**.

52.　　If the candidate's experience and skills match the client's requirements, and is interested in the position, Recruiters forward their resume and information to the AMs. Ex. 4 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to?" A: "Their account managers, specifically."), 162:18-163:7; Ex. 3 (Haycock Tr.) 60:7-12; Ex. 9 (Fronzaglio Tr.) 155:18-20; Ex. 12 (Pappas Tr.) 62:10-24, 137:15-19; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097923 ("Ask your coach to show you how they present candidates to AMs in your office."); Ex. 46 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 77 ("Sell/present the candidate to AM in person"); Ex. 96 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952; ECF Nos. 156-1 (Fink Decl.) ¶ 26; 156-5 (Bohen Decl.) ¶ 21; 156-6 (Rice Decl.) ¶ 12; 156-7 (Warren Decl.) ¶ 18; 156-11 (Marshall Decl.) ¶ 18; 156-12 (Payonk Decl.) ¶ 20.

320884109v.1

**RESPONSE:** Disputed. Disputed that it is sufficient that a "candidate's experience and skills match the client's requirements, and is interested in the position" in order to move the candidate forward in the process. (See, e.g., Df. Ex. 37, Budde Decl., ¶ 18 ("My assessment of whether a candidate is a good match for a customer's job requirements goes beyond just confirming that they have the right technical skills. Through my interactions with a candidate, I am also assessing their communication style, how they present themselves, whether they conduct themselves professionally, and whether they will be able to work well with others on the customer's project or team."); Df. Ex. 35, Harvey Decl., ¶ 12 ("There are a variety of factors I assess when reviewing the candidate for a position. Some client's development teams include people in many different positions, so I need to determine if the candidate has a deep enough technical knowledge for the specific type of position I am recruiting for. That requires that I need to know the proper questions to ask so I am not wasting the candidate's time with a position that is not suitable for them. Over time, I have created my own set of questions to ask candidates when interviewing them to determine if they would be qualified for a specific position. If the candidate can speak about all of the technologies, I have to make a judgment call on whether the candidate actually has the skills and knowledge needed for the position. This judgment call is critical because submitting an unqualified candidate for a requisition does not help me, and in fact can damage my relationships with Account Managers.")

Disputed that Recruiters merely "forward [the candidate's] resume to the AMs" if the Recruiter decides that the candidate should move forward in the process. (See, e.g., Df. Ex. 24, Walther Decl., ¶ 9 "(A Recruiter who just screens candidates to see if they possess the minimum qualifications for a req, then sends the candidate to an AM, is not meeting

TEK's expectations. In my view, that's no different than sending a spam email."); Df. Ex. 27, Compton Decl., ¶ 21 ("I only present a candidate to an Account Manager if the candidate has been fully qualified by me through my vetting process, and if the candidate is excited about the opportunity. I create a package for the Account Manager that explains why the candidate is a good fit, what the candidate's references had to say, and the results of any technical assessment that the candidate completed. After I send the package to the Account Manager, I will call to tell them to verbally explain why the candidate is a good fit for the requirement.").)

Plaintiffs' citations do not support the statement.

Plaintiffs' citation to the testimony of DiBenedetto is incomplete. In his complete response, DiBenedetto explains that during the particular Recruiter Trainee presentation being discussed, Recruiter Trainees practice presenting their candidates to their Account Manager, but in practice each Account Manager does it differently and may train Recruiters to directly present candidates to a client. (Df. Ex. 52, DiBenedetto Tr. 113:7-114:25.)

The cited testimony by Haycock demonstrates that Recruiters do more than confirm whether the candidate's experience and skills match the client's requirements, and is interested in the position, then forward the resume and information to an AM; the Recruiter's "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs." (Pls. Ex. 3 (Haycock Tr.) 32:10-13.) The complete answers by Haycock make the point even more clear, explaining that Recruiters consider not just "hard skills and technical skills," but also the candidate's interests (e.g., working independently v. as part of a collaborative team; in person v.

320884109v.1

remote v. hybrid; nature of the work; pay rate). (*Id.*, 30:18-32: 13.) As Haycock summarized, "when you say 'find,' it's like it's not just doing a database search and looking at all of the people and saying, Okay, this is the right person for the job. There's a lot more complexity in it than that." (*Id.*)

The cited testimony by Fronzaglio relates to a decision that an Account Manager may take after receiving a recommended candidate from a Recruiter, but is silent regarding the actions taken by a Recruiter prior to that point, which is the subject of the statement. (Pls. Ex. 9 (Fronzaglio Tr.) 155:18-20.)

Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page states that "Our recruiters identify and prepare IT professionals for the career opportunities presented by our AMs." (Pls. Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.) This is reflective of Recruiters and Account Managers working together in a partnership.

Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097923 ("Ask your coach to show you how they present candidates to AMs in your office.").) No explanation is provided why this supports Plaintiffs' statement.

Plaintiffs' Ex. 46 is an unauthenticated June 1, 2018 email with an attached presentation from a pilot program to "train the trainer" as it relates to Recruiter Leads. (Pls. Ex. 46 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 77.) The portion cited by Plaintiffs is consistent with TEK's explanations of its dispute above.

Plaintiffs' Ex. 96 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 96 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952.) Plaintiffs highlight that the document says "SELL THE CANDIDATE: You're an inside sales person." (*Id.*) Other content on the page is consistent with TEK's explanations of its dispute above, including that before "selling" the candidate to the AM, the presenter must be "extremely familiar with the account, the req., and the candidate" and able to explain "Why the candidate is a great fit," "Why the candidate is a great cultural fit," and "Why the candidate is excited about the opportunity," among other things. (*Id.*)

Plaintiffs' citations to declarations submitted by TEK also confirm TEK's basis for disputing the statement. See, e.g., ECF No. 156-1 (Fink Decl.) ¶ 26 (only presents "the best match" to a req); 156-5 (Bohen Decl.) ¶ 21 (explained conclusions why candidate should be submitted); 156-6 (Rice Decl.) ¶ 12 (describing extensive steps taken to validate candidate fit before proceeding); 156-7 (Warren Decl.) ¶ 18 (creates detailed packet "that describes why the candidate is the right person for the job;" common to present a candidate directly to a client); 156-11 (Marshall Decl.) ¶ 18 (does due diligence, and if the candidate is "the right fit," will advocate for my candidate with the AM"); 156-12 (Payonk Decl.) ¶ 20 (created detailed packages about the candidates; wanted to "make the AMs life easy" and establish trust that her "candidates are ready to be submitted to the client").

53.     AMs determine which candidates to forward on to the client. Ex. 4 (DiBenedetto Tr.) 162:18-163:17; Ex. 9 (Fronzaglio Tr.) 155:18-20; Ex. 12 (Pappas Tr.) 62:10-24, 137:15-19; Ex. 97 (Operations Playbook) at TEK-Recruiter_Lit-00019675 ("AMs must thoroughly screen or disqualify candidates."); Ex. 18 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-

00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets"); Ex. 55 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325 ("the Account Manager has submitted this person to the customer."); ECF Nos. 156-1 (Fink Decl.) ¶ 26; 156-5 (Bohen Decl.) ¶ 21; 156-6 (Rice Decl.) ¶ 12; 156-7 (Warren Decl.) ¶ 18; 156-11 (Marshall Decl.) ¶ 18.

**RESPONSE: Disputed. The decision which candidate to submit to a client often reflects a partnership between a Recruiter and an AM. (Df. Ex. 37, Budde Decl., ¶ 14 ("I do not report to an Account Manager, but I do partner with Account Managers frequently."); Df. Ex. 35, Harvey Decl., ¶ 19 ("In my job at TEKsystems, I work with multiple Account Managers to analyze the hiring needs of the clients and develop strategies to have our candidates chosen for positions. The Account Manager is not my supervisor. I treat it as a partnership to determine how to best address the clients' hiring needs. The Account Manager manages the network of clients, and I specialize in various types of technologies and develop a network of candidates who have the requisite skills in those technologies.")). Sometimes Recruiters present directly to a client. (Df. Ex. 18, Warren Decl. ¶ 18.)**

**Plaintiffs' citations do not support the statement.**

**Plaintiffs cite testimony by DiBenedetto, he explains that what is a "high value activity" by a Recruiter "depends on what part of the recruiting efforts they're in." (Pls. Ex. 4 (DiBenedetto Tr.) 162:18-163:7.) In one hypothetical example, he describes what a Recruiter might do after an AM presents a candidate to a customer. (*Id.*) DiBenedetto does not testify this is strictly adhered to. (*Id.*)**

