**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

|  |  |
|---|---|
| MICHAEL THOMAS, MARIA CONYERS-JORDAN, AUSTIN SHERMAN, LYNDA ALEXANDRA MAHER, AVA DORÉ, RACHEL RICHENBERG, and EMILY BURKE, on behalf of themselves and others similarly situated, | Civil Action No. 2:21-cv-00460-WSS |
| *Plaintiffs*, | Class and Collective Action |
| v. | (Document Filed Electronically) |
| TEKSYSTEMS, INC., | |
| *Defendant*. | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' CONCISE STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civ. R. 56(b)(1), Plaintiffs Michael Thomas, Maria Conyers-Jordan, Austin Sherman, Lynda Alexandra Maher, Ava Dore, Rachel Richenberg, and Emily Burke submit this Reply in Support of Plaintiffs' Concise Statement of Facts in Support of their Motion for Partial Summary Judgment.

## PLAINTIFFS' GENERAL OBJECTIONS TO DEFENDANT'S RESPONSES TO PLAINTIFFS' MATERIAL UNDISPUTED FACTS

Throughout the document, TEK raised three objections to Plaintiffs' exhibits that are unfounded. To avoid repetition, Plaintiffs lay out why the objections are baseless here. Further, TEK relied on summary documents that are not proper evidence in this case, as described below.

1.    **Geographic Scope.** TEK argues that some documents are outside the relevant geographic scope of this case; for instance, it argues a document from the "West Coast" is "outside the relevant geographic scope." *See, e.g.*, ¶ 7. However, Plaintiffs are moving for summary judgment on behalf of the four certified Rule 23 state classes *and* a *nationwide* certified Fair Labor Standards Act collective. As such, TEK's nationwide practices are at issue.

2.    **Temporal Scope.** TEK argues that that some documents are outside the temporal scope of this case.  However, the Third Circuit has held that pre- and post-class period evidence is relevant and can "be used to 'confirm what a defendant should have known during the class period.'" *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2nd Cir. 2001)). To the extent that TEK argues that some of the documents do not bear a date, TEK produced metadata for the documents (which contains dates and to which TEK has access because they are TEK's documents). At summary judgment, exhibits need not be in admissible form, so long as so long as they are ultimately "reduc[ible] to admissible evidence." *Lexington Ins. Co. v. W. Penn. Hosp.*, 423 F.3d 318, 329 n.6

(3d Cir. 2005). Below, Plaintiffs provide the metadata date information for the documents in their replies where TEK argues the documents are undated.

3.      **Authenticity.** TEK argues that some of the documents that *TEK* produced to Plaintiffs have not been authenticated. However, this objection is meritless. All the documents that Plaintiffs relied on were produced by TEK. "[D]ocuments produced by a party in discovery are deemed authentic when offered into evidence by the producing party's party-opponent." *Walsh v. Fusion Japanese Steakhouse, Inc.*, 585 F. Supp. 3d 766, 781 (W.D. Pa. 2022) (collecting cases). This is because "[a]uthentication evaluates the genuineness of a document, not its admissibility." *Bouriez v. Carnegie Mellon Univ.*, CV 02 Civ. 2104, 2005 WL 2106582, at \*5 (W.D. Pa. Aug. 26, 2005). TEK has not articulated any reason to believe the documents are inauthentic. Finally, at summary judgment, a court may consider materials that are not yet in admissible form (e.g., unauthenticated documents), so long as so long as they are ultimately "reduc[ible] to admissible evidence." *Lexington Ins. Co.*, 423 F.3d at 329 n.6. Here, the documents that TEK produced have metadata and could easily be reduced to admissible evidence through witness testimony, or other means. *See Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 106 (E.D. Pa. 2010) ("Metadata can assist in proving the authenticity of the content of electronic documents, as well as establish the context of the content.").

4.      **Summary Documents.** To the extent the Court considers the declarations submitted by TEK, it should consider the entire declarations and not the argumentative, misleading summary exhibits that TEK submitted. *See* ECF Nos. 203-1 – 203-11 (selectively pulling out portions of the declarations). These exhibits are not admissible summaries under Federal Rule of Evidence 1006 and should also be excluded under Rule 403. Rule 1006 allows for summary exhibits for "*voluminous*" data or writings. Here, TEK did not summarize *voluminous* writings but

instead selectively quotes from 28 declarations out of context, thereby turning testimonial evidence into an argumentative exhibit. *See Su v. E. Penn Mfg. Co.*, No. 18 Civ. 1194, 2023 WL 2796120, at *1 (E.D. Pa. Apr. 5, 2023) ("admission of Rule 1006 evidence runs the risk of inaccuracy, allowing proponents, either purposefully or accidentally, to shrink or grow figures to the benefit of their case"). These summary exhibits should also be excluded under Rule 403 because they are more prejudicial than probative. For example, in ECF No. 203-10, entitled, "Recruiters Develop Their Own Sourcing Strategy and Make Independent Decisions About Candidates and Exercise Independent Judgment," TEK submits a paragraph from Jason Edds declaration, ECF No. 203-14, which states "As a Recruiter, I made the decision whether to move forward with a candidate." ECF No. 203-10. However, in the actual declaration, Edds makes clear that it is the Account Managers who "submit" candidates to TEK's clients. ECF No. 203-14 at ¶ 24. Relying on the argumentative, summary exhibits would deprive the Court of the context in the declarations.

**PLAINTIFFS' MATERIAL UNDISPUTED FACTS**[1]

**I.    TEK Is a Recruiting Firm**

1.    TEK is an IT staffing company. Ex. 3 (TEK Senior Vice President of Talent Delivery Haycock Tr. ("Haycock Tr.")) 25:6-26:6; Ex. 20 (*TEKsystems, Inc. v. Andiamo Consulting, LLC* ("Andiamo") Complaint) at ¶ 2.

**RESPONSE: Disputed in part. In the cited testimony, Haycock does not accept Plaintiffs' counsel's characterization that TEK "provides IT staffing services." (Pls. Ex. 3, Haycock Tr. 25:6-10.) Haycock explained that TEK is a talent services company, and its**

---

[1]    Because all facts must be viewed in the light most favorable to TEK on Plaintiffs' motion for partial summary judgment, Plaintiffs cited exclusively to TEK's own documents and the testimony of TEK's employees and witnesses for purposes of this motion in its initial Statement of Undisputed Facts. In Plaintiffs' Reply, Plaintiffs cite to some of Plaintiffs' and Class and Collective Members' deposition testimony to put TEK's citations into proper context for the Court.

**business includes staff augmentation, i.e., placing workers with specific skills on assignment at customer companies to perform needed services for a certain period of time; capacity solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 59, Haycock Dep. 25:22-34:18, 73:16-77:7.)**

***PLAINTIFFS' REPLY:*** TEK does not dispute that ECF No. 190-20 (*TEKsystems, Inc. v. Andiamo Consulting, LLC* ("Andiamo") Complaint) at ¶ 2 states that "TEKsystems—a leading information technology ("IT") staffing company—recruits and hires professionals in support of its IT staffing business operations." TEK also does not dispute that, in the testimony cited by Plaintiffs, Haycock admits that TEK considers itself as "talent services" and "talent services is in the staffing world." ECF No. 190-3 (Haycock Tr.) 25:8-10. The staff augmentation, capacity solutions, and total management services that Haycock references are components of the talent services business that TEK provides, within the staffing world. *See* ECF No. 190-3 (Haycock Tr.) 26:1-6; ECF No. 203-59 (Haycock Tr.) 25:22-34:18, 73:16-77:7.

Further, TEK stated in its verified Answer to Plaintiffs' First Set of Interrogatories, Interrogatory No. 2, that it "is in the staffing business." ECF No. 190-1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.

Finally, other litigation, TEK routinely describes itself as a "staffing company" that "recruits." ECF No. 101-2 (*Andiamo Consulting, LLC* Complaint) at ¶ 2; *see also* ECF No. 190-20 (TEKsystems, Inc. v. Andiamo Consulting, LLC ("Andiamo") Complaint) at ¶ 2; ECF No. 190-21 (Andiamo Rule 30(b)(6) Dep. Tr. of Alexander Pulido ("Andiamo Rule 30(b)(6) Tr.")) at 153:13-23; ECF No. 190-22 (Andiamo Preliminary Injunction) at 2, 4; ECF No. 190-23 (Andiamo Aff. of Alexander Pulido) at ¶¶ 5, 7; ECF No. 190-24 (Ambar) Complaint) at ¶¶ 2, 13; ECF No.

190-25 (Berardis Complaint) ¶¶ 2, 13-15.

Accordingly, SOF ¶ 1 is undisputed and should be deemed admitted.

2.      TEK's principal business purpose is to recruit IT workers to work for third-party companies. *Id.*; Ex. 3 (Haycock Tr.) 60:2-6; Ex. 4 (Rule 30(b)(6) Deposition DiBenedetto Tr. ("DiBenedetto Tr.")) 134:5-13; Ex. 21 (*Andiamo* Rule 30(b)(6) Dep. Tr. of Alexander Pulido ("*Andiamo* Rule 30(b)(6) Tr.")) 24:14-25:5, 153:13-23; Ex. 26 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5.

**RESPONSE: Disputed. As noted in response to PSMF 1, TEK's business includes staff augmentation, i.e., placing workers with specific skills on assignment at customer companies to perform needed services for a certain period of time; capacity solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 59, Haycock Dep. 25:22-34:18, 73:16-77:7.)**

**Further, TEK's "business purpose" is not merely to "recruit" people to work for third-party companies. TEK's employees assist TEK's customers to define the requirements for roles the customers wants to fill; identify and develop sources of potential candidates to fill those roles; evaluate candidates' qualifications against the role requirements; negotiate pay rates and other conditions of employment with candidates; submit the best qualified candidates to customers for consideration; and employ and manage consultants who are on assignment. (Df. Ex. 59, Haycock Dep. 27:14-30:2; Df. Ex. 2, 3, 5, and 10 (compiling testimony regarding requisition intake, sourcing strategy, negotiation, and managing consultants on assignment).**

**In addition, the citations offered by Plaintiffs do not support their assertion. The**

**Haycock testimony states that TEK makes money when it makes a direct placement of a candidate to, or engages a contractor to perform work, at a third-party company. (See Pl. Ex. 3, 60:2-6.) The DiBendetto testimony states that TEK Recruiters "[w]ork on the placement of IT consultants." (See Pl. Ex. 4, 134:5-13.) The Pulido testimony describes how TEK generates fees from staffing engagements and direct placements. (See Pl. Ex. 21, 24:14-25.) The Q2 Talent Delivery Call is a single page from a PowerPoint presentation that states TEK's "goal is to become the most dominant recruiting workforce on the planet." (See Pl. Ex. 26, 5.)**

***PLAINTIFFS' REPLY:*** TEK disputes SOF ¶ 2, but it has not pointed to any testimony or documents in the record that is inconsistent with the evidence offered by Plaintiffs in SOF ¶ 2.  As detailed in Plaintiffs' Reply to SOF ¶ 2, Haycock testified that staff augmentation, capacity solutions, and total management services that TEK offers are part of talent services, which are within the staffing world. *See* ECF No. 190-3 (Haycock Tr.) 25:6-26:6. Haycock's testimony is not inconsistent with SOF ¶ 2 that TEK's principal business purpose is to recruit IT workers to work for third-party companies. *See id.*

Further, TEK does not dispute that its business purpose is to recruit people to work at third-party companies. Rather, TEK points out that its business purpose is not "merely" recruiting people to work at third-party companies. TEK does not offer any evidence that recruiting people to work at third-party companies is not its *principal* business purpose. TEK cites to ECF No. 203-59 (Haycock Tr.) 27:14-30:2; ECF No. 203-2; ECF No. 203-3; ECF No. 203-5; and ECF No. 203-10 to provide examples of tasks that it undertakes to further its business purpose of recruiting people to work at third-party companies, including requisition intakes and sourcing strategies. The tasks cited by TEK are consistent with its principal business purpose of recruiting people to work at

third-party companies.

Additionally, Plaintiffs' proffered evidence supports SOF ¶ 2. Haycock's testimony affirming that TEK makes money on placing candidates at third-party companies is consistent with SOF ¶ 2. *See* ECF No. 190-3 (Haycock Tr.) 60:2-6. DiBenedetto's testimony that TEK Recruiters work on the placement of IT consultants is also consistent with SOF ¶ 2. Pulido's testimony in *Andiamo* that TEK gets paid through placing consultants at contract rate positions and directly at third-party companies is also consistent with SOF ¶ 2. Finally, the fact that the statement "Our goal is to become the most dominant recruiting workforce on the planet" only appears on a single slide of a PowerPoint presentation is irrelevant the question of whether it supports SOF ¶ 2. *See* ECF No. 190-26 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5. The Q2 Talent Delivery Call slide supports SOF ¶ 2 that TEK's principal business purpose is to recruit IT workers to work for third-party companies. *See id.*

Finally, TEK's reliance on ECF Nos. 203-2, 203-3, 203-5, and 203-10 is improper because they are summary argumentative compilations of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra* Plaintiffs General Objections ¶ 4.

Accordingly, SOF ¶ 2 is undisputed and should be deemed admitted.

3.    TEK has two primary client bases: customers who need staffing help and candidates/consultants whom TEK places with customers. Ex. 21 (Andiamo Rule 30(b)(6) Tr.) 23:22-24:3 ("we technically have two client bases. We have – we have our customers, those companies . . . Then we have our consultants"), 24:14-25:5, 153:13-23; Ex. 3 (Haycock Tr.) 60:2-6; Ex. 4 (DiBenedetto Tr.) 134:5-13; Ex. 20 (Andiamo Compl.) at ¶ 2; Ex. 26 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting

workforce on the planet").

**RESPONSE**: Disputed in part. Undisputed that part of the cited *Andiamo* testimony identifies the "two client bases." (Pls. Ex. 21 at 23:22-24:3.)

Disputed insofar as it suggests that both "client bases" pay fees to TEK; the *Andiamo* testimony states that fees are paid by TEK customers who seeks TEK's help with staffing engagements and direct placements. (*Id.* at 24:14-25:5.) Haycock also testified that consultants do not pay for TEK's services. (Df. Ex. 59, Haycock Dep. At 43:14-44:5.) Also disputed that Plaintiffs' remaining citations support the statement, as none of them say anything about "client bases." (*See* Pls. Ex. 4, 20 and 26.)

*PLAINTIFFS' REPLY:* TEK does not dispute that the *Andiamo* testimony identifies customers and consultants as its two client bases. SOF ¶ 3 does not address which of TEK's two client bases pay fees to TEK, but the general understanding that TEK is selling its services to two groups – the job candidates and the employer customers. *See also* ECF No. 190-9 (TEK Change Management Lead Fronzaglio Tr. ("Fronzaglio Tr.")) 35:25-36:7 (reiterating the two clients concept and that Account Managers ("AMs") focus on TEK's clients and Recruiters on finding candidates). Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 3. Accordingly, SOF ¶ 3 is undisputed and should be deemed admitted.

4.      TEK competes with other recruiting firms to place candidates and ultimately is only successful at placing less than one-third of the candidates it submits to third-party companies. Ex. 4 (DiBenedetto Tr.) 96:2-6 (part of the customer service goal with potential job candidates is to get them to utilize TEK over its competitors); Ex. 5 (Rule 30(b)(6) Deposition Doyle Tr. ("Doyle Tr.")) 199:18-200:2; Ex. 6 (Doyle Sealed Tr. Portion) 237:20-238:9 (only 31.8% of the job requirements that TEK works to fill get filled by TEK); Ex. 3 (Haycock Tr.) 44:22-45:4 ("There's

always a war for talent."), 48:1-8 ("[T]here are many, many, many competitors out there"), 48:10-49:12; Ex. 7 (TEK Vice President of Managed Service Program Strategy McNelley Tr. ("McNelley Tr.")) 38:17-39:3, 40:23-41:13, 58:20-59:11; Ex. 8 (TEK Regional Director of Applications Innovation Services Estimada Tr. ("Estimada Tr.") 86:16-21, 88:2-6, 89:14-21, 92:18-25; Ex. 9 (TEK Change Management Lead Fronzaglio Tr. ("Fronzaglio Tr.")) 97:8-17; Ex. 10 (AM Hollister Tr. ("Hollister Tr.")) 36:16-37:16, 86:10-87:6; Ex. 11 (TEK Director of Business Operations Matthew Minniear ("Minniear Tr.")) 54:22-55:9, 92:15-18; Ex. 12 (Former TEK Account Manager Pappas Tr. ("Pappas Tr.")) 130:24-131:20; Ex. 21 (Andiamo Rule 30(b)(6) Tr.) 181:12-17; Ex. 27 (Haycock Email Oct. 26, 2020) at TEK-Recruiter_Lit-00386105 (discussing "reduc[ing] 'finger pointing' when we get beat on a *requirement*.") (emphasis added).

**RESPONSE**: **Disputed in part. Undisputed that TEK has business competitors that seek to place candidates at third-party companies.**

**Disputed that TEK competes with other companies on all requirements that it is engaged to fill for third-party companies. Some requirements are exclusive to TEK, meaning, the third-party company engages only TEK to identify candidates for the role(s.) (Df. Ex. 59, Haycock Dep. 48:10-49:12.) In addition, TEK may give lower priority to requirements where it is in competition with other firms, i.e., choose not to compete to fill those requirements. (Df. Ex. 64, McNelley Dep. 37:23-39:5, 40:23-43:13; DF. Ex. 56, Estimada Dep. 86:16-87:17, 88:2-6; (Df. Ex. 53, Doyle Tr. 199:18-200:11.)**

***PLAINTIFFS' REPLY***: TEK does not dispute that TEK competes with other recruiting firms to place candidates and ultimately is only successful at placing less than one-third of the candidates it submits to third-party companies. Accordingly, SOF ¶ 4 is undisputed and should be deemed admitted.

5. To compete against other companies, TEK often submits multiple candidates for a single requirement, submits one candidate for multiple requirements, and has multiple Recruiters work on the same requirement in order to increase the chances that one of its candidates will be selected. *Id.*; Ex. 5 (Doyle Tr.) 139:8-14, 140:3-11; Ex. 125 (Perrault Sept. 27, 2017 Email) TEK-Recruiter_Lit-00248137; Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Is this a marketable candidate that can be submitted to multiple other opportunities?"); Ex. 29 (Multiple Submittals) TEK-Recruiter_Lit-000000303; Ex. 30 (Bhasin Email May 17, 2022) at TEK-Recruiter_Lit-00127828 ("A candidate can be submitted by multiple producers"); Ex. 31 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467 (describing a coaching opportunity to ask Recruiters what other requirement a candidate Auto-Matches or fits); Ex. 16 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307 (coaching recruiters to determine whether a candidate is a match for multiple requirements or TEK clients); Ex. 32 (Minniear Email) TEK-Recruiter_Lit-00559495 ("Focus on multiple submittals").

**RESPONSE: Disputed in part Undisputed that there are instances when TEK may submit more than one candidate that may be fit a to fill a single requirement, or that a candidate may be submitted to more than requirement, or than more than one Recruiter may work on a single requirement.**

**Disputed insofar as Plaintiffs suggest that this is for purposes of "competition," that any of these scenarios are the norm, or that TEK increases its chances of placing its candidates by flooding its customers with resumes. Haycock explains that Recruiters speak with candidates; discuss career goals with candidates; and may present multiple roles that match the candidate's skills, goals, and interests. (Haycock Dep. At 59:3-60:1.) "They are talking to candidates about what it is that they're looking for in their career and making**

matches with the available jobs… a candidate might match more than one role, and they're talking to them about the role that is best for them." (*Id.*)

Doyle explains that sharing a requirement with multiple recruiters is about matching expertise, not boosting selection odds. (Doyle Dep. at 138:16-140:11.) An Account Manager may share a requirement with a "default opportunity team" of Recruiters with appropriate expertise and specialization relevant to the role. (*Id..*) If an Account Manager "send[s] a requirement to five recruiters, maybe one of them already has a candidate that's a good fit, and we don't even need to allocate to that business." In other words, TEK's aim is to match candidates to requirements efficiently. (*Id.*) TEK views this as "putting the consultant first" to help them find work opportunities. (*See* Pls. Ex. 30 (Bhasin Email May 17, 2022.)

Plaintiffs' Exhibit 125 is immaterial, as it is an email from September 27, 2017 (outside the relevant time period), from a Senior Account Manager (not a relevant role) based in a California office (not a relevant location), for a single client's requested process, to a distribution list of people whose roles and locations are not specified. (*See* Pls. Ex. 125 Perrault Sept. 27, 2017 Email.)

Plaintiffs' Ex. 28 contradicts their point that TEK "compete[s] against other companies" by submitting candidates to multiple positions. The document is a Guide for people in roles that may coach Recruiters, and the portion highlighted by Plaintiffs suggests that Recruiters consider whether a candidate who has been rejected by a client may have skills that make them the right candidate for a different role. It does not support the notion that candidates are submitted simultaneously for different roles.

Likewise, Plaintiffs' Ex. 29 is a classroom training exercise that encourages participates to view it as TEK's "responsibility to our consultants to keep them consistently

**employed and match them to positions that match their skills, goals, and interests. By identifying multiple opportunities for each consultant we increase the odds that they can secure a position." (Pls. Ex. 29 (Consultant Support Guidance) at TEK-Recruiter_Lit-000000303.) The guidance says nothing about "compet[ing] against other companies."**

**Plaintiffs Exs. 16 and 31 are training documents related to providing coaching to Recruiters, both of which include the same cited text about considering what requirements a candidate may be a match for. Neither says anything about "compet[ing] against other companies."**

**Plaintiffs' Ex. 32 is immaterial, as it is an unauthenticated and apparently unsent draft email, from which Plaintiffs have cited on partial ambiguous, and explained phrase.**

***PLAINTIFFS' REPLY:*** TEK does not dispute that TEK often submits multiple candidates for a single requirement, submits one candidate for multiple requirements, and has multiple Recruiters work on the same requirement. Without relying on any evidence, TEK disputes that TEK makes multiple submissions for the purposes of competition and that making multiple submissions increases its chances that its candidates will be selected. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986).

Haycock's testimony that Recruiters "may be working on three or four roles any given time" and that Recruiters "could have a candidate that might match more than one role and they're talking to them about the role that is best for them" supports SOF ¶ 5 in that Haycock discusses that a single candidate may be submitted for more than one role. *See* ECF No. 190-3 (Haycock Tr. 59:2-60:1). Haycock also testified that there are "many, many, many competitors out there." *Id.* 48:1-8. Haycock's testimony also does not contradict any portion of SOF ¶ 5.

Doyle testified that multiple recruiters work on the same requirement. ECF No. 190-5 (Doyle Tr.) 139:12-14 (Q. "Okay. Because multiple recruiters work on the same requirement?" A. "They can."). Contrary to TEK's assertion otherwise, Doyle did not testify at 138:16-140:11 that sharing a requirement with multiple recruiters is about matching expertise, or efficiency. *See id.* at 138:16-140:11. Rather, Doyle testified as to his understanding of the definition of "default opportunity teams." *See id.* Doyle's testimony merely sets forth one example of how a single requirement may be transmitted to multiple Recruiters and does not contradict any part of SOF ¶ 5. *See id.*

ECF No. 190-125 (Perrault Sept. 27, 2017 Email) TEK-Recruiter_Lit-00248137 supports SOF ¶ 5 and is not immaterial. TEK produced this document and it provides illustrative support to SOF ¶ 5. Further, the fact that ECF No. 190-125 contains an email sent from a TEK employee at a California office does not render it immaterial. The FLSA Collective in includes Recruiters who worked for TEK in California. *See* Ex. 154 (Opt-in Plaintiff Trevor Raras Tr. ("Raras Tr.")) 23:21-24:3 (Raras worked for TEK in California).

ECF No. 190-28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Is this a marketable candidate that can be submitted to multiple other opportunities?") supports SOF ¶ 5 in that it demonstrates that a candidate may be submitted to more than one requirement. Likewise, ECF No. 190-29 (Multiple Submittals) TEK-Recruiter_Lit-000000303 ("By identifying multiple opportunities for each consultant we increase the odds that they can secure a position.") supports SOF ¶ 5 in that it demonstrates that a candidate may be submitted for more than one requirement and that doing so increases TEK's chances that one of its candidates will be selected. The documents together support SOF ¶ 5.

As detailed above at Plaintiffs' Reply to TEK's Response to SOF ¶ 4, TEK also does not

dispute that it competes with other recruiting firms to place candidates. TEK has also not provided

an adequate basis to refute the evidence that Plaintiffs submitted in support of SOF ¶ 5, including

that "[b]y identifying multiple opportunities for each consultant [TEK] increase[s] the odds that

they can secure a position." *See* ECF No. 190-29 (Multiple Submittals) TEK-Recruiter_Lit-

000000303. Nor has TEK offered any specific documents or testimony that disputes any part of

SOF ¶ 5. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-25, (1986).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless.

*See supra,* Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 5 is undisputed and should be deemed admitted.

6.      TEK claims that it has an "exhaustive search, training, and matching process" and

that the process was "developed and fine-tuned over 20-plus years in the market." Ex. 20 (Andiamo

Compl.) at ¶ 22.

**RESPONSE: Undisputed but immaterial. The statements are not relevant to**

**Recruiter job duties, but rather are made in the context of claims of breach of agreement,**

**tortious interference with contractual relations, unjust enrichment, and statutory**

**misappropriation of trade secrets by former employees who allegedly took and used without**

**authorization information from a proprietary and confidential candidate database. (Pls. Ex.**

**20 (*Andiamo* Compl.) at ¶¶ 23, 164-249.)**

*PLAINTIFFS' REPLY:* TEK does not dispute that it claims that it has an "exhaustive

search, training, and matching process" and that the process was "developed and fine-tuned over

20-plus years in the market." *See* Ex. 20 (*Andiamo* Compl.) at ¶ 22. That TEK (unsuccessfully)

sued over the potential sharing of its "exhaustive search, training, and matching process" undercuts

its argument that Recruiters have discretion over matters over matters of significance because it is a concession that TEK creates the searching and matching processes that are so valuable it sues over their purported disclosure. Accordingly, SOF ¶ 6 is undisputed and should be deemed admitted.

## II.    Recruiters Are Entry-Level Employees Under Close Supervision

7.    TEK's own witnesses and documents describe Recruiters as an "entry-level" position. Ex. 33 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At an entry level role, there are certain competencies that are more likely correlated to performance than others."); Ex. 3 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; Ex. 21 (Andiamo Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 13 (TEK Director of Business Operations Lis Tr. ("Lis Tr.")) 33:22-34:10; Ex. 12 (Pappas Tr.) 91:3-9; Ex. 34 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 at 7 (474 of Recruiters are new graduates, 75 had six months to one year of experience, and 110 of Recruiters had 1-2 years of experience. Therefore, approximately 74% of the 892 Recruiters have less than two years of experience); Ex. 35 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 36 (Maltese Email Feb. 19, 2018) TEK-Recruiter_Lit-00616402; Ex. 37 (Maltese Email July 12, 2021) TEK-Recruiter_Lit-00586352.

**RESPONSE: Disputed. Haycock did not refer to the "Recruiter" role as an "entry-level" position. Haycock testified that TEK sometimes hires recruiters out of college, though he did not know what percentage those hires represent. (Pls. Ex. 3 (Haycock Tr.) 95:21-96:2.) The question was about "recruiters" generally, and not the specific Recruiter job title at issue**

in this litigation. (*Id.*) As Haycock testified, the entry recruiting job at TEK is Recruiter Trainee, not Recruiter, and a Recruiter Trainee cannot move out of their trainee period until they have shown the capability to be a Recruiter. (*Id.*, 104:14-115:6.)

Lis did not refer to the "Recruiter" role as an "entry-level" position. Lis testified to the qualifies that he looks for when hiring. (Pls. Ex. 13 (Lis Tr.) 33:22-34:10.) The question was about "recruiters" generally, and not the specific Recruiter job title at issue in this litigation. (*Id.*)

Pappas did not refer to the "Recruiter" role as an "entry-level" position. Pappas testified to looking for candidates with five years of experience or less. (Pls. Ex. 12 (Pappas Tr.) 91:3-9.) Neither the cited question nor response identifies what role(s) is being discussed. (*Id.*).

The *Andiamo* testimony does not refer to the "Recruiter" role as an "entry-level" position. The cited passage says merely that TEK invests in "hiring, training, coaching and development of individuals that have no recruitment experience," but does not even specify what role this investment may pertain to. (Pls. Ex. 21 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6.)

Plaintiffs' Ex. 33 is an unauthenticated and ambiguous document that does not expressly refer to the "Recruiter" role as an "entry-level" position. (Pls. Ex. 33 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318.)

Plaintiffs' Ex. 34 is an unauthenticated email that does not refer to the "Recruiter" role as an "entry-level" position. The document does state "53% of our hires are new grads." TEK-Recruiter_Lit-00405538. However, the same document also indicates that more than one-quarter had 3 or more years of professional or military experience, in professions such

as Recruiter / Talent Acquisition, Human Resources, Management, Sales / Account Manager / Business Development, or other fields. TEK-Recruiter_Lit-00405542.

Plaintiffs' Ex. 35 is immaterial, as it is dated May 2, 2017 and purports to include data from the preceding four months (outside the relevant time period), includes data related to hiring in both Canada and the United States (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other role or collection of roles.

Plaintiffs' Ex. 36 is immaterial, as it is an unauthenticated and apparently unsent draft email, that purports to include data about "West Coast Hiring" (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other roles or collection of roles.

Plaintiffs' Ex. 37 contradicts their statement, as the document nowhere refers to "Recruiter" as an "entry-level" position. The cited portion explicitly states that people are hired with experience: "At TEKsystems, we aim to find candidates who have demonstrated success in a variety of areas – including a traditional 4-year degree, community college, *the military or 3-4 years in a professional career*." (Emphasis added.)

***PLAINTIFFS' REPLY:*** TEK disputes that some of the testimony and documents cited by Plaintiffs use the exact phrase "entry-level," but does not dispute that they all describe Recruiters as an "entry-level" position.

ECF No. 190-33 explicitly refers to the Recruiter role as "entry level." ECF No. 190-33 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At an entry level role, there are certain competencies that are more likely correlated to performance than others.").

The testimony cited by Plaintiffs all demonstrate that TEK hires Recruiters out of college,

with no recruiting experience, and with under five years of experience. *See* ECF No. 190-3 (Haycock Tr.) 95:21-23, 115:16-21; ECF No. 190-12 (Pappas Tr.) 91:3-9; ECF No. 190-13 (Lis Tr.) 33:22-34:10; ECF No. 190-21 (Andiamo Rule 30(b)(6) Tr.) at 192:24-193:6. The fact that Haycock did not know the percent of recent college graduates hired into the Recruiter role is immaterial, especially where Plaintiffs cited to additional evidence that provides that information. *See* ECF No. 190-34 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."). To the extent that TEK disputes SOF ¶ 7 on the basis that Haycock, Lis, and Pappas testified about recruiters generally as opposed to the "Recruiter" role, TEK has not pointed to any specific testimony or documents in the record to support that contention. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

TEK does not dispute that ECF No. 190-34 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 states that "53% of our hires are new grads." TEK's dispute as to ECF No. 190-34 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405542 is illusory. ECF No. 190-34 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405542 does not indicate that one-quarter of Recruiters had 3 or more years of professional or military experience in professions such as Recruiter/Talent Acquisition, Human Resources, Management, Sales/Account Manager/ Business Development, or **other fields** (which encompasses experience as a waiter, for instance). Rather, it indicates that 17.48% of *offers* made for the Recruiter role were made to individuals with either 3 or more years of experience or military experience. *See id*. ECF No. 190-34 (Tabor Email July 31, 2018) does not include any information as to how many individuals who *accepted* a Recruiter role at TEK had 3 or more years of professional or military experience. *See id*. Thus, ECF No. 190-34 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 supports SOF ¶ 7.

ECF No. 190-35 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738 and ECF No. 190-36 (Maltese Email Feb. 19, 2018) TEK-Recruiter_Lit-00616402 are examples of internal TEK emails referencing the high number of entry level and recent college graduates that TEKsystems traditionally hires. Contrary to TEK's assertions otherwise, neither document falls outside the geographic scope of the litigation because the Recruiters who have opted into the FLSA collective worked for TEK nationwide, including in California. *See* Ex. 154 (Raras Tr) 23:21-24:3 (Raras worked for TEK in California). Moreover, the fact that ECF No. 190-35 (Entry Level/Experienced Hire) includes data from four months before the start of the class period does not render it inadmissible. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (pre- and post-class period evidence is relevant and can "be used to 'confirm what a defendant should have known during the class period'") (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2nd Cir. 2001)).

ECF No. 190-37 (Maltese Email July 12, 2021) TEK-Recruiter_Lit-00586352 does not contradict SOF ¶ 7. ECF No. 190-37 (Maltese Email July 12, 2021) refers explicitly to Recruiters ("To do that, we also need more people – specifically, recruiters."). Further, the fact that ECF No. 190-37 (Maltese Email July 12, 2021) does not contradict SOF ¶ 7 because Maltese asks TEK employees to "broaden the scope of referrals" to include individuals who "have the competencies [TEK] look[s] for: Being Resilient, Drives Results, Interpersonal Savvy, Customer Focus, Nimble Learning and Effective Communication skills and demonstrated a commitment to their craft, whatever that might be. ***It could be your bartender, barista, real estate agent, etc. Someone who has the drive to succeed and is interested in a change***." *Id.* (emphasis added). That some Recruiters had prior work experience in unrelated industries does not contradict the fact that TEK's own witnesses and documents describe Recruiters as an "entry-level" position. Thus, ECF No.

190-37 (Maltese Email July 12, 2021) TEK-Recruiter_Lit-00586352 supports SOF ¶ 7.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra,* Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 7 is undisputed and should be deemed admitted.

8.    TEK hires Recruiters early in their career and it has an average annual Recruiter attrition rate of approximately 38% to 47%. Ex. 5 (Doyle Tr.) 266:23-268:10; *see also* Ex. 21 (Andiamo Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 35 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 38 (Marland Email Feb. 4, 2022) at TEK-Recruiter_Lit-00557691-92 (describing that year-end attrition rate for Recruiters was 45.8%).

**RESPONSE: Immaterial in part, and disputed in part. A purported annual attrition rate is immaterial to the job duties of Recruiters and thus irrelevant to whether the role is properly classified as exempt.**

**Undisputed that some of the people TEK hires to perform recruiting work are early in their career.**

**Disputed as to the inference that all Recruiters are hired early in their respective careers because Plaintiff's citations do not support that assertion. TEK hires people with years of experience to perform recruiting work. (*See* Pls. Ex. 34, noting more than one-quarter of recruiting hires had 3 or more years of professional or military experience, in professions such as Recruiter / Talent Acquisition, Human Resources, Management, Sales / Account Manager / Business Development, or other fields. TEK-Recruiter_Lit-00405542.) (See also Df. Ex. 31, Rothermich Decl. ¶¶ 3, 5, 10 (nearly 20 years' prior experience before**

hire by TEK as a Recruiter Trainee, followed by promotion to Recruiter.).)

Disputed that TEK hires people directly into the Recruiter role. The entry point for recruiting at TEK is Recruiter Trainee, and a Recruiter Trainee cannot move out of their trainee period until they have shown the capability to be a Recruiter. (Pls. Ex. 3 (Haycock Tr.) 104:14-115:6.)

Plaintiffs' citations do not support their assertion regarding attrition rates for Recruiters.

The cited Doyle testimony is offered in response to questions about a specific document that was not included among Plaintiffs' exhibits. (See Ex. 5 (Doyle Tr.) 264:15-267:2, referring to Dyle Dep. Ex. 15 (TEK-Recruiter_Lit-00586687-89).) The document does not state whether the attrition rates provided are limited to "Recruiters" specifically (the only job title at issue in this litigation) or include other recruiting roles generally. (*Id.*) The document also does not state what geographic scope applies to the data, so it is not possible to determine whether it describes a population relevant to the litigation. (*Id.*)

Plaintiffs' Ex. 38 does not support the statement, as document does not state whether the attrition rates provided are limited to "Recruiters" specifically (the only job title at issue in this litigation) or include other recruiting roles generally. (Pls. Ex. 38 (Marland Email Feb. 4, 2022) at TEK-Recruiter_Lit-00557691-92.) The document also does not state what geographic scope applies to the data, so it is not possible to determine whether it describes a population relevant to the litigation. (*Id.*)

Plaintiffs' Ex. 21 does not support the statement, as it does not state that TEK is focused on "hir[ing] Recruiters early in their career" and it says nothing about attrition. The cited passage says merely that TEK invests in "hiring, training, coaching and development

of individuals that have no recruitment experience," but does not even specify what role or roles this investment may pertain to. (Pls. Ex. 21. (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6.)

Plaintiffs' Ex. 35 is immaterial, as it is dated May 2, 2017 and purports to include data from the preceding four months (outside the relevant time period), includes data related to hiring in both Canada and the United States (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other role or collection of roles.

***PLAINTIFFS' REPLY***: TEK does not dispute that it hires Recruiters early in their career. TEK disputes that TEK has an average annual Recruiter attrition rate of approximately 38% to 47%, but it has not pointed to any testimony or documents in the record that is inconsistent with the evidence offered by Plaintiffs in SOF ¶ 8. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

Doyle testified that there is generally around a 40% attrition rate at TEKsystems for Recruiters. ECF No. 190-5 (Doyle Tr.) 267:3-14 (Q. "Do you have an understanding of what the attrition rate is – what the attrition rate was in 2022?" A. "General idea. I think it was around 40 percent, give or take a couple percentage." Q. "And that is generally what the attrition rate is at TEKsystems **for recruiters** –" A. "**Yes**." Q. "—on an annual basis? Go ahead." A. "Yeah. Right – right now, this year through this time we're at 38 to 39 percent –") (emphasis added). Contrary to TEK's assertions otherwise, Doyle did not offer his testimony only in response to a specific document. Doyle's earlier testimony, *id.* 266:23-2, confirmed that the accuracy of a 2019 attrition rate of 47.66% for recruiters that appeared in an email presented to him as a deposition exhibit "[s]ounds right" but his later testimony at 267:4-268:10 was based on his recollection as a

corporate deponent. *See id.* (Doyle Tr.) 266:23-268:10. Regardless, in both contexts, Doyle testified as to the attrition rate of "recruiters," which is the job title at issue in this litigation. *Id.*

Similarly, ECF No. 190-38 (Marland Email Feb. 4, 2022) at TEK-Recruiter_Lit-00557691 states that "the year-end **recruiter** attrition rate was 45% for TEK." (Emphasis added). TEK has not offered any evidence that shows that Doyle's testimony regarding attrition rates or the 45% recruiter attrition rate discussed in ECF No. 190-38 (Marland Email Feb. 4, 2022) at TEK-Recruiter_Lit-00557691 contemplated non-Recruiters or Recruiters who fell outside the geographic scope of the Recruiters in this case. This case includes a nationwide FLSA Collective.

Further, SOF ¶ 8 does not state that *all* Recruiters are hired early in their respective careers. SOF ¶ 8 also does not state that TEK hires people directly into the Recruiter role. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 8.

Rothermitch is an *Avery* class member and not a class or collective member in this case and, as such, her declaration is immaterial. Regardless, Rothermitch took the TEK Recruiter position after being unemployed for 1.5 years. Ex. 138 (Rothermich Decl.) ¶ 9.

Accordingly, SOF ¶ 8 is undisputed and should be deemed admitted.

9.    The average tenure of the Named Plaintiffs and Opt-in Plaintiffs in the Recruiter position at TEK is 1.33 years, and 49% of the Recruiters worked in the position for less than one year and 79% of them worked in the position less than two years. ECF No. 190-19 (Calderon Decl.) ¶¶ 35-36.

**RESPONSE: Immaterial in part, and disputed in part. A purported average tenure is immaterial to the job duties of Recruiters and thus irrelevant to whether the role is properly classified as exempt.**

**Undisputed that the calculations reflected in Pls. Ex. 19 (Calderon Dec.) ¶¶ 35-36 are**

generally replicable.

Disputed that the calculations are meaningful, since the numbers do not reflect time that these same individuals may have similar roles for other companies, time learning Recruiter job duties as a Recruiter Trainee, or time in roles that have different job codes but perform identical job duties to those of Recruiter.

*PLAINTIFFS' REPLY*: TEK does not dispute that the average tenure of the Named Plaintiffs and Opt-in Plaintiffs in the Recruiter position at TEK is 1.33 years, and 49% of the Recruiters worked in the position for less than one year and 79% of them worked in the position less than two years. The short tenure, coupled by the fact that 21 of TEK's 27 deponents were promoted out of the Recruiter role into a higher-level position, *see* SOF ¶ 128 below, is material to the point that the Recruiter position is entry-level. Accordingly, SOF ¶ 9 is undisputed and should be deemed admitted.

10.    TEK has not produced the full employee history of the Rule 23 Class Members. Ex. 19 (Calderon Dec.) ¶ 37.

**RESPONSE: Undisputed.**

*PLAINTIFFS' REPLY*: SOF ¶ 10 is undisputed and should be deemed admitted.

11.    TEK does not require Recruiters to have prior IT knowledge or experience, or any specialized training or education. Ex. 4 (DiBenedetto Tr.) 121:1-7 ("The recruiter is not . . . an individual that has a technical background per se."); Ex. 5 (Doyle Tr.) 59:4-17, 79:16-20 (Q: "… recruiters don't have any prerequisites before they're hired to have any sort of technical knowledge; is that true?" A: "That's correct."), 208:23-210:17; Ex. 3 (Haycock Tr.) 121:12-17; Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313-17 (not requiring IT knowledge or a college degree, under some circumstances); Ex. 14 (Rule 30(b)(6) Deposition of Johnson Tr. ("Johnson

Tr.")) 87:16-88:9; *see also* Ex. 15 (Recruiter Lead Kartchner Tr. ("Kartchner Tr.")) 178:5-15.

**RESPONSE: Disputed in part. Undisputed that prior IT knowledge or experience, or any specialized training or education is not a prerequisite to being hired by TEK.**

**Disputed that TEK Recruiters do not have specialized IT knowledge and have not obtained specialized training or education before being promoted from Recruiter Trainee into the Recruiter role. TEK "provides comprehensive training where individuals learn terminology, job functions and applicable practices within the information technology industry." (Pls. Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313-17.) (*See also* Pls. Ex. 5 (Doyle Tr.) 55:15-58:4 (explaining that Recruiter Trainees are taught about specific skill specializations relevant to the particular specialized area of recruiting they will be engaged in).)**

**Disputed that Plaintiffs' Ex. 14 or 15 support the statement. The former testimony states only that TEK does not require college degrees for recruiters. (See Pls. Ex. 14 (Rule 30(b)(6) Deposition of Johnson Tr. ("Johnson Tr.")) 87:16-88:9.) Steve Jobs and Bill Gates both famously dropped out of college but could be said to possess IT knowledge or experience. The latter testimony includes only the unremarkable observation by a Recruiter Lead that he is not qualified to perform the technical aspects of the roles that he helps clients to fill. (Pls. Ex. 15 (Recruiter Lead Kartchner Tr. ("Kartchner Tr.")) 178:5-15.)**

***PLAINTIFFS' REPLY:*** TEK does not dispute that TEK does not require Recruiters to have prior IT knowledge or experience, or any specialized training or education. TEK's reference to Steve Jobs and Bill Gates has no bearing on whether TEK requires Recruiters to have prior IT knowledge or experience. Accordingly, SOF ¶ 11 is undisputed and should be deemed admitted.

12.    TEK intends for Recruiters to be promoted to AM or Recruiter Lead. Ex. 39 (Career

Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 ("TEKsystems promotes from within. More than 90 percent of current leaders began their careers as recruiters."); Ex. 40 (2019 Recruiter Trainee Compensation Talking Points) at TEK-Recruiter_Lit-00103684 ("After gaining some experience, many of our recruiters choose to pursue a sales career path and move into the role of account manager."); Ex. 41 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045215 ("We offer . . . a promote from within growth model"); Ex. 42 (Sales Trainee Program) at TEK-Recruiter_Lit-00527262 (discussing promotions from Recruiter to Account Manager); Ex. 4 (DiBenedetto Tr.) 27:14-17 (describing his promotion to recruiter lead/retention lead); Ex. 5 (Doyle Tr.) 50:8-14 ("promoting recruiter leads"), 106:12-16; Ex. 8 (Estimada Tr.) 103:17-104:3, 115:8-17, 131:18-23; Ex. 9 (Fronzaglio Tr.) 35:15-22; Ex. 43 (Lieberman Email Oct. 24, 2019) at TEK-Avery-00492062; Ex. 44 (LeBaron Email Feb. 26, 2021) TEK-Recruiter_Lit-00452463 ("Growth potential with various career paths for recruiters and sales professionals").

**RESPONSE: Disputed. Plaintiffs' citations do not support the statement. While the documents identify promotion opportunities, none express that TEK "intends" for Recruiters to move to different roles.**

**Plaintiffs' Ex. 42 directly contradicts Plaintiffs' premise. As the documents explains, a portion of Recruiters have "developed more interest in growing the recruiter career path" rather than transitioning into a sales role like Account Manager, "success in recruiting does not directly correlate to success in sales," and TEK prefer to "focus on developing our recruiter talent due to the current volume of business we have" rather than moving people out of the role. (Df. Ex. 44, at TEK-Recruiter_Lit-00527262.) Rather than looking to current Recruiters as a pool for promotion into sales roles, TEK creates a Sales Trainee Program for people who "were not interested in Recruiting" at TEK. (Df. Ex. 44, at TEK-Recruiter_Lit-**

00527266.)

Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page says only that TEK "promotes from within," but does not state that TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 40 is an unauthenticated document dated April 14, 2014 (outside the relevant time period) titled "Recruiter Trainee Compensation Talking Points." The document states that "many" recruiters later choose to move into a sales role, but does not state that TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 41 is an unauthenticated email dated December 6, 2018 from a Talent Acquisition Specialist (not a relevant role) based in an Arizona office (not a relevant location), to a distribution list of people whose roles and locations are not specified. The document states that TEK offers a "promote from within growth model," but does not state that TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 43 is an unauthenticated email thread dated October 24, 2019 and initiated by someone with the title Technical Recruiting Lead-Infrastructure Optimization Services (not a relevant role) based in a California office (not a relevant location), to a distribution list of people whose roles and locations are not specified. The document states that TEK offers a "promote from within environment," but does not state TEK intends for Recruiters to be promoted to any role.

Plaintiffs' Ex. 44 is an unauthenticated email dated February 26, 2021 and initiated by someone with the title Division Lead/Sr. Account Executive – Government Services (not a relevant role) based in a Utah office (not a relevant location) to an unknown Gmail address.

The document states that TEK offers "Grown potential with various career paths for recruiters and sales professionals," but does not state that TEK intends for Recruiters to be promoted to any role.

The citations in Plaintiffs' Ex. 4 and 5 merely note that the deponents were promoted from Recruiter to other roles based on the deponents' interests. The testimony does not state that TEK intends for Recruiters to be promoted to any role.

The citations in Plaintiffs' Ex. 5 note only that during the period of time when the recruiter lead program began, there was a focus on interviewing, hiring, and promoting recruiter leads. The testimony does not state that TEK intends for Recruiters to be promoted to Recruiter Lead or any other role.

The citations in Plaintiffs' Ex. 8 note that TEK sought to hire a mix of people interested in recruiting and people with aspirations to move into sales. (Pls. Ex. 8 (Estimada Tr.) 115:8-17 ("leaning towards identifying recruiters for the recruiter role" and "recruiters that had aspired to get into sales roles")

***PLAINTIFFS' REPLY:*** TEK has not pointed to any testimony or documents in the record that is inconsistent with the evidence offered by Plaintiffs in SOF ¶ 12 that TEK intends for Recruiters to be promoted. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

ECF No. 190-42 (Sales Trainee Program) at TEK-Recruiter_Lit-00527262 does not contradict SOF ¶ 12. ECF No. 190-42 (Sales Trainee Program) is illustrative of the fact that TEK promotes Recruiters into the Account Manager role and into higher-level recruiting roles, which includes Recruiter Lead roles. ECF No. 190-42 (Sales Trainee Program) at TEK-Recruiter_Lit-00527262 ("A portion of the pipeline of recruiters we would typically lean on has developed more

interest in growing in the recruiter career path" and "[o]verall promotions from recruiter to AM and the pipeline for SRP are down"). That the document also states that TEK relies on promotions from the Recruiter position to the AM position and TEK's desire to create *additional* pathways into sales roles at TEK is irrelevant to SOF ¶ 12. *See id*.

ECF No. 190-39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 ("TEKsystems promotes from within. More than 90 percent of current leaders began their careers as recruiters.") contains a list of roles at TEK that Recruiters may eventually be promoted to, the first three of which are: Account Recruiting Manager, Recruiter Lead, and Account Manager.

TEK's disputes as to Plaintiffs' exhibits from Arizona, California, and Utah as "not relevant locations" is bizarre and should be disregarded because this case includes a nationwide FLSA Collective *and* two *Named Plaintiffs* Alexandra Maher and Austin Sherman both worked for TEK in Utah. *See* Ex. 151 (Plaintiff Lynda Alexandra Maher Tr. ("Maher Tr.")) 9:3-6 (worked for TEK in Utah); Ex. 157 (Plaintiff Austin Sherman Tr. ("Sherman Tr.")) 13:5-7 (worked for TEK in Utah and Hawaii); *see also* Ex. 143 (Opt-in Plaintiff Brandy Baker Tr. ("Baker Tr.")) 67:6-10 (worked for TEK in Arizona); Ex. 154 (Raras Tr.) 23:21-24:3 (worked for TEK in California).

Notably, 22 of TEK's 28 declarants were promoted out of the Recruiter position into higher level positions. ECF No. 203-12 (Mosquera Decl.) ¶ 4 (former Recruiting Lead and promoted to Recruiter-10); ECF No. 203-13 (Fink Decl.) ¶ 4 (promoted to Recruiting Lead); ECF No. 203-14 (Edds Decl.) ¶ 4 (promoted to Specialization Lead); ECF No. 203-15 (Rice Decl.) ¶ 5 (promoted to Account Manager); ECF No. 203-16 (Bohen Decl.) ¶ 4 (promoted to Team Lead); ECF No. 203-17 (Chong Decl.) ¶ 6 (promoted to Specialization Lead); ECF No. 203-19 (Payonk Decl.) ¶ 4 (promoted to Specialization Lead); ECF No. 203-20 (Marshall Decl.) ¶¶ 6-7 (promoted to Recruiting Lead and then internal recruiter); ECF No. 203-21 (Fronzaglio Decl.) ¶ 4 (promoted to

Recruiting Lead);   ECF No. 203-22 (Fahey Decl.) ¶ 2 (promoted to Director of Business Operations); ECF No. 203-23 (Pagano Decl.) ¶ 2 (promoted to Director of Business Operations); ECF No. 203-24 (Walther Decl.) ¶ 2 (promoted to Executive Director); ECF No. 203-25 (Guffy Decl.) ¶¶ 5-6 (promoted from Recruiter to Recruiter Lead and then to Team Lead – Delivery); ECF No. 203-26 (Mendez Decl.) ¶ 5 (promoted from Recruiter to Recruiter Lead); ECF No. 203-27 (Compton Decl.) ¶¶ 11, 29 (promoted from Recruiter to Recruiter Lead); ECF No. 203-28 (Boland Decl.) ¶¶ 3-5 (promoted from Recruiter to retention Program Lead then to Account Manager then to Account Manager Recruiting Lead and then to Division Lead); ECF No. 203-29 (McCarty Decl.) ¶¶ 24, 25 (promoted from Recruiter to Recruiter Lead and then to Specialization Lead); ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 7, 26, 27 (promoted from Recruiter to Recruiter Lead and then to Team Lead); ECF No. 203-34 (Kehl Decl.) ¶¶ 4, 16 (promoted from Recruiter to Recruiter Lead and then to Team Lead Delivery II); ECF No. 203-36  (Ferrari Dec.) (promoted to senior Specialized Recruiter); Ex. 127 (Ferrari LinkedIn Profile) (promoted to Data Center & Infrastructure Solutions Manager); ECF No. 203-38 (Stryker Decl.) ¶¶ 10, 26-27 (promoted from Recruiter to Account Manager and then to Recruiting Lead and Delivery Manager).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 12 is undisputed and should be deemed admitted.

13.    Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team. Ex. 3 (Haycock Tr.) 103:6-104:1, 21:13-22:16; Ex. 45 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 7.

**RESPONSE: Disputed in part. "Talent delivery" refers to "all operations and responsibilities for our recruiting operations and all of our recruiters." (Pls. Ex. 3 (Haycock**

Tr.) 21:13-22:16.) However, the structure has not been the same over the entire period relevant to the litigation. Plaintiffs' Ex. 45 is a presentation dated November 6, 2020. (Pls. Ex. 45 (Big Rock 2 Evolve Delivery) TEK-Recruiter_Lit-00127891 at 1.) The presentation described a desired future state for TEK when it would have "a unified delivery organization that drives exceptional results for clients while creating a differentiated experience for consultants." (*Id.* at 5; *see also id.* at 8 (comparing "Current State" to "Future State" and at 10 (describing an "Evolution Timeline" extending years into the future).)

**PLAINTIFFS' REPLY**: TEK does not dispute that Recruiters are "unified" under "one structure" as part of TEK's "talent delivery" team. Haycock testified that "talent delivery" "describes all operations and responsibilities for our recruiting operations ***and all of our recruiters***." ECF No. 190-3 (Haycock Tr.) 21:13-22:16 (emphasis added). TEK's remaining "dispute" is irrelevant to SOF ¶ 13. Accordingly, SOF ¶ 13 is undisputed and should be deemed admitted.

14.    TEK employs people in 46 different recruiting job titles. Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.

**RESPONSE**: Disputed. Plaintiffs rely on a vague and ambiguous interrogatory seeking a list of "all job titles Defendant used to refer to individuals who worked for Defendant in recruiting job positions, and/or all job titles Defendant used to refer to employees to whom information is provided regarding specific credential and qualifications required of a candidate and who would identify potential candidates who meet the requirements for an open position." (Pls. Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.) The time period covered by the interrogatory spanned April 9, 2015 to the present. (*Id.*, General Objection No. 3.) In response, TEK provided a list of all job titles it included in the

**list used to send notice of the collective action. (Id., Def.'s Resp. No. 2.) Many of those roles only were in use for a portion of the period covered by this litigation, are not currently in use, and have not been in use for years. (Df. Ex. 62, Johnson 2 Tr. 24:8-26:12, 36:11-37:7, 39:17-41:2, 49:12-24.)**

*PLAINTIFFS' REPLY:* TEK does not dispute that it has employed individuals in 46 job titles who, as part of their duties, "would identify potential candidates who meet the requirements of an open position." *See* ECF No. 190-1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2. TEK does not dispute that individuals employed in job titles who, as part of their duties, "would identify potential candidates who meet the requirements of an open position" are in recruiting roles. *See id.*

TEK disputes that it has employed individuals in the 46 job titles during the relevant class and collective periods of this litigation, but TEK has not pointed to specific any testimony or documents in the record that would show that any of the 46 job titles were not in use during the class and collective periods. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). TEK's cite to the Johnson II testimony is inapposite because Johnson testified that "I do not have a good grasp on the dates the different titles were, stopped being used and new titles were starting to be used." *See* ECF No. 203-62 (Johnson II Tr.) 24:8-26:12.

Accordingly, SOF ¶ 14 is undisputed and should be deemed admitted.

15.    These job titles include the senior and supervisory level recruiting positions. *Id.*

**RESPONSE: Undisputed. Some of the job titles refer to senior and supervisory level positions in use at some time during the relevant period.**

*PLAINTIFFS' REPLY:* SOF ¶ 15 is undisputed and should be deemed admitted.

16.    With the exception of Recruiter Trainees, all of TEK's recruiting job titles are classified as exempt. *Id.*, No. 3.

**RESPONSE: Disputed in part. Undisputed that of the job titles listed in Defendant's Response to Plaintiffs' First Set of Interrogatories, No. 2, all but the Recruiter Trainee position were classified as exempt.**

**Disputed insofar as the phrase "recruiting job titles" used in the statement is vague and ambiguous and is not the same phrasing that Plaintiffs included in the interrogatory or that TEK included in its response. See Response to Statement 14.**

***PLAINTIFFS' REPLY:*** TEK does not dispute that, with the exception of Recruiter Trainee, all TEK's job titles listed in its Response to Plaintiffs' First Set of Interrogatories, No. 2 are classified as exempt positions. TEK also does not dispute that it has employed individuals in 46 job titles who, as part of their duties, "would identify potential candidates who meet the requirements of an open position." *See* ECF No. 190-1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2. TEK does not dispute that individuals employed in job titles who, as part of their duties, "would identify potential candidates who meet the requirements of an open position" are in recruiting roles. *See id.*

In its Response to SOF ¶ 15, TEK disputes that it has employed individuals in the 46 job titles during the relevant class and collective periods of this litigation, but TEK has not pointed to specific any testimony or documents in the record that would show that any of the 46 job titles were not in use during the class and collective periods. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). TEK's cite to the Johnson II testimony is inapposite because Johnson testified that "I do not have a good grasp on the dates the different titles were, stopped being used and new titles were starting to be used."

*See* ECF No. 203-62 (Johnson II Tr.) 24:8-26:12.

Accordingly, SOF ¶ 16 is undisputed and should be deemed admitted.

17.    TEK employs multiple layers of supervisors for Recruiters – Director of Business Operations ("DBOs"), Director of Regional Operations, Delivery Managers, Team Leads, Specialization Leads, and Recruiter Leads – who closely supervise Recruiters. Ex. 3 (Haycock Tr.) 65:14-18; Ex. 5 (Doyle Tr.) 78:3-12, 101:2-102:20, 255:3-256:8 (DROs monitor the Recruiters on a region-wide basis), 275:2-5; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 (identifying leaders above "Recruiter"); Ex. 46 (Lighthouse Recruiter Lead PowerPoint) TEK-Recruiter Lit-00125482 (describing supervisory tasks performed by Recruiter Leads); Ex. 7 (McNelley Tr.) 62:21-63:6; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132-33; Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691-92; Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274-75; Ex. 50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552029-30; Ex. 51 (Talent Delivery) TEK-Thomas-00000214 at 4-5.

**RESPONSE: Disputed. Many Recruiters testify that they are not closely supervised in the performance of their work. (Df. Ex. 6, collecting statements that Recruiters do not work under close supervision by Account Managers, Recruiter Leads, or DBOs.) Many Account Managers, Recruiter Leads, and DBOs testify that they do not closely supervise the work of Recruiters. (*Id.*)**

**Plaintiffs' citations do not support the statement either.**

**The cited Haycock testimony says only that TEK's Director of Business Operations report to Regional Vice Presidents. (Pls. Recruiters. Ex. 3 (Haycock Tr.) 65:14-18.) The testimony says nothing about supervision of Recruiters.**

The cited Doyle testimony says only that Recruiters doing staffing for global services work receive assignments based on their area of specialization, and those assignments will vary based on the size of the team to come from either a Delivery manager, Delivery Director, or Team Lead. (Pls. Ex. 5 (Doyle Tr.) 78:3-12, 101:2-102:20.) Doyle also testified that when he was Director of Regional Operations he "would look at" how Recruiters and salespeople in the Region were performing, since people struggling are "high attrition risks." (*Id.*, 255:3-256:8.) The testimony says nothing about supervision of Recruiters, much less that they are "closely supervised."

Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page does not identify "leaders above 'Recruiter,'" as Plaintiffs represent, but rather presents a list of different opportunities within a Region, not all of which are even in the same reporting structures as Recruiters. (Pls. Ex. 39 at TEK-Recruiter_Lit-00386849.) The document says nothing about supervision of Recruiters. (*Id.*)

Plaintiffs' Ex. 46 is an unauthenticated June 1, 2018 email with an attached presentation from a pilot program to "train the trainer" as it relates to Recruiter Leads. (Pl. Ex. 46 (Lighthouse Recruiter Lead PowerPoint).) Plaintiffs have highlighted a short list of general "Responsibilities," such as "Recruiter Leads are RESPONSIBLE for their Pod member's – success, growth and development," help with "onboarding and training of new Pod members," help to "Create a strategy for tenured Pod members," and assist with "Goals setting." (*Id.*, slide page 10.) None of the highlighted statements suggest "close supervision" of Recruiters. (*Id.*)

In the cited testimony of McNelley, she agrees with the statement that she

"monitor[ed] the productivity of producers" as a Director of Business Operations and Executive Director of Business Operations. (Pls. Ex. 7 (McNelley Tr.) 62:21-63:6.) McNelley explained that her definition of "producers" includes Account Managers, Recruiters, Recruiter Leads, Account Leads, Business Development Managers, and Division Leads. (Df. Ex. 64, McNelly Tr. 61:9-18; *see also* TEK's Response to Statement 26 and the general meaning of "producers."). McNelley also explained what she meant by "monitor" – "making sure that we've got high engagement and making sure that we've got clarity of expectation so that they know what it means to be a successful producer on our team." (Df. Ex. 64, McNelly Tr. 61:23-62:8, 62:21-63:3.)

Plaintiffs' Ex. 47-50 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite passages within the documents that describe various roles, including Account Manager, Director of Business Operations, Recruiter, and Regional Vice President. (*Id.*) None of the roles are described as "closely supervising" Recruiters. (*Id.*)

Plaintiffs' Ex. 51 is an unauthenticated organizational chart. The document says nothing about supervision of Recruiters. (*Id.*)

***PLAINTIFFS' REPLY:*** TEK fails to articulate why the testimony and evidence cited by Plaintiffs does not support SOF ¶ 17. Haycock testified that TEK employs Account Managers, Account Recruiting Manager Leads, Recruiter Leads, Specialization Leads, Team Leads, and PDMs, with most of the supervisory employees currently in Specialization Lead roles. ECF No. 190-3 (Haycock Tr.) 65:14-67-14. Contrary to TEK's contention otherwise, Haycock's testimony at 65:14-18 does not discuss Directors of Business Operations reporting to Regional Vice Presidents. *See id.*, 65:14-18 (A. "Yes. And today we have the roles that I mentioned in previous

testimony relative to – we have some RLs left. Most of our supervisory roles are SLs, specialization leads. And then we have team leads and PDMs as I mentioned before.").

Doyle testified that Recruiters often report directly to Recruiter Leads, who in turn report to Delivery Managers. ECF No. 190-5 (Doyle Tr.) 275:2-5. Delivery Managers then report to Directors of Business Operations. Doyle also testified that Delivery Managers, Delivery Directors, and Team Leads allocate recruiting assignments to Recruiters because individuals employed in those roles have the best knowledge of Recruiters' availability and experience recruiting for specific types of roles. *Id.* at 78:3-12, 101:2-102:20. That Delivery Managers, Delivery Directors, and Team Leads possess this information about specific Recruiters indicates that they closely supervise Recruiters. *See id.* Doyle further testified that Directors of Regional Operations monitor reports of Recruiters' activities and spread attainment, and work closely with Delivery Managers when Recruiters on their teams are underperforming. *Id.* at 255:3-256:8. This kind of monitoring also indicates close supervision of Recruiters. *See id.*

Similarly, DiBenedetto testified that Specialization Leads, Division Leads, Directors of Delivery, and Directors of Business Operations are all leaders of Recruiters. ECF No. 190-4 (DiBenedetto Tr.) 63:6-10.

ECF No. 190-46 (Lighthouse Recruiter Lead PowerPoint) TEK-Recruiter Lit-00125482 is a PowerPoint presentation that includes a list of Recruiter Lead responsibilities, including goal setting with Recruiters, onboarding and training new Recruiters, and making sure Recruiters "clearly understand their job." ECF No. 190-46 (Lighthouse Recruiter Lead PowerPoint) TEK-Recruiter Lit-00125482 at 18. In this document, TEK explains that Recruiter Leads can accomplish this by "[a]ctively leading and developing [Recruiters] on a daily basis utilizing a systematic training process, the DBC and the Staffing Quality process." *Id.* at 20. Testimony by Recruiter

Lead Adam Kartchner also confirms that Recruiter Leads closely supervise Recruiters, and they do so in conjunction with Team Leads, Directors of Business Operations, and other supervisory employees. *See* Ex. 165 (Kartchner Tr.) 26:9-10 (Q. "So do you supervise recruiters?" A. "Yes."), 164:15-18 (Q. "Do you do a one-on-one for each recruiter you supervise when you're supervising more than one recruiter?" A. "Yeah."), 27:19-28:1, 88:19-89:5 (Kartchner communicated with Team Lead and Director of Business Operations when Recruiters are not hitting their metrics).

ECF No. 190-39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386849 includes a list of leadership positions that are considered above Recruiters within TEK's reporting structure. *See id.* (identifying leaders above "Recruiter") (explaining that "[m]ore than 90 percent of current leaders began their careers at recruiters."). The list of positions includes Recruiter Leads, Delivery Managers, and Directors of Business Operations. *Id.* TEK's managers also describe this supervision structure. *See, e.g.,* Ex. 161 (Estimada Tr.) 145:14-23 (A. "And although Ms. Mita was not his direct supervisor, as a recruiter lead, they have synonymous functions as an account manager in teaching a recruiter the functions of the job since our account managers had previously been in recruiting roles themselves and had excelled to the point where they were interested in additional job opportunities with the company. So I trusted that between our account managers and our recruiter leads, they were able to teach the right behaviors of the job."), 155:10-24 (Q. "You mentioned that you would sometimes sit in the pit. Was that accurate?" A. "Yes." Q. "What was the purpose of that?" A. "To help support individuals that needed my presence, if they had questions or explanations. Being in a sales manager role meant that I had very little bandwidth between managing the office as a whole and managing individual employees with what they needed in order to achieve their goals and seek success within the company. And so I was told that the more I could make myself available rather than close my office door, the better access people

had to me and ability to quickly resolve any issues they had.").

TEK's reliance on ECF No. 203-6 is improper because they are summary argumentative compilations of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra* Plaintiffs' General Objections ¶ 4. Regardless, of the 22 paragraphs included in TEK's ECF No. 203-6, 18 paragraphs address Recruiters' relationship with Account Managers, and not Recruiter Leads or Specialized Leads. That is, the declaration citations are silent on the level of supervision Recruiters received from Recruiter Leads and Specialized Leads and do not contradict Plaintiffs' evidence. TEK's ECF No. 203-6 also makes clear that, while Account Managers may opt to follow Recruiters' recommendations about things like which candidate to present to a hiring manager, the ultimate authority still rests with Account Managers. *See, e.g.*, ECF No. 203-6 at Fink. Decl., ¶ 26 ("AMs *usually* took my recommendations about which candidates to present to our clients") (emphasis added), at McCarty Decl., ¶ 14 ("Because I have been in my role for two years and have been successful, I do not get *much* pushback on my candidates from the Account Manager") (emphasis added), at Compton Decl., ¶ 21 ("Account Managers I have worked with in the past take my recommendations *more often than not*") (emphasis added). The remaining four paragraphs support, rather than contradict SOF ¶ 17. Fink, Chong, and Paycock are all current or former Specialization Leads. *See id*. All three admit that they routinely meet with Recruiters in their "pods" to monitor Recruiters' activities, demonstrate recruiting strategies, and discuss methods for success. *See* ECF No. 203-6 at Fink Decl., ¶ 31, Chong Decl., ¶ 16, Payonk Decl., ¶ 24. Pagano admits that he had supervisory responsibilities as to Recruiters through 2023. *See id*. at Pagano Decl., ¶ 11.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless.

*See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 17 is undisputed and should be deemed admitted.

18.     Recruiters and their supervisors attend daily Red Zone meetings where Recruiters receive work assignments and report on their work activities they performed the prior day. Ex. 4 (DiBenedetto Tr.) 136:17-137:16; Ex. 5 (Doyle Tr.) 123:25-124:8, 238:16-246:4 ; Ex. 10 (Hollister Tr.) 98:4-99:1; Ex. 12 (Pappas Tr.) 51:16-21, 53:15-23; Ex. 52 (Running an Effective Red Zone) TEK-Recruiter_Lit-00665469; Ex. 53 (Ligouri Oct. 31, 2018 Email) TEK-Recruiter_Lit-00111237 (memorializing Red Zone assignments); Ex. 54 (DBO Operations: Red Zone) TEK-Recruiter_Lit-00426755; Ex. 55 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408136 ("Red Zone (RZ): An office meeting to *determine the priority of each requirement and Recruiter allocation.*") (emphasis added); Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399695 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489276 (same); Ex. 50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552033 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005767 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133190 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425013 (same); Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450707 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508986 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545027 (same); Ex. 62 (Kawabata Email Apr. 30, 2018) TEK-Thomas-00466253.

**RESPONSE: Disputed in part. Undisputed that Recruiters and others attend Red Zone Meetings.**

**Disputed that Recruiters attend Red Zone meetings daily, attend Red Zone meetings**

with their "supervisors," attend Red Zone meetings for the purpose of "receiv[ing] work assignments" or to "report on their work activities they performed the prior day." (Df. Ex. 17, Chong Decl., ¶ 16 (Red Zones are "time to further share information, strategies and takeaways for success and efficiency, and to collaborate on how to excel in the Recruiter role"); Df. Ex. 23, Pagano Decl., ¶ 5 (when he ran Red Zones, he would prioritize the best requirements, have Account Managers speak about the requirements, then open it up for Recruiters to volunteer to work on requirements they thought they could fill); Df. Ex. 15, Rice Decl., ¶ 9 (when working as a Recruiter, Red Zone meetings were collaborative, and Recruiters vocalized what they wanted to work on; as an Account Manager, she joints Recruiters at Red Zone meetings only twice per week); Df. Ex. 12, Mosquera Decl., ¶ 11 (attends Red Zone meetings to learn what requirements are available, volunteers for requirements he thinks he can fill if he is not already working on one); Df. Ex. 18, Warren Decl., ¶ 13 (Red Zones are a "meeting to exchange information, agree which business should be the highest priority to work on, and develop and share sourcing strategies. These are very collaborative meetings."), ¶ 14 (has the freedom to work on whatever requirements he chooses and will volunteer for a requirement at Red Zone if he thinks he can fill it).)

The cited testimony by Doyle is that there are different types of Red Zones that vary by Recruiter, and could include an office-specific meeting, a vertical (industry) specific meeting, or a specialized skill set meeting, and the size of the meetings could range from 10 to well over 100 people. (Pls. Ex. 5 (Doyle Tr.) 238:16-246:4.)

DiBenedetto's testimony is that Red Zones are morning meetings, where there is discussion about whether candidates have been identified to fill open requirements, identify new requirements, and set the precedence for what Recruiters will be working on (Pls. Ex. 4

Plaintiffs' Ex. 4 (DiBenedetto Tr.) 136:17-137:16.) A Recruiter may get an assignment if they are not already working on a requirement. (*Id.*)

Pappas testified that at Red Zones "recruiters and account managers would be present as well to chat through both their business updates from the client-facing side as well as the candidates in the pipeline and where they were at in their process." (Df. Ex. 66, Pappas Tr. 52:20-24.)

Plaintiffs' Ex. 52 is a document that merely explains ways to approach running a Red Zone, with common sense suggestions like "prioritize business vs. treating all reqs the same" and "Resources should be assigned to the most fillable reqs." (Pls. Ex. 52 (Running an Effective Red Zone) TEK-Recruiter_Lit-00665469.) The document does not mention assigning work to Recruiters or having Recruiters report on their work activities from the prior day.

Plaintiffs' Ex. 53 is an unauthenticated email dated October 31, 2018, sent by a Talent Acquisition Specialist – West Region. (Pls. Ex. 53 (Ligouri Oct. 31, 2018 Email) TEK-Recruiter_Lit-00111237.) Plaintiffs describe it as "memorializing Red Zone assignments," but this appears to be inaccurate. Talent Acquisition is part of TEK's human resources function that focuses on recruiting and hiring people to work directly for TEK as recruiters, account managers, and more. (Df. Ex. 62, Johnson 2 Tr., 30:4-31:16.) The email content refers to three recruiter hires made the prior week and committing to two hires during the week of the email. (Pls. Ex. 53 (Ligouri Oct. 31, 2018 Email) TEK-Recruiter_Lit-00111237.) It says nothing about Recruiters receiving work assignments and reporting on their work activities they performed the prior day. (*Id.*)

Plaintiffs' Ex. 54 is an unauthenticated document that appears to include a self-

assessment that DBOs can complete about Red Zones. (Pls. Ex. 54 (DBO Operations: Red Zone) TEK-Recruiter_Lit-00426755.) The document says nothing about Recruiters receiving work assignments and reporting on their work activities they performed the prior day. (*Id.*).

Plaintiffs' Ex. 55 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 55 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.) It includes common sense points, such as a reminder to "prioritize business" and assign Recruiters to "the most 'fillable' requirements." (*Id.*).

Plaintiffs' Ex. 47-50 and 56-61 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite pages within the documents that describe various "General Terms," including Red Zones, which are described as "An office meeting to determine the priority of each requirement and Recruiter allocation." (*Id.*) The documents do not say that Recruiters receive work assignments and report on their work activities they performed the prior day.

*__PLAINTIFFS' REPLY__*: TEK does not dispute that Recruiters attend Red Zone meetings. TEK disputes that Recruiters attend Red Zone meetings on a daily basis. But, even TEK's declarants agree that Red Zone meetings are held on a daily basis. ECF No. 203-13 (Fink Decl.) ¶ 33 ("The day usually started with a Red Zone meeting"); ECF No. 203-17 (Chong Decl.) ¶ 15 ("Throughout the time I was a Recruiter, I began each day with a virtual office 'Red Zone Meeting' at 8:00 a.m. to talk about business, share information, and ensure, as a group, that our goals for the day were aligned."), ¶ 37 ("[I]n my role as a Specialization Lead II, I still attend a virtual 'Red Zone Meeting.' AMs and Recruiters both attend the meetings on Mondays, Wednesdays, and Fridays, but Tuesdays and Thursdays are attended by Recruiters only."); ECF No. 203-15 (Rice Decl.) ¶ 9 ("When I was a Recruiter, daily 'Red Zone Meetings' were held at 8:30 a.m."); ECF No.

203-18 (Warren Decl.) ¶ 13 ("Around 9:00 a.m., I attend a 'Red Zone Meeting'").

TEK also disputes that Recruiters attend Red Zone meetings with their supervisors. As Plaintiffs' established in SOF ¶ 17 and their Reply in support of SOF ¶ 17, Directors of Business Operations, Delivery Managers, Team Leads, Specialization Leads, and Recruiter Leads are all involved in closely supervising Recruiters. TEK's declarants demonstrate that these supervisory employees attend, and often lead, Red Zone meetings. *See* ECF No. 203-17 (Chong Decl.) ¶¶ 15-16 (Chong, a Specialization Lead, attends Red Zones, which are usually run by Directors of Business Operations or Delivery Managers); ECF No. 203-18 (Warren Decl.) ¶ 14 (explaining that Recruiter Leads will ask him to work on reqs during Red Zone meetings); ECF No. 203-32 (Yancey Decl.) ¶ 10 (Yancey attends Red Zone meetings ran by her Director of Business Operations).

TEK further disputes that Recruiters are assigned work during Red Zone meetings and argues that they only "may" get assignments or volunteer for assignments at Red Zones meetings. This is a distinction without merit. Further, TEK's Declarant Nathan Warren confirmed that Recruiters receive work assignments during Red Zone meetings. ECF No. 203-18 (Warren Decl.) ¶ 14 (explaining that while he is allowed to volunteer to work on specific requisitions that interest him, Recruiter Leads also ask him to work on requisitions during Red Zone meetings). TEK's "Welcome Packets" cited by Plaintiffs also demonstrate that Recruiters are assigned job requisitions during Red Zone meetings. ECF No. 190-47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408136 ("Red Zone (RZ): An office meeting to *determine the priority of each requirement and Recruiter allocation.*") (emphasis added); ECF No. 190-48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399695 (same); ECF No. 190-49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489276 (same); ECF No. 190-50 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552033 (same); ECF No. 190-56 (Stamford Welcome Packet) at TEK-

Recruiter_Lit-00005767 (same); ECF No. 190-57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133190 (same); ECF No. 190-58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425013 (same); ECF No. 190-59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450707 (same); ECF No. 190-60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508986 (same); ECF No. 190-61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545027 (same); ECF No. 190-62 (Kawabata Email Apr. 30, 2018) TEK-Thomas-00466253.

Finally, TEK disputes that Recruiters report on their work activities they performed the prior day during Red Zone meetings. However, TEK's declarants support the evidence submitted by Plaintiffs that Recruiters reported on their work activities at the Red Zone meetings. *See* ECF No. 203-17 (Chong Decl.) ¶ 15 (Recruiters "share information about requirements they are working on" and "suggest ideas about how to fill requirements" during Red Zone meetings); ECF No. 203-13 (Fink Decl.) ¶ 14 (Red Zone meetings include discussions on "the status of work on reqs that were opened earlier.").

ECF No. 190-55 (Digital REDZONE Script) TEK-Recruiter Lit-00004325 has metadata, which TEK produced, that indicates it was dated August 12, 2021. *See* Ex. 169 at 2 (TEK-Recruiter_Lit-001).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra* Plaintiffs General Objections ¶ 3.

Accordingly, SOF ¶ 18 is undisputed and should be deemed admitted.

19.     Recruiters' managers monitor Recruiters' performance through weekly reports to their quota attainment and performance metrics. Ex. 5 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead . . . [and contains] certain key

performance indicators"), 44:2-18, 84:1-14, 91:21-92:2, 94:17-20, 255:3-256:8; Ex. 3 (Haycock Tr.) 158:2-14; Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("Using the weekly report, a Lead should be able to identify which activities a recruiter needs to focus on."); Ex. 63 (WIN narratives) TEK-Recruiter_Lit-00392430.

**RESPONSE**: **Disputed. Plaintiffs' citations do not support the statement.**

**The word "quota" does not appear in any of the citations provided by Plaintiffs.**

**Haycock testified that a WIN report is "a weekly report that a recruiter gets that gives them an understanding of what happened the week before and how that – how they rank against others in the same kinds of activities." (Pls. Ex. 3 (Haycock Tr.) 158:2-14.) The testimony does not mention anyone else receiving WIN reports, and the word "quota" does not appear. (*Id.*).**

**Doyle testified that a WIN report is a natural language, AI created weekly report to a Recruiter and their lead that is "designed to be a coaching tool" that a recruiter case use to become more successful over time. (Pls. Ex. 5 (Doyle Tr.) 112:6-113:24.)**

**Plaintiffs' Ex. 63 is simply an email exchange with sample narratives that might be included in WIN reports. (Pls. Ex. 63 (WIN narratives).)**

**Plaintiffs cite to testimony by Doyle regarding his time working in for TEK in Las Vegas, Nevada as a Sales Manager. (Pls. Ex. 5 (Doyle Tr.) 44:2-18.) This was from 2009 until 2011 or 2012, which is not in the relevant time period. (Df. Ex. 53, Doyle Tr. 43:11-14, 45:6-17.)**

**Plaintiffs cite to testimony by Doyle regarding the role of DBOs in California offices from 2018-2021; he explained that DBOs "weren't really tied to the success of the recruiters." (Pls. Ex. 5 (Doyle Tr.) 84:1-14.)**

**Doyle testified that there are differences among Recruiters in how much coaching and development they receive. (Pls. Ex. 5 (Doyle Tr.) 91:21-92:2, 94:17-20, 255:3-256:8.) Recruiters above the "growth line" – a function of tenure and spread – are "thriving," "highly successful," and "attrition is extraordinarily low" among this group, so they receive less coaching. (*Id.*) Recruiters below the "performance management line" – also a function of tenure and spread – "just aren't feeling successful. They're not making money. They're a high risk to leave." This group "need[s] more coaching, they need more development, they need more push" to present their attrition. (*Id.*) In the middle of the two lines are people who are "doing okay. They're doing fine," and they don't attrit at high rates. (*Id.*)**

**Plaintiffs' Ex. 28 is an unauthenticated Recruiter Excellence – Scorecard Coaching Guide. (Pls. Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide).) The document simply describes how the information in the Scorecard can be used by a Recruiter and their coach to understand how their activities at work impact their success. (*Id.*)**

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters' managers monitor Recruiters' performance through weekly reports of key performance indicators ("KPIs"). *See. e.g.,* ECF No. 190-5 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead . . . [and contains] certain key performance indicators"). TEK quibbles with the word "quota." However, it does not substantively dispute that TEK expects Recruiters to meet certain key performance indicators that are numerically measured.

ECF No. 190-63 (WIN narratives) states that WIN Reports include "minimum start and activity reporting" and explains that "[b]ecause the reports are dynamic, the narratives only discuss minimum start goals if a recruiter has not met them." ECF No. 190-63 (WIN narratives) at TEK-Recruiter_Lit-00392430. In other words, WIN Reports include information about whether

Recruiters are meeting their quota for starts. *See id.*; *see also* ECF No. 190-63 (WIN narratives) at TEK-Recruiter_Lit-00392435 ("You were below your minimum start expectation last quarter.").

ECF No. 190-28 (Recruiter Excellence – Scorecard Coaching Guide) further demonstrates that Recruiters' managers monitor their performance through weekly reports to their quota attainment and performance metrics because it breaks down the activities that Recruiters must perform to maintain at least 25 points to meet performance expectations. *See* ECF No. 190-28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226. The 25 points that Recruiters are expected to achieve come from completing G2s, reference checks, submittals, client interviews, and starts. *See id*. Thus, Recruiters must meet activity quotas to meet performance expectations. *Id.*

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 19 is undisputed and should be deemed admitted.

20.    Corporate officers also monitor Recruiters' quota compliance and spread (profit) attainment. Ex. 3 (Haycock Tr.) 70:13-71:22; Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161741-65; Ex. 65 (Haycock Jan. 25, 2018 Email) TEK-Recruiter_Lit-00253346.

**RESPONSE: Disputed.**

**Plaintiffs' citations do not support the statement.**

**The cited Haycock testimony states only that a small group of executives receive a "dashboard" to "provide a snapshot on the various operations of the business." (Pls. Ex. 3 (Haycock Tr.) 70:13-71:22.) The words "quota" and "spread" do not appear in the testimony. (*Id.*)**

**Plaintiffs' Ex. 64 is an example of one of those "dashboards." (Pls. Ex. 64.) The pages**

cited by Plaintiffs reflect aggregated spread numbers and high level trends across Recruiter populations, not "monitoring" individual Recruiters. (*Id*.) The word "quota" does not appear.

Plaintiffs' Ex. 65 is an email from Haycock sent on January 25, 2018 (outside the relevant time period) that shares some information about data about workforce planning. (Pls. Ex. 65 (Haycock Jan. 25, 2018 Email).) As Haycock explains in the email, the purpose of sharing the information is to "[u]understand and get ahead of our 'at risk' population" in order to prevent attrition. (*Id*., TEK-Recruiter_Lit-00253346.) The words "quota" and "spread" do not appear in the document. (*Id*.)

*PLAINTIFFS' REPLY:* TEK does not dispute that corporate officers receive an executive dashboard that "provide[s] the executives a snapshot of the various operations of the business." *See* ECF No. 190-3 (Haycock Tr.) 70:13-71:19. TEK admits that ECF No. 190-64 (Executive Dashboard) at TEK-Recruiter_Lit-00161741-65 is an example of an executive dashboard used by TEK's corporate officers. ECF No. 190-64 (Executive Dashboard) reports on "Producer Activity Trends YTD – Recruiter, TEK-Recruiter_Lit-00161755, including among other things, Recruiters' G2 intakes, TEK-Recruiter_Lit-00161756, meetings and "total activities," TEK-Recruiter_Lit-00161760-61, spread and number of starts. ECF No. 190-64 (Executive Dashboard) at TEK-Recruiter_Lit-0061762. As discussed above in Plaintiffs' Reply in support of SOF ¶ 19, these are one of the quotas that TEK monitors. *See* ECF No. 190-28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226; ECF No. 190-63 (WIN narratives) at TEK-Recruiter_Lit-00392435 ("You were below your minimum start expectation last quarter."). Moreover, contrary to TEK's assertion otherwise, Haycock's testimony confirms that "spread" is one of the metrics TEK's corporate officers monitor through weekly executive dashboards. *See*

ECF No. 190-3 (Haycock Tr.) 72:14-73:18. Additionally, Plaintiffs' Reply in support of SOF ¶ 70 provides further support for SOF ¶ 20 and Plaintiffs' use of the word "quota."

TEK disputes that the corporate officers are monitoring individual Recruiters. SOF ¶ 20 does not assert that corporate officers are monitoring individual Recruiters but that they monitor how Recruiters are generally doing at attaining the quotas.

Accordingly, SOF ¶ 20 is undisputed and should be deemed admitted.

21.     Recruiters are aligned to AMs, whose job is to "provid[e] solutions to [the] client's business & technology needs [and] Ensures [they] place quality (technical & cultural fit) consultants." Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132; Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274 (same); Ex. 50  (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552029 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005762 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133186 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425009 (same); Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450703 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508982 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545025 (same); Ex. 5 (Doyle Tr.) 101:15-102:7, 137:19-138:4, 169:18-170:5; Ex. 4 (DiBenedetto Tr.) 114:23-25; Ex. 12 (Pappas Tr.) 30:21-31:5.

**RESPONSE: Disputed in part.**

**Undisputed that some Recruiters during the relevant time period have been aligned to AMs and that Plaintiffs' statement generally describes the AM role.**

**Disputed that all Recruiters are aligned to AMs. (See, e.g., Df. Ex. 33, Levine-Gorelick Decl., ¶ 8 ("At the time I was promoted [to Recruiter], my supervisor was an Account**

Manager. Since then, TEK has moved away from the model of having a Recruiter supervised by an Account Manager, and now that approach is mostly gone. I have not been aligned to an Account Manager since 2018."); Df. Ex. 22, Fahey Decl., ¶ 3 ("When I started in Boston, most Recruiters partnered with an Account Manager in the Boston office and did most of their work on business from the local area, though they could do work they found around other parts of the country. However, since then Recruiters all have become specialized and focus on either a specific candidate skillset, a specific vertical (industry), or a specific account, or sometimes some combination of those three things, and recruiting for roles anywhere in the country is common. There's not a specific point in time when those changes happened. Some of it began organically, then later there were more structured changes."); Df. Ex. 37, Budde Decl., ¶ 14 ("I do not report to an Account Manager, but I do partner with Account Managers frequently."); Df. Ex. 35, Harvey Decl., ¶ 19 ("In my job at TEKsystems, I work with multiple Account Managers to analyze the hiring needs of the clients and develop strategies to have our candidates chosen for positions. The Account Manager is not my supervisor. I treat it as a partnership to determine how to best address the clients' hiring needs. The Account Manager manages the network of candidates who have the requisite skills in those technologies."); (Df. Ex. 16, Bohen Decl., ¶ 32 ("Over the time I've been at TEK, the Delivery model has changed. When I started as a Recruiter, there was no specialization whatsoever. I was aligned to an AM, and my experience was dictated by the AM. Now, Recruiters have more support. They report to other people who are also recruiters.").)

*__PLAINTIFFS' REPLY__*: TEK does not dispute that Recruiters have been aligned to Account Managers, whose job is to "provid[e] solutions to [the] client's business & technology

needs [and] Ensures [they] place quality (technical & cultural fit) consultants." *See* ECF No. 190-47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132. Further, TEK does not dispute that Recruiters work on job requisitions provided by Account Managers, whether they are aligned to one or multiple Account Managers.

Further, Levine-Gorelick,  Budde, and Harvey are *Avery* class members and not class or collective members in this case and, as such, their testimony is irrelevant.

Accordingly, SOF ¶ 21 is undisputed and should be deemed admitted.

22.    Recruiters work near AMs, they speak "multiple times" a day and the AMs also regularly monitor Recruiters' work activities. Ex. 5 (Doyle Tr.) 251:3-253:17 (AMs and Recruiters talk "multiple times" a day); Ex. 12 (Pappas Tr.) 30:21-31:5.

**RESPONSE**: **Disputed in part.**

**Undisputed that some Recruiters may work near AMs and may speak with AMs multiple times per day.**

**Disputed that all Recruiters work near AMs, speak with AMs multiple times per day, or are regularly monitored by AMs. (See TEK's Response to Plaintiffs' Statement 21. See also Df. Ex. 12, Mosquera Decl., ¶ 23 ("I work remotely two days per week."); Df. Ex. 14, Edds Decl., ¶ 31 ("I work remotely two days per week."); (Df. Ex. 16, Bohen Decl., ¶ 31 ("I've been working out of the Pennsylvania Delivery Center since 2021. There are about 75-80 people who work onsite for at least part of the week. Some of the Recruiters who are aligned to this office work remotely from Baltimore, New York, and Connecticut and don't come into the office.").)**

**_PLAINTIFFS' REPLY_**: TEK does not dispute that Recruiters speak with Account Managers multiple times a day. TEK's Rule 30(b)(6) witness, Doyle, testified that AMs and

Recruiters talk "multiple times" a day, ECF No. 190-5 (Doyle Tr.) 251:3-253:17. TEK does not dispute that when Recruiters work in the office, they work near AMs, other than providing a one-off example of Recruiters at the Pennsylvania Delivery Center.

TEK provides no support for its dispute that Account Managers regularly monitor Recruiters. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Account Managers received WIN reports for the Recruiters they supervised on a weekly basis to monitor their activity metrics. Ex. 162 (Fronzaglio Tr.) 65:5-9; *see* Ex. 154 (Raras Tr.) 107:18-108:6 (Q. "And how did Scott micromanage you?" A. "By paying attention to every number that I hit for the week, and just consistently, I was feeling like he was over my shoulder." Q. "Explain to me why you felt like he was over your shoulder." A. "It just felt like a lot of times I was being questioned and asked about my numbers and being reminded of where I was or was not at. It didn't feel like I had really much, I don't know the right word, privacy at TEK."). When Plaintiff Emily Burke, who also worked as an Account Manager during the relevant time period, was asked whether she provided Recruiters autonomy when she was an Account Manager, she responded "No[,] [b]ecause that wasn't their job duties." Ex. 145 (Plaintiff Emily Burke Tr. ("Burke Tr.")) 110:2-12.

Accordingly, SOF ¶ 22 is undisputed and should be deemed admitted.

23.    Recruiters' desks are located in the "pit," an open office set up with cubicles, with managers' offices surrounding them, which allows managers to monitor Recruiters. Ex. 5 (Doyle Tr.) 251:3-253:17; Ex. 8 (Estimada Tr.) 133:16-25, 134:20-22, 155:10-156:9; Ex. 11 (Minniear Tr.) 131:10-132:14; Ex. 66 (Manage & Develop Your Team) at TEK-Recruiter_Lit-00395328-29 ("You can't own the pit if you aren't there"); Ex. 67 (Thomson Email Sept. 18, 2020) TEK-Recruiter_Lit-00079338.

**RESPONSE**: Disputed in part. Undisputed that TEK refers to its open office concept as the "pit."

Disputed that Recruiters do not have offices. Doyle testified that some Recruiters do have offices. (Df. Ex. 53, Doyle Tr. 250:15-251:7.) Doyle also testified that there are "open offices where people can go in if they need to have conversations that are private." (Df. Ex. 53, Doyle Tr. 252:2-4; see also Df. Ex. 65, Minniear Tr. 157:12-158:21; Df. Ex. 56, Estimada Dep. at 135:4-14.)

Disputed that Recruiters must stay in the pit. Doyle testified that Recruiters are not required to be at their desks during the day when they work in the pit, people are "coming in and out all the time," and "Recruiters sometimes are picking up their computer and phones and walking into an office to have a conversation with somebody." (Df. Ex. 53, Doyle Tr. 294:2-25.) Minniear testified that Recruiters have access to private office space in every location he worked, including Salt Lake City, Iowa, and Schaumberg, underscoring that it is common for recruiters to use private workspaces. (Df. Ex. 65, Minniear Dep. at 157:12-159:3.)

Disputed that only Recruiters sit in the pit. Doyle testified that Account Managers also may have desks in the pit, rather than offices. (Df. Ex. 53, Doyle Tr. 251:4-7.) Doyle also testified that in the Silicon Valley office, as an example, all account managers and team leaders sit in the pit, which is meant for collaboration. (Df. Ex. 53, Doyle Tr. 252:5-14.) DBOs may sit in the pit for purposes of collaboration. (Df. Ex. 53, Doyle Tr. 253:14-17, 294:13-15.) Minniear testified that "anybody who's coming into the office sits in the pit," including recruiters, account managers, support staff, and even himself. (Df. Ex. 65, Minniear Dep. at 131:13-132:14.)

**Disputed that the pit is set up so that managers monitor Recruiters. Estimada testified that her presence in the pit as a sales manager was intended to provide support and accessibility, not to monitor recruiters. (Df. Ex. 56, Estimada Dep. at 155:10-156:9.) Estimada's team asked her to be more accessible. (Df. Ex. 56, Estimada Dep. at 157:3-15.) She adds "they like it when everybody had access to me because that meant that people on their team could ask me questions whereas if I were sitting in my office, they didn't always feel as if I was easily approachable." (*Id.*) Estimada also described the office layout as a shared community space. (Df. Ex. 56, Estimada Dep. at 135:4-14.)**

**Disputed that managers physically monitor Recruiters. Recruiters routinely work away from the office, beyond observation by managers, including some who are fully remote employees. (Df. Ex. 50, Bury Tr. 36:20-37:7 (worked remotely for 4 months); Df. Ex. 54, Baker Tr. 66:23-67:5 (fully remote during Covid); Df. Ex. 67, Raras Tr. 64:20-65:2 (same); Df. Ex. 12, Mosquera Decl., ¶ 23 ("I work remotely two days per week."); Df. Ex. 14, Edds Decl., ¶ 31 ("I work remotely two days per week."); (Df. Ex. 16, Bohen Decl., ¶ 31 ("I've been working out of the Pennsylvania Delivery Center since 2021. There are about 75-80 people who work onsite for at least part of the week. Some of the Recruiters who are aligned to this office work remotely from Baltimore, New York, and Connecticut and don't come into the office.")**

*PLAINTIFFS' REPLY:* TEK does not dispute that Recruiters' desks are located in the "pit," which is an open office set up with cubicles, and that managers' offices are in the pit or around it. TEK does not dispute that ECF No. 190-66 (Manage & Develop Your Team) at TEK-Recruiter_Lit-00395328-29 instructs managers that: "You can't own the pit if you aren't there."

TEK's deponents acknowledged that the pit set up allowed them to manage Recruiters.

Minniear testified that he sat in the pit when he was a Director of Business Operations because it allowed him to be "tied in with the people" and "engaged with the team," including Recruiters. ECF No. 190-11 (Minniear Tr.) 131:10-132:14.

TEK does not provide any evidence that Recruiters have assigned offices outside the pit, only that they can visit shared offices for specific purposes, such as conducting private conversations. TEK's assertion that other managers sit in the pit supports SOF ¶ 23 because the open office environment is designed for managers to observe Recruiters. SOF ¶ 23 does not address whether managers physically monitor Recruiters when they are not working in the office. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 23.

Accordingly, SOF ¶ 23 is undisputed and should be deemed admitted.

24.    TEK assigns Recruiters to "verticals" and also refers to "verticals" as "specializations." Ex. 4 (DiBenedetto Tr.) 46:6-21; Ex. 5 (Doyle Tr.) 59:1-17, 81:8-21, 297:4-20, 242:22-244:20; Ex. 14 (Johnson Tr.) 220:3-18.

**<u>RESPONSE</u>: Disputed in part.**

**Undisputed that some Recruiters are aligned to "verticals," of which there are five: financial services, media and entertainment, healthcare, government services, and technology enablement. (Pls. Ex. 5 (Doyle Tr.) 242:22-244:20.)**

**Disputed that all Recruiters are assigned to "verticals," or that "verticals" are the same as "specializations." This is explained in the cited Doyle testimony. Some Recruiters may be aligned to a vertical, meaning that they only support TEK clients in their aligned industry. (Pls. Ex. 5 (Doyle Tr.) 243:1-6.) Some Recruiters may be aligned to a specialized skill, meaning that they only support TEK clients needed candidates with a particular type of IT skillset. (*Id.*, 242:9-11.) Some Recruiters may be aligned to both a vertical and a**

specialized skill, meaning that they only support TEK clients in their aligned industry and with a need for a particular type of IT skillset. (*Id.*, 243:1-22.)

> *PLAINTIFFS' REPLY*: TEK does not dispute that Recruiters are aligned to verticals and that specializations exist within the verticals. Accordingly, SOF ¶ 24 is undisputed and should be deemed admitted.

25.    TEK refers to the specific industry and/or job category that Recruiters work in as a "specialization," but those Recruiters do not have any specific training or experience adjacent to that field. Ex. 5 (Doyle Tr.) 79:16-80:23, 244:8-17 (Q: "And when you're saying the specialized -- like, we have new recruiters are joining these teams that haven't done any of this training, but what they're doing is they're focusing on who they're placing, the skills that the job candidates have?" A. "Correct."), 244:18-20 (Q. "If you're in financial service team, you didn't come from a financial services background?" A. "No. Correct."); Ex. 3 (Haycock Tr.) 113:8-12 (Q: "What is the difference between a recruiter and a specialized recruiter?" A: "A specialized recruiter has one contest win and 60 percent of their starts aligned in their specialty area."), 114:4-115:10; Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313 (not requiring IT knowledge).

> **RESPONSE: Disputed in part.**
>
> **Undisputed that TEK refers to the specific industry and/or job category that Recruiters work in as a specialization.**
>
> **Disputed that Recruiters do not have any specific training or experience adjacent to their fields of specialization.**
>
> **TEK "provides comprehensive training where individuals learn terminology, job functions and applicable practices within the information technology industry." (Pls. Ex. 68 (Job Description) at TEK-Recruiter_Lit-00588313-17.) (*See also* Pls. Ex. 5 (Doyle Tr.) 55:15-**

58:4 (explaining that Recruiter Trainees are taught about specific skill specializations relevant to the particular specialized area of recruiting they will be engaged in).) Doyle testified that Recruiter Trainees "go through… ongoing training as well" (Df. Ex. 53, Doyle Dep. at 80:17-22.) Recruiters then receive ongoing training through TEK Academy, which offers "a huge library of resources and classes" housed in Degreed to support their continued development (Df. Ex. 53, Doyle Dep. at 80:24-81:7.) (See also Df. Ex. 52, DiBenedetto Dep. at 61:11-62:24 (Recruiter Trainees undergo an onboarding process that includes digital learning via Degreed, a three-day instructor-led training session, and a six-week development pathway).)

Doyle also testified the TEK offers specialization Badging and Credentialing programs that help Recruiters advance at TEK. (Df. Ex. 53, Doyle Dep. at 80:6-11.) "[T]o achieve certain badges, there are specific things such as percentage of their starts in their specialization." (*Id.*) Doyle provided an example of TEK Recruiter training in Java specialization, where Recruiters "get all trained up on the software development lifecycle," and learn "things like full stack versus front end versus back end and what technology is aligned to them" (Df. Ex. 53, Doyle Dep. at 295:25-297:3, 297:24-299:7.) Recruiters with this specialization are taught to understand "the different kinds of Java developers that customers might want based on this project needs" (Df. Ex. 53, Doyle Dep. at 298:7-13.) Recruiters must be specialized because the candidates who Recruiters are speaking with are "almost always employed," and if Recruiters are not "relevant and talking to them about things that are interesting to them… you have zero chance of recruiting them." (Df. Ex. 53, Doyle Dep. at 296:18-297:3.)

Recruiters also have specialized experience in the specific industry they recruit in.

**Recruiters are the experts in the labor market for the positions they work to fill and need to understand the customer, the customer's culture and environment, what the customer is seeking, and a number of nuances in order to help provide the services that the customer is seeking. (Df. Ex. 59, Haycock Dep. 27:14-30:2.)**

**Recruiters may specialize in areas like "enterprise applications" and "data analytics and insights," and "various areas of specialty… have been created" to support recruiter specialization. (Df. Ex. 59, Haycock Dep. at 114:19-115:3.)**

**Plaintiffs' citations do not support their statement. The citation to Haycock's testimony appears to suggest that specialization is based solely on a contest win and crossing a threshold of placements within one specialty area. (Pls. Ex. Ex. 3 (Haycock Tr.) 113:8-12.) However, Haycock's explanation continues, and he describes Tek's "badging" program, which is a public-facing credential that Recruiter "really understands [the] role" and is "specialized in this particular area," which "adds value" for clients and consultants. (Df. Ex. 59, Haycock Dep. at 114:4-18.) The designations allow potential consultants to understand the recruiter has received a designation relative to their specialization. (Df. Ex. 59, Haycock Dep. at 114:10-18.) Specialization is an ongoing process that enables Recruiters to "continue their knowledge and understanding of their area of specialty," and "as they reach certain milestones, they're able to move into a different level" (Df. Ex. 59, Haycock Dep. 113:23-114:2.)**

_**PLAINTIFFS' REPLY**_: TEK does not dispute that it refers to the specific industry and/or job category that Recruiters work in as a specialization. Contrary to TEK's assertions otherwise, Doyle did not testify that Recruiters receive training adjacent to the field they are "specializing" in. Rather, Doyle testified that Recruiters receive training in "the nuances of ways to recruit

because it's based on different skill specializations." ECF No. 190-5 (Doyle Tr) 56:5-12; *see also*, ECF No. 190-5 (Doyle Tr.) 56:20-57:7 (A. "A lot of the jobs we have require a lot of people to own tools and own ladders and trucks, and really so the type of questioning and the type of understanding of the types of positions is very different than if I was recruiter trying to recruit job developers. Then it's going to be very specific to technology, the types of Java, different flavors of Java, different enterprise applications, all of those types of things. ***So you're having to learn the nuance of how to attract those candidates, based on the specialization***, and the way you approach it are very different.") (emphasis added); ECF No. 203-53 (Doyle Tr.) 296:8-12 (A. "But, in general, most of the training we provide is through Degreed, where there's pathways that teach recruiters all about these specialization, what kind of projects they work on, ***what kind of questions you should ask***") (emphasis added). Likewise, Haycock did not testify that badging is proof that Recruiters received training in their field of "specialization," he merely testified that the benefit of giving badges is to "create[] an industry brand for [Recruiters]" for third parties looking at their LinkedIn profiles. *See* ECF No. 203-59 (Haycock Tr.) 114:4-18. TEK's citation to DiBenedetto's testimony also does not support TEK's dispute because it only discusses Recruiter Trainees generally, without any reference to specialization. *See* ECF No. 203-52 (DiBenedetto Tr.) 61:11-62:24.

Testimony from Plaintiffs and Opt-in Plaintiffs confirms that TEK refers to the specific industry and/or job category that Recruiters work in as a "specialization," but those Recruiters do not have any specific training or experience adjacent to that field. *See, e.g.*, Ex. 150 (Opt-in Plaintiff Rhyan Guidry Tr. ("Guidry Tr.")) 108:23-109:16 (Q. "So in the course of your recruiting, did you observe different styles, different approaches or techniques that are – that were used among the recruiters?" A. "No. We pretty much have the same job, so no. In terms of style, everything

that was – everything that we did was pretty systemically taught to us through training, which is why it didn't matter what vertical you were supporting. I went to training with people that were in a marketing vertical, design vertical, like it really didn't matter. Our talk tracks were the same, our execution style was the same, our templates were the same, we had access to all the same things, we had access to all the same roles. The only difference was if you were on a team and the bulk of your A focus was on that particular skill set."); Ex. 156 (Opt-in Plaintiff Lauren Seijas Tr. ("Seijas Tr.") 54:16-24 (Q. "Okay. Was there any sort of training that you went through when you were hired or at any point when you were at TEK as it related to certain specialties, so as it related to the digital and creative space or finance or any other of those specialties?" [Objection omitted] A. "No. I only went through general orientation."); *see also*, Ex. 160 (Plaintiff Michael Thomas Tr. ("Thomas Tr.")) 122:3-6 (Q. "Do you believe all recruiters would have similar job duties and work experience regardless of their specialization?" A. "Yes.").

Accordingly, SOF ¶ 25 is undisputed and should be deemed admitted.

## III.    Recruiters' Primary Duty: Production Work Screening Candidates

26.    TEK refers to Recruiters as "producers." Ex. 3 (Haycock Tr.) 60:7-12, 68:1-16 ("Anyone that is in a role that is a salesperson account manager or recruiter, we consider those as producing roles. Meaning that they are producing for the company. Our products and services are associated with putting people to work, and those producers are – it's just a generic term that's used to say you're either a salesperson or a recruiter. . . . Again, as I've stated before, they are a recruiter that is producing. Meaning that they are a – they're a recruiter that produces what recruiters produce . . . They find people for jobs."), 86:9-19 (SPP means "spread per producer" and refers to "recruiters"); Ex. 4 (DiBenedetto Tr.) 158:4-12; Ex. 5 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-

specific activities as part of your responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."), 213:4-7; Ex. 8 (Estimada Tr.) 100:3-101:12; Ex. 10 (Hollister Tr.) 103:4-15; Ex. 69 (Haycock Dep. Ex. 15 (Yearly Performance Summary)) TEK-Recruiter_Lit-00124518 (email attaching "*Producer* EOY Performance Reviews" and "*Producer* Performance Reviews 2021" for Recruiters) (emphasis added); Ex. 70 (Haycock Dep. Ex. 5 (Project Lighthouse Communication Plan)) at TEK-Recruiter_Lit-00614413 (referring to Recruiters as "production focused"); Ex. 71 (Alvather Email Oct. 2, 2019) at TEK-Recruiter_Lit-00392555-56; Ex. 30 (Bhasin May 17, 2022 Email) at TEK-Recruiter Lit-00127828; Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291 ("our producers must document in a consistent, timely manner"); Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-61; Ex. 73 (Recruiter Excellence: Scorecard FAQs) at TEK-Recruiter_Lit-00095089 ("many of our top producers are not maintaining 30 interactions."); Ex. 74 (Role Impact Summary: *Producers* (AM and Recruiter)) TEK-Recruiter_Lit-00004483 (emphasis added); Ex. 75 (Performance Review Guide 2021) at TEK-Recruiter_Lit-00528423 (referring to Recruiters as "Producers"); Ex. 76 (Producer Performance KPI 8-4-2020) TEK-Recruiter_Lit-00281725 (Recruiter metric summaries are referred to "Producer Performance KPI"); Ex. 77 (Annual Operating Plan) TEK-Recruiter_Lit-00583663 at 5, 10 ("Producer Enablement Technology").

**RESPONSE: Disputed in part. Undisputed that TEK refers to Recruiters as "producers."**

**Disputed that this term is limited to Recruiters. As Plaintiffs' citations show, this is a "generic term" applicable to people with sales or recruiting responsibilities.**

***PLAINTIFFS' REPLY***: TEK does not dispute that it refers to Recruiters as "producers." SOF ¶ 26 does not address whether TEK also refers to other inside sales or production employees as "producers." Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 26. Accordingly, SOF ¶ 26 is undisputed and should be deemed admitted.

27.    TEK refers to Recruiters as "sales employees" and not "human resources" employees. Ex. 4 (DiBenedetto Tr.) 90:13-91:8 (distinguishing Recruiters from human resources and noting Recruiters must have good sales skills); Ex. 3 (Haycock Tr.) 60:7-12, 68:1-16 ("[T]hey are a recruiter that is producing."), 123:21-24, 136:13-23; Ex. 5 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."); Ex. 8 (Estimada Tr.) 100:3-101:12; Ex. 10 (Hollister Tr.) 103:4-15; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386851 ("We work in a sales environment"); Ex. 41 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045214; Ex. 102 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sales"); Ex. 103 (LinkedIn Recruiting Strategy) at TEK-Recruiter_Lit-00494036 (same); Ex. 104 (Vitrano Email Nov. 29, 2018) at TEK-Recruiter_Lit-00129606 (same); Ex. 105 (Chezik Email Feb. 20, 2020) at TEK-Recruiter_Lit-00135668 (same); Ex. 106 (Zhou Email June 10, 2021) TEK-Recruiter_Lit-00481474 (same); Ex. 96 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952 ("You're an inside sales person!"); Ex. 107 (Thomson Email Apr. 20, 2020) TEK-Recruiter_Lit-00183226

("We are hiring for both inside sales (Recruiter) roles as well as Outside (Account Manager) roles."); Ex. 108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 33 ("You're an inside sales person!").

**RESPONSE: Disputed. Disputed that "sales" and "recruiting" are synonymous as TEK.**

**The cited Doyle testimony treats sales and recruiting as distinct. (Pls. Ex. 5 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles." (emphasis added).**

**Plaintiffs include a citation to Haycock reading from a document includes the phrase "We work in a sales environment where professional appearances and first impression matters." (Pls. Ex. 3 (Haycock Tr.) 136:13-23.) Haycock explains that this means the role is "customer facing, that you would be interacting with people," and you need "a high degree of professionalism[]" (*Id.*)**

**Other citations offered by Plaintiffs refer to "producing" or "producers" without any reference to sales." (Pls. Ex. 3 (Haycock Tr.) 60:7-12, 68:1-16, 123:21-24, 136:13-23; Pls. Ex. 5 (Doyle Tr.) 128:16-18.)**

***PLAINTIFFS' REPLY:*** TEK does not dispute that TEK refers to Recruiters as "sales employees" and not "human resources." Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 27. Accordingly, SOF ¶ 27 is undisputed and should be deemed admitted.

28.     In its own internal recruiting documents, TEK states: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they

are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales." Ex. 41 (Ligouri Dec. 6, 2018 Email) TEK-Recruiter_Lit-00045214; *see also* Ex. 102 (Ligouri Email Sept. 19, 2018) TEK-Recruiter_Lit-00256524; Ex. 109 (Framingham Female Hiring Blitz) TEK-Recruiter_Lit-00468402 at 6 ("If someone is interested in HR make sure you explain the difference between recruiting and human resources.  These are not the same thing in TEKsystems!"); Ex. 110 (Lightkep Email Jan. 18, 2021) at TEK-Recruiter_Lit-00472820; Ex. 111 (Donegan Email Feb. 21, 2020) at TEK-Recruiter_Lit-00435815; Ex. 112 (Haskin Email Mar. 9, 2020) at TEK-Recruiter_Lit-00198733; Ex. 113 (Bullock Email Sept. 13, 2019) at TEK-Recruiter_Lit-00132369; Ex. 43 (Lieberman Email Oct. 24, 2019) at TEK-Avery-00492061 ("we are looking for sales focused individuals"); Ex. 114 (Stadler Email Dec. 20, 2018) at TEK-Avery-00433138; Ex. 115 (Murrell Email Apr. 2, 2018) at TEK-Avery-00500049; Ex. 116 (Mooney Email Nov. 13, 2018) at TEK-Recruiter_Lit-00076220 ("We are a sales environment, if they don't want to do the brunt of the cold calling, they will not be a fit.").

**RESPONSE**: **Disputed in part. Disputed insofar as the phrase "its own internal recruiting documents" is vague and ambiguous in the context of litigation about Recruiters.**

**Undisputed that the cited documents included the cited phrases.**

***PLAINTIFFS' REPLY***: TEK does not dispute that documents on which Plaintiffs relied for SOF ¶ 28 were instructions for recruiting TEK Recruiters. The documents cited by Plaintiffs at SOF ¶ 28 are emails sent to/from TEK employees and discuss TEK's efforts to recruit people into the Recruiter role at TEK. They stated: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales." Accordingly, SOF ¶ 28 is undisputed and should be deemed admitted.

29.    Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's AMs. Ex. 4 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 162:18-163:7; Ex. 5 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 3 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12; Ex. 15 (Kartchner Tr.) 57:2-6; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter: . . .Screens consultants"); Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 50  (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552030 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005763 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133187 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425010 (same); Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450704 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508983 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545026 (same); Ex. 78 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. *Screens* consultants . . . .") (emphasis added); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (TEK's business cycle as including Recruiters "screening" candidates and AMs communicating with TEK's customers.).

**RESPONSE**: **Disputed. Disputed that Plaintiffs have fully described the primary job duties of TEK's Recruiters. TEK's job descriptions for the Recruiter role identifies the primary duties of the role to include:**

**• Recruit top IT talent and match their career goals with clients' hiring needs**

• **Develop recruiting strategies to identify qualified candidates**

• **Evaluate the strengths and weaknesses of candidates**

• **Negotiate unique compensation packages (wages, benefits, etc.) to attract and close candidates**

• **Communicate details of new assignments and manage contract employees while on assignment**

• **Partner with TEK's sales team to identify top accounts and target skill sets**

• **Maintain relationships with Technical Professionals to gain industry knowledge and obtain referrals**

**(Pls. Ex. 68 (Job Description), TEK-Recruiter_Lit-0-0588313. *See also* Df. Ex. 40 (TEK-Recruiter_Lit-00407375); Df. Ex. 41 (TEK-Recruiter_Lit-00511675); Df. Ex. 42 (TEK-Recruiter_Lit-00468398.)**

**Disputed that Recruiters only submit candidates to AMs. Recruiters also may submit candidates directly to TEK's clients. (Df. Ex. 57, Fronzaglio Tr. 171:5-9; Df. Ex. 63, Lis Tr. 139:15-141:2.)**

**Haycock testified that the job of a Recruiter is "to find the absolute best talent and the best match between the consultants' skills, goals, and interests and the customers needs." (Pls. Ex. 3 (Haycock Tr.) 32:5-13,**

**Plaintiffs' citation to the testimony of DiBenedetto is incomplete. In his complete response, DiBenedetto explains that during the particular Recruiter Trainee presentation being discussed, Recruiter Trainees practice presenting their candidates to their Account Manager, but in practice each Account Manager does it differently and may train Recruiters to directly present candidates to a client (Df. Ex. 52, DiBenedetto Tr. 113:7-114:25.)**

Plaintiffs' Ex. 5 is testimony by Doyle about the importance of submittals, among other things. (Pls. Ex. 5 (Doyle Tr.) 158:1-159:24.) The excerpt mentions Recruiters but does not mention Account Managers.

Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page states that "Together, our AMs and recruiters place talented IT professionals with rewarding career opportunities at our customers' workplaces." (Pls. Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.) This is reflective of the partnership between Recruiters and Account Managers.

Plaintiffs' Ex. 47-50 and 56-61 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite pages within the documents that include brief descriptions of various roles, including Recruiter. (*Id.*) Even the brief description in those documents is more expansive than what Plaintiffs suggest. (*Id.* ("Recruiter: Partners with AM to understand requirements and culture of a client. Screens consultants to gain insight into their skills, goals, interests and provides aligned opportunities."). See also Plaintiffs' Ex. 78 (same).)

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's Account Managers. TEK disputes that Plaintiffs have fully described the primary job duties of TEK's Recruiters. To support its dispute, TEK points to ECF No. 190-68 (Job Description), which contains a bullet point list of "Recruiter Responsibilities." But ECF No. 190-68 (Job Description) does not refer to these Recruiter Responsibilities as Recruiters' *primary job duties. See id.* In fact, there is no evidence in the record, and as such TEK cannot point to any,

that Recruiters "communicate details of new assignments and manage contract employees while on assignment" or that Recruiters "identify top accounts." As such, the job description is not fully accurate.

TEK does not dispute that ECF No. 190-39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846 states "Our recruiters identify and prepare IT professions for the career opportunities presented by our AMs." Nor does TEK dispute that ECF No. 190-18 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 states that "Recruiter: Partners with AM to understand requirements & culture of a client. *Screens* consultants . . . .".

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

While TEK argues Recruiters, at times, present candidates to individuals other than Account Managers, TEK's own declarants report that they do so when "the Account Manager is away." ECF No. 203-25 (Guffy Decl.) ¶ 16; ECF No. 203-34 (Kehl Decl.) ¶ 7; ECF No. 203-33 (Levine-Gorelick Decl.) ¶ 25; ECF No. 203-30 (Whitman Decl.) ¶ 24; ECF No. 203-15 (Rice Decl.) ¶ 14. The evidence is also clear Recruiters cannot override AM's decisions or speak directly with TEK's clients without AM's consent. Ex. 162 (Fronzaglio Tr.) 155:18-20.

DiBenedetto testified that TEK's training only includes Recruiters presenting candidates to Account Managers and does not include presenting candidates to clients directly. ECF No. 190-4 (DiBenedetto Tr.) 114:23-25. Regardless, DiBenedetto did not testify that Recruiters' primary job duty was anything but screening and matching. *See id*.

TEK has not pointed to any specific documents or testimony in the record that supports its contention that Recruiters have any primary job duty other than to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open

roles to TEK's AMs.

Accordingly, SOF ¶ 29 is undisputed and should be deemed admitted.

30.     Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates. Ex. 5 (Doyle Tr.) 252:24-253:2, 271:8-272:5 (Recruiters spend "the majority of the time . . . talking to consultants"); Ex. 3 (Haycock Tr.) 39:4-40:6, 59:2-11; Ex. 10 (Hollister Tr.) 109:5-20; Ex. 15 (Kartchner Tr.) 110:1-7; Ex. 12 (Pappas Tr.) 102:1-9; Ex. 80 (Recruiter Success Profile) at TEK-Recruiter_Lit-00020276 ("high call volume environment").

**RESPONSE: Disputed. Plaintiffs' citations do not support the statement. None of the citations provided by Plaintiffs mention "time reviewing potential candidates' resumes and LinkedIn profiles," "cold calling," or "completing intakes of potential job candidates."**

**For example, Plaintiffs cite to Doyle testimony that Recruiters are "[o]n the phone, emailing, texting consultants" and spend "the majority of the time . . . talking to consultants" (Pls. Ex. 5 (Doyle Tr.) 252:24-153:2, 271:8-272:5.) In his testimony, Doyle uses the term "consultant" interchangeably with candidates, though "consultant" generally refers to someone already working on assignment to a TEK client and is distinct from a candidate who has yet to be placed on assignment. (Pls. Ex. 5 (Doyle Tr.) 125:18-24. In addition, Plaintiffs add the word "spend," but in context Doyle is stating that, as it relates to calls, Recruiters speak more frequently with consultants than with clients. (*Id.*) Likewise, they cite to Haycock testimony agreeing that Recruiters "are generally speaking with candidates on a daily basis." (Pls. Ex. 3 (Haycock Tr.) 59:2-11.) Haycock does not opine how much time Recruiters spend speaking with candidates. (*Id.*)**

**Plaintiffs' citation to Haycock also misrepresents his testimony. Haycock describes**

both the "science" and the "art" of matching the right candidate to the right assignment, but Plaintiffs' citation includes only the portion related to the "science." The complete testimony by Haycock is provided at Pls. Ex. 3 (Haycock Tr.) 39:4-41:4.

The cited Pappas testimony only states that Recruiters "made a lot of phone calls." (Pls. Ex. Ex. 12 (Pappas Tr.) 102:1-9.) Pappas did not elaborate on how much time Recruiters spent on the phone but did explain "I just don't know who was on the other side of that phone." (Df. Ex. 66, Pappas Dep. 102:10-25.)

The cited Hollister testimony only states that "skilled verbal and written communications is necessary" because "the recruiter will spend most of their day on the phone and e-mailing," and these communications are "primarily" with consultants. (Pls. Ex. 10 (Hollister Tr.) 109:5-20.) The amount of time is not quantified. (*Id*.)

The Kartchner testimony states only that making phone is "a large part of our job[.]" (Pls. Ex. 15 (Kartchner Tr.) 110:1-7.) The amount of time is not quantified.

***PLAINTIFFS' REPLY***: TEK does not meaningfully dispute Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates.

Doyle testified that most of Recruiters' interactions with candidates/consultants are unscheduled phone calls. ECF No. 190-5 (Doyle Tr.) 271:14-17 (A. "For our recruiters, most of their interactions is calling a consultant. They might answer the phone; they may not. So they're not prescheduled."), 252:24-253:2 (Q. "Okay. And recruiters are on the phone a lot; that's correct?" A. "Correct. On the phone, emailing, texting consultants."). As TEK admits, Doyle used the term "consultant" and "candidate" interchangeably. *See id*., 125:18-24 (confirming he used the term "consultant" to refer to candidates). TEK states without pointing to specific testimony or

documents in the record that Doyle testified that Recruiters speak more frequently with consultants than clients. Plaintiffs have identified no such testimony in the record and TEK may not manufacture disputes without evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986).

TEK does not dispute that Haycock testified that Recruiters generally speak with candidates on a daily basis. *See* ECF No. 190-3 (Haycock Tr.) 59:2-11. As Haycock further testified, when Recruiters spoke with candidates, they did so to "talk[] to candidates about what it is that they're looking for in their career and making matches with the available jobs that they know about." *Id.*, at 59:12-20. Haycock's testimony establishes that Recruiters are cold calling candidates to complete intakes to match those candidates to job requisitions. *See id.*, 59:2-20. TEK also does not dispute that Haycock testified that Recruiters use LinkedIn and other tools to review candidate resumes and LinkedIn profiles. TEK's dispute that Plaintiffs' misrepresented Haycock's testimony by citing only his testimony about the "science" of matching and leaving out additional testimony about the "art" of recruiting is irrelevant because SOF ¶ 30 does not address the science or art of recruiting and/or matching. Taken together, Haycock's testimony at ECF No. 190-3 (Haycock Tr.) 59:2-20 and 39:4-40:6 fully support SOF ¶ 30.

TEK does not dispute that Pappas testified that Recruiters "make a lot of phone calls," *see* ECF No. 190-12 (Pappas Tr.) 102:1-9, but questions whether Pappas was testifying that the calls made by Recruiters were to candidates. *See id.*, 102:14-25. However, Pappas earlier testimony confirms that she agrees that Recruiters made many calls throughout the day to candidates specifically. *See id.*, 100-25:101-14 (describing Recruiters making a lot of calls to candidates as a grind).

TEK does not dispute that Hollister and Kartchner both testified that Recruiters make a lot

of calls. TEK also does not dispute that ECF No. 190-80 (Recruiter Success Profile) at TEK-Recruiter_Lit-00020276 explains that Recruiters are "expected to thrive in a fast-paced, high call volume environment."

Testimony from Plaintiffs and Opt-in Plaintiffs also confirms that Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates. *See, e.g.*, Ex. 146 (Opt-in Plaintiff Dorian Carter Tr. ("Carter Tr.")) 96:22-24 ("[m]y job duties were to call people or to – call people, source, you know, match people to open job requirements, right."); Ex. 151 (Maher Tr.) 26:18-20 (Q. "What would be the action/outcome for your resume of what you did at TEKsystems?" A. "Made calls, placed people."); Ex. 147 (Opt-in Plaintiff Collier Tr. ("Collier Tr.")) 71:16-19 ("And then, you know, for me as a recruiter, screening and matching was my day to day, the cold calls, just aligning candidates as quickly as I can and as much as I can."), 18:3-4 ("[I]t was a lot of reviewing profiles, reviewing resumes"); Ex. 143 (Baker Tr.) 75:18-19 ("Well, my job duties as a recruiter were to cold-call people to find candidates."); Ex. 144 (Opt-in Plaintiff Sean Blendy Tr. ("Blendy Tr.")) 71:6-11 ("I can't speak for others. But for me, it was, you know, generating, you know, more calls throughout the day. The more calls I'd make, the more people I talked to, it would hopefully fall down to generating more candidates to submit."); 72:23-73:1 ("Essentially what we were told by all of our account managers, just to really smile and dial and make as many calls as possible"); Ex. 152 (Opt-in Plaintiff Adam Malone Tr. ("Malone Tr.") 138:3-8 ("It was making phone calls, following-up with people that didn't answer, working off that call sheet, attending red zone when I needed to, attending one-on-one meetings with my account manager when I needed to, but that was really it. Usually we were just dialing on the phone."); Ex. 150 (Guidry Tr.) 117:16-118:4 (Q. "Okay. So how many resumes would you say on average that you were reviewing for each open

requisition?" A. "Hundreds." Q. "Hundreds you said?" A. "Yeah. For each requisition how many resumes were we looking at?" Q. "Yes." A. "Yeah, I'd say hundreds, because resumes are all through LinkedIn. LinkedIn was considered resumes before we actually receive an official one. So we looked through hundreds of profiles prior to for each requisition."); Ex. 156 (Seijas Tr.) 27:19-23 ("So it would be a lot of, you know, just non-stop on the phone, calling people. We would step out to meetings, if we needed to come back, you know, more LinkedIn, e-mails, phone calls."); Ex. 132 (Dries-Wielandt Decl.) ¶¶ 24, 36 (most of her time was spent matching potential candidates to job requirements and attempting to reach out to potential candidates; Ex. 134 (Holin Decl.) ¶¶ 24, 36 (same); Ex. 135 (Martin Decl.) ¶¶ 24, 36 (same); Ex. 137 (Olszewski Decl.) ¶¶ 23, 35 (same); Ex. 140 (Stein Decl.) ¶¶ 24, 36 (same); Ex. 142 (Walker Decl.) ¶¶ 23, 35 (same).

Accordingly, SOF ¶ 30 is undisputed and should be deemed admitted.

31.    As the initial recruiting step, TEK's clients fill out a form that the employees refer to as "job requisitions," "job requirements," or "job reqs." Ex. 3 (Haycock Tr.) 175:18-176:1; Ex. 4 (DiBenedetto Tr.) 91:9-22; Ex. 81 (Requisition Form) TEK-Recruiter_Lit-00281942.

**RESPONSE: Disputed in part. Undisputed that phrases "job requisitions," "job requirements," or "job reqs" are synonymous with each other.**

**Undisputed that Recruiters are involved at this initial step.**

**Disputed that "TEK's clients fill out a form" that is the job requirement. None of the cited testimony states that clients fill out a form. Plaintiffs' Ex. 81, which Plaintiffs describe as a "Requisition Form," are "mock ups" created as part of a pilot for a proposed new design within the Connected database. (Df. Ex. 43, TEK-Recruiter_Lit-00281939 – TEK-Recruiter_Lit-00281942.) TEK employees, not clients, input information to Connected. (Df. Ex. 45, 2019 Connected Guide, TEK-Recruiter_Lit-00135395.)**

***PLAINTIFFS' REPLY***: TEK does not dispute that Haycock and DiBenedetto testified that job requisitions come from clients. *See* ECF No. 190-3 (Haycock Tr.) 175:18-21 (Q. "…[I]t's a requisition from a client?" A. "Yes."); ECF No. 190-4 (DiBenedetto Tr.) 91:16-22 (Q. "The requirement is a job description, in essence. And we get submitted – we – we get customers [to] send us job requirements or business requirements and we are supporting them by providing them with the resources that they need to be able to fulfill that requirement."); *see also* ECF No. 190-3 (Haycock Tr.) 140:13-15 (Q. "And those skills necessary in the job would be in the requisition *from the client*?" A. "Yes.") (emphasis added).

TEK does not deny that ECF No. 190-81 is an exemplar of the Requisition Form or that it contains the categories of information provided on Requisition Forms. In fact, Doyle testified that ECF No. 203-43, at TEK-Recruiter_Lit-00281941 (which includes ECF No. 190-81) were "screen shots of what our [] req looks like in Connected. . . . Q: "[S]o Page 281941, is this what the req page looks like in Connected now?" A. "Very similar. There may have been -- there's probably been some minor enhancements, but very, very similar." ECF No. 190-5 (Doyle Tr.) 179:6-180:2. TEK has not provided any evidence about why Doyle's (one of TEK's Rule 30(b)(6) witness) testimony was not accurate.

Accordingly, SOF ¶ 31 is undisputed and should be deemed admitted.

32.    Job requisitions outline the clients' requirements for particular positions. Ex. 81 (Requisition Form) TEK-Recruiter_Lit-00281942; Ex. 4 (DiBenedetto Tr.) 91:9-22; Ex. 5 (Doyle Tr.) 58:5-25; Ex. 3 (Haycock Tr.) 59:2-6, 140:13-15.

**RESPONSE: Disputed in part. Undisputed that "job requisition" and "job requirements" are used interchangeably. See TEK's Response to Statement 31.**

**Undisputed that requirements provide information about the resources a client needs**

TEK's help to obtain. (Pls. Ex. 4 (DiBenedetto Tr.) 91:9-22.)

**Disputed that Plaintiffs' Ex. 81 is a "Requisition Form." See TEK's Response to Statement 31.**

***PLAINTIFFS' REPLY:*** TEK does not dispute that DiBenedetto testified that "[r]equirements are, basically, what a customer is looking for from a resource position," *see* ECF No. 190-4 (DiBenedetto Tr.) 91:12-14, or that Haycock testified that the necessary job skills are included in the job requisition from the client. ECF No. 190- 3 (Haycock Tr.) 140:13-15.

Doyle testified that ECF No. 203-43, at TEK-Recruiter_Lit-00281941 was "screen shots of what our [] req looks like in Connected. . . . Q: "[S]o Page 281941, is this what the req page looks like in Connected now?"  A. "Very similar. There may have been -- there's probably been some minor enhancements, but very, very similar." ECF No. 190-5 (Doyle Tr.) 179:6-180:2. TEK has not provided any evidence about why Doyle's (one of TEK's Rule 30(b)(6) witness) testimony was not accurate. In addition, Doyle explained what each portion of the Requisition Form included. ECF No. 190-5 (Doyle Tr.) 179:23-203:17.

Accordingly, SOF ¶ 32 is undisputed and should be deemed admitted.

33.    The clients, not Recruiters, determine the job requirements for job openings. Ex. 5 (Doyle Tr.) 58:22-59:3 (Q: "[T]he customer is determining what the customer needs for that position; is that correct?" A: "Correct." Q: "And that's true for all the skill specializations?" A: "Yeah."); Ex. 4 (DiBenedetto Tr.) 91:17-22 ("we get customers . . . send us job requirements . . . and we are supporting them"), 120:15-21.

**RESPONSE: Disputed in part. Undisputed that TEK's clients determine whether they need resources.**

**Disputed that clients alone provide the job requirements. Clients, Account Managers,**

**and Recruiters all may contribute to determining what are included among the requirements. (Pls. Ex. 5 (Doyle Tr.) 58:5-21; Df. Ex. 3 (collecting testimony related to the role of a Recruiter at requirement intake).)**

*PLAINTIFFS' REPLY:* TEK does not dispute that TEK's clients determine the job requirements for job openings.

Contrary to TEK's representations, Doyle does not testify that Recruiters may determine the job requirements for job openings. *See* ECF No. 190-5 (Doyle Tr.) 58:5-59:25. Rather, Doyle testifies that regardless of how Recruiters learn about a client's particular needs for a job opening, it is TEK's client who determines its needs for position. *See id.*, 58:22-25 (Q. "But the customer still, either way, it's the customer is determining what the customer needs for that position; is that correct?" A. "Correct.").

Similarly, the testimony cited by TEK in ECF No. 203-3 also does not support its dispute. As a preliminary matter, ECF No. 203-3 is an impermissible summary document and, to the extent the Court considers TEK's declarations, it should consider the declarations in context of the entire document. *See* Plaintiffs' General Objections ¶ 4. Regardless, the testimony cited by TEK demonstrates that Recruiters, at times, may listen in or participate in calls with clients *after the client has already informed TEK about their particular needs for a job opening* to offer information about the state of the job market, ask questions about what the client is looking for, or to discuss sourcing strategies for the role. *See* ECF No. 203-3 at Mosquera Decl., ¶ 10 ("speaking directly with the client helps me understand what type of candidates they are looking for"), Walther Decl., ¶ 6 ("my role was to speak with the client about what the local labor market looked like, how the positions they wanted to fill fit into the market for talent, and suggest strategy to fill those positions"), Fink Decl., ¶ 12 ("One of the first steps is req intake, or req qualifications, which

means meeting with a client *to learn* about the requirements for the project or role that they have asked for TEK's help to fill.") (emphasis added), Fronzaglio Decl., ¶ 14 ("TEK Recruiters provide customers with insights into the labor market and how that affects the trying to fill the role."), Marshall Decl., ¶ 12 ("Because of my knowledge of the skillset, I could give the client hiring manager information about the state of the market that I had learned from talking to candidates every day about the projects they were on."), Edds Decl., ¶ 12 (On calls to qualify roles with TEK clients, "we go over the job description and what the client thinks they need for the project").

Testimony from Plaintiffs and Opt-in Plaintiffs also supports the fact that Recruiters did not determine job requirements for open job positions. *See, e.g.*, Ex. 148 (Plaintiff Maria Conyers-Jordan Tr. ("Conyers-Jordan Tr.")) 68:24-69:2 (Q. "Did you ever assist hiring managers, including with the account manager, on putting together their requisitions for positions?" A. "No."); Ex. 156 (Seijas Tr.) 48:17-49:5 (Q. "But if you're working for a particular client who has an opening, was part of your job to analyze what the client needed from a candidate in order to successfully recommend a candidate for the role?" A. "No." Q. "Why not?" A. "All of that information was given to the account manager when they had their own calls to get the requisitions and then that information of what they wanted was just basically told to me."); Ex. 149 (Plaintiff Ava Dore Tr. ("Dore Tr.")) 40:6-11 (Q. So is it your testimony that you only learned about the job requirements verbally from account managers?" A. "It was first verbally, and then we would digitally get the actual requirement, usually through Teams, through email."); Ex. 153 (Opt-in Plaintiff Thomas Phommalinh Tr. ("Phommalinh Tr.")) 20:3-7 (Q. "So you would meet with the account managers and they would indicate what the client was looking for in their requisition?" A. "Correct."); Ex. 152 (Malone Tr.) 43:9-23 (Account Managers came out to the pit to provide Recruiters with job description and top three skills from the client); Ex. 158 (Opt-in Plaintiff Nadiya Shestopalko Tr.

("Shestopalko Tr.:)) 89:13-23 (Q. "In your role as a recruiter, did you have to analyze a certain client's needs relative to the role you were placing?" A. "So, the account manager more so analyzed them. They were the subject matter expert. So they would do that, and then they would tell me what the client wants. I would basically find that. They would give me the source strategy and I would find it. I didn't really interact with the client at all as a recruiter."); Ex. 132 (Dries-Wielandt Decl.) ¶ 16 ("I received Requirements from the Account Manager. I did not create Requirements, and if I had a question about Requirements, I asked the Account Manager."); Ex. 134 (Holin Decl.) ¶ 16 (same); Ex. 135 (Martin Decl.) ¶ 16 (same); Ex. 137 (Olszewski Decl.) ¶ 15 (same); Ex. 140 (Stein Decl.) ¶ 16 (same).

Accordingly, SOF ¶ 33 is undisputed and should be deemed admitted.

34.    TEK's managers assign the job requisitions to Recruiters. Ex. 4 (DiBenedetto Tr.) 122:10-13, 136:24-137:16; Ex. 5 (Doyle Tr.) 78:9-12 ("And who assigns them?" A. "Generally it's going to be a delivery manager or a delivery director or, in some cases, a team lead, depending on the size of the team"), 101:2-102:20 (delivery manager and team lead decide to reassign requirements), 123:25-124:8, 140:5-11 (allocate means assign), 238:16-246:4; Ex. 8 (Estimada Tr.) 80:24-81:10; Ex. 11 (Minniear Tr.) 64:19-23, 151:24-152:7; Ex. 82 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 (". . . we should fully qualify each req in order for the DBO to prioritize business and evaluate where to allocate recruiters in the office.").

**RESPONSE: Disputed. Many Recruiters choose which requirements they want to work on. (Df. Ex. 4 (collecting testimony that Recruiters decide what requirements to work on.)**

**In other settings, such as Red Zone meeting, it is common for Recruiters to volunteer to work on requirements they believe they can fill, rather than passively accepting an**

assignment from someone else. *See* TEK's Response to Plaintiffs' Statement 18.

> ***PLAINTIFFS' REPLY:*** TEK does not dispute that TEK's managers assign job requisitions to Recruiters. TEK also has not pointed to any testimony or documents demonstrating that Recruiters may opt not to work on job requirements assigned to them by TEK's managers. *See* Ex. 167 (McNelley Tr.) 173:24-174:14 (testifying that "[t]here's no recruiters like defiantly saying I'm not working on [specific] requirements today" absent "a very logical explanation" because, if that happened, "obviously they wouldn't work [at TEK]" anymore).

> Testimony by TEK leaders and supervisors confirms that TEK's managers assign job requisitions to Recruiters. *See id.*; ECF No. 190-5 (Doyle Tr.) 78:9-12 (Q. "And who assigns them?" A. "Generally it's going to be a delivery manager or a delivery director or, in some cases, a team lead, depending on the size of the team"), Ex. 168 (Pappas Tr.) 19:8-10 (A. "So, as a recruiter, you would be allocated to specific requisitions or positions to recruit on during the day."); ECF No. 190-11 (Minnear Tr.) 64:19-65:19 (testifying that, as DBO, he participated in allocating requirements in Red Zone meetings), 153:4-9; Ex. 165 (Kartchner Tr.) 71:6-19 (DBOs ultimately assign job requisitions to Recruiters).

> TEK's ECF No. 203-4 is an impermissible summary document and, to the extent the Court considers TEK's declarations, it should consider the declarations in context of the entire document. *See* Plaintiffs' General Objections ¶ 4.

> TEK disputes that Recruiters may also volunteer or choose to work on specific requirements. SOF ¶ 34 does not address circumstances in which Recruiters may volunteer to work on specific requirements – as a manager stills assigns the requirement. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 34.

> Accordingly, SOF ¶ 34 is undisputed and should be deemed admitted.

35.     AMs' primary job duty (and not Recruiters') is to directly communicate with clients regarding their hiring needs. Ex. 4 (DiBenedetto Tr.) 115:9-14, 121:25-122:13; Ex. 5 (Doyle Tr.) 150:8-10, 167:6-10, 178:14-15, 185:4-188:5, 189:11-25, 191:3-7, 191:22-192:4; Ex. 12 (Pappas Tr.) 121:9-13; Ex. 21 (Andiamo Rule 30(b)(6) Tr.) 16:2-4; Ex. 83 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741 (Recruiters are evaluated if they "[o]btain missing information about the requirement from their Account Manager"), TEK-Recruiter_Lit-00152744 (Recruiters evaluated on the "ability to gather the appropriate client information from the Account Manager"); Ex. 84 (Delivery Qualification Form) at TEK-Recruiter_Lit-00413296 ("Recruiter… should come to the AM meeting PREPARED just like an AM would with their client."); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and AMs communicating with TEK's customers.).

**RESPONSE: Disputed in part and immaterial. Undisputed that Account Managers generally communicate with client's regarding the client's hiring needs and that recruiters generally obtain client information from an Account Manager.**

**Disputed as to Plaintiff's characterization of client communications as an Account Manager's primary function and the implication that the Recruiter role could not share the same primary function. (See Pls. Ex. 5, 186:10-187:21.)**

**For example, Plaintiffs' Ex. 83 reflects that Recruiter Trainees are expected to learn how to "Assess their requirement against the 9 key questions to determine if the requirement is qualified or unqualified" and to "Obtain missing information about the requirement from their Account Manager." (Pls. Ex. 83 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741.) Some Recruiters go directly to TEK's customers when a requirement is deficient or additional information is needed. (Df. Ex. 33, Levine-Gorelick Decl, ¶ 23 ("I have direct**

**interactions with TEK's customers on a regular basis. I join calls between Account Managers and customer hiring managers when we are "qualifying" requisitions, which is the call when we talk to the customer about the role they want to fill and the skills that are required. I am the expert on the labor market and the types of candidates that are available, and I am able to speak to the customer hiring manager in detail and to capture the information we need in order to be able to find a candidate who meets the requirement."); Df. Ex. 27, Compton Decl., ¶ 15 "If an Account Manager brings in a new client that has a need for the software developer skill sets that I specialize in, I like to join the Account Manager for a call with the customer to gather the requirements for the position. One of the benefits of this is getting the opportunity to hear about the customer's business and get a better understanding. Another benefit is that I can ask questions and help put together a more detailed requirement.".)**

*__PLAINTIFFS' REPLY__*: TEK does not dispute that Account Managers (and not Recruiters) generally communicate with clients regarding their hiring needs. As illustrated by ECF No. 190-78 (TEK Acronyms) at TEK-Recruiter_Lit-00043958, Account Managers "[p]rovide solutions to [TEK's] client's businesses & technology needs. Account Managers accomplish this by being in constant contact with customers." *See* ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and AMs communicating with TEK's customers.).

TEK also does not dispute that Recruiters generally obtain client information from an Account Manager. While some Recruiters may occasionally sit in on Account Managers' calls with clients or assist Account Managers when they are on vacation does not render communicating with clients regarding their hiring needs a primary duty of Recruiters. *See* ECF No. 190-12 (Pappas Tr.) 120-15:13 (Q. "But ultimately it was your responsibility to manage the relationship with the

clients; is that correct?" A. "It was, yes. It was ultimately the account manager's role, like, responsibility.").

Further, Levine-Gorelick and Compton are *Avery* class members and not class or collective members in this case and, as such, their testimony is irrelevant. In addition, both Levine-Gorelick and Compton were promoted out of the Recruiter position to a Recruiter Lead position and described their job duties in present tense – as Recruiter Leads. ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28.

Accordingly, SOF ¶ 35 is undisputed and should be deemed admitted.

36.    If Recruiters have questions about the job requisition, they ask the AMs. *Id.*; Ex. 4 (DiBenedetto Tr.) 110:22-112:4, 115:7-25, 123:2-14; Ex. 5 (Doyle Tr.) 137:19-138:4, 169:5-170:17, 176:9-19, 187:9-25; Ex. 85 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at 37 ("Identify the right questions to ask the AM to get a fully qualified req"), 39-42; Ex. 46 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 74 (slide titled "Business Qualification") ("these are the questions that you must have the answers to in order to have a better understanding of the req. If you do not have this information you need to hold your AM accountable to providing you with the answers."), 75 ("Call the AM to better understand the Req that the Recruiter is working on."); Ex. 31 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129468 (AMs must ensure Recruiters have all the information necessary); Ex. 82 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("account managers should work very closely with their recruiting partners to develop a strategy for filling qualified reqs.").

**RESPONSE**: **Disputed in part. Undisputed that Recruiters may ask AMs questions about job requisitions.**

**Disputed that Recruiters may only ask AMs such questions.**

Some Recruiters go directly to TEK's customers when a requirement is deficient or additional information is needed. (Df. Ex. 33, Levine-Gorelick Decl., ¶ 23 ("I have direct interactions with TEK's customers on a regular basis. I join calls between Account Managers and customer hiring managers when we are "qualifying" requisitions, which is the call when we talk to the customer about the role they want to fill and the skills that are required. I am the expert on the labor market and the types of candidates that are available, and I am able to speak to the customer hiring manager in detail and to capture the information we need in order to be able to find a candidate who meets the requirement."); Df. Ex. 27, Compton Decl., ¶ 15 "If an Account Manager brings in a new client that has a need for the software developer skills that I specialize in, I like to join the Account Manager for a call with the customer to gather the requirements for the position. One of the benefits of this is getting the opportunity to hear about the customer's business and get a better understanding. Another benefit is that I can ask questions and help put together a more detailed requirement.").)

Plaintiffs' citations do not support the statement.

Plaintiffs cite four passages of testimony by Doyle. In one, Doyle testifies that Recruiters ask questions about requirements directly to TEK clients. (Pls. Ex. 5 (Doyle Tr.), 187:9-25. The other passages do not contradict this statement. For example, Doyle describes a way that Recruiters can send messages to Account Managers. (*Id.*, 137:19-138:4.) It does not say this is the only way for Recruiter to ask questions about a job requisition. (*Id.*) Another passage describes how a Recruiter might partner with an Account Manager to discuss whether a candidate is a good match to an open requirement. (*Id.*, 169:5-170:17.) The final cited passage of testimony refer to an unidentified set of "questions that recruiters and the AMs are supposed to communicate to the clients and the consultants." (*Id.* 176:9-19.)

Nothing in the passage says that Recruiters may only ask Account Managers such questions.

The cited testimony by DiBenedetto relates to his description of training exercises for Recruiter Trainees, not Recruiters. (Pls. Ex. 4 (DiBenedetto Tr.) 110:22-112:4, 115:7-25, 123:2-14.)

Plaintiffs' Ex. 31, 46, 82, 85 simply discuss ways that Recruiters and Account Managers should partner together to ensure that job requirements contain the detail needed to find quality candidates to fill the role. None are directive of how Recruiters must perform their job duties or contradict the testimony above that Recruiters may go to other sources, including directly to TEK's clients, to obtain additional information.

***PLAINTIFFS' REPLY***: TEK does not dispute that Recruiters ask Account Managers questions about job requisitions. TEK disputes that all Recruiters only ask Account Managers questions about job requisitions. SOF ¶ 36 does not address whether Recruiters may also ask other individuals questions about job requisitions. TEK does not point to any evidence that generally, Recruiters direct job requisition questions to anyone other than Account Managers. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 36.

The testimony and documents cited by Plaintiffs supports SOF ¶ 36. For instance, ECF No. 190-85 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at 39, 42 is a training PowerPoint presentation that directs training facilitators to "[m]ake the point[s]" that Recruiters "*need* to be prepared to ask your AM the right questions" and "*need* to partner with the AM to get all of the necessary req information." (Emphasis added). Likewise, ECF No. 190-46 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 74 (slide titled "Business Qualification") instructs Recruiters that, if they do not have specific information about a job requisition, such as "What are the Top 3 Skills?" and "Is the Req with a 'Current Account'?", they

"need to hold [their] AM accountable to providing [them] with the answers."

Further, Levine-Gorelick and Compton are *Avery* class members and not class or collective members in this case and, as such, their testimony is irrelevant. In addition, both Levine-Gorelick and Compton were promoted out of the Recruiter position to a Recruiter Lead position and described their job duties in present tense – as Recruiter Leads. ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Dec.) ¶¶ 26-28. Regardless, TEK's citations to Levine-Gorelick Decl. at ¶ 23 and Compton Decl. at ¶ 15 do not contradict SOF ¶ 36, because both declarants state that they sometimes join calls between *Account Managers and* clients when they have questions about job requisitions.

Accordingly, SOF ¶ 36 is undisputed and should be deemed admitted.

37.     AMs provide information regarding the necessary qualifications, job details, and target pay for the position to Recruiters, and if Recruiters have questions about the job requisition, they ask the AMs. *Id.*; Ex. 5 (Doyle Tr.) 137:19-138:4, 187:9-189:25.

**RESPONSE: Disputed in part. Undisputed that Account Managers are part of the process for gathering information from TEK's clients regarding job requirements.**

**Disputed that Account Managers alone gather information from TEK's clients regarding job requirements and that Recruiters only speak with AMs about questions concerning job requisitions. See TEK's Response to Plaintiffs' Statements 35 and 36.**

**Disputed that Account Managers alone establish target pay for a position. See Dfs. Ex. 3 (gathering testimony regarding Recruiters' role in job requirement intake.)**

***PLAINTIFFS' REPLY:*** TEK does not dispute that AMs provide information regarding the necessary qualifications, job details, and target pay for the position to Recruiters. For the reasons stated above in Plaintiffs' Replies in support of SOFs ¶¶ 35 and 36, TEK also does not dispute that,

if Recruiters have questions about the job requisition, they ask the Account Managers.

SOF ¶ 37 does not address whether Account Managers alone gather information from TEK's clients regarding job requirements, that Recruiters only speak with AMs about questions concerning job requisitions, or that Account Managers alone establish target pay for a position. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 37.

ECF No. 203-3 is an impermissible summary document and, to the extent the Court considers TEK's declarations, it should consider the declarations in context of the entire document. *See* Plaintiffs' General Objections ¶ 4.

Accordingly, SOF ¶ 37 is undisputed and should be deemed admitted.

38.    Relying on TEK's practices and procedures, Recruiters search TEK's internal database and external sources, like LinkedIn, to match potential candidates with clients' requirements. Ex. 4 (DiBenedetto Tr.) 92:6-93:25; Ex. 5 (Doyle Tr.) 143:17-144:22, 148:2-17, 151:9-152:18, 172:12-185:3; Ex. 3 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12; ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) Answer to ¶ 63 ("Defendant admits that Recruiters find candidates . . . Defendant admits that Recruiters may search employment databases, including LinkedIn, Indeed, and Defendant's internal system Connected, to assemble a list of names of potential candidates."); Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5; Ex. 86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.

**RESPONSE: Disputed in part. Undisputed that Recruiters may use TEK's Connected database or external sources, including LinkedIn, to search for candidates.**

**Disputed that Recruiters rely on TEK's "practices and procedures" to identify potential candidates for TEK's client's job requirements, and disputed that Recruiters must use or are encouraged to use only these sources. See Df. Ex. 10, collecting statements about**

how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.

Disputed that Recruiters merely "match" candidates to requirements. Recruiters also must validate that candidates in fact possess the skills and other attributes relevant to the job requirement. Df. Ex. 59, Haycock Tr. 40:7-41:4 ("It's not just do the buzz words match, because many buzz words match, and the person is absolutely positively not the right person for the role. Because [candidates also know] that you have to have the right buzz words on your resume to get hits in search and match. … So a recruiter has to be able to discern between this person has all the right buzz words and jargon and they can actually do the job."); Df. Ex. 50, Bury Tr. 116:23-118:24, 119:22-120:5; Df. Ex. 31, Rothermich Decl. ¶¶ 3-10; Df Ex. 27, Compton ¶ 18; Df Ex. 30, Whitman ¶ 20; Df Ex. 26, Mendez ¶¶ 9, 14; Df Ex. 25, Guffy ¶ 12; Df Ex. 29, McCarty ¶ 15; Df Ex. 32, Yancey ¶ 17, 18; Df Ex. 27, Compton ¶ 18; Df Ex. 34, Kehl ¶ 11; Df Ex. 36, Ferrari ¶ 11; DF Ex. 37, Budde ¶ 18.

Plaintiffs' citations also do not support the statement.

Plaintiffs offer an incomplete quote from TEK's Answer to the Amended Complaint, Paragraph 63. The full answer shows that TEK denied the allegation that "Recruiters are required to follow specific protocols. (ECF No. 55, Answer to ¶ 63.)

Plaintiffs' Ex. 86 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. 86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.) Nonetheless, it does state that anyone following this guidance should not leave it up to the Account Manager to assess a candidate, but rather "tell the [Account Manager] what to think" by "tell[ing] them why this person is ideally qualified for their Req," with references, description of the candidates

**skills, availability to start, pay rate, and location, among other things.) (*Id.*)**

    ***PLAINTIFFS' REPLY:*** TEK does not dispute that it has developed practices and procedures for searching and matching for candidates and that Recruiters search TEK's internal database and external sources, like LinkedIn, to match potential candidates with clients' requirements.

    TEK disputes that Recruiters rely on TEK's practices and procedures to match potential candidates with clients' requirements. ECF No. 190-86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824 is a prime example of TEK's practices and procedures for searching for candidates using Connected. It provides Recruiters with step-by-step instructions, such as "Pull Candidate Profile up in Connected" then "Click on Matched Reqs (in upper right of Connected Profile)" then "Click View More" followed by "Change Location field to United States" and then "Click 100% Remote to Yes (very bottom on left)" and then "Manipulate Skills (and/or Titles) to match Candidate's most marketable strength(s)" and finally "Click Update Search Results." *Id.*; *see also*, ECF No. 190-108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 47-52 provides an additional example of the step-by-step guidance TEK provides to Recruiters regarding how to screen and match candidates (providing guidance on where and how to search for potential candidates, including how to use the search feature in TEK's internal database, Connected, and how to use Boolean searches). Likewise, ECF No. 190-85 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at 53 provides Recruiters with a sourcing strategy "Plan of Attack" that lists sourcing resources in the order Recruiters should use them instructs Recruiters to start sourcing from "near inventory" to "increase our odds that we are filling business in the most efficient way possible to satisfy both the clients and consultants H&C." *See also*, ECF No. 190-87 (Welcome to The HVA Workshop

Series) TEK-Recruiter_Lit-00000377 at 91 (PowerPoint slide showing sourcing strategy "Plan of Attack" and facilitator instructions to have Recruiter read each sourcing strategy in the Plan of Attach and "explain why they think it belongs in that order.").

TEK also does not dispute that it "prides itself on the sophistication and effectiveness of its internal *processes* and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs." ECF No. 190-22 (*Andiamo* Preliminary Injunction) at 2 (emphasis added). TEK has sued over purported disclosures of from Recruiters regarding TEK's "processes" for searching and matching clients. *See* ECF No.190- 24 (*Ambar* Cmplt.) at ¶¶ 15-20; ECF No. 190-25 (*Berardis* Cmplt.) at ¶¶ 15-20.

As a preliminary matter, ECF No. 203-10 is an impermissible summary document and, to the extent the Court considers TEK's declarations, it should consider the declarations in context of the entire document. *See* Plaintiffs' General Objections ¶ 4. Regardless, while TEK's declarants do not explicitly state they are using TEK's practices and procedures to search for potential candidates, virtually all the declarants stated that they used Connected (or TEK's predecessor to Connected: RWS) and LinkedIn as part of their search tools. *See, e.g.*, ECF No. 203-10 at Bohen Decl., ¶ 16 (used Connected and LinkedIn to search for candidates when he did not have a candidate in his network or through referral requests from the clients' current consultants), Guffy Decl., ¶ 10 ("Some of the commonly available resources are LinkedIn, a TEK internal system known as Connected, and referrals."), Kehl Decl., ¶ 10 ("[S]ometimes I will create searches in databases like LinkedIn or a TEK internal database called Connected."), Compton Decl., ¶ 17 ("My philosophy is to start where the strong relationships are. After that, I will turn to using search strings in Connected, which is a TEK internal database, or LinkedIn"), Levine-Gorelike Decl., ¶ 15 ("I will go to LinkedIn … I will turn to TEK's internal database of candidates, known as

Connected."), Edds Decl., ¶ 17 ("Even if I search on LinkedIn, I will cross-reference Connected"), Rice Decl., ¶ 11 ("I usually start my search in Connected, TEK's client relationship management system … I also used a third-party tool, LinkedIn Recruiter, to look for candidates."), Marshall Decl., ¶ 15 ("Often times, I would start with TEK's internal database, Connected …I used LinkedIn Recruiter quote a bit as well."). This type of uniform adoption of Connected and LinkedIn as search tools is indicative of TEK's established practices and procedures.

While TEK does not dispute that Recruiters match potential candidates with TEK's clients' requirements, TEK disputes that Recruiters *merely* match candidates to requirements and states that Recruiters must also validate the information provided by candidates. SOF ¶ 38 does not address whether Recruiters must also validate information provided by candidates, which would be part of the searching and matching process. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 38.

ECF No. 190-86 (Finding, Qualifying, and Submitting to a Remote Job) TEK-Recruiter_Lit-00190824 has metadata, which TEK produced, that indicates it is dated February 10, 2021. *See* Ex. 169 at 12-13 (TEK-Recruiter_Lit-006).

ECF No. 190-87 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 has metadata, which TEK produced, that indicates it is dated May 26, 2021. *See* Ex. 169 at 2 (TEK-Recruiter_Lit-001).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 38 is undisputed and should be deemed admitted.

39.    Recruiters review resumes and LinkedIn profiles to make sure candidates' experience and skills meet the clients' minimum qualifications. ECF No. 55 (Def.'s Answer to Pls.

1st Amend. Compl.) Answer to ¶ 63 ("Defendant admits that Recruiters find candidates . . . Defendant admits that Recruiters may search employment databases, including LinkedIn, Indeed, and Defendant's internal system Connected, to assemble a list of names of potential candidates."); Ex. 4 (DiBenedetto Tr.) 92:6-93:25, 162:18-163:7 (listing Recruiter "high value activity" as "understanding th[e] requirement and then sourcing it"); Ex. 5 (Doyle Tr.) 139:15-140:8, 143:17-144:22, 148:2-17, 151:9-152:18, 158:1-159:24, 172:12-17 (Q: "But it's still the recruiter's job, then, to see if the information on the G2 matches a requirement?" A: "Completely, yeah. They're going to look through the requirements and say this might fit or this might not."), 181:19-23 (Q: "So recruiters shouldn't generally be matching G2s or candidates with requisitions that are not qualified yet?" A: "It would largely be a huge waste of time to do so."); Ex. 3 (Haycock Tr.) 32:10-13 (Recruiters' "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs"), 59:2-11, 60:7-12 (Q: Recruiters' "job is to try to bring . . . the appropriate people in by finding that appropriate match . . .?" A: "Yes."); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (Recruiters "screening" candidates and Account Managers communicating with TEK's customers.); Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5; Ex. 86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; Ex. 87 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 89.

**RESPONSE: Disputed in part. Undisputed that part of the Recruiters' role is to understand a candidate's experience and skills and determine whether the candidate meets the minimum qualifications stated in the job requirement.**

**Disputed that a Recruiter's review always includes or is limited to a resume or LinkedIn profile, and disputed that a Recruiter only is making sure that a candidates'**

experience and skills meet the clients' minimum qualifications. This is only a threshold question, and Recruiters further scrutinize and validate the skills and other relevant qualities of candidates who meet minimum qualifications. See TEK's Response to Plaintiffs' Statement 38.

Plaintiffs' citations also do not support the statement.

Plaintiffs cite TEK's Answer to Paragraph 63 of the Amended Complaint, but neither the allegation nor the answer mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications."

In the first passage of testimony by DiBenedetto, he is providing "in its simplest form" an explanation of how the Connected database can be used to analyze the "local market demo." (Pls. Ex. 4 (DiBenedetto Tr.) 92:6-93:25." In the same passage, DiBenedetto explains that a recruiter might do this analysis because it "really enhances a recruiter's ability to be able to talk about what's happening locally or on a national level." (*Id.*) Nothing in the passage relates to sourcing or minimum qualifications.

In the second passage of testimony by DiBenedetto, he explains that what is a "high value activity" by a Recruiter "depends on what part of the recruiting efforts they're in." (Pls. Ex. 4 (DiBenedetto Tr.) 162:18-163:7.) Plaintiffs' cited to just one of the examples he provided. (*Id.*)

In the first passage of testimony by Doyle, he describes a scenario where a Recruiter might see a job requirement and know of a qualified candidate without the need to do a search at all (e.g., if the Recruiter already has the candidate in his or her network). (Pls. Ex. 5 (Doyle Tr.) 139:15-140:8.) The testimony does not mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications."

In another passage of testimony by Doyle, he describes different ways that a Recruiter, having identified a candidate they believe may be a good fit for a job requirement, can flag that candidate or use that candidate's profile to find similar candidates. (Pls. Ex. 5 (Doyle Tr.) 143:17-144:22.) The passage does not relate to how the Recruiter makes the determination that the candidate may be a good fir for the job requirement. (*Id*.)

In other cited passages of testimony by Doyle, he explains why Recruiters' "conversations [with candidates should] be as relevant as possible," and why Recruiters record those conversations in Connected, and offers examples important to candidates (pay expectations, employers that will not be considered). (Pls. Ex. 5 (Doyle Tr.) 148:2-17, 151:9-152:18.) The testimony says nothing about Recruiters "review[ing] resumes and LinkedIn profiles" and contradicts any notion that Recruiters limit themselves to such information.

In another passage of testimony by Doyle, he explains how Recruiters can think about ways they may need to change their approach if their efforts are not turning into starts, i.e., consultants beginning assignments with clients. (Pls. Ex. 5 (Doyle Tr.) 172:12-17.) The full exchange is much longer and shows that Doyle is explaining an attempt to develop technology to try to match potentially qualified candidates to job requirements, observing that "it doesn't work very well," having only about a 30% success rate, and noting that in any event the Recruiter still needs to decide whether the match is valid or not. (Pls. Ex. 5 (Doyle Tr.) 171:13-172:17.)

The final passage of cited testimony by Doyle also is both incomplete, misleading, and irrelevant. (Pls. Ex. 5 (Doyle Tr.) 181:19-23.) Doyle testifies that it would "be a huge waste of time" for Recruiters to match candidates with "requirements that are not qualified." (*Id*.) This is a statement about the readiness of the job requirement and is irrelevant to how a

Recruiter sources and evaluates candidates. The full response explains that there are three stages of readiness for a requirement: draft, "qualified," and Red Zone. (*Id.*, 180:22-182:18.) A "qualified requirement" is one that has moved a draft and TEK has "enough details to feel like, yes, this is something we can support," meaning someone from TEK has spoken with the client's hiring manager to understand the role, the bill rate is established, the urgency is known, the competitive landscape is understood, and there likely is a contract between TEK and its client for the work. (*Id.*)

The cited testimony by Haycock demonstrates that Recruiters do more than "review resumes and LinkedIn profiles" to check whether "minimum qualifications" are met; the Recruiter's "job is to find the absolute best talent and the best match between the consultants' skills, goals, and interests and the customer's needs." (Pls. Ex. 3 (Haycock Tr.) 32:10-13.) The complete answers by Haycock make the point even more clear, explaining that Recruiters consider not just "hard skills and technical skills," but also the candidate's interests (e.g., working independently v. as part of a collaborative team; in person v. remote v. hybrid; nature of the work; pay rate). (*Id.*, 30:18-32: 13.) As Haycock summarized, "when you say 'find,' it's like it's not just doing a database search and looking at all of the people and saying, Okay, this is the right person for the job. There's a lot more complexity in it than that." (*Id.*)

Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891.) The cited page is a graphic with a high level description of the "Delivery Business Cycle." (*Id.*) It does not support Plaintiffs' statement, as it notes that "Recruiters must *thoroughly* screen *or disqualify* candidates via resume review, technical

screening, professional references, certifications, etc." (*Id.* (emphasis added).)

Plaintiffs cite TEK's response to an interrogatory seeking a description of "any and all electronic programs, databases, software, systems, interfaces, and applications that Recruiters may use and did use to perform their job duties." (Pls. Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.) Neither the interrogatory nor the response appear relevant to the statement, and Plaintiffs do not provide any explanation for including it.

Plaintiffs' Ex. 86 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 86 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.) Nonetheless, it does state that anyone following this guidance should not leave it up to the Account Manager to assess a candidate, but rather "tell the [Account Manager] what to think" by "tell[ing] them why this person is ideally qualified for their Req," with references, description of the candidates skills, availability to start, pay rate, and location, among other things.) (*Id.*)

Plaintiffs' Ex. 87 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 87 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 89.) The cited slide includes a reference to "the importance of Sourcing Strategy, and identifying top talent in the marketplace." (*Id.*) The slide does not appear relevant to the statement, and Plaintiffs do not provide any explanation for including it.

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters review resumes and LinkedIn profiles to determine whether candidates' experience and skills meet the clients' "minimum" qualifications. TEK disputes that Recruiters' review always includes or is limited to a resume or LinkedIn profile. SOF ¶ 39 does not address whether Recruiters' review always includes

or is limited to a resume or LinkedIn profile. TEK does not meaningfully dispute that Plaintiffs' cited exhibits demonstrate that Recruiters review resumes and Linkedin profiles to make sure candidates experiences and skills match clients' requirements. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 39.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

ECF No. 190-79 (Recruiter Onboarding Plan) TEK-Recruiter Lit-00097835 has metadata, which TEK produced, that indicates it is dated February 7, 2022. *See* Ex. 169 at 8 (TEK-Recruiter_Lit-004).

ECF No. 190-86 (Finding, Qualifying, and Submitting to a Remote Job) TEK-Recruiter Lit-00190824 has metadata, which TEK produced, that indicates it is dated February 10, 2021. *See* Ex. 169 at 12-13 (TEK-Recruiter_Lit-006).

ECF No. 190-87 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 has metadata, which TEK produced, that indicates it is dated May 26, 2021. *See* Ex. 169 at 2 (TEK-Recruiter_Lit-001).

Accordingly, SOF ¶ 36 is undisputed and should be deemed admitted.

40.    TEK provides Recruiters with "search and match" technology that helps automatize the screening process. Ex. 3 (Haycock Tr.) 39:17-40:24 ("Technology is getting better obviously every day to be able to do those matches by themselves"), 139:22-140:22; Ex. 5 (Doyle Tr.) 141:15-142:9, 143:3-14; Ex. 7 (McNelley Tr.) 82:11-15; Ex. 15 (Kartchner Tr.) 174:5-15; Ex. 88 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065 (describing Mock Red Zone exercise in which Recruiters are instructed to "auto match each candidate to ANY req that's currently open, regardless of location."); Ex. 31 (Running a D4 Coaching Venue) at TEK-

Recruiter_Lit-00129467 ("What other reqs does this candidate Auto-Match or fit?"); Ex. 16 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307.

**RESPONSE: Disputed in part. Undisputed that limited "search and match" technology is available to Recruiters.**

**Disputed that the technology is used consistently by Recruiters or meaningfully impacts Recruiter job duties.**

**Plaintiffs' Ex. 3 cites to a truncated portion of testimony by Haycock. (Pls. Ex. 3 (Haycock Tr.) 39:17-40:24.) In the more fulsome portion of his testimony, Haycock explains that "search and match" is a "very common industry term" used for third-party services like LinkedIn and Google, as well as internal tools. (*Id.*, 38:6-41:4.) Haycock further explains that the tool is the "science of recruiting," but its effectiveness depends on the "art of recruiting" and the ability to "discern" the difference between a candidate having "all the right buzz words and jargon" versus the ability to "actually do the job." (*Id.*) Discerning these differences is "really difficult for technology." (*Id.*)**

**Plaintiffs' Ex. 5 likewise cites to a truncated portion of testimony by Doyle. (Pls. Ex. 5 (Doyle Tr.) 141:15-142:9, 143:3-14.) In the abbreviated portion Plaintiffs cite, Doyle mentions that Connected was "setup with some AI technology that would comb through candidates and determine who might potentially be a fit for that opportunity and pull that up into a search." (*Id.*) In response to a later question, Doyle added more detail, testifying that while TEK had hoped the technology would help with matching, "It doesn't work very well… it was a great concept, but the technology is not very good." (Df. Ex. 53, Doyle Tr. 170:18-172:11.)**

**Plaintiffs' Ex. 7 truncates testimony by McNelly about "auto matches." (Pls. Ex. 7**

(McNelley Tr.) 82:11-15.) Plaintiffs omitted McNelley's immediately preceding statement: "Q: [W]hat is the auto match matching? A. I don't know. To be honest with you, I'm not in the weeds on the technology to know exactly how auto match works." (Df. Ex. 64, McNelley Tr. 82:3-15.)

Plaintiffs cite an excerpt of testimony by Kartchner explaining the "auto match" function in Connected. (Pls. Ex. 15 (Kartchner Tr.) 174:5-15.) Plaintiffs omitted his later statement that auto match does not replace the Recruiter: "If it would replace a recruiter, I wouldn't -- no, it does not. I wouldn't have a job if that were the case." (Df. Ex. 72, Kartchner Tr. 185:8-14.)

(Pls. Ex. 88 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065 (describing Mock Red Zone exercise in which Recruiters are instructed to "auto match each candidate to ANY req that's currently open, regardless of location.").)

Plaintiffs' Exhibit 31 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 31 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467.)

Plaintiffs' Ex. 16 is an unauthenticated email and attachment dated February 5, 2019. (Pls. Ex. 16 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307.) The document lists as a "Coaching" opportunity the question: "What other reqs does this candidate Auto-Match or fit?" (*Id.*) The purpose and meaning of the document is not clear from its face and not explained by Plaintiffs.

***PLAINTIFFS' REPLY:*** TEK does not dispute that it provides Recruiters with "search and match" technology that helps automatize the screening process. SOF ¶ 40 does not address whether the "search and match" technology provided by TEK could replace Recruiters' job duties. Thus,

TEK's remaining "disputes" are irrelevant to SOF ¶ 40.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

ECF No. 190-31 (Running a D4 Coaching Venue) TEK-Recruiter Lit-00129467 has metadata, which TEK produced, that indicates it is dated April 22, 2019. *See* Ex. 169 at 10 (TEK-Recruiter_Lit-005).

Accordingly, SOF ¶ 40 is undisputed and should be deemed admitted.

41.     TEK provides Recruiters with step-by-step guidance on how to search and match candidates. Ex. 5 (Doyle Tr.) 130:25-152:18; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 116-125; Ex. 90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 15, 20-22.

**RESPONSE: Disputed. While TEK provides support and training, "no one tells recruiters how to do their job," and that TEK "teaches [] question-based leadership." (Df. Ex. 25, Guffy Decl. at ¶19.)**

**Plaintiffs' citations do not support the statement, but instead relate to how to use the Connected tool to search for candidates. As explained elsewhere, Recruiters are not required, and many do not, use Connected at all. See TEK's Responses to Statement 38 and Df. Ex. 10, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.**

**Plaintiffs cite testimony by Doyle regarding the Connected User Guide. (Pls. Ex. 5 (Doyle Tr.) 130:25-152:18.) Doyle explains that while the Connected platform may assist in finding potential matches, recruiters are encouraged to rely on conversations and judgment, stating, "we really encourage more conversations versus using technology in these areas just because you can't tell the story there." (*Id.*, 144:6-14.) Doyle also explains that searching and**

matching is not rigid or standardized. (*Id.*) Doyle also describes the importance of gathering information about a candidate's skills, goals, preferences, and constraints, which helps recruiters tailor their outreach, rather than following standardized steps. (*Id.*, 130:25-152:18).

Plaintiffs also points to pages of the Connected User Guide. (Pls. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 116-125.) Those pages explain Connected functionality but do not direct how to conduct a search. (*Id.*) For example, one page describes how "filters" may be used to narrow search results. (*Id.* at 116.) However, the document does not tell the Recruiter what terms should be included in the initial search, or what filters to apply to narrow the results the initial search returns. (*Id.*)

Plaintiffs' Ex. 90 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 15, 20-22.) Plaintiffs do not provide any explanation for including it.

*PLAINTIFFS' REPLY:* TEK does not dispute meaningfully dispute that it provides step-by-step guidance on how to search and match candidates.

Plaintiffs' cited evidence supports SOF ¶ 41, and TEK has not pointed to documents or testimony that demonstrates otherwise. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986).

ECF No. 190-90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 15, 20-22 contains content descriptions for the Degreed training videos that TEK provides to Recruiters. These pathways include step-by-step guidance on how to navigate talent search, opportunity match, navigate req opportunity searches, how to match users to a job requisition through Connected, and

find similar talent, among other topics related to searching and matching candidates. *Id*.

ECF No. 190-90 (Degreed Pathway) TEK-Recruiter Lit-00078540 has metadata, which TEK produced, that indicates it is dated August 10, 2022. Ex. 169 at 6 (TEK-Recruiter_Lit-003).

Contrary to TEK's assertion otherwise, ECF No. 190-89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 116-125 also includes step-by-step guidance on how to search and match candidates. The Connected User Guide provides step-by-step guidance on how Recruiters can use Connected to narrow searches to find talent, preview resumes, use the Find Similar Candidate function to find candidates with similar skills and qualifications to one another, among other things, and it does so by providing sequentially numbered screenshots guiding Recruiters through each step of the process. *Id*. The Connected User Guide also provides guidance to Recruiters that it is best to start global searches using "two pieces of information (such as a company name and location)." *Id*. at 16. Doyle's testimony affirms that the Connected User Guide provides search and match guidance to Recruiters. *See* ECF No. 190-5 (Doyle Tr.) 130:25-152:18. ECF No. 190-108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 47-52 provides an additional example of the step-by-step guidance TEK provides to Recruiters regarding how to screen and match candidates (providing guidance on where and how to search for potential candidates, including how to use the search feature in TEK's internal database, Connected, and how to use Boolean searches).

TEK's reliance on Guffy's declaration is misplaced because she is an *Avery* class member and not class or collective member in this case and, as such, her declaration is irrelevant. In addition, Guffy was promoted out of the Recruiter position to a Recruiter Lead position and described her job duties in present tense – as a Recruiter Lead. ECF No. 203-25 (Guffy Decl.) ¶ 6.

Testimony from Opt-in Plaintiffs also confirms that TEK provides Recruiters with step-by-

step guidance on how to search and match candidates. *See, e.g.*, Ex. 146 (Carter Tr.) 111:7-23. (describing TEK's highlighter test in which Recruiters are instructed to highlight the skills on a potential candidates' resume to see if it matches the skills in the job requirement); Ex. 143 (Baker Tr.) 90:16-91:17 (same); Ex. 150 (Guidry Tr.) 115:16-22 (same); Ex. 132 (Dries-Wielandt Decl.) ¶ 18 ("I followed TEKsystems' procedures and searched employment databases, including TEKsystems' internal database and LinkedIn. When searching employment databases, TEKsystems instructed me to utilize the Requirement including 'top three job skills' and match it to candidates' resumes".); Ex. 134 (Holin Decl.) ¶ 18 (same); Ex. 135 (Martin Decl.) ¶ 18 (same); Ex. 137 (Olszewski Decl.) ¶ 17 (same); Ex. 140 (Stein Decl.) ¶ 18 (same); Ex. 142 (Walker Decl.) ¶ 17 (same).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 41 is undisputed and should be deemed admitted.

42.     TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs." Ex. 22 (Andiamo Preliminary Injunction) at 2; *see also* Ex. 23 (Andiamo Aff. of Alexander Pulido) at ¶ 7 ("In support of its staffing and recruitment efforts, TEKsystems uses a proprietary and confidential candidate database . . . TEKsystems uses the Database to identify candidates who are likely to prove a strong match for the prospective client's needs."); Ex. 24 (*TEKsystems, Inc. v. Ambar* ("*Ambar*") Complaint) at ¶¶ 15-20; Ex. 25 (*TEKsystems, Inc. v. Berardis* ("*Berardis*") Complaint) at ¶¶ 15-20.

**RESPONSE: Disputed in part. Undisputed that Plaintiffs have accurately quoted the**

cited portions of Pls. Ex. 22.

**Disputed insofar as Plaintiffs suggest that the "internal process and databases" referenced here diminish the job duties of Recruiters. See TEK's Response to Statement 38 and Df. Ex. 10, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.**

***PLAINTIFFS' REPLY:*** TEK does not dispute that TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs." ECF No. 190-22 (Andiamo Preliminary Injunction) at 2. TEK admits it sued former Recruiters and a recruiting company competitor because it alleged a breach of its confidential "proprietary and confidential candidate database." Simply put, TEK's technology is so important to TEK, it sued over alleged disclosure of it. SOF ¶ 42 does not address whether this statement diminishes the job duties of Recruiters. TEK's ECF No. 203-10 is an impermissible summary document and, to the extent the Court considers TEK's declarations, it should consider the declarations in context of the entire document. *See* Plaintiffs' General Objections ¶ 4. However, TEK's declarants do not contradict SOF ¶ 42.

Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 42. Accordingly, SOF ¶ 42 is undisputed and should be deemed admitted.

43.    TEK's own documents describe a primary duty for Recruiters as "[s]creen[ing] consultants." Ex. 83 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152743 (evaluated on "screen[ing]" candidates); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK business cycle as including Recruiters "screening" candidates.); Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter:  .  .  .  .  Screens

consultants"); Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692 (same); Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 50 (Seattle Welcome Packet) TEK-Recruiter_Lit-00552030 (same); Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005763 (same); Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133187 (same); Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425010 (same); Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450704 (same); Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508983 (same); Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545026 (same); Ex. 78 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. Screens consultants . . . ."); *see also* Ex. 15 (Kartchner Tr.) 57:2-6; Ex. 11 (Minniear Tr.) 77:7-19; *supra* ¶ 29.

**RESPONSE: Disputed in part. Undisputed that TEK documents describe "screening" by Recruiters.**

**Disputed that TEK documents describe "screening consultants" as a primary duty for Recruiters. Plaintiffs' citations do not support the statement.**

**Plaintiffs' Ex. 83 is an unauthenticated document. On its face, it appears to be an evaluation form for Recruiter Trainees, not the Recruiter role at issue in this litigation. (Pls. Ex. 83, misidentified by Plaintiffs as "*Recruiter* Evals Form 2021.") The portion cited by Plaintiffs reflects that recruiters are expected to do more than "screen," describing "screening" as an initial step as part of building a personal network of candidates who the recruiter may be able to match to the right role. (*Id.*, TEK-Recruiter_Lit-00152743.)**

**Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at**

TEK-Recruiter_Lit-00097891.) The cited page is a graphic which a high level description of the "Delivery Business Cycle." (*Id*.) It does not support Plaintiffs' statement, as it notes that "Recruiters must *thoroughly* screen *or disqualify* candidates via resume review, technical screening, professional references, certifications, etc." (*Id*. (emphasis added).)

Plaintiffs' Ex. 47-50, 56-62 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id*.) Plaintiffs cite pages within the documents that include brief descriptions of various roles, including Recruiter: "Partners with AM to understand requirements and culture of a client. Screens consultants to gain insight into their skills, goals, interests and provides aligned opportunities." (*Id*.) Even the brief description in those documents is more expansive than what Plaintiffs suggest, reflecting that Recruiters delve into learning about a candidate's skills, goals, and interests in order to see whether those align to TEK's customer's job requirements. (*Id*.) See also Plaintiffs' Ex. 78 (same).)

Plaintiffs cite the testimony of Kartchner, who agrees that "one of the duties as a recruiter is to screen and match candidates to job requirements." (Pls. Ex. 15 (Kartchner Tr.) 57:2-6.) Kartchner does not testify that this is a primary duty of Recruiters.

Plaintiffs cite the testimony of Minniear, who describes the many steps that Recruiters take to "qualify or disqualify candidates," which include understanding the requirement, understanding the candidate's qualifications toward that requirement, references, and in office interviews. (Pls. Ex. 11 (Minniear Tr.) 77:7-19.) Minniear does not use the word "screening" or testify that it is a primary duty.

*__PLAINTIFFS' REPLY__*: TEK does not dispute that TEK's documents describe "screening" as a job duty performed by Recruiters.

Plaintiffs' cited evidence supports SOF ¶ 43. The "Welcome Packets" cited by Plaintiffs in

SOF ¶ 43 include a TEK Dictionary for employees to "learn the different terms that [TEK] use[s] each day in our jobs." ECF No. 190-47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408132-33; ECF No. 190-48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399691-92 (same); ECF No. 190-49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489274-75 (same); ECF No. 190-50  (Seattle Welcome Packet) TEK-Recruiter_Lit-00552029-30 (same); ECF No. 190-56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005762-63 (same); ECF No. 190-57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133186-87 (same); ECF No. 190-58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425009-10 (same); ECF No. 190-59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-0045070304 (same); ECF No. 190-60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508982-83 (same); ECF No. 190-61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545025-26 (same). Each role definition at TEK is limited to one-to-two sentences summing up the most important functions of the role. *See id*. TEK defines the most important (*primary*) functions of the Recruiter role as "[p]artner[ing] with AMs to understand requirements and culture of a client. *Screens* to gain insight into their skills, goals, interests and provides aligned opportunities." *Id.* (emphasis added); *see also* ECF No. 190-78 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 (using same definition for "Recruiter"). As such, the "Welcome Packets" describe a primary job duty for Recruiters as screening consultants. *See id*.

ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097890 describes the Delivery Business Cycle as a "repeatable process that takes us from acquiring the business of Customers all the way to filling those Customer roles with Consultants." In other words, the Delivery Business Cycle encompasses all Recruiters' recruiting tasks. *See id*. at TEK-Recruiter_Lit-00097890-91. The Delivery Business Cycle includes six steps: Business

Development, Business Qualification, Sourcing Strategy, Qualify/Disqualify Candidates, Present Candidate to Customer, and Consistent Communication. *Id*. at TEK-Recruiter_Lit-00097891. ECF No. 190-79 includes a chart that describes the tasks that Recruiters, Account Managers, and Recruiter Leads should undertake at each step of the Delivery Business Cycle. *Id*. Based on this chart, Recruiters are expected to affirmatively act by: "feel[ing] comfortable asking the AMs about the level of relationship and how many times they have met with their Customers" during the Business Development phase, work with AMs or RLs "to develop a sourcing strategy for qualified reqs" during the Sourcing Strategy phase, "thoroughly screen or disqualify candidates via resume review, technical screening, professional references, certifications, etc." during the Qualify/Disqualify Candidates phase, "know the candidate and every aspect outlined in the highlighter test to sell to the AM before submitting any candidate" during the Present Candidate to Customer phase, and "maintain consistent communication with the Consultants to receive and provide feedback as needed" during the Consistent Communication phase. *Id*. With the exception of Recruiters' final task in the Delivery Business Cycle (consistent communication with consultants), all Recruiters' assigned tasks relate to screening candidates to match them to job requisitions. *See id*. Thus, ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097890-91 supports the fact that TEK's own documents describe a primary duty for Recruiters as screening consultants.

ECF No. 190-79 (Recruiter Onboarding Plan) TEK-Recruiter Lit-00097835 has metadata, which TEK produced, that indicates it is dated February 7, 2022. Ex. 169 at 8 (TEK-Recruiter_Lit-004).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 43 is undisputed and should be deemed admitted.

44.    Once Recruiters have matched potential job candidates to the job requisition, Recruiters contact potential candidates in the hope of reaching them to complete an initial intake. Ex. 5 (Doyle Tr.) 134:5-22, 271:14-18, 278:22-279:7; Ex. 4 (DiBenedetto Tr.) 180:13-182:13; ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) ¶ 63.

**RESPONSE: Disputed in part. Undisputed that Recruiters contact potential candidates regarding job requirements.**

**Disputed that a Recruiter's contact with potential candidates regarding job requirements is always, or even routinely, an "initial intake."**

**As notes above, Recruiters are encouraged to build personal networks so that they already have qualified candidates with whom they have spoken before aligning to a potential job requirement. See TEK's Response to Statement 39, 43. See also Df. Ex. 10, collecting statements regarding Recruiter's different sourcing strategies, including building and relying on personal networks.**

**Plaintiffs' citations do not support the statement either. The first cited passage of testimony by Doyle explains that Recruiters may plan their day to include calls to their consultants on assignment, people already in their network, or people "they are actively reaching out to see if they're interested in opportunities." (Pls. Ex. 5 (Doyle Tr.) 134:5-22.) The second passage of testimony by Doyle says that Recruiters spend most of their interactions with consultants. (*Id.*, 271:14-18.) He does not say that is in the context of contacting new candidates for initial intake. (*Id.*) The final passage of testimony by Doyle merely confirms that if a Recruiter calls a consultant and leaves a voicemail, they note that fact in Connected so that another Recruiter does not reach to the same person soon thereafter**

and give the appearance that TEK "do[esn]'t have its act together." (*Id.*, 278:22-279:7.)

Plaintiffs cite testimony by DiBenedetto, but in that passage he merely explains the difference in meaning between "Call" and "Attempt" as used in the Connected database. (Pls. Ex. 4 (DiBenedetto Tr.) 180:13-182:13.)

Finally, Plaintiffs cite TEK's Answer to Paragraph 63 of the First Amended Complaint. (ECF No. 55, ¶ 63.) The answer merely confirms that "Recruiters may contact potential candidates to see if they meet the qualifications set by Defendant's clients and are interested in the open position." (*Id.*)

**_PLAINTIFFS' REPLY:_** TEK does not dispute that Recruiters contact potential candidates regarding job requirements.

TEK disputes that Recruiters' contact with candidates regarding potential job requirements is "always" an "initial intake." SOF ¶ 44 does not address whether all of Recruiters' contact with potential candidates regarding potential job requirements is always an initial intake. Rather, SOF ¶ 44 addresses situations in which Recruiters are contacting potential job candidates to a job requirement *after* the Recruiter has already matched that candidate to a requirement. As illustrated by TEK's Response to SOF ¶ 38, TEK does not dispute that Recruiters are expected to confirm that the information on a candidate's profile or resume is correct and matches the job requirements. TEK has not pointed to any testimony or documents that contradicts SOF ¶ 44. Even if a Recruiter had prior contact with a potential candidate, Recruiters still contact candidates in hopes of reaching them to complete an initial intake regarding the specific job requirement to which the Recruiter has matched them. *See, e.g.*, ECF No. 190-11 (Minniear Tr.) 77:7-19 (A. "Qualify or disqualify candidates. So recruiters when they are working on a requirement they're consistently qualifying or disqualifying candidates based off of their understanding of the requirement and then the

candidates' qualifications toward that requirement, and they do that through the G2. They do that through the references. They do that through the IOIs, interoffice interviews that they do. And you either if they're qualified because they meet the aspects of the requirements then we move forward with submitting them. If they don't then we disqualify them for that particular requirement."); Ex. 158 (Shestopalko Tr.) 54:12-55:2 (Q. "So you said that qualifying would involve making some phone calls to check a candidate's qualifications, is that accurate?" A. "Yeah. It's more so like when you're on the phone with them going through the checklist of technologies they need to have experience with and asking them if they do and if they don't." Q. "Okay. What types of questions would you typically ask in a qualifying conversation?" A. "Yeah, do you have experience with this technology, if so, like what did you do with it, how many years have you worked with it. It's like that for all of the things that the job requirement asks for.").

Accordingly, SOF ¶ 44 is undisputed and should be deemed admitted.

45.    TEK's managers describe Recruiters' job duties as a "grind," and the vast majority of Recruiters' outreach goes unanswered or is rebuffed. Ex. 91 (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-00044799; Ex. 12 (Pappas Tr.) 93:14-24, 99:4-100:18, 100:25-101:14; Ex. 4 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact).

**RESPONSE: Disputed and immaterial. Plaintiffs citations do not support the broad assertion that TEK's managers generally describe Recruiter job duties as a "grind." It is also immaterial to an assessment of Recruiter job duties.**

**Pappas testified that "There was a lot of grit and a lot of grind to both the recruiting role and the account management role. I grinded in both of the roles when I was there. I worked really hard." (Pls. Ex. 12 (Pappas Tr.) 93:14-24.) She did not testify or suggest that**

the job duties were a grind, as opposed to her own efforts. Pappas did not testify that the vast majority of Recruiters' outreach goes unanswered or is rebuffed.

Plaintiffs' Ex. 91 is an unauthenticated email exchange with messages ranging from September 23, 2018 through April 10, 2019 between DiBenedetto and a Technical Recruiters. (Pls. (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-00044799.) From the face of the document, DiBenedetto sends a message to the Technical Recruiter to ask how she is doing, and she responds, in part "I finally got my first taste of commission last week and that was so exciting. It's definitely a grind but it's been a rewarding journey so far." (*Id.*) DiBenedetto responds, echoing her words, "Super happy for you to hear that all is well and you're seeing the value in what's called the 'grind'!" (*Id.*) The document does not saying that the vast majority of Recruiters' outreach goes unanswered or is rebuffed.

Plaintiffs' Ex. 4 is an excerpt of testimony by DiBenedetto, where he explains that it is important for Recruiter to develop skills to get past roadblocks they may experience when calling consultants, which enable "more meaningful conversations." (Pls. Ex. 4 (DiBenedetto Tr.) 80:14-82:22.) DiBenedetto did not testify that he or others view Recruiters' job duties as a "grind" or that the "vast majority of Recruiters' outreach goes unanswered or is rebuffed." (*Id.*)

*PLAINTIFFS' REPLY*: TEK disputes that TEK's managers describe Recruiters' job duties as a "grind," and that the vast majority of Recruiters' outreach goes unanswered or is rebuffed, but TEK has not pointed to any specific testimony or documents in the record in support of its disputes, and TEK cannot manufacture disputes. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986).

TEK does not dispute that DiBenedetto described Recruiter job duties as a "grind" in an April 10, 2019 email. *See* ECF No. 190-91 (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-

00044799; *see also* Ex. 128 (DiBenedetto Email Oct. 21, 2021) at TEK-Recruiter_Lit-00020979-80 ("**Compete harder than everyone else** – stay late, work from home, evenings, weekends, etc. Average inputs will yield average results. Be relentless in your effort."). Contrary to TEK's assertions otherwise, Pappas testified that Recruiters' job duties are a "grind." *See* ECF No. 190-12 (Pappas Tr.) 93:14-24 (Q. "And so why do you think Tek referred to the recruiters as sales roles?" [Objection and response by Plaintiffs' counsel omitted] A. "I think I mentioned earlier there was a lot of grind to this role. There was a lot of grit and a lot of grind to both the recruiting role and the account management role. I grinded in both of the roles when I worked there. I worked really hard. So I would anticipate that individuals that had that sales background to understand that."); *see also id*. at 99:4-7 (Q. "You had said that you thought one of the reasons Tek looked for people in sales was because the job could be a grind?" A. "Yes."); *id*. at 99:25-100:4 (Q. "When you said 'a grind,' did you mean [Recruiters] worked long hours?" A. "Yeah. There was a lot of hours that – worked long hours. And more than that was they were recruiting."); *id*. at 100:25-101:14 (Q. "What about for recruiters generally when they're making calls to potential candidates? Do you have an estimation of how many people actually picked up the phone and spoke with them?" A. "Oh, gosh –" [Objection and response by Plaintiffs' counsel omitted] A. "They will make a lot of calls for specific candidates, a lot of either not answering or callbacks. There was many calls that were made throughout the day by recruiters and even by account managers when they're prospecting new business." Q. "Is that part of the grind that you're talking about?" A. "Yes."). Pappas' reference to her own efforts in the recruiter role as being a "grind" illustrated her point that the Recruiter job duties are a "grind." *See id*. at 93;14-24; *see also id*., at 99:4-7, 99:25-100:4, 100:25-101:14. TEK's Executive Director of Finance, Philip Eisman similarly described as "high stress." Ex. 170 (TEK's Executive Director of Finance Philip Eisman Tr. ("Eisman Tr."))

68:22-69:5 ("[F]rom a common sense standpoint, I would say that, you know, that it's a high stress job, you know, just being a roller – you know, you're trying to get, you know, production levels, you know, spread levels as high as possible. You know, I'm not a salesperson, never could be, or a recruiter. But, you know, part of that is because it's a high stress job.").

Pappas also testified that, when making calls to potential candidates, Recruiters "will make a lot of calls for specific candidates" and Recruiters receive "a lot of not answers or callbacks" in response. ECF No. 190-12 (Pappas Tr.) 101:7-8. DiBenedetto similarly testified that Recruiters hit a lot of "roadblocks" when calling consultants, which he defined as a situation in which the person a Recruiter called does not want to speak with them. ECF No. 190-4 (DiBenedetto Tr.) 81:7-82:22.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 45 is undisputed and should be deemed admitted.

46. Recruiters face obstacles in reaching candidates – including consultants not answering their phone calls because, for one reason, they get on average 34 solicitation calls a week. Ex. 92 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 4 (consultants get on average 34 "solicitation" calls a week); Ex. 93 (Welcome to the H.V.A. Workshop Series) at TEK-Recruiter_Lit-00000343 (same); Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097858 (same); Ex. 82 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("Consultants tell us time and again that they're getting inundated with insignificant phone calls regarding jobs that they aren't even right for, and they're not interested in."); Ex. 4 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact), 180:13-182:13; Ex. 94 (Recruiter Lead Video Script) at TEK-Recruiter_Lit-00056681 ("Not everyone will answer the first time you call and persistence is important.").

**RESPONSE:** Disputed in part Undisputed that Recruiters are not always able to reach candidates or consultants by phone.

Disputed insofar as the statement suggests that TEK Recruiters are making, on average, 34 solicitation calls a week to the same candidate or consultant, and disputed insofar as the statement suggests the "obstacles" Recruiters face are insurmountable.

Plaintiffs' Ex. 4 is an excerpt of testimony by DiBenedetto, where he explains that it is important for Recruiters to develop skills to get past roadblocks they may experience when calling consultants, which enable "more meaningful conversations." (Pls. Ex. 4 (DiBenedetto Tr.) 80:14-82:22.)

Plaintiffs' Ex. 92 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 92 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 4.) On its face, the document describes how to use "value messaging" to engage consultants in discussion. (*Id.*)

Plaintiffs' Ex. 93 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 93 (Welcome to the H.V.A. Workshop Series) at TEK-Recruiter_Lit-00000343.) On its face, the document describes how to engage consultants in discussion. (*Id.*)

Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097758.) Plaintiffs appear to have cited the document only for the statement that consultants receive, on average, 34 solicitations for new job opportunities per week, a point that TEK does not dispute.

Plaintiffs' Ex. 82 is an unauthenticated document, bearing no date and having no

description of its purpose or intended audience. (Pls. Ex. 82 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677.) Plaintiffs appear to have cited the document only for the statement that consultants feel "inundated with phone calls regarding jobs they aren't even right for," a point that TEK does not dispute.

Plaintiffs' Ex. 94 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 94 (Recruiter Lead Video Script) at TEK-Recruiter_Lit-00056681.) Plaintiffs appear to have cited it for the common sense the statement that "Not everyone will answer the first time you call and persistence is important," a point that TEK does not dispute.

***PLAINTIFFS' REPLY***: TEK does not dispute that Recruiters face obstacles in reaching candidates, including consultants not answering their phone calls. TEK also does not dispute that consultants receive, on average, 34 solicitations for new job opportunities each week. SOF ¶ 46 does not address whether TEK Recruiters are making, on average, 34 solicitation calls a week to the same candidate or consultant, or whether the obstacles that Recruiters face are insurmountable. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 46.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

ECF No. 190-92 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 has metadata, which TEK produced, that indicates it is dated September 2, 2020. Ex. 169 at 4 (TEK-Recruiter_Lit-002).

ECF No. 190-93 (Welcome to the H.V.A. Workshop Series) TEK-Recruiter_Lit-00000337 has metadata, which TEK produced, that indicates it is dated November 22, 2019. Ex. 169 at 2 (TEK-Recruiter_Lit-001).

ECF No. 190-82 (Onboarding Pathway Script) TEK-Recruiter Lit-00056671 has metadata, which TEK produced, that indicates it is dated August 16, 2021. Ex. 169 at 4 (TEK-Recruiter_Lit-002).

ECF No. 190-94 (Recruiter Lead Video Script) TEK-Recruiter_Lit-00056679 has metadata, which TEK produced, that indicates it is dated August 16, 2021. Ex. 169 at 4 (TEK-Recruiter_Lit-002).

Accordingly, SOF ¶ 46 is undisputed and should be deemed admitted.

47.    When Recruiters are able to connect with candidates, they do an intake, internally referred to as a "G2." Ex. 4 (DiBenedetto Tr.) 84:11-85:13; Ex. 5 (Doyle Tr.) 144:25-145:10; Ex. 3 (Haycock Tr.) 60:19-21 ("A G2 is an information form that we use to be able to collect information about the candidate"); Ex. 9 (Fronzaglio Tr.) 157:24-158:10; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159.

**RESPONSE: Disputed in part. Undisputed that Recruiters may do an "intake" call the first time they speak with a candidate.**

**Disputed that a Recruiter does an "intake" each time they reach a candidate, and disputed that "intake" and "G2" are synonymous. See TEK's Response to Statement 44.**

**The cited testimony by Doyle explains that "G2 is information gathering" to learn about a consultant, with the Recruiter taking notes so that "they can go back and remember more details about that candidate," such as "what they're looking for and what is important to them" at a future time. (Pls. Ex. 5 (Doyle Tr.) 144:25-145:10.) He does not testify that a G2 is an "intake" discussion.**

**The cited testimony by DiBenedetto explains the "G2 framework," which he describes as the components of a phone conversation. (Pls. Ex. 4 (DiBenedetto Tr.) 84:11-85:13.) He**

does not testify that a G2 is an "intake" discussion. He does not clarify that a G2 is not a "form," but rather "an empty box where you simply type in what the consultant is saying." (*Id.*, 86:14-87:6.)

The cited testimony by Hancock explains that a G2 is the collection of information about a candidate. (Pls. Ex. 3 (Haycock Tr.) 60:19-21.)

The cited testimony by Fronzaglio explains that a G2 information gathering can refer to a call with someone the Recruiter has spoken with before, where there have been changes to their job search, skill sets, or interest since the previous discussion. (Pls. Ex. 9 (Fronzaglio Tr.) 157:24-158:10.)

Plaintiffs' Ex. 89 is the Connected User Guide, and the cited pages illustrate what a G2 looks like in the database and how a Recruiter can create or update a candidate's G2 information. (Pls. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159.)

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters may do an intake call the first time they speak with a candidate. TEK disputes that intakes and G2s are synonymous, but admits that G2s is "information gathering," and that its corporate witnesses testified as to such. TEK does not explain what the distinction is that it is arguing. Kartchner explains that a G2 is "[n]ew information from somebody." Ex. 165 (Kartchner Tr.) 105:6-7; *see also* Ex. 162 (Fronzaglio Tr.) 158:1-2 (A. "The intention of the terminology G2 is to reflect an initial information gathering conversation."); *see also* Ex. 151 (Maher Tr.) 86:15-87:2 (A. "[A] G-2 is military terminology for intelligence gathering which is what I did. In the context of TEKsystems, it is essentially capturing information about a candidate as it might pertain to whether or not they would be a viable person to consider for an open position. This includes their salary requirements, how open they are to commuting, what distance, and relevant technologies that they have

experience working with."). Thus, because the purpose of an intake is indisputably to obtain information from a candidate, an intake is necessarily a form of G2. Plaintiffs' Reply in support of SOF ¶ 44 further supports SOF ¶ 47.

Accordingly, SOF ¶ 47 is undisputed and should be deemed admitted.

48.    TEK's internal database prompts Recruiters to gather specific information from candidates during the G2. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159; Ex. 4 (DiBenedetto Tr.) 87:12-88:5, 148:1-18; Ex. 5 (Doyle Tr.) 144:25-148:17; Ex. 3 (Haycock Tr.) 151:1-12; Ex. 10 (Hollister Tr.) 125:5-8; Ex. 15 (Kartchner Tr.) 105:12-16.

**RESPONSE**: **Disputed in part. Undisputed that Recruiters gather and record information from candidates in Connected.**

**Disputed that there are "prompts" for a G2. DiBenedetto testified that a G2 is not a "form," but rather "an empty box where you simply type in what the consultant is saying." (Pls. Ex. 4 (DiBenedetto Tr.) 86:14-87:6.)**

**The remaining citations presented by Plaintiffs confirm that there are additional fields in Connected that Plaintiffs may complete when gathering information from a candidate or consultant, but these are not "prompts" that a Recruiter works through when communicating with the candidate or consultant. See Pls. Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159 (distinguishing the G2 from other fields that may be completed by a Recruiter).**

**_PLAINTIFFS' REPLY_:** TEK does not dispute that Recruiters gather and record information from candidates in TEK's internal database, Connected, when conducting a G2. TEK disputes that Connected "prompts" Recruiters to gather such specific information, TEK has not pointed to any specific testimony or documents in the record in support of its dispute. Plaintiffs

have attached a step-by-step guide to "Completing a G2" along with screen shots. ECF No. 190-89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159. TEK cannot manufacture a factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986).

While TEK is correct that DiBenedetto testified that he does not consider a G2 a "form," ECF No. 190-4 (DiBenedetto Tr.) 86:20-25, DiBenedetto also testified that Connected includes a G2 text box for Recruiters to "type in what the consultant is saying" in addition to fields that Recruiters are expected to fill in while they are conducting a G2. ECF No. 190-4 (DiBenedetto Tr.) 87:12-16 (Q. "Does Connected have other – and I won't use the word 'form,' but other fields that recruiters are expected to fill in when they're doing a G2?" A. "Yes."); *see also* ECF No. 190-4 (DiBenedetto Tr.) 85:7-13 (Q. "When a recruiter is doing the G2 framework, is there something they fill out that is Connected – that is in Connected?" [Objection and response by Plaintiffs' counsel omitted] A. "Yes."); ECF No. 190-3 (Haycock Tr.) 151:1-12 (testifying that TEK expects recruiters to input information gathered during a G2 in Connected). Some of the fields that Connected prompts Recruiters to fill in while conducting a G2 include a candidate's skills (including their preferred skills and tough skills), their interests, their preferred work schedule, and education, among others. ECF No. 190-4 (DiBenedetto Tr.) 87:12-99:5; ECF No. 190-5 (Doyle Tr.) 145:4-148:17 (describing the fields Recruiters are expected to gather information on during a G2 as including a candidates' skills – which in many cases can be selected from a prepopulated dropdown menu, preferred work location, and desired compensation); *see also* ECF No. 190-89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159 (containing images and step-by-step guidance for inputting G2 information into Connected). As the testimony cited by Plaintiffs confirms, TEK's internal database, Connected, prompts Recruiters to input specific categories of information from candidates into text boxes and drop-down menus while conducting a G2.

Accordingly, SOF ¶ 47 is undisputed and should be deemed admitted.

49.    TEK provides Recruiters with training and instructions about how to conduct a G2 with a candidate. Ex. 4 (DiBenedetto Tr.) 80:14-84:10, 87:12-88:5, 90:13-91:8, 105:2-107:8, 148:1-18; Ex. 5 (Doyle Tr.) 144:25-148:17; Ex. 3 (Haycock Tr.) 151:1-12; Ex. 90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 17, 24, 39-41, 48; Ex. 95 (DiBenedetto Nov. 22, 2020 Email) TEK-Recruiter_Lit-00041158; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 148-157.

**RESPONSE: Disputed in part. Disputed that the cited training is provided to Recruiters. It is in fact provided to Recruiter Trainees. (See Pls. Ex. 4 (DiBenedetto Tr.) 80:14-84:10, 87:12-88:5, 90:13-91:8, 105:2-107:8, 148:1-18 (discussing Recruiter Trainee training).)**

**Undisputed that Recruiters are knowledgeable regarding how to conduct a G2 with a candidate and have access to reference materials, including the Connected User Guide (Pls. Ex. 89.)**

***PLAINTIFFS' REPLY:*** TEK does not dispute that it provides training and instruction on how to conduct a G2 with a candidate and expects Recruiters to utilize this training. Accordingly, SOF ¶ 49 is undisputed and should be deemed admitted.

50.    When Recruiters speak to a candidate, their skills and experience may not match the client's prerequisites. Ex. 5 (Doyle Tr.) 169:5-17, 171:13-24.

**RESPONSE: Undisputed. Note, however, that the phrase "client's prerequisites" does not have a standard meaning at TEK, as confirmed by the many references throughout this document to "job requirements" and "job requisitions," which are the documents intended to embody the information needed for Recruiters to find individuals to fill roles for TEK's**

clients.

**PLAINTIFFS' REPLY**: SOF ¶ 50 is undisputed and should be deemed admitted.

51.    Candidates may not be interested in an open position for a variety of reasons, including: the pay is too low, the location is not appealing, the position is for a contract term and the candidate wants a permanent job, the candidate may not like the company, or the candidate may not want to leave their current position. Ex. 5 (Doyle Tr.) 145:25-148:17 (enumerating the reasons candidates may not be interested in a job), 172:20-173:24; Ex. 3 (Haycock Tr.) 30:18-32:3.

**RESPONSE: Undisputed.**

**PLAINTIFFS' REPLY**: SOF ¶ 51 is undisputed and should be deemed admitted.

52.    If the candidate's experience and skills match the client's requirements, and is interested in the position, Recruiters forward their resume and information to the AMs. ECF No. 190-4 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to?" A: "Their account managers, specifically."), 162:18-163:7; ECF No. 190-3 (Haycock Tr.) 60:7-12; ECF No. 190-9 (Fronzaglio Tr.) 155:18-20; ECF No. 190-12 (Pappas Tr.) 62:10-24, 137:15-19; Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097923 ("Ask your coach to show you how they present candidates to AMs in your office."); Ex. 46 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 77 ("Sell/present the candidate to AM in person"); Ex. 96 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952; ECF Nos. 156-1 (Fink Decl.) ¶ 26; 156-5 (Bohen Decl.) ¶ 21; 156-6 (Rice Decl.) ¶ 12; 156-7 (Warren Decl.) ¶ 18; 156-11 (Marshall Decl.) ¶ 18; 156-12 (Payonk Decl.) ¶ 20.

**RESPONSE: Disputed. Disputed that it is sufficient that a "candidate's experience and skills match the client's requirements, and is interested in the position" in order to move**

the candidate forward in the process. (See, e.g., Df. Ex. 37, Buddle Decl., ¶ 18 ("My assessment of whether a candidate is a good match for a customer's job requirements goes beyond just confirming that they have the right technical skills. Through my interactions with a candidate, I am also assessing their communication style, how they present themselves, whether they conduct themselves professionally, and whether they will be able to work well with others on the customer's project or team."); Df. Ex. 35, Harvey Decl., ¶ 12 ("There are a variety of factors I assess when reviewing the candidate for a position. Some client's development teams include people in many different positions, so I need to determine if the candidate has a deep enough technical knowledge for the specific type of position I am recruiting for. That requires that I need to know the proper questions to ask so I am not wasting the candidate's time with a position that is not suitable for them. Over time, I have created my own set of questions to ask candidates when interviewing them to determine if they would be qualified for a specific position. If the candidate can speak about all of the technologies, I have to make a judgment call on whether the candidate actually has the skills and knowledge needed for the position. This judgment call is critical because submitting an unqualified candidate for a requisition does not help me, and in fact can damage my relationships with Account Managers.")

Disputed that Recruiters merely "forward [the candidate's] resume to the AMs" if the Recruiter decides that the candidate should move forward in the process. (See, e.g., Df. Ex. 24, Walther Decl., ¶ 9 "(A Recruiter who just screens candidates to see if they possess the minimum qualifications for a req, then sends the candidate to an AM, is not meeting TEK's expectations. In my view, that's no different than sending a spam email."); Df. Ex. 27, Compton Decl., ¶ 21 ("I only present a candidate to an Account Manager if the candidate

has been fully qualified by me through my vetting process, and if the candidate is excited about the opportunity. I create a package for the Account Manager that explains why the candidate is a good fit, what the candidate's references had to say, and the results of any technical assessment that the candidate completed. After I send the package to the Account Manager, I will call to tell them to verbally explain why the candidate is a good fit for the requirement.").)

Plaintiffs' citations do not support the statement.

Plaintiffs' citation to the testimony of DiBenedetto is incomplete. In his complete response, DiBenedetto explains that during the particular Recruiter Trainee presentation being discussed, Recruiter Trainees practice presenting their candidates to their Account Manager, but in practice each Account Manager does it differently and may train Recruiters to directly present candidates to a client. (Df. Ex. 52, DiBenedetto Tr. 113:7-114:25.)

The cited testimony by Haycock demonstrates that Recruiters do more than confirm whether the candidate's experience and skills match the client's requirements, and is interested in the position, then forward the resume and information to an AM; the Recruiter's "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs." (Pls. Ex. 3 (Haycock Tr.) 32:10-13.) The complete answers by Haycock make the point even more clear, explaining that Recruiters consider not just "hard skills and technical skills," but also the candidate's interests (e.g., working independently v. as part of a collaborative time; in person v. remote v. hybrid; nature of the work; pay rate). (*Id.*, 30:18-32: 13.) As Haycock summarized, "when you say 'find,' it's like it's not just doing a database search and looking at all of the people and saying, Okay, this is the right person for the job. There's a lot more complexity in it than

that." (*Id.*)

The cited testimony by Fronzaglio relates to a decision that an Account Manager may take after receiving a recommendation candidate from a Recruiter, but is silent regarding the actions taken by a Recruiter prior to that point, which is the subject of the statement. (Pls. Ex. 9 (Fronzaglio Tr.) 155:18-20.)

Plaintiffs' Ex. 39 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page states that "Our recruiters identify and prepare IT professionals for the career opportunities presented by our AMs." (Pls. Ex. 39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.) This is reflective of Recruiters and Account Managers working together in partnership.

Plaintiffs' Ex. 79 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097923 ("Ask your coach to show you how they present candidates to AMs in your office.").) No explanation is provided why this supports Plaintiffs' statement.

Plaintiffs' Ex. 46 is an unauthenticated June 1, 2018 email with an attached presentation from a pilot program to "train the trainer" as it relates to Recruiter Leads. (Pls. Ex. 46 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 77.) The portion cited by Plaintiffs is consistent with TEK's explanations of its dispute above.

Plaintiffs' Ex. 96 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 96 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952.) Plaintiffs highlight that the document says "SELL THE CANDIDATE: You're an inside sales person." (*Id.*) Other content on the

page is consistent with TEK's explanations of its dispute above, including that before "selling" the candidate to the AM, the presenter must be "extremely familiar with the account, the req., and the candidate" and able to explain "Why the candidate is a great fit," "Why the candidate is a great cultural fit," and "Why the candidate is excited about the opportunity," among other things. (*Id.*)

Plaintiffs' citations to declarations submitted by TEK also confirm TEK's basis for disputing the statement. See, e.g., ECF No. 156-1 (Fink Decl.) ¶ 26 (only presents "the best match" to a req); 156-5 (Bohen Decl.) ¶ 21 (explained conclusions why candidate should be submitted); 156-6 (Rice Decl.) ¶ 12 (describing extensive steps taken to validate candidate fit before proceeding); 156-7 (Warren Decl.) ¶ 18 (creates detailed packet "that describes why the candidate is the right person for the job;" common to present a candidate directly to a client); 156-11 (Marshall Decl.) ¶ 18 (does due diligence, and if the candidate is "the right fit," will advocate for my candidate with the AM"); 156-12 (Payonk Decl.) ¶ 20 (created detailed packages about the candidates; wanted to "make the AMs life easy" and establish trust that her "candidates are ready to be submitted to the client").

***PLAINTIFFS' REPLY:*** TEK does not substantively dispute that, if the candidate's experience and skills match the client's requirements, and is interested in the position, Recruiters forward their resume and information to the AMs. Rather, TEK attempts to reframe the issue. In support of its dispute, TEK cites to testimony from nine of its declarants. *See* ECF No. 203-37 (Budde Decl.) ¶ 18; ECF No. 203-35 (Harvey Decl.) ¶ 12. As a preliminary matter, Budde, Harvey, and Compton are *Avery* class members and not class or collective members in this case and, as such, his testimony is irrelevant. Regardless, the declarations do not contradict SOF ¶ 52. *See id.* Budde's declaration reiterated that she "matched" a candidate to the customers' job requirement

and if "a candidate is a good match for a customer's job requirements, I will present the candidates credentials to the Account Manager." ECF No. 203-37 (Budde Decl.) ¶¶ 18-19. She also admitted that that she only "facilitate[s]" technical assessments and does not do them herself. *See id*. Harvey's declaration also acknowledges that he looks at if "a candidate meets the base level qualifications" and "determine[s] if their skill set and other qualities are a good fit for a particular role" and then forwards the candidate to the Account Managers. *See* ECF No. 203-35 (Harvey Decl.) ¶¶ 11-12.

Testimony from Plaintiffs and Opt-in Plaintiffs confirm that Recruiters forward candidates' resumes and information to Account Managers if the candidate's experience and skills match the client's requirements and the candidate is interested in the position. *See, e.g.*, Ex. 148 (Conyers-Jordan Tr.) 62:18-20 (Q. "So you would submit anyone that you could get that matched the skills and was interested?" A. "Yes. Yep. Yep."); Ex. 146 (Carter Tr.) 61:15-62:5 (Q. "Okay. When you were reviewing resumes, as you had described a bit earlier, what types of things would you look for in an individual who you would say, okay, this is someone who has the skills that I can present to my account manager as a potential?" [Objection omitted] A. "It would just be based off like if their resume matched what – if their resume matched like the job description that I would have, if it matched, you know, those top skills that might be in the job description, that's what I'd look at to present to the account manager."), 133:8-17 (Q. "How do you figure out if a candidate is a good fit for a particular technical environment at a company?" A. "Just based off the job description that I get from the account manager. If what they have on their resume matches, you know, what's in the job description. You know, I look to say, hey, this person looks like a good fit, they look like a match and get them submitted to the requirement."); Ex. 152 (Malone Tr.) 98:22-99:10 (Q. "So did you ever make notes about observations that you've had outside of the top three skills that you

thought would be important for them to succeed in a position?" A. "Typically not. I mean, the account manager would reach out to the customer and say I have ABC candidate, and if they didn't possess the appropriate skills interpersonally, then they didn't move on to the next process. But if they made it through the process but they hit all top three skills but they didn't have the interpersonal skills, that would be vetted out from the account manager."); Ex. 154 (Raras Tr.) 111:23-112:3 (Q. "Did you attempt to understand whether a candidate was a good cultural fit for the requisition you were working on?" A. "No. I was mainly just focused on if their skill set matched."); Ex. 159 (Opt-in Plaintiff Ashley Suliman Tr. (Suliman Tr.")) 115:14-20 (A. 'Whoever was first that we came across that met the criteria, especially since we were so quota-driven with our phone calls and our meetings and our G-2s, if somebody met that match and met the criteria as presented to me, we were moving forward with them, it seemed like."); Ex. 132 (Dries-Wieland Decl.) ¶ 27 ("If a candidate's listed skills matched the Requirement, I sent the candidate's resume and information about the candidate to the Account Manager."); Ex. 134 (Holin Decl.) ¶ 27 (same); Ex. 135 (Martin Decl.) ¶ 27 (same); Ex. 137 (Olszewski Decl.) ¶ 26 (same); Ex. 140 (Stein Decl.) ¶ 27 (same); Ex. 142 (Walker Decl.) ¶ 26 (same).

DiBenedetto clearly testified that Recruiters are only trained on presenting candidates to "[t]heir account managers, specifically." Ex. 4 (DiBenedetto Tr.) 114:23-25. DiBenedetto later testified that once 162:18-163:7; Ex. 5 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 3 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12

TEK also disputes that Recruiters "merely" forwards' candidates' resumes to Account Managers. SOF ¶ 52 does not state whether Recruiters "merely" forward candidates' resumes to Account Managers. Rather SOF ¶ 52 states that Recruiters send resumes *and* information to Account Managers. Thus, TEKs remaining "dispute" is irrelevant to SOF ¶ 52.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

ECF No. 190-79 (Recruiter Onboarding Plan) TEK-Recruiter Lit-00097835 has metadata, which TEK produced, that indicates it is dated February 7, 2022. Ex. 169 at 8 (TEK-Recruiter_Lit-004).

Accordingly, SOF ¶ 52 is undisputed and should be deemed admitted.

53.    AMs determine which candidates to forward on to the client. Ex. 4 (DiBenedetto Tr.) 162:18-163:17; Ex. 9 (Fronzaglio Tr.) 155:18-20; Ex. 12 (Pappas Tr.) 62:10-24, 137:15-19; Ex. 97 (Operations Playbook) at TEK-Recruiter_Lit-00019675 ("AMs must thoroughly screen or disqualify candidates."); Ex. 18 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets"); Ex. 55 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325 ("the Account Manager has submitted this person to the customer."); ECF Nos. 156-1 (Fink Decl.) ¶ 26; 156-5 (Bohen Decl.) ¶ 21; 156-6 (Rice Decl.) ¶ 12; 156-7 (Warren Decl.) ¶ 18; 156-11 (Marshall Decl.) ¶ 18.

**RESPONSE: Disputed. The decision which candidate to submit to a client often reflects a partnership between a Recruiter and an AM. (Df. Ex. 37, Budde Decl., ¶ 14 ("I do not report to an Account Manager, but I do partner with Account Managers frequently."); Df. Ex. 35, Harvey Decl., ¶ 19 ("In my job at TEKsystems, I work with multiple managers to analyze the hiring needs of the clients and develop strategies to have our candidates chosen for positions. The Account Manager is not my supervisor. I treat it as a partnership to determine how to best address the clients' hiring needs. The Account Manager manages the network of clients, and I specialize in various types of technologies and develop a network of candidates who have the requisite skills in those technologies.")). Sometimes Recruiters**

present directly to a client. (Df. Ex. 18, Warren Decl. ¶ 18.)

Plaintiffs' citations do not support the statement.

Plaintiffs cite testimony by DiBenedetto, he explains that what is a "high value activity" by a Recruiter "depends on what part of the recruiting efforts they're in." (Pls. Ex. 4 (DiBenedetto Tr.) 162:18-163:7.) In one hypothetical example, he describes what a Recruiter might do after an AM presents a candidate to a customer. (*Id*.) DiBenedetto does not testify this is strictly adhered to. (*Id*.)

Similarly, the cited testimony by Fronzaglio relates to a decision that an Account Manager may take after receiving a recommended candidate from a Recruiter, but she does not testify this is strictly adhered to. (Pls. Ex. 9 (Fronzaglio Tr.) 155:18-20.)

Plaintiffs' Ex. 97 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 97 (Operations Playbook) at TEK-Recruiter_Lit-00019675.) Plaintiffs point to a statement in the document that "AMs must thoroughly screen or disqualify candidates." (*Id*.) This statement is irrelevant, since it purports to speak to an AM job duty, not a Recruiter job duty, and does not foreclose a Recruiter doing the same.

Ex. 18 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets")

Plaintiffs' Ex. 55 is unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 55 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.)

With respect to Plaintiffs' citations to declarations submitted by TEK, see TEK's Response to Statement 52.

131

***PLAINTIFFS' REPLY***: TEK disputes that Account Managers determine which candidates to forward to the client but provides no evidence to counter that it is the Account Managers' job duty to determine which candidates to forward. Instead, TEK argues Recruiters and Account Managers work in a partnership, without denying that Account Managers have final say over which candidates to submit to TEK's clients. TEK relies on the declarations of Harvey and Warren. *See* ECF No. 203-35 (Harvey Decl.) ¶ 19; ECF No. 203-18 (Warren Decl.) ¶ 18. As a preliminary matter, Harvey is an *Avery* class member and not a class or collective member in this case and, as such, his testimony is irrelevant. However, neither declaration undermines SOF ¶ 53. Harvey stated in only general terms that he partners with Account Managers to analyze TEK's clients' hiring needs, *see* ECF No. 203-35 (Harvey Decl.) ¶ 19, and Warren stated that Account Managers "*typically* trust and defer to [his] judgment about submitting a candidate to a client to a role because [he] ha[s] built a reputation as someone who strongly vets candidates and thinks critically before submitting them to a role." *See* ECF No. 203-18 (Warren Decl.) ¶ 18 (emphasis added). Thus, both declarations support that Account Managers are the ultimate decision-makers on which candidates to forward to TEK's clients. Testimony from former Account Managers confirms that they – and not Recruiters – are the ultimate decision-makers as to which candidates to forward to the client. *See* ECF No. 190-9 (Fronzaglio Tr.) 155:18-20 (Q. "Can an AM reject a specific candidate from being sent to a client?" A. "Yes."); ECF No. 190-12 (Pappas Tr.) 62:10-16 (Q. "When you're talking about the qualifying/disqualifying candidates, did that ultimately fall on the account managers to make the final decision on who got qualified to get submittal?" [Objection omitted] A. "Yes.").

DiBenedetto also testified that once a candidate is identified, "the account manager [] present[s] them to the customer." ECF No. 190-4 (DiBenedetto Tr.) 163:8-11.

Testimony from Plaintiffs and Opt-in Plaintiffs further confirms that Account Managers determine which candidates are forwarded on to TEK's clients. *See, e.g.*, Ex. 144 (Blendy Tr.) 123:19-23 (A. "[Candidates] would be submitted by the recruiter to the account manager and then the account manager would make a final decision on whether he would submit them to the client or not."); Ex. 154 (Raras Tr.) 78:20-79:12 (explaining that his account manager spoke with every candidate he located before submitting the candidate to TEK's clients and ultimately submitted about 1/5th of the candidates he presented to his account manager); Ex. 146 (Carter Tr.) 32:21-23 (A. "The account manager would either decide to, you know, take their resume and present it to the client or decide not to."); Ex. 151 (Maher Tr.) 152:17-153:7 (A. "So referencing with the account managers. Ultimately that's what it boils down to because they are going to be the primary person that makes the decision. So I might just go like, hey, maybe this will work out better for me. But I don't have any like control or autonomy in those moments because ultimately, it's not going to be my choice on whether or not we move forward with them or not. I can't make a tactical recommendation to the client. The only thing that I can do is speculate on potentially a candidate being a good fit and then having a conversation with an account manager and allowing the account manager to decide whether or not that's true."); Ex. 132 (Dries-Wielandt Decl.) ¶¶ 28-29 ("Account managers reviewed the candidate information and decided which candidates, if any, would be forwarded to TEKsystems' client."); Ex. 134 (Holin Decl.) ¶¶ 28-29 (same); Ex. 135 (Martin Decl.) ¶¶ 28-29 (same); Ex. 137 (Olszewski Decl.) ¶¶ 27-28 (same); Ex. 140 (Stein Decl.) ¶¶ 28-29 (same); Ex. 142 (Walker Decl.) ¶¶ 27-28 (same).

The additional documents cited by Plaintiffs also support SOF ¶ 53.

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

ECF No. 190-97 (Operations Playbook) TEK-Recruiter_Lit-00019669 has metadata, which TEK produced, that indicates it is dated August 16, 2021. *See* Ex. 169 at 4 (TEK-Recruiter_Lit-002).

ECF No. 190-55 (Digital REDZONE Script) TEK-Recruiter Lit-00004325 also has metadata, which TEK produced, that indicates it is dated August 12, 2021. *See* Ex. 169 at 2 (TEK-Recruiter_Lit-001).

Accordingly, SOF ¶ 53 is undisputed and should be deemed admitted.

54.    The clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them. Ex. 4 (DiBenedetto Tr.) 167:9-14 (testifying that Recruiters do not make hiring and firing decisions) (Q: "Do recruiters make the ultimate [termination] decisions for the consultants?" A: "No."), 188:2-9; Ex. 5 (Doyle Tr.) 158:1-12 (client interviews the candidates), 192:13-193:14 (TEK's clients make hiring decisions), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes."); Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 142 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview."); Ex. 98 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at 20-21 (TEK's clients interview candidates); Ex. 99 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted our screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 55 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325; ECF Nos. 156-7 (Warren Decl.) ¶¶ 19-20; 156-11 (Marshall Decl.) ¶ 19; 156-12 (Payonk Dec.) ¶ 21.

**RESPONSE:** **Disputed in part. Undisputed that clients do not have to engage, or continue to engage, the services of a consultant presented by TEK.**

Disputed that Recruiters do not interview candidates. In Plaintiffs' Statement 71, Plaintiffs state that "interviews" are an action taken by Recruiters and recorded in Connected.

Disputed that clients interview Recruiters. In some circumstances, TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 53, Doyle Tr. 201:2-19.)

Disputed that clients hire consultants. That is true of direct hire arrangements, (Df. Ex. 66, T. Raras Tr. 40:20-41:7, 43:2-13.) In contrast, for staff augmentation engagements, the consultant is employed by TEK and placed on assignments to TEK's clients. (Df. Ex. 67, T. Raras Tr. 41:8-13; Df. Ex. 59, Haycock Tr. 27:2-30:6.) For another type of engagement, managed solutions, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client. (Df. Ex. 59, Haycock Tr. 26:1-22, 34:7-37:4.) In other circumstances, TEK's client has outsourced to a third-party MSP how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 53, Doyle Tr. 201:2-19.)

Disputed that only clients may terminate consultants. As noted above, TEK employs the consultants and may independently terminate a consultant's employment. (Df. Ex. 46, Thomas Tr. 113:1-10; Df. Ex. 59, Haycock Tr. 36:9-38:3.)

Disputed that clients determine how much to pay a consultant. In most arrangements, TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 53, Doyle Tr. 193:15-194:16.) Separately, a

Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.) Thus, the pay rate and other terms and conditions that a Recruiter negotiates with a candidate directly impact TEK's bottom line.

 ***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters do not determine whether to hire or fire candidates and consultants. Rather, TEK agrees that clients hire and fire consultants, with some limited exceptions, but does not argue that Recruiters are ever the individuals who hire or fire consultants. *See* ECF No. 203-59 (Haycock Tr.) 37:5-38:1 (testifying that Recruiters cannot decide to fire consultants); ECF No. 203-46 (Thomas Tr.) 113:1-10 (testifying that an Account Manager fired a consultant that he thought should be terminated). TEK's deponents also testified that Recruiters do make hiring and firing decisions. *See* Ex. 165 (Kartchner Tr.) 119:6-13 ("Q. So as a recruiter lead, did you have the power to select which consultant would be hired at one of TEK's client's businesses?" A. "No. So that's still no. Sorry." Q. "Okay. As a recruiter lead, did you have the power to decide when a consultant would be fired from one of TEK's client's businesses?" "A. "No.""); 124:24-125:4 (Q. "So you're not making the decisions to have somebody walk out; right?" A. "No." Q. "Who made those decisions?" A. "Usually the hiring manager or somebody on site."); Ex. 164 (Johnson II Tr.) 111:13-19 (Recruiters "may have to end a consultant's assignment *based on a customer's decision that they have provided to us*. [Recruiters] may at times have to escalate an issue to my team if they disagree with why a customer might be

asking to end a consultant's assignment and be the intermediary between the two or engage us to help manage through that situation.") (emphasis added).

TEK disputes that clients determine how much to pay a consultant. TEK does not dispute that its clients must approve the bill rate. *See* ECF No. 190-5 (Doyle Tr.) (Q. "Okay. But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A. "Correct. Yes."). TEK cites testimony from Doyle to support its contention that "a Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept to perform the work." *See* ECF No. 203-53 (Doyle Tr.) 194:17-195:7. But that is not what Doyle said. *See id.* Doyle testified that *Account Managers* set the pay rate and Recruiters assist Account Managers by providing information about the going rate various skills and experience levels. ECF No. 203-53 (Doyle Tr.) 194:17-195:7 (Q. "Okay. And then what about the pay rate min/ pay rate max? What is that?" A. "Yeah. So that's based on the type of skill set. What is the going rate. You know, based on what the max bill rate is, what's the amount – the most we would want to offer a consultant to still have a healthy margin. But that's where recruiters would be a lot more involved in saying, 'Here is what the going rate is for this type of skill set based on this level of experience,' and then that way ***the AM*** recruiters are partnering with on this part of it  to say, 'We think if we can bill this amount, you can only pay this amount, we think we can keep this amount of margin or spread.'") (emphasis added). Haycock agreed that Recruiters are not generally "doing the actual negotiation with a contract, but there are times when recruiters can be *involved* associated with *individual* placements." ECF No. 190-3 (Haycock Tr.) 58:2-10 (emphasis added). Further, Recruiters have no discretion to negotiate outside the range TEK management and/or the client sets – *i.e.*, Recruiter cannot negotiate a burden above 16% or promise a consultant higher pay than set forth in the client's requisition or by the Recruiter's supervisor. ECF No. 190-4 (DiBenedetto

Tr.) 187:5-8; ECF No. 203-25 (Guffy Decl.) ¶ 15 ("Usually there is a pay range for the role"); ECF

No. 203-34 (Kehl Decl.) ¶ 14 (same); ECF 203-29 (McCarty Decl.) ¶ 13 (same).

TEK disputes that Recruiters do not interview candidates. In making this dispute, TEK

incorrectly states that "[i]n Plaintiffs' Statement 71, Plaintiffs state that 'interviews' are an action

taken by Recruiters and recorded in Connected." TEK misquoted Plaintiffs' SOF ¶ 71.  SOF ¶ 71

defines interviews as "when the client interviews the candidate." TEK has not pointed to any

specific testimony or documents in the record in support of its dispute. TEK is not entitled to

manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25

(1986). TEK also disputes that clients interview Recruiters. SOF ¶ 54 does not address whether

clients interview Recruiters. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 54.

Accordingly, SOF ¶ 54 is undisputed and should be deemed admitted.

55.    TEK's clients, not Recruiters, interview the candidates. *Id.*; Ex. 4 (DiBenedetto Tr.)

188:2-9; Ex. 5 (Doyle Tr.) 158:1-12, 159:3-10, 199:4-17; Ex. 98 (Account Manager 2 Facilitator

Guide) TEK-Recruiter_Lit-00152588 at 20-21 (TEK's clients interview candidates); Ex. 99

(Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-

00545575 ("Once we have conducted our screening, your team will have the ability to conduct

interviews and offer final approval on all TEKsystems candidates."); Ex. 55 (Digital REDZONE

Script) TEK-Recruiter_Lit-00004325; Ex. 89 (Connected User Guide) TEK-Recruiter_Lit-

00175558 at 144 ("Client has requested an interview with the talent. Recruiter is reaching out to

talent to schedule the interview.").

**RESPONSE: Disputed. Disputed that Recruiters do not interview candidates. In**
**Plaintiffs' Statement 71, Plaintiffs state that "interviews" are an action taken by Recruiters**
**and recorded in Connected.**

**Disputed that clients interview candidates in all circumstances. For example, in some circumstances TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4, Df. Ex. 53, Doyle Tr. 201:2-19.) As another example, for a managed solutions arrangement, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client rather than presenting candidates to work with the client directly. (Df. Ex. 59, Haycock Tr. 26:1-22, 34:7-37:4.)**

*__PLAINTIFFS' REPLY__*: TEK disputes that Recruiters do not interview candidates. In making this dispute, TEK incorrectly states that "[i]n Plaintiffs' Statement 71, Plaintiffs state that 'interviews' are an action taken by Recruiters and recorded in Connected." TEK misquoted Plaintiffs' SOF ¶ 71.  SOF ¶ 71 defines interviews as "when the client interviews the candidate." TEK has not pointed to any specific testimony or documents in the record in support of its dispute. Conclusory denials or spin do not create triable issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986).

TEK also disputes that clients interview candidates in all circumstances. In those circumstances referenced by TEK, the client has either delegated its hiring, firing, and interviewing duties to a third-party managed service provider, or the client is not paying TEK to find a consultant to work at their business. *See* ECF No. 203-64 (McNelley Tr.) 17:19-19:13; ECF No. 190-3 (Haycock Tr.) 26:1-22. Regardless, TEK has not alleged that Recruiters interview candidates under these limited circumstances, so this aspect of TEK's "dispute" is irrelevant to SOF ¶ 55.

Accordingly, SOF ¶ 55 is undisputed and should be deemed admitted.

56.     If the client decides to make an offer, Recruiters relay the offer to the candidate. Ex. 5 (Doyle Tr.) 277:13-20; ECF Nos. 156-12 (Payonk Decl.) ¶ 21.

**RESPONSE**: Disputed in part. Disputed that clients make an offer in all circumstances. For example, in some circumstances TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 64, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 53, Doyle Tr. 201:2-19.) As another example, for a managed solutions arrangement, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client rather than presenting candidates to work with the client directly. (Df. Ex. 59, Haycock Tr. 26:1-22, 34:7-37:4.)

***PLAINTIFFS' REPLY***: TEK does not dispute that if a client decides to make an offer, Recruiters relay the offer to the candidate. Nor does TEK dispute that Recruiters are middlemen with job offers and are not making hiring decisions. Further, TEK has not pointed to any specific testimony or documents that would establish that Recruiters determine which candidates to hire. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

TEK also disputes that clients hire candidates in all circumstances. In those circumstances referenced by TEK, the client has either delegated its hiring, firing, and interviewing duties to a third-party managed service provider, or the client is not paying TEK to find a consultant to work at their business. *See* ECF No. 203-64 (McNelley Tr.) 17:19-19:13; ECF No. 190-3 (Haycock Tr.) 26:1-22. Regardless, TEK has not alleged that Recruiters hire candidates under these limited circumstances, so this aspect of TEK's "dispute" is irrelevant to SOF ¶ 55.

Accordingly, SOF ¶ 56 is undisputed and should be deemed admitted.

57.    Recruiters do "not oversee[] the actual work getting done." Ex. 3 (Haycock Tr.) 36:16-17; *see also* Ex. 4 (DiBenedetto Tr.) 167:12-14, 167:19-168:7.

**RESPONSE**: Undisputed.

*PLAINTIFFS' REPLY*: SOF ¶ 57 is undisputed and should be deemed admitted.

58.    Recruiters are not evaluating the substance of consultants' work. Ex. 4 (DiBenedetto Tr.) 167:19-168:7; Ex. 3 (Haycock Tr.) 36:12-17, 121:20-122:16, 144:18-145:12; Ex. 10 (Hollister Tr.) 46:6-12, 139:7-19; Ex. 15 (Kartchner Tr.) 124:24-125:4.

**RESPONSE**: Undisputed.

*PLAINTIFFS' REPLY*: SOF ¶ 58 is undisputed and should be deemed admitted.

59.    Recruiters also do not technically evaluate potential job candidates. Ex. 3 (Haycock Tr.) 121:20-122:16 (TEK uses a third-party software to evaluate consultants' technical skills, and evaluation of a person's technical abilities is not typically the responsibility of Recruiters); Ex. 4 (DiBenedetto Tr.) 168:2-7.

**RESPONSE**: Disputed in part.

**Plaintiffs' statement is vague and ambiguous.**

**Undisputed that TEK has available to it third-party software that may be used to evaluate a candidate's proficiency with certain technical skills. (Pls. Ex. 3 (Haycock Tr.) 121:20-25.)**

**Disputed that such third-party software is necessary to evaluate all types of technical skills or for all Recruiters. Haycock testified that the need for such software evaluations "depend[s] on the particular skill and how long the recruiter has been doing their job." (Pls. Ex. 3 (Haycock Tr.) 122:1-3.) Recruiters have testified to possessing such expertise. (See Df. Ex. 26, Mendez Decl., ¶ 9 ("I have developed specific technical knowledge so that I can understand and assess the qualifications of the front end engineers that I place. In my experience, front end engineers have their own language, including around Java script and**

**React and Angular computing languages used in their work, and I have had to learn how to communicate in their language as well.**"); **Df. Ex. 13, Fink Decl., ¶ 8 ("I joined online user groups to learn about the technology in these areas, and I would attend in-person meet-up groups of people who did this type of work to learn more. I spent a lot of time speaking directly with engineers to learn about what they do. While I did not earn a technical degree in college, I am able to speak in depth with people who do technical work, understand what they are describing, and describe it for other technical and non-technical people as well"); Df. Ex. 16, Bohen Decl., ¶ 15 ("The way I learned these specialized skills was through studying in TEK's Degreed pathways, which are like a curriculum and materials to help you learn about specific skill sets. I also learned a lot by talking with consultants who use these skillsets. I ask them lots of questions to help me understand the technologies they use and how they use them, and over time I've come to understand these topics very well.").)**

*__PLAINTIFFS' REPLY__:* TEK does not dispute that it uses third-party software to evaluate candidates' technical skills. TEK also does not dispute that Recruiters do not technically evaluate job candidates. TEK's citations to its declarants' statements regarding their ability to understand and learn about the skills they are recruiting for does not contradict the fact that Recruiters do not technically evaluate job candidates. *See* ECF No. 203-26 (Mendez Decl.) ¶ 9 (Mendez learned how to communicate in language used by Java developers and has developed "some technical knowledge"); ECF No. 203-13 (Fink Decl.) ¶ 8 (Fink is able to speak with people who do technical work and understand and talk about technical work engineers do); ECF No. 203-16 (Bohen Decl.) ¶ 15 (Bohen understands the technologies that consultants use and how they use them).

TEK disputes that third-party software is necessary to evaluate all types of technical skills. SOF ¶ 59 does not address whether third-party software is necessary to evaluate all types of

technical skills, SOF ¶ 59 only addresses whether Recruiters technically evaluate candidates. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 59.

Accordingly, SOF ¶ 59 is undisputed and should be deemed admitted.

60.    TEK uses standardized online technical assessments and "Tech Outs" (in-person or telephonic skills evaluations with third-party experts paid for by TEK) to evaluate candidates' technical skill. Ex. 100 (Recruiter Skill Plan Onboarding Facilitator Guide March 2020) TEK-Recruiter_Lit-00077253 at 31 (explaining that "TEKsystems has various tools to help validate the skills of our consultants and set them apart from the competition" and describing these tools as IKMs (standardized online assessments) and Tech Outs (in person or telephonic evaluations conducted and scored by experts paid by TEK); Ex. 101 (Doyle Email Aug. 13, 2020) TEK-Recruiter_Lit-00125624 (showing technical screenings of consultants are performed either through an assessment or a Tech Out from a consultant).

**RESPONSE**: **Disputed in part.**

**Undisputed that, as noted elsewhere, TEK has available to it third-party software that may be used to evaluate a candidate's proficiency with certain technical skills, or arranging "Tech Outs" to do the same. (See TEK's Response to Statement 59.)**

**Disputed that these are the only ways that Recruiters may make technical assessments of a candidate's technical skills. (See TEK's Response to Statement 59.)**

_**PLAINTIFFS' REPLY**_: TEK does not dispute that it uses standardized online technical assessments and "Tech Outs" to evaluate candidates' technical skills. SOF ¶ 60 does not address whether there are other tools in which a candidates' technical skills can be evaluated. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 60. Accordingly, SOF ¶ 60 is undisputed and should be deemed admitted.

**A.    TEK's Connected Data Shows Recruiters Overwhelmingly Spend Their Time Contacting Candidates.**

61.    Recruiters use TEK's Connected database to search for potential candidates, review information about candidates, and record the work activities they perform. Ex. 3 (Haycock Tr.) 140:19-22, 150:21-152:2; Ex. 10 (Hollister Tr.) 67:4-19; Ex. 1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.

**RESPONSE: Disputed in part.**

**Undisputed that Connected is one resource to search for and review information about potential candidates.**

**Undisputed that some activities performed by Recruiters are recorded in Connected.**

**Disputed that Connected is the only resource to search for and review information about potential candidates. (See TEK's Response to Statement 38.)**

**Disputed that all activities by Recruiters are recorded in Connected. For example, Plaintiffs assert in Statement 29 that Recruiters "screen and match IT job candidates for open roles." These activities are not recorded in Connected. (See Pls. Ex. 19 (Calderon Dec.).)**

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters use TEK's Connected database to search for potential candidates, review information about candidates, and record the work activities they perform. SOF ¶ 61 does not address whether Connected is the only resource to search for and review information about potential candidates or whether all activities performed by Recruiters are recorded in Connected. Thus, TEK's remaining "disputes" are irrelevant to SOF ¶ 61. Accordingly, SOF ¶ 61 is undisputed and should be deemed admitted.

62.    TEK expects Recruiters to enter their activities into Connected in real time. Ex. 4 (DiBenedetto Tr.) 180:13-181:10; Ex. 5 (Doyle Tr.) 124:25-126:20; Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291.

**RESPONSE: Disputed.**

Some activities occur while away from a computer and cannot be recorded in real time. (Df. Ex. 46, Thomas Tr. 198:20-202:24 (Means, Meetings, IOIs not recorded in Connected in real time).)

Plaintiffs' citations do not support the Statement.

Plaintiffs cite testimony by DiBenedetto, but in that passage he speaks only about "Call" and "Attempted Call" activity in the Connected database. (Pls. Ex. 4 (DiBenedetto Tr.) 180:13-182:13.)

Plaintiffs cite testimony by Doyle, but in the passage he says only that TEK has an "expectation" that Recruiters will "timely enter in activities that they've engaged in." (Pls. Ex. 5 (Doyle Tr.) 124:25-126:20.)

Plaintiffs' Ex. 27 is an email exchange initiated by Doyle on July 9, 2020. (Pls. Ex. 72 Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291.) Doyle asks various leaders to "Set documentation expectations with your AMs and Recruiters," elaborating "We should strive for real-time documentation[.]" (*Id.*) The reason provided for the request was to improve data accuracy. (*Id.*)

*PLAINTIFFS' REPLY:* TEK admits that TEK has an expectation that Recruiters strive for real-time documentation and timely enter their activities into Connected. Plaintiffs' citations support SOF ¶ 62. Accordingly, SOF ¶ 62 is undisputed and should be deemed admitted.

63.    Defendant produced Connected data for the seven Named Plaintiffs and 116 Opt-in Plaintiffs and Declarants. Ex. 19 (Calderon Decl.) ¶ 11.

**RESPONSE: Undisputed.**

*PLAINTIFFS' REPLY:* SOF ¶ 63 is undisputed and should be deemed admitted.

64.    The Connected data identifies the work activities the Named Plaintiffs, Opt-in Plaintiffs, and Declarants performed and the dates and times the activities were performed. Ex. 4 (DiBenedetto Tr.) 180:13-181:10; Ex. 5 (Doyle Tr.) 124:25-126:20; Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291; Ex. 19 (Calderon Decl.) ¶ 5, Attachment 1.

**RESPONSE: Disputed.**

**Some of the data in Connected relates to work activities by the Named Plaintiffs, Opt-in Plaintiffs, and Declarants. The Connected database includes dates and times when activities are recorded in the database, but activities are not necessarily recorded contemporaneously.**

**Disputed that all work activities are recorded in Connected. For example, in Statement 29, Plaintiffs claim that "Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients…" Recruiters do not record "screening" or "matching" in Connected.**

**See TEK's Response to Plaintiffs' Statement 61.**

***PLAINTIFFS' REPLY:*** TEK does not dispute that the Connected data identifies the work activities Named Plaintiffs, Opt-in Plaintiffs, and Declarants performed and the dates and times the activities were recorded. TEK concedes in its response to SOF ¶ 62 that TEK expects Recruiters to record activities contemporaneously to "improve data accuracy." *See* TEK's Response to SOF ¶ 62 (citing ECF No. 190-72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291).

SOF ¶ 64 does not address whether all activities are recorded in Connected. But, the culmination of those activities recorded in Connected are – for example, to attempt a call, Recruiters must search and match resumes. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 64.

Accordingly, SOF ¶ 64 is undisputed and should be deemed admitted.

65.    The data shows that 31.90% of the Recruiters' activities recorded in Connected were "Attempted Contact," followed by "G2" at 19.25%, and "Call" at 22.98%, which altogether comprise approximately 74% of the total work activities. Ex. 19 (Calderon Decl.) ¶ 14, Attachment 9.

**RESPONSE: Disputed in part.**

**While TEK has been unable to replicate these calculations, undisputed that the percentages are generally consistent with TEK's calculations based on the same sets of data.**

**Disputed that it is possible for Plaintiffs' calculations to reflect a percentage of "total work activities." As noted elsewhere, only a limited set of Recruiter work activities are recorded in Connected at all. (See TEK's Response to Statement 64.) Plaintiffs' calculations reflect only percentages of activities recorded in Connected, which are limited to**

***PLAINTIFFS' REPLY:*** TEK does not dispute that the data cited by Plaintiffs in SOF ¶ 65 is generally correct. TEK's Response to SOF ¶ 65 is incomplete and TEK does not point to any testimony or documents that would support any of its remaining "disputes."

Accordingly, SOF ¶ 65 is undisputed and should be deemed admitted.

66.    An "attempted contact" "means the recruiter made a phone call and the consultant did not answer." Ex. 4 (DiBenedetto Tr.) 180:15-22.

**RESPONSE: Undisputed.**

***PLAINTIFFS' REPLY:*** SOF ¶ 66 is undisputed and should be deemed admitted.

67.    The Connected data further shows that the number of attempted contacts, G2 intake calls, and calls the Sample Recruiters made dwarfed their submittals and starts:

| Activity | Count | % |
|---|---|---|
| Attempted Contact | 238,398 | 31.90% |

| G2 | 143,893 | 19.25% |
|---|---|---|
| Call | 171,714 | 22.98% |
| Submitted | 15,399 | 2.06% |
| Started | 2,509 | 0.34% |

Ex. 19 (Calderon Decl.) ¶¶ 14-20, Attachment 9.

**RESPONSE: Immaterial and disputed.**

**A Connected record of "Started" reflects that a candidate began work for a TEK customer on that day. (Df. Ex. 50, Bury Tr. 80:21-81:8.) In other words, a record of "Started" reflects the culmination of a variety of interactions with the candidate, as well as interactions with candidates who were not a match for the job requirements. That there necessarily must be more preceding interactions than starts is irrelevant to determining Recruiters' primary job duties.**

**Disputed because different "Activities" recorded in Connected are not comparable. An "Attempted Contact" might range from 10 seconds to two minutes. (Dr. Ex. 50, Bury Tr. 64:13-65:15; Df. Ex. 67, T. Raras Tr. 94:15-95:2.) A "Call" might range from 30 seconds to 30 minutes. (Df. Ex. 50, Bury Tr. 65:16-67:8; Df. Ex. 67, T. Raras Tr. 95:3-95:22; Df. Ex. 47, Richenberg Tr. 80:5-80:15.)**

*__PLAINTIFFS' REPLY:__* TEK does not dispute that the Connected data shows that the number of attempted contacts, G2s intake calls, and calls the Sample Recruiters made dwarfed their numbers of submittals and starts. TEK proves Plaintiffs' point that Recruiters must undertake a large number of interactions with potential candidates (including attempted contacts, G2s, and calls) to ultimately have an Account Manager submit a single candidate or for a consultant to start work for a TEK customer.

Further, SOF ¶ 67 does not address the range of time Recruiters may spend on each individual activity. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 67.

Accordingly, SOF ¶ 67 is undisputed and should be deemed admitted.

68.     Recruiters' Activity levels are consistent among the Rule 23 classes. Ex. 19 (Calderon Dec.) ¶¶ 21-25.

**RESPONSE: Disputed as vague and ambiguous. The meaning of Plaintiffs' Statement is disputed because it is vague and ambiguous.**

*PLAINTIFFS' REPLY:* TEK disputes that Recruiters' Activity levels are consistent among the Rule 23 classes, but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK may not manufacture disputes without providing support for its dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986). Accordingly, SOF ¶ 68 is undisputed and should be deemed admitted.

69.     On average on a monthly basis, one job candidates who Recruiters screen and match are ultimately placed at one of TEK's customers. Ex. 19 (Calderon Dec.) ¶ 28.

**RESPONSE: Disputed as vague and ambiguous and immaterial.**

**The meaning of Plaintiffs' Statement is disputed because it is vague and ambiguous.**

**Disputed for the additional reason that Plaintiffs' Statement is not supported by the cited declaration.**

**The cited paragraph states that "on average, the Sample Recruiters recorded the Activity Type "Started" one time per month." (Pls. Ex. 19 (Calderon Dec.) ¶ 28.) In other words, the Statement exceeds the scope of the Declaration by suggesting the conclusions apply to Recruiters generally, rather than just those "Sample Recruiters" in the data reviewed.**

**The statement is immaterial because a Connected event of "Started" is not a primary job duty of Recruiters. Rather, it is an outcome of a Recruiter's job duties.**

*PLAINTIFFS' REPLY:* TEK admits that the placement of consultants is not Recruiters' primary job duty.

TEK does not dispute that representative data referenced in Ms. Calderon's declaration shows that, on average, on a monthly basis, one job candidate who Recruiters screen and match for is ultimately placed at one of TEK's customers.

Accordingly, SOF ¶ 69 is undisputed and should be deemed admitted.

**B.    TEK Requires Recruiters to Meet Production Quotas.**

70.    TEK requires Recruiters to meet weekly production quotas. Ex. 5 (Doyle Tr.) 129:16-130:20; Ex. 3 (Haycock Tr.) 157:19-158:1; Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71.

**RESPONSE: Disputed. Plaintiffs' Statement is not supported by the citations.**

**Neither Doyle nor Haycock testified that Recruiters are subject to "quotas." (Pls. Ex. 5 (Doyle Tr.) 129:16-130:20; Pls. Ex. 3 (Haycock Tr.) 157:19-158:1.)**

**Plaintiffs' Ex. 117 is an email and draft attachment sent by Doyle to Haycock and others. (Pls. Ex. 117 (Haycock Ex. 16) TEK-Recruiter-Lit-00081069-71.) This document also does not include any reference to "quotas."**

*PLAINTIFFS' REPLY:* TEK disputes that it requires Recruiters to meet weekly production quotas, but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK may not manufacture disputes without providing support for its dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, (1986).

TEK also disputes that the testimony and document cited by Plaintiffs support their use of the word "quota" in SOF ¶ 70. Both Haycock and Doyle testified that Recruiters were expected to reach quotas of 25 or 30 activities each week (depending on the time period) and that TEK referred

to these activities requirements as "interactions." *See* ECF No. 190-3 (Haycock Tr.) 157:19-158:1; ECF No. 190-5 (Doyle Tr.) 129:16-130:20. That Haycock and Doyle use the term "interactions" instead of "quotas" does not contradict SOF ¶ 70. ECF No. 190-117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71 is an email and attachment from Doyle describing changes to the quotas that Recruiters must achieve to meet TEK's performance expectations also referred to ask KPIs. ECF No. 190-5 (Doyle Tr.) 112:6-113:24 ("WIN report is a weekly report that goes out to each recruiter and their lead . . . [and contains] certain key performance indicators"); ECF No. 190-117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71 (explaining that "[t]o be meeting performance expectations, a Recruiter must consistently be maintaining over 25 points" and that "these metrics will be available in WIN reports in the coming months" but "[i]n the meantime, as Leaders, you do not need to wait to communicate these changes and start driving these correct behaviors."). To the extent that TEK argues that ECF No. 190-117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71 should not be relied on because it includes a draft attachment, the attachment confirms that TEK already had metrics in place prior to updating its required number of activities.

Plaintiffs' Replies in support of SOFs ¶¶ 19 and 20 provide additional support for SOF ¶ 70 and Plaintiffs' use of the word "quota."

Accordingly, SOF ¶ 70 is undisputed and should be deemed admitted.

71.    Currently, the quota for Recruiters is 25 points a week based on the following activity points: G2s (intakes); reference checks; submittals (when an AMs submits a candidate to a client that the Recruiter has solicited); interviews (when the client interviews the candidate); and starts (when a candidate ultimately starts a job with a TEK's client). Ex. 5 (Doyle Tr.) 159:18-161:6; Ex. 3 (Haycock Tr.) 153:19-158:1; Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-

00081070-71; Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 5-7.

**RESPONSE: Disputed in part.**

**Undisputed that different Recruiter activities are assigned different "point" values.**

**Disputed that Recruiters are subject to "quotas."**

**Plaintiffs' Statement is not supported by the citations.**

**Neither Doyle nor Haycock testified that Recruiters are subject to "quotas." (Pls. Ex. 5 (Doyle Tr.) 159:18-161:6; Pls. Ex. 3 (Haycock Tr.) 153:19-158:1.)**

**Plaintiffs' Ex. 117 is an email and draft attachment sent by Doyle to Haycock and others. (Pls. Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71.) This document also does not include any reference to "quotas."**

**Plaintiffs' Ex. 118 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 5-7.) The document does not include a "Recruiter Scorecard" that states point values for different activities. The document does not include any reference to "quotas."**

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters are required to obtain 25 points a week based on activity points for G2s (intakes); reference checks; submittals; interviews; and starts.

TEK disputes that the testimony and document cited by Plaintiffs support their use of the word "quota" in SOF ¶ 71. Plaintiffs' Replies in support of SOFs ¶¶ 19, 20, and 70 provide additional support for SOF ¶ 71 and Plaintiffs' use of the word "quota."

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

ECF No. 190-118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 has metadata, which TEK produced, that indicates it is dated July 12, 2022. *See* Ex. 169 at 14 (TEK-Recruiter_Lit-008-010).

Accordingly, SOF ¶ 71 is undisputed and should be deemed admitted.

72.    Prior to July 2022, TEK required Recruiters to maintain a weekly average of 30 "interactions" a week, such as reference checks, G2s, and meals (lunches) with candidates. Ex. 5 (Doyle Tr.) 129:16-130:20, 153:5-19, 154:19-155:12; Ex. 3 (Haycock Tr.) 152:3-153:10; Ex. 117 (Haycock Ex. 16) at TEK-Recruiter_Lit-00081070-71; Ex. 10 (Hollister Tr.) 123:14-124:17; Ex. 72 (Doyle Email July 9, 2020) at TEK-Recruiter_Lit-00194292; Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 4; Ex. 108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 19.

**RESPONSE: Disputed in part. Undisputed that different Recruiter activities are assigned different "point" values.**

**Disputed that Recruiters were "required" to maintain any number of "interactions" per week.**

**Plaintiffs' Statement is not supported by the citations.**

**Doyle testified to TEK's "expectations" related to certain types of "interactions," but did not testify that Recruiters were subject to any "requirements." (Pls. Ex. 5 (Doyle Tr.) 129:16-130:20, 153:19, 154:19-155:12.)**

**Similarly, neither Haycock nor Hollister testified that Recruiters were subject to any "requirements." (Pls. Ex. 3 (Haycock Tr.) 152:3-153:10; (Pls. Ex. 10 (Hollister Tr.) 123:14-124:17.)**

**Plaintiffs' Ex. 117 is an email and draft attachment sent by Doyle to Haycock and**

others. (Pls. Ex. 117 (Haycock Ex. 16) TEK-Recruiter_Lit-000810070-71.) This document also does not include any reference to interactions Recruiters would be "required" to do.

Plaintiffs' Ex. 72 is an email exchange initiated by Doyle on July 9, 2020. (Pls. Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194292.) Doyle asks various leaders to "Set documentation expectations with your AMs and Recruiters," elaborating "We should strive for real-time documentation[.]" (*Id.*) The reason provided for the request was to improve data accuracy.

Plaintiffs' Ex. 118 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 5-7.) The document does not include a "Recruiter Scoreboard" that states point values for different activities. The document does not include any reference to interactions Recruiters would be "required" to do.

Plaintiffs' Ex. 108 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 19.) From its face, the document appears related to the 13 week Recruiter Trainee program. The document does not include any reference to interactions that Recruiter Trainees or Recruiters would be "required" to do.

***PLAINTIFFS' REPLY:*** TEK does not dispute that it assigned point values to activities performed by Recruiters. Contrary to TEK's assertion otherwise, Doyle agreed that Recruiters were *required* to maintain a weekly average of 30 "interactions" a week prior to July 2022. *See* ECF No. 190-5 (Doyle Tr.) 155:6-12 (Q. "So that was part of the 30 interactions?" A. "That was part, yes. So that would count as one of the interactions, if you had a meal with a consultant." Q

"Okay. And this requirement – okay. This requirement, you said, changed in July 2022?" A. "Correct.").

Plaintiffs' additional cited evidence also supports SOF ¶ 72. For instance, ECF No. 190-108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 includes numerous reminders to Recruiters that TEK requires them to meet activity "interactions" each week. ECF No. 190-108 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 19 (slide titled "Expectations of a Recruiter" states that there are "things that are expected of you weekly" including 25 G2s, 5 IOIs, 2 submittals, 3 lunches, 25 tickles, and 20 proactive calls (collectively referred to in this document as "EBRs"), and that "[i]t is important that you hit your EBR's every week."), ("There is no time you need to stay until. Some nights you will *have to* stay late to hit your EBRS and/or meet client expectations") (emphasis added), TEK-Recruiter_Lit-00473570 at 38 ("You have weekly EBR's to hit"). Likewise, ECF No. 190-118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 at 4, states that "[a] recruiter *must* consistently main[tain] 25 or more points to meet performance expectations." (emphasis added).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra* Plaintiffs General Objections ¶ 3.

ECF No. 190-118 (Recruiter Scorecard Introduction) TEK-Recruiter_Lit-00434512 has metadata, which TEK produced, that indicates it is dated July 12, 2022. *See* Ex. 169 at 14 (TEK-Recruiter_Lit-008-010).

ECF No. 190-108 (New York City Apps New Recruiter Training) TEK-Recruiter Lit-00473570 has metadata, which TEK produced, that indicates it is July 25, 2019. *See* Ex. 169 at 16 (TEK-Recruiter_Lit-008-010).

Accordingly, SOF ¶ 72 is undisputed and should be deemed admitted.

73.    TEK requires all Recruiters to meet the same "spread" levels, which align to their tenure at the company and is referred to as the "performance management line." Ex. 5 (Doyle Tr.) 92:3-94:20, 299:8-21.

**RESPONSE: Disputed as vague and ambiguous. Plaintiffs' Statement is disputed because it is vague and ambiguous. In particular, it is unclear how all Recruiters could be required to meet "the same 'spread' levels" while also stating that spread levels vary by tenure.**

**Plaintiffs' Statement is not supported by the citations.**

**Doyle testified to explain the meaning of the "performance management line." (Pls. Ex. 5 (Doyle Tr.) 91:21-92:2, 94:17-20, 255:3-256:8.) Recruiters above the "growth line" – a function of tenure and spread – are "thriving," "highly successful," and "attrition is extraordinarily low" among this group, so they receive less coaching. (*Id.*) Recruiters below the "performance management line" – also a function of tenure and spread – "just aren't feeling successful. They're not making money. They're a high risk to leave." This group "need[s] more coaching, they need more development, they need more push" to prevent their attrition. (*Id.*) In the middle of the two lines are people who are "doing okay. They're doing fine," and they don't attrit at high rates. (*Id.*)**

***PLAINTIFFS' REPLY:*** TEK disputes SOF ¶ 73 as "vague and ambiguous," but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK cannot manufacture disputes without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

The testimony cited by Plaintiffs supports SOF ¶ 73. Doyle testified that the performance

management line is the floor of the amount of "spread" that Recruiters must obtain. ECF No. 190-5 (Doyle Tr) 91:21:94:20. Doyle also testified that the performance management line changes as Recruiters become more tenured, but it is the same across verticals. *Id.* at 299:8-21.

Accordingly, SOF ¶ 73 is undisputed and should be deemed admitted.

74.     Spread is the difference between the amount a client pays TEK for placing the consultant and the costs to TEK to place them. Ex. 3 (Haycock Tr.) 72:19-21; Ex. 7 (McNelley Tr.) 33:2-6; Ex. 12 (Pappas Tr.) 21:22-22:6; Ex. 47 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408137; Ex. 48 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399696; Ex. 49 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489276; Ex. 50  (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552034; Ex. 56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005768; Ex. 57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133191; Ex. 58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425014; Ex. 59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450708; Ex. 60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508987; Ex. 61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545028.

**RESPONSE: Disputed in part. Plaintiffs' description of "spread" is incomplete and misleading. TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 53, Doyle Tr. 193:15-194:16.) A Recruiter negotiates with the candidate for the *pay rate* amount that they will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.* 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-**

42:19.)

This is confirmed by some of Plaintiffs' citations. For example, the various office "Welcome Packets" include a "TEK Dictionary" of "the different terms that we use each day in our jobs." (Pls. Ex. 47-49, 56, 58-61.) Those documents define "Spread" as "Net profit that TEKsystems generates when a consultant is placed. Calculation: Bill Rate – [Burden x Director Labor Rate] x Hours." (*Id.*)

Disputed that spread is generated merely by "placing the consultant." As explained in the preceding paragraphs, spread is calculated based on time worked by the consultant on the client's projects. Thus, a consultant will generate spread over the duration of their assignment, no matter how long, and not just at time of placement.

***PLAINTIFFS' REPLY***: TEK does not dispute that spread is the difference between the amount a client pays TEK for placing the consultants and the costs to TEK to place them. TEK disputes that spread is only generated by "placing the consultant" because spread is generated over the duration of a consultant's assignment, not only at the time of placement. SOF ¶ 74 does not state that spread is only generated at the time the consultant is placed, only that spread is generated from the placement of a consultant. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 74.

Separately, for the reasons stated in Plaintiffs' Reply in support of SOF ¶ 54, Plaintiffs dispute that Recruiters negotiate pay rates and other conditions of employment that affect TEK's burden amount.

Accordingly, SOF ¶ 74 is undisputed and should be deemed admitted.

75.    TEK monitors Recruiters' compliance with their quotas and performance management line. Ex. 5 (Doyle Tr.) 92:3-94:20, 112:6-113:21, 162:14-164:13, 255:3-256:8; Ex. 3 (Haycock Tr.) 147:5-11, 158:2-14; Ex. 7 (McNelley Tr.) 62:21-63:6; Ex. 8 (Estimada Tr.) 141:1-

21; Ex. 9 (Fronzaglio Tr.) 56:8-15; Ex. 15 (Kartchner Tr.) 88:3-89:5; Ex. 13 (Lis Tr.) 68:22-69:6;

Ex. 63 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 64 (Executive Dashboard) at TEK-

Recruiter_Lit-00161755-65; Ex. 119 (Performance Warning & Action) TEK-Recruiter_Lit-

00471328.

**RESPONSE**: Disputed. Plaintiffs' Statement is not supported by the citations.

None of the testimony cited refers to "quotas" or states that Recruiters are being "monitored."

Plaintiffs' Ex. 63 is simply an email exchange with sample narratives that might be included in WIN reports. (Pls. Ex. 63 (WIN narratives).)

Plaintiffs' Ex. 64 is an example of an "Executive Dashboard." (Pls. Ex. 64.) The pages cited by Plaintiffs reflect aggregated spread numbers and high level trends across Recruiter populations, not "monitoring" individual Recruiters. (*Id.*) The word "quota" does not appear.

Plaintiffs' Ex. 119 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 119 (Performance Warning & Action) TEK-Recruiter_Lit-00471328.) The word "quota" does not appear.

***PLAINTIFFS' REPLY***: TEK disputes that TEK monitors Recruiters' compliance with their quotas and performance management line, but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK cannot manufacture disputes without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

The testimony and documents presented by Plaintiffs supports SOF ¶ 75. For instance, ECF No. 190-119 (Performance Warning & Action) TEK-Recruiter_Lit-00471328 is an internal memorandum outlining performance expectations for Recruiters based on tenure and the steps

managers should take prior to addressing performance issues. The memorandum shows that TEK is monitoring Recruiters' compliance with their quotas and performance management line (spread attainment) and that Recruiters who fail to meet expectations may receive a formal written warning regarding their performance and could ultimately face termination. *Id.* at TEK-Recruiter_Lit-00471330. Testimony from current and former Recruiter supervisors and managers also confirms that TEK monitors Recruiters' compliance with their quotas and performance management line. *See* ECF No. 190-7 (McNelley Tr.) 62:21-63:6; ECF No. 190-8 (Estimada Tr.) 141:1-21; ECF No. 190-9 (Fronzaglio Tr.) 56:8-15; ECF No. 190-15 (Kartchner Tr.) 88:3-89:5; ECF No. 190-13 (Lis Tr.) 68:22-69:6. Plaintiffs' Replies in support of SOFs ¶¶ 19-20 also support Plaintiffs' use of the terms "monitor" and "quotas" in SOF ¶ 75.

ECF No. 190-119 (Performance Warning & Action) TEK-Recruiter_Lit-00471328 has metadata, which TEK produced, that indicates it is dated October 29, 2018. *See* Ex. 169 at 16 (TEK-Recruiter_Lit-008-10).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 75 is undisputed and should be deemed admitted.

76.     Every week, TEK generates a WIN Report for each Recruiter and their managers, which tracks how well Recruiters are meeting their quotas and spread compared to their peers. Ex. 5 (Doyle Tr.) 112:6-113:21; Ex. 3 (Haycock Tr.) 158:2-15; Ex. 9 (Fronzaglio Tr.) 59:2-20, 64:25-65:1, 65:5-9; Ex. 63 (WIN narratives) TEK-Recruiter_Lit-00392430; Ex. 28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("The report will be emailed to every person who is directly managing Recruiters as well as Production Delivery Managers, Delivery Director, and DBOs each week.").

**RESPONSE**: Disputed in part. Undisputed that WIN Reports were sent on a weekly basis for some portion of the relevant period.

Disputed that WIN reports include quotas.

Plaintiffs' Statement is not supported by the citations.

None of the testimony or documents cited refers to "quotas" or states that Recruiters are being "monitored."

*PLAINTIFFS' REPLY*: TEK does not dispute that TEK generates a WIN Report for each Recruiter and their managers on a weekly basis that tracks Recruiters' activities and spread compared to their peers. TEK disputes Plaintiffs' use of the term "quotas" in SOF ¶ 76, but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK cannot manufacture disputes without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

The documents and testimony cited by Plaintiffs support SOF ¶ 76. Plaintiffs' Replies in support of SOFs ¶¶ 19-20 further supports Plaintiffs' use of the term "quotas" in SOF ¶ 76.

Accordingly, SOF ¶ 76 is undisputed and should be deemed admitted.

77.    TEK executives also receive weekly Executive Dashboards, which provide "a snapshot on the various operations of the business." Ex. 3 (Haycock Tr.) 69:13-71:19; Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161739.

**RESPONSE**: Undisputed.

*PLAINTIFFS' REPLY*: SOF ¶ 77 is undisputed and should be deemed admitted.

78.    Included in the Executive Dashboard are summaries about how well Recruiters are meeting their quotas. Ex. 3 (Haycock Tr.) 91:15-93:14; Ex. 64 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-65.

**RESPONSE**: Disputed in part. Undisputed that Executive Dashboards are summaries.

Disputed that Executive Dashboards include quotas. Plaintiffs' Ex. 64 is an example of one of those "dashboards." (Pls. Ex. 64.) The pages cited by Plaintiffs reflect aggregated spread numbers and high level trends across Recruiter populations, not "monitoring" individual Recruiters. (*Id.*) The word "quota" does not appear.

*PLAINTIFFS' REPLY*: TEK does not dispute that Executive Dashboard includes summaries of Recruiters' spread numbers and producer activity trends. TEK disputes that the documents cited by Plaintiffs supports their use of the word "quota" in SOF ¶ 78. The documents and testimony cited by Plaintiffs support SOF ¶ 75. Plaintiffs' Replies in support of SOFs ¶¶ 19-20 further supports Plaintiffs' use of the word "quota" in SOF ¶ 78. Accordingly, SOF ¶ 75 is undisputed and should be deemed admitted.

79.    TEK's offices have "spread boards" that publicize the amount of spread attained by each Recruiter from best to worst. Ex. 120 (New Hire Checklist) TEK-Recruiter_Lit-00571397 ("Name on spread board"); see also Ex. 121 (Spread: Overview & Problem Resolution) at TEK-Recruiter_Lit-00240020-23; Ex. 8 (Estimada Tr.) 154:1-155:9; Ex. 11 (Minniear Tr.) 134:8-136:24; Ex. 122 (Sloan Email Apr. 12, 2021) TEK-Recruiter_Lit-00516551 (displaying virtual spread board).

**RESPONSE: Disputed in part. Undisputed that some office locations may have posted individual spread to "spread boards" that all could see.**

Disputed that this practice occurred at all TEK offices. Plaintiffs' Statement is not supported by the citations, as the cited evidence refers only to a small number of TEK offices.

*PLAINTIFFS' REPLY*: TEK does not dispute that some of TEK's offices have "spread

boards" that publicize the amount of spread attained by each Recruiter from best to worst. TEK disputes that all TEK offices have "spread boards," but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK cannot manufacture disputes without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Testimony from Plaintiff Maher and Opt-in Plaintiff Blendy, who worked for TEK in two different regions, provide additional support for SOF ¶ 79. *See* Ex. 151 (Maher Tr.) 90:16-20 (Q. "Have you seen numbers from any other recruiters at TEKsystems?" A. "Yeah. They would make us write down our weekly numbers on a whiteboard for everyone to see."), 9:3-6 (Maher worked for TEK out of the Sandy, Utah TEK office); Ex. 144 (Blendy Tr.) 72:3-8 (Q. "Was it announced when people were in the top 10 percent?" A. "Yes. Actually, there was a – There was a white board that represented the recruiter's spread visible for everyone to see what they were making each week."), 43:1-14 (Blendy worked for TEK in Pennsylvania). Accordingly, SOF ¶ 79 is undisputed and should be deemed admitted.

80.     If Recruiters fail to hit their quotas and meet their spread requirements, TEK puts them on a performance improvement plan. Ex. 5 (Doyle Tr.) 162:14-164:9; Ex. 14 (Johnson Tr.) 104:19-105:4; Ex. 119 (Performance Warning & Action Plan Job Aid) TEK-Recruiter_Lit-00471328.

**RESPONSE: Disputed. None of the testimony or documents cited refers to "quotas." In addition, Recruiters testified that they were not disciplined for falling below activity levels. (Df. Ex. 47, Richenberg 152:7-154:11 and Richenberg Dep. Ex. 13 and 14.)**

*PLAINTIFFS' REPLY:* TEK does not dispute that it puts Recruiters on performance improvement plans if Recruiters fail to meet their activity and spread requirements. TEK disputes Plaintiffs' use of the term "quotas" in SOF ¶ 80, but TEK has not pointed to any specific testimony

or documents in the record in support of its dispute. TEK cannot manufacture disputes without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Plaintiffs' Replies in support of SOFs ¶¶ 19-20 support Plaintiffs' use of the word "quota" in SOF ¶ 80.

TEK cites to the testimony of a single Plaintiff, who was never put on a performance improvement plan and did not testify that she ever fell below activity levels. *See* ECF No. 203-47 (Plaintiff Rachel Richenberg Tr. ("Richenberg Tr.")) 152:7-154:11. ECF No. 203-47 also does not include the Richenberg deposition exhibits referenced in TEK's Response to SOF ¶ 80.  TEK's citation to the Richenberg testimony is not persuasive.

Testimony from TEK supervisors and managers confirm their use of performance improvement plans when Recruiters fail to hit their quotas and meet their spread requirements. *See* Ex. 161 (Estimada Tr.) 25:12-16 (Q. "[I]f a recruiter is not hitting the appropriate metrics, they could be put on a performance plan. Yes or no?" [Objection omitted]. A. "Yes."); 23:25-24:21 (describing performance plan for employees falling below the growth line); Ex. 167 (McNelley Tr.) 171:16-25 (Q. "When you were a DBO, did you ever put recruiters on PIPs, performance improvement plan?" A. "Yes." Q. "Did the amount of spread weigh into whether or not they got put on a performance improvement plan?" A. "Yes, everything weighed into whether they got into a performance plan. Spread would have been one of those metrics."; Ex. 162 (Fronzaglio Tr.) 75:7-76:5 (putting Recruiters on performance improvement plans for failing to perform on metrics such as G2s and submittals); *see also* Ex. 165 (Kartchner Tr.) 114:16-25 (Q. "Okay. And you mentioned that Andrew Young was put on another PIP? What was that for?" [Objection omitted] A. "I believe the same things but admittedly, at the time he did not report to me, so – yeah. But I believe it was the same thing. I think his spread was below his performance line, and he wasn't getting enough submittals to get him where he needed to be is my understanding").

Accordingly, SOF ¶ 80 is undisputed and should be deemed admitted.

81.    TEK evaluates Recruiters annually based on their satisfaction of TEK's quotas and spread requirements. Ex. 5 (Doyle Tr.) 212:20-216:11; Ex. 69 (Haycock Dep. Ex. 15 (Yearly Performance Summary)) at TEK-Recruiter_Lit-00124520; Ex. 75 (Performance Review Guide 2021: For Leaders and Leads) TEK-Recruiter_Lit-00528422.

**RESPONSE: Disputed in part. Undisputed that Recruiters are evaluated annual.**

**Disputed that Recruiters must meet "quotas" or spread requirements. None of the testimony or documents cited refers to "quotas."**

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters are evaluated annually.

TEK disputes Plaintiffs' use of the word "quotas" in SOF ¶ 81, but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK cannot manufacture disputes without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Plaintiffs' Replies in support of SOFs ¶¶ 19-20 support Plaintiffs' use of the word "quota" in SOF ¶ 81.

TEK also disputes that Recruiters must meet spread requirements. Plaintiffs' Reply in support of SOF ¶ 80 establishes that Recruiters must meet spread requirements. If Recruiters do not meet spread requirements, TEK puts them on a performance improvement plan. *See* Reply in support of SOF ¶ 80.

Further, the testimony and documents cited by Plaintiffs supports SOF ¶ 81. Haycock testifies that annual performance reviews include a summary of Recruiters' performance, start, and spread attainment metrics. ECF No. 190-3 (Haycock Tr.) 212:20-216:11; *see also* ECF No. 190-69 (Haycock Dep. Ex. 15 (Yearly Performance Summary)) at TEK-Recruiter_Lit-00124520 (describing summary performance details provided to Recruiters during annual reviews as starts,

spread growth line, and activity); ECF No. 190-75 (Performance Review Guide 2021: For Leaders and Leads) TEK-Recruiter_Lit-00528422.

Accordingly, SOF ¶ 81 is undisputed and should be deemed admitted.

### C.    Recruiters' Compensation Is Tied to Their Production Tasks.

82.    TEK pays Recruiters a salary and commission based on their spread. Ex. 123 (2020 Recruiter Compensation – U.S.) at TEK-Recruiter_Lit-00073390-91 (setting forth Recruiter salary scale and commission tiers); Ex. 124 (Former Executive Director of Finance Philip Eisman ("Eisman Tr.")) 63:19-64:8:18; Ex. 9 (Fronzaglio Tr.) 79:17-21; Ex. 12 (Pappas Tr.) 44:21-45:21; Ex. 15 (Kartchner Tr.) 184:11-15.

**RESPONSE: Disputed in part. Undisputed that Recruiter pay includes both salary and a commission based on spread.**

**Disputed that these are the only types of Recruiter pay. Recruiters also may receive Cost of Living Adjustments (COLA) based on where they live, cell phone reimbursement, individual performance quarterly bonuses, individual performance annual bonuses, office performance bonuses, units in an Investment Growth Plan, an invitation to the Recruiter Summit Trip, an invitation to the Company Summit Trip, additional incentives. (Pls. Ex. 123 (2020 Recruiter Compensation – U.S.)**

*PLAINTIFFS' REPLY:* TEK does not dispute that it pays Recruiters a salary and commission based on their spread. SOF ¶ 82 does not address whether there are other types of compensation Recruiters may receive. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 82. Accordingly, SOF ¶ 82 is undisputed and should be deemed admitted.

83.    In other words, the more Recruiters produce candidates for TEK, the more TEK pays them. Ex. 3 (Haycock Tr.) 105:7-106:20; Ex. 121 (Spread: Overview & Problem Resolution)

at TEK-Recruiter_Lit-00240020-21.

**RESPONSE**: Disputed. Recruiters do not "produce" candidates because candidates are not a "product." Clients contract with TEK to engage consultants to provide services to the client. [CITE]

In addition, Recruiters are paid a salary plus "spread." "Spread" does not increase just by placing more consultants on assignment. TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 53, Doyle Tr. 193:15-194:16.) A Recruiter negotiates with the candidate the *pay rate* amount that they will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.) Recruiters can obtain more spread in a variety of ways, including negotiating lower pay rates with the candidates they are working with, focusing on requirements with higher client bill rates, focusing on quality assignments where both consultant and client want to work together for an extended period of time, and managing consultants to have successful and longer assignments that result in more worked hours and thus more spread, among other things. [CITE]

***PLAINTIFFS' REPLY***: TEK does not dispute that the more candidates that Recruiters put to work, the more TEK pays them.

TEK disputes that Recruiters produce consultants, but TEK has not pointed to any specific testimony or documents in the record in support of its dispute. TEK cannot manufacture disputes

167

without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Nor has TEK provided any support for its statement that "Clients contract with TEK to engage consultants to provide services to the client." TEK does not dispute that it refers to Recruiters as "producers." *See* TEK's Response to SOF ¶ 26 ("Undisputed that TEK refers to Recruiters as 'producers.'").

TEK does not dispute that Recruiters may obtain spread when a candidate they identified is put to work, and SOF ¶ 83 does not address the various other ways in which spread may be increased. Thus, TEK's remaining "dispute" is irrelevant to SOF ¶ 83.

Accordingly, SOF ¶ 83 is undisputed and should be deemed admitted.

## III. Recruiters' Work Is Not Related to the General Business Operations of TEK or Its Customers.

84.    Recruiters do not create or implement management or operational policies for TEK or its customers. Ex. 4 (DiBenedetto Tr.) 167:15-18; Ex. 3 (Haycock Tr.) 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives, and not recruiters, because the executives are "running [the] business."), 158:20-162:5 (testifying that Recruiters do not create or implement human resource, operational, or management policies for TEK or its clients).

**RESPONSE: Undisputed.**

***PLAINTIFFS' REPLY****:* SOF ¶ 84 is undisputed and should be deemed admitted.

85.    Recruiters have no authority to: waive or deviate from TEK's policies and procedures in performing their work; formulate, interpret, or enforce management policies or operating procedures; or negotiate or enter into contracts on behalf of TEK or its clients. Ex. 4 (DiBenedetto Tr.) 167:15-18; Ex. 5 (Doyle Tr.) 30:11-23 (testifying that he negotiated contracts as an AM and Director of Business Operations), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate" A: "Correct. Yes."); Ex. 3 (Haycock Tr.) 159:1-162:5 (Recruiters cannot bind TEK in legal proceedings); Ex. 2 (Def.'s Resp.

to Pls. 3rd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters.").

**RESPONSE**: Disputed in part. Undisputed that Recruiters do not negotiate contracts on behalf of TEK's clients.

Disputed that Recruiters may not deviate from TEK's policies or procedures. Recruiters have discretion to devise their own approach to how they person their job duties. See TEK's Response to Statement 38.

Disputed that Recruiters may not enter into contracts on behalf of TEK. See TEK's Response to Statement 54, 74, 86.

*PLAINTIFFS' REPLY:* TEK does not dispute that Recruiters have no authority to negotiate contracts on behalf of TEK's clients, formulate, interpret, or enforce management policies or operating procedures, negotiate contracts on behalf of TEK, or negotiate or enter into contracts on behalf of TEK's clients.

TEK disputes that Recruiters have no authority to deviate from TEK's policies and procedures in performing their work. For the reasons stated in Plaintiffs' Reply in support of SOF ¶ 38, TEK is incorrect that Recruiters have authority to deviate from TEK's policies and procedures in performing their work.

TEK disputes that Recruiters have no authority to enter into contracts on behalf of TEK. For the reasons stated in Plaintiffs' Reply in support of SOFs ¶¶ 54, 74, and 86, TEK is incorrect that Recruiters have authority to enter into contracts on behalf of TEK. TEK provides no evidence of contracts Recruiters enter into on TEK's behalf, because Recruiters have no such authority. TEK is not entitled to manufacture disputes without evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

Accordingly, SOF ¶ 85 is undisputed and should be deemed admitted.

86.    Recruiters do not have the authority to negotiate or bind TEK or its clients with respect to significant matters. *Supra*; Ex. 4 (DiBenedetto Tr.) 109:23-110:3; Ex. 3 (Haycock Tr.) 123:1-24, 158:20-161:15; Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25, 209:2-12; Ex. 2 (Def.'s Resp. to Pls. 3rd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters.").

**RESPONSE:** **Disputed. Recruiters have the authority to negotiate on behalf of TEK and to bind TEK with respect to the terms and conditions of employment agreed by contractors. (Df. Ex. 2, collecting testimony that Recruiters *negotiate* rates.)**

**This is a significant matter for TEK because it impacts TEK's net profits. TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 5 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 50, Doyle Tr. 193:15-194:16.) A Recruiter negotiates with the candidate the *pay rate* amount that they will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.) Thus, the pay rate and other terms and conditions that a Recruiter negotiates with a candidate directly impact TEK's bottom line.**

**The ability of a Recruiter to negotiate also is a significant matter for TEK's clients. TEK's clients engage the company to find and assign talented IT professionals to perform work the clients need. (Df. Ex. 1, collecting testimony about how Recruiters help TEK's**

**clients.) Negotiating pay rates that consultants will accept means that they will go to work for the clients and provide the needed services.**

**Plaintiffs' remaining citations do not support their point. The citations in Plaintiffs' Ex. 2 and 4 merely confirm that Recruiters do not negotiate bill rates with clients, which TEK has never asserted that they do. The citation in Plaintiffs' Ex. 3 identify some other types of duties that TEK has never claimed Recruiters perform, such as account payable functions.**

**Recruiters' job duties do not include negotiating with TEK's customers regarding what bill rate the customer will pay for the services provided to them by consultants that Recruiters place on assignment. (Pls. Ex. 2, No. 1.)**

***PLAINTIFFS' REPLY***: TEK does not dispute that Recruiters do not have the authority to bind TEK or its clients with respect to significant matters. Contrary to TEK's unfounded assertions, Recruiters have no authority to bind TEK or its customers. TEK's clients determine the job requirements, SOFs ¶¶ 31-33 and Plaintiffs' Replies in support of SOFs ¶¶ 31-33, Account Managers negotiate the bill rates with TEK's customers, Plaintiffs' Reply in support of SOF ¶ 54 and TEK's Response to SOF ¶ 86, Recruiter cannot negotiate a burden above 16% or promise a consultant higher pay than set forth in the client's requisition or by the Recruiter's supervisor, Plaintiffs' Reply in support of SOF ¶ 54, TEK's clients, and not Recruiters, determine which candidates to hire and fire – including if they are willing to pay a certain rate for a certain client. SOF ¶ 54.

Recruiters do not have the authority to bind TEK with respect to the terms and conditions of employment agreed by contractors. *See* ECF No. 190-5 (Doyle Tr.) 196:1-197:6 (describing benefits and other terms of employment as being part of a menu that TEK offers and consultants

can choose from), 198:19-25 (Q. "When you do – when recruiters are matching for direct placements, TEK does not have any control over what kind of benefits are being offered; is that correct?" A. "Correct. That would be whatever the customer offers their – all their full-time employees."); *see also* Ex. 143 (Baker Tr.) 61:3-16 (Account Managers are involved in discussions related to benefits); Ex. 146 (Carter Tr.) 67:15-68:17 (same); Ex. 153 (Phommalinh Tr.) 49:1-50:4 (Recruiters communicated – rather than negotiated – terms and conditions of employment).

TEK disputes that Recruiters do not have the authority to negotiate on behalf of TEK. Based on the evidence set forth in Plaintiffs' Reply in support of SOF ¶ 54, Recruiters negotiate pay rates and other conditions of employment that affect TEK's burden amount.

Accordingly, SOF ¶ 86 is undisputed and should be deemed admitted.

87.    They do not supervise anyone; represent TEK or its clients in formal grievance proceedings; advise TEK or its clients on how to more efficiently run their operations; or study or recommend changes to the operations or corporate structure of any business. *Supra*; Ex. 3 (Haycock Tr.) 34:3-6, 69:9-71:22, 122:17-123:25, 160:15-162:5; Ex. 17 (Horonzy Email Nov. 14, 2018) TEK-Recruiter_Lit-00550518 (demonstrating TEK's wage and hour team – not Recruiters – determines consultants' overtime status).

**RESPONSE: Disputed in part. Undisputed that Recruiters do not represent TEK or its clients in formal grievance proceedings; advise TEK on hot to more efficiently run its operations; or study or recommend changes to the corporate structure of TEK or its clients.**

**Disputed that Recruiters do not supervise anyone, advise TEK's clients on how to more efficiently run their operations, or study or recommend changes to the operations of TEK's clients.**

**The sources cited by Plaintiffs do not support their statement. Plaintiffs cited only a**

portion of a response by Haycock regarding TEK's capacity solutions offering, and whether TEK or its clients decide how many people to hire. The complete exchange shows that TEK is making the decision some of the time. (Pls. Ex. 3 (Haycock Tr.) 32:15-34:6. The second cited portion of Haycock's testimony only confirms that certain business executives are responsible for running the operations of TEK's business, such as monitoring the company's financial health. (*Id.*, 69:9-71:22.) The third cited portion of Haycock's testimony does not touch on any of the topics mentioned in Plaintiffs' statement. (*Id.*, 122:17-123:25.) In the final cited portion of Haycock's testimony, he confirms that Recruiters are part of evaluating TEK's operations in order to help give the company a better understanding of how to improve. (*Id.*, 160:15-162:5.)

Plaintiffs' Ex. 17 is immaterial. The document is an unauthenticated, vague, and ambiguous email dated November 14, 2018. (Pls. Ex. 17 (Horonzy Email Nov. 14, 2018) TEK-Recruiter_Lit-00550518.) The titles or roles of the sender and recipient are not provided. (*Id.*) The document refers to TEK's "wage and hours team" but does not explain who is or is not part of that team. (*Id.*) Nothing in the document relates to the assertions made by Plaintiffs in their statement.

***PLAINTIFFS' REPLY:*** TEK does not dispute that Recruiters do not represent TEK or its clients in formal grievance proceedings, advise TEK on how to more efficiently run its operations, or study or recommend changes to the corporate structure of TEK or its clients.

Without citation to any records, TEK disputes that Recruiters do not supervise anyone, advise TEK's clients on how to more efficiently run their operations, or study or recommend changes to the operations of TEK's clients, but TEK has not pointed to any specific testimony or documents in the record in support of its disputes. TEK cannot manufacture disputes without

evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).

The testimony and documents cited by Plaintiffs supports SOF ¶ 87. Haycock testified that Recruiters do not create or implement management or operational policies for TEK's clients. ECF No. 190-3 (Haycock Tr.) 159:4-160:14. He further testified that TEK's clients decide the skill sets they need to support their business operations. *Id.,* 34:3-6.

ECF No. 190-17 (Horonzy Email Nov. 14, 2018) TEK-Recruiter_Lit-00550518 demonstrates that TEK utilizes a wage and hour team – as opposed to Recruiters – to determine consultants' overtime status and study TEK's clients' choices regarding those statuses. This document supports the fact that Recruiters do not advise TEK's clients on how to more efficiently run their operations or study or recommend changes to the operations of TEK's clients. *See id.*; *see also* Ex. 168 (Pappas Tr.) 20:13-17 (Q. "You mentioned that, as an AM, you were closer to the business. Was that because it was the AM's job to have the communications with the businesses that are Tek's clients?" A. "Absolutely."). Recruiters do not supervise anyone. *See also* Ex. 162 (Fronzaglio Tr.) 39:19-23 (Q. "Did any of the recruiters you supervised that we just spoke about have any employees report to them?" A. "At the time I was supervising them?" Q. "Correct." A. "Not formally that I recall."). TEK admits that Recruiters do not oversee the actual work consultants are performing or evaluate the substance of consultant's work. SOF ¶ 7.

Testimony from Plaintiffs and Opt-in Plaintiffs further confirms that Recruiters do not advise TEK's clients on how to more efficiently run their operations, or study or recommend changes to the operations of TEK's clients because Recruiters rarely even communicate directly with TEK's clients and their hiring managers. *See, e.g.*, Ex. 150 (Guidry Tr.) 84:20-85:2 (Q. "Okay. So did you feel that you got to know those customers' business and practices a little better as you continued to recruit for their positions?" A. "No. I wish. No, we didn't have insight to maintaining

like a relationship with the customer directly."); Ex. 143 (Baker Tr.) 38:2-6 (Q. "So in your role as a recruiter, you never had any direct interaction with the client?" A. "The most direct interaction I had with the client was walking a candidate in on site on their first day and shaking their hand."), 87:12-15 (Q. "So account managers are responsible for client relationships, is that fair?" A. "Yes."); Ex. 144 (Blendy Tr.) 63:8-13 ("The account managers would work directly with our hiring managers at our clients and then sometimes the recruiters would be there on the phone call or in the room or anything like that, but it was directly those two to each other); Ex. 147 (Collier Tr.) 47:4-6 (Q. "Did you ever interact directly with TEK's clients?" A. "No."); Ex. 152 (Malone Tr.) 70:15-22 (Q. "Okay. And so did you ever have direct communications with folks at the customer locations?" A. "No. I would say like the candidates that worked at the customer technically did like be part of the customer, but since they were a consultant, I did not have direct access to the customer."); Ex. 151 (Maher Tr.) 119:11-13 (Q. "Did you partner closely with any hiring managers?" A. "No, I did not."); Ex. 148 (Conyers-Jordan Tr.) 68:4-5 (Q. "Did you have direct contact with the clients?" A. "No. I didn't. I didn't."); *see also* Ex. 168 (Pappas Tr.) 20:13-17 (Q. "You mentioned that, as an AM, you were closer to the business. Was that because it was the AM's job to have the communications with the businesses that are Tek's clients?" A. "Absolutely.").

Testimony also confirms that Recruiters do not supervise anyone. Ex. 157 (Sherman Tr.) 182:8-10 (Q. "Do you remember a time when any recruiter was your direct supervisor?" A. "No."); Ex. 162 (Fronzaglio Tr.) 39:19-23 (Q. "Did any of the recruiters you supervised that we just spoke about have any employees report to them?" A. "At the time I was supervising them?" Q. "Correct." A. "Not formally that I recall."); Ex. 132 (Dries-Wielandt Decl.) ¶ 33 ("I did not supervise job candidates once they were hired by TEKsystems' clients, and I did not evaluate their performance."); Ex. 134 (Holin Decl.) ¶ 33 (same); Ex. 135 (Martin Decl.) ¶ 33 (same); Ex. 137

(Olszewski Decl.) ¶ 32 (same); Ex. 140 (Stein Decl.) ¶ 33 (same); Ex. 142 (Walker Decl.) ¶ 32 (same).

TEK's objection regarding the authenticity of documents that *TEK* produced is meritless. *See supra*, Plaintiffs' General Objections ¶ 3.

Accordingly, SOF ¶ 87 is undisputed and should be deemed admitted.

88.    Recruiters do not provide human resource services, public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients. Ex. 3 (Haycock Tr.) 123:21-24, 158:20-161:15; Ex. 5 (Doyle Tr.) 198:19-25, 209:2-12.

**RESPONSE: Disputed in part. Undisputed that Recruiters do not provide public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients.**

**Disputed that Recruiters do not provide human resource services for TEK or its clients.**

**The sources cited by Plaintiffs do not support their statement. In the cited testimony by Haycock, he agreed that "Recruiters do not fall under TEK's human resources department" and Recruiters do not "make determinations internally at TEK regarding human resources." (Pls. Ex. 3 (Haycock Tr.) 123:21-24, 158:20-161:15.) In the cited testimony by Doyle, he agreed that Recruiters "are not required to have human resources certification" and do not have any control over benefits offered when there is a direct placement, i.e., when the individual is hired directly by TEK's client, as opposed to being employed by TEK and placed on assignment to the client on a temporary basis. (Pls. Ex. 5 (Doyle Tr.) 198:19-25, 209:2-12.)**

**None of these responses contradict the idea that Recruiters perform duties akin to human resources services for TEK or its clients.**

**_PLAINTIFFS' REPLY:_** TEK does not dispute that Recruiters do not provide public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients.

Without relying on any evidence and ignoring its previously cited admissions that "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sales," ECF No. 190-102 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524, TEK has not pointed to any evidence in the record in support of its disputes. TEK cannot manufacture disputes without evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). TEK concedes that Haycock testified that Recruiters do not fall under TEK's human resources department and that Recruiters do not make internal determinations regarding human resources at TEK. *See* ECF No. 190-3 (Haycock Tr.) 123:21-24, 158:20-161:15. TEK also concedes Doyle testified that Recruiters do not need any training in human resources, and that Recruiters do not determine benefits offered by TEK's clients to candidates hired into direct placements. ECF No. 190-5 (Doyle Tr.) 198:19-25, 209:2-12.

TEK employs Customer Service Associates ("CSAs") to handle human resources functions for TEK's clients. *See* Ex. 161 (Estimada Tr.) 100:3-101:12 (explaining that human resources functions are handled by Customer Service Associates, which is "a completely different job" from recruiting); ECF No. 190-10 (Hollister Tr.) 94:18-95:17 (confirming Customer Support Associates handle human resources functions); Ex. 164 (Johnson II Tr.) 117:8-118:4 (explaining that TEK has a field support team that handles onboarding for consultants), 115:10-116:1 (testifying that TEK

has a background screening team that handles consultant background checks).

Accordingly, SOF ¶ 88 is undisputed and should be deemed admitted.

**PLAINITFFS' RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

89.    TEK is a global business and technology firm that assists its customers in achieving their business transformation, customer experience, and business goals. (Df. Ex. 59, Haycock Dep. 25:6-26:6, 134:6-13.)

**RESPONSE: Admitted in part and denied in part. Admitted that this reflects some of Haycock's testimony. Denied to the extent that TEK is claiming its primary marketplace offering is not recruiting. TEK has repeatedly represented itself as a "staffing company" that "recruits" in court filings in other lawsuits where it sued other recruiting companies for accessing its purportedly proprietary process, depositions, discovery responses, and internal training documents. ECF No. 190-20 (*Andiamo* Complaint) at ¶ 2; ECF No. 190-21 (*Andiamo* Rule 30(b)(6) Tr.) at 153:12-23; ECF No. 190-22 (*Andiamo* Preliminary Injunction) at 2, 4; ECF No. 190-4 (*Andiamo* Aff. of Alexander Pulido) at ¶¶ 5, 7; ECF No. 190-24 (*Ambar*) Complaint) at ¶¶ 2, 13; Ex. 25 (*Berardis*) Complaint) ¶¶ 2, 13-15; ECF No. 190-1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3 ("Defendant is in the staffing business"); ECF No. 190-39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; ECF No. 190-26 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting workforce on the planet."); *see also* Plaintiffs' SOFs ¶¶ 1-2.**

90.    TEK's business is providing IT talent services, which it divides into three categories: staffing augmentation; capacity solutions; and total management services. (Df. Ex. 59, Haycock Dep. 25:22-34:7-18, 73:16-77:7.)

**RESPONSE: Admitted in part and denied in part. Admitted that TEK divides its IT**

talent services into three categories: staffing augmentation; capacity solutions; and total management services. Denied to the extent that TEK is claiming it is not in the staffing business. Haycock testified that "talent services is in the staffing world." Ex. 3 (Haycock Tr.) 25:8-10. TEK also referred to itself as being "in the staffing business" in its verified Answer to Plaintiffs' First Set of Interrogatories. ECF No. 190-1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 2.

91.    Staffing augmentation refers to placing consultants with specific skills on assignment at TEK's customers, where they perform needed services for a certain period of time. (Df. Ex. 59, Haycock Dep. 25:22-34:7-18, 73:16-77:7.)

**RESPONSE**: Admitted.

92.    Capacity solutions refers to assembling entire teams for large or specialized projects. (Df. Ex. 59, Haycock Dep. 32:15-33:8.) For example, TEK might provide a team of developers, testers and project managers for a customer who wants to upgrade their software system. Id. As another example, TEK might assemble a team to take on an online retailer's project to streamline delivery to customers' homes faster and more efficiently, by increasing the volume of products carried in each delivery vehicle, or improve the client's customer experience by enabling real-time tracking of shipments. (Fahey Decl. ¶ 11.)

**RESPONSE**: **Admitted in part and denied in part. Admitted that capacity solutions may refer to assembling entire teams for large or specialized projects. Denied that capacity solutions always refers to assembling entire teams for large or specialized projects. As Haycock testified, sometimes "we have an existing team and they're augmenting that team because somebody quit, was fired, whatever it happens to be, and so they're placing one individual on a team that is in that flexible capacity, you know, solution." ECF No. 203-59**

**(Haycock Tr.) 33:4-8. Within the capacity solutions category, TEK's clients are determining the number of consultants they need and the skill set those consultants should possess. ECF No. 190-3 (Haycock Tr.) 34:3-6.**

93.    Total management services refers to outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 59, Haycock Dep. 25:22-34:7-18, 73:16-77:7.) For example, TEK might build, design, and maintain a website for a customer who does not have the internal resources or expertise to do so. (*Id*. at 73:16-77:7.)

**RESPONSE: Admitted in part and denied in part. Admitted that total management services refers to TEK's outsourcing and management of an IT function or outcome for TEK's customers. Denied to the extent that TEK is claiming Recruiters manage an IT function or outcome for a customer or consultants performing work on an entire IT function or outcomes for a customer.** ***See*** **ECF No. 190-3 (Haycock Tr.) 35:23-25 (consultants working on total management services are supervised by TEK's Global Services organization);** ***see also***, **Plaintiffs' Reply in support of SOF ¶ 87 (pointing to testimony that demonstrates that Recruiters do not supervise anyone).**

94.    What TEK provides its customers is the ability to achieve their technological goals through the talents and services of those IT professionals. (Df. Ex. 59, Haycock Dep. 25:1-27:10, 60:22-61:16.)

95.    **RESPONSE: Admitted in part and denied in part. Admitted that TEK provides recruiting services to its clients. ECF No. 190-3 (Haycock Tr.) 25:6-26:6; ECF No. 190-20 (*Andiamo* Complaint) at ¶ 2.  Denied to the extent that it implies that TEK does not compete with other recruiting companies to place consultants. TEK competes with other recruiting firms to place candidates and ultimately is only successful at placing less than one-**

**third of the candidates it submits to third-party companies. ECF No. 190-4 (DiBenedetto Tr.) 96:2-6 (part of the customer service goal with potential job candidates is to get them to utilize TEK over its competitors); ECF No. 190-5 (Doyle Tr.) 199:18-200:2; ECF No. 190-6 (Doyle Sealed Tr. Portion) 237:20-238:9 (only 31.8% of the job requirements that TEK works to fill get filled by TEK); ECF No. 190-3 (Haycock Tr.) 44:22-45:4 ("There's always a war for talent."), 48:1-8 ("[T]here are many, many, many competitors out there"), 48:10-49:12; ECF No. 190-7 (TEK Vice President of Managed Service Program Strategy McNelley Tr. ("McNelley Tr.")) 38:17-39:3, 40:23-41:13, 58:20-59:11; ECF No. 190-8 (Estimada Tr.) 86:16-21, 88:2-6, 89:14-21, 92:18-25; ECF No. 190-9 (Fronzaglio Tr.) 97:8-17; ECF No. 190-10 (Hollister Tr.) 36:16-37:16, 86:10-87:6; ECF No. 190-11 (Minniear Tr.) 54:22-55:9, 92:15-18; ECF No. 190-12 (Pappas Tr.) 130:24-131:20; ECF No. 190-21 (Andiamo Rule 30(b)(6) Tr.) 181:12-17; ECF No. 190-27 (Haycock Email Oct. 26, 2020) at TEK-Recruiter_Lit-00386105 (discussing "reduc[ing] 'finger pointing' when we get beat on a *requirement*.") (emphasis added).**

96.    TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Df. Ex. 50, Doyle Tr. 193:15-194:16, 198:19-25.)

**RESPONSE: Admitted in part and denied in part. Admitted that TEK and its client reach an agreement regarding the bill rate. Denied that Recruiters place consultants on assignment. Account Managers – not Recruiters – have the ultimate authority to determine which candidates to forward to TEK's clients. *See* ECF No. 190-18 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets"); ECF No. 190-55 (Digital REDZONE**

Script) TEK-Recruiter_Lit-00004325 ("the Account Manager has submitted this person to the customer."); ECF No. 190-9 (Fronzaglio Tr.) 155:18-20 (Q. "Can an AM reject a specific candidate from being sent to a client?" A. "Yes."); ECF No. 190-12 (Pappas Tr.) 62:10-16 (Q. "When you're talking about the qualifying/disqualifying candidates, did that ultimately fall on the account managers to make the final decision on who got qualified to get submittal?" [Objection omitted] A. "Yes."); Ex. 144 (Blendy Tr.) 123:19-23 (A. "[Candidates] would be submitted by the recruiter to the account manager and then the account manager would make a final decision on whether he would submit them to the client or not."); Ex. 154 (Raras Tr.) 78:20-79:12 (explaining that his account manager spoke with every candidate he located before submitting the candidate to TEK's clients and ultimately submitted about 1/5th of the candidates he presented to his account manager); Ex. 146 (Carter Tr.) 32:21-23 (A. "The account manager would either decide to, you know, take their resume and present it to the client or decide not to."); Ex. 157 (Sherman Tr.) 164:6-13 (Q. "How often when you presented a candidate to an account manager would the account manager say I'm going to submit this candidate to the client?" A. "I don't have a specific recollection of like the number of people I would or the percentage. I would say like 60 to 80 percent of the people I presented, they wanted to move forward."); Ex. 151 (Maher Tr.) 152:17-153:7 (A. "So referencing with the account managers. Ultimately that's what it boils down to because they are going to be the primary person that makes the decision. So I might just go like, hey, maybe this will work out better for me. But I don't have any like control or autonomy in those moments because ultimately, it's not going to be my choice on whether or not we move forward with them or not. I can't make a tactical recommendation to the client. The only thing that I can do is speculate on potentially a candidate being a good fit and then having a conversation with an

**account manager and allowing the account manager to decide whether or not that's true.");**
**Ex. 132 (Dries-Wielandt Decl.) ¶¶ 28-29 ("Account managers reviewed the candidate**
**information and decided which candidates, if any, would be forwarded to TEKsystems'**
**client."); Ex. 134 (Holin Decl.) ¶¶ 28-29 (same); Ex. 135 (Martin Decl.) ¶¶ 28-29 (same); Ex.**
**137 (Olszewski Decl.) ¶¶ 27-28 (same); Ex. 140 (Stein Decl.) ¶¶ 28-29 (same); Ex. 142 (Walker**
**Decl.) ¶¶ 27-28 (same). And, Recruiters do not hire consultants. Ex. 4 (DiBenedetto Tr.)**
**167:9-11 (Q. "Do recruiters make the ultimate hiring decision for the consultants?" A.**
**"No."); Ex. 132 (Dries-Wielandt Decl.) ¶ 35 ("I did not participate in any decisions regarding**
**the hiring or firing of candidates."); Ex. 134 (Holin Decl.) ¶ 35 (same); Ex. 135 (Martin Decl.)**
**¶ 35 (same); Ex. 137 (Olszewski Decl.) ¶ 34 (same); Ex. 142 (Walker Decl.) ¶ 34 (same).**

97.    A recruiter negotiates with the candidate the *pay rate* amount that they will accept
to perform the work. (Df. Ex. 50, Doyle Tr. 194:17-195:7.) A recruiter also negotiates with the
candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead
costs, such as for paid time off. (Df. Ex. 50, 196:1-198:9.)

**RESPONSE: Denied.**

**Denied that Recruiters negotiate with candidates the pay rate amount that candidates**
**will accept to perform the work. ECF No. 190- 2 (Def.'s Resp. to Pls. 3rd Interrogatories) No.**
**1 ("The rates negotiated between Defendant and its customers are not relevant to the duties**
**performed by Recruiters."). TEK cites testimony from Doyle to support its contention that**
**"a Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept**
**to perform the work." *See* ECF No. 203-53 (Doyle Tr.) 194:17-195:7. But that is not what**
**Doyle said. *See id*. Doyle testified that *Account Managers* set the pay rate and Recruiters**
**assist Account Managers by providing information about the going rate various skills and**

experience levels. ECF No. 203-53 (Doyle Tr.) 194:17-195:7 (Q. "Okay. And then what about the pay rate min/ pay rate max? What is that?" A. "Yeah. So that's based on the type of skill set. What is the going rate. You know, based on what the max bill rate is, what's the amount – the most we would want to offer a consultant to still have a healthy margin. But that's where recruiters would be a lot more involved in saying, "Here is what the going rate is for this type of skill set based on this level of experience," and then that way *the AM* recruiters are partnering with on this part of it  to say, "We think if we can bill this amount, you can only pay this amount, we think we can keep this amount of margin or spread.") (emphasis added). Haycock agreed that Recruiters are not generally "doing the actual negotiation with a contract, but there are times when recruiters can be *involved* associated with individual placements." ECF No. 190-3 (Haycock Tr.) 58:2-10 (emphasis added). Plaintiffs and Opt-in Plaintiffs also testified that Recruiters do not determine the pay rate. *See, e.g.*, Ex. 143 (Baker Tr.) 61:3-16 (Q. "Was there ever an instance where you found a successful candidate who came back before accepting the offer and asked for a change in pay or terms?" A. "Yes." Q. "And how would you handle that situation." A. "It had to be approved by the account manager."); Ex. 153 (Phommalinh Tr.) 31:5-12 (Q. "Did you negotiate rates and salaries for consultants?" A. "No." Q. "You never negotiated any rate or salary for a consultant?" A. "We were given direction on what we can pay the consultant from the account manager."); Ex. 146 (Carter Tr.) 67:15-68:17; Ex. 149 (Dore Tr.) 83:15-85:7; Ex. 155 (Richenberg Tr.) 169:16-20; Ex. 145 (Burke Tr.) 138:17-139:4.

Denied that Recruiters negotiate with candidates other conditions of employment that affect TEK's "burden" amount. *See* Ex. 5 (Doyle Tr.) 196:1-197:6 (describing benefits and other terms of employment as being part of a menu that TEK offers and consultants can

**choose from), 198:19-25 (Q. "When you do – when recruiters are matching for direct placements, TEK does not have any control over what kind of benefits are being offered; is that correct?" A. "Correct. That would be whatever the customer offers their – all their full-time employees."); Ex. 143 (Baker Tr.) 61:3-16 (Account Managers are involved in discussions related to benefits); Ex. 146 (Carter Tr.) 67:15-68:17 (same); Ex. 153 (Phommalinh Tr.) 49:1-50:4 (Recruiters communicated – rather than negotiated – terms and conditions of employment); Ex. 132 (Dries-Wielandt Decl.) ¶ 32 ("I did not negotiate the terms of a candidate's employment."); Ex. 134 (Holin Decl.) ¶ 32 (same); Ex. 135 (Martin Decl.) ¶ 32 (same); Ex. 137 (Olszewski Decl.) ¶ 31 (same); Ex. 140 (Stein Decl.) ¶ 32 (same); Ex. 142 (Walker Decl.) ¶ 31 (same).**

98.     The difference between the bill rate and the pay rate and burden figures is the margin or net profit, which TEK refers to as "spread." (Df. Ex. 50, 68:23-69:23; Df. Ex. 67, T. Raras Tr. 41:14-42:19.)

**RESPONSE: Admitted.**

99.     TEK considers its primary competitors to be managed service providers such as Deloitte, Accenture, Tata Consultancy Services ("TCS"), Wipro, Insight Global, CGI, and Apex. (Df. Ex. 59, Haycock Dep. 182:6-20; Df. Ex. 61, Johnson I Dep. 221:11-20; Df. Ex. 63, Df. Ex. 62, Df. Ex. 62, Johnson 2 Dep. 106:12-107:6; Df. Ex. 56, Estimada Dep. 78:5-16.)

**RESPONSE: Admitted in part and denied in part. Admitted that Haycock testified that Tata, Wipro, Deloitte, Insight Global, and Apex are competitors of TEK. ECF No. 203-59 (Haycock Tr.) 182:6-20. Admitted that Johnson testified that she would identify Insight Global, Wipro, and Tata as a few companies that come to mind as TEK's competitors. ECF No. 203-61 (Johnson I Tr.) 221:11-20. Admitted that Lis testified that Deloitte, Accenture,**

TCS, and CGI are TEK's biggest competitors today. ECF No. 203-63 (Lis Tr.) 106:12-107:6.

Denied that TEK considers Deloitte, Accenture, Tata Consultancy Services ("TCS"), Wipro, Insight Global, CGI, and Apex to be its "primary" competitors because TEK has not pointed to any testimony or documents that states as much. *See* ECF No. 203-59 (Haycock Tr.) 182:6-20; ECF No. 203-61 (Johnson I Tr.) 221:11-20; ECF No. 203-63 (Lis Tr.) 106:12-107:6; ECF No. 203-56 (Estimada Tr.) 78:5-16. TEK's SOF ¶ 98 is misleading because it omits that Johnson also testified that she would identify Eden, Randstad, and Randstad Technical as TEK's competitors. *See* ECF No. 203-61 (Johnson I Tr.) 221:11-20; *see also*, Ex. 140 (Stein Decl.) ¶ 17 (identifying Randstad as a TEK competitor). TEK also omits that Estimada testified that TEK is in competition with local staffing companies, including Bishop & Co., *see* Df. Ex. 56 (Estimada Tr.) 78:5-16; Ex. 161 (Estimada Tr.) 89:14-25. Hollister similarly testified that local recruiting company, Judge Group, and Apex are competitors of TEK. ECF No. 190-10 (Hollister Tr.) 36:8-11.

Further, TEK describes Andiamo Consulting LLC as one of its direct competitors and filed a motion for preliminary injunction to enjoin Andiamo from soliciting TEK's employees. ECF No. 190-22 (*Andiamo* Preliminary Injunction) at 2. TEK's complaint against Andiamo in the same action shows that TEK views both TEK and Andiamo and staffing companies. *See* ECF No. 190-20 (*Andiamo* Complaint) at ¶¶ 29-31. TEK also filed actions against Startfinder and Collabera, Inc. for interfering with TEK's contractual relationships by hiring former TEK employees. *See* ECF No. 190-24 (*Ambar* Complaint); ECF No. 190-25 (*Berardis* Complaint). In those complaints, TEK refers to Startfinder and Collabera, Inc. as TEK's staffing company competitors. ECF No. 190-24 (*Ambar* Complaint) at ¶¶ 2, 21-23; ECF No. 190-25 (*Berardis* Complaint) at ¶¶ 2, 21-23.

100.    To become a Recruiter, one must first work at TEK as a Recruiter Trainee, a non-exempt, hourly position. (Df. Ex. 59, Haycock Dep. 104:11-105:6 (all Recruiters are hired as Trainees; the job duties of Recruiter Trainee are "[t]o learn how to be a recruiter."); Df. Ex. 61, Johnson I Dep.. 186:6-187:10.)

**RESPONSE: Admitted that TEK hires new Recruiters as hourly, non-exempt Recruiter Trainees.**

101.    To advance from Recruiter Trainee to Recruiter, one must complete 13 weeks of training and demonstrate the ability to perform the duties of the exempt Recruiter. (Haycock Dep. 104:11-105:6 ("The recruiter trainee cannot move out of the trainee period until they have shown a capability to be a recruiter.").)

**RESPONSE: Admitted in part and denied in part. Admitted that Recruiter Trainees undergo 13-weeks of training. Admitted that non-exempt Recruiter Trainees engage in the same job duties as Recruiters. ECF No. 190-3 (Haycock Tr.) 104:22-105:2 ("I don't call it a promotion"); ECF No. 190-5 (Doyle Tr.) 210:5-15 (Recruiter Trainees "convert" to Recruiters and Recruiter Trainees are "actually doing the job duty of a recruiter"); *see also*, Ex. 40 (2019 New Recruiter Compensation Talking Points) at TEK-Recruiter_Lit-00103685 (explaining that TEK's internal recruiters do not need to share with Recruiter Trainees that there is a training period during the onboarding or offer process). Denied that Recruiter Trainees must demonstrate the ability to perform the duties of the exempt Recruiter to advance from Recruiter Trainee to Recruiter. After Recruiter Trainees hit certain metrics and duration of employment, including earning a passing score on the Recruiter Evaluation, they are converted into salaried, exempt Recruiters.  ECF No. 190-4 (DiBenedetto Tr.) 63:20-64:9; ECF No. 190- 3 (Haycock Tr.) 104:14-105:25, 137:20-144:6; Ex. 151 (Maher Tr.) 80:10-**

**23; Ex. 144 (Blendy Tr.) 40:19-41:2; Ex. 129 (Clavet Decl.) ¶ 7; Ex. 130 (Coles Decl.) ¶ 7; Ex. 131 (Doerner Decl.) ¶ 6; Ex. 133 (Gahard Decl.) ¶ 6; Ex. 136 (Miller Decl.) ¶ 6; Ex. 139 (Seaward Decl.) ¶ 7; Ex. 141 (Strauchen Decl.) ¶ 6.**

102.    TEK expects Recruiters to understand the customer, the business problem the customer has engaged TEK to solve, the skills and experience needed to solve those business problems, the customer's culture and environment, in addition to understanding the labor market for people who possess those attributes, where to find those people, how to validate their experience or ability to apply those attributes to the client's project, how to persuade candidates to provide their services to TEK's customer, and how to present the person to the customer in a manner that makes the match clear. (Haycock Dep. 27:14-30:2; 50;1-51:18 (Recruiters support account managers and other roles at TEK, for example, in "are the knowledge experts and understand more about a particular skill specialty than sometimes. . .way more than the customer would themselves"); Fronzaglio Dep. 115:7-16, 173:12-20 (explaining that Recruiters have different styles as to how they approach candidates to persuade them to work with TEK and some choose to "talk about their area of expertise or their specialization."); Fronzaglia Decl. ¶ 14; Df. Ex. 18, Warren Decl. ¶¶ 11, 17-18; Df. Ex. 15, Rice Decl. ¶¶ 11-19.)

**RESPONSE: Admitted in part and denied in part. Admitted that TEK expects Recruiters to understand where to find potential candidates. Denied that Recruiters' primary job duty includes communicating directly with clients.**

**Admitted that TEK expects the Recruiter to understand what the Account Manager has communicated to them about TEK's customers. *See* Plaintiffs' Replies in support of SOFs ¶¶ 35-37; ECF No. 203-21 (Fronzaglio Decl.) ¶ 4 (describing "understanding the business problems [TEK's client's] might use TEK's help to address" as a responsibility she had as an**

Account Manager Recruiter Lead); Ex. 150 (Guidry Tr.) 84:20-85:11 (Q. "Okay. So did you feel that you got to know those customers' business and practices a little better as you continued to recruit for their positions?" A. "No. I wish. No, we didn't have insight to maintaining like a relationship with the customer directly. So there was not really any indication of like what they're looking for, why – you know, how to become better I guess at recruiting for them particularly. It was really just what is the account manager letting us know, what are they looking for and submitting candidates to the account manager to determine whether or not they would – they believe they would be a good fit for their client."); Ex. 151 (Maher Tr.) 107:2-9 (Q. "And did you have to understand those requirements prior to recruiting for them?" A. "At a surface level, I would have to understand, but I wouldn't require in-depth knowledge." Q. "How would you even gain the surface level understanding?" A. "Through the account manager."); Ex. 143 (Baker Tr.) 36:21-23 (A. "Yes. So each account manager is responsible for maintaining the relationship with the client and understanding the client's needs."); Ex. 147 (Collier Tr.) 48:16-21 (Q. "Did you ever discuss the role that clients were trying to fill with account managers?" A. Well, so we did have conversations about the position, but I never interacted directly with hiring managers."); Ex. 152 (Malone Tr.) 121:21-24 (Q. "So we've mentioned earlier that the account manager manages the relationship with customers, correct?" A. "Yeah."), 106:19-23 (A. "I didn't understand the clients' initiatives in terms of business, like me specifically. Whatever I was given from my account manager is what I understood about the customer."); Ex. 153 (Phommalinh Tr.) 21:14-15 (A. "The account manager would describe the job to us."); Ex. 168 (Pappas Tr.) 20:13-17 (Q. "You mentioned that, as an AM, you were closer to the business. Was that because it was the AM's job to have the communications with the

businesses that are Tek's clients?" A. "Absolutely."). For the reasons stated above in Plaintiffs' Response to TEK's SOF ¶ 101, denied that TEK expects Recruiters to have an understanding of the business problem the customer has engaged TEK to solve beyond what is communicated to Recruiters by Account Managers. *See supra*.

Admitted that TEK expects Recruiters to understand which skills and what experience level are listed on the job requirement. Denied to the extent TEK suggests that TEK expects Recruiters to have a technical understanding of the skills listed on the job requirement. ECF No. 190-68 (Job Description) ("No IT knowledge required. TEKsystems provides comprehensive training where individuals learn terminology, job functions and applicable practices within the information technology industry."); Ex. 152 (Malone Tr.) 89:20-90:5 (Q. "So can you talk to me a little bit more about what you meant by advised technical professionals?" A. "It should be rephrased to just like communicating with candidates directly regarding their skills in collaboration with the role that they're interviewing for. These skill sets were skill sets that we would hire for, but I wasn't trained or I wasn't expected to be a subject matter expert with any of those categories."); *see also* Plaintiffs' Reply in support of SOF ¶ 59.

For the reasons stated above in Plaintiffs' Response to TEK's SOF ¶ 101, denied that TEK expects Recruiters to understand anything about the customer's culture and environment outside of the information communicated to Recruiters by Account Managers and the information contained in the job requisition. *See also*, Ex. 154 (Raras Tr.) 111:23-112:3 (Q. "Did you attempt to understand whether a candidate was a good cultural fit for the requisition you were working on?" A. "No. I was mainly just focused on if their skill set matched."); Ex. 150 (Guidry Tr.) 87:3-12 (Q. "Okay. So there were distinctions from one

client to the next about the different systems that they used is what I'm hearing?" A. "Yes. There may have been differences with the different system that they used, but in terms of like cultural differences or anything like that, it really wasn't up to us to determine whether or not our candidate would be a good fit. It was solely based off of their skill set on their resume."); Ex. 152 (Malone Tr.) 98:22-99:10 (Q. "So did you ever make notes about observations that you've had outside the top three skills that you thought would be important for them to succeed in a position?" A. "Typically not. I mean, the account manager would reach out to the customer and say I have ABC candidate, and if they didn't possess the appropriate skills interpersonally, then they didn't move on to the next process. But if they made it through the process but they hit all three top skills but they didn't have the interpersonal skills, that would be vetted out from the account manager."); Ex. 151 (Maher Tr.) 223:19-224:6 (Q. "Did you share information you received from [Account Manager] about the culture of a particular client or a hiring manager at a client?" A. "Yes." Q. "And how did you determine what information to share with the candidate?" A. "I didn't determine that information, it was dependent on what [Account Manager] shared with me and what he felt was relevant that should be surfaced by the candidate when they were meeting with the client.").

Admitted that TEK provides training to Recruiters on how to use LinkedIn Recruiter and Connected to obtain various statistics regarding individuals who possess similar skill and experience levels as the skill types and experience levels listed in job requirements. ECF No. 190-5 (Doyle Tr.) 130:25-152:18; ECF No. 190-89 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 116-125; ECF No. 190-90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 15, 20-22. Admitted that TEK provides training to Recruiters

about how to look up statistics on LinkedIn about a market or skillset they are currently Recruiting for. ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097869-70 (TEK's LinkedIn Talent Insights activity trains Recruiters on how to use LinkedIn Talent Insights to obtain information about the number of IT professionals in a specific market or within a specific skill set and how to locate the average pay rate for a skillset). Denied that TEK expects Recruiters to understand the labor market for people who possess the attributes TEK's customer is looking for. TEK trains Recruiters to locate information about local markets and industries they are recruiting for from Account Managers. ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097871-74 ("Account Managers have in-depth knowledge of the Customers in the local market and can serve as a wealth of knowledge on the industry."). Additionally, Recruiters are often assigned to work on job requisitions outside of their vertical or specialization and are able to do so without an understanding of the labor market. *See* Ex. 156 (Seijas Tr.) 54:4-15 (Q. "So fair to say that maybe digital and creative was your specialty but you weren't completely siloed to just filling reqs for that particular specialty, is that right?" A. "Yes. Because at the end of the day, I was a recruiter at TEKsystems, everything else was kind of just a little extra, I guess. But, you know, you were taught the same way, so, like I said, I could basically recruit for any vertical, but I was assigned to a specific one."); Ex. 155 (Richenberg Tr.) 174:16-18 (Q. "Did you work on requisitions outside of the applications space as well?" A. "Yes."); *see also* Ex. 160 (Thomas Tr.) 86:15-20 (Q. "Did you find that there were any differences in how you went about looking for candidates for business analyst roles as opposed to UI or UX designer roles?" A. "I used Connected and LinkedIn Recruiter for those roles as well.").

Admitted that TEK expects Recruiters to understand how to follow TEK's practices

and procedures regarding how to validate candidates' skills and experience and determine whether they believe the skills and experience matches the minimum requirements set forth in the job requirement. TEK trains Recruiters on multiple practices and procedures to validate candidates' skills and experience, including the highlighter test, G2s, referrals, and IOIs. ECF No. 190-90 (Degreed Pathway) TEK-Recruiter_Lit-00078540 (TEK provides Recruiters with training modules on IOIs, G2s, and obtaining references); ECF No. 190-46 (Lighthouse Recruiter Lead PowerPoint) TEK-Recruiter_Lit-00125482 at 71 (describing IOIs and G2s as non-negotiables of Recruiter role); ECF No. 190-96 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952 (instructing Recruiters to use the highlighter test); ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097922 (highlighter test role playing activity), TEK-Recruiter_Lit-00097900-06 (training on information to gather during G2s), TEK-Recruiter_Lit-00097908 (training exercise on performing reference checks), TEK-Recruiter_Lit-00097912 (training exercise on IOIs); Ex. 156 (Seijas Tr.) 55:6-16 (TEK trains Recruiters on how to complete G2s); Ex. 155 (Richenberg Tr.) 108:15-109:2 (using G2s and IOIs to validate information on a candidates' resume), 170:18-20 (Richenberg received training from TEK on how to conduct a G2); *see also* Plaintiffs' Reply in support of SOF ¶ 41. Those principles are reinforced throughout Recruiters' tenure at TEK. Ex. 159 (Suliman Tr.) 96:24-97:19 (Q. "Okay. Do you know approximately when account managers stopped shadowing you during these meetings?" A. "There was never a time that we were ever stopped shadowing. We always had – Shadow exercises were consistent throughout my career at TEKsystems. Shadow exercises and role-playing exercises. They wanted TEKsystems to be the same everywhere as much as possible, the same exercise for consultants as well as the same experience, from what I could gather,

the same experience for the customers as well. And during my time as an account manager, they wanted that to be the same experience, too. So we had a lot of messaging practice, it was ongoing and constantly being refreshed by the company.").

Denied that TEK expects Recruiters to understand how to persuade candidates to provide their services to TEK's customers. Admitted that TEK provides training to Recruiters on how to overcome roadblocks when contacting or attempting to contact potential candidates. ECF No. 190-97 (Operations Playbook) at TEK-Recruiter_Lit-00019673 (TEK's Hearts & Clouds training instructs Recruiters how to overcome roadblocks when speaking with consultants); ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097860-63 (TEK's Voice of Consultants training helps provide Recruiters with "a better idea of Consultants wants and frustrations"), TEK-Recruiter_Lit-00097899 (TEK's Roadblocks Interviews training); ECF No. 190-4 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact).

Admitted that TEK provides training to Recruiters on how to present a potential candidate to Account Managers in a manner that shows the Account Manager why the Recruiter believes the potential candidate's skills and experience matches the job requirement. *See* ECF No. 203-18 (Warren Decl.) ¶ 18 (explaining that she presents a packet containing information about potential candidates to Account Managers. Denied that TEK expects Recruiters to understand how to present candidates to TEK's customers; Ex. 168 (Pappas Tr.) 62:19-24 ("The account managers would be the ones who would actually send [candidates] over to the client."); ECF No. 190-97 (Operations Playbook) at TEK-Recruiter_Lit-00019675 ("AMs must thoroughly screen or disqualify candidates."); ECF No. 190-18 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account

Managers [w]ill proactively submit all candidates that match customer skill sets"); ECF No. 190-55 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325 ("the Account Manager has submitted this person to the customer."). Warren's testimony that, at times, he presented candidates directly to TEK's clients does not contradict the fact that TEK does not expect Recruiters to understand how to present candidates to TEK's customers. *See* ECF No. 203-18 (Warren Decl.) ¶ 18. While some Account Managers allowed Recruiters to participate in communications with TEK's clients on occasion, communicating and maintaining relationships is a primary duty of Account Managers – not Recruiters. Ex. 162 (Fronzaglio Tr.) 121:12-15 (Q. "As an account manager and an account manager recruiter lead, would you say you were the primary contact with the clients?" A. "Yes."), 36:8-11; Ex. 168 (Pappas Tr.) 121:9-13 (Q. "But ultimately it was your responsibility to manage the relationship with the clients; is that correct?" A. "It was, yes. It was ultimately the account manager's role, like responsibility.").

103.    Some Recruiters work with clients at the outset to define the requirements of the role. (Bury Dep. 40:3-40:12; Fronzaglio Tr. 119:12-24; 162:19-163:1; Fronzaglia Decl. ¶¶ 4-8.)

**RESPONSE: Admitted in part and denied in part. Admitted that some Account Managers may choose to include Recruiters on calls with TEK's clients where Account Managers work with clients to qualify the job requirement.**

**Denied that Recruiters work with clients at the outset to define the requirements. TEK's clients – not Recruiters – determine the information included in the job requirement. *See* Plaintiffs' Reply in support of SOF ¶ 35. The testimony cited by TEK does not support SOF ¶ 103. Bury did not testify that he worked with clients at the outset to define the requirements. *See* ECF No. 203-40 (Bury Tr.) 40:3-12. Rather, Bury testified that he**

sometimes sat in on calls between Account Managers and client hiring managers to qualify job requirements to ask clarifying questions about the technologies and top skills TEK's client has determined it needs from a consultant, at the request of his Account Manager. *Id*. Similarly, Fronzaglio testified that she liked to have Recruiters meet hiring managers to learn about the client and or to inform the client about consultants they interacted with in the past and tools those consultants have used – not to work with clients to define requirements.  ECF No. 203-57 (Fronzaglio Tr.) 119:8-24, 162:18-163:1; ECF No. 203-21 (Fronzaglio Decl.) ¶¶ 4-8.

Denied to the extent that TEK asserts that providing information to clients during the job requirement qualification process is a primary duty of Recruiters. *See* Plaintiffs' Replies in support of SOFs ¶¶ 35-37.

104.    Some Recruiters work with AMs to refine requirements when the written document is not clear. (Fronzaglia Decl. ¶¶ 4-7; Df. Ex. 15, Rice Decl. ¶ 10.)

<u>RESPONSE</u>: Admitted in part and denied in part. Admitted that TEK expects Recruiters to ask Account Managers when they have questions about a job requisition. ECF No. 190-79 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097919 (describing the 9 Key Questions Recruiters are trained to ask Account Managers about job requisitions they are assigned to work on).

Denied that Recruiters work with AMs to refine requirements when the written document is not clear. The testimony cited by TEK does not support SOF ¶ 103. ECF No. 203-21 (Fronzaglio Decl.) ¶¶ 4-7 does not address situations in which Recruiters work with AMs to refine requirements when the written document is not clear. Rather, Fronzaglio testified that Recruiters may possess knowledge about consultants in particular labor

markets or tools that are useful to TEK's clients. *See id.* Additionally, while Rice testified that she may attend meetings between Account Managers and TEK's clients in limited situations in which a job requirement has gone unfilled for awhile and the Account Manager wants to know if the client wants to change the skills and experience requested in the requirement or to seek clarification from TEK's client when the Account Manager could not answer a question about the requirement, Rice did not testify that she works with Account Managers to refine requirements when the written document is not clear. *See* ECF No. 203-15 (Rice Decl.) ¶ 10. TEK has not pointed to any specific testimony or documents that support SOF ¶ 104. Moreover, TEK has not pointed to any testimony or documents in which a Recruiter testified that working with Account Managers to refine requirements when the written document is not clear is a primary duty of Recruiters. *See* Ex. 132 (Dries-Wielandt Decl.) ¶ 16 ("I received Requirements from the Account Manager. I did not create Requirements, and if I had a question about Requirements, I asked the Account Manager."; Ex. 134 (Holin Decl.) ¶ 16 (same); Ex. 135 (Martin Decl.) ¶ 16 (same); Ex. 137 (Olszewski Decl.) ¶ 15 (same); Ex. 140 (Stein Decl.) ¶ 16 (same); *see also* Plaintiffs' Replies in support of SOFs ¶¶ 35-36.

105.    Some Recruiters assessed candidates to find the best match for the client's role. (Bury Dep. 88:1-88:18; Haycock Dep. 32:10-13; Df. Ex. 53, Doyle Dep. 78:10-79:14.)

**RESPONSE: Admitted in part and denied in part. Admitted that Haycock testified that in certain scenarios, it is Recruiters job to "find the absolute best talent and the best match between the consultant's skills, goals, and interests, and the customer's needs." ECF No. 203-59 (Haycock Tr.) 32:10-13. Denied that any of the testimony cited by TEKsystems supports the fact that some Recruiters assessed candidates to find the best match for the client's role. Bury did not testify that he assessed candidates to find the "best" match for the**

client's role. *See* ECF No. 203-50 (Bury Tr.) 88:1-18. Rather, Bury testified that it was important to him to "send over candidates that I feel have a better chance to get a position than not." *Id.*, at 88:16-18. Likewise, Doyle testified only that if TEK "win[s] a very large project in financial services, it's more than likely going to be the financial services specialized recruiters will have that expertise to best have the consultants to provide the right people for that project." ECF No. 203-53 (Doyle Tr.) 78:24-79:4. In contrast, testimony from Plaintiffs and Opt-in Plaintiff shows that it is not a primary duty of Recruiters to find the "best" match for the client's role. *See, e.g.*, Ex. 159 (Suliman Tr.) 114:2-7 (A. "It was always – it was always just presenting the first person that matches. It was never where's the better match, where's the better candidate, it was just who's the first person that even needs the minimum criteria as presented to me."); Ex. 154 (Raras Tr.) 104:11-18 (Q. "Would you agree that it was your job to present the account manager with the strongest candidate according to the criteria that you were asked to evaluate in the job requisition?" A. "I presented the account manager with candidates that I believed fit the requirement."); Ex. 156 (Seijas Tr.) 77:23-78:8 (Q. "How is it that you would highlight the key attributes of the candidate to the account manager?" A. "Based on the resume as well as our conversation and the job description, kind of in looking at all three, seeing what matched. And if there was a significantly, you know, good amount of information matching what was requested, I would share that with the account manager."); Ex. 148 (Conyers-Jordan Tr.) 62:18-20 (Q. "So you would submit anyone that you could get that matched the skills and was interested?" A. "Yes. Yep. Yep."); Ex. 155 (Richenberg Tr.) 109:13-21 (describing that some Account Managers wanted to review more than one potential candidate).

    106.    There are TEK Recruiters who provide TEK's customers with talent that the

customers need to complete projects that are important to their business. (Ex. 1 (collecting declaration statements Df. Ex. 12, Mosquera Decl., ¶ 24; Df. Ex. 20, Marshall Decl., ¶ 26; Df. Ex. 27, Compton Decl., ¶ 16, Df. Ex. 30, Whitman Decl., ¶ 13, Df. Ex. 24, Walther Decl., ¶ 10, Df. Ex. 13, Fink Decl., ¶ 11, Df. Ex. 14, Edds Decl., ¶ 8, Df. Ex. 16, Bohen Decl., ¶ 33, Df. Ex. 18, Warren Decl., ¶ 22, Df. Ex. 22, Fahey Decl. ¶ 7, Df. Ex. 15, Rice Decl., ¶ 22, Df. Ex. 21, Df. Ex. 21, Fronzaglio Decl., ¶ 6, Df. Ex. 20, Marshall Decl., ¶ 9, Df. Ex. 21, Fronzaglio Decl., ¶ 16, Df. Ex. 19, Payonk Decl., ¶ 28, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 8, Df. Ex. 26, Mendez Decl., ¶ 11, Df. Ex. 27, Compton Decl., ¶ 15, Df. Ex. 34, Kehl Decl., ¶ 6, Df. Ex. 36, Ferrari Decl., ¶ 19, Df. Ex. 37, Budde Decl., ¶ 14, Df. Ex. 29, McCarty Decl., ¶ 21.)

**RESPONSE: Admitted in part and denied in part. Admitted that there are Recruiters who review resumes and LinkedIn profiles of potential candidates to match their skills and experiences to a job requirement for TEK's clients. Admitted that, if an Account Manager decides to submit a candidate that a Recruiter located, and TEK's client decides to hire that person, the consultant may complete projects that are important to TEK's client's businesses. Denied that Recruiters "provide" TEK's customers with talent. The testimony cited by TEK supports that Recruiters screened and matched potential candidates' resumes and LinkedIn profiles to job requirements. *See* ECF No. 203- 1. The evidence does not support that Recruiters "provide" TEK's customers with talent. *See* SOF ¶ 53 (discussing that Account Managers – not Recruiters – determine which candidates to forward to clients); SOF ¶ 54 (discussing that clients – not Recruiters – determine who to interview, hire, terminate and how much to pay them). Denied that TEK provides exclusive placement for its clients or that only one Recruiter works on a job requisition. *See* SOFs ¶¶ 4, 124.**

107.    TEK Recruiters are expected to negotiate and finalize pay and other terms and

conditions of employment with candidates regarding their placements to work with TEK's customers. Df. Ex. 53, Doyle Dep. 196:8-19; Df. Ex. 61, Johnson I Dep. 200:12-204:14; Johnson II Dep. 121:14-122:10; Haycock Dep. 50:1-51:18, 140:23-142:10

**RESPONSE: Denied.**

**Denied that TEK expects Recruiters to negotiate pay and other terms and conditions of employment with candidates regarding their placements to work with TEK's customers. Doyle's testimony that consultants select benefits from a menu maintained by TEK contradicts SOF ¶ 107 because it shows that Recruiters are not negotiating terms and conditions of employment.** *See* **ECF No. 203-53 (Doyle Tr.) 196:8-19. Doyle likewise testified that Account Managers set the pay rate and Recruiters assist Account Managers by providing information about the going rate various skills and experience levels.** *Id.* **194:17-195:7 (Q. "Okay. And then what about the pay rate min/ pay rate max? What is that?" A. "Yeah. So that's based on the type of skill set. What is the going rate. You know, based on what the max bill rate is, what's the amount – the most we would want to offer a consultant to still have a healthy margin. But that's where recruiters would be a lot more involved in saying, "Here is what the going rate is for this type of skill set based on this level of experience," and then that way** *the AM* **recruiters are partnering with on this part of it  to say, "We think if we can bill this amount, you can only pay this amount, we think we can keep this amount of margin or spread.") (emphasis added).**

**Further, as Doyle testified, Recruiters cannot finalize pay and other terms and conditions of employment with candidates because Recruiters are not authorized to determine the "burden" amount to TEK.** *See* **ECF No. 203-53 (Doyle Tr.) 197:11-198:9 (account directors determine whether to deviate from the standard burden of 16%).**

Recruiter cannot negotiate a burden above 16% or promise a consultant higher pay than set forth in the client's requisition or by the Recruiter's supervisor. ECF No. 190-4 (DiBenedetto Tr.) 187:5-8; ECF No. 203-25 (Guffy Decl.) ¶ 15 ("Usually there is a pay range for the role"); ECF No. 203-34 (Kehl Decl.) ¶ 14 (same); ECF 203-29 (McCarty Decl.) ¶ 13 (same).

Johnson further confirms that Recruiters cannot negotiate pay with candidates because they must "align [] with what the customer says that they are willing to provide." ECF No. 203-62 (Johnson II Tr.) 121:14-122:10. *See* Plaintiffs' Replies in support of SOFs ¶¶ 54, 86.

Denied that TEK expects Recruiters to finalize pay and other terms and conditions of employment with candidates regarding their placements to work with TEK's customers. TEK's clients – as opposed to Recruiters – make hiring decisions. Thus, TEK's clients are the party who finalize pay and other terms and conditions of employment. *See* ECF No. 190-5 (Doyle Tr.) 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes."); ECF No. 190-99 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted our screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates.").

108.    There are TEK Recruiters who negotiate and finalize pay and other terms and conditions of employment with candidates regarding their placements to work with TEK's customers. (Ex. 2 (collecting declaration statements Df. Ex. 18, Warren Decl., ¶ 20, Df. Ex. 20, Marshall Decl., ¶ 21, Df. Ex. 34, Kehl Decl., ¶ 14, Df. Ex. 31, Rothermich Decl., ¶ 34, Df. Ex. 12, Mosquera Decl., ¶ 19, 20, Df. Ex. 13, Fink Decl., ¶ 28, Df. Ex. 14, Edds Decl., ¶ 27, Df. Ex. 17, Chong Decl., ¶ 23, Df. Ex. 16, Bohen Decl., ¶ 20, Df. Ex. 15, Rice Decl., ¶ 17, Df. Ex. 21,

Fronzaglio Decl., ¶ 14, Df. Ex. 19, Payonk Decl., ¶¶ 18, 22, Df. Ex. 29, McCarty Decl., ¶ 12, Df. Ex. 26, Mendez Decl., ¶ 18, Df. Ex. 30, Whitman Decl., ¶ 22.); Df. Ex. 48; Avery Dep. 50:22-51:23 and Ex. 12; Camilleri Dep. 18:6-14 and Ex. 7.

**RESPONSE: Denied.**

As a preliminary matter, TEK's ECF No. 203-2 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Denied that there are TEK Recruiters who negotiate pay and other terms and conditions of employment with candidates regarding their placements to work with TEK's customers. The testimony cited by TEK demonstrates that Recruiters communicate with candidates about whether the candidate is willing to accept pay within a specific range provided to them by TEK's clients and Account Managers. *See* ECF No. 203-2 at Mendez Decl., ¶ 18 ("When interviewing the candidates, I obtain a good understanding from them as to their expectations for compensation. Sometimes I have to get creative to meet their expectations for compensation goals if the rate negotiated with the client will not meet the expectations of the candidate. If a candidate is given an offer and I know that the compensation will not meet the candidate's expectation, I will collaborate with the Account Manager to determine if we can get flexibility from the client on the wages or if we can make internal adjustments on the compensation to the candidate. I know the market for people with the skills that clients are looking for, and I can provide information to clients about what they should expect to pay for certain people with the skill sets they need."), Kehl Decl., ¶ 14 ("Most job requirements include a pay range"), (Rothermich Decl.) ¶ 34 ("The job

requirement will include an hourly pay range that the customer will pay someone to work in the role."), Mosquera Decl., ¶ 20 (testifying that he does not submit candidates for a job if the candidate wants $80-$85 but the job pays $70-$75 unless the consultant agrees to the lower pay range), Fink Decl., ¶ 38 ("If I was working on a req with a pay range that was lower than the candidate was looking for, I might still discuss the opportunity with them if I believed the other aspects of the job might make it appealing for them."), McCarty Decl., ¶ 12 ("I ask candidates to tell me their pay expectations. This helps me to make sure that the person is a good match for the job."), Whitman Decl., ¶ 22 ("I ask candidates what they are targeting to earn. I also ask them, what pay rate is too low, so you would not even want me to call you even if I thought everything else is a great fit."); *see also*, Plaintiffs' Response to SOF ¶ 107; Plaintiffs' Replies in support of SOF ¶ 54, 86. Testimony by Opt-in Plaintiffs confirms that Recruiters did not negotiate pay or other terms and conditions of employment. Ex. 153 (Phommalinh Tr.) 49:1-50:4 (Recruiters communicated – rather than negotiated – terms and conditions of employment); Ex. 132 (Dries-Wielandt Decl.) ¶ 32 ("I did not negotiate the terms of a candidate's employment."); Ex. 134 (Holin Decl.) ¶ 32 (same); Ex. 135 (Martin Decl.) ¶ 32 (same); Ex. 137 (Olszewski Decl.) ¶ 31 (same); Ex. 140 (Stein Decl.) ¶ 32 (same); Ex. 142 (Walker Decl.) ¶ 31 (same).

Denied that there are Recruiters who finalize pay and other terms and conditions of employment with candidates regarding their placements to work with TEK's customers. The testimony cited by TEK demonstrates that Recruiters were communicating with consultants regarding pay and other terms and conditions of employment before submitting them for consideration for the role, thus, Recruiters could not have finalized pay and other terms and conditions of employment because the candidates have not been hired yet. *See* ECF No. 203-

2 at Edds Decl., ¶ 27 ("As a Recruiter, I was responsible for locking in the candidate's compensation package. I always locked this in *before* submitting.") (emphasis added), Bohen Decl., ¶ 20 ("I negotiate and lock in their pay rate *before* they are submitted to the customer.") (emphasis added), Marshall Decl., ¶ 21 ("I was responsible for locking in a candidates' compensation rate *before* a submittal.") (emphasis added). These statements make clear TEK's clients have final say over candidates' compensation as they decide whether to hire a candidate at the candidate's desired rate. Further, as stated above in Plaintiffs' Response to SOF ¶ 107, TEK's clients – not Recruiters – make hiring decisions. Thus, it is the clients who are finalizing pay and other terms and conditions of employment with candidates. *See* Plaintiffs' Response to SOF ¶ 107.

109.    There are TEK Recruiters who are part of the job requirement intake process, working with TEK's customers to define the terms of job requirements. (Ex. 3 collecting declaration statements Df. Ex. 12, Mosquera Decl., ¶ 10, Df. Ex. 24, Walther Decl., ¶ 6, Df. Ex. 13, Fink Decl., ¶¶ 12, 13, Df. Ex. 16, Bohen Decl., ¶ 10, Df. Ex. 23, Pagano Decl., ¶ 12, Df. Ex. 21, Fronzaglio Decl., ¶¶ 7, 8, 14, Df. Ex. 20, Marshall Decl., ¶ 12, Df. Ex. 14, Edds Decl., ¶ 12.); Df. Ex. 28, Boland Decl. ¶ 10; Df. Ex. 37, Budde Decl. ¶ 10, 1

**RESPONSE**: Admitted in part and denied in part. Admitted that there are Recruiters attend the Account Managers' meetings with TEK's customers. Denied that Recruiters work with TEK's customers to define the terms of job requirements. *See* Plaintiffs' Reply in support of SOF ¶¶ 31-33, 35-73; Plaintiffs' Response to SOF ¶ 102.

TEK's ECF No. 203-3 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*,

Plaintiffs' General Objections ¶ 4.

110.    There are TEK Recruiters who possess specialized knowledge and expertise about the skillsets or industries for which they recruit. (Ex. 11 (collecting declaration statements Df. Ex. 17, Chong Decl., ¶¶ 11, 12, 14, Df. Ex. 14, Edds Decl., ¶ 9, 11, Df. Ex. 20, Marshall Decl., ¶ 10, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 7, Df. Ex. 19, Payonk Decl., ¶ 10, 11, Df. Ex. 24, Walther Decl., ¶ 9, 10, Df. Ex. 14, Edds Decl., ¶ 21, Df. Ex. 12, Mosquera Decl., ¶ 9, Df. Ex. 16, Bohen Decl., ¶ 14, 15, Df. Ex. 15, Rice Decl., ¶ 6, 7, Df. Ex. 22, Fahey Decl., ¶ 3, 5, 13, Df. Ex. 18, Warren Decl., ¶ 10, 11, Df. Ex. 23, Pagano Decl., ¶ 8, Df. Ex. 21, Fronzaglio Decl., ¶ 5, 6, Df. Ex. 13, Fink Decl., ¶¶ 7, 8, 10, 12, Df. Ex. 20, Marshall Decl., ¶ 11, Df. Ex. 33, Levine-Gorelick Decl, ¶ 23, Df. Ex. 29 McCarty Decl., ¶ 21, Df. Ex. 30, Whitman Decl., ¶ 13, Df. Ex. 32, Yancey Decl., ¶ 11, Df. Ex. 27, Compton Decl., ¶ 8, Df. Ex. 25, Guffy Decl., ¶ 9.))

**RESPONSE: Admitted in part and denied in part. Admitted that some Recruiters search and match for candidates with specific skill sets or recruit within specific industries. Denied that TEK expects Recruiters to possess specialized knowledge and expertise about the skillsets or industries for which they recruit. ECF No. 190-5 (Doyle Tr.) 79:16-80:23, 244:8-17 (Q: "And when you're saying the specialized -- like, we have new recruiters are joining these teams that haven't done any of this training, but what they're doing is they're focusing on who they're placing, the skills that the job candidates have?" A. "Correct."), 244:18-20 (Q. "If you're in financial service team, you didn't come from a financial services background?" A. "No. Correct."); ECF No. 190-3 (Haycock Tr.) 113:8-12 (Q: "What is the difference between a recruiter and a specialized recruiter?" A: "A specialized recruiter has one contest win and 60 percent of their starts aligned in their specialty area."), 114:4-115:10; ECF No. 190-68 (Job Description) at TEK-Recruiter_Lit-00588313 (not requiring IT**

knowledge); Plaintiffs' Reply in support of SOF ¶ 25.

Denied that the testimony cited by TEK supports an inference that some Recruiters *perform* the skills that they are recruiting for. *See* ECF No. 203-11 at Chong Decl., ¶ 12 (describing the ways he researched the what the job duties are associated with jobs in his specialization, but not how to *perform* those job duties), Edds Decl., ¶ 11 (describing how he learned about his specialization by asking other Recruiters), Walther Decl., ¶ 10 (stating only that Recruiters should know their marketplace and their consultants).

Further, TEK's ECF No. 203-11 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Fourteen of the declarations TEK submitted are from the *Avery* case and are not parties to this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

In addition, 12 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No. 156-2 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 156-3 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 156-4 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25 (Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶

24-25; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).

111.    There are Recruiters who choose which job requirements they work on. (Ex. 4 (collecting declaration statements Df. Ex. 19, Payonk Decl., ¶ 13, Df. Ex. 12, Mosquera Decl., ¶ 11, Df. Ex. 13, Fink Decl., ¶ 15, Df. Ex. 14, Edds Decl., ¶ 15, Df. Ex. 16, Bohen Decl., ¶¶ 10, 13, Df. Ex. 18, Warren Decl., ¶ 14, Df. Ex. 15, Rice Decl., ¶ 9, Df. Ex. 23, Pagano Decl., ¶ 5.))

**RESPONSE: Admitted in part and denied in part. Admitted that there are Recruiters who may volunteer to work on specific job requirements at times. Denied that TEK permits Recruiters to decline to work on job requirements assigned to them by their supervisors and managers.** *See* **Ex. 167 (McNelley Tr.) 173:24-174:14 (testifying that "[t]here's no recruiters like defiantly saying I'm not working on [specific] requirements today" absent "a very logical explanation" because, if that happened, "obviously they wouldn't work [at TEK]" anymore);** *see also* **ECF No. 190-5 (Doyle Tr.) 78:9-12 (Q. "And who assigns them?" A. "Generally it's going to be a delivery manager or a delivery director or, in some cases, a team lead, depending on the size of the team"), Ex. 168 (Pappas Tr.) 19:8-14 (A. "So, as a recruiter, you would be allocated to specific requisitions or positions to recruit on during the day."); ECF No. 190-11 (Minnear Tr.) 64:19-65:19 (testifying that, as DBO, he participated in allocating requirements in Red Zone meetings), 153:4-9; Ex. 165 (Kartchner Tr.) 71:6-19 (DBOs ultimately assign job requisitions to Recruiters); Ex. 154 (Raras Tr.) 48:16-19 (Q. "Did you ever look for requisitions that you wanted to seek candidates for rather than having them assigned or allocated to you?" A. "No. Every position was allocated."); Ex. 160 (Thomas Tr.)**

89:19-22 (Q. "And were you also able to work on requisitions that you weren't allocated to?" A. "No. If I worked on a role I was given the requirements and allocated to work on it."); Ex. 149 (Dore Tr.) 39:23-40:5 (Q. "In your own experience, how did you receive job descriptions or requirements from account managers?" A. "We had lots of internal meetings where these were shared, and we were – recruiters were assigned to work on specific requirements every day."); Ex. 155 (Richenberg Tr.) 95:12-96:3 (requisitions were assigned to Recruiters in Red Zone after the position had been approved by the DBO); Plaintiffs' Replies in support of SOFs ¶¶ 18, 34.

Further, TEK's ECF No. 203-4 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Fourteen of the declarations TEK submitted are from the *Avery* case and are not parties to this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

In addition, 12 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No. 156-2 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 156-3 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 156-4 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25

(Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶ 24-25; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).

112.    There are TEK Recruiters who develop their own sourcing strategies to identify candidates, and they differ in whether or to what extent they employ TEK's Connected database, LinkedIn, third-party websites, personal networks, and other sources. (Ex. 10 (collecting declaration statements Df. Ex. 16, Bohen Decl., ¶¶ 16, 17, 21, Df. Ex. 25, Guffy Decl., ¶¶ 10, 11, Df. Ex. 32, Yancey Decl., ¶ 14, Df. Ex. 34, Kehl Decl., ¶ 10, Df. Ex. 27, Compton Decl., ¶ 17, Df. Ex. 33, Levine-Gorelick Decl., ¶ 15, Df. Ex. 19, Payonk Decl., ¶ 15, Df. Ex. 14, Edds Decl., ¶¶ 17, 18, Df. Ex. 17, Chong Decl., ¶¶ 18, 19, 22, 26, Df. Ex. 15, Rice Decl., ¶ 11, 13, Df. Ex. 18, Warren Decl., ¶ 12, 17, Df. Ex. 23, Pagano Decl., ¶ 13, Df. Ex. 13, Fink Decl., ¶ ¶ 16, 17, 18, 23, Df. Ex. 20, Marshall Decl., ¶ 15, Df. Ex. 30, Whitman Decl., ¶ 8, Df. Ex. 26, Mendez Decl., ¶ 13, Df. Ex. 36, Ferrari Decl., ¶ 9, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 10, Df. Ex. 30, Whitman Decl., ¶ 20, Df. Ex. 26, Mendez Decl., ¶ 9, 14, Df. Ex. 25, Guffy Decl., ¶ 12, Df. Ex. 29, McCarty Decl., ¶ 15, Df. Ex. 32, Yancey Decl., ¶ 17, 18, Df. Ex. 34, Kehl Decl., ¶ 11, Df. Ex. 36, Ferrari Decl., ¶ 11, Df. Ex. 37, Budde Decl., ¶ 18, Df. Ex. 33, Levine-Gorelick Decl., ¶ 8, Df. Ex. 30, Whitman Decl., ¶ 9, 21, Df. Ex. 25, Guffy Decl., ¶ 11, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 12, 13, Df. Ex. 26, Mendez Decl., ¶ 8, Df. Ex. 29, McCarty Decl., ¶ 11, Df. Ex. 31, Rothermich Decl., ¶ 20, Df. Ex. 38, Stryker Decl., ¶ 20, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 15.))

**RESPONSE:** Admitted in part and denied in part. Admitted that Recruiters use TEK's Connected database, LinkedIn, third-party websites, personal networks, referrals,

and other sources to varying degrees. Denied that the testimony cited by TEK supports its contention that there are TEK Recruiters who develop their own sourcing strategies to identify candidates.

While TEK's declarants do not explicitly state they are using TEK's practices and procedures to search for potential candidates, virtually all the declarants testified that they used Connected (or TEK's predecessor to Connected: RWS) and LinkedIn as part of their search tools. *See, e.g.*, ECF No. 203-10 at Bohen Decl., ¶ 16 (used Connected and LinkedIn to search for candidates when he did not have a candidate in his network or through referral requests from the clients' current consultants), Guffy Decl., ¶ 10 ("Some of the commonly available resources are LinkedIn, a TEK internal system known as Connected, and referrals."), Kehl Decl., ¶ 10 ("[S]ometimes I will create searches in databases like LinkedIn or a TEK internal database called Connected."), Compton Decl., ¶ 17 ("My philosophy is to start where the strong relationships are. After that, I will turn to using search strings in Connected, which is a TEK internal database, or LinkedIn"), Levine-Gorelike Decl., ¶ 15 ("I will go to LinkedIn … I will turn to TEK's internal database of candidates, known as Connected."), Edds Decl., ¶ 17 ("Even if I search on LinkedIn, I will cross-reference Connected"), Rice Decl., ¶ 11 ("I usually start my search in Connected, TEK's client relationship management system … I also used a third-party tool, LinkedIn Recruiter, to look for candidates."), Marshall Decl., ¶ 15 ("Often times, I would start with TEK's internal database, Connected …I used LinkedIn Recruiter quote a bit as well."). This type of uniform adoption of Connected and LinkedIn as search tools is indicative of TEK's established practices and procedures – not of Recruiters creating unique sourcing strategies. *See* Plaintiffs' SOFs ¶¶ 38-39, 41. TEK also trains Recruiters on using additional sourcing

methods mentioned in TEK's ECF No. 203-10, such as sourcing from Recruiters' networks and pipelines and speaking with current and former consultants and their references. *See* ECF No. 190-79 (Recruiter Operating Plan) at TEK-Recruiter_Lit-00097893.

Further, TEK's ECF No. 203-10 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Fourteen of the declarations TEK submitted are from the *Avery* case and are not parties to this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

In addition, 12 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No. 156-2 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 156-3 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 156-4 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25 (Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶ 24-25; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).

113.    There are TEK Recruiters who make their own judgments about whether to move forward with a candidate, (Ex. 10 (collecting declaration statements Df. Ex. 16, Bohen Decl., ¶¶ 16, 17, 21, Df. Ex. 25, Guffy Decl., ¶¶ 10, 11, Df. Ex. 32, Yancey Decl., ¶ 14, Df. Ex. 34, Kehl Decl., ¶ 10, Df. Ex. 27, Compton Decl., ¶ 17, Df. Ex. 33, Levine-Gorelick Decl., ¶ 15, Df. Ex. 19, Payonk Decl., ¶ 15, Df. Ex. 14, Edds Decl., ¶¶ 17, 18, Df. Ex. 17, Chong Decl., ¶¶ 18, 19, 22, 26, Df. Ex. 15, Rice Decl., ¶ 11, 13. Df. Ex. 18, Warren Decl., ¶ 12, 17, Df. Ex. 23, Pagano Decl., ¶ 13, Df. Ex. 13, Fink Decl., ¶¶ 16, 17, 18, 23, Df. Ex. 20, Marshall Decl., ¶ 15, Df. Ex. 30, Whitman Decl., ¶ 8, Df. Ex. 26, Mendez Decl., ¶ 13, Df. Ex. 36, Ferrari Decl., ¶ 9, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 10, Df. Ex. 30, Whitman Decl., ¶ 20, Df. Ex. 26, Mendez Decl., ¶ 9, 14, Df. Ex. 25, Guffy Decl., ¶ 12, Df. Ex. 29, McCarty Decl., ¶ 15, Df. Ex. 32, Yancey Decl., ¶ 17, 18, Df. Ex. 34, Kehl Decl., ¶ 11, Df. Ex. 36, Ferrari Decl., ¶ 11, Df. Ex. 37, Budde Decl., ¶ 18, Df. Ex. 33, Levine-Gorelick Decl., ¶ 8, Df. Ex. 30, Whitman Decl., ¶ 9, 21, Df. Ex. 25, Guffy Decl., ¶ 11, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 12, 13, Df. Ex. 26, Mendez Decl., ¶ 8, Df. Ex. 29, McCarty Decl., ¶ 11, Df. Ex. 31, Rothermich Decl., ¶ 20, Df. Ex. 38, Stryker Decl., ¶ 20, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 15.); Df. Ex. 35, Df. Ex. 35 Harvey ¶ 21, Df. Ex. 37, Budde ¶¶ 17, 19; Df. Ex. 25, Guffey ¶ 13, Df. Ex. 30, Whitman ¶ 23; Df. Ex. 27, Compton ¶ 18; Bury Dep. 124:20-126:24.

**RESPONSE: Admitted in part and denied in part. Admitted that Recruiters can decide whether to forward a candidate's resume and information to an Account Manager. Denied that Recruiters – as opposed to Account Managers – make their own judgments about whether to submit a candidate to TEK's clients.** *See* **ECF No. 190-4 (DiBenedetto Tr.) 162:18-163:17; ECF No. 190-9 (Fronzaglio Tr.) 155:18-20; ECF No. 190-12 (Pappas Tr.) 62:10-24, 137:15-19; ECF No. 190-97 (Operations Playbook) at TEK-Recruiter_Lit-00019675 ("AMs**

must thoroughly screen or disqualify candidates."); ECF No. 190-18 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets"); ECF No. 190-55 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325 ("the Account Manager has submitted this person to the customer.").

The testimony cited by TEK demonstrates that Recruiters can decide which candidates to submit to Account Managers, but they do not decide which candidates to submit to clients, or which candidates should be hired. *See* ECF No. 203-10 at Bohen Decl., ¶ 21 ("As a Recruiter, it was my decision which candidates *to present to an AM*.") (emphasis added), Chong Decl., ¶ 26 ("Ultimately, with any role I place, I use my judgment and discretion about whether or not to advance a candidate *to an AM*.") (emphasis added), Whitman Decl., ¶ 9 ("If I decided that the candidate was a good fit for the req, I would present their credentials *to the Account Manager*."); ECF No. 203-50 (Bury Tr.) 124:20-126:24 (testifying that he decided whether to submit candidates *to Account Managers*) (emphasis added).

Testimony from former Account Managers confirms that Account Managers are the ultimate decision-makers as to which candidates to forward to the client. *See* ECF No. 190-9 (Fronzaglio Tr.) 155:18-20 (Q. "Can an AM reject a specific candidate from being sent to a client?" A. "Yes."); ECF No. 190-12 (Pappas Tr.) 62:10-16 (Q. "When you're talking about the qualifying/disqualifying candidates, did that ultimately fall on the account managers to make the final decision on who got qualified to get submittal?" [Objection omitted] A. "Yes."); *see also* Plaintiffs' Reply in support of SOF ¶ 53.

Testimony from Plaintiffs and Opt-in Plaintiffs also confirms that Account Managers

determine which candidates are forwarded on to TEK's clients. *See, e.g.*, Ex. 144 (Blendy Tr.) 123:19-23 (A. "[Candidates] would be submitted by the recruiter to the account manager and then the account manager would make a final decision on whether he would submit them to the client or not."); Ex. 154 (Raras Tr.) 78:20-79:12 (explaining that his account manager spoke with every candidate he located before submitting the candidate to TEK's clients and ultimately submitted about 1/5th of the candidates he presented to his account manager); Ex. 146 (Carter Tr.) 32:21-23 (A. "The account manager would either decide to, you know, take their resume and present it to the client or decide not to."); Ex. 157 (Sherman Tr.) 164:6-13 (Q. "How often when you presented a candidate to an account manager would the account manager say I'm going to submit this candidate to the client?" A. "I don't have a specific recollection of like the number of people I would or the percentage. I would say like 60 to 80 percent of the people I presented, they wanted to move forward."); Ex. 151 (Maher Tr.) 152:17-153:7 (A. "So referencing with the account managers. Ultimately that's what it boils down to because they are going to be the primary person that makes the decision. So I might just go like, hey, maybe this will work out better for me. But I don't have any like control or autonomy in those moments because ultimately, it's not going to be my choice on whether or not we move forward with them or not. I can't make a tactical recommendation to the client. The only thing that I can do is speculate on potentially a candidate being a good fit and then having a conversation with an account manager and allowing the account manager to decide whether or not that's true."); Ex. 132 (Dries-Wielandt Decl.) ¶¶ 28-29 ("Account managers reviewed the candidate information and decided which candidates, if any, would be forwarded to TEKsystems' client."); Ex. 134 (Holin Decl.) ¶¶ 28-29 (same); Ex. 135 (Martin Decl.) ¶¶ 28-29 (same); Ex. 137 (Olszewski Decl.) ¶¶ 27-28 (same); Ex. 140 (Stein Decl.) ¶¶

214

28-29 (same); Ex. 142 (Walker Decl.) ¶¶ 27-28 (same).

Further, TEK's ECF No. 203-10 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Fourteen of the declarations TEK submitted are from the *Avery* case and are not parties to this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

In addition, 12 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No. 156-2 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 156-3 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 156-4 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25 (Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez  Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶ 24-25; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).

114.    TEK has the expectation that Recruiters manage the consultants they place. (Df. Ex. 59, Haycock Dep. 36:9-38:1).

**RESPONSE**: Denied. TEK does not dispute that Recruiters do not oversee the actual work consultants are performing or evaluate the substance of consultant's work. *See* TEK's Responses to SOFs ¶ 57-58. TEK also does not dispute that Recruiters do not create or implement management or operational policies for TEK's customers. *See* TEK's Response to SOF ¶ 84. Further, the testimony by Haycock does not support SOF ¶ 114. Haycock testified that Recruiters do not "oversee the actual work getting done" or "manag[e] [consultant's] day-to-day activity." *See* ECF No. 203-59 (Haycock Tr.) 36:9-38:1. Instead, on an infrequent basis, Recruiters communicate work-related information to consultants, including hiring or firing decisions made by TEK or its clients. *See id.*; *see also* Plaintiffs' Response to SOF ¶ 115.

115.    There are TEK Recruiters who manage TEK consultants while they are on assignment. (Ex. 5 (collecting declaration statements Df. Ex. 14, Edds Decl., ¶ 28, Df. Ex. 21, Fronzaglio Decl., ¶¶ 9, 10, 14, Df. Ex. 31, Rothermich Decl., ¶ 37, Df. Ex. 12, Mosquera Decl., ¶ 21, Df. Ex. 13, Fink Decl., ¶¶ 29, 30, Df. Ex. 17, Chong Decl., ¶¶ 31, 33, Df. Ex. 16, Bohen Decl., ¶ 24, Df. Ex. 18, Warren Decl., ¶ 21, Df. Ex. 15, Rice Decl., ¶ 19, Df. Ex. 20, Marshall Decl., ¶ 20, Df. Ex. 19, Payonk Decl., ¶ 23, Df. Ex. 29, McCarty Decl., ¶ 18, Df. Ex. 33, Levine-Gorelick Decl., ¶ 21, Df. Ex. 25, Guffy Decl., ¶ 17, 18, Df. Ex. 37, Buddle Decl., ¶ 21.))

**RESPONSE**: Denied.

The testimony cited by TEK shows that Recruiters maintain communication with consultants while they are on assignment and passed along information regarding consultants' performance from TEK's clients, but it does not demonstrate that there are TEK Recruiters who "manage" TEK consultants while they are on assignment. *See* ECF No. 203-5 at Edds Decl., ¶ 28 ("I tried to contact [consultants] on[c]e a month, though sometimes it

was more like every six weeks" and "when I contacted the candidate I have performance feedback to deliver *from the client*") (emphasis added), Fronzaglio Decl., ¶ 10 ("If the consultant was not performing well, the Recruiter would *convey the customer's feedback to the consultant* about what needed to be improved") (emphasis added), Rothermich Decl., ¶ 37 ("I am responsible to communicate any performance messages that *a customer may have for a consultant*.") (emphasis added), Mosquera Decl., ¶ 21 ("When a candidate starts an assignment my practice is to check in with them after their first week to see how it went, then again after their first month" and "[a]fter that, my practice is to check-in at least every quarter"), Fink Decl., ¶ 29 ("As a Recruiter, it was my responsibilities to give them feedback about their work for TEK's clients. The specific feedback usually came from the client manager who the consultant worked for."), Fink Decl., ¶ 30 ("As a Recruiter, I also maintained regular contact with consultants as part of my practice. I did this to help them feel connected to TEK"), Chong Decl., ¶ 31 (checking in with consultants approximately every 45 days), Bohen Decl., ¶ 24 ("[M]y practice as a Recruiter was to meet with them every 6 week[s].*"), Warren Decl., ¶ 21 ("During my check-ins with candidates, I deliver positive or negative feedback *from the client*.") (emphasis added), Rice Decl., ¶ 19 ("I opted to have monthly touchpoints with candidates *to deliver feedback from the client managers*.") (emphasis added), Fronzaglio Decl., ¶ 9 ("The best practice was to speak to the consultant every 30 days, with more contact early on in the assignment and nearing the end date."), Marshall Decl., ¶ 20 ("If a candidate went to work for the client (became a consultant), I would try to have a monthly check in. I used those opportunities to see how the assignment was going, *and to provide any performance feedback that the clients managers had*.") (emphasis added), Payonk Decl., ¶ 23 ("As a Recruiter, when the candidate (now consultant) is on

217

assignment, I prescheduled a meeting after the first month, then touchpoints for every six weeks after that to see how things are going. *I also conveyed any performance messages that the client may want us to deliver.*") (emphasis added). The testimony cited by TEK is consistent with Johnson's 30(b)(6) testimony that Recruiters do not manage consultants, but they do relay information to the consultant. *See* Ex. 164 (Johnson II Tr.) 111:6-15 (Q. "So when you said that recruiters manage consultants, what are you referring to?" A. "I don't believe I said they manage consultants. But I said they manage specific situations as it relates to their consultants so they may have to have a performance conversation that would be relayed to them from the customer. They may have to end a consultant's assignment based on a customer's decision that they have provided to us.").

Further, TEK's ECF No. 203-5 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Fourteen of the declarations TEK submitted are from the *Avery* case and are not parties to this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

In addition, 12 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No.

**156-2 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 156-3 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 156-4 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25 (Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶ 24-25; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).**

116.     There are TEK Recruiters who work in partnership with Account Managers, and not under close supervision by them. (Ex. 6 (collecting declaration statements Df. Ex. 13, Fink Decl., ¶ 26, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 19, Levine Gorelick Decl., ¶ 9, 19, Df. Ex. 16, Bohen Decl., ¶¶ 11, 12, Df. Ex. 13, Fink Decl., ¶ 31, Df. Ex. 17, Chong Decl., ¶ 16, Df. Ex. 15, Rice Decl., ¶ 11, Df. Ex. 15, Rice Decl., ¶ 21, Df. Ex. 23, Pagano Decl., ¶ 11, 12, Df. Ex. 21, Fronzaglio Decl., ¶ 12, Df. Ex. 19, Payonk Decl., ¶ 24, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 21, Df. Ex. 37, Budde Decl., ¶ 19, Df. Ex. 25, Guffy Decl., ¶ 13, Df. Ex. 30, Whitman Decl., ¶ 23, Df. Ex. 29, McCarty Decl., ¶ 14, Df. Ex. 27, Compton Decl., ¶ 21, Df. Ex. 34, Kehl Decl., ¶ 13, Df. Ex. 32, Yancey Decl., ¶ 19.); Df. Ex. 28, Boland ¶¶ 7-8, 12-14.

**RESPONSE: Denied.**

**The testimony cited by TEK does not support TEK's contention that there are TEK Recruiters who work in partnership with Account Managers, and not under close supervision by them. For instance, Fink testified that Account Managers "*usually* took [his] recommendations about which candidates to present to our clients." ECF No. 203-6 at Fink Decl., ¶ 26; *see also* ECF No. 203-25 (Guffy Decl.) ¶ 13 (when a candidate is a match, she will "discuss [with the AM] the merits of a candidate and how they align with the technical and**

cultural requirements of a client. There are times when the AM disagrees with me on a recommendation, but I have the opportunity to push back, and it is my favorite thing to do. I am the agent representing the candidate whereas the AM represents the client, and then we negotiate. Most of the time, the AM follows my recommendation about which candidates to present to the client."); ECF No. 203-29 (McCarty Decl.) ¶ 14 (AMs rarely push back on; See also ECF No. 203-33, Levine-Gorelick ¶ 19 ("[AMs] generally follow my recommendations"); ECF No. 203-27 (Compton Decl.) ¶¶ 21-22 (AMs take recommendations "more often than not."); ECF No. 203-34 (Kehl Decl.) ¶ 13 ("Putting a candidate up for a job for a client is a collaboration between the Recruiter and [AM], and once we are on the same page, we will send the candidate over to a client. [AMs] take my recommendation about a candidate most of the time."). This shows that Account Managers are the ultimate decision-makers about which candidates to send to TEK's clients.

Additionally, Harvey, Levine-Gorelick, Fink, and Rice testified that their Account Managers permitted them to determine how to source for potential candidates for a job requirement. *See* ECF No. 203-6 at Harvey Decl., ¶ 19, Levine-Gorelick Decl., ¶ 9, Fink Decl., ¶ 31, Rice Decl., ¶ 21. But, this testimony fails to mention that, if Recruiters do not meet their required activity metrics for things like G2s (intake calls for new information), submittals, and starts, Account Managers have the authority to place them on performance improvement plans. Ex. 162 (Fronzaglio Tr.) 75:7-76:5 (Account Manager puts Recruiters on performance improvement plans for failing to perform on metrics such as G2s and submittals). If Recruiters do not meet the goals stated in their performance improvement plans, they are subject to discipline and termination. ECF No. 190-119 (Performance Warning & Action Plan Job Aid) at TEK-Recruiter_Lit-00471330 (performance

improvement plan template that states that "failure to meet the above requirements will be grounds for further disciplinary action up to and including termination."). TEK's remaining citations are also not persuasive as they are out of context quotes that only discuss small aspects of the relationship between Recruiters and Account Managers, and do not speak to the balance of power within the relationship as a whole. *See* ECF No. 203-6. As Pappas testified, Account Managers had far more power than Recruiters within TEK. Ex. 168 (Pappas Tr.) 99:11-24 (A. "Yeah. For the recruiter role I didn't feel that they had quite as much, quite as much power over the business as the account manager did because the account manager was the front face to the client and the account manager was the one that was prioritizing some of those additional, you know component pieces whereas a recruiter was working with candidates.")

Account Managers manage Recruiters and have final say regarding submissions. Ex. 168 (Pappas Tr.) 20:1-4 (Q. "So the recruiter is reporting the account manager, and the account manager is reporting to the DBO?" A. "Yes."); Ex. 161 (Estimada Tr.) 145:21-23 (A. "So I trusted between our account managers and our recruiter leads, they were able to teach [Recruiters] the right behaviors of the job."). For instance, Account Managers regularly monitor Recruiters' work activities. *See* Plaintiffs' Reply in support of SOF ¶ 22. Account Managers are the ultimate decision-makers about which candidates to forward to TEK's clients. Account Managers have the authority to assign job requirements to Recruiters. *See* Plaintiffs' Replies in support of SOFs ¶¶ 18, 34. Account Managers provide information regarding job requirements to Recruiters. *See* SOF ¶ 37; *see also* Ex. 168 (Pappas Tr.) 26:22-24 (testifying that it was TEK's expectation that Account Managers lead calls with clients); 79:24-80:4 (Q. "Did you lead the conversations with the client when the recruiters were on

the call?" A. "Typically, yes." Q. "When you say 'typically,' can you think of any times in which the recruiter led it?" A. "No, not offhand."). If Recruiters have questions about a job requirement, they are expected to ask the Account Manager. *See* SOF ¶ 36.

Further, TEK intends for Recruiters to be promoted into Account Manager or Recruiter Lead roles. *See* SOF ¶ 12. This indicates that the relationship between Account Managers and Recruiters is vertical rather than horizontal. *See id.*

Testimony from Plaintiffs and Opt-in Plaintiffs further demonstrates that the relationship between Account Managers and Recruiters is not a horizontal partnership. *See, e.g.*, Ex. 155 (Richenberg Tr.) 56:19-57:6 (Q. "And why don't you describe for me what the working relationship is between recruiters and account managers as you understand it?" [Objection omitted] A. "Every recruiter as assigned an account manager that was responsible for ensuring that they were adequately trained and following day-to-day responsibilities. You were then also assigned a requisition in which a different account manager may have been overseeing."); Ex. 158 (Shestopalko Tr.) 121:14-122:7 (Q. "Can you kind of describe to me the distinction at a high level between the recruiter role and the account manager role?" A. "Sure. So the easiest way is the recruiter is consultant-facing and the [Account Manager] is client-facing. As a recruiter, my goal every single day is to talk to as many consultants as possible. Then as an account manager, their job is to be with the hiring manager all the time. Also, the other half of their job is they usually have a recruiter reporting into them, and they are responsible for the success of the recruiter. They have that management component where they're essentially like making sure that the recruiter is successful, that they have sourcing strategies, and that kind of thing, whereas the recruiter doesn't have anybody reporting into them."); Ex. 152 (Malone Tr.) 12:18-21 (Q. "Okay. And who did you report to

during your tenure?" A. "I reported to a variety of different account managers."), 14:18-15:2 (Q. "And so if you were to have a performance evaluation, for example, who would be the ones, per individual or individuals, to sit in from the managerial perspective of that evaluation?" A. "Typically the account manager and the delivery manager would be included. The account manager was typically the one who would steer conversations."); Ex. 153 (Phommalinh Tr.) 42:20-43:2 (Q. "Do you recall who you reported to during your time at TEKsystems?" A. "Yes." . . . Q. "And do you recall their job titles?" A. "Account manager."); Ex. 144 (Blendy Tr.) 64:7-22 (describing Account Managers monitoring his calls to candidates and providing feedback); Ex. 147 (Collier Tr.) 89:19-21 (Q. "Did you report directly to account managers?" A. "Yes."), 93:16-18 (Q. "Did account managers ever shadow you on phone calls with candidates?" A. "Yes."); Ex. 159 (Suliman Tr.) 96:24-97:6 (Q. "Okay. Do you know approximately when account managers stopped shadowing you during these meetings?" A. "There was never a time that we were ever stopped shadowing. We always had – Shadow exercises were consistent throughout my career at TEKsystems."); Ex. 150 (Guidry Tr.) 84:20-85:11 (Q. "Okay. So did you feel that you got to know those customers' business practices a little better as you continued to recruit for their positions?" A. "No. I wish. No, we didn't have insight to maintaining like a relationship with the customer directly. So there was not really any indication of like what they're looking for, why – you know, how to become better I guess at recruiting for them particularly. It was really just what the account manager is letting us know, what they are looking for and submitting candidates to the account manager to determine whether or not they would – they believe they would be a good fit for their client."); Ex. 154 (Raras Tr.) 107:18-108:16 (Q. "And how did Scott micromanage you?" A. "By paying attention to every number that I hit for the week, and it just consistently, I

was feeling like he was over my shoulder.").

Further, TEK's ECF No. 203-6 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Fourteen of the declarations TEK submitted are from the *Avery* case and are not parties to this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

In addition, 12 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No. 156-2 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 156-3 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 156-4 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25 (Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶ 24-25; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).

117.    There are TEK Recruiters who report to Recruiter Leads but are not closely supervised by them. (Ex. 6 (collecting declaration statements Df. Ex. 13, Fink Decl., ¶ 26, Df. Ex.

35, Df. Ex. 35, Harvey Decl., ¶ 19, Levine Gorelick Decl., ¶ 9, 19, Df. Ex. 16, Bohen Decl., ¶¶ 11,

12, Df. Ex. 13, Fink Decl., ¶ 31, Df. Ex. 17, Chong Decl., ¶ 16, Df. Ex. 15, Rice Decl., ¶ 11, Df.

Ex. 15, Rice Decl., ¶ 21, Df. Ex. 23, Pagano Decl., ¶ 11, 12, Df. Ex. 21, Fronzaglio Decl., ¶ 12,

Df. Ex. 19, Payonk Decl., ¶ 24, Df. Ex. 35, Df. Ex. 35, Harvey Decl., ¶ 21, Df. Ex. 37, Buddle

Decl., ¶ 18, Df. Ex. 25, Guffy Decl., ¶ 13, Df. Ex. 30, Whitman Decl., ¶ 23, Df. Ex. 29, McCarty

Decl., ¶ 14, Df. Ex. 27, Compton Decl., ¶ 21, Df. Ex. 34, Kelh Decl., ¶ 13, Df. Ex. 32, Yancey

Decl., ¶ 19.))

**RESPONSE**: **Admitted in part and denied in part. Admitted that there are TEK**
**Recruiters who report to Recruiter Leads.**

**Denied that those Recruiters are not closely supervised by Recruiter Leads. TEK's**
**ECF No. 203-6 (collecting declaration statements) does not address the relationship between**
**Recruiter and Recruiter Leads. Instead, eighteen out of the twenty-two paragraphs deal with**
**Recruiters' relationships with Account Managers.** *See id.* **The remaining paragraphs by Fink,**
**Chong, and Payonk address Recruiters' relationships with Specialization Leads.** *See id.* **All**
**three admit that they routinely meet with Recruiters in their "pods" to monitor Recruiters'**
**activities, demonstrate recruiting strategies, and discuss methods for success.** *See id.* **at Fink**
**Decl., ¶ 31, Chong Decl., ¶ 16, Payonk Decl., ¶ 24.**

**ECF No. 190-46 (Lighthouse Recruiter Lead PowerPoint) TEK-Recruiter Lit-**
**00125482 is a PowerPoint presentation that includes a list of Recruiter Lead responsibilities,**
**including goal setting with Recruiters, onboarding and training new Recruiters, and making**
**sure Recruiters "clearly understand their job."** *Id.* **at 18. In this document, TEK explains**
**that Recruiter Leads can accomplish this by "[a]ctively leading and developing [Recruiters]**
**on a daily basis utilizing a systematic training process, the DBC and the Staffing Quality**

process." *Id.* at 20.

Further, DBO Lis testified that Recruiter Leads have the authority to place Recruiters on performance improvement plans. Ex. 166 (Lis Tr.) 86:16-22. Testimony by Recruiter Lead Adam Kartchner also confirms that Recruiter Leads closely supervise Recruiters, and they do so in conjunction with Team Leads, Directors of Business Operations, and other supervisory employees. *See* Ex. 165 (Kartchner Tr.) 26:9-10 (Q. "So do you supervise recruiters?" A. "Yes."), 164:15-18 (Q. "Do you do a one-on-one for each recruiter you supervise when you're supervising more than one recruiter?" A. "Yeah."), 27:19-28:1, 88:19-89:5 (Kartchner communicated with Team Lead and Director of Business Operations when Recruiters were not hitting their metrics). Testimony from Plaintiffs and Opt-In Plaintiffs also confirms that Recruiter Leads closely supervise Recruiters. *See, e.g.*, Ex. 148 (Conyers-Jordan Tr.) 100:8-10 ("Q. Okay. You mentioned before that you had a recruiting lead as someone you're reporting to?" A. "Yep."), 59:3-17 (Q. "What would you talk every day with Stefanie or Dylan about?" A. "Metrics, candidates that I had submitted, how – candidates who I had scheduled for screens – like so anything that had to do with the metrics. So am I on track for the number of G2s that I need this week? Am I on track for the number of, like, in-person meetings that I need this week? Am I on track for the number of cold calls I'm supposed to do? Getting a pulse on all the metrics that they expected me to have completed by the close of the week, and then any candidates who were interviewing, any open positions that she wanted me to, like, work on based on the candidates that I had interviewing."); Ex. 147 (Collier Tr.) 90:1-6 (explaining that Recruiters were supervised in small pods of one or two Recruiters to one Recruiter Lead or Account Manager); Ex. 149 (Dore Tr.) 17:4-9 (Q. "One of the people on your list is Tracy Stine. And she's described as director, recruiter,

delivery. What did you understand Ms. Stine's job duties to include?" A. "Basically she managed all the recruiters."), 17:15-23 (Q. "You also identified Martin Sanchez as a recruiter lead at the Seattle location. What did you understand Martin Sanchez's responsibilities to be?" A. "He was sort of a second Tracy. He managed a lot of recruiters. I wasn't directly under him, but we were instructed to go to Martin with any questions we had, basically, if Tracy wasn't available."); *see also* Plaintiffs' Reply in support of SOF ¶ 17.

Further, TEK's ECF No. 203-6 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

Fourteen of the declarations TEK submitted are from the *Avery* case and are not parties to this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

In addition, 12 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No. 156-2 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 156-3 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 156-4 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25 (Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶ 24-25; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-

**28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).**

118.    There are TEK Recruiters who work remotely. (Ex. 7 (collecting declaration statements Df. Ex. 12, Mosequera Decl., ¶ 23, Df. Ex. 13, Fink Decl., ¶ 39, Df. Ex. 14, Edds Decl., ¶ 31, 32, Df. Ex. 16, Bohen Decl., ¶ 26, Df. Ex. 18, Warren Decl., ¶ 13, 16, Df. Ex. 22, Fahey Decl., ¶ 16, Df. Ex. 15, Rice Decl., ¶ 21.))

**RESPONSE: Admitted.**

**Further, TEK's ECF No. 203-7 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.**

119.    There are TEK Recruiters who have flexibility to manager their own schedules. (Ex. 9 (collecting declaration statements Df. Ex. 12, Mosquera Decl., ¶ 25, Df. Ex. 13, Fink Decl., ¶ 39, 40, Df. Ex. 19, Payonk Decl., ¶ 27, Df. Ex. 18, Warren Decl., ¶ 13, 16.))

**RESPONSE: Denied. TEK requires Recruiters to attend daily Red Zone meetings unless the Recruiter is meeting with a candidate or consultant during the Red Zone meeting. *See* ECF No. 203-13 (Fink Decl.) ¶ 33 ("The day usually started with a Red Zone meeting"); ECF No. 203-17 (Chong Decl.) ¶ 15 ("Throughout the time I was a Recruiter, I began each day with a virtual office 'Red Zone Meeting' at 8:00 a.m. to talk about business, share information, and ensure, as a group, that our goals for the day were aligned."), ¶ 37 ("[I]n my role as a Specialization Lead II, I still attend a virtual 'Red Zone Meeting.' AMs and Recruiters both attend the meetings on Mondays, Wednesdays, and Fridays, but Tuesdays**

and Thursdays are attended by Recruiters only."); ECF No. 203-15 (Rice Decl.) ¶ 9 ("When I was a Recruiter, daily 'Red Zone Meetings' were held at 8:30 a.m."); ECF No. 203-18 (Warren Decl.) ¶ 13 ("Around 9:00 a.m., I attend a 'Red Zone Meeting'"); *see also* Plaintiffs' Reply in support of SOF ¶ 18.

Further, while TEK's ECF No. 203-9 shows that Recruiters often have some flexibility to decide the order in which they perform their duties each day, it does not support that Recruiters have flexibility to manage their own schedules because, TEK's office hours are generally 8:00 a.m. to 5:00 p.m. ECF No. 203-19 (Payonk Decl.) ¶ 27.

Further, TEK's ECF No. 203-9 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

120.    Activity levels, such as those reflected on the Scorecard, are for coaching purposes, and some Recruiters and supervisors do not refer to them at all. (Ex. 8 (collecting declaration statements Df. Ex. 19, Payonk Decl., ¶ 26, Df. Ex. 12, Mosquera Decl., ¶ 22, Df. Ex. 13, Fink Decl., ¶ 36, Df. Ex. 14, Edds Decl., ¶ 29, 30, Df. Ex. 23, Pagano Decl., ¶ 10, 11.))

**RESPONSE:** Admitted in part and denied in part. Admitted that TEK uses metrics, in part, for coaching purposes. Denied that TEK uses metrics and quotas, including the ones reflected on the Scorecard, only for coaching purposes. *See* ECF No. 190-119 (Performance Warning & Action Plan Job Aid) at TEK-Recruiter_Lit-00471330 (performance improvement plan template that states that "failure to meet the above requirements will be grounds for further disciplinary action up to and including termination."). Testimony from TEK supervisors and managers confirms TEK's use of performance improvement plans

when Recruiters fail to meet their quotas. *See* Ex. 161 (Estimada Tr.) 25:12-16 (Q. "[I]f a recruiter is not hitting the appropriate metrics, they could be put on a performance plan. Yes or no?" [Objection omitted]. A. "Yes."); 23:25-24:21 (describing performance plan for employees falling below the growth line); Ex. 167 (McNelley Tr.) 171:16-25 (Q. "When you were a DBO, did you ever put recruiters on PIPs, performance improvement plan?" A. "Yes." Q. "Did the amount of spread weigh into whether or not they got put on a performance improvement plan?" A. "Yes, everything weighed into whether they got into a performance plan. Spread would have been one of those metrics."; Ex. 162 (Fronzaglio Tr.) 75:7-76:5 (putting Recruiters on performance improvement plans for failing to perform on metrics such as G2s and submittals); *see also*, Ex. 165 (Kartchner Tr.) 114:16-25 (Q. "Okay. And you mentioned that Andrew Young was put on another PIP? What was that for?" [Objection omitted] A. "I believe the same things but admittedly, at the time he did not report to me, so – yeah. But I believe it was the same thing. I think his spread was below his performance line, and he wasn't getting enough submittals to get him where he needed to be is my understanding"); Ex. 154 (Raras Tr.) 107:18-108:16 (Q. "And how did Scott micromanage you?" A. "By paying attention to every number that I hit for the week, and it just consistently, I was feeling like he was over my shoulder." Q. "Explain to me why you felt like he was over your shoulder?" A. It just felt like a lot of times I was being questioned and asked about my numbers and being reminded of where I was or was not at It didn't feel like I had really much, I don't know the right word, privacy at TEK." Q. "Give me an example." A. "Well, for example, there was some weeks where maybe I wasn't up to the weekly standard for, you know, the numbers we were supposed to hit. And so if that's the case, then *I was constantly being reminded of it and told that I needed to make sure I hit my numbers or, you know, the*

*leadership is watching and I could be put on a performance plan or fired.*") (emphasis added).

Denied that the testimony cited by TEK supports TEK's assertion that some Recruiters and supervisors do not refer to them at all. Every week, TEK generates a WIN report for each Recruiter and their supervisors and managers which tracks how well Recruiters are meeting their quotas compared to their peers. ECF No. 190-5 (Doyle Tr.) 112:6-113:21; ECF No. 190-3 (Haycock Tr.) 158:2-15; ECF No. 190-9 (Fronzaglio Tr.) 59:2-20, 64:25-65:1, 65:5-9; ECF No. 190-63 (WIN narratives) TEK-Recruiter_Lit-00392430; ECF No. 190-28 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-Recruiter_Lit-00520226 ("The report will be emailed to every person who is directly managing Recruiters as well as Production Delivery Managers, Delivery Director, and DBOs each week."); *see also* Plaintiffs' Replies in support of SOFs ¶¶ 19-20.

Further, TEK's ECF No. 203-8 is improper because it is a summary argumentative compilation of selective quotes from TEK's declarants' declarations. To the extent the Court considers these declarations, the Court should review the declarations in their entirety. *Supra*, Plaintiffs' General Objections ¶ 4.

121.    For TEK Recruiters, identifying relevant skills is only the beginning of a screening inquiry. (Bury Dep. 116:23-118:24, 119:22-120:5; Df. Ex. 31, Rothermich ¶¶ 3-10; Df. Ex. 27, Compton ¶ 18; Df. Ex. 30, Whitman ¶ 20; Df. Ex. 26, Mendez ¶¶ 9, 14; Df. Ex. 25, Guffy ¶ 12; Df. Ex. 29, McCarty ¶ 15; Df. Ex. 32, Yancey ¶ 17, 18; Df. Ex. 27, Compton ¶ 18; Df. Ex. 34, Kehl ¶ 11; Df. Ex. 36, Ferrari ¶ 11; Df. Ex. 37, Budde ¶ 18.

**RESPONSE: Admitted. TEK trains Recruiters to review a job requisition for the 9 Key Questions, which includes "What are the top three skills?" and to ask Account Managers for additional information if the relevant skills are not already included in the requisition**

prior to screening for potential candidates. ECF No. 190-87 (Welcome to The HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 84; ECF No. 190-85 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at 41-46 (explaining that Recruiters are ready to find candidates after obtaining answers to the 9 Key Questions from the job requisition and the Account Manager).

122.    Recruiters decide whether a candidate is the right match for a requisition and whether to present the candidate to an AM. (Guffy ¶ 13 (hen a candidate is a match, she will "discuss [with the AM] the merits of a candidate and how they align with the technical and cultural requirements of a client. There are times when the AM disagrees with me on a recommendation, but I have the opportunity to push back, and it is my favorite thing to do. I am the agent representing the candidate whereas the AM represents the client, and then we negotiate. Most of the time, the AM follows my recommendation about which candidates to present to the client."); Df. Ex. 31, Rothermich ¶ 29; Df. Ex. 29, McCarty ¶ 14 (AMs rarely push back on; See also Df. Ex. 33, Levine-Gorelick ¶ 19 ("[AMs] generally follow my recommendations"); Df. Ex. 27, Compton ¶¶ 21-22 (AMs take recommendations "more often than not."); Kehl ¶ 13 ("Putting a candidate up for a job for a client is a collaboration between the Recruiter and [AM], and once we are on the same page, we will send the candidate over to a client. [AMs] take my recommendation about a candidate most of the time."); Df. Ex. 37, Budde ¶ 19 (AMs "almost always follow my recommendation."); Df. Ex. 35, Guffy ¶ 13 (describing her process for submitting candidates to TEK customers); Df. Ex. 32, Yancey ¶ 19 (same); Df. Ex. 35, Df. Ex. 35, Harvey ¶ 19 (same).

**RESPONSE: Admitted in part and denied in part. Admitted that Recruiters decide whether to present a candidate to an Account Manager. Denied that Recruiters decide whether a candidate is the right match for a requisition.**

The testimony cited by TEK does not support TEK's assertion that Recruiters decide whether a candidate is the right match for a requisition. Rather, the testimony cited by TEK demonstrates that Account Managers have the authority to veto candidates submitted to them by Recruiters. *See* ECF No. 203-25 (Guffy Decl.) ¶ 13; ECF No. 203-31 (Rothermich Decl.) ¶ 23; ECF No. 203-29 (McCarty Decl.) ¶ 14; ECF No. 203-27 (Compton Decl.) ¶ 22-21; ECF No. 203-37 (Budde Decl.) ¶ 19; ECF No. 203-32 (Yancey Decl.) ¶ 19; ECF No. 203-35 (Harvey Decl.) ¶ 19.

Recruiters may determine whether to present a candidate to an Account Manager, but Account Managers have the ultimate authority to determine which candidates to submit to TEK's clients. *See* Plaintiffs' Replies in support of SOFs ¶¶ 52-53. And, TEK's clients have the ultimate authority to determine which candidate to hire. *See* Plaintiffs' Reply in support of SOF ¶ 54. Thus, TEK's clients determine whether a candidate is the "right" match for a requisition. *See* Plaintiffs' Replies in support of SOFs ¶¶ 52-54.

123.    According to Connected data produced in this case, Recruiters average only about 5 Attempted Contacts, 3 G2s, 2.5 calls per day. (Df. Ex. 39, Scroggins Decl. ¶6.)

**RESPONSE: Denied. Plaintiffs are unable to replicate these calculations and TEK did not provide information regarding how it came to these numbers. Further, TEK's "minimum expectations per recruiter is that they make about 25 calls a day." Ex. 171 (Colavito Email June 19, 2018) TEK-Avery-00521319.**

**PLAINTIFFS' FURTHER STATEMENT OF UNDISPUTED FACTS**

124.    In a recent unsuccessful lawsuit against former Recruiters and a recruiting competitor, TEK described itself as a "staffing company." ECF No. 101-2 (*Andiamo* Consulting, Complaint) at ¶ 2; *see also* ECF No. 190-20 (*TEKsystems, Inc. v. Andiamo Consulting, LLC*

("*Andiamo*") Complaint) at ¶ 2; ECF No. 190-21 (*Andiamo* Rule 30(b)(6) Dep. Tr. of Alexander Pulido ("*Andiamo* Rule 30(b)(6) Tr.")) at 153:13-23; ECF No. 190-22 (*Andiamo* Preliminary Injunction) at 2, 4; ECF No. 190-23 (*Andiamo* Aff. of Alexander Pulido) at ¶¶ 5, 7; ECF No. 190-24 (*Ambar* Complaint) at ¶¶ 2, 13; ECF No. 190-25 (*Berardis* Complaint) ¶¶ 2, 13-15.

125.    Account Managers' primary job duty, and *not Recruiters'*, is to manage relationships with its clients and "ensure [they] place quality (technical and cultural fit) consultants." ECF No. 190-47 (Pittsburgh Welcome Packet) at TEK-Recruiter Lit-00408132; ECF No. 190-48 (Rochester Welcome Packet) at TEK-Recruiter Lit-00399691 (same); ECF No. 190-49 (Boston Welcome Packet) at TEK-Recruiter Lit-00489274 (same); ECF No. 190-50 (Seattle Welcome Packet) at TEK-Recruiter Lit-00552029 (same); ECF No. 190-56 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005762 (same); ECF No. 190-57 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133186 (same); ECF No. 190-58 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425009 (same); ECF No. 190-59 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00425009 (same); ECF No. 190-60 (Columbus Welcome Packet) at TEK-Recruiter_Lit-O0508982 (same); ECF No. 190-61 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545025 (same); ECF No. 190-5 (Doyle Tr.) 101:15-102:7, 137:19-138:4, 169:18-170:5; ECF No. 190-4 (DiBenedetto Tr.) 114:23-25; Ex. 154 (Raras Tr.) 66:9-14, 113:21-114:1 (AMs "qualify" requisition by speaking to TEK's customers); *see also* Ex. 138 (Rothermich Decl.) ¶ 16; ECF No. 190-9 (Fronzaglio Tr.) 35:25-36:7 (AMs' focus on TEK's clients and Recruiters on finding candidates).

126.    TEK submitted 14 declarations that it previously submitted in the *Avery* case that discussed the declarants' job duties, but these individuals are not class or collective members in this case. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27

(Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

127.    In total, 19 out of the 28 declarations that TEK submitted came from current employees who are not members of the Rule 23 Classes or FLSA Collective but purportedly discuss Recruiter (or Recruiter/Specialization Lead) experience. ECF No. 203-25 (Guffy Decl.); ECF No. 203-26 (Mendez Decl.); ECF No. 203-27 (Compton Decl.); ECF No. 203-28 (Boland Decl.); ECF No. 203-29 (McCarty Decl.); ECF No. 203-30 (Whitman Decl.); ECF No. 203-31 (Rothermich Decl.); ECF No. 203-32 (Yancey Decl.); ECF No. 203-33 (Levine-Gorelick Decl.); ECF No. 203-34 (Kehl Decl.); ECF No. 203-35 (Harvey Decl.); ECF No. 203-36 (Ferrari Decl.); ECF No. 203-37 (Budde Decl.); ECF No. 203-38 (Stryker Decl.).

128.    21 of TEK's 27 declarants were promoted out of the Recruiter position into higher level positions. ECF No. 203-12 (Mosquera Decl.) ¶ 4 (former Recruiting Lead and promoted to Recruiter-10); ECF No. 203-13 (Fink Decl.) ¶ 4 (promoted to Recruiting Lead); ECF No. 203-14 (Edds Decl.) ¶ 4 (promoted to Specialization Lead); ECF No. 203-15 (Rice Decl.) ¶ 5 (promoted to Account Manager); ECF No. 203-16 (Bohen Decl.) ¶ 4 (promoted to Team Lead); ECF No. 203-17 (Chong Decl.) ¶ 6 (promoted to Specialization Lead); ECF No. 203-19 (Payonk Decl.) ¶ 4 (promoted to Specialization Lead); ECF No. 203-20 (Marshall Decl.) ¶¶ 6-7 (promoted to Recruiting Lead and then internal recruiter); ECF No. 203-21 (Fronzaglio Decl.) ¶ 4 (promoted to Recruiting Lead);   ECF No. 203-22 (Fahey Decl.) ¶ 2 (promoted to Director of Business Operations); ECF No. 203-23 (Pagano Decl.) ¶ 2 (promoted to Director of Business Operations);

ECF No. 203-24 (Walther Decl.) ¶ 2 (promoted to Executive Director); ECF No. 203-25 (Guffy Decl.) ¶¶ 5-6 (promoted from Recruiter to Recruiter Lead and then to Team Lead – Delivery); ECF No. 203-26 (Mendez Decl.) ¶ 5 (promoted from Recruiter to Recruiter Lead); ECF No. 203-27 (Compton Decl.) ¶¶ 11, 29 (promoted from Recruiter to Recruiter Lead); ECF No. 203-28 (Boland Decl.) ¶¶ 3-5 (promoted from Recruiter to retention Program Lead then to Account Manager then to Account Manager Recruiting Lead and then to Division Lead); ECF No. 203-29 (McCarty Decl.) ¶¶ 24, 25 (promoted from Recruiter to Recruiter Lead and then to Specialization Lead); ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 7, 26, 27 (promoted from Recruiter to Recruiter Lead and then to Team Lead); ECF No. 203-34 (Kehl Decl.) ¶¶ 4, 16 (promoted from Recruiter to Recruiter Lead and then to Team Lead Delivery II); ECF No. 203-36 (Ferrari Decl.) (promoted to senior Specialized Recruiter); Ex. 127 (Ferrari LinkedIn Profile) (promoted to Data Center & Infrastructure Solutions Manager); ECF No. 203-38 (Stryker Decl.) ¶¶ 10, 26-27 (promoted from Recruiter to Account Manager and then to Recruiting Lead and Delivery Manager);

129.    12 of TEK's 27 declarations are from Recruiter Leads whose declarations use the present tense and thus appear to describe their current Recruiter Lead job duties. ECF No. 203-14 (Edds Decl.) ¶ 6, 12-13, 17, 21, 24, 26; ECF No. 203-17 (Chong Decl.) ¶ 6, 11, 17-33; ECF No. 203-12 (Mosquera Decl.) ¶ 10-21; ECF No. 203-19 (Payonk Decl.) ¶ 13; ECF No. 203-25 (Guffy Decl.) ¶ 6; ECF No. 203-26 (Mendez Decl.) ¶ 4; ECF No. 203-29 (McCarty Decl.) ¶¶ 24-25**;** ECF No. 68-11 ¶ 6; ECF No. 203-27 (Compton Decl.) ¶ 29; ECF No. 203-33 (Levine-Gorelick Decl.) ¶¶ 26-28; ECF No. 203-34 (Kehl Decl.) ¶¶ 16-17; ECF No. 203-36 (Ferrari Decl.) ¶ 4 ("On December 29, 2019, I was promoted to Recruiter, and I have been in different recruiting roles ever since."); Ex. 127 (Ferrari LinkedIn Profile).

130.    TEK's declarations describe Recruiters' primary job duty as searching for and

contacting potential job candidates to fill open positions with TEK's clients. ECF No. 203-12 (Mosquera Decl.) ¶ 8 (job of a Recruiter is to "find the talent that is the best match for the requirement"); ECF No. 203-13 (Fink Decl.) ¶ 11 (same); ECF No. 203-14 (Edds Decl.) ¶ 8 (same); ECF No. 203-15 (Rice Decl.) ¶ 8 (same); ECF No. 203-16 (Bohen Decl.) ¶ 6 (same); ECF No. 203-17 (Chong Decl.) ¶ 10 (same); ECF No. 203-18 (Warren Decl.) ¶ 9 (same); ECF No. 203-19 (Payonk Decl.) ¶ 8 (same); ECF No. 203-20 (Marshall Decl.) ¶ 9; ECF No. 203-21 (Fronzaglio Decl.) ¶ 3; ECF No. 203-25 (Guffy Decl.) ¶ 7; ECF No. 203-31 (Rothermich Decl.) ¶ 13 ("My objective as a Recruiter is to help TEK's customers find the best candidates to fill the positions"); ECF No. 203-26 (Mendez Decl.) ¶ 20; ECF No. 203-30 (Whitman Decl.) ¶ 5 ("The other Recruiters and I were responsible to find candidates whose skills were the right match for the job"); ECF No. 203-32 (Yancey Decl.) ¶ 8 (same); ECF No. 203-35 (Harvey Decl.) ¶ 7 ("[I] locate suitable candidates for the requirement from a variety of sources [and] contact the potential candidates and interview them to determine if they are a good fit for the position"); ECF No. 203-36 (Ferrari Decl.) ¶ 6 ("a job of a Recruiter is to find candidates who fit the requirements of TEK's customers").

131.    Recruiters receive requisitions that identify the necessary skills and experience a candidate must have, search for candidates who fit the requisitions, and screen candidates to see if their experience and preferences match the requisitions. ECF No. 203-12 (Mosquera Decl.) ¶¶ 14-16 (attesting that the starting point for his work as a Recruiter is the requisition that TEK's customer needs to fill and describing how he searches for candidates, and speaks to candidates to see if they match the job req); ECF No. 203-13 (Fink Decl.) ¶¶ 16-22 (same); ECF No. 203-14 (Edds Decl.) ¶¶ 17, 20 (same); ECF No. 203-15 (Rice Decl.) ¶¶ 8, 11-13, 16 (same); ECF No. 203-16 (Bohen Decl.) ¶¶ 16-18 (same); ECF No. 203-17 (Chong Decl.) ¶¶ 10, 18, 22, 23 (same); ECF No. 203-

18 (Warren Decl.) ¶¶ 15, 13, 15, 16, 17 (same); ECF No. 203-19 (Payonk Decl.) ¶¶ 15-17 (same); ECF No. 203-20 (Marshall Decl.) ¶¶ 15-17; Ex. 162 (Fronzaglio Tr.) 157:19-161:2, 181:8-22 (TEK Declarant explaining the calls and G2s Recruiters make, the process for contacting candidates using a call sheet, and explaining that candidates may not match a req because "there's lots and lots of reasons [a candidate] would not be interested in a job."); ECF No. 203-25 (Guffy Decl.) ¶¶ 10, 13; ECF No. 203-26 (Mendez Decl.) ¶¶ 11-14; ECF No. 203-27 (Compton Decl.) ¶¶ 17-19; ECF No. 203-28 (Boland Decl.) ¶¶ 10-11; ECF No. 203-31 (Rothermich Decl.) ¶¶ 14, 19, 21, 22, 27, 28 (attesting that the starting point for her work as a Recruiter is the requisition or the description of the role that TEK's customer needs to fill and describing how she searches for candidates, and speaks to candidates to see if they match the job req); ECF No. 203-30 (Whitman Decl.) ¶¶ 5, 8, 17, 18, 21 (same); ECF No. 203-32 (Yancey Decl.) ¶¶ 8, 14, 15 (same); ECF No. 203-35 (Harvey Decl.) ¶¶ 8, 10-11 (same); ECF No. 68-16 (Ferrari Decl.) ¶¶ 6, 9 11 (same); ECF No. 203-37 (Budde Decl.) ¶¶ 15-18  (same).

132.    If the Recruiter finds a match, the Recruiter informs the AM, and the AM decides whether the candidate will be presented to the client. ECF No. 203-12 (Mosquera Decl.) ¶ 17; ECF No. 203-13 (Fink Decl.) ¶ 26; ECF No. 203-14 (Edds Decl.) ¶ 24; ECF No. 203-15 (Rice Decl.) ¶ 14; ECF No. 203-16 (Bohen Decl.) ¶ 21; ECF No. 203-17 (Chong Decl.) ¶ 26-27; ECF No. 203-18 (Warren Decl.) ¶ 18; ECF No. 203-19 (Payonk Decl.) ¶ 20; ECF No. 203-20 (Marshall Decl.) ¶ 18; ECF No. 203-25 (Guffy Decl.) ¶ 13-15; ECF No. 203-26 (Mendez Decl.) ¶ 17; ECF No. 203-27 (Compton Decl.) ¶ 21; ECF No. 203-31 (Rothermich Decl.) ¶ 12, 13, 15, 29; ECF No. 203-30 (Whitman Decl.) ¶¶ 9, 14; ECF No. 203-32 (Yancey Decl.) ¶¶ 8, 19; ECF No. 203-35 (Harvey Decl.) ¶¶ 6, 17, 19, 21; ECF No. 203-37 (Budde Decl.) ¶ 19.

133.    The instances when declarants report reaching out to TEK's clients directly with a

job candidate are infrequent and occur in situation such as when "the Account Manager is away." ECF No. 203-25 (Guffy Decl.) ¶ 16; ECF No. 203-34 (Kehl Decl.) ¶ 7; ECF No. 203-33 (Levine-Gorelick Decl.) ¶ 25; ECF No. 203-30 (Whitman Decl.) ¶ 24; ECF No. 203-15 (Rice Decl.) ¶ 14.

134.    TEK's declarants confirm that Recruiters receive direction and supervision from a variety of sources, including through regular Red Zone meetings, communications with their supervisors, and daily communications with Account Managers "to discuss the status and challenges they are facing."  ECF No. 203-28 (Boland Decl.) ¶ 17 ("Recruiters and Account Managers typically touch base at the beginning and the end of the day to discuss the status and challenges they are facing"); *see also* ECF No. 203-31 (Rothermich Decl.) ¶¶ 16, 18; ECF No. 203-30 (Whitman Decl.) ¶¶ 6, 26, 27; ECF No. 203-32 (Yancey Decl.) ¶¶ 9, 10; ECF No. 203-36 (Ferrari Decl.) ¶¶ 7-8, 20; ECF No. 203-37 (Budde Decl.) ¶ 21; ECF No. 203-12 (Mosquera Decl.) ¶ 11; ECF No. 203-13 (Fink Decl.) ¶¶ 26, 33; ECF No. 203-17 (Chong Decl.) ¶¶ 8, 15, 16, 35, 37; ECF No. 203-16 (Bohen Decl.) ¶¶ 12, 28-30; ECF No. 203-15 (Rice Decl.) ¶ 9; ECF No. 203-18 (Warren Decl.) ¶¶ 7, 13, 14; ECF No. 203-23 (Pagano Decl.) ¶¶ 5-6, 9; ECF No. 203-20 (Marshall Decl.) ¶¶ 22-23; ECF No. 203-19 (Payonk Decl.) ¶¶ 24, 25; ECF No. 203-24 (Walther Decl.) ¶ 8; Ex. 162 (Fronzaglio Tr.) 119:25-120:11, 120:24-121:11 (TEK Declarant testified in her deposition that as an account manager she was "a coach and a supporting mechanism for the recruiter to effectively match a consultant in a rec," "was very high touch with my team," and met with recruiters on a daily basis.).

135.    TEK's declarants confirm that TEK evaluates all Recruiters based on the same "production metrics"—spread and activity goals and Recruiters who do not meet TEK's "production metrics" are subject to coaching and discipline. ECF No. 203-38 (Stryker Decl.) ¶¶ 27-30; ECF No. 203-37 (Budde Decl.) ¶¶ 24-25, 27; ECF No. 203-30 (Whitman Decl.) ¶¶ 10, 29;

ECF No. 203-13 (Fink Decl.) ¶¶ 34, 36; ECF No. 203-14 (Edds Decl.) ¶ 30; ECF No. 203-23 (Pagano Decl.) ¶ 10; ECF No. 203-19 (Payonk Decl.) ¶¶ 24, 26; Ex. 162 (Fronzaglio Tr.) 53:22-59:17, 64:14-69:4, 72:21-76:5 (TEK Declarant testified in her deposition about the multitude of ways Recruiters were monitored and coached, and how they were put on performance improvement plans when their metrics were low.).

136.    TEK's declarants represent that *TEK's clients* determine who to interview and who to hire. ECF No. 203-12 (Mosquera Decl.) ¶ 18 ("If the Client wants to interview the candidate . . ."); ECF No. 203-14 (Edds Decl.) ¶ 26 (same); ECF No. 203-17 (Chong Decl.) ¶ 30; ECF No. 203-19 (Payonk Decl.) ¶ 21; ECF No. 203-20 (Marshall Decl.) ¶¶ 19-20; Ex. 162 (Fronzaglio Tr.) 122:5-16, 157:9-18;  ECF No. 203-25 (Guffy Decl.) ¶ 14; ECF No. 203-26 (Mendez Decl.) ¶ 19; ECF No. 203-27 (Compton Decl.) ¶ 23; ECF No. 203-28 (Boland Decl.) ¶¶ 19-20; ECF No. 203-29 (McCarty Decl.) ¶¶ 16-17; ECF No. 203-32 (Yancey Decl.) ¶ 20; ECF No. 203-36 (Ferrari Decl.) ¶ 13.

137.    TEK's declarants do not manage consultants – they just occasionally relay information. ECF No. 203-12 (Mosquera Decl.) ¶ 21; ECF No. 203-13 (Fink Decl.) ¶¶ 29-20; ECF No. 203-14 (Edds Decl.) ¶ 28; ECF No. 203-17 (Chong Decl.) ¶ 33; ECF No. 203-16 (Bohen Decl.) ¶ 24; ECF No. 203-15 (Rice Decl.) ¶ 19; ECF No. 203-18 (Warren Decl.) ¶ 21; ECF No. 203-21 (Fronzaglio Decl.) ¶ 9; ECF No. 203-20 (Marshall Decl.) ¶ 20; ECF No. 203-19 (Payonk Decl.) ¶ 23; ECF No. 203-31 (Rothermich Decl.) ¶¶ 36, 37; ECF No. 203-30 (Whitman Decl.) ¶ 25; ECF No. 203-32 (Yancy Decl.) ¶ 22, 23; ECF No. 203-35 (Harvey Decl.) ¶ 18; ECF No. 203-28 (Boland Decl.) ¶ 20; ECF No. 203-36 (Ferrari Decl.) ¶ 15.

Dated: November 7, 2025                    Respectfully submitted,

                                           */s/* Sally J. Abrahamson

Sally J. Abrahamson* (DC 999058)
sabrahamson@flsalaw.com
**Werman Salas P.C.**
609 H Street NE, 4th Floor
Washington, D.C. 20002
Phone No.: (202) 830-2016
Fax No.: (312) 419-1025

Douglas M. Werman * (IL 6204740)
dwerman@flsalaw.com
Maureen A. Salas* (IL 6289000)
msalas@flsalaw.com
Anne Kramer* (MA 697435)
akramer@flsalaw.com
**Werman Salas P.C.**
77 West Washington Street, Ste 1402
Chicago, Illinois 60602
Phone No.: (312) 419-1008
Fax No.: (312) 419-1025

Sarah R. Schalman-Bergen (PA 206211)
ssb@llrlaw.com
Krysten Connon* (PA 314190)
kconnon@llrlaw.com
Olena Savytska* (MA 693324)
osavytska@llrlaw.com
**Lichten & Liss-Riordan, P.C.**
729 Boylston Street, Suite 2000,
Boston, MA 02116
Phone No.: (617) 994-5800
Fax No.: (617) 994-5801

*Attorneys for Plaintiffs, the FLSA Collective, and
Rule 23 Classes*

*Pro hac vice*