**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

MICHAEL THOMAS, MARIA
CONYERS-JORDAN, AUSTIN
SHERMAN, LYNDA ALEXANDRA
MAHER, AVA DORÉ, RACHEL
RICHENBERG, and EMILY BURKE, on
behalf of themselves and others similarly
situated,

        Plaintiffs,

    v.

TEKSYSTEMS, INC.,

        Defendant.

Civil Action No. 2:21-CV-00460-WSS

---

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RESPONSIVE STATEMENT OF
MATERIAL FACTS SUBMITTED IN CONNECTION WITH DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

      Pursuant to Federal Rule of Civil Procedure 56 and LCvR 56, Defendant TEKsystems,

Inc. ("TEK" or the "Company") submits this Reply to Plaintiffs' Response to Defendant's

Concise Statement of Material Facts (Paragraphs 1-27) and Response to Plaintiffs' Concise

Statement of Material Facts (Paragraphs 28-116):

**DEFENDANT'S REPLY TO
PLAINTIFFS' RESPONSE TO TEK'S STATEMENT OF MATERIAL FACTS
(PARAGRAPHS 1-27)**

      1.      TEKsystems, Inc. is a wholly owned subsidiary of TEKsystems Holdings, LLC,

which in turn is a wholly owned subsidiary of Allegis Group, Inc. ("Allegis Group"). (ECF No.

16.) Another Allegis Group, Inc. subsidiary is Aerotek, Inc. (Ex. 2, June 19, 2024 Deposition of

Faith Johnson ("Johnson Tr. II"), 129:1-16.)

      **PLAINTIFFS' RESPONSE TO PARAGRAPH 2: Admitted.**

2.      TEK is a global business and technology firm that assists its customers in achieving their business transformation, customer experience, and business goals. (Ex. 3, Deposition of Garrett Haycock ("Haycock"), 134:6-13.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 2:** Admitted in part and denied in part. Admitted that this reflects some of Mr. Haycock's testimony. Denied to the extent that TEK is claiming its primary marketplace offering is not recruiting. TEK has repeatedly represented itself as a "staffing company" that "recruits" in court filings in other lawsuits, depositions, discovery responses, and internal training documents. Ex. 1 (TEKsystems, Inc. v. Andiamo Consulting, LLC ("Andiamo") Complaint) at ¶ 2; Ex. 2 (Andiamo Rule 30(b)(6) Dep. Tr. of Alexander Pulido ("Andiamo Rule 30(b)(6) Tr.")) at 153:13-23; Ex. 3 (Andiamo Preliminary Injunction) at 2, 4; Ex. 4 (Andiamo Aff. of Alexander Pulido) at ¶¶ 5, 7; Ex. 5 (TEKsystems, Inc. v. Ambar ("Ambar") Complaint) at ¶¶ 2, 13; Ex. 6 (TEKsystems, Inc. v. Berardis ("Berardis") Complaint) ¶¶ 2, 13-15; Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3 ("Defendant is in the staffing business"); Ex. 46 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 47 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting workforce on the planet").

**TEK'S REPLY TO PARAGRAPH 2: Plaintiffs must be deemed as having admitted Paragraph 2, as none of the sources cited by Plaintiff state that TEK's "primary marketplace offering" is "recruiting." TEK is not paid by its customers to "recruit." Rather, TEK is paid by its customers for the services that TEK's consultants perform. In most arrangements, TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex.**

13 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 8, Doyle Tr. 193:15-194:16.) Separately, a Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit for TEK, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 58, T. Raras Tr. 41:14-42:19.)

In addition, Haycock did not accept Plaintiffs' counsel's characterization that TEK only "provides IT staffing services." (Df. Ex. 7, Haycock Tr. 25:6-10.) Haycock explained that TEK is a talent services company, and its business includes staff augmentation, i.e., placing workers with specific skills on assignment at customer companies to perform needed services for a certain period of time; capacity solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 7, Haycock Dep. 25:22-34:18, 73:16-77:7.)

In addition, Plaintiffs' citations contradict their purported clarification. Documents reflecting that TEK provides "staffing services" are consistent with Mr. Haycock's description of that aspect of TEK's business and the fact that TEK is paid for the services performed by those it staffs on assignment to its customers. (See Plaintiffs' Exhibits 1-5, 8, 46.) Setting a goal to "become the most dominant recruiting workforce on the planet" is consistent with the aim of finding, recruiting, placing, and managing the top talent to provide those services to customers. (See Plaintiffs' Exhibit 47.) None of these documents support the notion that recruiting is TEK's "marketplace offering."

3.    At the core of TEK's business is IT talent services, which involves staff augmentation, i.e., finding, screening, placing, and managing workers with specific skills on assignment at TEK's customer companies for a certain period of time. (Haycock, 25:22-34:7-18, 73:16-77:7.) TEK also offers capacity solutions, which involves assembling teams of workers for customers who need a larger or more specialized workforce for a project; and total management services, which involves outsourcing and managing an entire IT function or outcome for a customer. (*Id.*)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 3:** Admitted in part and denied in part. Admitted that TEK's principal business purpose is to recruit IT workers and propose them to third-party companies for hire. Ex. 18 (TEK Senior Vice President of Talent Delivery Haycock Tr. ("Haycock Tr.")) 27:4-10, 60:2-12, 75:23-77:7 (even Global Services consultants often work at a third-party customer site); Ex. 48 (Executive Dashboard) at TEK-Recruiter_Lit-00161733 (TEK generates only approximately $16.8 million (approximately 16%) of its approximately $101.85 million of its expected sales from Global Services); Ex. 12 (Rule 30(b)(6) Deposition DiBenedetto Tr. ("DiBenedetto Tr.")) 134:5-13; Ex. 1 (Andiamo Compl.) at ¶ 2; Ex. 2 (Andiamo Rule 30(b)(6) Tr.) 24:14-25:5, 153:13-23; Ex. 47 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting workforce on the planet"). Denied to the extent TEK implies its principal business offering is "managing" workers or that Recruiters' primary job duties involve managing. Ex. 2 (Andiamo Aff. of Alexander Pulido) at ¶¶ 6 ("TEKsystems' stature in the market is due in large part to its exhaustive search, training, and matching process."), 12-13; Ex. 5 (Ambar Complaint) at ¶¶ 14, 21; Ex. 6 (Berardis Complaint) ¶¶ 20-21.

**TEK'S REPLY TO PARAGRAPH 3:** Plaintiffs must be deemed to have admitted Paragraph 5. Plaintiffs' statement regarding what is "admitted" in the Paragraph is non-responsive to and misrepresents TEK's Paragraph 3 (e.g., TEK's Paragraph states that it places workers "*on assignment* at TEK's customer companies," while Plaintiffs state that TEK "propose[s] them to third-party companies *for hire*." (emphasis added).) As described in the Reply to Paragraph 3, TEK is not paid by its customers to "recruit IT workers and propose them to third-party companies for hire." Thus, recruitment cannot be TEK's "principal business purpose," since it is not on its own revenue generating. Rather, TEK is paid by its customers for the services that TEK's consultants perform. In most arrangements, TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 13 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 8, Doyle Tr. 193:15-194:16.) Separately, a Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit for TEK, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 58, T. Raras Tr. 41:14-42:19.)

Likewise, Plaintiffs' denial also is non-responsive, speaking to "Recruiters' primary job duties," when Paragraph 3 relates to the main facets of TEK's business. Plaintiffs' cited evidence does not contradict TEK's statement that it offers its customers IT talent services, including staff augmentation, capacity solutions, and total management services.

4.    Garrett Haycock, TEK's Senior Vice President of Talent Delivery, describes the

Company's expectations for Recruiters as follows:

Their job [Recruiter] is to understand the customer, the customer's need, the customer's project, the outcomes that the customer is looking to achieve.

They need to understand the customer's environment, what type of culture do they have, and also understanding what are the skills necessary for them to be able to assist the customer in achieving the outcomes that they're looking for.

They also have to understand the nuances and details associated with the contractual arrangements associated with that particular customer. And at times we have multiple agreements with one customer, so they have to understand which agreement are we working under and what are the terms and conditions of that agreement. And ultimately they have to know what are the details of what they can

offer a consultant associated with the hourly bill rate that we might be billing a customer as well as any parameters or necessary background investigations or screening that would be necessary for that particular customer.

And once they have all that information, they will then have to understand the skills, goals, and interests of the consultant to be able to make a very complex match between this person [who] has not only the skills, the technical skills, they have the level of experience associated with those skills.

At times maybe need to understand the industry, is this a banking and finance customer, and do they need to have banking and finance experience, and what does that mean. If they work for a bank, is that the same as working for an insurance company. Sometimes it doesn't matter; sometimes it does.

And so for them, they have to manage all of these complexities associated with the assignment and the skills to be able to make a match to be able to associate that consultant, not waste a customer's time sending over people that are not qualified for that requirement, and ensuring that that customer ultimately is satisfied.

Because they placed the person. Then they maintain the person; meaning, they are getting feedback from the customer, providing that feedback to the consultant --So if they're working on the customer's site, the customer may tell them, Hey, you know, they're doing great technically. They're not getting along with their coworkers. They need to do a better job. Hey, Johnny was late three times in the past month. You need to talk to Johnny about their punctuality relative to the assignment.

And then ultimately the recruiter is responsible for continuing to work with that consultant, because many of our assignments are six months, nine months, 12 months, 18 months, whatever it is. But they are temporary in that

nature, and in that case their responsibility is to help that person find another
job once their current assignment comes to conclusion.

(Haycock p. 27:14-30:2.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 4:** Admitted in part and denied in part.

Admitted that this was Mr. Haycock's testimony. Denied that this accurately represents

Recruiters' primary job duties or encompasses a full picture of what Mr. Haycock testified about

Recruiters' primary job duties. Mr. Haycock and TEK's other witnesses testified, and corporate

documents reflect, that Recruiters' primary job duty is production and that recruiters are

producers. Ex. 18 (Haycock Tr.) 60:7-12, 68:1-16 ("Anyone that is in a role that is a salesperson

account manager or recruiter, we consider those as producing roles. Meaning that they are

producing for the company. Our products and services are associated with putting people to

work, and those producers are – it's just a generic term that's used to say you're either a

salesperson or a recruiter. . . . Again, as I've stated before, they are a recruiter that is producing.

Meaning that they are a – they're a recruiter that produces what recruiters produce . . . They find

people for jobs."), 86:9-19 (SPP means "spread per producer" and refers to "recruiters"); Ex. 12

(DiBenedetto Tr.) 158:4-12; Ex. 13 (Rule 30(b)(6) Deposition Doyle Tr. ("Doyle Tr.")) 65:24-

66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where

you've got either sales-specific activities as part of your responsibilities, or you've got recruiting

responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-

18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A:

"That is correct."), 213:4-7; Ex. 16 (TEK Regional Director of Applications Innovation Services

Estimada Tr. ("Estimada Tr.")) 100:3-101:12; Ex. 19 (AM Hollister Tr. ("Hollister Tr.")) 103:4-

15; Ex. 49 (Haycock Dep. Ex. 15 (Yearly Performance Summary)) TEK-Recruiter_Lit-

00124518 (email attaching "Producer EOY Performance Reviews" and "Producer Performance

Reviews 2021" for Recruiters); Ex. 50 (Haycock Dep. Ex. 5 (Project Lighthouse Communication Plan)) at TEK-Recruiter_Lit-00614413 (referring to Recruiters as "production focused"); Ex. 51 (Alvather Email Oct. 2, 2019) at TEK-Recruiter_Lit-00392555-56; Ex. 52 (Bhasin May 17, 2022 Email) at TEK-Recruiter_Lit-00127828; Ex. 53 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291 ("our producers must document in a consistent, timely manner"); Ex. 48 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-61; Ex. 54 (Recruiter Excellence: Scorecard FAQs) at TEK- Recruiter_Lit-00095089 ("many of our top producers are not maintaining 30 interactions."); Ex. 55 (Role Impact Summary: Producers (AM and Recruiter)) TEK-Recruiter_Lit-00004483; Ex. 56 (Performance Review Guide 2021) at TEK-Recruiter_Lit-00528423 (referring to Recruiters as "Producers"); Ex. 57 (Producer Performance KPI 8-4-2020) TEK-Recruiter_Lit-00281725 (Recruiter metric summaries are referred to "Producer Performance KPI"); Ex. 58 (Annual Operating Plan) TEK-Recruiter_Lit-00583663 at 5, 10 ("Producer Enablement Technology").

TEK's own witnesses and documents describe Recruiters as an "entry-level" position. Ex. 59 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At an entry level role, there are certain competencies that are more likely correlated to performance than others."); Ex. 18 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; Ex. 2 (Andiamo Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 23 (TEK Director of Business Operations Lis Tr. ("Lis Tr.")) 33:22-34:10; Ex. 26 (Former TEK Account Manager Pappas Tr. ("Pappas Tr.")) 91:3-9; Ex. 60 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 at 7 (474 of Recruiters are new graduates, 75 had six months to one year

of experience, and 110 of Recruiters had 1-2 years of experience. Therefore, approximately 74% of the 892 Recruiters have less than two years of experience); Ex. 61 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 62 (Maltese Email Feb. 19, 2018) TEK1-Recruiter_Lit-00616402; Ex. 63 (Maltese Email July 12, 2021) TEK-Recruiter_Lit-00586352.

Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's Account Managers. Ex. 12 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to?" A: "Their account managers, specifically"), 162:18-163:7; Ex. 13 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 18 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12; Ex. 22 (Kartchner Tr.) 57:2-6; Ex. 46 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 64 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter: . . .Screens consultants"); Ex. 65 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692 (same); Ex. 66 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 67 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552030 (same); Ex. 68 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005763 (same); Ex. 69 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133187 (same); Ex. 70 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425010 (same); Ex. 71 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450704 (same); Ex. 72 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508983 (same); Ex. 73 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545026 (same); Ex. 74 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. Screens consultants . . . ."); Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (TEK's business cycle as including Recruiters "screening" candidates and Account Managers communicating with TEK's customers.).

Recruiters do not manage consultants or evaluate their work. Ex. 18 (Haycock Tr.) 36:16-17 (Recruiters do "not oversee[] the actual work getting done."), 121:20-122:16, 144:18-145:12; Ex. 21 (Johnson Tr. II) 114:11-14; Ex. 12 (DiBenedetto Tr.) 167:12-14, 167:19-168:7; Ex. 19 (Hollister Tr.) 46:6-12, 139:7-19; Ex. 22 (Kartchner Tr.) 124:24-125:4.

Recruiters' primary job duty does not include speaking with TEK's customers, which is the Account Managers' primary job duty. Ex. 12 (DiBenedetto Tr.) 115:9-14, 121:25-122:13; Ex. 13 (Doyle Tr.) 150:8-10, 167:6-10, 178:14-15, 185:4-188:5, 189:11-25, 191:3-7, 191:22-192:4; Ex. 26 (Pappas Tr.) 121:9-13; Ex. 2 (Andiamo Rule 30(b)(6) Tr.) 16:2-4; Ex. 76 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741 (Recruiters are evaluated if they "[o]btain missing information about the requirement from their Account Manager"), TEK-Recruiter_Lit-00152744 (Recruiters evaluated on the "ability to gather the appropriate client information from the Account Manager"); Ex. 77 (Delivery Qualification Form) at TEK-Recruiter_Lit-00413296 ("Recruiter... should come to the AM meeting PREPARED just like an AM would with their client."); Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK's business cycle as including Recruiters "screening" candidates and Account Managers communicating with TEK's customers.); Ex. 20 (Johnson Tr. I) 211:12-18.

**TEK'S REPLY TO PARAGRAPH 4:** **Plaintiffs must be deemed to have admitted Paragraph 4 in its entirety. Plaintiffs admit that Haycock offered the cited testimony regarding his expectations for the role of Recruiter. Some of Plaintiffs' statements are non-sensical and inherently contradictory, such as stating within this response that "Recruiters' primary job duty is production," then stating two paragraphs later that "Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's Account Managers."**

Plaintiffs' purported denials are unrelated to the statements in Paragraph 4 and are repeated by Plaintiffs as additional fact Paragraphs 58, 66, 69, 75, and 101. TEK incorporates by reference here its Responses to Plaintiffs' Paragraphs 58, 66, 69, 75, and 101.

5.      **What TEK provides its customers is the ability to achieve their technological goals through the talents and services of the IT professionals assigned by TEK. (Haycock 25:1-27:10, 60:22-61:16.)**

**PLAINTIFFS' RESPONSE TO PARAGRAPH 5:** Admitted in part and denied in part. Admitted that TEK proposes job candidates to TEK's customers. Denied that TEK "assigns" IT professionals. The clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them. Ex. 12 (DiBenedetto Tr.) 167:9-14 (testifying that Recruiters do not make hiring and firing decisions) (Q: "Do recruiters make the ultimate [termination] decisions for the consultants?" A: "No."), 188:2-9; Ex. 13 (Doyle Tr.) 158:1-12 (client interviews the candidates), 192:13-193:14 (TEK's clients make hiring decisions), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes."); Ex. 21 (Johnson Tr. II) 120:3-13; Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 144 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview."); Ex. 79 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at 20-21 (TEK's clients interview candidates); Ex. 80 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted our screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 81 (Digital REDZONE Script) TEK-Recruiter_Lit-

00004325; ECF Nos. 156-7 (Warren Decl.) ¶¶ 19-20; 156-11 (Marshall Decl.) ¶ 19; 156-12

(Payonk Dec.) ¶ 21.

TEK competes with other recruiting firms to place candidates and ultimately is only

successful at placing less than one-third of the candidates it submits to third-party companies. Ex.

12 (DiBenedetto Tr.) 96:2-6 (part of the customer service goal with potential job candidates is to

get them to utilize TEK over its competitors); Ex. 13 (Doyle Tr.) 199:18-200:2; Ex. 14 (Doyle

Sealed Tr. Portion) 237:20-238:9 (only 31.8% of the job requirements that TEK works to fill get

filled by TEK); Ex. 18 (Haycock Tr.) 44:22-45:4 ("There's always a war for talent."), 48:1-8

("[T]here are many, many, many competitors out there"), 48:10-49:12; Ex. 24 (TEK Vice

President of Managed Service Program Strategy McNelley Tr. ("McNelley Tr.")) 38:17-39:3,

40:23-41:13, 58:20-59:11; Ex. 16 (Estimada Tr.) 86:16-21, 88:2-6, 89:14-21, 92:18-25; Ex. 17

(TEK Change Management Lead Fronzaglio Tr. ("Fronzaglio Tr.")) 97:8-17; Ex. 19 (Hollister Tr.)

36:16-37:16, 86:10-87:6; Ex. 25 (TEK Director of Business Operations Matthew Minniear

("Minniear Tr.")) 54:22-55:9, 92:15-18; Ex. 26 (Pappas Tr.) 130:24-131:20; Ex. 2 (Andiamo Rule

30(b)(6) Tr.) 181:12-17; Ex. 82 (Haycock Email Oct. 26, 2020) at TEK-Recruiter_Lit-00386105

(discussing "reduc[ing] 'finger pointing' when we get beat on a *requirement*.") (emphasis added).

To compete against other companies, TEK often submits multiple candidates for a single

requirement, submits one candidate for multiple requirements, and has multiple Recruiters work

on the same requirement in order to increase the chances that one of its candidates will be selected.

*Id.*; Ex. 13 (Doyle Tr.) 139:8-14, 140:3-11; Ex. 83 (Perrault Sept. 27, 2017 Email) TEK-

Recruiter_Lit-00248137; Ex. 84 (Recruiter Excellence – Scorecard Coaching Guide) at TEK-

Recruiter_Lit-00520226 ("Is this a marketable candidate that can be submitted to multiple other

opportunities?"); Ex. 85 (Multiple Submittals) TEK-Recruiter_Lit-000000303; Ex. 52 (Bhasin

Email May 17, 2022) at TEK-Recruiter_Lit-00127828 ("A candidate can be submitted by multiple producers"); Ex. 86 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467 (describing a coaching opportunity to ask Recruiters what other requirement a candidate Auto-Matches or fits); Ex. 87 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307 (coaching recruiters to determine whether a candidate is a match for multiple requirements or TEK clients); Ex. 88 (Minniear Email) TEK-Recruiter_Lit-00559495 ("Focus on multiple submittals").

**TEK'S REPLY TO PARAGRAPH 5: Plaintiffs must be deemed to have admitted Paragraph 5 in its entirety. Plaintiffs' purported denials are unrelated to the statements in Paragraph 5 and are repeated by Plaintiffs as additional fact Paragraphs 65 and 94. TEK incorporates by reference here its Responses to Plaintiffs' Paragraphs 65 and 94.**

6.    In 2002, TEK settled litigation that alleged it had violated the FLSA by misclassifying recruiter employees. (Ex. 4, *Johannes, et al. v. Aerotek, Inc., et al.*, Case No. 98-6153 DT (AJWx) (C.D. Cal.), Docket No. 367-1 (settlement agreement), § 1.2; Ex. 5, final approval at Docket 371.) TEK and the other defendants, which included Aerotek, Inc., Maxim Group, Inc., MAXIM Healthcare Services, Inc., Onsite Engineering & Management, Inc., TEKsystems Management, Inc., Allegis Group, Inc. and Affiliated Services, Inc., disputed the plaintiffs' claims and made no admission of fault or liability. (Ex. 4, §§ 1.3. 3.2.) Among the terms of the settlement was an agreement that newly hired recruiters would be classified as non-exempt for purposes of the FLSA as they undertook an "initial orientation and training period designed to acquaint them with the industry focus of the company, the role and responsibility of the recruiting function, and the processes and procedures utilized in the recruiting role" of the company. (Ex. 4, § 14.1.) The training was "designed to develop the recruiter's skills and use of discretion and

judgment to assess the skills and abilities of candidates and client requirements and to otherwise function in the full scope of the recruiting and selection role," to continue until satisfactory completion of "an individual assessment of the recruiter's ability to function independently and exercise discretion and independent judgment." (*Id*.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 6:** Admitted that the language quoted above is in the Johannes settlement agreement. By way of further answer, the Johannes court also denied TEK's motion for summary judgment that its Recruiters' primary job duty met the requirements of the administrative exemption. Ex. 7 (Johannes Summ. J. Order) at 25-44.

**TEK'S REPLY TO PARAGRAPH 6: Plaintiffs must be deemed to have admitted Paragraph 6 in its entirety. Plaintiffs' purported "further answer" is unrelated and immaterial to the statements in Paragraph 6. Plaintiffs' Response to Paragraph 6 is asserted as additional fact Paragraph 31. TEK incorporates by reference here its Response to Plaintiffs' Paragraph 31.**

7.      It has remained TEK's practice that it does not hire directly into the role of Recruiter. (Haycock, 104:14-16; Johnson I, 96:2-97:5, 194:5-10; Johnson II, 81:9-22.) Rather, it hires Recruiter Trainees who may be elevated to the Recruiter role after completing training and demonstrating the ability to perform the Recruiter role. (Haycock, 104:11-105-6.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 7:** Admitted in part and denied in part. Admitted that TEK hires new Recruiters as hourly, non-exempt Recruiter Trainees. Denied that Mr. Haycock testified that they are "elevated" to the Recruiter role. Ex. 18 (Haycock Tr.) 104:22-105:2 ("I don't call it a promotion"); Ex. 13 (Doyle Tr.) 210:5-15 (Recruiter Trainees "convert" to Recruiters). Recruiter Trainees perform the same job duties as Recruiters. Ex. 13 (Doyle Tr.)

210:5-15 ("they start actually doing the job duty of a recruiter"); Ex. 28 (Burke Tr.) 49:6-10; Ex. 29 (Conyers-Jordan Tr.) 18:5-16; Ex. 31 (Sherman Tr.) 42:7-18; Ex. 32 (Clavet Dec.) ¶ 8; Ex. 33 (Coles Dec.) ¶ 8; Ex. 34 (Doerner Dec.) ¶ 7; Ex. 36 (Gahard Dec.) ¶ 7; Ex. 39 (Miller Dec.) ¶ 7; Ex. 41 (Seaward Dec.) ¶ 8; Ex. 43 (Strauchen Dec.) ¶ 7.

**TEK'S REPLY TO PARAGRAPH 7:** **Plaintiffs must be deemed to have admitted Paragraph 7 in its entirety. Plaintiffs' assertion that Recruiter Trainees are not elevated to the Recruiter role is not supported by their citations. Mr. Haycock testified that Recruiter Trainees "are moving from one role to the next" when they become Recruiters, and this move occurs only after the Recruiter Trainee "ha[s] shown the capability to a recruiter." (Df. Ex. 7 (Haycock Tr.) 104:22-105:6.) Plaintiffs' purported denials are unrelated to the statements in Paragraph 4**

**Plaintiffs' additional statement that "Recruiter Trainees perform the same job duties as Recruiters" is unrelated to the facts stated by TEK in Paragraph 7 and incorrect. Mr. Doyle testified that Recruiter Trainees are in training in the office and offsite for the first eight or nine weeks of their employment, then start to perform some job duties of a recruiter to begin "building up that momentum" to move into the role. (Pls. Ex. 13 (Doyle Tr.) 210:5-15.) Recruiter Trainees must complete their training period and satisfy an evaluation before they may transition to the salaried role of Recruiter. (Df. Ex. 8 (Doyle Tr.) 204:1-11.) Plaintiff Burke's testimony does not support that she performed the same job duties as Recruiter Trainee and Recruiter; rather, she testified that at the time of her promotion, "I still had the same expectations of me" (Pls. Ex. 28 (Burke Tr.) 49:6-10), which is consistent with TEK's requirement that individuals demonstrate the ability to perform the role of Recruiter in an exempt manner before their elevation. Other declarations cited by Plaintiffs are similarly**

**vague with respect to the differences in their job duties as an hourly v. salaried employee, but with no supporting detail regarding what the differences in job duties were or how they performed those job duties. (Pls. Ex. 32 (Clavet Dec.) ¶ 8 ("were not substantially different"); Pls. Ex. 34 (Doerner Dec.) ¶ 7 ("not really any different"); Pls. Ex. 36 (Gahard Dec.) ¶ 7 ("not substantively different"); Pls. Ex. 39 (Miller Dec.) ¶ 7 ("not materially different"); Pls. Ex. 43 (Strauchen Dec.) ¶ 7 (same); Pls. Ex. 41 (Seaward Dec.) ¶ 8 ("largely the same").) Plaintiffs' Response to Paragraph 7 is asserted as additional fact Paragraph 61. TEK incorporates by reference here its Response to Plaintiffs' Paragraph 61.**

8.      Recruiter Trainees are classified as non-exempt and paid on an hourly basis. (Haycock, 104:17-19; (Ex. 1, February 23, 2024 Deposition of Faith Johnson ("Johnson I"), 186:6-187:10.) While in this role, Trainees are new to the company. (Johnson I, 186:6-187:10.) Trainees undergo a 13 week training period to acclimate themselves to TEK, its business, and the roles and responsibilities of a Recruiter, and they perform parts of the Recruiter role in order to learn. (Id.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 8:** Admitted in part and denied in part. Admitted that Recruiter Trainees are classified as non-exempt and paid on an hourly basis, that Recruiter Trainees are new to the company, and that they undergo 13-weeks of training. Denied that that they only perform "parts" of the Recruiter role to "learn." Recruiter Trainees perform the same job duties as Recruiters. Ex. 13 (Doyle Tr.) 204:1-11, 210:5-15 ("they start actually doing the job duty of a recruiter"); Ex. 28 (Burke Tr.) 49:6-10; Ex. 29 (Conyers-Jordan Tr.) 18:5-16; Ex. 31 (Sherman Tr.) 42:7-18; Ex. 32 (Clavet Dec.) ¶ 8; Ex. 33 (Coles Dec.) ¶ 8; Ex. 34 (Doerner Dec.) ¶ 7; Ex. 36 (Gahard Dec.) ¶ 7; Ex. 39 (Miller Dec.) ¶ 7; Ex. 41 (Seaward Dec.) ¶ 8; Ex. 43 (Strauchen Dec.) ¶ 7. After Recruiter Trainees hit certain metrics and duration of employment,

including earning a passing score on the Recruiter Evaluation, they are converted into salaried, exempt Recruiters. Ex. 12 (DiBenedetto Tr.) 63:20-64:9; Ex. 18 (Haycock Tr.) 104:14-105:25, 137:20-144:6; Ex. 30 (Maher Tr.) 80:10-23; Ex. 27 (Blendy Tr.) 40:19-41:2; Ex. 32 (Clavet Dec.) ¶ 7; Ex. 33 (Coles Dec.) ¶ 7; Ex. 34 (Doerner Dec.) ¶ 6; Ex. 36 (Gahard Dec.) ¶ 6; Ex. 39 (Miller Dec.) ¶ 6; Ex. 41 (Seaward Dec.) ¶ 7; Ex. 43 (Strauchen Dec.) ¶ 6.

