IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL THOMAS, *et al*,

        *Plaintiffs*,

v.

TEKSYSTEMS, INC.,

        *Defendant*.

Civil Action No. 2:21-cv-460

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiffs Michael Thomas, Maria Conyers-Jordan, Austin Sherman, Lynda Alexandra Maher, Ava Doré, Rachel Richenberg, and Emily Burke, on behalf of themselves and others similarly situated ("Plaintiffs"), filed a complaint ("Complaint") on April 9, 2021, against their former employer, TEKsystems, Inc ("TEK"). (ECF No. 1). At Count One, Plaintiffs, on behalf of themselves and the FLSA collective,[1] allege that TEK violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, by failing to pay Plaintiffs their appropriate overtime wages. (*Id.* at ¶ 69). At Count Two, Plaintiff Michael Thomas ("Thomas") and Plaintiff Maria Conyers-Jordan ("Conyers-Jordan") on behalf of themselves and the Pennsylvania Minimum Wage Act ("PMWA") class, assert that TEK violated 43 P.S. §§ 333.101, *et seq.* of the PMWA by failing to pay overtime wages as required by the statute. (*Id.* at ¶ 79). Plaintiffs filed a motion for final FLSA Collective Action Certification, and the Court granted their motion on March 10, 2025,

---

[1] The FLSA collective is defined as, "All individuals employed by Defendant as Recruiters, or in other positions with similar job duties, at any time within three years prior to the filing date of this action through the date of final disposition and who were paid on a salary basis and classified as exempt from overtime." (ECF No. 52, ¶ 72).

pursuant to 29 U.S.C. § 216(b). (ECF No. 141); (ECF No. 173).  On August 29, 2025, both parties filed motions for partial summary judgment.  Plaintiffs—representing the FLSA collective and the certified Pennsylvania, Washington, New York, and Massachusetts Rule 23 classes of Recruiters—filed a motion for partial summary judgment on TEK's administrative exemption affirmative defense, pursuant to Federal Rule of Civil Procedure 56 and Local Civ. R. 56.  (ECF No. 186); (ECF No. 187).  Plaintiffs' motion for partial summary judgment was followed, and supplemented, by a motion for judicial notice pursuant to Fed. R. Evid. 201, asking that the Court take judicial notice of prior records identifying TEK as a "staffing company that recruits as part of its business operations and marketplace offerings."[2]  (ECF No. 200, p. 2).  TEK filed its motion for partial summary judgment on the grounds that its alleged FLSA violations were not willful, thus the statute of limitations provided under the FLSA should remain two years and cannot be extended to three years.  (ECF No. 191); (ECF No. 192); 29 U.S.C. § 255(a).  For the following reasons, Plaintiffs' motion for partial summary judgment will be granted, and TEK's motion for partial summary judgment will be denied.

## I.    FACTUAL BACKGROUND

### A.  Facts relevant to Recruiters' administrative exemption classification.

TEK characterizes itself as "a global business and technology services firm" that provides clients with "talent services" to assist its clients with achieving their "business goals."  (ECF No. 190-3, p. 30); (ECF No. 203-59, p. 5).[3]  TEK's Vice President of Talent Delivery, Garrett Haycock

---

[2] The Court granted Plaintiffs' Motion for Judicial Notice of several filings from prior litigation proceedings in which TEK was a party. (ECF No. 212).

[3] TEK, in *TEKsystems, Inc. v. Andiamo Consulting LLC, et al.*, stated in its complaint, "TEKsystems—a leading information technology ("IT") staffing company—recruits and hires professionals in support of its IT staffing business operations."  (ECF No. 190-20, ¶ 2).

("Haycock"),[4] clarified that TEK supplies "talent services, which would be categorized as IT staffing."[5] (*Id.*). Several prior records, of which the Court has taken judicial notice of pursuant to Plaintiffs' motion (ECF No. 200), include multiple instances of TEK designating itself as a "staffing company."[6] TEK states that its "'business purpose' is not merely to 'recruit' people to work for third-party companies." Instead, TEK asserts that:

> TEK's employees assist TEK's customers to define the requirements for roles the customers want to fill; identify and develop sources of potential candidates to fill those roles; evaluate candidates' qualifications against the role requirements; negotiate pay rates and other conditions of employment with candidates; submit the best qualified candidates to customers for consideration; and employ and manage consultants who are on assignment.

(ECF No. 207, p. 6) (citing (ECF No. 203-59, p. 5); (ECF Nos. 203-2, 203-3, 205-5, 203-10)). Haycock confirmed that "TEK makes money on placing…candidates at third-party companies." (ECF No. 203-59, p. 12). TEK has two client bases: (1) customers, the companies that TEK delivers talent to and (2) consultants, the candidates that TEK ultimately places at the customer's third-party company. (ECF No. 207, p. 9); (ECF No. 190-21, p. 5).

TEK asserts that a Recruiter's primary duties are those listed in the job description: (1) "Recruit top IT talent and match their career goals with clients' hiring needs"; (2) "Develop recruiting strategies to identify qualified candidates"; (3) "Evaluate the strengths and weaknesses

---

[4] The deposition testimony of Garrett Haycock, taken on July 14, 2023, is attached as an exhibit at the following: ECF Nos. 190-3, 203-59, 199-18, 211-1. For purposes of consistency, the Court cites to ECF No. 190-3 in relation to Plaintiffs' partial motion for summary judgment, and ECF No. 199-18 in relation to Defendant's partial motion for summary judgment.

[5] TEK provides "talent services in the form of staff augmentation," in which TEK supplies "a worker to go to work for [TEK's] client" to provide "a very specific skill set or capability" so that the client can "achieve their objectives in whatever the project is that the individual is working on." (ECF No. 203-59, p. 5).

[6] The prior records are subject to judicial notice, but the Court only takes notice of the fact that the statements were made by TEK in prior proceedings, not for determining the truth of the statements. *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 257–58 (E.D. Pa. 2020).

of candidates"; (4) "Negotiate unique compensation packages (wages, benefits, etc.) to attract and close candidates"; (5) "Communicate details of new assignments and manage contract employees while on assignment"; (6) "Partner with TEK's sales team to identify top account and target skill sets"; and (7) "Maintain relationships with Technical Professionals to gain industry knowledge and obtain referrals." (ECF No. 207, p. 67–68) (citing (ECF Nos. 190-68, p. 2; 203-40, p. 2)). Leo DiBenedetto ("DiBenedetto")[7] is employed by TEK as a "lead training facilitator" tasked with training Recruiter Trainees on "skills that the recruiter is going to be using most" early on in their Recruiter role. (ECF 190-4, p. 4, 23). Specifically, DiBenedetto explained that early on, Recruiters "spend an immense amount of time at reviewing business requirements, sourcing strategy, getting on the phone, and qualifying and disqualifying candidates." Recruiters "spend most of their day on the phone and emailing" consultants. (ECF No. 190-10, p. 11).

Recruiters receive "requirements" from TEK's clients, source a candidate—a potential consultant—that is most qualified for that requirement, and once that candidate is sourced, the Recruiters submit their recommendations to an Account Manager ("AM"), who then presents the candidates to the client. (ECF No. 190-4, pp. 20, 30); (ECF No. 203-35, pp. 3–6). Recruiters do not make "ultimate hiring decisions for clients." (ECF No. 190-4, p. 31). Further, Recruiters do not "create management policy for" TEK or TEK's clients, "create operational policies" for TEK or its clients, "implement management policies" for TEK or its clients, "evaluate TEK's operations" and make decisions for TEK, or "make determinations internally at TEK regarding human resources. (ECF No. 190-3, pp. 36–37).

---

[7] The deposition testimony of DiBenedetto, taken August 22, 2023, at 9:00 AM, is attached as an exhibit at the following: ECF Nos. 190-4, 199-12, 203-52, 211-18. For purposes of consistency, the Court cites to ECF No. 190-4 in relation to Plaintiffs' partial motion for summary judgment, and ECF No. 199-12 in relation to Defendant's partial motion for summary judgment, as those exhibits contain 35 pages of the testimony, while the others contain only 18 pages.

TEK evaluates Recruiters annually, and they are paid a "salary, plus commission, plus a bonus." The commission Recruiters earn is determined by "the spread they produce." (*Id.* at 37) (*See* (ECF No. 190-7, p. 5)) ("Spread is how we track success. It's taking the margin of what we are billing our customer and deducting what we're paying our consultants as well as the costs associated with that.").

**B.  Facts relevant to whether TEK was willful in its alleged violation of the FLSA.**

TEK asserts that it employs "a consistent, thorough, and multi-layered compliance approach to ensure that the Recruiter role is appropriately classified" and that "TEK changed its practices more than two decades ago in order to ensure that Recruiters satisfy the administrative exemption." (ECF No. 192, p. 2). In the past, TEK has been involved in litigation for its classification of Recruiters. In *Avery v. TEKsystems, Inc.*, No. 22-cv-02733, 2024 WL 4281442 (N.D. Cal. Sept. 23, 2024), a district court, over one year ago, found that Recruiters were non-exempt under California law, analogous to the FLSA. (ECF No. 197, p. 7). Additionally, [i]n 2002, TEK settled a case, *Johannes v. Aerotek, Inc.*, No. 2:98-CV-05153, (C.D. Ca., Apr. 22, 2002), in which Recruiters challenged their exemption classification. (*Id.*). The *Johannes* court also denied TEK's motion for summary judgment wherein it argued that its Recruiters were properly classified as exempt under the FLSA or California Law. (*Id.*) (citing (ECF No. 199-7)). As part of its settlement in the 2002 litigation, TEK created the Recruiter Trainee role for new hires, which is classified as non-exempt. (ECF No. 192, p. 4).