**Similarly, the cited testimony by Fronzaglio relates to a decision that an Account Manager may take after receiving a recommended candidate from a Recruiter, but she does not testify this is strictly adhered to. (Pls. Ex. 9 (Fronzaglio Tr.) 155:18-20.)**

- 76 -

**Plaintiffs' Ex. 97 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 97 (Operations Playbook) at TEK-Recruiter_Lit-00019675.) Plaintiffs point to a statement in the document that "AMs must thoroughly screen or disqualify candidates." (*Id.*) This statement is irrelevant, since it purports to speak to an AM job duty, not a Recruiter job duty, and does not foreclose a Recruiter doing the same.**

**Ex. 18 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets")**

**Plaintiffs' Ex. 55 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 55 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.)**

**With respect to Plaintiffs' citations to declarations submitted by TEK, see TEK's Response to Statement 52.**

54.     The clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them. Ex. 4 (DiBenedetto Tr.) 167:9-14 (testifying that Recruiters do not make hiring and firing decisions) (Q: "Do recruiters make the ultimate [termination] decisions for the consultants?" A: "No."), 188:2-9; Ex. 5 (Doyle Tr.) 158:1-12 (client interviews the candidates), 192:13-193:14 (TEK's clients make hiring decisions), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes."); Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 142 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview."); Ex. 98 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at 20-21 (TEK's clients

320884109v.1

interview candidates); Ex. 99 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted our screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 55 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325; ECF Nos. 156-7 (Warren Decl.) ¶¶ 19-20; 156-11 (Marshall Decl.) ¶ 19; 156-12 (Payonk Dec.) ¶ 21.

**RESPONSE: Disputed in part. Undisputed that clients do not have to engage, or continue to engage, the services of a consultant presented by TEK.**

**Disputed that Recruiters do not interview candidates. In Plaintiffs' Statement 71, Plaintiffs state that "interviews" are an action taken by Recruiters and recorded in Connected.**

**Disputed that clients interview Recruiters. In some circumstances, TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 53, Doyle Tr. 201:2-19.)**

**Disputed that clients hire consultants. That is true of direct hire arrangements, (Df. Ex. 66, T. Raras Tr. 40:20-41:7, 43:2-13.) In contrast, for staff augmentation engagements, the consultant is employed by TEK and placed on assignment to TEK's client. (Df. Ex. 67, T. Raras Tr. 41:8-13; Df. Ex. 59, Haycock Tr. 27:2-30:6.) For another type of engagement, managed solutions, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client. (Df. Ex. 59, Haycock Tr. 26:1-22, 34:7-37:4.) In other circumstances, TEK's client has outsourced to a third-party MSP how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 53, Doyle Tr. 201:2-19.)**

- 78 -

**Disputed that only clients may terminate consultants. As noted above, TEK employs the consultants and may independently terminate a consultant's employment. (Df. Ex. 46, Thomas Tr. 113:1-10; Df. Ex. 59, Haycock Tr. 36:9-38:3.)**

**Disputed that clients determine how much to pay a consultant. In most arrangements, TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 53, Doyle Tr. 193:15-194:16.) Separately, a Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.) Thus, the pay rate and other terms and conditions that a Recruiter negotiates with a candidate directly impact TEK's bottom line.**

55.  TEK's clients, not Recruiters, interview the candidates. *Id.*; Ex. 4 (DiBenedetto Tr.) 188:2-9; Ex. 5 (Doyle Tr.) 158:1-12, 159:3-10, 199:4-17; Ex. 98 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at 20-21(TEK's clients interview candidates); Ex. 99 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted our screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 55 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 144 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview.").

**RESPONSE:** **Disputed. Disputed that Recruiters do not interview candidates. In Plaintiffs' Statement 71, Plaintiffs state that "interviews" are an action taken by Recruiters and recorded in Connected.**

**Disputed that clients interview candidates in all circumstances. For example, in some circumstances TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 53, Doyle Tr. 201:2-19.) As another example, for a managed solutions arrangement, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client rather than presenting candidates to work with the client directly. (Df. Ex. 59, Haycock Tr. 26:1-22, 34:7-37:4.)**

56.     If the client decides to make an offer, Recruiters relay the offer to the candidate. Ex. 5 (Doyle Tr.) 277:13-20; ECF Nos. 156-12 (Payonk Decl.) ¶ 21.

**RESPONSE:** **Disputed in part. Disputed that clients make an offer in all circumstances. For example, in some circumstances TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 53, Doyle Tr. 201:2-19.) As another example, for a managed solutions arrangement, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client rather than presenting candidates to work with the client directly. (Df. Ex. 59, Haycock Tr. 26:1-22, 34:7-37:4.)**

57.     Recruiters do "not oversee[] the actual work getting done." Ex. 3 (Haycock Tr.) 36:16-17; *see also* Ex. 4 (DiBenedetto Tr.) 167:12-14, 167:19-168:7.

**RESPONSE:** **Undisputed**.

58.     Recruiters are not evaluating the substance of consultants' work. Ex. 4 (DiBenedetto Tr.) 167:19-168:7; Ex. 3 (Haycock Tr.) 36:12-17, 121:20-122:16, 144:18-145:12; Ex. 10 (Hollister Tr.) 46:6-12, 139:7-19; Ex. 15 (Kartchner Tr.) 124:24-125:4.

**RESPONSE:  Undisputed**.

59.     Recruiters also do not technically evaluate potential job candidates. Ex. 3 (Haycock Tr.) 121:20-122:16 (TEK uses a third-party software to evaluate consultants' technical skills, and evaluation of a person's technical abilities is not typically the responsibility of Recruiters); Ex. 4 (DiBenedetto Tr.) 168:2-7.

**RESPONSE:  Disputed in part.**

**Plaintiffs' statement is vague and ambiguous.**

**Undisputed that TEK has available to it third-party software that may be used to evaluate a candidate's proficiency with certain technical skills. (Pls. Ex. 3 (Haycock Tr.) 121:20-25.)**

**Disputed that such third-party software is necessary to evaluate all types of technical skills or for all Recruiters. Haycock testified that the need for such software evaluations "depend[s] on the particular skill and how long the recruiter has been doing the job." (Pls. Ex. 3 (Haycock Tr.) 122:1-3.) Recruiters have testified to possessing such expertise. (See Df. Ex. 26, Mendez Decl., ¶ 9 ("I have developed specific technical knowledge so that I can understand and assess the qualifications of the front end engineers that I place. In my experience, front end engineers have their own language, including around Java script and React and Angular computing languages used in their work, and I have had to learn how to communicate in their language as well."); Df. Ex. 13, Fink Decl., ¶ 8 ("I joined online user groups to learn about the technology in these areas, and I would**

attend in-person meet-up groups of people who did this type of work to learn more. I spent a lot of time speaking directly with engineers to learn about what they do. While I did not earn a technical degree in college, I am able to speak in depth with people who do technical work, understand what they are describing, and describe it for other technical and non-technical people as well."); Df. Ex. 16, Bohen Decl., ¶ 15 ("The way I learned these specialized skills was through studying in TEK's Degreed pathways, which are like a curriculum and materials to help you learn about specific skill sets. I also learned a lot by talking with consultants who use these skillsets. I ask them lots of questions to help me understand the technologies they use and how they use them, and over time I've come to understand these topics very well.").)

60.     TEK uses standardized online technical assessments and "Tech Outs" (in-person or telephonic skills evaluations with third-party experts paid for by TEK) to evaluate candidates' technical skill. Ex. 100 (Recruiter Skill Plan Onboarding Facilitator Guide March 2020) TEK-Recruiter_Lit-00077253 at 31 (explaining that "TEKsystems has various tools to help validate the skills of our consultants and set them apart from the competition" and describing these tools as IKMs (standardized online assessments) and Tech Outs (in person or telephonic evaluations conducted and scored by experts paid by TEK); Ex. 101 (Doyle Email Aug. 13, 2020) TEK-Recruiter_Lit-00125624 (showing technical screenings of consultants are performed either through an assessment or a Tech Out from a consultant).

**RESPONSE:  Disputed in part.**

**Undisputed that, as noted elsewhere, TEK has available to it third-party software that may be used to evaluate a candidate's proficiency with certain technical skills, or arranging "Tech Outs" to do the same. (See TEK's Response to Statement 59.)**

320884109v.1

**Disputed that these are the only ways that Recruiters may make technical assessments of a candidate's technical skills. (See TEK's Response to Statement 59.)**

61.    Recruiters use TEK's Connected database to search for potential candidates, review information about candidates, and record the work activities they perform. Ex. 3 (Haycock Tr.) 140:19-22, 150:21-152:2; Ex. 10 (Hollister Tr.) 67:4-19; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.