Also denied that Ms. Johnson has a detailed understanding of Recruiters' and Recruiter Trainees' actual job duties: (1) she does not supervise Recruiters or observe them executing their job duties, Ex. 20 (Johnson Tr. I) 42:7-10; Ex. 21 (Johnson Tr. II) 55:4-7, 103:14-19; (2) she has not participated in any evaluation of Recruiters' job duties, nor is she aware of TEK ever doing so, Ex. 20 (Johnson Tr. I) 42:15-20, 122:1-11; Ex. 21 (Johnson Tr. II) 41:20-43:3 ("The duties aspect of [the administrative exemption] is not reviewed"), 82:1-4; (3) Ms. Johnson could not testify about how often Recruiters communicate with clients or how much they rely on questionnaires provided to them when searching and matching job candidates, Ex. 21 (Johnson Tr. II) 55:4-7, 105:1-16; and (4) she does not know the specific metrics by which TEK assess Recruiters' job performance, Ex. 21 (Johnson Tr. II) 74:17-75:15. Ms. Johnson testified that she does not know all of the systems that Recruiters use to perform their job duties. Ex. 20 (Johnson Tr. I) 208:4-6. Ms. Johnson could not testify about the timeline that Recruiter Trainees operate under to become Recruiters. Id. 116:8-17. Ms. Johnson also testified that she does not know why Recruiter Trainees are classified as non-exempt or whether there has been any evaluation about whether Recruiter Trainees should be classified as overtime exempt. Id. 97:6-14; Ex. 21 (Johnson Tr. II) 81:20-24, 82:9-13.

**TEK'S REPLY TO PARAGRAPH 8: Plaintiffs must be deemed to have admitted Paragraph 8 in its entirety. Plaintiffs deny that Recruiter Trainees only perform "parts" of**

the Recruiter role to "learn," asserting that Recruiter Trainees perform the same job duties as Recruiters. As explained in TEK's Reply to Paragraph 7, Plaintiffs' citations do not support this point.

Plaintiffs' additional "denial" does not relate to Paragraph 8 at all, as TEK's statement says nothing whatsoever about Ms. Johnson and her "understanding of Recruiters' and Recruiter Trainees' actual job duties." In any event, Ms. Johnson testified at length regarding the basis for her knowledge of the Recruiter role and job duties performed by Recruiters. (Df. Ex. 9 (Johnson I Tr.) 191:13-199:10, 201:12-204:14; Df. Ex. 10 (Johnson II Tr.) 100:7-103:13.) Plaintiffs' Response to Paragraph 8 is asserted as additional fact Paragraph 61. TEK incorporates by reference here its Response to Plaintiffs' Paragraph 61.


9.      After the Trainee has fully learned the Recruiter skill sets, they may be moved into a Recruiter role. (Id.; Haycock, 131:9-13, 137:22-138:2.) Recruiters are classified as exempt and paid on a salary basis, with commission and bonus eligibility. (Haycock, 104:20-105:12; Johnson I, 186:6-10.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 9:** Admitted in part and denied in part. Admitted that Recruiter Trainees are moved into the Recruiter role and that TEK classifies Recruiters as exempt and pays them on a salary basis, with commission and bonus eligibility. Denied that Recruiter Trainees are only moved into the Recruiter position after they "fully learned the Recruiter skill set." Instead, after Recruiter Trainees meet certain performance metrics and duration of employment, including earning a passing score on the Recruiter Evaluation, Recruiter Trainees are moved into the Recruiter role and are converted into salaried, exempt Recruiters.

Supra Response 9; Ex. 18 (Haycock Tr.) 131:9-13, 137:22-138:2 (Q: "What is your understanding of what the recruiter trainee evaluation is?" A: "It's a valuation process that we use to determine whether or not a recruiter has met the minimum expectations to be able to move forward into a full-time recruiter role.") (emphasis added).

**TEK'S REPLY TO PARAGRAPH 9: Plaintiffs must be deemed to have admitted Paragraph 9 in its entirety. Plaintiffs' denial that Recruiter Trainees move into the Recruiter role only after fully learning the Recruiter skill set is misleading. As Mr. Haycock testified, "[t]he recruiter trainee cannot move out of the trainee period until they have shown a capability to be a recruiter." (Df. Ex. 7 (Haycock Tr.) 104:20-105:1.) Meeting certain performance metrics and passing the Recruiter evaluation are simply means by which to determine whether the Recruiter Trainee has shown such capabilities.**


10.    In 1997, Faith Johnson joined Allegis Group in 1997, where she worked in a variety of human resources functions for the company until 2004. (Johnson I, 26:2-27:16.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH  : Admitted.**


11.    In 2004, Johnson became Director of Human Resources for TEK in 2004 and has continued in that role since. (Johnson I, 27:10-28:13.) She is responsible for overseeing a variety of human resources functions, including employee relations, strategic human relations, people strategy, talent acquisition, corporate social responsibility, workforce development, and HR reporting. (Johnson I, 30:14-20.) From about 2017-2019 or 2020, Johnson reported to Garrett Haycock. (Johnson I, 44:8-20.) Since then, Johnson has reported to TEK's Chief Financial Officer. (Johnson I, 31:12-17.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 11:** Admitted. It is further noted that Ms. Johnson could not provide one example of an individual Recruiter performance issue that she worked on in 2023. Ex. 20 (Johnson Tr. I) 209:10-210:2.

**TEK'S REPLY TO PARAGRAPH 11:** Plaintiffs must be deemed as having admitted Paragraph 5. Plaintiffs' purported "note" should be disregarded as irrelevant to the statement. In addition, Ms. Johnson, who was appearing as a Rule 30(b)(6) witness on unrelated topics, testified that she could not recall at that moment specific examples of Recruiter performance issues that she was involved with in 2023 but she might be able to recall examples if given some "time to think through it." (Df. Ex. 9 (Johnson Tr. I) 209:10-210:1.) Ms. Johnson also is not the sole person in human resources who is involved in individual Recruiter performance issues, and she testified that she and the members of the team she leads have assisted with Recruiter performance issues since 2018, though her team members handle more of such issues than she does personally. (Df. Ex. 9 (Johnson Tr. I) 192:11-193:7.)

12.    In addition to her on-the-job experience in HR, Johnson's training includes earning a Master's degree in Human Resources, holding a professional and human resources certification, attending Society for Human Resource Management (SHRM) conferences, and attending trainings offered by outside counsel in in-house counsel at TEK. (Johnson I, 24:8-11, 28:11-29:10.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 12:** Admitted except that Ms. Johnson testified that she no longer has "active" professional and human resource certifications. Ex. 20 (Johnson I) 28:16-20. By way of further answer, Ms. Johnson could not recall if any of the trainings

that she attended were wage and hour trainings because she did not "recall specifically" the trainings. Id. 29:11-19.

**TEK'S REPLY TO PARAGRAPH 12:** **Plaintiffs must be deemed as having admitted Paragraph 12. Plaintiffs' additional statement that Ms. Johnson's professional and human resource certifications are not currently active is irrelevant. Plaintiffs' additional statement regarding training Ms. Johnson attended is inaccurate. Ms. Johnson testified "I'm sure we had – we have discussed that topic [wage and hour] in our trainings." (Df. Ex. 9 (Johnson Tr. I) 28:21-29:19.)**

13.    Through her 27 years in the staffing industry, and more than 20 years of experience at TEK, Johnson has an understanding of the expectations for the role of Recruiter. (Johnson I, 191:9-194:4; Johnson II, 88:13-91:11, 100:7-103:13, 161:4-10.) This understanding has come through attending regular meetings with leaders to understand the Company's expectations for how the role is to be performed, as well as being involved in Recruiter performance management discussions, among other things.

**PLAINTIFFS' RESPONSE TO PARAGRAPH 13:** Admitted in part and denied in part. Admitted that Ms. Johnson testified that she worked in the industry for 27 years and at TEK for more than 20 years and that she has some understanding of the expectation of Recruiters. Denied that Ms. Johnson has a detailed understanding of Recruiters' actual job duties or expectations. Ms. Johnson testified that she is not routinely included in meetings with leaders at TEK where they discuss how they want individual recruiting tasks and responsibilities performed. Ex. 20 (Johnson Tr. I) 193:15-194:4. Ms. Johnson also testified she does not and has not: (1) supervise Recruiters, Ex. 20 (Johnson Tr. I) 42:7-10; (2) participated in any kind of evaluation on how much time

Recruiters spend on their tasks, id. 42:15-18; (3) have knowledge regarding the spread thresholds for Recruiters, id. 58:2-5; (4) could not testify regarding the specifics of Recruiters' career progression during their first year, id. 116:8-17; and (5) she did not have any knowledge about how TEK recruits Recruiters. Id. 205:16-207:2. In addition, Ms. Johnson is not aware of any study or audit regarding Recruiters' job duties and if they meet the administrative exemption requirements. Id. 121:5-122:11; Ex. 21 (Johnson Tr. II) 96:24-97:12, 97:19-22, 98:2-100:1. Further, Ms. Johnson is not aware of whether TEK has sought any external legal opinions about whether Recruiters are properly classified as exempt from overtime requirements. Ex. 20 (Johnson Tr. I) 97:15-98:14.

Ms. Johnson could not provide one example of an individual Recruiter performance issue on which she worked. Id. 209:10-210:2.

Ms. Johnson was designated by TEK as its Rule 30(b)(6) witness on TEK's good faith defense regarding the exempt classification of Recruiters. ECF No. 55 at 40 (TEK stated that it "acted in good faith and had reasonable grounds for believing that it acted properly in its pay practices and was in good faith compliance with the FLSA and applicable state law with respect to Plaintiffs and/or potential collective action members."); Ex. 11 (Rule 30(b)(6) Deposition Notice) at 7; Ex. 21 (Johnson Tr. II) 78:4-81:5. However, Ms. Johnson could not answer if TEK had always classified Recruiters as exempt or if TEK ever took any steps to make sure that the exempt classification complied with the law. Ex. 21 (Johnson Tr. II) 79:19-81:5, 85:20-86:4.

Ms. Johnson could not recall any document, other than TEK's Interrogatory responses, that she relied on to support TEK's exempt classification of Recruiters. Ex. 20 (Johnson Tr. I) 125:14-18.

**TEK'S REPLY TO PARAGRAPH 13:** Plaintiffs must be deemed as having admitted Paragraph 13. Plaintiffs' denial that Ms. Johnson has a detailed understanding of Recruiters' actual job duties or expectations relies is not supported by their citations.

Ms. Johnson testified that she is not *routinely* included in meetings with leaders at TEK where they discuss how they want *individual* recruiting tasks and responsibilities performed. However, in Plaintiffs' Ex. 20 (Johnson Tr. I) 193:15-194:4, Ms. Johnson testified that she is part of senior leadership team meetings where they discuss business strategy and structure, and also is part of meetings about individual recruiting tasks and responsibilities some of the time. That Ms. Johnson does not directly supervise Recruiters, evaluate Recruiters, know how TEK recruits candidates to be Recruiters, or know the spread (commission) thresholds for Recruiters is irrelevant to understanding the Recruiter function and job duties. Likewise, whether any outside study or legal analysis of Recruiters' job duties was performed is irrelevant to the knowledge possessed by Ms. Johnson.

14.    Ultimate responsibility for ensuring proper classification of Recruiters falls to Ms. Johnson. (Johnson I, 197:21-198-4.) However, she relies on others as well, such that responsibility for ensuring compliance with wage and hour exemptions at TEK is shared among multiple groups, including the HR team, a compliance team, the legal team, [and] people responsible for the business. (Id., 198:5-199:10; Johnson II, 123:7-125:1, 148:16-149:15.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 14:** Denied. In its Interrogatory responses, TEK identified Philip Eisman, Garrett Haycock, and Ben Jackson as the individuals responsible for classifying Recruiters as exempt, and did not even list Ms. Johnson. Ex. 8 (Def.'s

Resp. to Pls. 1st Interrogatories) No. 7. Ms. Johnson also did not consistently testify that she had "ultimate" responsibility for Recruiter classification. Ms. Johnson also testified that she is "partially" responsible. Ex. 20 (Johnson Tr. I) 74:20-76:8, 198:5-7 (Q. "Is that a responsibility that is yours alone?" A. "No."); Ex. 21 (Johnson Tr. II) 123:7-124:6, 148:12-150:18. Ms. Johnson testified that the decision to classify Recruiters at TEK as exempt is made by Allegis, TEK's parent company. Ex. 20 (Johnson Tr. I) 37:7-38:5, 38:16-20, 39:8-14.

**TEK'S REPLY TO PARAGRAPH 14: Plaintiffs must be deemed as having admitted Paragraph 14. Plaintiffs' denial that Ms. Johnson has "ultimate responsibility for ensuring proper classification of Recruiters" is not supported by their citations. Ms. Johnson was asked directly: "I believe you testified earlier that the ultimate responsibility for classification of recruiters falls to you. Is that fair?," to which she responded "That's fair." (Pls. Ex. 20 (Johnson I Tr.) 197:21-198:3.) Ms. Johnson went on to explain how she works with others to ensuring compliance with wage and hour exemptions at TEK, including the HR team, a compliance team, the legal team, and people responsible for TEK's business. See TEK's Paragraph 14. None of this is inconsistent with Ms. Johnson having ultimate responsibility to ensure appropriate classification decisions.**

15.     **TEK's internal human resources group is involved in ensuring compliance with wage and hour exemptions. (Johnson II, 150:14-18.) For example, when job descriptions and responsibilities are modified, this triggers a compliance review by HR to determine whether the modifications require adjustments to the job classification or otherwise. (Johnson I, 198:21-199:10.)**

**PLAINTIFFS' RESPONSE TO PARAGRAPH 15:** Admitted in part and denied in part. Admitted that Ms. Johnson testified that TEK's human resources is involved in wage and hour matters. Denied that when the Recruiter job descriptions were modified it triggered a compliance review by human resources with respect to whether Recruiters' job duties render them administratively exempt. Ms. Johnson testified that she could not identify any modification to Recruiters' job description or TEK doing compliance review of Recruiters' job duties because of a change to the job description. Ex. 20 (Johnson Tr. I) 121:15-21; Ex. 21 (Johnson Tr. II) 57:19-58:15. TEK has never done an evaluation "of the administrative exemption as it relates to the Recruiter role at TEKsystems." Ex. 21 (Johnson Tr. II) 140:6-15, 158:23-159:4, 159:19-23, 160:6-10.

**TEK'S REPLY TO PARAGRAPH 15: Plaintiffs must be deemed as having admitted Paragraph 15. Ms. Johnson did not testify that the Recruiter job description had not been modified. Rather, testifying as a Rule 30(b)(6) witness, she explained that there had been changes to the Recruiter job description over time, and while she could not in the moment recall a specific time when she had reviewed proposed changes to the job description, any changes would have been reviewed by her or someone on her HR team, as well as someone from the legal department. (Pls. Ex. 21 (Johnson Tr. II) 57:19-58:15.) Also, Ms. Johnson did not testify that TEK had never evaluated whether Recruiters satisfy the administrative exemption. Rather, Ms. Johnson testified that the role was under constant evaluation by the HR team, the compliance team, and the legal team, with input from the business leaders. (ECF No. 194 at 22-24 (Johnson I, 197:21-199:10); ECF No. 194 at 12-14, 18-19 (Johnson II, 123:7-125:1, 148:16-149:15).)**

16.    Modifications to any job description at TEK are initiated in the business unit, reviewed by Human Resources, and sent to the legal team for final review. (Johnson I, 200:5-204:14.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 16:** Admitted in part and denied in part. Admitted that Ms. Johnson testified that this was TEK's process. Denied that TEK has ever done a compliance review regarding Recruiters' job duties based on any modification to Recruiters job description. Ex. 20 (Johnson Tr. I) 121:15-21, 73:6-74:2, 88:10-14; Ex. 21 (Johnson Tr. II) 57:19-58:15.

**TEK'S REPLY TO PARAGRAPH 16: Plaintiffs must be deemed as having admitted Paragraph 16. Ms. Johnson did not testify that the Recruiter job description had not been modified. Rather, testifying as a Rule 30(b)(6) witness, she explained that there had been changes to the Recruiter job description over time, and while she could not in the moment recall a specific time when she had reviewed proposed changes to the job description, any changes would have been reviewed by her or someone on her HR team, as well as someone from the legal department. (Pls. Ex. 21 (Johnson Tr. II) 57:19-58:15.) Also, Ms. Johnson did not testify that TEK had never evaluated whether Recruiters satisfy the administrative exemption. Rather, Ms. Johnson testified that the role was under constant evaluation by the HR team, the compliance team, and the legal team, with input from the business leaders. (ECF No. 194-1 at 22-24 (Johnson I, 197:21-199:10); ECF No. 194-2 at 12-14, 18-19 (Johnson II, 123:7-125:1, 148:16-149:15).)**

17.    Johnson knows the requirements to satisfy the FLSA's exemptions to being eligible for overtime pay, and she has knowledge of the Recruiter role. (Johnson I, 200:12-204:14; Johnson

II, 150:25-151:3; 161:3-14; Ex. 6, Defendant's Responses and Objections to Plaintiffs' First Set of Interrogatories, Nos. 10-11.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 17:** Admitted in part and denied in part. Admitted that Ms. Johnson testified that she knows the requirements to satisfy the FLSA's exemptions to overtime. Denied that Ms. Johnson's testimony reflected a complete understanding of the administrative exemption. Ms. Johnson did not identify that Recruiters' *primary* job duty must involve discretion over matters of significance nor that their *primary* job duty must relate to the management or business operations of TEK or its customers. Denied that Ms. Johnson has knowledge of Recruiters' day-to-day responsibilities. Ms. Johnson testified that she is not "in the weeds" with respect to recruiting Recruiters or how TEK outlines Recruiters' job duties when it is conducting recruitment efforts for Recruiters. Ex. 20 (Johnson Tr. I) 205:16-206:19. Ms. Johnson does not know: (1) which systems Recruiters use to perform their job duties, Ex. 20 (Johnson Tr. I) 208:4-6; (2) how many phone calls and emails Recruiters make to potential consultants, Ex. 20 (Johnson Tr. I) 209:6-9, Ex. 21 (Johnson Tr. II) 82:14-16; (3) how many G2s Recruiters complete for each requisition they work on, Ex. 21 (Johnson Tr. II) 84:9-13; (4) where Recruiters find candidates to fulfill the requisitions they are working on, Ex. 21 (Johnson Tr. II) 103:2-13; or (5) how Recruiters rely on requisitions when conducting candidate screenings, Ex. 21 (Johnson Tr. II) 105:13-16. Ms. Johnson also testified that she does not know whether there have been any time studies concerning how much time recruiters spend performing any of their specific tasks. Ex. 20 (Johnson Tr. I) 42:15-20; Ex. 21 (Johnson Tr. II) 85:20-23. Ms. Johnson testified that she has never shadowed Recruiters to evaluate what their job duties are or how much time they are spending on specific tasks. Ex. 20 (Johnson Tr. I) 122:5-11. Further, Ms. Johnson testified that she "[doesn't] know that the senior leadership team as a whole is looking at the performance metrics to identify

individual job responsibilities of a recruiter or group of recruiters" and is not "monitoring the day-to-day job duties that Recruiters are performing." Ex. 21 (Johnson Tr. II) 93:7-11, 94:19-22.

**TEK'S REPLY TO PARAGRAPH 17: Plaintiffs must be deemed as having admitted Paragraph 17. Plaintiffs write in their response: "Denied that Ms. Johnson's testimony reflected a complete understanding of the administrative exemption. Ms. Johnson did not identify that Recruiters'** *primary* **job duty must involve discretion over matters of significance nor that their** *primary* **job duty must relate to the management or business operations of TEK or its customers." However, these statements are not supported by any citations to testimony by Ms. Johnson.**

**Plaintiffs' statement that Ms. Johnson testified that she is not 'in the weeds' with respect to recruiting Recruiters or how TEK outlines Recruiters' job duties when it is conducting recruitment efforts for Recruiters." is immaterial. As the cited testimony shows, this is not a statement about the job duties performed by TEK's Recruiters; it is about how TEK's internal team (Talent Acquisition) searches for and hires people to fill roles as customer-facing Recruiter Trainees and eventually customer-facing Recruiters. (Pls. Ex. 20 (Johnson Tr. I) 205:16-206:19.)**

**The remainder of Plaintiffs' Response to Paragraph 17 is asserted as additional fact Paragraph 49 TEK incorporates by reference here its Response to Plaintiffs' Paragraph 49.**

18.    **Johnson's assessment of the Recruiter position is that it has grown more complex and required more independence over time, (Johnson I, 194:11-195:16.)**

**PLAINTIFFS' RESPONSE TO PARAGRAPH 18:** Admitted in part and denied in part. Admitted that this reflects some of Ms. Johnson's testimony. Denied that Ms. Johnson identified

Recruiters' job duties as becoming more complex versus TEK's organizational structure chancing. Ex. 20 (Johnson Tr. I) 139:4-140:9. Also, denied that Ms. Johnson had the foundation or understanding of Recruiters' job duties to render such an opinion. Ms. Johnson admitted she is not "in the weeds" with respect to recruiting Recruiters or how TEK outlines Recruiters' job duties when it is conducting recruitment efforts for Recruiters. Ex. 20 (Johnson Tr. I) 205:16-206:19. Further, Ms. Johnson testified that she "[doesn't] know that the senior leadership team as a whole is looking at the performance metrics to identify individual job responsibilities of a recruiter or group of recruiters" and are not "monitoring the day-to-day job duties that Recruiters are performing." Ex. 21 (Johnson Tr. II) 93:7-11, 94:19-22. TEK abolished a non-exempt "sourcing specialist" position that helped "source" job candidates and transferred those non-exempt job duties to Recruiters, but TEK never examined whether this modification in job duties affected the exempt classification of Recruiters. Ex. 21 (Johnson Tr. II) 62:9-19, 64:17-66:24 (there was no longer a need for sourcing specialist because their job duties were "being covered by the recruiter role"). Ms. Johnson also testified that she is not aware of TEK performing any analysis of Recruiters' job duties. Ex. 21 (Johnson Tr. II) 86:24-88:8. Ms. Johnson further testified that she is not aware of any expectations that have changed for the Recruiter role since 2018, or any substantive changes to Recruiters' job duties at any time that would have led her to review Recruiters' job responsibilities for the purpose of examining whether Recruiters are administratively exempt. Ex. 21 (Johnson Tr. II) 88:10-89:6, 99:17-100:1, 131:16-132:7.

**TEK'S REPLY TO PARAGRAPH 18: Plaintiffs must be deemed as having admitted Paragraph 18. Plaintiffs' citation to testimony by Ms. Johnson that TEK's organization structure has changed (Pls. Ex. 20 (Johnson Tr. I) 139:4-140:9) does not contradict Ms. Johnson's testimony and assessment that the Recruiter position has grown more complex**

and required more independence over time. **(ECF No. 194-1 at 20-21 (Johnson I, 194:11-195:16).)**

As noted in the preceding section, Plaintiffs' statement that Ms. Johnson testified that she is not 'in the weeds' with respect to recruiting Recruiters or how TEK outlines Recruiters' job duties when it is conducting recruitment efforts for Recruiters." is immaterial. As the cited testimony shows, this is not a statement about the job duties performed by TEK's Recruiters; it is about how TEK's internal team (Talent Acquisition) searches for and hires people to fill roles as customer-facing Recruiter Trainees and eventually customer-facing Recruiters. **(Pls. Ex. 20 (Johnson Tr. I) 205:16-206:19.)**

The remainder of Plaintiffs' Response to Paragraph 18 is asserted as additional fact Paragraph 54. TEK incorporates by reference here its Response to Plaintiffs' Paragraph 54.

19.     In order to stay abreast of legal requirements under the FLSA, Johnson subscribes to and reads daily and weekly updates from the ASA, SIA, law firms, the DOL, the OFCCP, and the Society for Human Resources Management (SHRM); participates in trainings offered by outside counsel; participates in trainings offered by the TEK legal team; and participates in webinars and other trainings offered by SHRM and the ASA; and speaks directly with counsel. **(Johnson II, 151-152-9.)**

**PLAINTIFFS' RESPONSE TO PARAGRAPH 19:** Admitted that this reflects some of Ms. Johnson's testimony. By way of further answer, Ms. Johnson could not recall if she attended any trainings on wage and hour because she did not "recall specifically" the trainings. Ex. 20 (Johnson Tr. I) 29:11-19. TEK does not provide any training on the administrative exemption to business leaders. Ex. 21 (Johnson Tr. II) 128:3-7.

**TEK'S REPLY TO PARAGRAPH 19:** Plaintiffs must be deemed as having admitted Paragraph 19. Plaintiffs' additional statement regarding training Ms. Johnson attended is inaccurate. Ms. Johnson testified "I'm sure we had – we have discussed that topic [wage and hour] in our trainings." (Df. Ex. 9 (Johnson Tr. I) 28:21-29:19.) Plaintiffs' additional statement regarding training for business leaders is inaccurate as well. Ms. Johnson testified that she was "not aware of a current training that we provide them [business leaders] *specific to* the administrative exemption, no." (Pls. Ex. 21 (Johnson Tr. II) 128:3-7 (emphasis added).) However, immediately preceding this statement, Ms. Johnson testified that TEK's business leaders have an obligation to understand the law, including a basic understanding of the FLSA and its requirements, and there is introductory training for new leaders and annual training for leaders; communications to leaders from HR, legal, and compliance partners when there are changes in the law; and HR is available to the leaders as a resource. (*Id.*, 124:16-128:2.)