TEK's purported compliance practice "is a shared responsibility" between Faith Johnson ("Johnson"), the Director of Human Resources at TEK, along with "TEK's internal human resources group, a Compliance team from Allegis Group (of which TEK is a subsidiary), TEK's in-house legal team, and TEK's business leaders." (*Id.* at 5). Johnson "is knowledgeable regarding

the FLSA exemption standards based on her education, work experience, trainings she has attended, and following news topics in her field," and she attends scheduled meetings with the aforementioned compliance team "in order to identify potential risks and take steps for the company to stay in compliance with applicable laws." (*Id*.).

Johnson has not engaged in any evaluation of Recruiters' job duties to ascertain the legality of TEK's classification of Recruiters as exempt throughout her tenure at the company, nor is she aware of anyone else at the company performing such an evaluation. (ECF No. 197, p. 8). TEK's interrogatory response separately identifies Philip Eisman, Garrett Haycock, and Ben Jackson as those who are responsible for classifying Recruiters as exempt. (ECF No. 197, pp. 17–18) (citing (ECF No. 190-1, p. 11)).[8]  That response does not identify Johnson as responsible for the classification. (*Id*.).  Further, the individuals named in TEK's interrogatory response testified that they were not involved in the classification of Recruiters. (ECF Nos. 199-15, pp. 6–7; 199-18, p. 38).

## II.    STANDARD OF REVIEW

A motion for partial summary judgment is reviewed under the same standard as a motion for full summary judgment. *Pettengill v. United States*, 867 F. Supp. 380, 381 (E.D. Va. 1994). Federal Rules of Civil Procedure Rule 56(a) states that a party may move for either summary judgment or partial summary judgment, "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cattrett*,

---

[8] TEK's responses to Plaintiffs' first set of interrogatories is attached as an exhibit at the following: ECF Nos. 190-1, 194-6, 197-8.  For purposes of consistency, the Court will cite to ECF No. 190-1.

477 U.S. 317, 322 (1986). A fact is material if it must be decided in order to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof," will defeat a motion for summary judgment. *El v. Se Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

"Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof." *Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Serv.'s Co.*, 120 F. Supp. 3d 449, 456 (W.D. Pa. 2015) (citing *Celotex Corp.*, 477 U.S. at 322). "Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial." *Id.* (citing *Celotex Corp.*, 477 U.S. at 324).

## III.    ANALYSIS

Section 213(a) of the FLSA provides requirements for employers' minimum wage and overtime payments to employees covered by the Act. 29 U.S.C.A. § 213(a). However, "[s]ection 13(a)(1) of the [FLSA], as amended, provides an exemption from the Act's minimum wage and overtime requirements for any employee employed in a bona fide executive, administrative, or professional capacity... or in the capacity of an outside sales employee..." 29 C.F.R. § 541.0(a).

The administrative exemption is relevant and at issue here. The general rule for administrative employees states:

> (a) The term 'employee employed in a bona fide administrative capacity' in section 13(a)(1) of the Act shall mean any employee:
>   (1) Compensated on a salary or fee basis at not less than the level set forth in § 541.600;
>   (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>   (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

"In considering a motion for summary judgment, the Court must examine the facts in a light most favorable to the party opposing the motion." *Gillott v. Powerex, Inc.*, 904 F. Supp. 442, 445 (W.D. Pa. 1995). The partial motion for summary judgment for determination of TEK's classification of Recruiters was brought by Plaintiffs, but the employer (TEK) bears the burden of proving that an employee satisfies the administrative exemption test and is therefore exempt with no entitlement to overtime pay—"i.e., an employee will not be exempt from the overtime pay requirements of the FLSA unless the employer affirmatively shows that the employee fits all the exemption's requirements."[9] *Id.* at 446–47. Further, "the Supreme Court has long held that exemptions from the FLSA are to be narrowly construed against the employer." *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 694 (3d Cir. 1994) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

---

[9] "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movants burden of proof at trial." *Gillott v. Powerex, Inc.*, 904 F. Supp. 442, 445 (W.D. Pa. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

As stated in 29 U.S.C.A. § 255(a), an action, such as this, for unpaid overtime compensation under the FLSA "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." A violation of the FLSA will be deemed willful "if, at minimum, the employer showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *Stone v. Troy Construction, LLC*, 935 F.3d 141, 148 (3d Cir. 2019) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

## A. TEK's Recruiters do not satisfy the FLSA requirements for an administrative exemption classification.

TEK, in its response to Plaintiffs' first set of interrogatories, asserts that:

> Recruiters satisfy the administrative exemption because: (1) Recruiters are paid compensation on a salary basis and in an amount equal to or greater than that required by the FLSA; (2) Recruiters' primary duty is the performance of office or non-manual work directly related to the management or general business operations of [TEK's] customers as well as [TEK] itself; and (3) Recruiters' primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

(ECF No. 190-1, p. 13).

### *1. Recruiters are paid on a salary basis within the meaning of the FLSA.*

The first requirement for purposes of establishing that an employee is administratively exempt is that the employee is paid on a salary basis. An employee will satisfy the salary requirement as defined by the FLSA:

> if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which is not subject to reduction because of variations in the quality or quantity of the work performed … the employee must receive his full

salary for any week in which he performs any work without regard to the number of days or hours worked.[10]

*Gillott*, 904 F. Supp. at 447. TEK "admits that Recruiters who were classified as exempt were paid a salary that did not vary based on how many hours they worked each week." (ECF No. 17, p. 14). TEK pays its Recruiters a base salary, plus commission and a bonus. (ECF No. 190-3, p. 23). Neither TEK nor Plaintiffs dispute that Recruiters satisfy the salary compensation requirement under the FLSA for an administrative exemption.

2. *TEK fails to demonstrate that Recruiters' primary duties "include office or non-manual work directly related to the management or general operations" of TEK or its clients.*

"Primary duty" is defined by the FLSA as the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700. The United States Court of Appeals for the Third Circuit stated that "as a 'general rule of thumb,' primary duty means a duty at which an employee spends the major part, or over 50% of his or her time." *Reich*, 13 F.3d at 699 (citing *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1145 (3d Cir. 1983)). The determination of an employee's primary duty requires an analysis of all the facts, "the focus is on the evidence of the plaintiff's day-to-day duties, and not on job descriptions, resumes, or performance evaluations." *Smith v. Bank N.Y. Mellon Corp.*, No. 10-678, 2011 WL 836858, at *15 (W.D. Pa. Jan. 20, 2011) (citing *Schaefer v. Indiana Mich. Power Co.*, 358 F.3d 394, 400–01 (6th Cir. 2004)). When an employee "performs work directly related to assisting with the running or servicing of the business," their duties constitute "work directly related to [their] employer's management or

---

[10] An employee's compensation should not be reduced due to change in quality or quantity of his performance, but there are specific exceptions contained in 29 C.F.R. § 541.118(a)(1)–(a)(5). *Gillott*, 904 F.Supp. at 447.

general business operations," as is required for administrative exemption under the FLSA. *Swartz v. Windstream Comms. Inc.*, 429 F. App'x 102, 104–05 (3d Cir. 2011).

TEK claims that Recruiters' primary duties are sufficient to fulfill the primary duty requirement. As support, it states:

> Recruiters' efforts impact the ability of TEK's customers to complete business projects that they have deemed important; TEK's Recruiters possess the expertise needed to find people to perform the technical work the customers need and to provide management oversight of the consultants performing that work. For TEK, Recruiters' efforts contribute to the Company's marketplace reputation for finding the right talent to complete hard to fill technical projects. Recruiters' efforts also go directly to TEK's bottom line.

(ECF No. 202, p. 8). TEK relies on several cases to substantiate its position. In *Goff v. Bayada Nurses, Inc.*, 424 F. Supp. 2d 816, 817–18 (E.D. Pa. 2006), the district court found that the plaintiff, "a staff supervisor" at a company providing "in-home nursing care to patients," satisfied the requirements for the FLSA administrative exemption. The staff supervisor position was like Recruiters in that the staff supervisor was responsible for "finding nurses to fill emergency needs…She had to match up specific patients with specific nurse skills." *Id.* at 823. Recruiters similarly work to match candidates with clients' needs. However, the staff supervisor's duties are distinguishable from Recruiters. For example, the "'[m]ain [f]unction as a staff supervisor was to 'oversee all caseload management activity, assuming responsibility for the delivery of services in accordance with Bayada Nurses' standards," and "her specific responsibilities included scheduling, monitoring her caseload, facilitating, supervising, evaluating field staff performance, helping with interviewing, hiring, salary determinations and terminations, and documenting incidents." *Id.* at 818–19. The Court found that the staff supervisor met the administrative exemption requirement because her primary duties were "office or non-manual work directly related to the management or general business operations" of the company—specifically, the staff

11

supervisor was in a supervisory role and was responsible for ensuring that the nurses she provided for patients were adhering with the standards set forth by the company. *Id.* Conversely, Recruiters do not supervise anyone, nor do they have the authority to make a final determination on which candidate will be placed with a client. The duties of a staff supervisor are distinct from Recruiters' duties at TEK.[11]

There is an important dichotomy that must be drawn between an employee whose work is "directly related to management policies or general business operations of his employer or his employer's customers," versus an employee whose duties relate to "the day-to-day 'production' of sales" in a retail or service establishment. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 901, 903 (3d Cir. 1991). "The administrative/production dichotomy turns on whether the services or goods provided by the employee constitute the marketplace offerings of the employer, or whether they contribute to the running of the business itself." *In re Enterprise Rent-a-Car Wage & Hour Emp. Pracs. Litig.*, No. 07-1687, 2012 WL 4356762, at *17 (W.D. Pa. Sept. 24, 2012) (citing *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002)). "An employee is engaged in administrative work when the employee 'services his employer's business,' which 'denotes employment activity *ancillary* to an employer's principal production activity." *Wolfslayer v. Ikon Office Sols., Inc.*, No. 03-6709, 2005 WL 181913, at *8 (E.D. Pa. Jan. 26, 2005) (quoting *Martin*, 940 F.2d at 903)) (emphasis in original). In determining whether the employees are administrative or production employees, "it is important to consider the nature of the

---

[11] Zoe Dries-Wielandt ("Wielandt"), a former Recruiter for TEK stated, "I did not supervise job candidates once they were hired by TEKsystems' clients, and I did not evaluate their performance." (ECF No. 208-7, ¶ 33). *See also* (ECF No. 208-37, p. 5) (When asked, "Did any of the recruiters you supervised that we just spoke about have any employees report to them?" Alexia Fronzaglio ("Fronzaglio"), an AM at TEK, responded that "at the time I was supervising them…Not formally that I recall.").

employer's business." *Martin*, 940 F.2d at 903.  "[T]he term production is not limited to manufacturing activities"; rather, "non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Wolfslayer*, 2005 WL 181913, at *8.