**RESPONSE:  Disputed in part.**

**Undisputed that Connected is one resource to search for and review information about potential candidates.**

**Undisputed that some activities performed by Recruiters are recorded in Connected.**

**Disputed that Connected is the only resource to search for and review information about potential candidates. (See TEK's Response to Statement 38.)**

**Disputed that all activities by Recruiters are recorded in Connected. For example, Plaintiffs assert in Statement 29 that Recruiters "screen and match IT job candidates for open roles." These activities are not recorded in Connected. (See Pls. Ex. 19 (Calderon Dec.).)**

62.    TEK expects Recruiters to enter their activities into Connected in real time. Ex. 4 (DiBenedetto Tr.) 180:13-181:10; Ex. 5 (Doyle Tr.) 124:25-126:20; Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291.

**RESPONSE:  Disputed.**

**Some activities occur while away from a computer and cannot be recorded in real time. (Df. Ex. 46, Thomas Tr. 198:20-202:24 (Meals, Meetings, IOIs not recorded in Connected in real time).)**

**Plaintiffs' citations do not support the Statement.**

**Plaintiffs cite testimony by DiBenedetto, but in that passage he speaks only about "Call" and "Attempted Call" activity in the Connected database. (Pls. Ex. 4 (DiBenedetto Tr.) 180:13-182:13.)**

**Plaintiffs cite testimony by Doyle, but in the passage he says only that TEK has an "expectation" that Recruiters will "timely enter in activities that they've engaged in." (Pls. Ex. 5 (Doyle Tr.) 124:25-126:20.)**

**Plaintiffs' Ex. 72 is an email exchange initiated by Doyle on July 9, 2020. (Pls. Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291.) Doyle asks various leaders to "Set documentation expectations with your AMs and Recruiters," elaborating "We should strive for real-time documentation[.]" (*Id.*) The reason provided for the request was to improve data accuracy. (*Id.*)**

63.     Defendant produced Connected data for the seven Named Plaintiffs and 116 Opt-in Plaintiffs and Declarants. Ex. 19 (Calderon Decl.) ¶ 11.

**RESPONSE:  Undisputed**.

64.     The Connected data identifies the work activities the Named Plaintiffs, Opt-in Plaintiffs, and Declarants performed and the dates and times the activities were performed. Ex. 4 (DiBenedetto Tr.) 180:13-181:10; Ex. 5 (Doyle Tr.) 124:25-126:20; Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291; Ex. 19 (Calderon Decl.) ¶ 5, Attachment 1.

**RESPONSE:  Disputed.**

320884109v.1

Some of the data in Connected relates to work activities by the Named Plaintiffs, Opt-in Plaintiffs, and Declarants. The Connected database includes dates and times when activities are recorded in the database, but activities are not necessarily recorded contemporaneously.

Disputed that all work activities are recorded in Connected. For example, in Statement 29, Plaintiffs claim that "Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients…" Recruiters do not record "screening" or "matching" in Connected.

See TEK's Response to Plaintiffs' Statement 61.

65.    The data shows that 31.90% of the Recruiters' activities recorded in Connected were "Attempted Contact," followed by "G2" at 19.25%, and "Call" at 22.98%, which altogether comprise approximately 74% of the total work activities. Ex. 19 (Calderon Decl.) ¶ 14, Attachment 9.

**RESPONSE:  Disputed in part.**

While TEK has been unable to replicate these calculations, undisputed that the percentages are generally consistent with TEK's calculations based on the same sets of data.

Disputed that it is possible for Plaintiffs' calculations to reflect a percentage of "total work activities." As noted elsewhere, only a limited set of Recruiter work activities are recorded in Connected at all. (See TEK's Response to Statement 64.) Plaintiffs' calculations reflect only percentages of activities recorded in Connected, which are limited to

66.    An "attempted contact" "means the recruiter made a phone call and the consultant did not answer." Ex. 4 (DiBenedetto Tr.) 180:15-22.

**RESPONSE:  Undisputed**.

67.    The Connected data further shows that the number of attempted contacts, G2 intake calls, and calls the Sample Recruiters made dwarfed their submittals and starts:

| Activity | Count | % |
| --- | --- | --- |
| Attempted Contact | 238,398 | 31.90% |
| G2 | 143,893 | 19.25% |
| Call | 171,714 | 22.98% |
| Submitted | 15,399 | 2.06% |
| Started | 2,509 | 0.34% |

Ex. 19 (Calderon Decl.) ¶¶ 14-20, Attachment 9.

**RESPONSE:  Immaterial and disputed.**

**A Connected record of "Started" reflects that a candidate began work for a TEK customer on that day. (Df. Ex. 50, Bury Tr. 80:21-81:8.) In other words, a record of "Started" reflects the culmination of a variety of interactions with the candidate, as well as interactions with candidates who were not a match to the job requirements. That there necessarily must be more preceding interactions than starts is irrelevant to determining Recruiters' primary job duties.**

**Disputed because different "Activities" recorded in Connected are not comparable. An "Attempted Contact" might range from 10 seconds to two minutes. (Dr. Ex. 50, Bury Tr. 64:13-65:15; Df. Ex. 67, T. Raras Tr. 94:15-95:2.) A "Call" might range from 30**

**seconds to 30 minutes. (Df. Ex. 50, Bury Tr. 65:16-67:8; Df. Ex. 67, T. Raras Tr. 95:3-95:22; Df. Ex. 47 Richenberg Tr. 80:5-80:15.)**

68.     Recruiters' Activity levels are consistent among the Rule 23 classes. Ex. 19 (Calderon Dec.) ¶¶ 21-25.

**RESPONSE: Disputed as vague and ambiguous. The meaning of Plaintiffs' Statement is disputed because it is vague and ambiguous.**

69.     On average on a monthly basis, one job candidates who Recruiters screen and match are ultimately placed at one of TEK's customers. Ex. 19 (Calderon Dec.) ¶ 28.

**RESPONSE:  Disputed as vague and ambiguous and immaterial.**

**The meaning of Plaintiffs' Statement is disputed because it is vague and ambiguous.**

**Disputed for the additional reason that Plaintiffs' Statement is not supported by the cited declaration.**

**The cited paragraph states that "on average, the Sample Recruiters recorded the Activity Type "Started" one time per month." (Pls. Ex. 19 (Calderon Dec.) ¶ 28.) In other words, the Statement exceeds the scope of the Declaration by suggesting the conclusions apply to Recruiters generally, rather than just those "Sample Recruiters" in the data reviewed.**

**The Statement is immaterial because a Connected event of "Started" is not a primary job duty of Recruiters. Rather, it is an outcome of a Recruiter's job duties.**

70.     TEK requires Recruiters to meet weekly production quotas. Ex. 5 (Doyle Tr.) 129:16-130:20; Ex. 3 (Haycock Tr.) 157:19-158:1; Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71.

**RESPONSE:  Disputed. Plaintiffs' Statement is not supported by the citations.**

320884109v.1

Case 2:21-cv-00460-WSS   Document 201   Filed 10/10/25   Page 88 of 111

**Neither Doyle nor Haycock testified that Recruiters are subject to "quotas." (Pls. Ex. 5 (Doyle Tr.) 129:16-130:20; Pls. Ex. 3 (Haycock Tr.) 157:19-158:1.)**

**Plaintiffs' Ex. 117 is an email and draft attachment sent by Doyle to Haycock and others. (Pls. Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71.) This document also does not include any reference to "quotas."**

71.     Currently, the quota for Recruiters is 25 points a week based on the following activity points: G2s (intakes); reference checks; submittals (when an AMs submits a candidate to a client that the Recruiter has solicited); interviews (when the client interviews the candidate); and starts (when a candidate ultimately starts a job with a TEK's client.) Ex. 5 (Doyle Tr.) 159:18-161:6; Ex. 3 (Haycock Tr.) 153:19-158:1; Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081070-71; Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 5-7.

**<u>RESPONSE:</u>  Disputed in part.**

**Undisputed that different Recruiter activities are assigned different "point" values.**

**Disputed that Recruiters are subject to "quotas."**

**Plaintiffs' Statement is not supported by the citations.**

**Neither Doyle nor Haycock testified that Recruiters are subject to "quotas." (Pls. Ex. 5 (Doyle Tr.) 159:18-161:6; Pls. Ex. 3 (Haycock Tr.) 153:19-158:1.)**

**Plaintiffs' Ex. 117 is an email and draft attachment sent by Doyle to Haycock and others. (Pls. Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71.) This document also does not include any reference to "quotas."**

**Plaintiffs' Ex. 118 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 5-7.) The document does include a**

320884109v.1

**"Recruiter Scorecard" that states point values for different activities. The document does not include any reference to "quotas."**

72.     Prior to July 2022, TEK required Recruiters to maintain a weekly average "interactions" a week, such as reference checks, G2s, and meals (lunches) with candidates. Ex. 5 (Doyle Tr.) 129:16-130:20, 153:5-19, 154:19-155:12; Ex. 3 (Haycock Tr.) 152:3-153:10; Ex. 117 (Haycock Ex. 16) at TEK-Recruiter_Lit-00081070-71; Ex. 10 (Hollister Tr.) 123:14-124:17; Ex. 72 (Doyle Email July 9, 2020) at TEK-Recruiter_Lit-00194292; Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 4; Ex. 108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 19.