20.    Johnson and her HR leadership team have weekly meetings with one of TEK's in-house lawyers; monthly meetings between the HR leadership team and the TEK's in-house legal team; monthly calls between the HR leadership team and a group responsible for operational risk and compliance; and an annual meeting to identify potential future risk items and how to respond to those risks and stay in compliance that includes the HR leadership team, TEK's legal team, TEK's Chief Financial Officer (CFO), the information security team, and the operational security team. (Johnson I, 198:15-21; Johnson II, 152:10-153-16.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 20:** Admitted that this reflects some of Ms. Johnson's testimony. By way of further answer, Ms. Johnson testified that she is not aware of

TEK ever examining Recruiters' job duties and whether they comply with the administrative exemption. Ex. 20 (Johnson Tr. I) 121:5-122:11; Ex. 21 (Johnson Tr. II) 96:24-97:12, 97:19-22, 98:2-100:1.

**TEK'S REPLY TO PARAGRAPH 20: Plaintiffs must be deemed as having admitted Paragraph 20. Plaintiffs' additional statement is inaccurate. Ms. Johnson testified she was not aware of any standalone examinations of audits of Recruiters' job duties. Ms. Johnson testified that analysis of the Recruiter and other roles for compliance with the exemptions is a continuous process based on understanding the Recruiter role and duties and the applicable law. (Pls. Ex. 21 (Johnson Tr. II) 312:2-7; TEK's Paragraphs 14-27.)**

21.    Johnson and her HR team have reclassified jobs from overtime exempt to non-exempt when warranted. (Johnson II, 153:18-154:24.) For example, one job was reclassified from exempt to non-exempt after it was identified through TEK's annual compensation analysis. (Id.) After investigating the duties of the role, the HR team determined that the job description should be changed and role reclassified to one that is non-exempt, with hourly and overtime pay. (Id.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 21:** Admitted that Ms. Johnson identified one job that TEK reclassified because it acquired a business. Ex. 21 (Johnson Tr. II) 153:18-154:24. By way of further answer, Ms. Johnson testified that she is not aware of TEK ever examining Recruiters' job duties and whether they comply with the administrative exemption. Ex. 20 (Johnson Tr. I) 121:5-122:11; Ex. 21 (Johnson Tr. II) 96:24-97:12, 97:19-22, 98:2-100:1.

**TEK'S REPLY TO PARAGRAPH 21: Plaintiffs must be deemed as having admitted Paragraph 21. Plaintiffs' additional statement is inaccurate. Ms. Johnson testified she was not aware of any _standalone_ examinations of audits of Recruiters' job duties. Ms. Johnson**

**testified that analysis of the Recruiter and other roles for compliance with the exemptions is a continuous process based on understanding the Recruiter role and duties and the applicable law. (Pls. Ex. 21 (Johnson Tr. II) 312:2-7; TEK's Paragraphs 14-27.)**

22.    Johnson is assisted by a Compliance group that is part of Allegis Group and reporting to its head counsel. (Johnson II, 128:8-18.) The Compliance group regularly looks for new or changing federal, state, and local law; shares that information with legal partners within TEK; and helps develop frameworks for compliance with those laws. (Johnson I, 36:10-37:6.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 22:** Admitted that there is a compliance group that is part of Allegis. By further explanation, Ms. Johnson testified that she "need[s] to rely" on business leaders to alert her regarding job duty changes that would affect the exemption status of employees. Ex. 20 (Johnson Tr. I) 198:8-199:10, 220:19-221:10; Ex. 21 (Johnson Tr. II) 124:11-125:6. However, TEK does not provide any training on the administrative exemption to business leaders. Ex. 21 (Johnson Tr. II) 128:3-7.

**TEK'S REPLY TO PARAGRAPH 22: Plaintiffs must be deemed as having admitted Paragraph 22. Ms. Johnson testified that she was "not aware of a current training that we provide them [business leaders] *specific to* the administrative exemption, no." (Pls. Ex. 21 (Johnson Tr. II) 128:3-7 (emphasis added).) However, immediately preceding this statement, Ms. Johnson testified that TEK's business leaders have an obligation to understand the law, including a basic understanding of the FLSA and its requirements, and there is introductory training for new leaders and annual training for leaders; communications to leaders from HR, legal, and compliance partners when there are changes in the law; and HR is available to the leaders as a resource. (*Id.*, 124:16-128:2.)**

23.     The Compliance group relies on multiple resources to perform its role, including partnering with law firms such as Seyfarth Shaw, Littler Mendelson, and Fisher Phillips; staffing industry sites such as American Staffing Association (ASA) and Staffing Industry Analysts (SIA); the Center for Workplace Compliance (CWC); LexisNexis; and newsletters and information directly from government agencies including the Department of Labor (DOL) and Office of Federal Compliance Programs (OFCCP). (Johnson II, 149:17-150:1.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH :** Admitted.

24.     TEK has its own internal legal group that is involved in providing advice on exemptions under wage and hour law. (Johnson II, 150:2-13.) The TEK internal legal group also consults with outside counsel on issues related to wage and hour law. (Id.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 24:** Admitted. By way of further explanation, TEK never examined whether this modification in job duties affected the exempt classification of Recruiters. Ex. 21 (Johnson Tr. II) 62:9-19, 64:17-66:24, 96:24-97:12, 97:19-22, 98:2-100:1; Ex. 20 (Johnson Tr. I) 121:5-122:11.

**TEK'S REPLY TO PARAGRAPH 24: Plaintiffs must be deemed as having admitted Paragraph 24. Plaintiffs' statement regarding examination of modification in job duties concerns the role of Sourcing Specialist and is unrelated to TEK's Paragraph 24 and immaterial to the motion.**

25.     TEK's business leaders are obligated to keep Johnson and others informed of changes to the Recruiter role, and which triggers Johnson to consider whether classification

changes may be necessary. (Johnson I, 198:8-199:10.) In particular, they have an obligation to understand the law and to raise to the attention of HR if there is any potential compliance concern that should be evaluated more closely. (Johnson II, 124:16-125:1, 127:9-128:2.) To assist the business leaders in this regard, they receive introductory training as new leaders and annual training thereafter. (Id., 125:19-126:4.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 25:** Admitted in part and denied in part. Admitted that this reflects some of Ms. Johnson's testimony. Denied that TEK provides business leaders with any training on the administrative exemption. Ex. 21 (Johnson Tr. II) 128:3-7. By way of further explanation, Ms. Johnson testified that she could not identify any modification to Recruiters' job description or TEK doing compliance review of Recruiters' job duties because of a change to the job description. Ex. 20 (Johnson Tr. I) 121:15-21; Ex. 21 (Johnson Tr. II) 57:19-58:15. TEK has never done an evaluation "of the administrative exemption as it relates to the Recruiter role at TEKsystems." Ex. 21 (Johnson Tr. II) 140:6-15, 158:23-159:4, 159:19-23, 160:6-10.

**TEK'S REPLY TO PARAGRAPH 25: Plaintiffs must be deemed as having admitted Paragraph 25. Ms. Johnson did not testify that the Recruiter job description had not been modified. Rather, testifying as a Rule 30(b)(6) witness, she explained that there had been changes to the Recruiter job description over time, and while she could not in the moment recall a specific time when she had reviewed proposed changes to the job description, any changes would have been reviewed by her or someone on her HR team, as well as someone from the legal department. (Pls. Ex. 21 (Johnson Tr. II) 57:19-58:15.) Also, Ms. Johnson did not testify that TEK had never evaluated whether Recruiters satisfy the administrative exemption. Rather, Ms. Johnson testified that the role was under constant evaluation by the**

**HR team, the compliance team, and the legal team, with input from the business leaders. (ECF No. 194 at 22-24 (Johnson I, 197:21-199:10); ECF No. 194 at 12-14, 18-19 (Johnson II, 123:7-125:1, 148:16-149:15).)**

26.     TEK evaluated Recruiter role changes in 2016 and 2020 to ensure the company was in compliance with announced changes the FLSA. (Johnson II, 155:2-15.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 26:** Denied. Ms. Johnson only testified that TEK evaluated whether the "*salary* threshold changes" prompted an evaluation on how TEK paid Recruiters and not that there was any examination regarding Recruiters' "role." Ex. 21 (Johnson Tr. II) 155:2-15 (emphasis added).

**TEK'S REPLY TO PARAGRAPH 26: Plaintiffs must be deemed as having admitted Paragraph 26. As Ms. Johnson testified, the Recruiter role was reviewed in 2016 and 2020 to ensure compliance with the FLSA. (ECF No. 194-2 at 25 (Johnson II, 155:2-15). That FLSA changes related to salary threshold changes, rather than a change in the duties test, does not contradict or undermine TEK's Paragraph 26.**

27.     Johnson is aware that other companies, which like TEK are aligned with Allegis Group, have faced lawsuits challenging whether the Recruiters they employ are properly classified as exempt, and that the exempt classification was upheld in those lawsuits. (Johnson II, 156:12-19.)

**PLAINTIFFS' RESPONSE TO PARAGRAPH 27:** Admitted that Ms. Johnson testified she was aware at "a high level" "whether other Allegis Group opcos whether there has been lawsuits against other Allegis Group opcos challenging the classification of recruiters as exempt."

Ex. 21 (Johnson Tr. II) 156:12-19. By way of further explanation, Ms. Johnson provided no testimony that these lawsuits weighed into TEKs' decision to classify Recruiters as exempt. Ms. Johnson also testified that she is not aware of how TEK's competitors classify their Recruiters or if there have been any settlements based on the classification of Recruiters. Ex. 20 (Johnson Tr. I) 222:8-15. Ms. Johnson also did not testify about Avery v. TEKsystems, Inc. No. 22 Civ. 02733, 2024 WL 4281442 (N.D. Cal. Sept. 23, 2024), summary judgment decision that TEK misclassified its Recruiters under California law or that TEK lost summary judgment that its Recruiters' primary job duty met the requirements of the administrative exemption in *Johannes v. Aerotek, Inc*. Ex. 7 (Johannes Summ. J. Order) at 25-44.

**TEK'S REPLY TO PARAGRAPH 27:** **Plaintiffs must be deemed as having admitted Paragraph 27. As Plaintiffs acknowledge, Ms. Johnson did testify that she was aware at "a high level" of other litigation against Allegis Group OpCos regarding the classification of their recruiters. Ms. Johnson also testified that she was aware that the OpCos had been successful in those litigation matters. (Pls. Ex. 21 (Johnson Tr. II) 156:12-19.)**

**Plaintiffs' assertion that Ms. Johnson did not testify about the summary judgment decision in *Avery v. TEKsystems, Inc.* is disingenuous. Ms. Johnson testified twice—first on February 23, 2024 then a second time on June 19, 2024 (ECF No. 194-1 (Johnson I, held February 23, 2024) and ECF No. 194-2 (Johnson II, held June 19, 2024))—months before the summary judgment decision in *Avery* was issued on September 23, 2024.**

**Plaintiffs' assertion that Ms. Johnson did not testify about Johannes v. Aerotek also is disingenuous. Plaintiffs took Ms. Johnson's deposition and did not ask her about the case. (Plaintiffs did ask Mr. Doyle about the case. See Plaintiffs' Ex. 13 (Doyle Tr.) 269:3-18.)**

Disputed that it is material to the Motion that a summary judgment order was issued in *Johannes* regarding defendants' motion concerning the primary job duties of recruiting employees. First, Plaintiffs mislead regarding the nature of the order. Defendants did not "lose" summary judgment. Rather, the motion was denied. (Plaintiffs' Ex. 7.) Second, the *Johannes* court also denied plaintiffs' motion for summary judgment on defendants' affirmative defense that the recruiting employees satisfied the administrative exemption. (Df. Ex. 61 (*Johannes* Order Denying Plaintiffs' Motion for Partial Summary Judgment).)

It is immaterial to TEK's Paragraph 27 whether Ms. Johnson was aware or not of how TEK's competitors classify their Recruiters. Plaintiffs made the same statement as additional fact Paragraph 56. TEK incorporates by reference here its Response to Plaintiffs' Paragraph 56.

### PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN OPPOSITION TO TEK'S MOTION FOR PARTIAL SUMMARY JUDGMENT (PARAGRAPHS 28-116)

I. **TEK Settled Litigation Regarding the Classification of Recruiters in 2002 and Reclassified Recruiters as Non-Exempt During the First Months of Employment but Made No Changes for the Remainder of Recruiters' Tenure.**

28. In 2002, TEK settled a case, *Johannes v. Aerotek, Inc.*, in which Recruiters challenged their exemption classification. ECF No. 194-4.

**TEK'S RESPONSE TO PARAGRAPH 28: Admitted in part. TEK was one of the settling defendants.**

Denied in order to clarify that in the instant litigation claims are asserted as to those in the singular job title "Recruiter," while the *Johannes* case was not limited to a single job title. (ECF No. 194-4, ¶ 1.2 (complaint filed on behalf of "recruiter employees"), ¶ 2.1

("California Class Member" includes "all recruiters employed in California from July 30, 1995 through May 14, 1999"); Pls. Ex. 7 (relief sought on behalf of "Recruiters" and "Technical Recruiters.").)

29.    Plaintiffs in that case alleged that a number of companies, including TEK, misclassified Recruiters as exempt under the FLSA and California law. *Id.* at 8.[1]

**TEK'S RESPONSE TO PARAGRAPH 29: Admitted that the *Johannes* plaintiffs alleged misclassification claims under the FLSA and California law against TEK.**

**Denied in order to clarify that in the instant litigation claims are asserted as to those in the singular job title "Recruiter," while the *Johannes* case was not limited to a single job title. (ECF No. 194-4, ¶ 1.2 (complaint filed on behalf of "recruiter employees"), ¶ 2.1 ("California Class Member" includes "all recruiters employed in California from July 30, 1995 through May 14, 1999"); Pls. Ex. 7 (relief sought on behalf of "Recruiters" and "Technical Recruiters.").)**

30.    The *Johannes* parties settled after the court certified a Rule 23 California class and FLSA collective of TEK Recruiters. *Id.*

**TEK'S RESPONSE TO PARAGRAPH 30: Admitted that the *Johannes* settlement was reached after the court certified a Rule 23 California class and FLSA collective.**

**Denied in order to clarify that in the instant litigation claims are asserted as to those in the singular job title "Recruiter," while the *Johannes* case was not limited to a single job title. (ECF No. 194-4, ¶ 1.2 (complaint filed on behalf of "recruiter employees"), ¶ 2.1**

---

[1] ECF citations are to the ECF-generated page numbers at the top of the documents.

("California Class Member" includes "all recruiters employed in California from July 30, 1995 through May 14, 1999"); Pls. Ex. 7 (relief sought on behalf of "Recruiters" and "Technical Recruiters.").)

31.    The *Johannes* court denied TEK's motion for summary judgment that its Recruiters' primary job duty met the requirements of the administrative exemption. Ex. 7 (Johannes Summ. J. Order) at 25-44.

**TEK'S RESPONSE TO PARAGRAPH 31:** **Admitted that Johannes court denied TEK's motion for summary judgment regarding the primary duty.**

**Denied in order to clarify that in the instant litigation claims are asserted as to those in the singular job title "Recruiter," while the *Johannes* case was not limited to a single job title. (ECF No. 194-4, ¶ 1.2 (complaint filed on behalf of "recruiter employees"), ¶ 2.1 ("California Class Member" includes "all recruiters employed in California from July 30, 1995 through May 14, 1999"); Pls. Ex. 7 (relief sought on behalf of "Recruiters" and "Technical Recruiters.").)**

32.    *Johannes* parties agreed their settlement would include recovery for two groups. "Pool #1" could recover for "up to" 13 weeks that Recruiters worked for a defendant, including TEK, ECF No. 194-4 at 15 ("The maximum 13 week period, which is a compromise reached by the parties is intended to compensate for eligible Settling Class Members for overtime they worked during their initial period of employment as a recruiter."). "Pool #2" included Recruiters who were employed as a Recruiter by defendants, including TEK, for more than six months. *Id.* at 16.

**TEK'S RESPONSE TO PARAGRAPH 32:** Admitted that the *Johannes* settlement included recovery for two groups as described.

Denied in order to clarify that in the instant litigation claims are asserted as to those in the singular job title "Recruiter," while the *Johannes* case was not limited to a single job title. (ECF No. 194-4, ¶ 1.2 (complaint filed on behalf of "recruiter employees"), ¶ 2.1 ("California Class Member" includes "all recruiters employed in California from July 30, 1995 through May 14, 1999"); Pls. Ex. 7 (relief sought on behalf of "Recruiters" and "Technical Recruiters.").)

33.    As part of the settlement, TEK carved out the Recruiters' initial employment period, created a "Recruiter Trainee" position, and classified that period as non-exempt. ECF No. 194-4 at 33-34.

**TEK'S RESPONSE TO PARAGRAPH 33:** Admitted that the *Johannes* settlement carved out the initial employment period, created a "Recruiter Trainee" position, and classified that period as non-exempt .

Denied in order to clarify that in the instant litigation claims are asserted as to those in the singular job title "Recruiter," while the *Johannes* case was not limited to a single job title. (ECF No. 194-4, ¶ 1.2 (complaint filed on behalf of "recruiter employees"), ¶ 2.1 ("California Class Member" includes "all recruiters employed in California from July 30, 1995 through May 14, 1999"); Pls. Ex. 7 (relief sought on behalf of "Recruiters" and "Technical Recruiters.").)

34.    Although TEK settled for Pool #2, it did not reclassify Recruiters after their initial "Recruiter Trainee" period. TEK, ECF No. 194-4 at 15.

**TEK'S RESPONSE TO PARAGRAPH 34: Admitted that TEK did not reclassify those in Pool #2 under the *Johannes* settlement.**

**Denied in order to clarify that in the instant litigation claims are asserted as to those in the singular job title "Recruiter," while the *Johannes* case was not limited to a single job title. (ECF No. 194-4, ¶ 1.2 (complaint filed on behalf of "recruiter employees"), ¶ 2.1 ("California Class Member" includes "all recruiters employed in California from July 30, 1995 through May 14, 1999"); Pls. Ex. 7 (relief sought on behalf of "Recruiters" and "Technical Recruiters.").)**

**II.    TEK Has Not Engaged in Any Analysis Regarding Whether Recruiters' Primary Job Duty Meets the Administrative Exemption Requirements.**

35.    TEK's Rule 30(b)(6) witness Faith Johnson, TEK's Human Resources Director, testified that she was not aware of any examination or audit of Recruiters' job duties and if those duties qualify for the administrative exemption. Ex. 20 (Johnson Tr. I) 121:5-122:11; Ex. 21 (Johnson Tr. II) 84:1-89:6, 96:24-97:12, 97:19-22, 98:2-100:1, 131:16-132:7.

**TEK'S RESPONSE TO PARAGRAPH 35: Admitted in part and denied in part.**

**Admitted that Ms. Johnson testified she was not aware of any standalone examinations of audits of Recruiters' job duties.**

**Denied that Recruiters' job duties and other aspects of the role were not analyzed to assess qualification for the administrative exemption. As Ms. Johnson testified, analysis of the Recruiter and other roles for compliance with the exemptions is a continuous process**

based on understanding the Recruiter role and duties and the applicable law. (Pls. Ex. 21 (Johnson Tr. II) 312:2-7; TEK's Paragraphs 14-27.) Furthermore, Plaintiffs' cited testimony is not relevant to an analysis of whether Recruiters satisfy the administrative exemption. For example, Plaintiffs point to questions asked of Ms. Johnson as a Rule 30(b)(6) witness that were not within the scope of the notice and are not relevant to classification of Recruiters as exempt, such as the number of calls Recruiters make that go unanswered, or the number of G2 calls that Recruiters make per week (Plaintiffs' Ex. 21 (Johnson Tr. II) 84:1-89:6); time studies and the number of hours worked by Recruiters each week (*id.*, 96:24-97:12, 97:19-22); 131:16-132:7).

36.    Although requested in discovery, TEK has provided no evidence that it ever engaged in any analysis of the correct classification of Recruiter Trainees or Recruiters. See Ex. 10 (Def.'s Resp. to Pls. 1st Requests for Production) Nos. 36, 39; Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 11.

**TEK'S RESPONSE TO PARAGRAPH 36: Denied.**

Plaintiffs' Ex. 10 (Def.'s Resp. to Pls. 1st Requests for Production) No. 36 sought information related to audits by government entities. TEK provided evidence of its analysis of the classification of Recruiters through the testimony of Ms. Johnson and others. See TEK's Paragraphs 14-27. In addition, testimony by Philip Eisman confirms that legal counsel was involved in decisions about the classification of Recruiters. See TEK's Response to Paragraph 40.

37.    TEK's Rule 30(b)(6) witness on its good faith defense could not answer when TEK first classified Recruiters as exempt from overtime or provide any evidence that it reconsidered the classification after the Johannes lawsuit. Ex. 21 (Johnson Tr. II) 79:19-82:13, 85:20-86:4.

**TEK'S RESPONSE TO PARAGRAPH 37: Denied as irrelevant.**

**Ms. Johnson testified that the Recruiter role has been classified as exempt since she began working at the company (Pls. Ex. 21 (Johnson Tr. II) 79:14-17), which was in 2004 (TEK's Paragraph 11). The date of first classification of the role is irrelevant to whether the classification is appropriate during the period at issue in this litigation.**

38.    TEK also did not reexamine Recruiters' classification after this case was filed, and there is no evidence TEK reexamined the classification after it lost summary judgment on the exemption in the Avery matter. Ex. 21 (Johnson Tr. II) 86:6-11.

**TEK'S RESPONSE TO PARAGRAPH 38: Denied. As Ms. Johnson testified, TEK engages in continuous review of its compliance with wage and hour laws, including classification of employees as exempt or non-exempt. See TEK's Facts 14-27. Furthermore, Plaintiffs' assertion that TEK did not re-examine the classification of Recruiters after the Avery court granted summary judgment is disingenuous. The cited testimony by Ms. Johnson was given on June 19, 2024 (Pls. Ex. 21 (Johnson Tr. II) at 1), months before the summary judgment decision in Avery was issued on September 23, 2024 (ECF No. 187 at 5).**

39.    In its Interrogatory responses, TEK identifies Philip Eisman, Garrett Haycock, and Ben Jackson, but not Faith Johnson, as the individuals who had responsibility for classifying Recruiters as exempt. Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 7.

**TEK'S RESPONSE TO PARAGRAPH 39:** Admitted.

40.    Mr. Eisman testified that he had no "training" on how to "administer" the administrative exemption, Ex. 15 (Eisman Tr.) 31:20-32:15, that he did not "look at" the exemption of Recruiters, id. 34:21-35:7, that he did not make any decisions regarding the exempt classification of Recruiters, id. 35:9-16, and that aside from discussing the financial impacts of classification decisions, he was not involved in the decision of whether to classify Recruiters as exempt. Id. 35:17-36:6, 38:2-39:5 ("Q: A statement that you were responsible for making exemption decisions for Recruiters would not be true; is that correct?" A: "Correct, no").

**TEK'S RESPONSE TO PARAGRAPH 40:** Admitted in part, denied in part.

Admitted that Mr. Eisman testified that he "didn't have any training specifically in how to administer" the administrative exemption.

However, Mr. Eisman testified that he was familiar with the administration exemption under the Fair Labor Standards Act and the tasks, duties, and compensation levels needed to satisfy it. (Pls. Ex. 15 (Eisman Tr.) 31:16-35:8.) Mr. Eisman was part of discussions regarding classification of Recruiters as exempt. (*Id.*, 35:20-36:6.) Mr. Eisman also testified that legal counsel were part of the classification decision. (*Id.*, 34:18-35:7.)

41.    Mr. Haycock testified that he delegated any decision regarding Recruiters' classification to Ms. Johnson. Ex. 18 (Haycock Tr.) 168:22-171:12.

**TEK'S RESPONSE TO PARAGRAPH 41:** Admitted. Answering further, Mr. Haycock explained the HR function reported to him in his role as an executive responsible for running Employee Experience. (Pls. Ex. 18 (Haycock Tr.) 169:5-14.)

42.     When asked to identify what should be considered in classifying Recruiters as exempt form overtime, Mr. Haycock could not answer substantively and only responded: "That would be expertise that I would leave to Faith [Johnson]." Ex. 18 (Haycock Tr.) 168:22-171:12.

**TEK'S RESPONSE TO PARAGRAPH 42: Admitted in part and denied in part. Admitted that Mr. Haycock in his executive role relied on Ms. Johnson for her expertise. Denied that Mr. Haycock did not "answer substantively." Mr. Haycock testified that "TEKsystems is constantly, and Faith [Johnson] was constantly, evaluating," he was briefed on those evaluations, and he played a part in that "[a]nytime we made any changes to recruiter comp or the way we went about that, we would have discussions. Andy the briefing would be Faith [Johnson] looking at the scenario, making sure that we were doing the right things and that we were properly classifying our employees." (Pls. Ex. 18 (Haycock Tr.) 170:13-171:4.)**

43.     Ms. Johnson testified it was Mr. Haycock's obligation, as a business leader, to keep her informed of any need to change the Recruiters' classification. Ex. 20 (Johnson Tr. I) 220:19-221:10.

**TEK'S RESPONSE TO PARAGRAPH 43: Admitted in part and denied in part. Admitted that Ms. Johnson testified that Mr. Haycock was one of the business leaders to keep her informed of changes to roles in his organization.**

**Denied insofar as the statement is incomplete. Ms. Johnson testified that for learning about changes to recruiting roles specifically, she received information shared by Mr.**

**Haycock, Mr. Doyle, and the rest of the leadership team. (Pls. Ex. 20 (Johnson Tr. I) 220:19-221:10.)**

44.     Ms. Johnson testified that she "[doesn't] know that the senior leadership team as a whole is looking at the performance metrics to identify individual job responsibilities of a recruiter or group of recruiters." Ex. 21 (Johnson Tr. II) 93:7-11.

**TEK'S RESPONSE TO PARAGRAPH 44: Admitted that Ms. Johnson gave the testimony cited, but denied in that it is misleading. Plaintiffs' counsel asked Ms. Johnson "what performance specifically of recruiters is senior leadership monitoring?" (Pls. Ex. 21 (Johnson Tr. II) 92:7-8.) Ms. Johnson explained that senior leadership looked at the recruiting function, not individual recruiters, and identified categories such as "open [requirements], filled opportunities, spread that's generated from those opportunities, how many opportunities go unfilled. So they're looking at that information as it relates to the overall performance of the organization." (*Id.*, 92:9-19.) Plaintiffs' counsel then asked Ms. Johnson how senior leadership's evaluation of this information "inform[ed] them about what job duties recruiters are actually engaged in," to which Ms. Johnson responded with the quote cited by Plaintiffs in Paragraph 44. (*Id.*, 92:20-93:11.) In other words, Ms. Johnson rejected Plaintiffs' counsel's assumption that this type of "monitoring" is related to Recruiter job duties.**

45.     Notably, TEK does not provide any training on the administrative exemption to business leaders. Ex. 21 (Johnson Tr. II) 128:3-7.