The Third Circuit in *Martin* found that the employees, referred to as "inside salespersons," were production employees rather than administrative employees. *Id.*[12]  The defendant's business was "'the sale of electrical products' and its 'primary business purpose [was] to *produce sales* of electrical products.'"  *Id.*  The Third Circuit found that, because the employees spent most of their time "in the office making telephone sales of electrical products, or in work closely related to selling electrical products," they did not perform administrative duties.  *Id.* at 902.  Further, the Third Circuit noted that employees were "paid a fixed salary plus incentive bonuses based on their sales performance."  Although it recognized that while performing their work, employees could deviate from the price quotes for electrical products, advise customers about supplemental products they may wish to purchase, and, in some instances, negotiate "on behalf of the company to make a particular sale to a particular customer, "such selling efforts in the context of discrete, particularized sales transactions [did] not constitute 'administrative' work within the meaning of section 13(a)(1) of the Act."  *Id.* at 905.  The defendant contended that inside salespersons constitute administrative employees because they "'affect' [defendant's] business operations to a substantial degree' within the meaning of 29 C.F.R. § 541.205(c)."  *Id.* at 906 (emphasis in original).  The Third Circuit disagreed, reasoning those duties affecting business operations to a

---

[12] "An 'inside' salesperson is an employee who makes sales inside his or her place of business, which contrasts with the outside salesperson, exempt under the FLSA, who must be 'customarily and regularly engaged away from the employer's place of business.'" *In re Enterprise Rent-a-Car Wage & Hour Emp. Pracs. Lit.*, 2012 WL 4356762, at *21, n. 10 (quoting 29 C.F.R. § 541.500).

"substantial degree" are duties that "substantially affects the *structure* of an employer's business operations and management policies," so employees whose work falls into that category "may be characterized as administrative workers." *Id.* The Third Circuit agreed with the district court's explanation: if it were to accept defendant's argument that an inside salesperson is "carrying out major assignments" in making sales, it would effectively "strain the interpretation [of 19 C.F.R. § 541.205(a) and (c)] beyond common sense…[T]he nature of an inside salespersons' work is to produce sales for [defendant], not to develop or implement specific work assignments consistent with an overall company policy." *Id.* at 905–06.

In *Gusdonovich v. Bus. Info. Co.*, 705 F. Supp. 262, 265 (W.D. Pa. 1985), the district court determined that an Investigator employed at a company whose "business is 'producing' information for its clients," was a production employee. The defendant argued that the Investigator was an administrative employee "within the meaning of 29 C.F.R. § 541.2," specifically noting that:

> his position was directly related to the management policies and general business operations of [the company], and he exercised a great deal of discretion and independent judgment in such things as deciding which informants to interrogate, what elements of an investigation to pursue, what questions to ask, what records to search, and how to follow up on a record search. They assert that this work was done with only general supervision.

*Id.* at 264. The district court, however, found that the Investigator's duties were not administrative. Instead, it found that the defendant's business was "'producing information for its clients, and the Investigator's "duties consisted almost entirely of gathering that 'product,'" noting his primary duty "was the investigation of insurance claims" including "the search of public records, the serving of subpoenas and orders, surveillance, the interrogation of witnesses, and additional duties arising in the course of and subsequent to such investigations." *Id.* at 264–65. The Investigator was not a supervisor of any employees at defendant's company, was not required to have

"specialized education to obtain a job as an investigator" with the defendant, and was not a licensed private investigator. *Id.* at 263.

Plaintiffs assert that Recruiters' primary duties are those of production employees rather than administrative employees. According to Plaintiffs, Recruiters are producers of the services that TEK's business offers to its customers—"talent services," that is, "recruiting and placing job candidates." (ECF No. 190-3, p. 5); (ECF No. 205, pp. 8). Haycock affirmed that TEK provides "talent services" which, he states, "is in the staffing world." (ECF No. 190-3, p. 5). Additionally, TEK's answer to Plaintiff's first interrogatory further confirmed that TEK "is in the staffing business." (ECF No. 190-1, p. 5). Plaintiffs maintain that "Recruiters' primary job duty— screening and matching candidates—is entry-level, frontline, production work that does not meet the administrative exemption's requirements." (ECF No. 205, p. 6). Plaintiffs contend that "Recruiters spend the majority of their time reviewing potential candidates' resumes and LinkedIn profiles, cold calling, and completing intakes of potential job candidates." (ECF No. 187, pp. 9– 10). DiBenedetto explained that Recruiters "[w]ork on the placement of IT consultants even if they don't ultimately place them." (ECF No. 190-4, p. 24). Recruiters' work is akin to the work performed by the inside salespersons in *Martin* and the Investigator in *Gusdonovich*. Specifically, Recruiters' work, outlined below, is "part and parcel" to their main pursuit, which is producing candidates for clients. *Martin*, at 904.

DiBenedetto explained that Recruiters engage in specific "high value activity," meaning tasks Recruiters spend a "majority of their time" performing. (ECF No. 190-4, p. 30). "For example, if [as a recruiter] I'm just starting out with an allocation to a new requirement,[13] my high

---

[13] "Requirements are, basically, what a customer is looking for from a resource perspective…The requirement is a job description in essence" that the customers send to TEK, and TEK "support[s]

value activity is…understanding that requirement and then sourcing it. Once I've completed those, my high value activity is going to be making the phone call." (*Id.*).  Additionally, DiBenedetto discussed "skills that the [Recruiters are] going to be using most" early in their career, such as spending "an immense amount of time at reviewing business requirements, sourcing strategy, getting on the phone, and qualifying and disqualifying candidates." (*Id.* at 23).  Haycock further confirmed that part of a Recruiter's job "is to work to solicit candidates that meet the needs specified in the requisition…And to fulfill that duty, recruiters are generally speaking with candidates on a daily basis." (ECF No. 190-3, p. 12).

John Robert Doyle ("Doyle") worked at TEK as both an AM ("working with customers, interacting with them, negotiating pay rates"), and as a "director of business operations," which "no longer had direct sales focus," but was "purely a leadership and management role," managing "account managers and recruiters." (ECF No. 190-5, pp. 5–7).  Doyle testified that "[f]or our Recruiters, most of their interactions [are] calling a consultant" or candidate. (*Id.* at 53).  If Recruiters successfully contact a candidate, and obtain information about them, they track the candidate's data, such as "their skills, goals, interests" and possible positions of interest on Connected—TEK's "system of records" that stores candidates' and consultants' data. (*Id.* at 17, 21).

While Recruiters maintain contact with consultants during their work for TEK's clients, the AMs are primarily engaging with TEK's clients. (*Id.* at 28).  The communication that Recruiters maintain with consultants consists of both sharing feedback that AMs received from the client about that consultant's performance and getting feedback from the consultant about their

---

them by providing them with the resources they need to be able to fulfill that requirement." (ECF No. 190-4, p. 15) (Requirements are the same as "requisitions," the terms are interchangeable).

job experience. (*Id.* at 27–28). But Haycock clarified that Recruiters are "not overseeing the actual work getting done" by consultants. (ECF No. 190-3, p. 8). Plaintiffs produced the testimony of Lauren Estimada ("Estimada"), an employee for TEK who worked as the director of business operations in the Hawaii market, and, at one point, was the sales manager of the market where she "had a team of recruiters and account managers that reported to" her. (ECF No. 190-8, p. 4). Estimada noted that Recruiters' duties align with "seeking candidates for opportunities and partnering with account managers to identify the best talent or situation *where we can provide our services.*" (*Id.* at 9) (emphasis added). The record indicates that Recruiters primarily work to source candidates for placement at TEK's clients' companies, and spend most of their days sourcing and contacting potential candidates.

In *Rood v. R&R Express, Inc.*, No. 2:17-cv-1223, 2022 WL 1082481, at *1, *6 (W.D. Pa. Apr. 2022), the district court found that Logistic Coordinators were not administrative employees, rather, they perform tasks of "inside sales people." The employer's "entire business [was] selling logistics coordination services." *Id.* at *7. In summarizing the job, a Logistics Coordinator manager stated, "We contact customers and we sell a service." *Id.* at *6. The Logistic Coordinators, aiming to make sales, "(i) contact potential customers to attempt to sell them transportation services; (ii) make sales according to training and pre-approved resource lists provided by [the employer]; and (iii) confirm that the transportation service was provided after the sale is made. The Logistics Coordinators conduct all these activities from inside [employer's] offices." *Id.* at *2. The defendant alternatively argued "that the 'primary duty of logistics coordinators, as the name suggests, is coordination between shippers and transporters and acting as a consultant to customers with shipping needs, [which] is a multi-faceted and complex series of interactions." *Id.* at *6. The district court, however, emphasized that "'[a]ctivities necessarily

included in the process of closing specific sales' do not transform the primary duties of an inside salesperson into administrative tasks." *Id.* at *7 (quoting *Martin*, 940 F.2d at 905). Further, the employer's "entire business is selling logistics coordination services" and, as such, Logistics Coordinators "would have to understand the customer's 'unique distribution challenges' and then 'develop ways to meet those challenges.'" The district court determined that those "activities are only routine aspects of sales production within the context of [the employer's] operation." *Id.* And, importantly, Logistics Coordinators are tasked with securing sales through individualized techniques and procedures, rather than acting to "'create an increase in sales generally among all customers,' which would make them administrative." *Id.* (quoting *Reiseck v. Universal Commc'ns Miami, Inc.*, 591 F.3d 101, 107 (2d Cir. 2010)).