**RESPONSE: Disputed in part. Undisputed that different Recruiter activities are assigned different "point" values.**

**Disputed that Recruiters were "required" to maintain any number of "interactions" per week.**

**Plaintiffs' Statement is not supported by the citations.**

**Doyle testified to TEK's "expectations" related to certain types of "interactions," but did not testify that Recruiters were subject to any "requirements." (Pls. Ex. 5 (Doyle Tr.) 129:16-130:20, 153:5-19, 154:19-155:12.)**

**Similarly, neither Haycock nor Hollister testified that Recruiters were subject to any "requirements." (Pls. Ex. 3 (Haycock Tr.) 152:3-153:10; (Pls. Ex. 10 (Hollister Tr.) 123:14-124:17.)**

**Plaintiffs' Ex. 117 is an email and draft attachment sent by Doyle to Haycock and others. (Pls. Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081070-71.) This document also does not include any reference to interactions Recruiters would be "required" to do.**

**Plaintiffs' Ex. 72 is an email exchange initiated by Doyle on July 9, 2020. (Pls. Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194292.) Doyle asks various leaders to "Set documentation expectations with your AMs and Recruiters," elaborating "We should strive for real-time documentation[.]" (*Id.*) The reason provided for the request was to improve data accuracy. (*Id.*)**

**Plaintiffs' Ex. 118 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 5-7.) The document does include a "Recruiter Scorecard" that states point values for different activities. The document does not include any reference to interactions Recruiters would be "required" to do.**

**Plaintiffs' Ex. 108 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 19.) From its face, the document appears related to the 13 week Recruiter Trainee program. The document does not include any reference to interactions that Recruiter Trainees or Recruiters would be "required" to do.**

73.    TEK requires all Recruiters to meet the same "spread" levels, which align to their tenure at the company and is referred to as the "performance management line." Ex. 5 (Doyle Tr.) 92:3-94:20, 299:8-21.

**RESPONSE: Disputed as vague and ambiguous. Plaintiffs' Statement is disputed because it is vague and ambiguous. In particular, it is unclear how all Recruiters could be required to meet "the same 'spread' levels" while also stating that spread levels vary by tenure.**

**Plaintiffs' Statement is not supported by the citations.**

**Doyle testified to explain the meaning of the "performance management line." (Pls. Ex. 5 (Doyle Tr.) 91:21-92:2, 94:17-20, 255:3-256:8.) Recruiters above the "growth line" – a function of tenure and spread – are "thriving," "highly successful," and "attrition is extraordinarily low" among this group, so they receive less coaching. (*Id.*) Recruiters below the "performance management line" – also a function of tenure and spread – "just aren't feeling successful. They're not making money. They're a high risk to leave." This group "need[s] more coaching, they need more development, they need more push" to prevent their attrition. (*Id.*) In the middle of the two lines are people who are "doing okay. They're doing fine," and they don't attrit at high rates. (*Id.*)**

74.    Spread is the difference between the amount a client pays TEK for placing the consultant and the costs to TEK to place them. Ex. 3 (Haycock Tr.) 72:19-21; Ex. 7 (McNelley Tr.) 33:2-6; Ex. 12 (Pappas Tr.) 21:22-22:6; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408137; Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399696; Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489276; Ex. 50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552034; Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005768; Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133191; Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425014; Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450708; Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508987; Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545028.

**RESPONSE:  Disputed in part. Plaintiffs' description of "spread" is incomplete and misleading. TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the**

**client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 53, Doyle Tr. 193:15-194:16.) A Recruiter negotiates with the candidate the *pay rate* amount that they will accept to perform the work. (*Id*., 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id*., 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id*., 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.)**

**This is confirmed by some of Plaintiffs' citations. For example, the various office "Welcome Packets" include a "TEK Dictionary" of "the different terms that we use each day in our jobs." (Pls. Ex. 47-49, 56, 58-61.) Those documents define "Spread" as "Net profit that TEKsystems generates when a consultant is placed. Calculation: Bill Rate – [Burden x Director Labor Rate] x Hours." (*Id*.)**

**Disputed that spread is generated merely by "placing the consultant." As explained in the preceding paragraphs, spread is calculated based on time worked by the consultant on the client's projects. Thus, a consultant will generate spread over the duration of their assignment, no matter how long, and not just at time of placement.**

75.     TEK monitors Recruiters' compliance with their quotas and performance management line. Ex. 5 (Doyle Tr.) 92:3-94:20, 112:6-113:21, 162:14-164:13, 255:3-256:8; Ex. 3 (Haycock Tr.) 147:5-11, 158:2-14; Ex. 7 (McNelley Tr.) 62:21-63:6; Ex. 8 (Estimada Tr.) 141:1-21; Ex. 9 (Fronzaglio Tr.) 56:8-15; Ex. 15 (Kartchner Tr.) 88:3-89:5; Ex. 13 (Lis Tr.) 68:22-69:6; Ex. 63 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 64 (Executive Dashboard) at TEK-

Recruiter_Lit-00161755-65; Ex. 119 (Performance Warning & Action) TEK-Recruiter_Lit-00471328.

**RESPONSE:  Disputed. Plaintiffs' Statement is not supported by the citations.**

**None of the testimony cited refers to "quotas" or states that Recruiters are being "monitored."**

**Plaintiffs' Ex. 63 is simply an email exchange with sample narratives that might be included in WIN reports. (Pls. Ex. 63 (WIN narratives).)**

**Plaintiffs' Ex. 64 is an example of an "Executive Dashboard." (Pls. Ex. 64.) The pages cited by Plaintiffs reflect aggregated spread numbers and high level trends across Recruiter populations, not "monitoring" individual Recruiters. (*Id.*) The word "quota" does not appear.**

**Plaintiffs' Ex. 119 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 119 (Performance Warning & Action) TEK-Recruiter_Lit-00471328.) The word "quota" does not appear.**

76.     Every week, TEK generates a WIN Report for each Recruiter and their managers, which tracks how well Recruiters are meeting their quotas and spread compared to their peers. Ex. 5 (Doyle Tr.) 112:6-113:21; Ex. 3 (Haycock Tr.) 158:2-15; Ex. 9 (Fronzaglio Tr.) 59:2-20, 64:25-65:1, 65:5-9; Ex. 63 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("The report will be emailed to every person who is directly managing Recruiters as well as Production Delivery Managers, Delivery Director, and DBOs each week.").

**RESPONSE:  Disputed in part. Undisputed that WIN Reports were sent on a weekly basis for some portion of the relevant period.**

**Disputed that WIN Reports include quotas.**

**Plaintiffs' Statement is not supported by the citations.**

**None of the testimony or documents cited refers to "quotas" or states that Recruiters are being "monitored."**

77.     TEK executives also receive weekly Executive Dashboards, which provide "a snapshot on the various operations of the business." Ex. 3 (Haycock Tr.) 69:13-71:19; Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161739.

**RESPONSE:  Undisputed**.

78.     Included in the Executive Dashboard are summaries about how well Recruiters are meeting their quotas. Ex. 3 (Haycock Tr.) 91:15-93:14; Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-65.

**RESPONSE: Disputed in part. Undisputed that Executive Dashboards are summaries.**

**Disputed that Executive Dashboards include quotas. Plaintiffs' Ex. 64 is an example of one of those "dashboards." (Pls. Ex. 64.) The pages cited by Plaintiffs reflect aggregated spread numbers and high level trends across Recruiter populations, not "monitoring" individual Recruiters. (*Id.*) The word "quota" does not appear.**

79.     TEK's offices have "spread boards" that publicize the amount of spread attained by each Recruiter from best to worst. Ex. 120 (New Hire Checklist) TEK-Recruiter_Lit-00571397 ("Name on spread board"); see also Ex. 121 (Spread: Overview & Problem Resolution) at TEK-Recruiter_Lit-00240020-23; Ex. 8 (Estimada Tr.) 154:1-155:9; Ex. 11 (Minniear Tr.) 134:8-136:24; Ex. 122 (Sloan Email Apr. 12, 2021) TEK-Recruiter_Lit-00516551 (displaying virtual spread board).