**TEK'S RESPONSE TO PARAGRAPH 45:** Denied. Ms. Johnson testified that she was "not aware of a current training that we provide them [business leaders] *specific to* the administrative exemption, no." (Pls. Ex. 21 (Johnson Tr. II) 128:3-7 (emphasis added).) However, immediately preceding this statement, Ms. Johnson testified that TEK's business leaders have an obligation to understand the law, including a basic understanding of the FLSA and its requirements, and there is introductory training for new leaders and annual training for leaders; communications to leaders from HR, legal, and compliance partners when there are changes in the law; and HR is available to the leaders as a resource. (*Id.*, 124:16-128:2.)

46.     Finally, Mr. Eisman testified that Ben Jackson, the third person TEK identified in its Interrogatory responses as having responsibility over the classification of Recruiters, also did not engage in such duties. Ex. 15 (Eisman Tr.) 36:10-38:1, 39:6-39:17.

**TEK'S RESPONSE TO PARAGRAPH 46:** Admitted in part and disputed in part. Admitted that Mr. Eisman testified that, to his knowledge, Ben Jackson was not involved in classification decisions related to Recruiters (Pls. Ex. 15 (Eisman Tr.) 36:7-38:1.) However, Mr. Eisman testified that Mr. Jackson did not report to him during the time at issue, and Mr. Eisman's testimony was to the best of his knowledge. (*Id.*)

47.     In TEK's brief it identifies Ms. Johnson, as the ultimate decision maker with respect to ensuring the Recruiters are properly classified. ECF No. 192 at 5. However, Ms. Johnson equivocated on whether this was true and stated that she merely has "a role" in the classification decision. Ex. 20 (Johnson Tr. I) 74:20-75:12. Ms. Johnson also testified that she is "partially"

responsible. Ex. 21 (Johnson Tr. II) 123:7-124:6. Ms. Johnson further testified that the decision to classify Recruiters at TEK as exempt is made by Allegis, TEK's parent company. Ex. 20 (Johnson Tr. I) 38:16-20.

**TEK'S RESPONSE TO PARAGRAPH 47: Disputed in part and undisputed in part.**

**Undisputed that Ms. Johnson, as the ultimate decision maker with respect to ensuring the Recruiters are properly classified.**

**Disputed that Ms. Johnson "equivocated" on this point. Ms. Johnson was asked directly: "I believe you testified earlier that the ultimate responsibility for classification of recruiters falls to you. Is that fair?," to which she responded "That's fair." (Pls. Ex. 20 (Johnson I Tr.) 197:21-198:3.) Ms. Johnson went on to explain how she works with others to ensure compliance with wage and hour exemptions at TEK, including the HR team, a compliance team, the legal team, and people responsible for TEK's business. See TEK's Paragraph 14. None of this is inconsistent with Ms. Johnson having ultimate responsibility to ensure appropriate classification decisions.**

48.    Ms. Johnson testified she has taken no steps to ensure Recruiters' job duties properly fall under the administrative exemption: (1) she does not supervise them, Ex. 20 (Johnson Tr. I) 42:7-10; and (2) she has not participated in any evaluation of Recruiters' job duties, nor is she aware of TEK ever doing so, Ex. 20 (Johnson Tr. I) 42:15-20, 122:1-11. Ex. 21 (Johnson Tr. II) 41:20-43:3 ("The duties aspect of [the administrative exemption] is not reviewed").

**TEK'S RESPONSE TO PARAGRAPH   48: Admitted in part and disputed in part.**

**Admitted that Ms. Johnson does not supervise any Recruiters. (Ex. 20 (Johnson Tr. I) 42:7-10.)**

**Disputed that one must supervise a role in order to ensure the role is properly classified. Ms. Johnson is well informed of the Recruiter role and duties. See TEK Paragraph 17. Disputed that Ms. Johnson has not evaluated Recruiters' jobs duties. As Ms. Johnson testified, TEK engages in continuous review of its compliance with wage and hour laws, including classification of employees as exempt or non-exempt. See TEK's Facts 14-27.**

49.      Ms. Johnson does not know: (1) which systems Recruiters use to perform their job duties, Ex. 20 (Johnson Tr. I) 208:4-6; (2) how many phone calls and emails Recruiters make to potential consultants, Ex. 20 (Johnson Tr. I) 209:6-9, Ex. 21 (Johnson Tr. II) 82:14-16; (3) how many G2 Intakes Recruiters complete for each requisition they work on, Ex. 21 (Johnson Tr. II) 84:9-13; (4) where Recruiters find candidates to fulfill the requisitions they are working on, Ex. 21 (Johnson Tr. II) 103:2-13; or (5) how Recruiters rely on requisitions when conducting candidate screenings, Ex. 21 (Johnson Tr. II) 105:13-16.

**<u>TEK'S RESPONSE TO PARAGRAPH 49:</u> Admitted in part and disputed in part.**

**Admitted that Ms. Johnson does not know how many phone calls and emails Recruiters make to potential consultants, or how many G2s Recruiters conduct. (Pls. Ex. 20 (Johnson Tr. I) 209:6-9; Pls. Ex. 21 (Johnson Tr. II) 82:14-16, 84:9-13.) Disputed that these "facts" have a uniform answer and disputed that the fact is material to the Motion.**

**Disputed that Ms. Johnson does not know "which systems Recruiters use to perform their job duties." The cited testimony by Ms. Johnson in fact says "I couldn't tell you every single pencil that they pick up or system that they enter into. But I don't think that takes away from me being able to tell you exactly or to a very good degree what role they're playing in our organization and in support of our business." (Pls. Ex. 20 (Johnson Tr. I) 208:4-9.)**

Disputed that these "facts" have a uniform answer and disputed that the fact is material to the Motion.

Disputed that Ms. Johnson does not know where Recruiters find candidates. The cited testimony by Ms. Johnson in fact says "whereas I may not be able to tell you every individual place they [Recruiters] go to find candidates, I can certainly speak on behalf of the company at a high level what their responsibilities are, and have sat through enough trainings and national meetings and strategy discussions and global calls to understand what they are responsible for and how they do their jobs and how they contribute to the organization." (Pls. Ex. 21 (Johnson Tr. II) 103:2-13.) Disputed that these "facts" have a uniform answer and disputed that the fact is material to the Motion.

Disputed that Ms. Johnson does not know "how Recruiters rely on requisitions when conducting candidate screenings." The question to Ms. Johnson was in fact "Do you have any information about *how much* recruiters rely on the requisitions when they're doing their screenings?," to which she answered "I do not." (Pls. Ex. 21 (Johnson Tr. II) 105:13-16.) Disputed that these "facts" have a uniform answer and disputed that the fact is material to the Motion.

50.    In 2020, TEK considered reclassifying its California Recruiters as non-exempt. Ex. 92 (Pichler Dec. 11, 2020 Email) at TEK-Recruiter_Lit-00503234-36.[2]

---

[2]    The communication regarding potentially reclassifying California Recruiters in 2020, demonstrated that driving reason for TEK's potential reclassification of California Recruiters was to save money. Ex. 92 (Pichler Dec. 11, 2020 Email) at TEK-Recruiter_Lit-00503235 ("paying a new [Recruiter] with no experience $60,000 in Sacramento (for example) [to meet the salary threshold under California law] makes no sense and that long term, [TEK will] need to adjust our compensation and delivery models to account for this."). Absent from the analysis was any discussion of job duties.

**TEK'S RESPONSE TO PARAGRAPH 50:** **Disputed. Plaintiffs' Ex. 92 is an unauthenticated document and there is no testimony about the context or meaning of the document. The document may also be read to suggest that TEK evaluated whether it was necessary to increase pay for Recruiters and others in order to satisfy California state law requirements. Disputed that it is relevant that this particular document does not include any discussion of job duties, since there is no evidence that the job duties test under California law had changed, as was the case with the salary level requirement. Disputed also that these "facts" are material to the Motion, since they appear to concern classification decisions made under California state law, which is not at issue in this case.**

51.    Ms. Johnson testified that she had no knowledge of the reclassification consideration, Ex. 20 (Johnson Tr. I) 71:10-16, even though TEK purports that Ms. Johnson is the decision maker with respect to Recruiter classification.

**TEK'S RESPONSE TO PARAGRAPH 51:** **Disputed. Plaintiffs' contention that there was a "reclassification consideration" is based on their speculated meaning of the document referenced in Paragraph 50. See TEK's Response to Paragraph 50. Plaintiffs did not show Ms. Johnson the document referenced in Paragraph 50 or any other materials in connection with their questions about purported "reclassification consideration." (Pls. Ex. 20 (Johnson Tr. I) 71:10-72:12.)**

52.    Ms. Johnson also testified that she does not know why Recruiter Trainees are classified as non-exempt. Ex. 20 (Johnson Tr. I) 97:6-10; Ex. 21 (Johnson Tr. II) 81:20-24.

**TEK'S RESPONSE TO PARAGRAPH 52:** **Disputed as immaterial. No justification is necessary to classify a role as non-exempt since that is the default rule, and the Recruiter Trainee classification is not at issue in this litigation.**

53.     Further, Ms. Johnson testified that the decision to classify Recruiter Trainees as non-exempt was not based on any evaluation of their job duties. Ex. 21 (Johnson Tr. II) 153:18-154:24.

**TEK'S RESPONSE TO PARAGRAPH 53:** **Disputed as immaterial. No justification is necessary to classify a role as non-exempt since that is the default rule, and the Recruiter Trainee classification is not at issue in this litigation.**

54.     Ms. Johnson asserted several changes occurred with respect to the Recruiter role, including: (1) TEK discontinued its "sourcing specialist" role, which was classified as non-exempt, and Recruiters took over the sourcing specialists' job duties, Ex. 21 (Johnson Tr. II) 66:1-24, 67:8-68:3, 62:9-19; (2) TEK stopped requiring a college degree for Recruiters, Ex. 20 (Johnson Tr. I) 84:18-85:4; Ex. 93 (Johnson March 13, 2018 Email) TEK-Recruiter_Lit-00065694-95; (3) TEK changed its organization structure, Ex. 20 (Johnson Tr. I) 217:10-218:9, Ex. 21 (Johnson Tr. II) 44:9-14, 61:7-13; (4) TEK changed the career progression for Recruiters from where entry-level Recruiters were promoted into sales to entry-level Recruiter being promoted into "leadership" or "management" roles in recruiting, Ex. 20 (Johnson Tr. I) 66:16-67:18; and (5) TEK was aware of widespread negative feelings among Recruiters, particularly regarding compensation, Ex. 20 (Johnson Tr. I) 159:13-161:15; Ex. 94 (Webb Sept. 6, 2019 Email) TEK-Recruiter_Lit-00601367.

**<u>TEK'S RESPONSE TO PARAGRAPH 54:</u> Admitted in part and disputed in part.**

**Admitted that TEK discontinued the sourcing specialist role. (Pls. Ex. 21 (Johnson Tr. II) 66:1-24, 67:8-68:3, 62:9-19.) Disputed that Recruiters took over the sourcing specialists' job duties. Ms. Johnson testified that Recruiters were "able to get their own volume of candidates that they needed within their role," so the sourcing specialist role was unnecessary. (*Id.*, 66:2-10.) Ms. Johnson did not testify that this changed the Recruiter role. (*Id.*)**

**Admitted that TEK did not require a college degree of Recruiters. (Pls. Ex. 20 (Johnson Tr. I) 84:18-85:4.) Disputed that this is material to the job duties of Recruiters.**

**Admitted that TEK has changed its organization structure over the time period covered by the litigation. (Pls. Ex. 20 (Johnson Tr. I) 217:10-218:9.)**

**Admitted that TEK has introduced additional career progression options for Recruiters over the time period covered by the litigation. (Pls. Ex. 20 (Johnson Tr. I) 66:16-67:18.) Disputed that Recruiters at any time were required to "progress" into sales, or that Recruiters now must move into a sales role or a "leadership" or "management" role in recruiting. (See, e.g., Df. Ex. 36 (Marshal Decl.) ¶¶ 23-24 (Marshall became a Recruiter Lead, then went back to being a Recruiter to focus on those responsibilities); Df. Ex. 12 (resume of opt-in plaintiff Suliman), P003681-P003686 (reflects working at TEK as a Recruiter, then as Account Manager, then Recruiter again).**

**Disputed that "TEK was aware of widespread negative feelings among Recruiters, particularly regarding compensation." The cited document combines data from the United States and Canada, and for employees in Recruiting and Sales. (Pls. Ex. 94 (Webb Sept. 6,**

**2019 Email) TEK-Recruiter_Lit-00601367.) Disputed also that this information is material to the Motion.**

55.    Ms. Johnson testified only that she was aware at "a high level" that "other Allegis Group opcos" faced litigation over the classifications of their recruiters. Ex. 21 (Johnson Tr. II) 156:12-19, 135:4-12, 156:12-19.

**TEK'S RESPONSE TO PARAGRAPH 55: Admitted in part. Ms. Johnson did testify that she was aware at "a high level" of other litigation against Allegis Group OpCos regarding the classification of their recruiters. Ms. Johnson also testified that she was aware that the OpCos had been successful in those litigation matters. (Pls. Ex. 21 (Johnson Tr. II) 156:12-19.)**

56.    Ms. Johnson also testified that she is not aware of how TEK's competitors classify their Recruiters or if there have been any settlements based on the classification of Recruiters. Ex. 20 (Johnson Tr. I) 222:8-15.

**TEK'S RESPONSE TO PARAGRAPH 56: Admitted, but disputed that this is material to the Motion.**

57.    TEK offers no evidence it ever engaged in any analysis regarding the similarities in the Recruiter Trainee and Recruiter roles; nor did it provide any evidence that it ever engaged in any analysis at all about legality of its exempt classification of Recruiters. Ex. 21 (Johnson Tr. II) 140:6-15 (TEK has never done an evaluation "of the administrative exemption as it relates to the Recruiter role at TEKsystems.").

**TEK'S RESPONSE TO PARAGRAPH 57:** **Disputed. Disputed as immaterial that TEK did not compare the Recruiter Trainee and Recruiter roles. No justification is necessary to classify the Recruiter Trainee role as non-exempt since that is the default rule, and the Recruiter Trainee classification is not at issue in this litigation.**

> **Disputed that TEK never did an evaluation of the Recruiter role classification. As Ms. Johnson testified, the role was under constant evaluation by the HR team, the compliance team, and the legal team, with input from the business leaders. See TEK Paragraph 14.**

58.    TEK's own witnesses and documents describe Recruiters as an "entry-level" position. Ex. 59 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318 ("At an entry level role, there are certain competencies that are more likely correlated to performance than others."); Ex. 18 (Haycock Tr.) 95:21-23 (TEK hires recruiters directly out of college), 115:16-21; Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6 ("TEKsystems makes a substantial investment upfront in hiring, training, coaching, and development of individuals that have no recruitment experience."); Ex. 23 (Lis Tr.) 33:22-34:10; Ex. 26 (Pappas Tr.) 91:3-9; Ex. 60 (Tabor Email July 31, 2018) at TEK-Recruiter_Lit-00405538 ("53% of our hires are new grads."), TEK-Recruiter_Lit-00405542 at 7 (474 of Recruiters are new graduates, 75 had six months to one year of experience, and 110 of Recruiters had 1-2 years of experience. Therefore, approximately 74% of the 892 Recruiters have less than two years of experience); Ex. 61 (Entry Level/Experienced Hire) TEK-Recruiter_Lit-00385738; Ex. 62 (Maltese Email Feb. 19, 2018) TEK-Recruiter_Lit-00616402; Ex. 63 (Maltese Email July 12, 2021) TEK-Recruiter_Lit-00586352.

**TEK'S RESPONSE TO PARAGRAPH 58:**

Disputed. Haycock did not refer to the "Recruiter" role as an "entry-level" position. Haycock testified that TEK sometimes hires recruiters out of college, though he did not know what percentage those hires represent. (Pls. Ex. 18 (Haycock Tr.) 95:21-96:2.) The question was about "recruiters" generally, and not the specific Recruiter job title at issue in this litigation. (*Id.*) As Haycock testified, the entry recruiting job at TEK is Recruiter Trainee, not Recruiter, and a Recruiter Trainee cannot move out of their trainee period until they have shown the capability to be a Recruiter. (*Id.*, 104:14-115:6.)

Lis did not refer to the "Recruiter" role as an "entry-level" position. Lis testified to the qualities that he looks for when hiring. (Pls. Ex. 23 (Lis Tr.) 33:22-34:10.) The question was about "recruiters" generally, and not the specific Recruiter job title at issue in this litigation. (*Id.*)

Pappas did not refer to the "Recruiter" role as an "entry-level" position. Pappas testified to looking for candidates with five years of experience or less. (Pls. Ex. 26 (Pappas Tr.) 91:3-9.) Neither the cited question nor response identifies what role(s) is being discussed. (*Id.*)

The *Andiamo* testimony does not refer to the "Recruiter" role as an "entry-level" position. The cited passage says merely that TEK invests in "hiring, training, coaching and development of individuals that have no recruitment experience," but does not even specify what role or roles this investment may pertain to. (Pls. Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.) at 192:24-193:6.)

Plaintiffs' Ex. 33 is an unauthenticated and ambiguous document that does not expressly refer to the "Recruiter" role as an "entry-level" position. (Pls. Ex. 59 (Recruiter Interview Guide Job Aid) at TEK-Recruiter_Lit-00020318.)

Plaintiffs' Ex. 60 (Tabor Email July 31, 2018) is an unauthenticated email that does not refer to the "Recruiter" role as an "entry-level" position. The document does state "53% of our hires are new grads." TEK-Recruiter_Lit-00405538. However, the same document also indicates that more than one-quarter had 3 or more years of professional or military experience, in professions such as Recruiter / Talent Acquisition, Human Resources, Management, Sales / Account Manager / Business Development, or other fields. TEK-Recruiter_Lit-00405542. Plaintiffs are also incorrect when they interpret this email to mean "approximately 74% of the 892 Recruiters have less than two years of experience." The population in question is "new hires," not a broader group including all "Recruiters." In addition, the data includes people hired to work in countries other than the United States. See, e.g., ECF No. 199-60 at Pages 37, 74, 82, 83, 113 (showing people hired to work at office locations in Ottawa, Ontario, Canada); at Pages 29, 33, 38, 39, 41, 53, 55, 82, 91, 97, 101, 102, 104, 105, 108 (showing people hired to work at office locations in Vancouver, British Columbia, Canada); at Pages 18, 21, 24, 40, 47, 63, 67, 94, 99, 108, 114, 117, 121 (showing people hired to work at office locations in Toronto, Ontario, Canada).

Plaintiffs' Ex. 61 (Entry Level/Experienced Hire) is immaterial, as it is dated May 2, 2017 and purports to include data from the preceding four months (outside the relevant time period), includes data related to hiring in both Canada and the United States (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other role or collection of roles.

Plaintiffs' Ex. 62 (Maltese Email Feb. 19, 2018) is immaterial, as it is an unauthenticated and apparently unsent draft email, that purports to include data about

"West Coast Hiring" (outside the relevant geographic scope), and nowhere indicates that the data is about Recruiters as opposed to some other role or collection of roles.

Plaintiffs' Ex. 63 (Maltese Email July 12, 2021) contradicts their statement, as the document nowhere refers to "Recruiter" as an "entry-level" position. The cited portion explicitly states that people are hired with experience: "At TEKsystems, we aim to find candidates who have demonstrated success in a variety of areas – including a traditional 4-year degree, community college, *the military or 3-4 years in a professional career*." (Emphasis added.)

59.     Mr. Haycock admitted that TEK employs multiple layers of supervisors for Recruiters. Ex. 18 (Haycock Tr.) 65:14-18.

**TEK'S RESPONSE TO PARAGRAPH 59: Disputed. The cited Haycock testimony says only that TEK's Directors of Business Operations report to Regional Vice Presidents. (Pls. Recruiters. Ex. 18 (Haycock Tr.) 65:14-18.) The testimony says nothing about supervision of Recruiters.**

60.     Mr. Haycock admitted that TEK monitors Recruiters' performance through weekly reports to their quota attainment and performance metrics. Ex. 18 (Haycock Tr.) 158:2-14; Ex. 132 (Doyle Apr. 27, 2022 Email) TEK-Recruiter_Lit-00081069-TEK-Recruiter_Lit-00081071.

**TEK'S RESPONSE TO PARAGRAPH 60: Disputed.**

**The word "quota" does not appear in any of the citations provided by Plaintiffs.**

**Haycock testified that a WIN report is "a weekly report that a recruiter gets that gives them an understanding of what happened the week before and how that – how they**

rank against others in the same kinds of activities." (Pls. Ex. 18 (Haycock Tr.) 158:2-14.) The testimony does not mention anyone else receiving WIN reports, and the word "quota" does not appear. (*Id.*)

Plaintiffs' Ex. 132 is an email and draft attachment sent by Doyle to Haycock and others. (Pls. Ex. 132 (Haycock Ex. 16) TEK-Recruiter_Lit-00081069-71.) This document also does not include any reference to "quotas."

61.    Recruiter Trainees engage in the same job duties as Recruiters. Ex. 91 (2016 Recruiter and Account Manager Compensation Changes) TEK-Recruiter_Lit-00386481 at 19 ("Here's a very key point – We are not hiring people to be hourly trainees – we are hiring $50K Recruiters with commission upside – who just happen to have to work through a trainee period, learn the fundamentals of the job, show success as you'll see, to transition to that comp level. And, in the meantime during that trainee period, they will be paid on an hourly basis."); Ex. 13 (Doyle Tr.) 210:5-15; Ex. 18 (Haycock Tr.) 104:14-16; Ex. 28 (Burke Tr.) 49:6-10; Ex. 29 (Conyers-Jordan Tr.) 18:5-16; Ex. 32 (Clavet Dec.) ¶ 8; Ex. 33 (Coles Dec.) ¶ 8; Ex. 35 (Dries-Wielandt Dec.) ¶ 8; Ex. 36 (Gahard Dec.) ¶ 7; Ex. 37 (Holin Dec.) ¶ 8; Ex. 38 (Martin Dec.) ¶ 7; Ex. 39 (Miller Dec.) ¶ 7; Ex. 40 (Olszewski Dec.) ¶ 7; Ex. 41 (Seaward Dec.) ¶ 8; Ex. 43 (Strauchen Dec.) ¶ 7; Ex. 42 (Stein Dec.) ¶ 8; Ex. 44 (Walker Dec.) ¶ 7; Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3; Ex. 89 (2020 New Recruiter Compensation Talking Points) TEK-Recruiter_Lit-00059836; Ex. 90 (2019 New Recruiter Compensation Talking Points) at TEK-Recruiter_Lit-00103684; Ex. 45 (Tampa Direct Sales Hire) at TEK-Recruiter_Lit-00253493-94.

**TEK'S RESPONSE TO PARAGRAPH 61: Disputed.**

Plaintiffs' citations do not support their statement. Plaintiffs' Ex. 91 is an unauthenticated document dated 2016, which is before the period covered by this litigation. (Pls. Ex. 91 (2016 Recruiter and Account Manager Compensation Changes) TEK-Recruiter_Lit-00386481 at 19.) No testimony is offered to explain the document, and the single excerpt highlighted by Plaintiffs does not say anything about the job duties of Recruiter Trainees or Recruiters, much less say that same. (Id. at 19.) To the contrary, the same page shows that multiple benchmarks must be achieved before a new hire may become a salaried employee. (*Id.*) A fair interpretation of the cited text is that TEK hires individuals with the expectation that they will successfully complete the steps to become Recruiters, not that they will from the outset perform the job duties of a Recruiter.

The cited testimony by Mr. Doyle does not support the position either. (Pls. Ex. 13 (Doyle Tr.) 210:5-15.) Mr. Doyle testifies that after a couple of months of training, Recruiter Trainees "start actually doing the job duty of a recruiter, building up that momentum so when they convert, they're already kind of doing the job." (*Id.*) The testimony does not state that Recruiter Trainees are performing the same job duties as a salaried Recruiter. (*Id.*) Nor does the testimony state that any job duties performed by Recruiter Trainees are performed in the same ways as performed by Recruiters. (*Id.*) Similarly, the cited testimony by Mr. Haycock states only that everyone is hired as a Recruiter Trainee, rather than as a Recruiter. (Pls. Ex. 3 (Haycock Tr.) 104:14-16.) The passage says nothing about job duties in either role.

Plaintiffs' self-serving and boilerplate declarations do not provide details to support that Recruiter Trainees perform the same job duties as Recruiters and in the same fashion. (Pls. Ex. 28-29, 32-33, 45-44.)

Plaintiffs' Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3 states only that "Employees remain in the position of Recruiter Trainee until they have completed all required training and also demonstrated the ability to perform the job duties of Recruiter." It does not suggest that Recruiter Trainees perform the same job duties as Recruiters and in the same fashion throughout their training period. (*Id.*)

Plaintiffs' Ex. 89 (2020 New Recruiter Compensation Talking Points) TEK-Recruiter_Lit-00059836 is an unauthenticated document that again states only that Recruiter Trainees must demonstrate the ability to perform the job duties of Recruiter before promotion to the salaried role. It does not suggest that Recruiter Trainees perform the same job duties as Recruiters and in the same fashion throughout their training period. (*Id.*) Similarly, Plaintiffs' Ex. 90 (2019 New Recruiter Compensation Talking Points) at TEK-Recruiter_Lit-00103684 is an unauthenticated document that states that a Recruiter Trainee must complete a 13 week training program – and that training program may be extended – before being moved into the Recruiter role. It says nothing about the job duties of either role. (*Id.*) Finally, Plaintiffs' Ex. 45 (Tampa Direct Sales Hire) at TEK-Recruiter_Lit-00253493-94 is an unauthenticated document that relates to hiring for a different role, in Sales, of Account Manager. The document mentions Recruiter Trainees but does not say anything about their job duties, or the job duties of Recruiters. (*Id.*)

### A.    Recruiters Are Production Employees and Not Administrative Employees.

62.    TEK is an IT staffing company. Ex. 18 (Haycock Tr.) 25:6-26:6; Ex. 1 (*Andiamo* Complaint) at ¶ 2; Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.) at 8; Ex. 3 (*Andiamo* Preliminary Injunction) at 1, 4; Ex. 4 (*Andiamo* Aff. of Alexander Pulido) at ¶¶ 5, 7; Ex. 5 (*Ambar* Complaint) at ¶¶ 2, 13;

Ex. 6 (*Berardis* Complaint) ¶¶ 2, 13-15; ECF No. 190-1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3 ("Defendant is in the staffing business") ECF No. 190-39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 47 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting workforce on the planet").