TEK disagrees with Plaintiffs' definition of its business as well as their assertions that Recruiters are production employees. In its opposition to Plaintiffs' motion for partial summary judgment, TEK claimed that its "market offering is talent services, i.e., the work performed by the consultants it places to work for customers. TEK's market offering is not selling people." (ECF No. 202, p. 18). However, as testimony has shown, TEK has identified that it is in the "staffing business," specifically providing "talent services, which would be categorized as IT staffing," and that it competes with other staffing companies.[14] (ECF 190-3, pp. 11, 30) ("I would say the staffing business and the staff augmentation side of the business is very easy to get into. They're very low barriers of entry to get into this business. And so there are many, many, many competitors out there."). In another attempt to support its position that Recruiters are not producers, TEK states that "Recruiters serve as personnel management and human resources recruiters to staff and

---

[14] *See also* (ECF No. 190-10, p. 4, 10) (Dylan Hollister listing competing companies such as "Judge Group" and "Apex" which are "IT staffing" companies.).

manage critical positions for a variety of TEK's customers in a variety of industries. Said another way, TEK Recruiters do not 'produce' anything for TEK's clients." (ECF No. 202, p. 19). But several of TEK's employees have made it clear that Recruiters are not in a human resources position.  For example, Haycock confirmed that "Recruiters do not fall under the Human Resources Department" nor do Recruiters "make determinations internally at TEK regarding human resources." (ECF No. 190-3, pp. 27, 36).  TEK's clients pay for its services—that is it pays for TEK's sourcing and identification of qualified candidates.  (ECF No. 190-3, p. 10) (Haycock stating, "We absolutely treat our consultants and contractors as clients, because they are just as important as our clients that pay for the service that we provide….").

TEK additionally insists that Plaintiffs' reliance on cases like *Martin* and *Rood* are misplaced because, according to TEK, Recruiters are not inside sales employees.  (ECF No. 202, pp. 11–12, n. 14).  But Plaintiffs provide several sources that both describe Recruiters as inside sales employees and further confirm that they are not human resources employees.  An email sent by Josephine Ligouri, a "Talent Acquisition Specialist" for TEK, stated: "If someone is interested in HR make sure you explain to them the difference between recruiting and Human Resources, they are not the same thing in regard to TEK.  We consider our recruiter role inside sales and our account manager role outside sales." (ECF No. 190-102, p. 2).[15]  When asked to explain the use of the term "inside sales" to describe Recruiters, Dylan Hollister ("Hollister"), an AM at TEK, said, "TEKsystems is looking for salespeople" further noting that "as a recruiter…we're selling people, essentially." (ECF No. 190-10, pp. 10–11).[16]

---

[15] The same language is used in an email sent on February 20, 2020, from Lauren Estimada, a Sales Manager at TEK.  *See* (ECF No. 190-103, p. 3).

[16] "An 'inside' salesperson is an employee who makes sales inside his or her place of business, which contrasts with the outside salesperson, exempt under the FLSA, who must be 'customarily

The title of a position is not indicative of "the exempt status of an employee." *Rood*, 2022 WL 1082481, at *5 (quoting 29 C.F.R. 541.2). Instead, the Court must focus on the employee's duties, and, as the evidence illustrates, a Recruiter is tasked with identifying potential candidates for clients' IT positions—all of Recruiters' day-to-day activities are performed to aid in that pursuit. Like the district court found in *Rood*, the Court finds that Recruiters' "activities are only routine aspects of sales production within the context of [TEK's] operation," Recruiters do not otherwise create any strategy or policy for purposes of increasing "sales generally among all customers." *Rood*, 2022 WL 1082481, at *7.

As stated in Plaintiffs' brief, "TEK repeatedly admits that Recruiters are 'producers.'" Plaintiffs specifically cite to TEK's Senior Vice President of Talent Delivery, Haycock, who stated that Recruiters are producers: "They are a recruiter that is producing…they find people for jobs." (ECF No. 205, p. 8) (citing ECF (No. 190-3, p. 14)). Haycock also admitted that "[a]nyone that is in a role that is a salesperson[,] account manager[,] or recruiter, we consider those…producing roles. Meaning that they are producing for the company. Our products and services are associated with putting people to work, and those producers are…" *Id.* Additionally, in an internal training

---

and regularly engaged away from the employer's place of business." *In re Enterprise Rent-a-Car Wage & Hour Emp. Pracs. Lit*, 2012 WL 4048845, at *34, n. 15 (W.D. Pa. Sept. 13, 2012) (quoting 29 C.F.R. § 541.500).

document titled "Presenting a Candidate to an Account Manager," paragraph 3 reads: "Sell the Candidate: You're an inside sales person!"[17]  (ECF No. 199-102, p. 2).[18]

Although TEK maintains that it is not in the business of selling talent to clients, and that Recruiters' duties are administrative, the evidence proves otherwise.  TEK provides the job description for Recruiters to support its position that Recruiters are administrative; however, courts in this circuit have found that employee's duties (and, thus, the determination of exempt status), is dependent on the facts of a particular case "'with the major emphasis on the character of the employee's job as a whole'…The focus is on the evidence of the plaintiff's day-to-day duties, and not on job descriptions, resumes, or performance evaluations." *Paul v. UPMC Health System*, 2009 WL 699943 (W.D. Pa. Mar. 10, 2009) (citing *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 400 (6th Cir. 2004)).  Thus, although the listed duties in the Recruiter job description include tasks like "negotiate," "manage," and "develop recruiting strategies," the testimony and facts

---

[17]  Multiple sources of evidence indicate that Recruiters' job requirements include "presenting…candidates" to "their account managers, specifically."  (ECF No. 190-4, p. 20) (DiBenedetto's testimony also confirms that there is specific training for Recruiters "on how to present candidates.").  *See also* (ECF No. 190-12, p. 9) (Testimony of Alexandra Pappas, former Account Manager at TEK: "Recruiters would come and present specific candidates and sell specific candidates [to Account Manager]. Then the good account managers would make sure to present the candidates that the recruiters were selling and proposing").

[18]  TEK disputes the use of this document for summary judgment, asserting that it is "an unauthenticated document, bearing no date and having no description of its purpose or intended audience."  (ECF No. 201, p. 75).  Plaintiffs state that "[a]ll the documents that Plaintiffs relied on were produced by TEK."  (ECF No. 207, p. 3).  The Third Circuit found that where testimony combined with "circumstantial evidence of the authenticity of the document," specifically where the document was produced by the opposing party "pursuant to discovery requests…there is a sufficient foundation for a jury to determine that [the] document is what it is purported to be." *Lexington Ins. Co. v. W. Pa. Hosp*, 423 F.3d 318, 329 (3d Cir. 2005).  At summary judgment, unauthenticated documents can be considered if they can ultimately "be rendered admissible under the Federal Rules of Evidence." *Id.*  Thus, the Court will consider the document in making its decision on the partial summary judgment motion—the document is an internal file from TEK—demonstrating the requisite circumstantial evidence of authenticity required for the Court to consider it.

contradict that representation. (ECF No. 203-40, p. 2). For example, Doyle's testimony clarified that "most of the time recruiters are not…doing the actual negotiation with a contract," and TEK's response to an interrogatory provided that "[t]he rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters." (ECF No. 190-2, p. 4).[19] Further, "Recruiters do not create management policies for TEK" or "TEK's clients" nor is there evidence that they develop recruitment strategies that TEK implements. (ECF No. 190-3, pp. 36–37); (ECF No. 190-4, p. 31) (DiBenedetto confirmed that TEK does not "provide recruiters with written training documents about how to create employment policies").

The Court holds that the evidence of record is such that Recruiters' day-to-day duties do not rise to the requisite level of "work of substantial importance" that the administrative exemption mandates. Such work would require that Recruiters are involved with "directly or indirectly formulating, affecting, executing or carrying out management policies by, for example, undertaking 'major assignments' or performing work which 'affects business operations to a substantial degree,'" as defined by 29 C.F.R. § 541.205(a) and (c). *Martin*, 940 F.2d at 900–01. Recruiters' job requires that they abide by TEK's expectations so they can successfully match candidates with TEK's clients. (ECF No. 190-5, p. 20).[20] Recruiters' performance is assessed by their supervisors, and they are coached based on that performance. (*Id.*). Recruiters are expected

---

[19] The Third Circuit has explained that even if an employee sometimes negotiates, that is not considered their primary duty and cannot aid in a determination that the employee is administratively exempt. *Martin*, 940 F.2d at 904.

[20] For example, Recruiters and their leads, who supervise them, are provided WIN reports, which help leads to assess the Recruiter's performance, focusing on "key performance indicators" to understand whether Recruiters are "doing the right behaviors," and "spending their time in the right places that [will] lead to long-term success." Additionally, the Recruiters were required to "have 30 interactions on a weekly basis," which measure different Recruiter activities. TEK explained that these requirements provided "expectations around activities that would lead to more long-term success." (ECF No. 190-5, p. 20, 22–23).

to follow instructions and perform "the right behaviors," which they do not have authority to create or implement, for the purpose of producing candidates for clients. (*Id.*).