**RESPONSE: Disputed in part. Undisputed that some office locations may have posted individual spread to "spread boards" that all could see.**

**Disputed that this practice occurred at all TEK offices. Plaintiffs' Statement is not supported by the citations, as the cited evidence refers to only a small number of TEK offices.**

80.     If Recruiters fail to hit their quotas and meet their spread requirements, TEK puts them on a performance improvement plan. Ex. 5 (Doyle Tr.) 162:14-164:9; Ex. 14 (Johnson Tr.) 104:19-105:4; Ex. 119 (Performance Warning & Action Plan Job Aid) TEK-Recruiter_Lit-00471328.

**RESPONSE:  Disputed. None of the testimony or documents cited refers to "quotas." In addition, Recruiters testified that they were not disciplined for falling below activity levels. (Df. Ex. 47, Richenberg 152:7-154:11 and Richenberg Dep. Ex. 13 and 14.)**

81.     TEK evaluates Recruiters annually based on their satisfaction of TEK's quotas and spread requirements. Ex. 5 (Doyle Tr.) 212:20-216:11; Ex. 69 (Haycock Dep. Ex. 15 (Yearly Performance Summary)) at TEK-Recruiter_Lit-00124520; Ex. 75 (Performance Review Guide 2021: For Leaders and Leads) TEK-Recruiter_Lit-00528422.

**RESPONSE:  Disputed in part. Undisputed that Recruiters are evaluated annual.**

**Disputed that Recruiters must meet "quotas" or spread requirements. None of the testimony or documents cited refers to "quotas."**

82.     TEK pays Recruiters a salary and commission based on their spread. Ex. 123 (2020 Recruiter Compensation – U.S.) at TEK-Recruiter_Lit-00073390-91 (setting forth Recruiter salary scale and commission tiers); Ex. 124 (Former Executive Director of Finance Philip Eisman

("Eisman Tr.")) 63:19-64:8:18; Ex. 9 (Fronzaglio Tr.) 79:17-21; Ex. 12 (Pappas Tr.) 44:21-45:21; Ex. 15 (Kartchner Tr.) 184:11-15.

**RESPONSE:  Disputed in part. Undisputed that Recruiter pay includes both salary and a commission based on spread.**

**Disputed that these are the only types of Recruiter pay. Recruiters also may receive Cost of Living Adjustments (COLA) based on where they live, cell phone reimbursement, individual performance quarterly bonuses, individual performance annual bonuses, office performance bonuses, units in an Investment Growth Plan, an invitation to the Recruiter Summit Trip, an invitation to the Company Summit Trip, additional incentives. (Pls. Ex. 123 (2020 Recruiter Compensation – U.S.)**

83.    In other words, the more Recruiters produce candidates for TEK, the more TEK pays them. Ex. 3 (Haycock Tr.) 105:7-106:20; Ex. 121 (Spread: Overview & Problem Resolution) at TEK-Recruiter_Lit-00240020-21.

**RESPONSE:  Disputed. Recruiters do not "produce" candidates because candidates are not a "product." Clients contract with TEK to engage consultants to provide services to the client. [CITE]**

**In addition, Recruiters are paid a salary plus "spread." "Spread" does not increase just by placing more consultants on assignment. TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 53, Doyle Tr. 193:15-194:16.) A Recruiter negotiates with the candidate the *pay rate* amount that they will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*"**

320884109v.1

**amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.) Recruiters can obtain more spread in a variety of ways, including negotiating lower pay rates with the candidates they are working with, focusing on requirements with higher client bill rates, focusing on quality assignments where both consultant and client want to work together for an extended period of time, and managing consultants to have successful and longer assignments that result in more worked hours and thus more spread, among other things. [CITE]**

84.     Recruiters do not create or implement management or operational policies for TEK or its customers. Ex. 4 (DiBenedetto Tr.) 167:15-18; Ex. 3 (Haycock Tr.) 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives, and not recruiters, because the executives are "running [the] business."), 158:20-162:5 (testifying that Recruiters do not create or implement human resource, operational, or management policies for TEK or its clients).

**RESPONSE:  Undisputed**.

**85.**     Recruiters have no authority to: waive or deviate from TEK's policies and procedures in performing their work; formulate, interpret, or enforce management policies or operating procedures; or negotiate or enter into contracts on behalf of TEK or its clients. Ex. 4 (DiBenedetto Tr.) 167:15-18; Ex. 5 (Doyle Tr.) 30:11-23 (testifying that he negotiated contracts as an AM and Director of Business Operations), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate" A: "Correct. Yes."); Ex. 3 (Haycock Tr.) 159:1-162:5 (Recruiters cannot bind TEK in legal proceedings); Ex. 2 (Def.'s Resp. to Pls. 3rd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters.").

320884109v.1

**RESPONSE:   Disputed in part. Undisputed that Recruiters do not negotiate contracts on behalf of TEK's clients.**

**Disputed that Recruiters may not deviate from TEK's policies or procedures. Recruiters have discretion to devise their own approach to how they person their job duties. See TEK's Response to Statement 38.**

**Disputed that Recruiters may not enter into contracts on behalf of TEK. See TEK's Response to Statement 54, 74, 86.**

86.    Recruiters do not have the authority to negotiate or bind TEK or its clients with respect to significant matters. Supra; Ex. 4 (DiBenedetto Tr.) 109:23-110:3; Ex. 3 (Haycock Tr.) 123:1-24, 158:20-161:15; Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25, 209:2-12; Ex. 2 (Def.'s Resp. to Pls. 3rd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters.").

**RESPONSE:   Disputed. Recruiters have the authority to negotiate on behalf of TEK and to bind TEK with respect to the terms and conditions of employment agreed by contractors. (Df. Ex. 2, collecting testimony that Recruiters *negotiate* rates.)**

**This is a significant matter for TEK because it impacts TEK's net profits. TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 50, Doyle Tr. 193:15-194:16.) A Recruiter negotiates with the candidate the *pay rate* amount that they will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit,**

which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.) Thus, the pay rate and other terms and conditions that a Recruiter negotiates with a candidate directly impact TEK's bottom line.

The ability of a Recruiter to negotiate also is a significant matter for TEK's clients. TEK's clients engage the company to find and assign talented IT professionals to perform work the clients need. (Df. Ex. 1, collecting testimony about how Recruiters help TEK's clients.) Negotiating pay rates that consultants will accept means that they will go to work for the clients and provide the needed services.

Plaintiffs' remaining citations do not support their point. The citations in Plaintiffs' Ex. 2 and 4 merely confirm that Recruiters do not negotiate bill rates with clients, which TEK has never asserted that they do. The citation in Plaintiffs' Ex. 3 identify some other types of duties that TEK has never claimed Recruiters perform, such as account payable functions.

Recruiters' job duties do not include negotiating with TEK's customers regarding what bill rate the customer will pay for the services provided to them by consultants that Recruiters place on assignment. (Pls. Ex. 2, No. 1.)

87.     They do not supervise anyone; represent TEK or its clients in formal grievance proceedings; advise TEK or its clients on how to more efficiently run their operations; or study or recommend changes to the operations or corporate structure of any business. Supra; Ex. 3 (Haycock Tr.) 34:3-6, 69:9-71:22, 122:17-123:25, 160:15-162:5; Ex. 17 (Horonzy Email Nov. 14, 2018) TEK-Recruiter_Lit-00550518 (demonstrating TEK's wage and hour team – not Recruiters – determines consultants' overtime status).

320884109v.1

**RESPONSE:  Disputed in part. Undisputed that Recruiters do not represent TEK or its clients in formal grievance proceedings; advise TEK on hot to more efficiently run its operations; or study or recommend changes to the corporate structure of TEK or its clients.**

**Disputed that Recruiters do not supervise anyone, advise TEK's clients on how to more efficiently run their operations, or study or recommend changes to the operations of TEK's clients.**

**The sources cited by Plaintiffs do not support their statement. Plaintiffs cited only a portion of a response by Haycock regarding TEK's capacity solutions offering, and whether TEK or its clients decide how many people to hire. The complete exchange shows that TEK is making that decision some of the time. (Pls. Ex. 3 (Haycock Tr.) 32:15-34:6. The second cited portion of Haycock's testimony only confirms that certain business executives are responsible for running the operations of TEK's business, such as monitoring the company's financial health. (*Id.*, 69:9-71:22.) The third cited portion of Haycock's testimony does not touch on any of the topics mentioned in Plaintiffs' statement. (*Id.*, 122:17-123:25.) In the final cited portion of Haycock's testimony, he confirms that Recruiters are part of evaluating TEK's operations in order to help give the company a better understanding of how to improve. (*Id.*, 160:15-162:5.)**

**Plaintiffs' Ex. 17 is immaterial. The document is an unauthenticated, vague, and ambiguous email dated November 14, 2018. (Pls. Ex. 17 (Horonzy Email Nov. 14, 2018) TEK-Recruiter_Lit-00550518.) The titles or roles of the sender and recipient are not provided. (*Id.*) The document refers to TEK's "wage and hours team" but does not explain who is or is not part of that team. (*Id.*) Nothing in the document relates to the assertions made by Plaintiffs in their statement.**

- 100 -

**88.** Recruiters do not provide human resource services, public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients. Ex. 3 (Haycock Tr.) 123:21-24, 158:20-161:15; Ex. 5 (Doyle Tr.) 198:19-25, 209:2-12.