**TEK'S RESPONSE TO PARAGRAPH 62: Disputed in part. In the cited testimony, Haycock does not accept Plaintiffs' counsel's characterization that TEK "provides IT staffing services." (Pls. Ex. 18, Haycock Tr. 25:6-10.) Haycock explained that TEK is a talent services company, and its business includes staff augmentation, i.e., placing workers with specific skills on assignment at customer companies to perform needed services for a certain period of time; capacity solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 7, Haycock Dep. 25:22-34:18, 73:16-77:7.)**

**The cited documents testimony in Plaintiffs' Ex. 1 (*Andiamo* Complaint) at ¶ 2, Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.), Ex. 3 (*Andiamo* Preliminary Injunction) at 1, 4; Ex. 4 (*Andiamo* Aff. of Alexander Pulido) at ¶¶ 5, 7, Ex. 5 (*Ambar* Complaint) at ¶¶ 2, 13; and Ex. 6 (*Berardis* Complaint) ¶¶ 2, 13-15; identify one way that other companies are competitors to TEK but do not purport to explain all of TEK's lines of business. Likewise, ECF No. 190-1 (Def.'s Resp. to Pls. 1st Interrogatories) No. 3 acknowledges that is in the staffing business but does not purport to explain all of TEK's lines of business.**

**Plaintiffs' citation to ECF No. 190-39 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846 states that that TEK is "the leading IT staffing and services company in North America," which is not as limited as Plaintiffs' Paragraph 62. The same**

document explains that "TEKsystems' role in this growth [increased business spending on technology such as "software, devices, services, etc."] is to provide talent and services to plan, build and run this emerging technology." (*Id.*)

Plaintiffs' Ex. 47 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting workforce on the planet") is an unauthenticated document and it is unrelated to the statement in Plaintiffs' Paragraph 62.

63.    TEK's principal business purpose is to recruit IT workers to work for third-party companies. *Id.*; Ex. 18 (Haycock Tr.) 60:2-6; Ex. 12 (DiBenedetto Tr.) 134:5-13; Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.) 24:14-25:5, 153:13-23; Ex. 47 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5.

**TEK'S RESPONSE TO PARAGRAPH 63:** **Disputed**. **As noted elsewhere, TEK's business includes staff augmentation, i.e., placing workers with specific skills on assignment at customer companies to perform needed services for a certain period of time; capacity solutions, i.e., assembling entire teams for large or specialized projects; and total management services, i.e., outsourcing and managing an entire IT function or outcome for a customer. (Df. Ex. 7, Haycock Dep. 25:22-34:18, 73:16-77:7.)**

**TEK is not paid by its customers to "recruit IT workers." Thus, recruitment cannot be TEK's "principal business purpose," since it is not on its own revenue generating. Rather, TEK is paid by its customers for the services that TEK's consultants perform. In most arrangements, TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 13 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 8, Doyle Tr. 193:15-194:16.)**

Separately, a Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit for TEK, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 58, T. Raras Tr. 41:14-42:19.)

Further, TEK does not merely to "recruit" people to work for third-party companies. TEK's employees assist TEK's customers to define the requirements for roles the customers wants to fill; identify and develop sources of potential candidates to fill those roles; evaluate candidates' qualifications against the role requirements; negotiate pay rates and other conditions of employment with candidates; submit the best qualified candidates to customers for consideration; and employ and manage consultants who are on assignment. (Df. Ex. 7, Haycock Dep. 27:14-30:2; Df. Ex. 13, 14, 15, and 16 (compiling testimony regarding requisition intake, sourcing strategy, negotiation, and managing consultants on assignment).

In addition, the citations offered by Plaintiffs do not support their assertion. The Haycock testimony states that TEK makes money when it makes a direct placement of a candidate to, or engages a contractor to perform work, at a third-party company. (See Pl. Ex. 18, 60:2-6.) The DiBendetto testimony states that TEK Recruiters "[w]ork on the placement of IT consultants." (See Pl. Ex. 12, 134:5-13.) The Pulido testimony describes how TEK generates fees from staffing engagements and direct placements. (See Pl. Ex. 2, 24:14-25.) The Q2 Talent Delivery Call is a single page from a PowerPoint presentation

**that states TEK's "goal is to become the most dominant recruiting workforce on the planet." (See Pl. Ex. 47, 5.)**

64.    TEK has two primary client bases: customers who need staffing help and candidates/consultants whom TEK places with customers. Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.) 23:22-24:3 ("we technically have two client bases. We have – we have our customers, those would be companies . . . Then we have our consultants"), 24:14-25:5, 153:13-23; Ex. 18 (Haycock Tr.) 60:2-6; Ex. 12 (DiBenedetto Tr.) 134:5-13; Ex. 1 (*Andiamo* Compl.) at ¶ 2; Ex. 47 (Q2 Talent Delivery Call) TEK-Recruiter_Lit-00391866 at 5 ("Our goal is to become the most dominant recruiting workforce on the planet").

**<u>TEK'S RESPONSE TO PARAGRAPH 64:</u> Disputed in part. Undisputed that part of the cited *Andiamo* testimony identifies the "two client bases." (Pls. Ex. 2 at 23:22-24:3.)**

**Disputed insofar as it suggests that both "client bases" pay fees to TEK; the *Andiamo* testimony states that fees are paid by TEK customers who seek TEK's help with staffing engagements and direct placements. (*Id*. at 24:14-25:5.) Haycock also testified that consultants do not pay for TEK's services. (Df. Ex. 7, Haycock Dep. at 43:14-44:5.) Also disputed that Plaintiffs' remaining citations support the statement, as none of them say anything about "client bases." (*See* Pls. Ex. 1, 12 and 47.)**

65.    TEK competes with other recruiting firms to place candidates and ultimately is only successful at placing less than one-third of the candidates it submits to third-party companies. Ex. 12 (DiBenedetto Tr.) 96:2-6 (part of the customer service goal with potential job candidates is to get them to utilize TEK over its competitors); Ex. 13 (Doyle Tr.) 199:18-200:2; Ex. 14 (Doyle

Sealed Tr. Portion) 237:20-238:9 (only 31.8% of the job requirements that TEK works to fill get filled by TEK); Ex. 18 (Haycock Tr.) 44:22-45:4 ("There's always a war for talent."), 48:1-8 ("[T]here are many, many, many competitors out there"), 48:10-49:12; Ex. 24 ( McNelley Tr.) 38:17-39:3, 40:23-41:13, 58:20-59:11; Ex. 16 (Estimada Tr.) 86:16-21, 88:2-6, 89:14-21, 92:18-25; Ex. 17 (Fronzaglio Tr.) 97:8-17; Ex. 19 (Hollister Tr.) 36:16-37:16, 86:10-87:6; Ex. 25 (Minniear Tr.) 54:22-55:9, 92:15-18; Ex. 26 (Pappas Tr.) 130:24-131:20; Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.) 181:12-17; Ex. 82 (Haycock Email Oct. 26, 2020) at TEK-Recruiter_Lit-00386105 (discussing "reduc[ing] 'finger pointing' when we get beat on a *requirement*.") (emphasis added).

**TEK'S RESPONSE TO PARAGRAPH 65: Disputed in part. Undisputed that TEK has business competitors that seek to place candidates at third-party companies.**

**Disputed that TEK competes with other companies on all requirements that it is engaged to fill for third-party companies. Some requirements are exclusive to TEK, meaning the third-party company engages only TEK to identify candidates for the role(s.) (Df. Ex. 7, Haycock Dep. 48:10-49:12.) In addition, TEK may give lower priority to requirements where it is in competition with other firms, i.e., choose not to compete to fill those requirements. (Df. Ex. 17, McNelley Dep. 37:23-39:5, 40:23-43:13; Df. Ex. 18, Estimada Dep. 86:16-87:17, 88:2-6; Df. Ex. 8, Doyle Tr. 199:18-200:11.)**

**Disputed as to Plaintiff's characterization of TEK as a "recruiting firm." (*See* TEK's Reply to Paragraph 2 and Response to Paragraph 62.)**

**Disputed that TEK is "only successful at placing less than one-third of the candidates it submits to third-party companies." The cited testimony is unrelated to *candidate submissions* to third-party companies. (*See* Pls. Ex. 14, 237:20-238:9.) Doyle testified that in 2019, TEK filled 31.8 percent of the requirements that it *entered into its***

*systems*, and that at the time of his deposition in 2023 TEK filled about 41 percent of the requirements it entered into its systems. (*Id.*) Requirements may go unfilled by TEK for many reasons, including that the customer lost its budget for the role, the third-party company has moved an internal candidate into the role, or TEK gives it a low priority, among other things. (Pls. Ex. 25, Minniear Tr. 54:22-55:9; Df. Ex. 8, Doyle Dep. 99:16-100:7, 199:18-201:1.)

66.    TEK refers to Recruiters as "producers." Ex. 18 (Haycock Tr.) 60:7-12, 68:1-16 ("Anyone that is in a role that is a salesperson account manager or recruiter, we consider those as producing roles. Meaning that they are producing for the company. Our products and services are associated with putting people to work, and those producers are – it's just a generic term that's used to say you're either a salesperson or a recruiter. . . . Again, as I've stated before, they are a recruiter that is producing. Meaning that they are a – they're a recruiter that produces what recruiters produce . . . They find people for jobs."), 86:9-19 (SPP means "spread per producer" and refers to "recruiters"); Ex. 12 (DiBenedetto Tr.) 158:4-12; Ex. 13 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."), 213:4-7; Ex. 16 (Estimada Tr.) 100:3-101:12; Ex. 19 (Hollister Tr.) 103:4-15; Ex. 49 (Haycock Dep., Ex. 15 (Yearly Performance Summary)) TEK-Recruiter_Lit-00124518 (email attaching "Producer EOY Performance Reviews" and "Producer Performance Reviews 2021" for Recruiters) (emphasis added); Ex. 50 (Haycock Dep., Ex. 5 (Project Lighthouse

Communication Plan)) at TEK-Recruiter_Lit-00614413 (referring to Recruiters as "production focused"); Ex. 51 (Alvather Email Oct. 2, 2019) at TEK-Recruiter_Lit-00392555-56; Ex. 52 (Bhasin May 17, 2022 Email) at TEK-Recruiter Lit-00127828; Ex. 53 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291 ("our producers must document in a consistent, timely manner"); Ex. 48 (Executive Dashboard) at TEK-Recruiter_Lit-00161755-61; Ex. 54 (Recruiter Excellence: Scorecard FAQs) at TEK-Recruiter_Lit-00095089 ("many of our top producers are not maintaining 30 interactions."); Ex. 55 (Role Impact Summary: Producers (AM and Recruiter)) TEK-Recruiter_Lit-00004483 (emphasis added); Ex. 56 (Performance Review Guide 2021) at TEK-Recruiter_Lit-00528423 (referring to Recruiters as "Producers"); Ex. 57 (Producer Performance KPI 8-4-2020) TEK-Recruiter_Lit-00281725 (Recruiter metric summaries are referred to "Producer Performance KPI"); Ex. 58 (Annual Operating Plan) TEK-Recruiter_Lit-00583663 at 5, 10 ("Producer Enablement Technology").

**TEK'S RESPONSE TO PARAGRAPH 66: Disputed in part.**

**Undisputed that TEK refers to Recruiters as "producers."**

**Disputed that this term is limited to Recruiters. As Plaintiffs' citations show, this is a "generic term" applicable to people with sales or recruiting responsibilities. See, e.g., Plaintiffs' Ex. 18 (Haycock Tr.) 60:7-12, 68:1-16 ("Anyone that is in a role that is a *salesperson account manager or recruiter*, we consider those as producing roles. Meaning that they are producing for the company. Our products and services are associated with putting people to work, and those producers are – it's just a generic term that's used to say you're *either a salesperson or a recruiter*." (emphasis added)); Ex. 13 (Doyle Tr.) 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is**

**correct."). This general use of the term does not make Recruiters or others "production employees" as that phrase has been applied to exempt status classification decisions.**

67.    TEK refers to Recruiters as "sales employees" and not "human resources" employees. Ex. 12 (DiBenedetto Tr.) 90:13-91:8 (distinguishing Recruiters from human resources and noting Recruiters must have good sales skills); Ex. 18 (Haycock Tr.) 60:7-12, 68:1-16 ("[T]hey are a recruiter that is producing."), 123:21-24, 136:13-23; Ex. 13 (Doyle Tr.) 65:24-66:5 (Q: "When you say 'producing roles,' what are you referring to?" A: "So roles where you've got either sales-specific activities as part of your job responsibilities, or you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles."), 128:16-18 (Q: "And when you're saying 'producers,' there you're referring to recruiters and AMs?" A: "That is correct."); Ex. 16 (Estimada Tr.) 100:3-101:12; Ex. 19 (Hollister Tr.) 103:4-15; Ex. 46 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386851 ("We work in a sales environment"); Ex. 95 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045214; Ex. 97 (Ligouri Sept. 19, 2018 Email) TEK-Recruiter_Lit-00256524 ("If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter role inside sales"); Ex. 98 (LinkedIn Recruiting Strategy) at TEK-Recruiter_Lit-00494036 (same); Ex. 99 (Vitrano Email Nov. 29, 2018) at TEK-Recruiter_Lit-00129606 (same); Ex. 100 (Chezik Email Feb. 20, 2020) at TEK-Recruiter_Lit-00135668 (same); Ex. 101 (Zhou Email June 10, 2021) TEK-Recruiter_Lit-00481474 (same); Ex. 102 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952 ("You're an inside sales person!"); Ex. 103 (Thomson Email Apr. 20, 2020) TEK-Recruiter_Lit-00183226 ("We are hiring for both inside sales (Recruiter) roles as well as Outside

(Account Manager) roles.”); Ex. 104 (New York City Apps New Recruiter Training) TEK-Recruiter_Lit-00473570 at 33 (“You're an inside sales person!”).

**TEK'S RESPONSE TO PARAGRAPH 67: Disputed. Disputed that “sales” and “recruiting” are synonymous as TEK.**

**The cited Doyle testimony treats sales and recruiting as distinct. (Pls. Ex. 13 (Doyle Tr.) 65:24-66:5 (Q: “When you say ‘producing roles,’ what are you referring to?” A: “So roles where you've got either sales-specific activities as part of your job responsibilities, *or* you've got recruiting responsibilities as part of your job duties, that would be what I'd call producing roles.”) (emphasis added).**

**Plaintiffs include a citation to Haycock reading from a document that includes the phrase “We work in a sales environment where professional appearances and first impression matters.” (Pls. Ex. 18 (Haycock Tr.) 136:13-23.) Haycock explains that this means the role is “customer facing, that you would be interacting with people,” and you need “a high degree of professionalism[]” (*Id.*)**

**Other citations offered by Plaintiffs refer to “producing” or “producers” without any reference to “sales.” (Pls. Ex. 18 (Haycock Tr.) 60:7-12, 68:1-16, 123:21-24, 136:13-23; Pls. Ex. 5 (Doyle Tr.) 128:16-18.).**

68.    In its own internal recruiting documents, TEK states: “If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regards to TEK. We consider our recruiter/sourcer role sales.” Ex. 95 (Ligouri Dec. 6, 2018 Email) TEK-Recruiter_Lit-00045214; *see also* Ex. 97 (Ligouri Email Sept. 19, 2018) TEK-Recruiter_Lit-00256524; Ex. 105 (Framingham Female Hiring Blitz) TEK-

Recruiter_Lit-00468402 at 6 ("If someone is interested in HR make sure you explain the difference between recruiting and human resources. These are not the same thing in TEKsystems!"); Ex. 106 (Lightkep Email Jan. 18, 2021) at TEK-Recruiter_Lit-00472820; Ex. 107 (Donegan Email Feb. 21, 2020) at TEK-Recruiter_Lit-00435815; Ex. 108 (Haskin Email Mar. 9, 2020) at TEK-Recruiter_Lit-00198733; Ex. 109 (Bullock Email Sept. 13, 2019) at TEK-Recruiter_Lit-00132369; Ex. 110 (Lieberman Email Oct. 24, 2019) at TEK-Avery-00492061 ("we are looking for sales focused individuals"); Ex. 111 (Stadler Email Dec. 20, 2018) at TEK-Avery-00433138; Ex. 112 (Murrell Email Apr. 2, 2018) at TEK-Avery-00500049; Ex. 113 (Mooney Email Nov. 13, 2018) at TEK-Recruiter_Lit-00076220 ("We are a sales environment, if they don't want to do the brunt of the cold calling, they will not be a fit.").

**TEK'S RESPONSE TO PARAGRAPH 68: Disputed in part. Disputed insofar as the phrase "its own internal recruiting documents" is vague and ambiguous in the context of litigation about Recruiters.**

**Undisputed that the cited documents included the cited phrases.**

69.    Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients and to submit candidates who match with the open roles to TEK's Account Managers. Ex. 12 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to? A: "Their account managers, specifically"), 162:18-163:7; Ex. 13 (Doyle Tr.) 139:15-140:8, 158:1-159:24, 172:12-17; Ex. 18 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12; Ex. 22 (Kartchner Tr.) 57:2-6; Ex. 46 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 64 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter: . . .Screens consultants"); Ex. 65 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692

(same); Ex. 66 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 67 (Seattle Welcome Packet) at TEK-Recruiter_Lit-00552030 (same); Ex. 68 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005763 (same); Ex. 69 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133187 (same); Ex. 70 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425010 (same); Ex. 71 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450704 (same); Ex. 72 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508983 (same); Ex. 73 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545026 (same); Ex. 74 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. *Screens* consultants . . . .") (emphasis added); Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (TEK's business cycle as including Recruiters "screening" candidates and Account Managers communicating with TEK's customers.).

**TEK'S RESPONSE TO PARAGRAPH 69: Disputed. Disputed that Plaintiffs have fully described the primary job duties of TEK's Recruiters. TEK's job descriptions for the Recruiter role identifies the primary duties of the role to include:**

- **Recruit top IT talent and match their career goals with clients' hiring needs**

- **Develop recruiting strategies to identify qualified candidates**

- **Evaluate the strengths and weaknesses of candidates**

- **Negotiate unique compensation packages (wages, benefits, etc.) to attract and close candidates**

- **Communicate details of new assignments and manage contract employees while on assignment**

- **Partner with TEK's sales team to identify top accounts and target skill sets**

- **Maintain relationships with Technical Professionals to gain industry knowledge and obtain referrals**

(Df. Ex. 19 (TEK-Recruiter_Lit-00407375); Df. Ex. 20 (TEK-Recruiter_Lit-00511675); Df. Ex. 21 (TEK-Recruiter_Lit-00468398).)

Disputed that Recruiters only submit candidates to AMs. Recruiters also may submit candidates directly to TEK's clients. (Df. Ex. 22, Fronzaglio Tr. 171:5-9; Df. Ex. 23, Lis. Tr. 139:15-141:2.)

Haycock testified that the job of a Recruiter is "to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customers needs." (Pls. Ex. 18 (Haycock Tr.) 32:5-13.)

Plaintiffs' citation to the testimony of DiBenedetto is incomplete. In his complete response, DiBenedetto explains that during the particular Recruiter Trainee presentation being discussed, Recruiter Trainees practice presenting their candidates to their Account Manager, but in practice each Account Manager does it differently and may train Recruiters to directly present candidates to a client. (Df. Ex. 24, DiBenedetto Tr. 113:7-114:25.)

Plaintiffs' Ex. 13 is testimony by Doyle about the importance of submittals, among other things. (Pls. Ex. 13 (Doyle Tr.) 158:1-159:24.) The excerpt mentions Recruiters but does not mention Account Managers.

Plaintiffs' Ex. 117 is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page states that "Together, our AMs and recruiters place talented IT professionals with rewarding career opportunities at our customers' workplaces." (Pls. Ex. 117 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.) This is reflective of the partnership between Recruiters and Account Managers.

**Plaintiffs' Ex. 64-73 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite pages within the documents that include brief descriptions of various roles, including Recruiter. (*Id.*) Even the brief description in those documents is more expansive than what Plaintiffs suggest. (*Id.* ("Recruiter: Partners with AM to understand requirements and culture of a client. Screens consultants to gain insight into their skills, goals, interests and provides aligned opportunities."). See also Plaintiffs' Ex. 74 (same).)**

70.     Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates. Ex. 13 (Doyle Tr.) 252:24-253:2, 271:8-272:5 (Recruiters spend "the majority of the time . . . talking to consultants"); Ex. 18 (Haycock Tr.) 39:4-40:6, 59:2-11; Ex. 19 (Hollister Tr.) 109:5-20; Ex. 22 (Kartchner Tr.) 110:1-7; Ex. 26 (Pappas Tr.) 102:1-9; Ex. 114 (Recruiter Success Profile) at TEK-Recruiter_Lit-00020276 ("high call volume environment").

**TEK'S RESPONSE TO PARAGRAPH 70: Disputed. Plaintiffs' citations do not support the statement. None of the citations provided by Plaintiffs mention "time reviewing potential candidates' resumes and LinkedIn profiles," "cold calling," or "completing intakes of potential job candidates."**

**For example, Plaintiffs cite to Doyle testimony that Recruiters are "[o]n the phone, emailing, texting consultants" and spend "the majority of the time . . . talking to consultants" (Pls. Ex. 13 (Doyle Tr.) 252:24-153:2, 271:8-272:5.) In his testimony, Doyle uses the term "consultant" interchangeably with candidates, though "consultant" generally refers to someone already working on assignment to a TEK client and is distinct from a**

candidate who has yet to be placed on assignment. (Pls. Ex. 13 (Doyle Tr.) 125:18-24. In addition, Plaintiffs add the word "spend," but in context Doyle is stating that, as it relates to calls, Recruiters speak more frequently with consultants than with clients. (*Id.*) Likewise, they cite to Haycock testimony agreeing that Recruiters "are generally speaking with candidates on a daily basis." (Pls. Ex. 18 (Haycock Tr.) 59:2-11.) Haycock does not opine how much time Recruiters spend speaking with candidates. (*Id.*)

      Plaintiffs' citation to Haycock also misrepresents his testimony. Haycock describes both the "science" and the "art" of matching the right candidate to the right assignment, but Plaintiffs' citation includes only the portion related to the "science." The complete testimony by Haycock is provided at Pls. Ex. 18 (Haycock Tr.) 39:4-41:4.

      The cited Pappas testimony only states that Recruiters "made a lot of phone calls." (Pls. Ex. Ex. 26 (Pappas Tr.) 102:1-9.) Pappas did not elaborate on how much time Recruiters spent on the phone but did explain "I just don't know who was on the other side of that phone." (Df. Ex. 25, Pappas Dep. 102:10-25.)

      The cited Hollister testimony only states that "skilled verbal and written communications is necessary" because "the recruiter will spend most of their day on the phone and e-mailing," and these communications are "primarily" with consultants. (Pls. Ex. 19 (Hollister Tr.) 109:5-20.) The amount of time is not quantified. (*Id.*)

      The cited Kartchner testimony states only that making phone calls is "a large part of our job[.]" (Pls. Ex. 22 (Kartchner Tr.) 110:1-7.) The amount of time is not quantified, nor does Kartchner offer any description of the purpose or content of the calls. "Phone calls" could include a variety of activities such as discussions with customers or Account Managers regarding job requirements, outreach to a candidate, detailed interviews to vet a candidate's

**skills, discussions with a candidate's references, preparation of a candidate for an interview with a TEK customer, and service touchpoints with consultants the Recruiter has placed on assignment, to name but a few.**

71.     As the initial recruiting step, TEK's clients fill out a form that the employees refer to as "job requisitions," "job requirements," or "job reqs." Ex. 18 (Haycock Tr.) 175:18-176:1; Ex. 12 (DiBenedetto Tr.) 91:9-22; Ex. 115 (Requisition Form) TEK-Recruiter_Lit-00281942.

**TEK'S RESPONSE TO PARAGRAPH 71: Disputed in part. Undisputed that the phrases "job requisitions," "job requirements," or "job reqs" are synonymous with each other. Also undisputed that Recruiters are involved at this initial step.**

**Disputed that "TEK's clients fill out a form" that is the job requirement. None of the cited testimony states that clients "fill out a form." Plaintiffs' Ex. 115, which Plaintiffs describe as a "Requisition Form," are "mock ups" created as part of a pilot for a proposed new design within the Connected database. (Df. Ex. 26, TEK-Recruiter_Lit-00281939 - TEK-Recruiter_Lit-00281942.) TEK employees, not clients, input information to Connected. (Df. Ex. 27, 2019 Connected Guide, TEK-Recruiter_Lit-00135395.)**

72.     Job requisitions outline the clients' requirements for particular positions. Ex. 115 (Requisition Form) TEK-Recruiter_Lit-00281942; Ex. 12 (DiBenedetto Tr.) 91:9-22; Ex. 13 (Doyle Tr.) 58:5-25; Ex. 18 (Haycock Tr.) 59:2-6, 140:13-15.

**TEK'S RESPONSE TO PARAGRAPH 72: Disputed in part. Undisputed that "job requisition" and "job requirements" are used interchangeably. See TEK's Response to**

**Paragraph 31. Also undisputed that requirements provide information about the resources a client needs TEK's help to obtain. (Pls. Ex. 12 (DiBenedetto Tr.) 91:9-22.)**

**Disputed that Plaintiffs' Ex. 115 is a "Requisition Form." The document contains "mock ups" created as part of a pilot for a proposed new design within the Connected database. (Df. Ex. 26, TEK-Recruiter_Lit-00281939 - TEK-Recruiter_Lit-00281942.) TEK employees, not clients, input information to Connected. (Df. Ex. 27, 2019 Connected Guide, TEK-Recruiter_Lit-00135395.)**

73.     The clients, not Recruiters, determine the job requirements for job openings. Ex. 13 (Doyle Tr.) 58:22-59:3 (Q: "[T]he customer is determining what the customer needs for that position; is that correct?" A: "Correct." Q: "And that's true for all the skill specializations?" A: "Yeah."); Ex. 12 (DiBenedetto Tr.) 91:17-22 ("we get customers . . . send us job requirements . . . and we are supporting them"), 120:15-21.

**TEK'S RESPONSE TO PARAGRAPH 73: Disputed in part. Undisputed that TEK's clients determine whether they need resources.**

**Disputed that clients alone provide the job requirements. Clients, Account Managers, and Recruiters all may contribute to determining what are included among the requirements. (Pls. Ex. 13 (Doyle Tr.) 58:5-21; Df. Ex. 14 (collecting testimony related to the role of a Recruiter at requirement intake).)**

74.     TEK's managers assign the job requisitions to Recruiters. Ex. 12 (DiBenedetto Tr.) 122:10-13, 136:24-137:16; Ex. 13 (Doyle Tr.) 78:9-12 ("And who assigns them?" A. "Generally it's going to be a delivery manager or a delivery director or, in some cases, a team lead, depending

on the size of the team"), 101:2-102:20 (delivery manager and team lead decide to reassign requirements), 123:25-124:8, 140:5-11 (allocate means assign), 238:16-246:4; Ex. 16 (Estimada Tr.) 80:24-81:10; Ex. 25 (Minniear Tr.) 64:19-23, 151:24-152:7; Ex. 96 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 (". . . we should fully qualify each req in order for the DBO to prioritize business and evaluate where to allocate recruiters in the office.").