3. *Recruiters do not exercise discretion and independent judgment with respect to matters of significance.*

In addition to a showing that an employee's primary duties "relate to the management or general business operations of the employer or the employer's customers," an employer is required to demonstrate that the employee's primary duties include "the exercise of discretion and independent judgment with respect to matters of significance." *Smith v. Johnson & Johnson*, 593 F.3d 280, 284–85 (3d Cir. 2010). Generally, exercising discretion and independent judgment implies that an employee compares and evaluates "possible courses of conduct" and considers multiple possibilities before "acting or making a decision." 29 C.F.R. § 541.202(a). Determining whether an employee possesses "discretion and independent judgment," requires an analysis of all the relevant facts, and if "the employee has authority to make an independent choice, free from immediate direction or supervision" they may satisfy this requirement. *Id.* § 541.202(c). The employee's decisions satisfy the requirement even if they "may be subject to review," and their decisions "may consist of recommendations for action rather than the actual taking of action." *Id.* However, decisions that are merely "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources" do not, without more, rise to the requisite level of discretion and independent judgment. *Id.* 20 C.F.R. § 541.202(c) lists several duties considered as "matters of significance." The non-exhaustive list includes: the "authority to formulate, affect, interpret, or implement management policies or operating practices"; carrying "out major assignments in conducting the operations of business"; engaging in decision making practices that substantially "affects business operations"; having authority to make decisions to commit the employer "in matters that have a significant financial impact";

23

making decisions to "waive or deviate from established policies and procedures without prior approval"; negotiating and binding the company "on significant matters"; providing "consultation or expert advice to management"; taking part in long-term or short-term plans to further "business objectives"; investigating and resolving "matters of significance on behalf of management"; and representing the company in legal proceedings. *Id.*

TEK asserts that Recruiters exercise discretion and independent judgment when carrying-out their primary duties. (ECF No. 202, p. 7). Specifically, TEK states that Recruiters exercise such discretion "regularly" in their role as Recruiter:

> from learning about TEK's customers, defining the requirements for customers' roles finding the right sources for candidates who possess the necessary technical and professional skills, making initial screening decisions to narrow the pool of candidates, closely evaluating and validating the skills those candidates possess to find the best person to match to the customer's job requirements, presenting the candidate to the customer in a way that demonstrates how the candidate fits the role, negotiating with the candidate regarding their pay rate and other terms and conditions of employment, and converting that candidate to a consultant for whom they provide management oversight once the assignment begins. All this is done with little supervision by others at TEK.

(*Id.* at 7–8). TEK highlights Recruiters' use of "screening and sourcing tools" to support its assertion that Recruiters practice discretion and independent judgment. (*Id.* at 23). Further, TEK maintains that even Recruiters' use of a "best practice" guideline does not prevent a finding of discretionary decision-making. (*Id.* at 24).

Plaintiffs argue that screening and sourcing candidates are not matters of significance, citing *Avery* and *Goff* for support. (ECF No. 205, p. 16). The district court in *Avery* found that, "[w]hile Recruiters can choose how to source candidates, they do not have discretion or independence in terms of the candidates that get sent to the client—instead, Account Managers decide which individuals to send to clients." *Avery*, 2024 WL 4281442, at *8. The record reveals that the same is true here, the significant decisions—ultimately sending candidates to clients—are

not made by Recruiters, rather the AMs must sign-off on Recruiter recommendations, and even still, clients themselves make the final determination.[21]

Plaintiffs assert that Recruiters' job duties are similar to "personnel clerks," as described in the regulation at 29 C.F.R. § 541.203(e):

> [P]ersonnel clerks who 'screen' applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption. Such personnel clerks typically will reject applicants who do not meet minimum standards for the particular job or for employment by the company. The minimum standards are usually set by the exempt human resources manager or other company officials, and the decision to hire from the group of qualified applicants who do not meet the minimum standards is similarly made by the exempt human resources manager or other company officials.

29 C.F.R. § 541.203(e). Plaintiffs cite to the *Avery* decision in which the Court, considering some of the same evidence as we are presented with here, found that Recruiters did not exercise discretion on matters of significance, instead they determined Recruiters were akin to personnel clerks because "they spend most of their time screening for candidates that match the job qualifications listed in the job requirements or requisitions."[22] *Avery*, 2024 WL 4281442, at *8. Multiple Recruiters explained that after they began working at TEK, they were sent to "a multi-day classroom training with other Recruiters from around the country" where they learned that the

---

[21] The district court in *Avery* relied on the same evidence in supporting their finding as the Court has been provided with here. (ECF No. 205, p. 16, n. 21). *See* (ECF No. 203-37, ¶ 19); (ECF No. 203-35, ¶¶ 19–21); (ECF No. 203-30, ¶ 23–24); (ECF No. 203-32, ¶¶ 14, 19); (ECF No. 190-4, pp. 20, 30); (ECF No. 190-5, p. 36).

[22] In its analysis, the *Avery* Court cites to multiple sources of evidence that the parties have provided to the Court here. For example, *Avery* quotes DiBenedetto's deposition where he explains "Recruiters do not do 'their own performance evaluation of the consultants,' but that it is 'a recruiter's responsibility…to provide consultants performance feedback' which is 'generally conducted after the [AM] and the hiring manager get together and discuss the consultants they work with.'" *Avery*, 2024 WL 4281442, at *7 (same testimony in our record at (ECF No. 190-4, p. 34). Similarly, *Avery* cites to evidence explaining that Recruiters "[s]creen[] consultants to gain insight into their skills, goals, and interests and provide[] relevant opportunities." *Id*. at *8 (same evidence present here at (ECF No. 190-78, p. 27)).

"job as a Recruiter was to try to contact and screen as many potential candidates as possible using TEK's procedures, guides, and systems." (ECF No. 208-7, ¶ 9). Further, they "learned how to track and log [their] work activities, and that [they] were expected to meet certain weekly metrics set by [TEK]." (*Id.*); (ECF No. 208-10, ¶ 8); (ECF No. 208-12, ¶ 8); (ECF No. 208-15, ¶ 9). TEK refutes the classification of Recruiters as personnel clerks, offering evidence that screening consultants requires "more than just match[ing] keywords on a resume to the words in a particular job requirement." (ECF No. 202, p. 10) (citing (ECF No. 201, p. 50–51)).

The Court finds that many of the discretionary duties TEK purports Recruiters perform are unsupported by evidence in the record. (ECF No. 202, pp. 7–8). According to TEK, the evidence demonstrates that Recruiters' duties include defining the requirements for TEK's customers; however, TEK fails to provide evidence that supports that assertion. John Bury's ("Bury") testimony, offered to strengthen its claim, does not support that contention when viewed as a whole. (ECF No. 201, p. 104) (citing (ECF No. 203-50, p. 7) ("As a technical recruiter, I have joined calls with an [AM] while they were qualifying a position with a hiring manager…and asked questions…to get a better understanding of the top skills that we should be looking for…that's often why they would bring me alongside to those meetings."). Bury did not claim that he was brought into meetings with clients for the purpose of defining the requisition requirements, he was merely present for the purpose of asking questions and gaining a better understanding of the client's needs. (*Id.*).[23] Nor do Recruiters have the responsibility of "presenting the candidate to

---

[23] Additionally, TEK cites to the Fronzaglio declaration, in which she states that when she was an AM, she took the approach of involving Recruiters in the conversations she was having with customers about their needs for talent, "whether the conversations were specific to a [requirement] or not." (ECF No. 203-21, ¶¶ 5–8). The cited testimony shows that AMs could allow Recruiters to join calls to help define requirements, but Fronzaglio does not demonstrate that this was the typical approach. Fronzaglio also clarified in her deposition testimony that she remained "the primary contact with clients." (ECF No. 190-9, p. 11). *See also, e.g.*, (ECF No. 203-31, ¶¶ 15,

the customer," or the authority to negotiate "pay rate and other terms and conditions of employment" with candidates for consulting jobs.[24] TEK's response to an interrogatory confirms, "[t]he rates negotiated between Defendant and its customers are not relevant to the duties performed by Recruiters." (ECF No. 190-2, p. 4). Recruiters do not, themselves, convert a candidate into a consultant or manage the consultant. As noted, [AMs] and clients choose which candidate will fill the role of a consultant, and when a candidate is placed, "Recruiters are not managing their day-to-day activity." (ECF No. 211-1, p. 7); (ECF No. 190-9, p. 13). Finally, the evidence in the record demonstrates that Recruiters are subject to supervision and typically do not have the authority to communicate with TEK's clients without prior approval. Nicole Whitman ("Whitman") has been employed at TEK since March 24, 2015, and has held multiple positions, including Recruiter Trainee, Recruiting Lead, Talent Acquisition Specialist, and Senior Talent Acquisition Specialist. (ECF No. 203-30, ¶¶ 1, 6, 8). Whitman's declaration shows that she was given the opportunity to communicate with clients and present candidates directly to clients, but that was not a regular duty for Recruiters. (*Id.* ¶ 24) ("Typically, [AMs] are the ones who present candidates to the customer. However, as I have established my knowledge and competency as a

---

18) (TEK provides the declaration of TEK employee Richelle Rothermich to establish Recruiters' ability to define requirements. Rothermich explained, "[i]t is common for me to join an [AM] during an initial call with the customer to learn what the customer is looking for. The [AM] is on the call because they have a relationship with the customer. What I bring to the call is a much deeper understanding of the type of role the customer needs to fill…If I was not part of the initial call with the customer, I will ask questions of the [AM] to make sure that I understand the customer's needs and the details of the requirement." TEK fails to establish, through Rothermich's declaration, that defining requirements is one of Recruiters' job duties.).