**RESPONSE: Disputed in part. Undisputed that Recruiters do not provide public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients.**

**Disputed that Recruiters do not provide human resource services for TEK or its clients.**

**The sources cited by Plaintiffs do not support their statement. In the cited testimony by Haycock, he agreed that "Recruiters do not fall under TEK's human resources department" and Recruiters do not "make determinations internally at TEK regarding human resources." (Pls. Ex. 3 (Haycock Tr.) 123:21-24, 158:20-161:15.) In the cited testimony by Doyle, he agreed that Recruiters "are not required to have human resources certification" and do not have any control over benefits offered when there is a direct placement, i.e., when the individual is hired directly by TEK's client, as opposed to being employed by TEK and placed on assignment to the client on a temporary basis. (Pls. Ex. 5 (Doyle Tr.) 198:19-25, 209:2-12.)**

**None of these responses contradict the idea that Recruiters perform duties akin to human resources services for TEK or its clients.**

320884109v.1

**DEFENDANT'S STATEMENT OF MATERIAL FACTS IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

89.     TEK is a global business and technology firm that assists its customers in achieving their business transformation, customer experience, and business goals. (Df. Ex. 59, Haycock Dep. 25:6-26:6, 134:6-13.)

90.     TEK's business is providing IT talent services, which it divides into three categories: staff augmentation; capacity solutions; and total management services. (Df. Ex. 59, Haycock Dep. 25:22-34:7-18, 73:16-77:7.)

91.     Staff augmentation refers to placing consultants with specific skills on assignment at TEK's customers, where they perform needed services for a certain period of time. (Df. Ex. 59, Haycock Dep. 25:22-34:7-18, 73:16-77:7.)

92.     Capacity solutions refers to assembling entire teams for large or specialized projects. (Df. Ex. 59, Haycock Dep. 32:15-33:8.) For example, TEK might provide a team of developers, testers and project managers for a customer who wants to upgrade their software system. Id. As another example, TEK might assemble a team to take on an online retailer's project to streamline delivery to customers' homes faster and more efficiently, by increasing the volume of products carried in each delivery vehicle, or improve the client's customer experience by enabling real-time tracking of shipments. (Fahey Decl. ¶ 11.)

93.     Total management services refers to outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 59, Haycock Dep. 25:22-34:7-18, 73:16-77:7.) For example, TEK might build, design, and maintain a website for a customer who does not have the internal resources or expertise to do so. (*Id*. at 73:16-77:7.)

320884109v.1

94.     What TEK provides its customers is the ability to achieve their technological goals through the talents and services of those IT professionals. (Df. Ex. 59, Haycock Dep. 25:1-27:10, 60:22-61:16.)

95.     TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Df. Ex. 50, Doyle Tr. 193:15-194:16, 198:19-25.)

96.     A recruiter negotiates with the candidate the *pay rate* amount that they will accept to perform the work. (Df. Ex. 50, Doyle Tr. 194:17-195:7.) A recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (Df. Ex. 50, 196:1-198:9.)

97.     The difference between the bill rate and the pay rate and burden figures is the margin or net profit, which TEK refers to as "spread." (Df. Ex. 50, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.)

98.     TEK considers its primary competitors to be managed service providers such as Deloitte, Accenture, Tata Consultancy Services ("TCS"), Wipro, Insight Global, CGI, and Apex. (Df. Ex. 59, Haycock Dep. 182:6-20; Df. Ex. 61, Johnson I Dep. 221:11-20; Df. Ex. 63, Df. Ex. 62, Df. Ex. 62, Johnson 2 Dep. 106:12-107:6; Df. Ex. 56, Estimada Dep. 78:5-16.)

99.     To become a Recruiter, one must first work at TEK as a Recruiter Trainee, a non-exempt, hourly position. (Df. Ex. 59, Haycock Dep. 104:11-105:6 (all Recruiters are hired as Trainees; the job duties of Recruiter Trainee are "[t]o learn how to be a recruiter."); Df. Ex. 61, Johnson I Dep.. 186:6-187:10.)

100.     To advance from Recruiter Trainee to Recruiter, one must complete 13 weeks of training and demonstrate the ability to perform the duties of the exempt Recruiter. (Haycock Dep.

320884109v.1

104:11-105:6 ("The recruiter trainee cannot move out of the trainee period until they have shown a capability to be a recruiter.").)

101. TEK expects Recruiters to understand the customer, the business problem the customer has engaged TEK to solve, the skills and experience needed to solve those business problems, the customer's culture and environment, in addition to understanding the labor market for people who possess those attributes, where to find those people, how to validate their experience or ability to apply those attributes to the client's project, how to persuade candidates to provide their services to TEK's customer, and how to present the person to the customer in a manner that makes the match clear. (Haycock Dep. 27:14-30:2; 50:1-51:18 (Recruiters support account managers and other roles at TEK, for example, in "are the knowledge experts and understand more about a particular skill specialty than sometimes. . .way more than the customer would themselves"); Fronzaglio Dep. 115:7-16, 173:12-20 (explaining that Recruiters have different styles as to how they approach candidates to persuade them to work with TEK and some choose to "talk about their area of expertise or their specialization."); Fronzaglia Decl. ¶ 14; Df. Ex. 18, Warren Decl. ¶¶ 11, 17-18; Df. Ex. 15, Rice Decl. ¶¶ 11-19.)

102. Some Recruiters work with clients at the outset to define the requirements of the role. (Bury Dep. 40:3-40:12; Fronzaglio Tr. 119:12-24; 162:19-163:1; Fronzaglia Decl.¶¶ 4-8.)

103. Some Recruiters work with AMs to refine requirements when the written document is not clear. (Fronzaglia Decl.¶¶ 4-7; Df. Ex. 15, Rice Decl.¶ 10.)

104. Some Recruiters assessed candidates to find the best match for the client's role. (Bury Dep. 88:1-88:18; Haycock Dep. 32:10-13; Df. Ex. 53, Doyle Dep. 78:10-79:14.)

105. There are TEK Recruiters who provide TEK's customers with talent that the customers need to complete projects that are important to their business. (Ex. 1 (collecting

320884109v.1

declaration statements Df. Ex. 12, Mosquera Decl., ¶ 24; Df. Ex. 20, Marshall Decl., ¶ 26; Df. Ex. 27, Compton Decl.,¶ 16, Df. Ex. 30, Whitman Decl., ¶ 13, Df. Ex. 24, Walther Decl., ¶ 10, Df. Ex. 13, Fink Decl., ¶ 11, Df. Ex. 14, Edds Decl., ¶ 8, Df. Ex. 16, Bohen Decl., ¶ 33, Df. Ex. 18, Warren Decl., ¶ 22, Df. Ex. 22, Fahey Decl., ¶ 7, Df. Ex. 15, Rice Decl., ¶ 22, Df. Ex. 21, Df. Ex. 21, Fronzaglio Decl., ¶ 6, Df. Ex. 20, Marshall Decl., ¶ 9, Df. Ex. 21, Fronzaglio Decl., ¶ 16, Df. Ex. 19, Payonk Decl., ¶ 28, Df. Ex. 35, Df. Ex. 35, Harvey Decl.,¶ 8, Df. Ex. 26, Mendez Decl.,¶ 11, Df. Ex. 27, Compton Decl., ¶ 15, Df. Ex. 34, Kehl Decl., ¶ 6, Df. Ex. 36, Ferrari Decl.,¶ 19, Df. Ex. 37, Budde Decl., ¶ 14, Df. Ex. 29, McCarty Decl.,¶ 21.)