**TEK'S RESPONSE TO PARAGRAPH 74:** **Disputed. Many Recruiters choose which requirements they want to work on. (Df. Ex. 11 (collecting testimony that Recruiters decide what requirements to work on.)**

**In other settings, such as Red Zone meetings, it is common for Recruiters to volunteer to work on requirements they believe they can fill, rather than passively accepting an assignment from someone else. *See* Df. Ex. 33, Chong Decl., ¶ 16 (Red Zones are "time to further share information, strategies and takeaways for success and efficiency, and to collaborate on how to excel in the Recruiter role"); Df. Ex. 39, Pagano Decl., ¶ 5 (when he ran Red Zones, he would prioritize the best requirements, have Account Managers speak about the requirements, then open it up for Recruiters to volunteer to work on requirements they thought they could fill); Df. Ex. 31, Rice Decl., ¶ 9 (when working as a Recruiter, Red Zone meetings were collaborative, and Recruiters vocalized what they wanted to work on; as an Account Manager, she joins Recruiters at Red Zone meetings only twice per week); Df. Ex. 28, Mosquera Decl., ¶ 11 (attends Red Zone meetings to learn what requirements are available, volunteers for requirements he thinks he can fill if he is not already working on one); Df. Ex. 34, Warren Decl., ¶ 13 (Red Zones are a "meeting to exchange information, agree which business should be the highest priority to work on, and develop and share sourcing strategies. These are very collaborative meetings."), ¶ 14 (has the freedom to work**

**on whatever requirements he chooses and will volunteer for a requirement at Red Zone if he**

**thinks he can fill it).**

75.    The Account Managers' primary job duty (and not Recruiters') is to directly communicate with TEK's clients. Ex. 12 (DiBenedetto Tr.) 115:9-14, 121:25-122:13; Ex. 13 (Doyle Tr.) 150:8-10, 167:6-10, 178:14-15, 185:4-188:5, 189:11-25, 191:3-7, 191:22-192:4; Ex. 26 (Pappas Tr.) 121:9-13; Ex. 2 (*Andiamo* Rule 30(b)(6) Tr.) 16:2-4; Ex. 76 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741 (Recruiters are evaluated if they "[o]btain missing information about the requirement from their Account Manager"), TEK-Recruiter_Lit-00152744 (Recruiters evaluated on the "ability to gather the appropriate client information from the Account Manager"); Ex. 77 (Delivery Qualification Form) at TEK-Recruiter_Lit-00413296 ("Recruiter... should come to the AM meeting PREPARED just like an AM would with their client."); Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891.

**TEK'S RESPONSE TO PARAGRAPH 75: Disputed in part and immaterial.**

**Undisputed that Account Managers generally communicate with client's regarding the client's hiring needs and that recruiters generally obtain client information from an Account Manager.**

**Disputed as to Plaintiff's characterization of client communication as an Account Manager's primary function and the implication that the Recruiter role could not share the same primary function. (See Pls. Ex. 13, 186:10-187:21.)**

**For example, Plaintiffs' Ex. 76 reflects that Recruiter Trainees are expected to learn how to "Assess their requirement against the 9 key questions to determine if the requirement is qualified or unqualified" and to "Obtain missing information about the requirement from**

their Account Manager." (Pls. Ex. 76 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152741.) Some Recruiters go directly to TEK's customers when a requirement is deficient or additional information is needed. (Df. Ex. 49, Levine-Gorelick Decl, ¶ 23 ("I have direct interactions with TEK's customers on a regular basis. I join calls between Account Managers and customer hiring managers when we are "qualifying" requisitions, which is the call when we talk to the customer about the role they want to fill and the skills that are required. I am the expert on the labor market and the types of candidates that are available, and I am able to speak to the customer hiring manager in detail and to capture the information we need in order to be able to find a candidate who meets the requirement."); Df. Ex. 43, Compton Decl., ¶ 15 "If an Account Manager brings in a new client that has a need for the software developer skill sets that I specialize in, I like to join the Account Manager for a call with the customer to gather the requirements for the position. One of the benefits of this is getting the opportunity to hear about the customer's business and get a better understanding. Another benefit is that I can ask questions and help put together a more detailed requirement.").)

76.    If Recruiters have questions about the job requisition, they ask the Account Managers. *Supra* ¶ 75.; Ex. 12 (DiBenedetto Tr.) 110:22-112:4, 123:2-14; Ex. 13 (Doyle Tr.) 137:19-138:4, 169:5-170:17, 176:9-19, 187:9-25; Ex. 116 (Welcome to Recruiter 1 Training Facilitator Slides) TEK-Recruiter_Lit-00078020 at 37 ("Identify the right questions to ask the AM to get a fully qualified req"), 39-42; Ex. 117 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 74 (slide titled "Business Qualification") ("these are the questions that you must have the answers to in order to have a better understanding of the req. If you do not have this information you need to hold your AM accountable to providing you with the answers."), 75

("Call the AM to better understand the Req that the Recruiter is working on."); Ex. 86 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129468 (Account Managers must ensure Recruiters have all the information necessary); Ex. 96 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("account managers should work very closely with their recruiting partners to develop a strategy for filling qualified reqs.").

**TEK'S RESPONSE TO PARAGRAPH 76: Disputed in part.**

**Undisputed that Recruiters may ask AMs questions about job requisitions.**

**Disputed that Recruiters may only ask AMs such questions. Some Recruiters go directly to TEK's customers when a requirement is deficient or additional information is needed. (Df. Ex. 49, Levine-Gorelick Decl, ¶ 23 ("I have direct interactions with TEK's customers on a regular basis. I join calls between Account Managers and customer hiring managers when we are "qualifying" requisitions, which is the call when we talk to the customer about the role they want to fill and the skills that are required. I am the expert on the labor market and the types of candidates that are available, and I am able to speak to the customer hiring manager in detail and to capture the information we need in order to be able to find a candidate who meets the requirement."); Df. Ex. 43, Compton Decl., ¶ 15 "If an Account Manager brings in a new client that has a need for the software developer skill sets that I specialize in, I like to join the Account Manager for a call with the customer to gather the requirements for the position. One of the benefits of this is getting the opportunity to hear about the customer's business and get a better understanding. Another benefit is that I can ask questions and help put together a more detailed requirement.").)**

**Disputed also because Plaintiffs' citations do not support the statement. Plaintiffs cite four passages of testimony by Doyle. In one, Doyle testifies that Recruiters asks**

questions about requirements directly to TEK clients. (Pls. Ex. 13 (Doyle Tr.), 187:9-25.)
The other passages do not contradict this statement. For example, Doyle describes a way
that Recruiters can send messages to Account Managers. (*Id.*, 137:19-138:4.) It does not say
this is the only way for Recruiter to asks questions about a job requisition. (*Id.*) Another
passage describes how a Recruiter might partner with an Account Manager to discuss
whether a candidate is a good match to an open requirement. (*Id.*, 169:5-170:17.) The final
cited passage of testimony refers to an unidentified set of "questions that recruiters and the
AMs are supposed to communicate to the clients and the consultants." (*Id.* 176:9-19.)
Nothing in the passage says that Recruiters may only ask Account Managers such
questions.

The cited testimony by DiBenedetto relates to his description of training exercises
for Recruiter Trainees, not Recruiters. (Pls. Ex. 12 (DiBenedetto Tr.) 110:22-112:4, 115:7-
25, 123:2-14.)

Plaintiffs' Ex. 31, 46, 82, 85 simply discuss ways that Recruiters and Account
Managers should partner together to ensure that job requirements contain the detail needed
to find quality candidates to fill the role. None are directive of how Recruiters must perform
their job duties or contradict the testimony above that Recruiters may go to other sources,
including directly to TEK's clients, to obtain additional information.

77.    Account Managers provide information regarding the necessary qualifications, job
details, and target pay for the position to Recruiters, and if Recruiters have questions about the
job requisition, they ask the Account Managers. Supra ¶ 76; Ex. 13 (Doyle Tr.) 137:19-138:4,
187:9-189:25.

**TEK'S RESPONSE TO PARAGRAPH 77:** Disputed in part.

Undisputed that Account Managers are part of the process for gathering information from TEK's clients regarding job requirements.

Disputed that Account Managers alone gather information from TEK's clients regarding job requirements and that Recruiters only speak with AMs about questions concerning job requisitions. See TEK's Response to Plaintiffs' Paragraphs 35 and 36.

Disputed that Account Managers alone establish target pay for a position. See Dfs. Ex. 14 (gathering testimony regarding Recruiters' role in job requirement intake.)

78.    Relying on TEK's practices and procedures, Recruiters search TEK's internal database and external sources, like LinkedIn, to match potential candidates with clients' requirements. Ex. 12 (DiBenedetto Tr.) 92:6-93:25; Ex. 13 (Doyle Tr.) 143:17-144:22, 148:2-17, 151:9-152:18, 172:12-185:3; Ex. 18 (Haycock Tr.) 32:5-13, 59:2-11, 60:7-12; ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) Answer to ¶ 63 ("Defendant admits that Recruiters find candidates . . . Defendant admits that Recruiters may search employment databases, including LinkedIn, Indeed, and Defendant's internal system Connected, to assemble a list of names of potential candidates."); Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5; Ex. 118 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶¶ 39-42.

**TEK'S RESPONSE TO PARAGRAPH 78:** Disputed in part. Undisputed that Recruiters may use TEK's Connected database or external sources, including LinkedIn, to search for candidates.

Disputed that Recruiters rely on TEK's "practices and procedures" to identify potential candidates for TEK's client's job requirements, and disputed that Recruiters

must use or are encouraged to use only these sources. See TEK's Responses to Paragraph 81, 82, and 107 and Df. Ex. 16, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.

Disputed that Recruiters merely "match" candidates to requirements. Recruiters also must validate that candidates in fact possess the skills and other attributes relevant to the job requirement. Df. Ex. 7, Haycock Tr. 40:7-41:4 ("It's not just do the buzz words match, because many buzz words match, and the person is absolutely positively not the right person for the role. Because [candidates also know] that you have to have the right buzz words on your resume to get hits in search and match. … So a recruiter has to be able to discern between this person has all the right buzz words and jargon and they can actually do the job."); Df. Ex. 56, Bury Tr. 116:23-118:24, 119:22-120:5; Df. Ex. 47, Rothermich Decl. ¶¶ 3-10; Df. Ex. 43, Compton ¶ 18; Df. Ex. 46, Whitman ¶ 20; Df. Ex. 42, Mendez ¶¶ 9, 14; Df. Ex. 41, Guffy ¶ 12; Df. Ex. 45, McCarty ¶ 15; Df. Ex. 48, Yancey ¶ 17, 18; Df. Ex. 50, Kehl ¶ 11; Df. Ex. 52, Ferrari ¶ 11; Df. Ex. 53, Budde ¶ 18.

Disputed for the additional reason that Plaintiffs' citations also do not support the statement. Plaintiffs offer an incomplete quote from TEK's Answer to the Amended Complaint, Paragraph 63. The full answer shows that TEK denied the allegation that "Recruiters are required to follow specific protocols. (ECF No. 55, Answer to ¶ 63.)

Plaintiffs' Ex. 118 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 118 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.) Nonetheless, it does state that anyone following this guidance should not leave it up to the Account

Manager to assess a candidate, but rather "tell the [Account Manager] what to think" by "tell[ing] them why this person is ideally qualified for their Req," with references, description of the candidates skills, availability to start, pay rate, and location, among other things. ) (*Id.*)

79.     Recruiters review resumes and LinkedIn profiles to make sure candidates' experience and skills meet the clients' minimum qualifications. ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) Answer to ¶ 63 ("Defendant admits that Recruiters find candidates . . . Defendant admits that Recruiters may search employment databases, including LinkedIn, Indeed, and Defendant's internal system Connected, to assemble a list of names of potential candidates."); Ex. 12 (DiBenedetto Tr.) 92:6-93:25, 162:18-163:7 (listing Recruiter "high value activity" as "understanding th[e] requirement and then sourcing it"); Ex. 13 (Doyle Tr.) 139:15-140:8, 143:17-144:22, 148:2-17, 151:9-152:18, 158:1-159:24, 172:12-17 (Q: "But it's still the recruiter's job, then, to see if the information on the G2 matches a requirement?" A: "Completely, yeah. They're going to look through the requirements and say this might fit or this might not."), 181:19-23 (Q: "So recruiters shouldn't generally be matching G2s or candidates with requisitions that are not qualified yet?" A: "It would largely be a huge waste of time to do so."); Ex. 18 (Haycock Tr.) 32:10-13 (Recruiters' "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs"), 59:2-11, 60:7-12 (Q: Recruiters' "job is to try to bring . . . the appropriate people in by finding that appropriate match . . .?" A: "Yes."); Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (Recruiters "screening" candidates and Account Managers communicating with TEK's customers.); Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5; Ex. 118 (Finding, Qualifying, and Submitting to a

Remote Job) at TEK-Recruiter_Lit-00190824; Ex. 119 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 89.

**TEK'S RESPONSE TO PARAGRAPH 79: Disputed in part. Undisputed that part of the Recruiters' role is to understand a candidate's experience and skills and determine whether the candidate meets the minimum qualifications stated in the job requirement.**

**Disputed that a Recruiter's review always includes or is limited to a resume or LinkedIn profile, and disputed that a Recruiter only is making sure that a candidates' experience and skills meet the clients' minimum qualifications. This is only a threshold question, and Recruiters further scrutinize and validate the skills and other relevant qualities of candidates who meet minimum qualifications. See TEK's Response to Plaintiffs' Paragraph 38.**

**Disputed for the additional reason that Plaintiffs' citations also do not support the statement. Plaintiffs cite TEK's Answer to Paragraph 63 of the Amended Complaint, but neither the allegation nor the answer mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications."**

**In the first passage of cited testimony by DiBenedetto, he is providing "in its simplest form" an explanation of how the Connected database can be used to analyze the "local market demo." (Pls. Ex. 12 (DiBenedetto Tr.) 92:6-93:25." In the same passage, DiBenedetto explains that a recruiter might do this analysis because it "really enhances a recruiter's ability to be able to talk about what's happening locally or on a national level." (*Id.*) Nothing in the passage relates to sourcing or minimum qualifications. In the second passage of testimony by DiBenedetto, he explains that what is a "high value activity" by a Recruiter "depends on what part of the recruiting efforts they're in." (Pls. Ex. 12**

(DiBenedetto Tr.) 162:18-163:7.) Plaintiffs cited to just one of the examples he provided. (*Id.*)

In the first passage of testimony by Doyle, he describes a scenario where a Recruiter might see a job requirement and know of a qualified candidate without the need to do a search at all (e.g., if the Recruiter already has the candidate in his or her network). (Pls. Ex. 13 (Doyle Tr.) 139:15-140:8.) The testimony does not mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications." In another passage of testimony by Doyle, he describes different ways that a Recruiter, having identified a candidate they believe may be a good fit for a job requirement, can flag that candidate or use that candidate's profile to find similar candidates. (Pls. Ex. 13 (Doyle Tr.) 143:17-144:22.) The passage does not relate to how the Recruiter makes the determination that the candidate may be a good fit for the job requirement. (*Id.*)

In other cited passages of testimony by Doyle, he explains why Recruiters' "conversations [with candidates should] be as relevant as possible," and why Recruiters record those conversations in Connected, and offers examples important to candidates (pay expectations, employers that will not be considered). (Pls. Ex. 13 (Doyle Tr.) 148:2-17, 151:9-152:18.) The testimony says nothing about Recruiters "review[ing] resumes and LinkedIn profiles" and contradicts any notion that Recruiters limit themselves to such information. In another passage of testimony by Doyle, he explains how Recruiters can think about ways they may need to change their approach if their efforts are not turning into starts, i.e., consultants beginning assignments with clients. (Pls. Ex. 13 (Doyle Tr.) 158:1-159:24.) The testimony does not mention "review," "resumes," "LinkedIn profiles," or "minimum qualifications."

Plaintiffs next cite a partial answer by Doyle. (Pls. Ex. 13 (Doyle Tr.) 172:12-17.) The full exchange is much longer and shows that Doyle is explaining an attempt to develop technology to try to match potentially qualified candidates to job requirements, observing that "it doesn't work very well," having only about a 30% success rate, and noting that in any event the Recruiter still needs to decide whether the match is valid or not. (Pls. Ex. 11113 (Doyle Tr.) 171:13-172:17.)

The final passage of cited testimony by Doyle also is both incomplete, misleading, and irrelevant. (Pls. Ex. 13 (Doyle Tr.) 181:19-23.) Doyle testifies that it would "be a huge waste of time" for Recruiters to match candidates with "requisitions that are not qualified." (*Id*.) This is a statement about the readiness of the job requirement and is irrelevant to how a Recruiter sources and evaluates candidates. The full response explains that are three stages of readiness for a requirement: draft, "qualified," and Red Zone. (*Id*., 180:22-182:18.) A "qualified requirement" is one that has moved a draft and TEK has "enough details to feel like, yes, this is something we can support," meaning someone from TEK has spoken with the client's hiring manager to understand the role, the bill rate is established, the urgency is known, the competitive landscape is understood, and there likely is a contract between TEK and its client for the work. (*Id*.)

The cited testimony by Haycock demonstrates that Recruiters do more than "review resumes and LinkedIn profiles" to check whether "minimum qualifications" are met; the Recruiter's "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs." (Pls. Ex. 18 (Haycock Tr.) 32:10-13.) The complete answers by Haycock make the point even more clear, explaining that Recruiters consider not just "hard skills and technical skills," but also the

candidate's interests (e.g., working independently v. as part of a collaborative team; in person v. remote v. hybrid; nature of the work; pay rate). (*Id.*, 30:18-32: 13.) As Haycock summarized, "when you say 'find,' it's like it's not just doing a database search and looking at all of the people and saying, Okay, this is the right person for the job. There's a lot more complexity in it than that." (*Id.*)

Plaintiffs' Ex. 75 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891.) The cited page is a graphic with a high level description of the "Delivery Business Cycle." (*Id.*) It does not support Plaintiffs' statement, as it notes that "Recruiters must *thoroughly* screen *or disqualify* candidates via resume review, technical screening, professional references, certifications, etc." (*Id.* (emphasis added).)

Plaintiffs cite TEK's response to an interrogatory seeking a description of "any and all electronic programs, databases, software, systems, interfaces, and applications that Recruiters may use and did use to perform their job duties." (Pls. Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.) Neither the interrogatory nor the response appear relevant to the statement, and Plaintiffs do not provide any explanation for including it.

Plaintiffs' Ex. 118 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 118 (Finding, Qualifying, and Submitting to a Remote Job) at TEK-Recruiter_Lit-00190824; *Infra* ¶ 39-42.) Nonetheless, it does state that anyone following this guidance should not leave it up to the Account Manager to assess a candidate, but rather "tell the [Account Manager] what to think" by "tell[ing] them why this person is ideally qualified for their Req," with references,

description of the candidates skills, availability to start, pay rate, and location, among other things. ) (*Id.*)

Plaintiffs' Ex. 119 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 119 (Welcome to the HVA Workshop Series) TEK-Recruiter_Lit-00000377 at 89.) The cited slide includes a reference to "the importance of Sourcing Strategy, and identifying top talent in the marketplace." (*Id.*) The slide does not appear relevant to the statement, and Plaintiffs do not provide any explanation for including it.

80.    TEK provides Recruiters with "search and match" technology that helps automatize the screening process. Ex. 18 (Haycock Tr.) 39:17-40:24 ("Technology is getting better obviously every day to be able to do those matches by themselves"), 139:22-140:22; Ex. 13 (Doyle Tr.) 141:15-142:9, 143:3-14; Ex. 24 (McNelley Tr.) 82:11-15; Ex. 22 (Kartchner Tr.) 174:5-15; Ex. 120 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065 (describing Mock Red Zone exercise in which Recruiters are instructed to "auto match each candidate to ANY req that's currently open, regardless of location."); Ex. 86 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467 ("What other reqs does this candidate Auto-Match or fit?"); Ex. 87 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307.

**TEK'S RESPONSE TO PARAGRAPH 80:** Disputed in part.

Undisputed that limited "search and match" technology is available to Recruiters.

Disputed that the technology is used consistently by Recruiters or meaningfully impacts Recruiter job duties.

Plaintiffs' Ex. 18 cites to a truncated portion of testimony by Haycock. (Pls. Ex. 18 (Haycock Tr.) 39:17-40:24.) In the more fulsome portion of his testimony, Haycock explains that "search and match" is a "very common industry term" used for third-party services like LinkedIn and Google, as well as internal tools. (*Id.*, 38:6-41:4.) Haycock further explains that the tool is the "science of recruiting," but its effectiveness depends on the "art of recruiting" and the ability to "discern" the difference between a candidate having "all the right buzz words and jargon" versus the ability to "actually do the job." (*Id.*) Discerning these differences is "really difficult for technology." (*Id.*)

Plaintiffs' Ex. 13 likewise cites to a truncated portion of testimony by Doyle. (Pls. Ex. 13 (Doyle Tr.) 141:15-142:9, 143:3-14.) In the abbreviated portion Plaintiffs cite, Doyle mentions that Connected was "setup with some AI technology that would comb through candidates and determine who might potentially be a fit for that opportunity and pull that up into a search." (*Id.*) In response to a later question, Doyle added more detail, testifying that while TEK had hoped the technology would help with matching, "It doesn't work very well… it was a great concept, but the technology is not very good." (Df. Ex. 8, Doyle Tr. 170:18-172:11.)

Plaintiffs' Ex. 24 truncates testimony by McNelly about "auto matches." (Pls. Ex. 24 (McNelley Tr.) 82:11-15.) Plaintiffs omitted McNelley's immediately preceding statement: "Q: [W]hat is the auto match matching? A. I don't know. To be honest with you, I'm not in the weeds on the technology to know exactly how auto match works." (Df. Ex. 17, McNelley Tr. 82:3-15.)

Plaintiffs cite an excerpt of testimony by Kartchner explaining the "auto match" function in Connected. (Pls. Ex. 22 (Kartchner Tr.) 174:5-15.) Plaintiffs omitted his later

statement that auto match does not replace the Recruiter: "If it would replace a recruiter, I wouldn't -- no, it does not. I wouldn't have a job if that were the case." (Df. Ex. 57, Kartchner Tr. 185:8-14.)

(Pls. Ex. 120 (New Recruiter Training Coaches Guide) at TEK-Recruiter_Lit-00000065 (describing Mock Red Zone exercise in which Recruiters are instructed to "auto match each candidate to ANY req that's currently open, regardless of location.").)

Plaintiffs' Ex. 86 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 86 (Running a D4 Coaching Venue) at TEK-Recruiter_Lit-00129467.)

Plaintiffs' Ex. 87 is an unauthenticated email and attachment dated February 5, 2019. (Pls. Ex. 87 (Recruiter Coaching Best Practices) at TEK-Recruiter_Lit-00426307.) The document lists as a "Coaching" opportunity the question: "What other reqs does this candidate Auto-Match or fit?" (*Id.*) The purpose and meaning of the document is not clear from its face and not explained by Plaintiffs.

81.    TEK provides Recruiters with step-by-step guidance on how to search and match candidates. Ex. 13 (Doyle Tr.) 130:25-152:18; Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 118-126; Ex. 121 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 15, 20-22.

**TEK'S RESPONSE TO PARAGRAPH 81: Disputed. While TEK provides support and training, "no one tells recruiters how to do their job," and that TEK "teaches [] question-based leadership." (Df. Ex. 41, Guffy Decl. at ¶19.)**

Plaintiffs' citations do not support the statement, but instead relate to how to use the Connected tool to search for candidates. As explained elsewhere, Recruiters are not required, and many do not, use Connected at all. See TEK's Responses to Paragraph 78, 82, and 107 and Df. Ex. 16, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.

Plaintiffs cite testimony by Doyle regarding the Connected User Guide. (Pls. Ex. 13 (Doyle Tr.) 130:25-152:18.) Doyle explains that while the Connected platform may assist in finding potential matches, recruiters are encouraged to rely on conversations and judgment, stating, "we really encourage more conversations versus using technology in these areas just because you can't tell the story there." (*Id.*, 144:6–14.) Doyle also explains that searching and matching is not rigid or standardized. (*Id.*) Doyle also describes the importance of gathering information about a candidate's skills, goals, preferences, and constraints, which helps recruiters tailor their outreach, rather than following standardized steps. (*Id.*, 130:25–152:18).

Plaintiffs also point to pages of the Connected User Guide. (Pls. Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 116-125.) Those pages explain Connected functionality but do not direct how to conduct a search. (*Id.*) For example, one page describes how "filters" may be used to narrow search results. (*Id.* at 116.) However, the document does not tell the Recruiter what terms should be included in the initial search, or what filters to apply to narrow the results the initial search returns. (*Id.*)

Plaintiffs' Ex. 121 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 121 (Degreed Pathway) TEK-

**Recruiter_Lit-00078540 at 15, 20-22.) Plaintiffs do not provide any explanation for including it.**

82.    TEK "prides itself on the sophistication and effectiveness of its internal processes and databases, which have been developed over the years, to match technical talent with appropriate customers based on that particular client's needs." Ex. 3 (*Andiamo* Preliminary Injunction) at 2; *see also* Ex. 4 (*Andiamo* Aff. of Alexander Pulido) at ¶ 7 ("In support of its staffing and recruitment efforts, TEKsystems uses a proprietary and confidential candidate database . . . TEKsystems uses the Database to identify candidates who are likely to prove a strong match for the prospective client's needs."); Ex. 5 (*Ambar* Complaint) at ¶¶ 15-20; Ex. 6 (*Berardis* Complaint) at ¶¶ 15-20.

**<u>TEK'S RESPONSE TO PARAGRAPH 82:</u> Disputed in part.**

**Undisputed that Plaintiffs have accurately quoted the cited portions of Pls. Ex. 22.**

**Disputed insofar as Plaintiffs suggest that the "internal processes and databases" referenced here diminish the job duties of Recruiters. See TEK's Responses to Paragraph 78, 81, and 107 and Df. Ex. 16, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.**

83.    TEK's own documents describe a primary duty for Recruiters as "[s]creen[ing] consultants." Ex. 76 (Recruiter Evals Form 2021) at TEK-Recruiter_Lit-00152743 (evaluated on "screen[ing]" candidates); Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097891 (describing the TEK business cycle as including Recruiters "screening" candidates.); Ex. 64 (Pittsburgh Welcome Packet) at TEK-Recruiter_Lit-00408133 ("Recruiter:___Screens

consultants"); Ex. 65 (Rochester Welcome Packet) at TEK-Recruiter_Lit-00399692 (same); Ex. 66 (Boston Welcome Packet) at TEK-Recruiter_Lit-00489275 (same); Ex. 67 (Seattle Welcome Packet) TEK-Recruiter_Lit-00552030 (same); Ex. 68 (Stamford Welcome Packet) at TEK-Recruiter_Lit-00005763 (same); Ex. 69 (Detroit Welcome Packet) at TEK-Recruiter_Lit-00133187 (same); Ex. 70 (San Diego Welcome Packet) at TEK-Recruiter_Lit-00425010 (same); Ex. 71 (Salt Lake City Welcome Packet) at TEK-Recruiter_Lit-00450704 (same); Ex. 72 (Columbus Welcome Packet) at TEK-Recruiter_Lit-00508983 (same); Ex. 73 (Silicon Valley Welcome Packet) at TEK-Recruiter_Lit-00545026 (same); Ex. 74 (TEK Acronyms) at TEK-Recruiter_Lit-00043958 ("Recruiter: Partners with AM to understand requirements & culture of a client. Screens consultants . . . ."); *see also* Ex. 22 (Kartchner Tr.) 57:2-6; Ex. 25 (Minniear Tr.) 77:7-19; *supra* ¶ 29.