24 (ECF No. 211-2, pp. 11–12) ("As I mentioned before, at times [Recruiters] are involved in the process of negotiation and providing information. I would imagine most of the time recruiters are not providing—or, actually, doing the actual negotiation with a contract, but there are times when recruiters can be involved…with individual placements…[o]f a consultant with the customer."); (ECF No. 211-2, p. 18) ("Q: Okay. But the customer makes the ultimate decision about the amount they're willing to pay for the bill rate? A: Correct. Yes.").

specialized Recruiter with the [AMs] I work with, they have trusted me to present candidates to the customer on my own.").

Additionally, Recruiters are evaluated based on performance metrics—if supervisors believe that a Recruiter is under performing because they are not using the right Recruiting tactics, the Recruiter will be coached or disciplined.  Paul Stryker, in his declaration, explained that he was promoted to Delivery Manager at TEK, and his duties primarily included leading "the people that directly lead Recruiters…coach[ing] the Leads how to give feedback and support to their Recruiters… [and] get[ting] involved in instances where progressive discipline is needed for Recruiters who have a history of struggles meeting performance objectives."  (ECF No. 203-38, ¶ 27).  Similarly, in her testimony, Fronzaglio explained that as an AM, she received WIN reports for individual recruiters she was supervising.  Fronzaglio also noted that she can recall two recruiters that she put on a performance improvement plan because of production issues.[25]  And Doyle referenced annual performance reviews which take place between Recruiters and their direct supervisors who examine the Recruiter data, focusing on "their spread growth…how they are performing in starts" and how they are performing in "activities," to evaluate their performance. (ECF No. 190-5, p. 44).[26]

---

[25]  TEK also insists that AMs work in partnership with Recruiters, sharing decision-making duties with each other, rather than working in a supervisory role over Recruiters.  (ECF No. 202, p. 25). TEK cites testimony from several of its employees who state that they work in partnership with AMs.  (ECF No. 205-35, ¶ 19); (ECF No. 203-37, ¶ 14) ("I do not report to an Account Manager, but I do partner with Account Managers frequently.").

[26] TEK uses the term "start" to indicate a Recruiter's successful placement of a consultant.  (ECF No. 190-5, p. 29).  "Activities" include the interactions that Recruiters have with candidates when working on a requirement.  (*Id.* at 21–22).

TEK's contention that its Recruiters were given autonomy to use creative sourcing tactics is not sufficient to establish that Recruiters exercised the requisite level of discretion and independent judgment for purposes of satisfying the FLSA's exemption standards. (*See* (ECF No. 203-10) ("collecting statements about how different Recruiters approach sourcing strategy, including many who do not source through Connected or LinkedIn." (ECF No. 201, p. 52)). As the district court found in *Gusdonovich*, although "defendants maintain[ed] that the plaintiff exercised great discretion and independent judgment because there was no set procedure for carrying out his duties," his supervisor ability to discipline him if his performance "did not coincide with [the] supervisor's idea of the proper procedure" indicated that he could exercise only limited discretion and independent judgment, if any at all. *Gusdonovich*, 705 F. Supp. at 265. There, the district court found, "[u]nder these circumstances, [plaintiffs] were merely applying their knowledge and skill in determining what procedures to follow, which, as 29 C.F.R. § 541.207 states, is not the exercise of discretion and independent judgment contemplated by the regulation." *Id.* Here, the Court finds that the evidence of record demonstrates that while Recruiters are afforded the opportunity to develop sourcing strategies of their own, their supervisors are provided with various sources of performance metrics that TEK uses to either coach Recruiters to focus on specific recruiting tactics that they deem "the right behaviors" or discipline the Recruiters. (ECF No. 190-5, p. 20).

TEK cites to portions of declarations given by TEK employees, a majority of whom are not parties to this litigation, as evidence of discretionary decision making.[27] (ECF No. 203-10).

---

[27] "Drawing liability conclusions about a large group based upon a small portion of statements can be problematic, especially when testimony among the representatives themselves is disparate." *Walsh v. E. Penn Mfg. Co., Inc.*, 555 F. Supp. 3d 89, 126 (E.D. Pa. 2021) (citing *Martin v. Citizens Fin. Grp., Inc.*, No. 10-260, 2013 WL 1234081, at *7 (E.D. Pa. Mar. 27, 2013)).

However, the portions of the statements taken from the declarations leave out important information as to the Recruiters' experiences.[28]  The Court's review of the declarations produced by TEK, in their entirety, suggests that Recruiters are afforded the ability to use discretion, but not over matters of significance.[29]  Recruiters develop and use sourcing strategies that they consider most effective.  For example, Cristen Kehl, who worked as a Recruiter for TEK, stated, "[n]o one at [TEK] really cares what source I use [to find candidates], as long as I'm not wasting time and [I'm] finding the right candidates."  (ECF No. 203-34, ¶ 10).  Although TEK gives Recruiters the freedom to establish their individual sourcing strategies, Recruiters do not have a final say over the candidates AMs submit to the clients, or those ultimately hired by clients.

The Court holds that the evidence of record is such that Recruiters' discretionary duties do not fall within the list of duties that the Regulation deems "matters of significance."  (ECF No. 190-3, pp. 36–37).[30]  In his testimony, Doyle explained that, prior to 2021, the "management structure" started with Recruiters at the bottom, who "reported to recruiter leads, who reported to

---

[28] The Court may consider all materials in the record, regardless of whether they are cited by a party, when deciding a motion for summary judgment.  Fed. R. Civ. 56(c)(3).

[29] Plaintiffs contend that "[t]he testimony cited by TEK does not support TEK's assertion that Recruiters decide whether a candidate is the right match for a requisition.  Rather, the testimony cited by TEK demonstrates that [AMs] have the authority to veto candidates submitted to them by Recruiters."  (ECF No. 207, p. 233) (citing (ECF Nos. 203-25, ¶ 13; 203-31, ¶ 23; 203-29, ¶ 14; 203-27, ¶ 21; 203-37, ¶ 19; 203-32, ¶ 19; 203-35, at ¶ 19)); *See also* (ECF Nos. 203-26, ¶ 8; 203-33, ¶ 19; 203-34, ¶ 13; 203-16, ¶ 21) (although there is variation in wording, all declarations included in (ECF No. 203-10), from which TEK pulled portions, contain statements like that of Nicole Guffy, who said, "[m]ost of the time, the AM follows my recommendations about which candidate to present to the client." (ECF No. 203-25, ¶ 13)).

[30] Haycock's testimony confirms that Recruiters do not: "create management policies for TEK" or "for TEK's clients," "create operational policies for TEK" or "for TEK's clients," "implement management policies for TEK" or "for TEK's clients," have "the ability to bind TEK in a legal proceeding," "make determinations internally at TEK regarding human resources," nor make decisions regarding TEK's operations."  (ECF No. 209-37, pp. 36–37).

delivery managers" that ultimately reported to someone in Doyle's position as the director of business operations. (ECF No. 190-5, pp. 15, 19, 54). Moreover, Recruiters' work was scrutinized by their supervisors to ensure that they were producing as expected. (ECF No. 208-37, p. 12). Though TEK provides evidence to support its position that Recruiters use some discretion and independent judgment as to sourcing strategies, TEK fails to prove an essential element in which it bears the burden of proving at trial—that their use of discretion is over *matters of significance*.[31]

Upon review of the evidence cited by both TEK and Plaintiffs, in consideration of Plaintiffs' partial motion for summary judgment on TEK's administrative exemption defense as to the FLSA collective and all certified classes, the Court finds that no genuine dispute of material fact remains. TEK's administrative exemption affirmative defense is inapplicable—it has failed to establish that Recruiters' primary duties are related to the management or business operations of TEK or its clients, nor has TEK shown that Recruiters' primary duties allow them to exercise discretion or independent judgment over matters of significance. *See* 29 C.F.R. §§ 541.200–03; 29 U.S.C. § 213 (a)(1). Instead, as the evidence demonstrates, TEK Recruiters' day-to-day activities largely include sourcing potential candidates, attempting to contact potential candidates, and fulfilling tasks that will aid them in successfully filling a client's requirement. The Court grants Plaintiffs' prayer for relief and finds that Recruiters are entitled to overtime compensation and all protections of non-exempt employees under the FLSA. *See* (ECF No. 186-1) (asking for

---

[31] The Supreme Court stated, "[i]n our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

the same under the Pennsylvania, Washington, New York, and Massachusetts wage and hour laws which they cite to as being parallel to the FLSA).