106.    TEK Recruiters are expected to negotiate and finalize pay and other terms and conditions of employment with candidates regarding their placements to work with TEK's customers. Df. Ex. 53, Doyle Dep. 196:8-19; Df. Ex. 61, Johnson I Dep. 200:12-204:14; Johnson II Dep. 121:14-122:10; Haycock Dep. 50:1-51:18, 140:23-142:10

107.    There are TEK Recruiters who negotiate and finalize pay and other terms and conditions of employment with candidates regarding their placements to work with TEK's customers. (Ex. 2 (collecting declaration statements Df. Ex. 18, Warren Decl., ¶ 20, Df. Ex. 20, Marshall Decl.,¶ 21, Df. Ex. 34, Kehl Decl., ¶ 14, Df. Ex. 31, Rothermich Decl., ¶ 34, Df. Ex. 12, Mosquera Decl., ¶ 19, 20, Df. Ex. 13, Fink Decl., ¶ 28, Df. Ex. 14, Edds Decl., ¶ 27, Df. Ex. 17, Chong Decl., ¶ 23, Df. Ex. 16, Bohen Decl., ¶ 20, Df. Ex. 15, Rice Decl., ¶ 17, Df. Ex. 21, Fronzaglio Decl., ¶ 14, Df. Ex. 19, Payonk Decl., ¶¶ 18, 22, Df. Ex. 29, McCarty Decl., ¶ 12, Df. Ex. 26, Mendez Decl., ¶ 18, Df. Ex. 30, Whitman Decl., ¶ 22.); Df. Ex. 48; Avery Dep. 50:22-51:23 and Ex. 12; Camilleri Dep. 18:6-14 and Ex. 7.

108.    There are TEK Recruiters who are part of the job requirement intake process, working with TEK's customers to define the terms of job requirements. (Ex. 3 (collecting

- 105 -

320884109v.1

declaration statements Df. Ex. 12, Mosquera Decl., ¶ 10, Df. Ex. 24, Walther Decl., ¶ 6, Df. Ex. 13, Fink Decl., ¶¶ 12, 13, Df. Ex. 16, Bohen Decl., ¶ 10, Df. Ex. 23, Pagano Decl., ¶ 12, Df. Ex. 21, Fronzaglio Decl., ¶¶ 7, 8, 14, Df. Ex. 20, Marshall Decl., ¶ 12, Df. Ex. 14, Edds Decl., ¶ 12.); Df. Ex. 28, Boland Decl. ¶ 10; Df. Ex. 37, Budde Decl. ¶ 10, 1

109.    There are TEK Recruiters who possess specialized knowledge and expertise about the skillsets or industries for which they recruit. (Ex. 11 (collecting declaration statements Df. Ex. 17, Chong Decl., ¶¶ 11, 12, 14, Df. Ex. 14, Edds Decl., ¶ 9, 11, Df. Ex. 20, Marshall Decl., ¶ 10, Df. Ex. 35, Df. Ex. 35, Harvey Decl.,¶ 7, Df. Ex. 19, Payonk Decl., ¶ 10, 11, Df. Ex. 24, Walther Decl., ¶ 9, 10, Df. Ex. 14, Edds Decl., ¶ 21, Df. Ex. 12, Mosquera Decl., ¶ 9, Df. Ex. 16, Bohen Decl., ¶ 14, 15, Df. Ex. 15, Rice Decl., ¶ 6, 7, Df. Ex. 22, Fahey Decl., ¶ 3, 5, 13, Df. Ex. 18, Warren Decl., ¶ 10, 11, Df. Ex. 23, Pagano Decl., ¶ 8, Df. Ex. 21, Fronzaglio Decl., ¶ 5, 6, Df. Ex. 13, Fink Decl., ¶¶ 7, 8, 10, 12, Df. Ex. 20, Marshall Decl., ¶ 11, Df. Ex. 33, Levine-Gorelick Decl, ¶ 23, Df. Ex. 29, McCarty Decl.,¶ 21, Df. Ex. 30, Whitman Decl., ¶ 13, Df. Ex. 32, Yancey Decl.,¶ 11, Df. Ex. 27, Compton Decl.,¶ 8, Df. Ex. 25, Guffy Decl., ¶9.))

110.    There are Recruiters who choose which job requirements they work on. (Ex. 4 (collecting declaration statements Df. Ex. 19, Payonk Decl., ¶ 13, Df. Ex. 12, Mosquera Decl., ¶ 11, Df. Ex. 13, Fink Decl., ¶ 15, Df. Ex. 14, Edds Decl., ¶ 15, Df. Ex. 16, Bohen Decl., ¶¶ 10, 13, Df. Ex. 18, Warren Decl., ¶ 14, Df. Ex. 15, Rice Decl., ¶ 9, Df. Ex. 23, Pagano Decl., ¶ 5.))

111.    There are TEK Recruiters who develop their own sourcing strategies to identify candidates, and they differ in whether or to what extent they employ TEK's Connected database, LinkedIn, third-party websites, personal networks, and other sources. (Ex. 10 (collecting declaration statements Df. Ex. 16, Bohen Decl., ¶¶ 16, 17, 21, Df. Ex. 25, Guffy Decl., ¶¶ 10, 11, Df. Ex. 32, Yancey Decl., ¶ 14, Df. Ex. 34, Kehl Decl., ¶ 10, Df. Ex. 27, Compton Decl., ¶ 17, Df.

320884109v.1

Ex. 33, Levine-Gorelick Decl., ¶ 15, Df. Ex. 19, Payonk Decl., ¶ 15, Df. Ex. 14, Edds Decl., ¶¶ 17,18, Df. Ex. 17, Chong Decl., ¶¶ 18, 19, 22, 26, Df. Ex. 15, Rice Decl., ¶ 11, 13, Df. Ex. 18, Warren Decl., ¶ 12, 17, Df. Ex. 23, Pagano Decl., ¶ 13, Df. Ex. 13, Fink Decl., ¶¶ 16, 17, 18, 23, Df. Ex. 20, Marshall Decl., ¶ 15, Df. Ex. 30, Whitman Decl.,¶ 8, Df. Ex. 26, Mendez Decl., ¶ 13, Df. Ex. 36, Ferrari Decl.,¶ 9, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 10, Df. Ex. 30, Whitman Decl.,¶ 20, Df. Ex. 26, Mendez Decl., ¶ 9, 14, Df. Ex. 25, Guffy Decl., ¶12, Df. Ex. 29, McCarty Decl., ¶ 15, Df. Ex. 32, Yancey Decl., ¶ 17, 18, Df. Ex. 34, Kehl Decl., ¶11, Df. Ex. 36, Ferrari Decl., ¶ 11, Df. Ex. 37, Budde Decl., ¶ 18, Df. Ex. 33, Levine-Gorelick Decl., ¶ 8, Df. Ex. 30, Whitman Decl.,¶ 9, 21, Df. Ex. 25, Guffy Decl., ¶ 11, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 12, 13, Df. Ex. 26, Mendez Decl., ¶ 8, Df. Ex. 29, McCarty Decl., ¶ 11, Df. Ex. 31, Rothermich Decl., ¶ 20, Df. Ex. 38, Stryker Decl., ¶ 20, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 15.))

112.    There are TEK Recruiters who make their own judgements about whether to move forward with a candidate, (Ex. 10 (collecting declaration statements Df. Ex. 16, Bohen Decl., ¶¶ 16, 17, 21, Df. Ex. 25, Guffy Decl., ¶¶ 10, 11, Df. Ex. 32, Yancey Decl., ¶ 14, Df. Ex. 34, Kehl Decl., ¶ 10, Df. Ex. 27, Compton Decl., ¶ 17, Df. Ex. 33, Levine-Gorelick Decl., ¶ 15, Df. Ex. 19, Payonk Decl., ¶ 15, Df. Ex. 14, Edds Decl., ¶¶ 17,18, Df. Ex. 17, Chong Decl., ¶¶ 18, 19, 22, 26, Df. Ex. 15, Rice Decl., ¶ 11, 13, Df. Ex. 18, Warren Decl., ¶ 12, 17, Df. Ex. 23, Pagano Decl., ¶ 13, Df. Ex. 13, Fink Decl., ¶¶ 16, 17, 18, 23, Df. Ex. 20, Marshall Decl., ¶ 15, Df. Ex. 30, Whitman Decl.,¶ 8, Df. Ex. 26, Mendez Decl., ¶ 13, Df. Ex. 36, Ferrari Decl.,¶ 9, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 10, Df. Ex. 30, Whitman Decl.,¶ 20, Df. Ex. 26, Mendez Decl., ¶ 9, 14, Df. Ex. 25, Guffy Decl., ¶12, Df. Ex. 29, McCarty Decl., ¶ 15, Df. Ex. 32, Yancey Decl., ¶ 17, 18, Df. Ex. 34, Kehl Decl., ¶11, Df. Ex. 36, Ferrari Decl., ¶ 11, Df. Ex. 37, Budde Decl., ¶ 18, Df. Ex. 33, Levine-Gorelick Decl., ¶ 8, Df. Ex. 30, Whitman Decl.,¶ 9, 21, Df. Ex. 25, Guffy Decl., ¶ 11, Df.