**TEK'S RESPONSE TO PARAGRAPH 83: Disputed in part.**

**Undisputed that TEK documents describe "screening" by Recruiters.**

**Disputed that TEK documents describe "screening consultants" as a primary duty for Recruiters. Plaintiffs' citations do not support the statement.**

**Plaintiffs' Ex. 76 is an unauthenticated document. On its face, it appears to be an evaluation form for Recruiter Trainees, not the Recruiter role at issue in this litigation. (Pls. Ex. 76, misidentified by Plaintiffs as "*Recruiter* Evals Form 2021.") The portion cited by Plaintiffs reflects that recruiters are expected to do more than "screen," describing "screening" as an initial step as part of building a personal network of candidates who the recruiter may be able to match to the right role. (*Id.*, TEK-Recruiter_Lit-00152743.)**

**Plaintiffs' Ex. 75 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 75 (Recruiter Onboarding Plan)**

at TEK-Recruiter_Lit-00097891.) The cited page is a graphic with a high level description of the "Delivery Business Cycle." (*Id.*) It does not support Plaintiffs' statement, as it notes that "Recruiters must *thoroughly* screen *or disqualify* candidates via resume review, technical screening, professional references, certifications, etc." (*Id.* (emphasis added).)

Plaintiffs' Ex. 64-73 are unauthenticated. On their face, the documents purport to be local office "Welcome Packets." (*Id.*) Plaintiffs cite pages within the documents that include brief descriptions of various roles, including Recruiter: "Partners with AM to understand requirements and culture of a client. Screens consultants to gain insight into their skills, goals, interests and provides aligned opportunities." (*Id.*) Even the brief description in those documents is more expansive than what Plaintiffs suggest, reflecting that Recruiters delve into learning about a candidate's skills, goals, and interests in order to see whether those align to TEK's customer's job requirements. (*Id.*) See also Plaintiffs' Ex. 74 (same).)

Plaintiffs cite the testimony of Kartchner, who agrees that "one of the duties as a recruiter is to screen and match candidates to job requirements." (Pls. Ex. 15 (Kartchner Tr.) 57:2-6.) Kartchner does not testify that this is a primary duty of Recruiters.

Plaintiffs cite the testimony of Minniear, who describes the many steps that Recruiters take to "qualify or disqualify candidates," which include understanding the requirement, understanding the candidate's qualifications toward that requirement, references, and in office interviews. (Pls. Ex. 25 (Minniear Tr.) 77:7-19.) Minniear does not use the word "screening" or testify that it is a primary duty.

84.     Once Recruiters have matched potential job candidates to the job requisition, Recruiters contact potential candidates in the hope of reaching them to complete an initial intake. Ex. 13 (Doyle Tr.) 134:5-22, 271:14-18, 278:22-279:7; Ex. 12 (DiBenedetto Tr.) 180:13-182:13; ECF No. 55 (Def.'s Answer to Pls. 1st Amend. Compl.) ¶ 63.

**<u>TEK'S RESPONSE TO PARAGRAPH  84</u> Disputed in part.**

**Undisputed that Recruiters contact potential candidates regarding job requirements.**

**Disputed that a Recruiter's contact with potential candidates regarding job requirements is always, or even routinely, an "initial intake."**

**As noted above, Recruiters are encouraged to build personal networks so that they already have qualified candidates with whom they have spoken before aligning to a potential job requirement. See TEK's Response to Paragraphs 39, 43. See also Df. Ex. 16, collecting statements regarding Recruiter's different sourcing strategies, including building and relying on personal networks.**

**Plaintiffs' citations do not support the statement either. The first cited passage of testimony by Doyle explains that Recruiters may plan their day to include calls to their consultants on assignment, people already in their network, or people "they are actively reaching out to see if they're interested in opportunities." (Pls. Ex. 13 (Doyle Tr.) 134:5-22.) The second passage of testimony by Doyle says that Recruiters spend most of their interactions with consultants. (*Id*., 271:14-18.) He does not say that is in the context of contacting new candidates for initial intake. (*Id*.) The final passage of testimony by Doyle merely confirms that if a Recruiter calls a consultant and leaves a voicemail, they note that fact in Connected so that another Recruiter does not reach to the same person soon**

thereafter and give the appearance that TEK "do[esn]'t have its act together." (*Id*., 278:22-279:7.)

Plaintiffs cite testimony by DiBenedetto, but in that passage he merely explains the difference in meaning between "Call" and "Attempted Call" as used in the Connected database. (Pls. Ex. 12 (DiBenedetto Tr.) 180:13-182:13.)

Finally, Plaintiffs cite TEK's Answer to Paragraph 63 of the First Amended Complaint. (ECF No. 55, ¶ 63.) The answer merely confirms that "Recruiters may contact potential candidates to see if they meet the qualifications set by Defendant's clients and are interested in the open position." (*Id.*)

85.    TEK's managers describe Recruiters' job duties as a "grind," and the vast majority of Recruiters' outreach goes unanswered or is rebuffed. Ex. 122 (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-00044799; Ex. 26 (Pappas Tr.) 93:14-24, 99:4-100:18, 100:25-101:14; Ex. 12 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact).

**TEK'S RESPONSE TO PARAGRAPH 85:** Disputed and immaterial.

Plaintiffs citations do not support the broad assertion that TEK's managers generally describe Recruiter job duties as a "grind." It is also immaterial to an assessment of Recruiter job duties.

Pappas testified that "There was a lot of grit and a lot of grind to both the recruiting role and the account management role. I grinded in both of the roles when I was there. I worked really hard." (Pls. Ex. 26 (Pappas Tr.) 93:14-24.) She did not testify or suggest that

the job duties were a grind, as opposed to her own efforts. Pappas did not testify that the vast majority of Recruiters' outreach goes unanswered or is rebuffed.

Plaintiffs' Ex. 122 is an unauthenticated email exchange with messages ranging from September 23, 2018 through April 10, 2019 between DiBenedetto and a Technical Recruiter. (Pls. Ex. 122 (DiBenedetto Email Apr. 10, 2019) TEK-Recruiter_Lit-00044799.) From the face of the document, DiBenedetto sends a message to the Technical Recruiter to ask how she is doing, and she responds, in part, "I finally got my first taste of commission last week and that was so exciting. It's definitely a grind but it's been a rewarding journey so far." (*Id.*) DiBenedetto responds, echoing her words, "Super happy for you to hear that all is well and you're seeing the value in what's called the 'grind'!" (*Id.*) The document does not say that the vast majority of Recruiters' outreach goes unanswered or is rebuffed.

Plaintiffs' Ex. 12 is an excerpt of testimony by DiBenedetto, where he explains that it is important for Recruiters to develop skills to get past roadblocks they may experience when calling consultants, which enable "more meaningful conversations." (Pls. Ex. 12 (DiBenedetto Tr.) 80:14-82:22.) DiBenedetto did not testify that he or others view Recruiters' job duties as a "grind" or that the "vast majority of Recruiters' outreach goes unanswered or is rebuffed." (*Id.*)

86.     Recruiters face obstacles in reaching candidates – including consultants not answering their phone calls because, for one reason, they get on average 34 solicitation calls a week. Ex. 123 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 4 (consultants get on average 34 "solicitation" calls a week); Ex. 124 (Welcome to the H.V.A. Workshop Series) at TEK-Recruiter_Lit-00000343 (same); Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-

00097858 (same); Ex. 96 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677 ("Consultants tell us time and again that they're getting inundated with insignificant phone calls regarding jobs that they aren't even right for, and they're not interested in."); Ex. 12 (DiBenedetto Tr.) 80:14-82:22 (Recruiters often face "roadblocks" from potential job candidates they contact), 180:13-182:13; Ex. 125 (Recruiter Lead Video Script) at TEK-Recruiter_Lit-00056681 ("Not everyone will answer the first time you call and persistence is important.").

**TEK'S RESPONSE TO PARAGRAPH 86: Disputed in part**.

**Undisputed that Recruiters are not always able to reach candidates or consultants by phone.**

**Disputed insofar as the statement suggests that TEK Recruiters are making, on average, 34 solicitation calls a week to the same candidate or consultant, and disputed insofar as the statement suggests the "obstacles" Recruiters face are insurmountable.**

**Plaintiffs' Ex. 12 is an excerpt of testimony by DiBenedetto, where he explains that it is important for Recruiters to develop skills to get past roadblocks they may experience when calling consultants, which enable "more meaningful conversations." (Pls. Ex. 12 (DiBenedetto Tr.) 80:14-82:22.)**

**Plaintiffs' Ex. 123 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 123 (Week 10: Value Messaging) TEK-Recruiter_Lit-00041666 at 4.) On its face, the document describes how to use "value messaging" to engage consultants in discussion. (*Id*.)**

**Plaintiffs' Ex. 124 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 124 (Welcome to the H.V.A.**

Workshop Series) at TEK-Recruiter_Lit-00000343.) On its face, the document describes how to engage consultants in discussion. (*Id.*)

Plaintiffs' Ex. 75 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097858.) Plaintiffs appear to have cited the document only for the statement that consultants receive, on average, 34 solicitations for new job opportunities per week, a point that TEK does not dispute.

Plaintiffs' Ex. 96 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 96 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056677.) Plaintiffs appear to have cited the document only for the statement that consultants feel "inundated with phone calls regarding jobs they aren't even right for," a point that TEK does not dispute.

Plaintiffs' Ex. 125 is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 125 (Recruiter Lead Video Script) at TEK-Recruiter_Lit-00056681.) Plaintiffs appear to have cited it for the common sense statement that "Not everyone will answer the first time you call and persistence is important," a point that TEK does not dispute.

87.    When Recruiters are able to connect with candidates, they do an intake, internally referred to as a "G2." Ex. 12 (DiBenedetto Tr.) 84:11-85:13; Ex. 13 (Doyle Tr.) 144:25-145:10; Ex. 18 (Haycock Tr.) 60:19-21 ("A G2 is an information form that we use to be able to collect information about the candidate"); Ex. 17 (Fronzaglio Tr.) 157:24-158:10; Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159.

**TEK'S RESPONSE TO PARAGRAPH 87:** **Disputed in part.**

Undisputed that Recruiters may do an "intake" call the first time they speak with a candidate.

Disputed that a Recruiter does an "intake" each time they reach a candidate, and disputed that "intake" and "G2" are synonymous. See TEK's Response to Paragraph 44.

The cited testimony by Doyle explains that "G2 is information gathering" to learn about a consultant, with the Recruiter taking notes so that "they can go back and remember more details about that candidate," such as "what they're looking for and what is important to them" at a future time. (Pls. Ex. 13 (Doyle Tr.) 144:25-145:10.) He does not testify that a G2 is an "intake" discussion.

The cited testimony by DiBenedetto explains the "G2 framework," which he describes as the components of a phone conversation. (Pls. Ex. 12 (DiBenedetto Tr.) 84:11-85:13.) He does not testify that a G2 is an "intake" discussion. He does clarify that a G2 is not a "form," but rather "an empty box where you simply type in what the consultant is saying." (*Id.*, 86:14-87:6.)

The cited testimony by Hancock explains that a G2 is the collection of information about a candidate. (Pls. Ex. 18 (Haycock Tr.) 60:19-21.)

The cited testimony by Fronzaglio explains that a G2 information gathering can refer to a call with someone the Recruiter has spoken with before, where there have been changes to their job search, skill sets, or interests since the previous discussion. (Pls. Ex. 17 (Fronzaglio Tr.) 157:24-158:10.)

Plaintiffs' Ex. 78 is the Connected User Guide, and the cited pages illustrate what a G2 looks like in the database and how a Recruiter can create or update a candidate's G2

information. (Pls. Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159.)

88.    TEK's internal database prompts Recruiters to gather specific information from candidates during the G2. Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159; Ex. 12 (DiBenedetto Tr.) 87:12-88:5, 148:1-18; Ex. 13 (Doyle Tr.) 144:25-148:17; Ex. 18 (Haycock Tr.) 151:1-12; Ex. 19 (Hollister Tr.) 125:5-8; Ex. 22 (Kartchner Tr.) 105:12-16.

**TEK'S RESPONSE TO PARAGRAPH 88: Disputed in part. Undisputed that Recruiters gather and record information from candidates in Connected.**

**Disputed that there are "prompts" for a G2. DiBenedetto testified that a G2 is not a "form," but rather "an empty box where you simply type in what the consultant is saying." (Pls. Ex. 12 (DiBenedetto Tr.) 86:14-87:6.)**

**The remaining citations presented by Plaintiffs confirm that there are additional fields in Connected that Plaintiffs may complete when gathering information from a candidate or consultant, but these are not "prompts" that a Recruiter works through when communicating with the candidate or consultant. See Pls. Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159 (distinguishing the G2 from other fields that may be completed by a Recruiter).**

89.    TEK provides Recruiters with training and instructions about how to conduct a G2 with a candidate. Ex. 12 (DiBenedetto Tr.) 80:14-84:10, 87:12-88:5, 90:13-91:8, 105:2-107:8, 148:1-18; Ex. 13 (Doyle Tr.) 144:25-148:17; Ex. 18 (Haycock Tr.) 151:1-12; Ex. 121 (Degreed Pathway) TEK-Recruiter_Lit-00078540 at 17, 24, 39-41, 48; Ex. 126 (DiBenedetto Nov. 22, 2020

Email) TEK-Recruiter_Lit-00041158; Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 150-159.

**TEK'S RESPONSE TO PARAGRAPH 89: Disputed in part.**

**Undisputed that Recruiters are knowledgeable regarding how to conduct a G2 with a candidate and have access to reference materials, including the Connected User Guide (Pls. Ex. 78.)**

**Disputed that the cited training is provided to Recruiters. It is in fact provided to Recruiter Trainees. (See Pls. Ex. 12 (DiBenedetto Tr.) 80:14-84:10, 87:12-88:5, 90:13-91:8, 105:2-107:8, 148:1-18 (discussing Recruiter Trainee training).)**

90.    When Recruiters speak to a candidate, their skills and experience may not match the client's prerequisites. Ex. 13 (Doyle Tr.) 169:5-17, 171:13-23.

**TEK'S RESPONSE TO PARAGRAPH 90: Admitted. Note, however, that the phrase "client's prerequisites" does not have a standard meaning at TEK, as confirmed by the many references throughout this document to "job requirements" and "job requisitions," which are the documents intended to embody the information needed for Recruiters to find individuals to fill roles for TEK's clients.**

91.    Candidates may not be interested in an open position for a variety of reasons, including: the pay is too low, the location is not appealing, the position is for a contract term and the candidate wants a permanent job, the candidate may not like the company, or the candidate may not want to leave their current position. Ex. 13 (Doyle Tr.) 145:25-148:17 (enumerating the

reasons candidates may not be interested in a job), 172:20-173:24; Ex. 18 (Haycock Tr.) 30:18-32:3.

**TEK'S RESPONSE TO PARAGRAPH 91: Admitted.**

92.    If the candidate's experience and skills match the client's requirements, and is interested in the position, Recruiters forward their resume and information to the Account Managers. Ex. 12 (DiBenedetto Tr.) 114:23-25 (Q: "Who are recruiters trying to present candidates to?" A: "Their account managers, specifically."), 162:18-163:7; Ex. 18 (Haycock Tr.) 60:7-12; Ex. 17 (Fronzaglio Tr.) 155:18-20; Ex. 26 (Pappas Tr.) 62:10-24, 137:15-19; Ex. 46 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846; Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097923 ("Ask your coach to show you how they present candidates to AMs in your office."); Ex. 117 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 77 ("Sell/present the candidate to AM in person"); Ex. 102 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952; ECF Nos. 156-1 (Fink Dec.) ¶ 26; 156-5 (Bohen Dec.) ¶ 21; 156-6 (Rice Dec.) ¶ 12; 156-7 (Warren Dec.) ¶ 18; 156-11 (Marshall Dec.) ¶ 18; 156-12 (Payonk Dec.) ¶ 20.

**TEK'S RESPONSE TO PARAGRAPH 92: Disputed.**

**Disputed that it is sufficient that a "candidate's experience and skills match the client's requirements, and is interested in the position" in order to move the candidate forward in the process. (See, e.g., Df. Ex. 53, Budde Decl., ¶ 18 ("My assessment of whether a candidate is a good match for a customer's job requirements goes beyond just confirming that they have the right technical skills. Through my interactions with a candidate, I am also assessing their communication style, how they present themselves, whether they conduct**

themselves professionally, and whether they will be able to work well with others on the customer's project or team."); Df. Ex. 51, Harvey Decl., ¶ 12 ("There are a variety of factors I assess when reviewing the candidate for a position. Some client's development teams include people in many different positions, so I need to determine if the candidate has a deep enough technical knowledge for the specific type of position I am recruiting for. That requires that I need to know the proper questions to ask so I am not wasting the candidate's time with a position that is not suitable for them. Over time, I have created my own set of questions to ask candidates when interviewing them to determine if they would be qualified for a specific position. If the candidate can speak about all of the technologies, I have to make a judgment call on whether the candidate actually has the skills and knowledge needed for the position. This judgment call is critical because submitting an unqualified candidate for a requisition does not help me, and in fact can damage my relationships with Account Managers.")

Disputed that Recruiters merely "forward [the candidate's] resume to the AMs" if the Recruiter decides that the candidate should move forward in the process. (See, e.g., Df. Ex. 40, Walther Decl., ¶ 9 "(A Recruiter who just screens candidates to see if they possess the minimum qualifications for a req, then sends the candidate to an AM, is not meeting TEK's expectations. In my view, that's no different than sending a spam email."); Df. Ex. 43, Compton Decl., ¶ 21 ("I only present a candidate to an Account Manager if the candidate has been fully qualified by me through my vetting process, and if the candidate is excited about the opportunity. I create a package for the Account Manager that explains why the candidate is a good fit, what the candidate's references had to say, and the results of any technical assessment that the candidate completed. After I send the package to the

Account Manager, I will call to tell them to verbally explain why the candidate is a good fit for the requirement.").)

Disputed also because Plaintiffs' citations do not support the statement. Plaintiffs' citation to the testimony of DiBenedetto is incomplete. In his complete response, DiBenedetto explains that during the particular Recruiter Trainee presentation being discussed, Recruiter Trainees practice presenting their candidates to their Account Manager, but in practice each Account Manager does it differently and may train Recruiters to directly present candidates to a client. (Df. Ex. 24, DiBenedetto Tr. 113:7-114:25.)

The cited testimony by Haycock demonstrates that Recruiters do more than confirm whether the candidate's experience and skills match the client's requirements, and is interested in the position, then forward the resume and information to an AM; the Recruiter's "job is to find the absolute best talent and the best match between the consultant's skills, goals, and interests and the customer's needs." (Pls. Ex. 18 (Haycock Tr.) 32:10-13.) The complete answers by Haycock make the point even more clear, explaining that Recruiters consider not just "hard skills and technical skills," but also the candidate's interests (e.g., working independently v. as part of a collaborative team; in person v. remote v. hybrid; nature of the work; pay rate). (*Id.*, 30:18-32: 13.) As Haycock summarized, "when you say 'find,' it's like it's not just doing a database search and looking at all of the people and saying, Okay, this is the right person for the job. There's a lot more complexity in it than that." (*Id.*)

The cited testimony by Fronzaglio relates to a decision that an Account Manager may take after receiving a recommended candidate from a Recruiter, but is silent

regarding the actions taken by a Recruiter prior to that point, which is the subject of the statement. **(Pls. Ex. 17 (Fronzaglio Tr.) 155:18-20.)**

**Plaintiffs' Ex. 46** is an unauthenticated email document from January 10, 2017 (outside the relevant time period) with an unauthenticated attachment. The cited page states that "Our recruiters identify and prepare IT professionals for the career opportunities presented by our AMs." **(Pls. Ex. 46 (Career Opportunities & Expectations) at TEK-Recruiter_Lit-00386846.)** This is reflective of Recruiters and Account Managers working together in a partnership.

**Plaintiffs' Ex. 75** is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. **(Pls. Ex. 75 (Recruiter Onboarding Plan) at TEK-Recruiter_Lit-00097923 ("Ask your coach to show you how they present candidates to AMs in your office.").)** No explanation is provided why this supports Plaintiffs' statement.

**Plaintiffs' Ex. 117** is an unauthenticated June 1, 2018 email with an attached presentation from a pilot program to "train the trainer" as it relates to Recruiter Leads. **(Pls. Ex. 117 (Lighthouse Recruiter Lead) TEK-Recruiter_Lit-00125482 at 77.)** The portion cited by Plaintiffs is consistent with TEK's explanations of its dispute above.

**Plaintiffs' Ex. 102** is an unauthenticated document, bearing no date and having no description of its purpose or intended audience. **(Pls. Ex. 102 (Presenting a Candidate to an Account Manager) TEK-Recruiter_Lit-00527952.)** Plaintiffs highlight that the document says "SELL THE CANDIDATE: You're an inside sales person." (*Id.*) Other content on the page is consistent with TEK's explanations of its dispute above, including that before "selling" the candidate to the AM, the presenter must be "extremely familiar with the

account, the req., and the candidate" and able to explain "Why the candidate is a great fit," "Why the candidate is a great cultural fit," and "Why the candidate is excited about the opportunity," among other things. (*Id.*)

Declarations from Recruiters also confirm TEK's basis for disputing the statement. *See, e.g.,* ECF No. 156-1 (Fink Decl.) ¶ 26 (only presents "the best match" to a req); 156-5 (Bohen Decl.) ¶ 21 (explained his conclusions why candidate should be submitted); 156-6 (Rice Decl.) ¶ 12 (describing extensive steps taken to validate candidate fit before proceeding); 156-7 (Warren Decl.) ¶ 18 (creates detailed packet "that describes why the candidate is the right person for the job;" common to present a candidate directly to a client); 156-11 (Marshall Decl.) ¶ 18 (does due diligence, and if the candidate is "the right fit," will advocate for my candidate with the AM"); 156-12 (Payonk Decl.) ¶ 20 (created detailed packages about the candidates; wanted to "make the AMs life easy" and establish trust that her "candidates are ready to be submitted to the client").

93.    Account Managers determine which candidates to forward on to the client. Ex. 12 (DiBenedetto Tr.) 162:18-163:17; Ex. 17 (Fronzaglio Tr.) 155:18-20; Ex. 26 (Pappas Tr.) 62:10-24, 137:15-19; Ex. 127 (Operations Playbook) at TEK-Recruiter_Lit-00019675 ("AMs must thoroughly screen or disqualify candidates."); Ex. 128 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets"); Ex. 81 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325 ("the Account Manager has submitted this person to the customer."); ECF Nos. 156-1 (Fink Dec.) ¶ 26; 156-5 (Bohen Dec.) ¶ 21; 156-6 (Rice Dec.) ¶ 12; 156-7 (Warren Dec.) ¶ 18; 156-11 (Marshall Dec.) ¶ 18.

**TEK'S RESPONSE TO PARAGRAPH 93:** Disputed.

The decision which candidate to submit to a client often reflects a partnership between a Recruiter and an AM. (Df. Ex. 53, Budde Decl., ¶ 14 ("I do not report to an Account Manager, but I do partner with Account Managers frequently."); Df. Ex. 51, Harvey Decl., ¶ 19 ("In my job at TEKsystems, I work with multiple Account Managers to analyze the hiring needs of the clients and develop strategies to have our candidates chosen for positions. The Account Manager is not my supervisor. I treat it as a partnership to determine how to best address the clients' hiring needs. The Account Manager manages the network of clients, and I specialize in various types of technologies and develop a network of candidates who have the requisite skills in those technologies.")). Sometimes Recruiters present directly to a client. (Df. Ex. 34, Warren Decl. ¶ 18.)

Undisputed for the additional reason that Plaintiffs' citations do not support the statement. Plaintiffs cite testimony by DiBenedetto, he explains that what is a "high value activity" by a Recruiter "depends on what part of the recruiting efforts they're in." (Pls. Ex. 12 (DiBenedetto Tr.) 162:18-163:7.) In one hypothetical example, he describes what a Recruiter might do after an AM presents a candidate to a customer. (*Id.*) DiBenedetto does not testify this is strictly adhered to. (*Id.*)

Similarly, the cited testimony by Fronzaglio relates to a decision that an Account Manager may take after receiving a recommended candidate from a Recruiter, but she does not testify this is strictly adhered to. (Pls. Ex. 17 (Fronzaglio Tr.) 155:18-20.)

Plaintiffs' Ex. 127 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 127 (Operations Playbook) at TEK-Recruiter_Lit-00019675.) Plaintiffs point to a statement in the document that "AMs

must thoroughly screen or disqualify candidates." (*Id.*) This statement is irrelevant, since it purports to speak to an AM job duty, not a Recruiter job duty, and does not foreclose a Recruiter doing the same.

Plaintiffs' Ex. 128 (Orange County 2021 Quarterly Operating Plan) at TEK-Avery-00501727 ("Account Managers [w]ill proactively submit all candidates that match customer skill sets")

Plaintiffs' Ex. 81 is an unauthenticated document bearing no date and having no description of its purpose or intended audience. (Pls. Ex. 81 (Digital REDZONE Script) at TEK-Recruiter_Lit-00004325.)

94.    The clients, not Recruiters, determine who to interview, hire, and terminate, and how much to pay them. Ex. 12 (DiBenedetto Tr.) 167:9-14 (testifying that Recruiters do not make hiring and firing decisions) (Q: "Do recruiters make the ultimate [termination] decisions for the consultants?" A: "No."), 188:2-9; Ex. 13 (Doyle Tr.) 158:1-12 (client interviews the candidates), 192:13-193:14 (TEK's clients make hiring decisions), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes."); Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 144 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview."); Ex. 79 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at 20-21 (TEK's clients interview candidates); Ex. 80 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted our screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 81 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325;

ECF Nos. 156-7 (Warren Dec.) ¶¶ 19-20; 156-11 (Marshall Dec.) ¶ 19; 156-12 (Payonk Dec.) ¶ 21.