**B. There exists a genuine issue of material fact as to whether TEK *willfully* violated the FLSA.**

TEK filed its cross-motion for partial summary judgment (ECF No. 191), asserting that Plaintiffs' claims under the FLSA should be limited to the default statute of limitations period—two years—as opposed to a three-year period for willful violation of the FLSA. (ECF No. 192, p. 7). The standard statute of limitations period for an action brought under the FLSA is two years—the action must "be commenced within two years after the cause of action accrued." *McLaughlin*, 486 U.S. at 128; *see* 29 U.S.C. § 255(a). However, if it is "a cause of action arising out of a 'willful' violation," the statute of limitations period may be extended to allow for commencement within three years of the violation. *Id.*

The Supreme Court has determined that the "willfulness" standard requires a showing "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 133 (adopting the "willfulness" standard stated in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985)). The plaintiff bears the burden to show that an employer's violation was willful. *Sec'y U.S. Dep't Labor v. Nursing Home Care Mgmt. Inc.*, 128 F.4th 146, 158 (3d Cir. 2025) (citing *McLaughlin*, 486 U.S. 128, 135 (1988)). "The line between willful and non-willful can be narrow. On one hand, a defendant who 'acts reasonably and in good faith in attempting to determine whether its plan would violate the FLSA' does not act willfully." *Id.* at 159. Conversely, if an employer is on notice of the FLSA and its requirements and proceeds with acting in violation of those actions, or recklessly disregards the possibility that it is in violation, it is willful. *Id.* (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991)). The FLSA does not provide a definition of "reckless disregard," but the term is defined in

32

a FLSA-related regulation "as the 'failure to make adequate inquiry into whether the conduct is in compliance with the FLSA.'" *Carts v. Wings Over Happy Valley MDF, LLC*, No. 4:14-cv-000915, 2023 WL 373175, at *5 (M.D. Pa. Jan. 24, 2023) (citing 5 C.F.R. § 551.104). The Third Circuit has further adopted "evident indifference" as a test of willfulness—if an employer's actions demonstrate "indifference toward the requirements imposed by the FLSA." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1296 (3d Cir. 1991). Generally, willfulness is a question of fact; however, if "'there is no legally sufficient evidentiary basis for a reasonable jury to find for the' non-moving party," it may be decided on summary judgment. *Souryavong v. Lackawanna Cnty.*, 872 F.3d 122, 126 (3d Cir. 2017). The Third Circuit found that an employer willfully violated the FLSA because the defendant continued using the practice at issue "despite concerns and doubts as to its legality." *Id.*

Summary judgment should be denied if a genuine issue of material fact exists as to whether an employer—TEK in the instant case—either knew that it was violating the FLSA's overtime pay provision or acted in reckless disregard as to whether it was violating the FLSA. *Stone v. Troy Construction, LLC*, 935 F.3d 141, 150–51 (3d Cir. 2019). Such is the case here. Based on the evidence in the record, the Court finds that a reasonable jury could determine that TEK at least exhibited recklessness in misclassifying Recruiters as exempt administrative employees, thus violating the FLSA. For the reasons set forth below, TEK's partial motion for summary judgment is denied.

A plaintiff must present evidence that the defendant had "some degree of actual awareness" of its FLSA obligations, and "either knew or suspected that their practices were violative of the FLSA or recklessly disregarded the possibility of the same." *Souryavong*, 872 F.3d at 127; *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 115 (3d Cir. 2020). The United States District

Court for the Middle District of Pennsylvania granted a plaintiff's motion for summary judgment on the issue of defendants' willful violation of the FLSA. *Scalia v. Shalimar Distributors, LLC*, No. 4:18-CV-10642, 2020 WL 4335020, at *4 (M.D. Pa. July 28, 2020). Because the defendants were previously investigated for alleged FLSA compliance issues, the Court found that "Defendants were on notice of their FLSA obligations and failed to either comply or make a good-faith effort to investigate the legality of these practices." *Id.* at 5 (*see also Garcia v. Tenafly Gourmet Farms, Inc.*, No. 11-cv-6828, 2012 WL 715316, at *2 (D.N.J. Mar. 5, 2012) (finding that an employer's awareness of possible violations of the FLSA in addition to indifference to the statute's requirements supports a finding of willfulness.)). The United States District Court for the Western District of Pennsylvania held that the "defendant's history of past FLSA violations lend[ed] further support to the [Plaintiff's] argument that the violations in the present action were willful," as those violations gave the defendant "reason to suspect that his conduct violated the FLSA." *Solis v. A-1 Mortg. Corp.*, 934 F. Supp. 2d 778, 810 (W.D. Pa. 2013).

In addition to satisfying the notice requirement through evidence of past investigations, courts in this Circuit have found that prior FLSA lawsuits may be evidence that defendants were on notice. *Kaynaroglu v. Avis Budget Group, Inc.*, 773 F. Supp. 3d. 169, 182 (D.N.J. 2025). Plaintiffs in *Kaynaroglu* asserted that "Avis was 'put on notice' that it may be classifying 'assistant-level managers,' like [Plaintiffs], through prior litigation, and that Avis failed to make either 'a good faith inquiry' or 'perform an individualized assessment' into the exempt classification of [Plaintiffs]," which prompted the district court to find that plaintiffs sufficiently "paint[ed] a picture of 'evident indifference toward the requirements imposed by the FLSA,' which the Third Circuit has held can constitute willfulness." *Id.* at 181–82 (citing *Selker Bros.*, 949 at 1296). Similarly, the United States District Court for the District of New Jersey denied a summary

judgment motion on the issue of a defendant's alleged willful violations because questions remained as to the nature of defendant's conduct. *D'Alessio v. County of Essex*, 2021 WL 5413987, at *6 (D.N.J. Nov. 19, 2021). The district court noted that the defendant had "previously been sued by [its] employees for violations of the FLSA" and defendant's employee "was aware of those suits." *Id.* Additionally, defendant's employee testified that "he believed the [defendant] to be in compliance with the FLSA and relied on [Defendant employer] and his Personnel Office to ensure that [Defendant employer] was following the law." *Id.* In light of those facts, the Court held that there remained "a genuine issue of material fact as to whether Defendant had 'any awareness of impropriety' or acted in a way that suggested 'awareness that their actions violated or could violate the FLSA." *Id.*[32]

"'General awareness of the [FLSA's] requirements' is insufficient to demonstrate willfulness…rather 'willful FLSA violations require a more specific awareness of the legal issue.'" *Wintjen v. Denny's, Inc.*, No. 2:19-cv-00069, 2022 WL 3681707, at *2 (W.D. Pa. Aug. 25, 2022) (quoting *Wright v. Ristorante La Buca Inc.*, No. 18-2207, 2018 WL 5259469, at *1, *7 (E.D. Pa. Oct. 22, 2018). If the plaintiff provides sufficient facts to demonstrate that the employer had the requisite awareness of the FLSA obligations and notice of its possible violations, evidence of the employer's actions in light of that awareness can be dispositive of whether the employer was willful. *Sec'y U.S. Dept. Labor*, 128 F.4th at 158–59 (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991)). In *Walsh v. Nursing Home Care Mgmt. Inc.*, No. 21-cv-02583, 2023 WL 4274976 (E.D. Pa. June 29, 2023), evidence that "Defendants failed to seek the advice

---

[32] Conversely, defendants are not on notice of possible FLSA violations through prior litigation if the allegations in the prior case were brought "by a different plaintiff involving a different position" and the case "never reached the merits." *Freeman v. Sam's E. Inc.*, No. 2:17-cv-1786, 2021 WL 3362611, at *3 (D.N.J. Aug. 3, 2021).

of the Department of Labor, any other governmental or regulatory body, accountant, or outside guidance to determine whether the practices of Prestige, an enterprise governed by the FLSA, complied with the FLSA," in addition to Defendants' failure "to even maintain records of travel time *during this litigation*, when it was apparent that the Court could hold that such time was compensable," constituted "reckless disregard for whether the conduct was prohibited." *Id.* at *3, *aff'd sub nom.*, *Sec'y U.S. Dept. Labor*, 128 F.4th 146 (emphasis in original); *See also Su v. Nursing Home Care Mgmt. Inc.*, No. 21-cv-02583, 2023 WL 3440237, at *10–12 (E.D. Pa. May 12, 2023), *aff'd sub nom. Sec'y U.S. Dept. Labor*, 128 F.4th 146. The United States District Court for the Middle District of Pennsylvania found that the defendants willfully violated the FLSA because they were aware of the possible violations and the "undisputed evidence indicate[d] that Defendants did not consult with 'any individuals or third parties, including accountants, attorneys, and representatives of other business' pertaining to their FLSA obligations." *Chavez-DeRemer v. Mennonite Messianic Mission E. Pa. Mennonite Church*, No. 1:22-cv-01355, 2025 WL 3653555, at *28 (M.D. Pa. Dec. 17, 2025). The United States District Court for the Eastern District of Pennsylvania determined that there remained a genuine dispute of fact as to whether the defendant willfully violated the FLSA. *Walsh v. East Penn Mfg. Co., Inc.*, 555 F. Supp. 3d 89, 132, 136–37 (E.D. Pa. 2021) (despite Defendant's contention that it "implemented its policies to comply with the FLSA" in response to the Department of Labor's opinion that it was violating the FLSA, "a rational trier of fact could not only reject [Defendant's] argument that" it's policies were implemented for purposes of FLSA compliance, but also find that the new policy "was an administrative fig leaf designed to skirt the actual dictates of the FLSA." Further noting that consultation with a lawyer was insufficient to negate a finding of willfulness). Where Plaintiffs "allege a widespread pattern of misclassifying employees across business locations who

[Defendant] knew performed primarily non-exempt duties, and in that context, other collective suits for similar roles" had been litigated, Defendants should have been compelled "to reevaluate their employee classification policies." *Kaynaroglu*, 773 F. Supp. 3d at 182 (citing *D'Allesio*, 2021 WL 5413987, at *6). A failure to "inquire into the proper classifications" is "probative of willfulness." *Id.*

TEK relies on several cases from 2002 (the "*Johannes* matter"), in which "TEK and several related companies settled litigation challenging designations of recruiters as overtime exempt from their date of hire." (ECF No. 192, p. 4). TEK asserts that when it settled the action against it as part of the *Johannes* matter, it "did not admit that its decision to classify recruiting employees as exempt had been in violation of the FLSA"; however, TEK explains that after resolving that dispute, it "altered its practice" regarding the Recruiter role. *Id.* Specifically, in the aftermath of its settlement, TEK's practice of hiring Recruiters shifted, instead of hiring individuals into a Recruiter Trainee role—classified as non-exempt, paid on an hourly basis, and eligible to receive overtime—and after completion of a 13-week training period, those Recruiter Trainees were promoted to Recruiters, earning a salary, and classified as exempt from overtime. *Id.* TEK also cites to other companies, those included in the *Johannes* matter, that have since been subjected to allegations of FLSA classification violations "and have prevailed." (*Id.* at 8–9). In *Andrade v. Aerotek, Inc.*, 700 F. Supp. 2d 738 (D. Md. 2010), for example, the United States District Court for the District of Maryland found that a recruiter at Aerotek—one of the defendants involved in the *Johannes* matter and a subsidiary of the Allegis Group, like TEK—was properly classified as an exempt employee under the FLSA. *Id.* The Aerotek recruiter's duties, according to TEK, "included making phone calls with potential staffing candidates, completing phone and in-person screenings, conferring with management regarding candidates, vetting candidates' prior work

experience and performance, and preparing candidates for interviews." (*Id.*). These duties, according to TEK, convinced the district court that recruiter's responsibilities sufficiently satisfied the required elements of the FLSA overtime exemption. (*Id.* at 9).