320884109v.1

Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 12, 13, Df. Ex. 26, Mendez Decl., ¶ 8, Df. Ex. 29, McCarty Decl., ¶ 11, Df. Ex. 31, Rothermich Decl., ¶ 20, Df. Ex. 38, Stryker Decl., ¶ 20, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 15.); Df. Ex. 35, Df. Ex. 35, Harvey ¶ 21; Df. Ex. 37, Budde ¶¶ 17, 19; Df. Ex. 25, Guffy ¶ 13; Df. Ex. 30, Whitman ¶ 23; Df. Ex. 27, Compton ¶ 18; Bury Dep. 124:20-126:24.

**113.** TEK has the expectation that Recruiters manage the consultants they place. (Df. Ex. 59, Haycock Dep. 36:9-38:1.

**114.** There are TEK Recruiters who manage TEK consultants while they are on assignment. (Ex. 5 (collecting declaration statements Df. Ex. 14, Edds Decl., ¶ 28, Df. Ex. 21, Fronzaglio Decl., ¶¶ 9, 10, 14, Df. Ex. 31, Rothermich Decl., ¶ 37, Df. Ex. 12, Mosquera Decl., ¶ 21, Df. Ex. 13, Fink Decl., ¶¶ 29, 30, Df. Ex. 17, Chong Decl., ¶¶ 31, 33, Df. Ex. 16, Bohen Decl., ¶ 24, Df. Ex. 18, Warren Decl., ¶ 21, Df. Ex. 15, Rice Decl., ¶ 19, Df. Ex. 20, Marshall Decl., ¶ 20, Df. Ex. 19, Payonk Decl., ¶ 23, Df. Ex. 29, McCarty Decl.,¶ 18, Df. Ex. 33, Levine-Gorelick Decl., ¶ 21, Df. Ex. 25, Guffy Decl., ¶ 17, 18, Df. Ex. 37, Budde Decl.,¶ 21.))

**115.** There are TEK Recruiters who work in partnership with Account Managers, and not under close supervision by them. (Ex. 6 (collecting declaration statements Df. Ex. 13, Fink Decl., ¶ 26, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 19, Levine Gorelick Decl., ¶ 9, 19, Df. Ex. 16, Bohen Decl., ¶¶ 11, 12, Df. Ex. 13, Fink Decl., ¶ 31, Df. Ex. 17, Chong Decl., ¶ 16, Df. Ex. 15, Rice Decl., ¶ 11, Df. Ex. 15, Rice Decl., ¶ 21, Df. Ex. 23, Pagano Decl., ¶ 11, 12, Df. Ex. 21, Fronzaglio Decl., ¶ 12, Df. Ex. 19, Payonk Decl., ¶ 24, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 21, Df. Ex. 37, Budde Decl.,¶ 19, Df. Ex. 25, Guffy Decl., ¶ 13, Df. Ex. 30, Whitman Decl., ¶ 23, Df. Ex. 29, McCarty Decl., ¶ 14, Df. Ex. 27, Compton Decl., ¶ 21, Df. Ex. 34, Kehl Decl., ¶ 13, Df. Ex. 32, Yancey Decl., ¶ 19.); Df. Ex. 28, Boland ¶¶ 7-8, 12-14.

320884109v.1

116.    There are TEK Recruiters who report to Recruiter Leads but are not closely supervised by them. (Ex. 6 (collecting declaration statements Df. Ex. 13, Fink Decl., ¶ 26, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 19, Levine Gorelick Decl., ¶ 9, 19, Df. Ex. 16, Bohen Decl., ¶¶ 11, 12, Df. Ex. 13, Fink Decl., ¶ 31, Df. Ex. 17, Chong Decl., ¶ 16, Df. Ex. 15, Rice Decl., ¶ 11, Df. Ex. 15, Rice Decl., ¶ 21, Df. Ex. 23, Pagano Decl., ¶ 11, 12, Df. Ex. 21, Fronzaglio Decl., ¶ 12, Df. Ex. 19, Payonk Decl., ¶ 24, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 21, Df. Ex. 37, Budde Decl., ¶ 19, Df. Ex. 25, Guffy Decl., ¶ 13, Df. Ex. 30, Whitman Decl., ¶ 23, Df. Ex. 29, McCarty Decl., ¶ 14, Df. Ex. 27, Compton Decl., ¶ 21, Df. Ex. 34, Kehl Decl., ¶ 13, Df. Ex. 32, Yancey Decl., ¶ 19.))

117.    There are TEK Recruiters who work remotely. (Ex. 7 (collecting declaration statements Df. Ex. 12, Mosquera Decl., ¶ 23, Df. Ex. 13, Fink Decl., ¶ 39, Df. Ex. 14, Edds Decl., ¶ 31, 32, Df. Ex. 16, Bohen Decl., ¶ 26, Df. Ex. 18, Warren Decl., ¶ 13, 16, Df. Ex. 22, Fahey Decl., ¶ 16, Df. Ex. 15, Rice Decl., ¶ 21.))

118.    There are TEK Recruiters who have flexibility to manager their own schedules. (Ex. 9 (collecting declaration statements Df. Ex. 12, Mosquera Decl., ¶ 25, Df. Ex. 13, Fink Decl., ¶ 39, 40, Df. Ex. 19, Payonk Decl., ¶ 27, Df. Ex. 18, Warren Decl., ¶ 13, 16.))

119.    Activity levels, such as those reflected on the Scorecard, are for coaching purposes, and some Recruiters and supervisors do not refer to them at all. (Ex. 8 (collecting declaration statements Df. Ex. 19, Payonk Decl., ¶ 26, Df. Ex. 12, Mosquera Decl., ¶ 22, Df. Ex. 13, Fink Decl., ¶ 36, Df. Ex. 14, Edds Decl., ¶ 29, 30, Df. Ex. 23, Pagano Decl., ¶ 10, 11.))

120.    For TEK Recruiters, identifying relevant skills is only the beginning of a screening inquiry. (Bury Dep. 116:23-118:24, 119:22-120:5; Df. Ex. 31, Rothermich ¶¶ 3-10; Df. Ex. 27, Compton ¶ 18; Df. Ex. 30, Whitman ¶ 20; Df. Ex. 26, Mendez ¶¶ 9, 14; Df. Ex. 25, Guffy ¶ 12;

320884109v.1

Df. Ex. 29, McCarty ¶ 15; Df. Ex. 32, Yancey ¶ 17, 18; Df. Ex. 27, Compton ¶ 18; Df. Ex. 34, Kehl ¶ 11; Df. Ex. 36, Ferrari ¶ 11; Df. Ex. 37, Budde ¶ 18.

121.    Recruiters decide whether a candidate is the right match for a requisition and whether to present the candidate to an AM. (Guffy ¶ 13 (hen a candidate is a match, she will "discuss [with the AM] the merits of a candidate and how they align with the technical and cultural requirements of a client. There are times when the AM disagrees with me on a recommendation, but I have the opportunity to push back, and it is my favorite thing to do. I am the agent representing the candidate whereas the AM represents the client, and then we negotiate. Most of the time, the AM follows my recommendation about which candidates to present to the client."); Df. Ex. 31, Rothermich ¶ 29; Df. Ex. 29, McCarty ¶ 14 (AMs rarely push back on; See also Df. Ex. 33, Levine-Gorelick ¶ 19 ("[AMs] generally follow my recommendations"); Df. Ex. 27, Compton ¶¶ 21-22 (AMs take recommendations "more often than not.");Kehl ¶ 13 ("Putting a candidate up for a job for a client is a collaboration between the Recruiter and [AM], and once we are on the same page, we will send the candidate over to a client. [AMs] take my recommendation about a candidate most of the time."); Df. Ex. 37, Budde ¶ 19 (AMs "almost always follow my recommendation."); Df. Ex. 25, Guffy ¶ 13 (describing her process for submitting candidates to TEK customers); Df. Ex. 32, Yancey ¶ 19 (same); Df. Ex. 35, Df. Ex. 35, Harvey ¶ 19 (same).

122.    According to Connected data produced in this case, Recruiters average only about 5 Attempted Contacts, 3 G2s, 2.5 calls per day. (Df. Ex. 39, Scroggins Decl. ¶6.)

320884109v.1

DATED: October 10, 2025

Respectfully submitted,

SEYFARTH SHAW LLP


By: /s/ Andrew Scroggins

    Andrew L. Scroggins
    ascroggins@seyfarth.com
    Noah A. Finkel
    nfinkel@seyfarth.com


SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Attorneys for Defendant

320884109v.1