**TEK'S RESPONSE TO PARAGRAPH 94: Disputed in part. Undisputed that clients do not have to engage, or continue to engage, the services of a consultant presented by TEK.**

**Disputed that Recruiters do not interview candidates. Indeed, in Paragraph 71, Plaintiffs state that "interviews" are an action taken by Recruiters and recorded in Connected.**

**Disputed that clients interview Recruiters. In some circumstances, TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 17 McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 8, Doyle Tr. 201:2-19.)**

**Disputed that clients hire consultants. That is true of direct hire arrangements, (Df. Ex. 58, T. Raras Tr. 40:20-41:7, 43:2-13.) In contrast, for staff augmentation engagements, the consultant is employed by TEK and placed on assignment to TEK's client. (Df. Ex. 58, T. Raras Tr. 41:8-13; Df. Ex. 7, Haycock Tr. 27:2-30:6.) For another type of engagement, managed solutions, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client. (Df. Ex. 7, Haycock Tr. 26:1-22, 34:7-37:4.) In other circumstances, TEK's client has outsourced to a third-party MSP how its relationships with contingent workers are handled. (Df. Ex. 17, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 8, Doyle Tr. 201:2-19.)**

**Disputed that only clients may terminate consultants. As noted above, TEK employs the consultants and may independently terminate a consultant's employment. (Df. Ex. 59, Thomas Tr. 113:1-10; Df. Ex. 7, Haycock Tr. 36:9-38:3.)**

**Disputed that clients determine how much to pay a consultant. In most arrangements, TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 13 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 8, Doyle Tr. 193:15-194:16.) Separately, a Recruiter negotiates with the candidate the *pay rate* amount that the candidate will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 58, T. Raras Tr. 41:14-42:19.) Thus, the pay rate and other terms and conditions that a Recruiter negotiates with a candidate directly impact TEK's bottom line.**

95.     TEK's clients, not Recruiters, interview the candidates. Supra ¶ 94; Ex. 12 (DiBenedetto Tr.) 188:2-9; Ex. 13 (Doyle Tr.) 158:1-12, 159:3-10, 199:4-17; Ex. 79 (Account Manager 2 Facilitator Guide) TEK-Recruiter_Lit-00152588 at 20-21 (TEK's clients interview candidates); Ex. 80 (Proposal Template for a Computer and Consumer Electronics Company) at TEK-Recruiter_Lit-00545575 ("Once we have conducted our screening, your team will have the ability to conduct interviews and offer final approval on all TEKsystems candidates."); Ex. 81 (Digital REDZONE Script) TEK-Recruiter_Lit-00004325; Ex. 78 (Connected User Guide) TEK-Recruiter_Lit-00175558 at 144 ("Client has requested an interview with the talent. Recruiter is reaching out to talent to schedule the interview.").

**TEK'S RESPONSE TO PARAGRAPH 95: Disputed.**

**Disputed that Recruiters do not interview candidates. This is conceded by Plaintiffs, who Paragraph 71 identify "interviews" as an action taken by Recruiters and recorded in Connected.**

**Disputed that clients interview candidates in all circumstances. For example, in some circumstances TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 17, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 8, Doyle Tr. 201:2-19.) As another example, for a managed solutions arrangement, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client rather than presenting candidates to work with the client directly. (Df. Ex. 7, Haycock Tr. 26:1-22, 34:7-37:4.)**

96.    If the client decides to make an offer, Recruiters relay the offer to the candidate. Ex. 13 (Doyle Tr.) 277:13-20; ECF Nos. 156-12 (Payonk Dec.) ¶ 21.

**TEK'S RESPONSE TO PARAGRAPH 96: Disputed in part. Disputed that clients make an offer in all circumstances. For example, in some circumstances TEK's client has outsourced to a third-party (a managed service provider, or MSP) how its relationships with contingent workers are handled. (Df. Ex. 17, McNelley Tr. 16:1-18:13, 163:2-165:4; Df. Ex. 8, Doyle Tr. 201:2-19.) As another example, for a managed solutions arrangement, TEK provides total management of the consultants to provide a fully outsourced, outcome-based solution for the client rather than presenting candidates to work with the client directly. (Df. Ex. 7, Haycock Tr. 26:1-22, 34:7-37:4.)**

97.    Recruiters do "not oversee[] the actual work getting done." Ex. 18 (Haycock Tr.) 36:16-17; *see also* Ex. 12 (DiBenedetto Tr.) 167:12-14, 167:19-168:7.

**TEK'S RESPONSE TO PARAGRAPH 97: Admitted.**

98.    Recruiters are not evaluating the substance of consultants' work. Ex. 12 (DiBenedetto Tr.) 167:19-168:7; Ex. 18 (Haycock Tr.) 36:12-17, 121:20-122:16, 144:18-145:12; Ex. 19 (Hollister Tr.) 46:6-12, 139:7-19; Ex. 22 (Kartchner Tr.) 124:24-125:4.

**TEK'S RESPONSE TO PARAGRAPH 98: Admitted.**

99.    Recruiters also do not technically evaluate potential job candidates. Ex. 18 (Haycock Tr.) 121:20-122:16 (TEK uses a third-party software to evaluate consultants' technical skills, and evaluation of a person's technical abilities is not typically the responsibility of Recruiters); Ex. 12 (DiBenedetto Tr.) 168:2-7.

**TEK'S RESPONSE TO PARAGRAPH 99: Disputed in part.**

**Plaintiffs' statement is vague and ambiguous with respect to the meaning of "technically evaluate." Recruiters carefully evaluate all relevant aspects of a candidate to determine whether they are the best match for a requirement. (Df. Ex. 7, Haycock Dep. 27:14-30:2 (among other things, Recruiters evaluate candidates' qualifications against the role requirements); Df. Ex. 19 (TEK-Recruiter_Lit-00407375) (Recruiter "Evaluate the strengths and weaknesses of candidates").)**

**Undisputed that TEK has available to it third-party software that may be used to evaluate a candidate's proficiency with certain technical skills. (Pls. Ex. 18 (Haycock Tr.) 121:20-25.)**

**Disputed that such third-party software is necessary to evaluate all types of technical skills or for all Recruiters. Haycock testified that the need for such software evaluations "depend[s] on the particular skill and how long the recruiter has been doing the job." (Pls. Ex. 18 (Haycock Tr.) 122:1-3.) Recruiters have testified to possessing such expertise. (See Df. Ex. 42, Mendez Decl., ¶ 9 ("I have developed specific technical knowledge so that I can understand and assess the qualifications of the front end engineers that I place. In my experience, front end engineers have their own language, including around Java script and React and Angular computing languages used in their work, and I have had to learn how to communicate in their language as well."); Df. Ex. 29, Fink Decl., ¶ 8 ("I joined online user groups to learn about the technology in these areas, and I would attend in-person meet-up groups of people who did this type of work to learn more. I spent a lot of time speaking directly with engineers to learn about what they do. While I did not earn a technical degree in college, I am able to speak in depth with people who do technical work, understand what they are describing, and describe it for other technical and non-technical people as well."); Df. Ex. 32, Bohen Decl., ¶ 15 ("The way I learned these specialized skills was through studying in TEK's Degreed pathways, which are like a curriculum and materials to help you learn about specific skill sets. I also learned a lot by talking with consultants who use these skillsets. I ask them lots of questions to help me understand the technologies they use and how they use them, and over time I've come to understand these topics very well.").)**

100.    TEK uses standardized online technical assessments and "Tech Outs" (in-person or telephonic skills evaluations with third-party experts paid for by TEK) to evaluate candidates' technical skill. Ex. 129 (Recruiter Skill Plan Onboarding Facilitator Guide March 2020) TEK-

Recruiter_Lit-00077253 at 31 (explaining that "TEKsystems has various tools to help validate the skills of our consultants and set them apart from the competition" and describing these tools as IKMs (standardized online assessments) and Tech Outs (in person or telephonic evaluations conducted and scored by experts paid by TEK); Ex. 130 (Doyle Email Aug. 13, 2020) TEK-Recruiter_Lit-00125624 (showing technical screenings of consultants are performed either through an assessment or a Tech Out from a consultant).

**TEK'S RESPONSE TO PARAGRAPH 100: Disputed in part.**

**Undisputed that, as noted elsewhere, TEK has available to it third-party software that may be used to evaluate a candidate's proficiency with certain technical skills, or arranging "Tech Outs" to do the same. (See TEK's Response to Paragraph 99.)**

**Disputed that these are the only ways that Recruiters may make technical assessments of a candidate's technical skills. (See TEK's Response to Paragraph 99.)**

101.    Recruiters do not manage consultants or evaluate their work. Ex. 18 (Haycock Tr.) 36:16-17 (Recruiters do "not oversee[] the actual work getting done."), 121:20-122:16, 144:18- 145:12; Ex. 21 (Johnson Tr. II) 114:11-14; Ex. 12 (DiBenedetto Tr.) 167:12-14, 167:19-168:7; Ex. 19 (Hollister Tr.) 46:6-12, 139:7-19; Ex. 22 (Kartchner Tr.) 124:24-125:4.

**TEK'S RESPONSE TO PARAGRAPH 101: Disputed in part.**

**Recruiters are do not evaluate the substance of consultants' work. See Paragraph 98.**

**Disputed that Recruiters do not manage consultants who are on assignment. (Df. Ex. 7, Haycock Dep. 27:14-30:2 (explaining how Recruiters are responsible to manage consultants they have placed on assignment); Df. Ex. 15 (compiling testimony regarding managing consultants on assignment).**

**B.      Recruiters' Primary Job Duty Does Not Relate to the Management or Business Operations of TEK or its Customers.**

102.    Recruiters do not create or implement management or operational policies for TEK or its customers. Ex. 12 (DiBenedetto Tr.) 167:15-18; Ex. 18 (Haycock Tr.) 69:13-72:16 (TEK circulates a weekly "Executive Dashboard" to its executives, and not recruiters, because the executives are "running [the] business."), 158:20-162:5 (testifying that Recruiters do not create or implement human resource, operational, or management policies for TEK or its clients).

**TEK'S RESPONSE TO PARAGRAPH 102: Admitted.**

103.    Recruiters have no authority to: waive or deviate from TEK's policies and procedures in performing their work; formulate, interpret, or enforce management policies or operating procedures; or negotiate or enter into contracts on behalf of TEK or its clients. Ex. 12 (DiBenedetto Tr.) 167:15-18; Ex. 13 (Doyle Tr.) 30:11-23 (testifying that he negotiated contracts as an AM and Director of Business Operations), 194:13-16 (Q: "But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate?" A: "Correct. Yes."); Ex. 18 (Haycock Tr.) 159:1-162:5 (Recruiters cannot bind TEK in legal proceedings); Ex. 9 (Def.'s Resp. to Pls. 3rd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters.").

**TEK'S RESPONSE TO PARAGRAPH 103: Disputed in part. Undisputed that Recruiters do not negotiate contracts on behalf of TEK's clients.**

**Disputed that Recruiters may not deviate from TEK's policies or procedures. Recruiters have discretion to devise their own approach to how they perform their job**

duties. **See Df. Ex. 16, collecting statements about how different Recruiters approach**

**sourcing strategy; Recruiters have individual approaches for validating that candidates in**

**fact possess the skills and other attributes relevant to the job requirement. Df. Ex. 56, Bury**

**Tr. 116:23-118:24, 119:22-120:5; Df. Ex. 47, Rothermich Decl. ¶¶ 3-10; Df. Ex. 43,**

**Compton ¶ 18; Df. Ex. 46, Whitman ¶ 20; Df. Ex. 42, Mendez ¶¶ 9, 14; Df. Ex. 41, Guffy ¶**

**12; Df. Ex. 45, McCarty ¶ 15; Df. Ex. 48, Yancey ¶ 17, 18; Df. Ex. 50, Kehl ¶ 11; Df. Ex. 52,**

**Ferrari ¶ 11; Df. Ex. 53, Budde ¶ 18.**

> **Disputed that Recruiters may not enter into contracts on behalf of TEK. A Recruiter**
>
> **negotiates with the candidate the pay rate amount that the candidate will accept to perform**
>
> **the work. (Df. Ex. 8, Doyle Tr. 194:17-195:7.) A Recruiter also negotiates with the candidate**
>
> **other conditions of employment that affect TEK's "burden" amount, i.e., its overhead costs,**
>
> **such as for paid time off. (*Id.*, 196:1-198:9.)**

> 104.    Recruiters do not have the authority to negotiate or bind TEK or its clients with
>
> respect to significant matters. Supra ¶ 77; Ex. 12 (DiBenedetto Tr.) 109:23-110:3; Ex. 18 (Haycock
>
> Tr.) 123:1-24, 158:20-161:15; Ex. 13 (Doyle Tr.) 194:13-16, 198:19-25, 209:2-12; Ex. 9 (Def.'s
>
> Resp. to Pls. 3rd Interrogatories) No. 1 ("The rates negotiated between Defendant and its customers
>
> are not relevant to the duties performed by Recruiters.").

> **<u>TEK'S RESPONSE TO PARAGRAPH 104:</u> Disputed. Recruiters have the authority**
>
> **to negotiate on behalf of TEK and to bind TEK with respect to the terms and conditions of**
>
> **employment agreed by contractors. (Df. Ex. 13, collecting testimony that Recruiters *negotiate***
>
> **rates.)**

This is a significant matter for TEK because it impacts TEK's net profits. TEK and its client reach an agreement regarding the *bill rate*, i.e., how much the client will pay for the services provided by a consultant that a Recruiter places on assignment. (Pls. Ex. 13 (Doyle Tr.) 194:13-16, 198:19-25; Df. Ex. 8, Doyle Tr. 193:15-194:16.) A Recruiter negotiates with the candidate the *pay rate* amount that they will accept to perform the work. (*Id.*, 194:17-195:7.) A Recruiter also negotiates with the candidate other conditions of employment that affect TEK's "*burden*" amount, i.e., its overhead costs, such as for paid time off. (*Id.*, 196:1-198:9.) The difference between these figures is the margin or net profit, which TEK refers to as "spread." (*Id.*, 68:23-69:23; Df. Ex. 58, T. Raras Tr. 41:14-42:19.) Thus, the pay rate and other terms and conditions that a Recruiter negotiates with a candidate directly impact TEK's bottom line.

The ability of a Recruiter to negotiate also is a significant matter for TEK's customers. TEK's customers engage the company to find and assign talented IT professionals to perform work the customers need. (Df. Ex. 55, collecting testimony about how Recruiters help TEK's customers.) Negotiating pay rates that consultants will accept means that they will go to work for the customers and provide the services the customers need.

105.    They do not supervise anyone; represent TEK or its clients in formal grievance proceedings; advise TEK or its clients on how to more efficiently run their operations; or study or recommend changes to the operations or corporate structure of any business. Supra; Ex. 18 (Haycock Tr.) 34:3-6, 69:9-71:22, 122:17-123:25, 160:15-162:5; Ex. 131 (Horonzy Email Nov.

14, 2018) TEK-Recruiter_Lit-00550518 (demonstrating TEK's wage and hour team – not Recruiters – determines consultants' overtime status).

**TEK'S RESPONSE TO PARAGRAPH 105: Disputed in part.**

Undisputed that Recruiters do not represent TEK or its clients in formal grievance proceedings; advise TEK on hot to more efficiently run its operations; or study or recommend changes to the corporate structure of TEK or its clients.

Disputed that Recruiters do not supervise anyone, advise TEK's clients on how to more efficiently run their operations, or study or recommend changes to the operations of TEK's clients.

The sources cited by Plaintiffs do not support their statement. Plaintiffs cited only a portion of a response by Haycock regarding TEK's capacity solutions offering, and whether TEK or its clients decide how many people to hire. The complete exchange shows that TEK is making that decision some of the time. (Pls. Ex. 18 (Haycock Tr.) 32:15-34:6. The second cited portion of Haycock's testimony only confirms that certain business executives are responsible for running the operations of TEK's business, such as monitoring the company's financial health. (*Id.*, 69:9-71:22.) The third cited portion of Haycock's testimony does not touch on any of the topics mentioned in Plaintiffs' statement. (*Id.*, 122:17-123:25.) In the final cited portion of Haycock's testimony, he confirms that Recruiters are part of evaluating TEK's operations in order to help give the company a better understanding of how to improve. (*Id.*, 160:15-162:5.)

Plaintiffs' Ex. 131 is immaterial. The document is an unauthenticated, vague, and ambiguous email dated November 14, 2018. (Pls. Ex. 131 (Horonzy Email Nov. 14, 2018) TEK-Recruiter_Lit-00550518.) The titles or roles of the sender and recipient are not

provided. (*Id.*) **The document refers to TEK's "wage and hours team" but does not explain who is or is not part of that team. (*Id.*) Nothing in the document relates to the assertions made by Plaintiffs in their statement.**

106.   Recruiters do not provide human resource services, public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients. Ex. 18 (Haycock Tr.) 123:21-24, 158:20-161:15; Ex. 13 (Doyle Tr.) 198:19-25, 209:2-12.

**TEK'S RESPONSE TO PARAGRAPH 106: Disputed in part. Undisputed that Recruiters do not provide public relations services, employee benefit functions, quality control services, or advertising or marketing services for TEK or its clients.**

**Disputed that Recruiters do not provide human resource services for TEK or its clients.**

**The sources cited by Plaintiffs do not support their statement. In the cited testimony by Haycock, he agreed that "Recruiters do not fall under TEK's human resources department" and Recruiters do not "make determinations internally at TEK regarding human resources." (Pls. Ex. 18 (Haycock Tr.) 123:21-24, 158:20-161:15.) In the cited testimony by Doyle, he agreed that Recruiters "are not required to have human resources certification" and do not have any control over benefits offered when there is a direct placement, i.e., when the individual is hired directly by TEK's client, as opposed to being employed by TEK and placed on assignment to the client on a temporary basis. (Pls. Ex. 13 (Doyle Tr.) 198:19-25, 209:2-12.)**

None of these responses contradict the idea that Recruiters perform duties akin to human resources services for TEK or its clients.

**C.    TEK's Connected Data Shows Recruiters Overwhelmingly Spend Their Time Contacting Candidates.**

107.    Recruiters use TEK's Connected database to search for potential candidates, review information about candidates, and record the work activities they perform. Ex. 18 (Haycock Tr.) 140:19-22, 150:21-152:2; Ex. 19 (Hollister Tr.) 67:4-19; Ex. 8 (Def.'s Resp. to Pls. 1st Interrogatories) No. 5.

**TEK'S RESPONSE TO PARAGRAPH 107: Disputed in part.**

**Undisputed that Connected is one resource to search for and review information about potential candidates. Also undisputed that some activities performed by Recruiters are recorded in Connected.**

**Disputed that Connected is the only resource to search for and review information about potential candidates. See TEK's Responses to Paragraph 78, 81, and 82 and Df. Ex. 16, collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn.**

**Disputed that all activities by Recruiters are recorded in Connected. For example, Plaintiffs assert in Paragraph 69 that Recruiters' primary duty is to "screen and match IT job candidates for open roles." These activities are not recorded in Connected. (See ECF No. 190-19 (Calderon Dec.).)**

108.    TEK expects Recruiters to enter their activities into Connected in real time. Ex. 12 (DiBenedetto Tr.) 180:13-181:10; Ex. 13 (Doyle Tr.) 124:25-126:20; Ex. 53 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291.

**TEK'S RESPONSE TO PARAGRAPH 108:** Disputed.

**Some activities occur while away from a computer and cannot be recorded in real time. (Df. Ex. 59, Thomas Tr. 198:20-202:24 (Meals, Meetings, IOIs not recorded in Connected in real time).)**

**Plaintiffs' citations do not support the Paragraph.**

**Plaintiffs cite testimony by DiBenedetto, but in that passage he speaks only about "Call" and "Attempted Call" activity in the Connected database. (Pls. Ex. 12 (DiBenedetto Tr.) 180:13-182:13.)**

**Plaintiffs cite testimony by Doyle, but in the passage he says only that TEK has an "expectation" that Recruiters will "timely enter in activities that they've engaged in." (Pls. Ex. 13 (Doyle Tr.) 124:25-126:20.)**

**Plaintiffs' Ex. 72 is an email exchange initiated by Doyle on July 9, 2020. (Pls. Ex. 72 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291.) Doyle asks various leaders to "Set documentation expectations with your AMs and Recruiters," elaborating "We should strive for real-time documentation[.]" (*Id*.) The reason provided for the request was to improve data accuracy. (*Id*.)**

109.    Defendant produced Connected data for the seven Named Plaintiffs and 116 Opt-in Plaintiffs and Declarants. ECF No. 190-19 (Calderon Dec.) ¶ 11.

**TEK'S RESPONSE TO PARAGRAPH 109:** Admitted.

110.    The Connected data identifies the work activities the Named Plaintiffs, Opt-in Plaintiffs, and Declarants performed and the dates and times the activities were performed. Ex. 12 (DiBenedetto Tr.) 180:13-181:10; Ex. 13 (Doyle Tr.) 124:25-126:20; Ex. 53 (Doyle Email July 9, 2020) TEK-Recruiter_Lit-00194291; ECF No. 190-19 (Calderon Dec.) ¶ 5, Attachment 1.

**TEK'S RESPONSE TO PARAGRAPH 110: Disputed.**

**Some of the data in Connected relates to work activities by the Named Plaintiffs, Opt-in Plaintiffs, and Declarants. The Connected database includes dates and times when activities are recorded in the database, but activities are not necessarily recorded contemporaneously.**

**Disputed that all work activities are recorded in Connected. For example, in Paragraph 69, Plaintiffs claim that "Recruiters' primary job duty is to screen and match IT job candidates for open roles with TEK's clients…" Recruiters do not record "screening" or "matching" in Connected. (See ECF No. 190-19 (Calderon Dec.).)**

111.    The data shows that 31.90% of the Recruiters' activities recorded in Connected were "Attempted Contact," followed by "G2" at 19.25%, and "Call" at 22.98%, which altogether comprise approximately 74% of the total work activities. ECF No. 190-19 (Calderon Dec.) ¶ 14, Attachment 9.

**TEK'S RESPONSE TO PARAGRAPH 111: Disputed in part.**

**While TEK has been unable to replicate these calculations, undisputed that the percentages are generally consistent with TEK's calculations based on the same sets of data.**

**Disputed that it is possible for Plaintiffs' calculations to reflect a percentage of "total work activities." As noted elsewhere, only a limited set of Recruiter work activities are recorded in Connected at all. (See TEK's Response to Paragraph 110, explaining that Connected does not include the duties that Plaintiffs claim are their primary duties.) Plaintiffs' calculations reflect only the percentages of activities recorded in Connected, not all Recruiter activities . (ECF No. 190-19 (Calderon Dec.) ¶ 14, Attachment 9.)**

112.    An "attempted contact" "means the recruiter made a phone call and the consultant did not answer." Ex. 12 (DiBenedetto Tr.) 180:15-22.

**TEK'S RESPONSE TO PARAGRAPH 112: Admitted.**

113.    The Connected data further shows that the number of attempted contacts, G2 intake calls, and calls the Sample Recruiters made dwarfed their submittals and starts:

| Activity | Count | % |
|---|---|---|
| Attempted Contact | 238,398 | 31.90% |
| G2 | 143,893 | 19.25% |
| Call | 171,714 | 22.98% |
| Submitted | 15,399 | 2.06% |
| Started | 2,509 | 0.34% |

ECF No. 190-19 (Calderon Dec.) ¶¶ 14-20, Attachment 9.

**TEK'S RESPONSE TO PARAGRAPH 113: Immaterial and disputed.**

**A Connected record of "Started" reflects that a candidate began work for a TEK customer on that day. (Df. Ex. 56, Bury Tr. 80:21-81:8.) In other words, a record of "Started" reflects the culmination of a variety of interactions with the candidate, as well as interactions with candidates who were not a match to the job requirements. That there**

**necessarily must be more preceding interactions than starts is irrelevant to determining**

**Recruiters' primary job duties.**

**Disputed because different "Activities" recorded in Connected are not comparable.**

**An "Attempted Contact" might range from 10 seconds to two minutes. (Df. Ex. 56, Bury**

**Tr. 64:13-65:15; Df. Ex. 58, T. Raras Tr. 94:15-95:2.) A "Call" might range from 30**

**seconds to 30 minutes. (Df. Ex. 56, Bury Tr. 65:16-67:8; Df. Ex. 58, T. Raras Tr. 95:3-**

**95:22; Df. Ex. 60, Richenberg Tr. 80:5-80:15.)**

114.    Recruiters' Activity levels are consistent among the Rule 23 classes. ECF No. 190-19 (Calderon Dec.) ¶¶ 21-25.

**TEK'S RESPONSE TO PARAGRAPH 114:** **Disputed as vague and ambiguous. The**

**meaning of Plaintiffs' Paragraph is disputed because it is vague and ambiguous as to what it**

**means for "Rule 23 classes" to be "consistent" as it relates to "Activity levels."**

115.    On average on a monthly basis, one job candidates who Recruiters screen and match are ultimately placed at one of TEK's customers. ECF No. 190-19 (Calderon Dec.) ¶ 28.

**TEK'S RESPONSE TO PARAGRAPH 115:** **Disputed as vague and ambiguous and**

**immaterial.**

**The meaning of Plaintiffs' Paragraph is disputed because it is vague and ambiguous**

**as to what "one job candidates" means; or what monthly "average" is being discussed; or**

**whether "placed" refers to consultants newly placed on assignment, those continuing on**

**assignment, or something else altogether.**

**Disputed for the additional reason that Plaintiffs' Paragraph 115 is not supported by the cited declaration.**

**Paragraph 115 states that "on average, the Sample Recruiters recorded the Activity Type "Started" one time per month." (ECF No. 190-19 (Calderon Dec.) ¶ 28.) In other words, the Paragraph exceeds the scope of the Declaration by suggesting the conclusions apply to Recruiters generally, rather than just those "Sample Recruiters" in the data reviewed.**

**Paragraph 115 is immaterial because a Connected event of "Started" is not a primary job duty of Recruiters. Rather, it is an outcome of a Recruiter's job duties.**

116.    TEK's documents describe the role as "fast paced." *See* Ex. 95 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045218 ("TEKsystems seeks professional individuals with competitive spirit, drive, team mentality, courage, commitment, perseverance, and a desire to build a career in a fast paced environment."); Ex. 96 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056676 ("Before we move on, it's important that we address the elephant in the room - speed to market. While the screening process we just walked through looks linear, it's really meant to be very dynamic. . . . We must have focus and urgency and work to qualify or disqualify the candidate as quickly as possible.").

**TEK'S RESPONSE TO PARAGRAPH 116: Disputed as unsupported by the evidence and immaterial.**

**Plaintiffs' Ex. 95 (Ligouri Dec. 6, 2018 Email) at TEK-Recruiter_Lit-00045218 states that the *environment* is fast paced, not that the *role* is fast paced.**

**Plaintiffs' Ex. 96 (Onboarding Pathway Script) at TEK-Recruiter_Lit-00056676 does not mention "fact pace" at all. In fact, the overarching theme of the video script that Plaintiffs have cited is the importance of understanding TEK's customers' business and very carefully and thoroughly vetting the skills of candidates in order to ensure the best match.** *See* **TEK-Recruiter_Lit-00056675 – TEK-Recruiter_Lit-00056676.**

**Furthermore, whether the work of Recruiters is "fast-paced" is vague in its meaning and is irrelevant to the classification of the role.**

DATED: November 7, 2025                    Respectfully submitted,

                                                         SEYFARTH SHAW LLP


                                                         By: /s/ Andrew Scroggins
                                                              Andrew L. Scroggins
                                                              ascroggins@seyfarth.com
                                                              Noah A. Finkel
                                                              nfinkel@seyfarth.com

SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2025, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Andrew Scroggins*
Andrew L. Scroggins

321044129