Plaintiffs emphasize, in their opposing brief, that there are several major differences in the responsibilities of recruiters at Aerotek when compared to the responsibilities of Recruiters at TEK. (ECF No. 197, p. 23). Unlike Recruiters at TEK, the recruiters at Aerotek "managed contractors, investigated problems, and exercised independent discretion." *Andrade*, 700 F. Supp. 2d at 747–48. The evidence provided by Plaintiffs supports their claims that TEK Recruiters are not involved in management of consultants, nor are they responsible for disciplining contractors hired by clients, unless clients communicated directives for discipline to AMs, who then instruct TEK Recruiters to pass on those disciplinary messages. (*Id.* at 23–24) (citing (ECF No. 198, ¶¶ 75, 94–101)). Due to the differences in responsibilities, Plaintiffs contend that "TEK cannot rely on *Andrade*, nor the other cited cases pertaining to co-defendants in the *Johannes* matter, to demonstrate as a matter of law that it did not act willfully in misclassifying Recruiters." (*Id.* at 24).[33]

---

[33] Plaintiffs also distinguish the other cases cited by TEK involving its *Johannes* matter co-defendants that it uses to support its proposition that it did not act willfully in violation of the FLSA. (ECF No. 197, pp. 21–24). *Delodder v. Aerotek Inc.*, 471 F. App'x 804 (9th Cir. 2012) is a Ninth Circuit case which TEK cites, stating "the appellate court upheld the lower court finding that a class of Aerotek recruiters were properly classified as administratively exempt." (ECF No. 192, p. 9). However, Plaintiffs note that the *Delodder* court's opinion dealt with the issue of class certification under Rule 23(c)(4) and did not discuss the analysis of plaintiffs' FLSA claims. Class certification is not at issue here. Similarly, Plaintiffs contend that *Hudkins v. Maxim Healthcare Servs., Inc.*, 39 F. Supp. 2d 1349 (M.D. Fla. 1998), *aff'd* 176 F.3d 1349, offers no guidance, as it is "devoid of analysis, and stands as an outlier against the overwhelming authority holding that employees engaged in a company's core marketplace offering are production, not administrative, workers." (*Id.* at 23) (citing *Martin*, 940 F.2d at 903). And TEK's use of *Drake v. Aerotek, Inc.*, No. 14-cv-216, 2016 WL 80672, at *2 (W.D. Wis. Jan. 7, 2016) is factually distinct—the facts showed that recruiting was "slow" and "specialized" "and the plaintiff *admitted* his duties rendered

The Court holds that there exists a genuine dispute as to whether TEK employs a "continuous, vigorous, and multi-pronged approach to ensure the role is properly classified," as it asserts. (ECF No. 192, p. 10). TEK purports that Faith Johnson ("Johnson"),[34] "an experienced human resources professional with decades of knowledge about the Recruiter role," along with "the rest of the HR team, a compliance team, a legal team, and business leaders," are responsible for observing the legal standards applicable for classification of exempt status, as well as staying up-to-date on any changes to those standards. Additionally, they are tasked with deciding "whether the duties of the Recruiter role have changed in a way that may impact the job's classification." (*Id.*) (citing ECF No. 193, ¶¶ 14–26). TEK specifically focuses on Johnson's duties as they relate to classification, noting that Johnson knows the FLSA exemption standards, and understands the Recruiters' responsibilities at TEK. (*Id.* at 5) (citing (ECF No. 193, ¶¶ 13, 17). Johnson "holds the belief that the [Recruiter] role satisfies the exemption and has only grown more complex and required more independence over time. (*Id.*) (citing (ECF No. 193, ¶ 18)). It is Johnson's "ultimate responsibility" to ensure "that the Recruiter role is properly classified." (*Id.* ¶ 14). TEK contends that Johnson participates "in scheduled weekly, monthly, and annual meetings with [a Compliance team from Allegis Group (of which TEK is a subsidiary), TEK's in-house legal team, and TEK's business leaders] in order to identify potential risks and take steps for the company to stay in compliance with applicable laws" and if she finds that it is necessary, she and her team will reclassify roles according to their appropriate exemption status. (ECF No. 192, p. 5). Johnson explained that in making classification decisions, she relies on "the business,"

---

him exempt under the FLSA." (*Id.* at 24) (citing ECF No. 199-95 evidence of TEK Recruiters' role being described as "fast paced.").

[34] Johnson is TEK's FED. R. CIV. P. 30(b)(6) witness. "The testimony of the Rule 30(b)(6) designee is deemed to be the testimony of the corporation itself." *State Farm Mut. Auto. Ins. Co. v. New Horizon*, 250 F.R.D. 203, 212 (E.D. Pa. 2008).

meaning those in leadership positions, to keep her informed of any changes to a role that would require her to review the classification status and make any necessary changes. (ECF No. 199-20, pp. 26, 31).

Plaintiffs' assertions are in direct contention with TEK's claim that it has a "multi-layered system to ensure that the Recruiter role is properly classified." (ECF No. 209, p. 4); (ECF No. 197, pp. 14–20). Specifically, Plaintiffs cite to Johnson's testimony in relation to TEK's interrogatories and additional assertions, maintaining that the facts do not substantiate the compliance system TEK purports to have, and more importantly, TEK's conduct creates a genuine dispute of fact as to whether its violations of the FLSA were willful.

Plaintiffs note that TEK has failed to conduct any analysis of the Recruiter exemption classification—Johnson testified that there has not been a reevaluation of the legality of Recruiters exemption status since she started working at TEK, over two decades ago—including after a lawsuit taking place in the late 90's—nor after this lawsuit was filed on April 9, 2021. (ECF No. 199-20, pp. 13, 22–24). It is further admitted that in 2001, the *Johannes* court denied TEK's motion for summary judgment" that the primary duties of "Recruiters" and "Technical Recruiters" at TEK and its co-defendants' companies met the administrative exemption requirements under the FLSA. (ECF No. 210, p. 40) (citing (ECF No. 194-7)). Although TEK asserts that as part of its settlement agreement, it implemented the Recruiter Trainee role as a non-exempt position for new hires, there is no evidence that this new position impacted the legality of the exempt classification of the Recruiter role. (*Id.* at ¶¶ 6–7). Johnson stated that she believed TEK created the Recruiter Trainee role in response to a lawsuit that took place "[i]n the late '90s," but she was not aware of whether "TEK engaged in any kind of analysis about the legality of the exemption for recruiters after that lawsuit." (ECF No. 190-21, pp. 11–12). Johnson also testified that she

40

was not aware of "an evaluation of the job duties of the recruiter trainees" for purposes of classifying them as non-exempt employees. (*Id.* at 11–12). There are disputes of fact as to whether Recruiters and Recruiter trainees perform different duties that result in differential classifications. (ECF No. 210, ¶ 8) (TEK claims that Recruiter Trainees only perform "parts of the Recruiter role" for learning purposes during the training period, while Plaintiffs cite to Doyle's testimony where he stated that within the 13-week training period "they start actually doing the job duty of a recruiter, building up that momentum so when they convert, they're already kind of doing the job." (ECF No. 199-13). Johnson further stated that HR, the compliance group, and legal, all of which are groups TEK identifies as responsible for exemption classifications, did not "consult outside parties" or "review any resources" for evaluating whether Recruiters' exemption status is proper under the FLSA. (ECF No. 199-21, pp. 27–28).

Given the conflicting assertions made by TEK and Plaintiffs, in addition to the evidence in the record, a reasonable jury could find that TEK was in willful violation of the FLSA. TEK has been involved in prior litigation challenging its classification of Recruiters as exempt. Johnson's testimony confirms that TEK has not taken any affirmative steps to reevaluate the legality of Recruiters' exemption status, even when it was subject to litigation for possible violations. (ECF No. 199-21, pp. 12–13). The Court notes that, although Johnson asserts that she believes, based on the Recruiter job description and her long history of employment at TEK, that Recruiters are appropriately classified as administratively exempt, she has not personally reviewed the day-to-day duties performed by Recruiters and has not received any instruction to engage in an evaluation of Recruiters' exemption status. (*Id.* at 6).[35] TEK fails to provide any evidence that proves they

---

[35] *See Paul*, 2009 WL 699943, at *10 (citing *Schaefer*, 358 F.3d at 400–01) ("'Determination of the primary duty must be based on all the facts in a particular case, with the major emphasis on the

were not willful in violating the FLSA—instead, the evidence tends to show TEK was at least reckless and indifferent to whether its classification practices complied with the FLSA. Hence, it's motion will be denied.

## C. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' partial motion for summary judgment and deny TEK's partial motion for summary judgment. An Order of Court shall follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

_2/11/26_____
Dated

---

character of the employee's job as a whole…The focus is on the evidence of the plaintiff's day-to-day duties, and not on job descriptions, resumes, or performance evaluations.").

42